**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: REFCO INC. SECURITIES LITIGATION | MDL- 1902 |

| | |
|---|---|
| MARC S. KIRSCHNER, As Trustee of the Refco Litigation Trust, <br><br> Plaintiff, <br><br> v. <br><br> GRANT THORNTON LLP, MAYER BROWN, ROWE & MAW, LLP; ERNST & YOUNG U.S. LLP; PRICEWATERHOUSECOOPERS LLP; CREDIT SUISSE SECURITIES (USA) LLC (f/k/a CREDIT SUISSE FIRST BOSTON LLC); BANC OF AMERICA SECURITIES LLC; DEUTSCHE BANK SECURITIES INC.; PHILLIP R. BENNETT; SANTO C. MAGGIO; ROBERT C. TROSTEN; TONE N. GRANT; REFCO GROUP HOLDINGS, INC.; LIBERTY CORNER CAPITAL STRATEGIES, LLC; WILLIAM T. PIGOTT; EMF FINANCIAL PRODUCTS, LLC; EMF CORE FUND, LTD.; DELTA FLYER FUND, LLC; ERIC M. FLANAGAN; INGRAM MICRO, INC.; CIM VENTURES, INC.; BECKENHAM TRADING CO. INC.; ANDREW KRIEGER; COAST ASSET MANAGEMENT, LLC (f/k/a COAST ASSET MANAGEMENT LP); CS LAND MANAGEMENT, LLC; and CHRISTOPHER PETITT, <br><br> Defendants. | Case No. 07 Civ. 11604 (GEL) <br><br> ECF Filed |

**PLAINTIFF'S OPPOSITION TO ERNST & YOUNG LLP'S MOTION TO STAY PROCEEDINGS AS TO ERNST & YOUNG PENDING MEDIATION AND, IF NECESSARY, ARBITRATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

SUMMARY OF PERTINENT FACTS.................................................................................2

    A.    E&Y's participation in the fraud against Refco.........................................................2

    B.    The evidence submitted by E&Y regarding its engagement letters.........................4

    C.    The lawsuit and E&Y's motion. ..............................................................................6

ARGUMENT...........................................................................................................................7

I.    E&Y HAS NOT PROVEN THE EXISTENCE OF ANY AGREEMENT TO ARBITRATE. ..........................................................................................................7

    A.    The Court and not an arbitrator must decide whether the parties reached an agreement to arbitrate. ...........................................................................................7

    B.    E&Y has not proven a meeting of the minds regarding arbitration.........................7

    C.    At a minimum, factual issues exist regarding the existence of an agreement to arbitrate. ...........................................................................................9

II.    EVEN ASSUMING *ARGUENDO* THAT THE 2002 OR 2003 ENGAGEMENT LETTERS CONTAINED VALID ARBITRATION PROVISIONS, THE CLAIMS AGAINST E&Y ARE NOT ARBITRABLE UNDER THE PLAIN TERMS OF THE LETTERS. ..........................................................................10

    A.    The claims asserted by the Trustee do not fall within the scope of the arbitration provisions. ...........................................................................................10

    B.    Because RCM is not a party to the engagement letters, it cannot be bound by arbitration language in those letters. ................................................................14

    C.    If the Court finds that some of the claims must be arbitrated, it should not stay any claims that do not fall within the purported arbitration agreement. ........16

CONCLUSION.....................................................................................................................18

# TABLE OF AUTHORITIES

**Page**

## Cases

*AT&T Technologies, Inc., v. Communications Workers of America*,
    475 U.S. 643 (1986).............................................................................................................7

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*,
    170 F.3d 349 (2d Cir. 1999)..............................................................................................16

*Bell v. Cendant Corp.*,
    293 F.3d 563 (2d Cir. 2002)..............................................................................................13

*Bensadoun v. Jobe-Riat*
    316 F.3d 171 (2d. Cir. 2003)................................................................................................2

*Clark v. Kidder, Peabody & Co.*,
    636 F. Supp. 195 (S.D.N.Y. 1986).....................................................................................12

*Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*,
    58 F.3d 16 (2d Cir. 1995) .............................................................................................11, 17

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985)...........................................................................................................17

*Express Indus. and Terminal Corp. v. New York State Dept. of Transp.*,
    93 N.Y.2d 584, 715 N.E.2d 1050 (N.Y. 1999) ...................................................................9

*Fehribach v. Ernst & Young, LLP*,
    No. 1:02-CV-01270, 2003 WL. 1906136 (S.D. Ind. Jan. 6, 2003)............................12, 13, 14

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)...........................................................................................................13

*HIM Portland, LLC v. DeVito Builders, Inc.*,
    317 F.3d 41 (1st Cir. 2003)................................................................................................10

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002)...............................................................................................................7

*Irving Trust Co. v. Nationwide Leisure Corp.*,
    575 F. Supp. 261 (S.D.N.Y. 1983).....................................................................................10

*John Handcock Life Ins. Co.  v. Wilson*,
    254 F.3d 48 (2d Cir. 2001)...................................................................................................8

*Kemiron Atlantic, Inc. v. Aguakem Int'l, Inc.*,
    290 F.3d 1287 (11th Cir. 2002) .........................................................................................10

*Klay v. All Defendants*,
    389 F.3d 1191 (11th Cir. 2004) .........................................................................................11

*Mehler v. Terminix Int'l Co.*,
   205 F.3d 44 (2d Cir. 2000)........................................................................12

*Milnes v. Salomon Smith Barney, Inc.*,
   2002 WL. 31940718 (N.Y. Sur. 2002) .....................................................9

*New Moon Shipping Co., Ltd. v. Man B&W Diesel AG*,
   121 F.3d 24 (2d Cir. 1997)......................................................................14

*Ocean Indus., Inc. v. Soros Assocs. Int'l, Inc.*,
   328 F. Supp. 944 (S.D.N.Y. 1971)............................................................2

*In re Oil Spill by the Amoco Cadiz*,
   659 F.2d 789 (7th Cir. 1981) ..................................................................12

*Opals on Ice Lingerie v. Body Lines, Inc.*,
   320 F.3d 362 (2d Cir. 2003).....................................................................9

*Peterson v. Beale*,
   1995 WL. 479425 (S.D.N.Y.)...................................................................2

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967)................................................................................17

*Sands Bros. & Co., Ltd. v. Ettinger*,
   2004 WL. 541846 (S.D.N.Y.).................................................................10

*Sec. Watch, Inc. v. Sentinel Sys., Inc.*,
   176 F.3d 369 (6th Cir. 1999) ..................................................................11

*Thompson-CSF, SA v. American Arbitration Assoc.*,
   64 F.3d 773 (2d Cir. 1995).........................................................15, 16, 17

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*,
   363 U.S. 574 (1960)................................................................................17

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
   489 U.S. 468 (1967).................................................................................7

*Whisler v. H.J. Meyers & Co.*,
   948 F. Supp. 798 (N.D. Ill. 1996) ..........................................................12

*Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
   13 F.3d 330 (10th Cir. 1993) ..................................................................12

## INTRODUCTION

Plaintiff Marc S. Kirschner, as trustee for the Refco Litigation Trust (the "Trustee" or "Plaintiff"), has brought claims against Ernst & Young LLP ("E&Y") for its role in aiding and abetting a massive fraud against various Refco entities (collectively, "Refco") perpetrated by certain members of Refco's management and its outside professionals. As set forth in the Complaint, E&Y had knowledge of the misconduct of members of Refco's management as early as 1997, but did nothing to stop the fraud. Instead, E&Y continued to willingly provide its professional services and facilitate the fraudulent scheme that ultimately led to Refco's demise.

E&Y has moved to stay all claims against it, arguing that arbitration is required under "agreed-upon mediation and arbitration procedures" incorporated into "executed engagement letter agreements in 2001, 2002 and 2003" with Refco Group Ltd., LLC ("RGL"). Ernst & Young LLP's Motion to Stay Proceedings Pending Mediation And, If Necessary, Arbitration, filed October 9, 2007 in the N.D.Ill. ("E&Y Br.") at 1. The engagement letters E&Y submits in support of its motion, however, do not establish that RGL or Refco Capital Markets ("RCM") -- the two Refco entities that contributed claims against E&Y to the Litigation Trust -- ever agreed to these "arbitration procedures." Indeed, the "mediation and arbitration procedures" E&Y relies on are attached only to a *draft* 2001 engagement letter between E&Y and RGL produced from E&Y's files that was never executed by RGL. While the 2002 engagement letter is executed by RGL and purports to incorporate procedures "previously sent" to RGL, E&Y has come forward with no evidence that any such dispute procedures were, in fact, ever sent to RGL and a review of available Refco documents has not located the referenced procedures. Similarly, while the 2003 engagement letter purports to incorporate arbitration procedures set forth in an attachment to the letter, no such attachment has been produced from E&Y files and there is no evidence of such an attachment in Refco's files.

1

This assortment of draft, unsigned and incomplete documents between E&Y and one of the two entities that assigned claims against E&Y to the Litigation Trust is insufficient to satisfy E&Y's burden of proving the existence of an enforceable agreement to arbitrate. *See Peterson v. Beale*, 1995 WL 479425 (S.D.N.Y.) ("Under New York law, the burden of proving agreement to arbitrate is on the party seeking to resolve the dispute in that forum."); *Ocean Indus., Inc. v. Soros Assocs. Int'l, Inc.*, 328 F.Supp. 944, 947 (S.D.N.Y. 1971) (party moving to stay arbitration has burden of proving the existence of a written agreement to arbitrate). At a minimum, E&Y's motion cannot be granted given the disputed issues of fact regarding the existence of an agreement to arbitrate. *Sands Bros. & Co., Ltd. v. Ettinger*, 2004 WL 541846 at *3 (S.D.N.Y.) ("any disputed issues of fact concerning the existence of a binding agreement to arbitrate are decided under the standard that applies to a motion for summary judgment") (citing *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)).

Moreover, even if, in the absence of agreed upon dispute procedures, the Court were to find the arbitration language in the 2002 and 2003 engagement letters enforceable, the scope of any such arbitration is expressly limited to claims arising from services performed *after* the July 25, 2002 engagement letter -- well after E&Y's misconduct began. In addition, E&Y presents no evidence that RCM, which is not a signatory to the engagement letters and a separate and distinct entity from RGL, agreed to the letters' terms and offers no cognizable reason why RCM's claims should be subject to the 2002 and 2003 letters, let alone arbitrated. As a result, E&Y has no right to a stay.

## SUMMARY OF PERTINENT FACTS

### A.    E&Y's participation in the fraud against Refco.

Refco provided securities brokerage, execution and clearing services. Compl., ¶ 32. In the late 1990s, Refco sustained hundreds of millions of dollars in losses. Compl., ¶¶ 3, 60-63.

Beginning in 1997, Phillip Bennett, Santo Maggio, Tone Grant, and Robert Trosten (collectively, the "Refco Insiders") with the active assistance of certain of Refco's outside professionals, engaged in a scheme to defraud Refco out of billions of dollars.  Compl., ¶¶ 1-2, 4-8, 59.  They first created the illusion that Refco was a successful company by, among other things, falsely recording Refco's massive losses as a receivable owed to Refco by Refco Group Holdings, Inc. ("RGHI"), a company owned and controlled by the Refco Insiders.  *Id.*  The Refco Insiders and outside professionals perpetuated this fraud by hiding the true nature of the RGHI receivable through a series of sham round trip "loans."  Compl., ¶¶ 6, 75-93.  The Refco Insiders and outside professionals then arranged to "cash out" the Refco Insiders' interests in Refco for far more than those interests were worth.  Compl., ¶¶ 2, 9, 106-49.

E&Y began working for Refco in 1991.  Compl., ¶ 249.  Starting in 1993 or 1994, E&Y prepared Refco's tax returns and helped Refco with IRS audits.  *Id.*  It also provided various other services to Refco.  Compl., ¶ 251.  E&Y continued to prepare tax returns for various Refco entities until at least 2005.  Compl., ¶ 274.  Throughout the time that E&Y provided services to Refco, it knew that Refco's innocent officers, directors, and agents and various third parties were relying on the tax returns prepared by E&Y in connection with the Refco Insiders' continuous efforts to sell their interests in Refco.  Compl., ¶ 250.

By 1997, E&Y was concerned about its own liability for helping the Refco Insiders with their fraud but, incredibly, consciously decided to continue to participate in the scheme.  Compl., ¶¶ 268-69.  By 1998, E&Y knew that the Refco Insiders were falsifying Refco's financial statements and hiding bad debts and losses in the RGHI Receivable.  Compl., ¶¶ 260.  E&Y also knew that the purpose of the RGHI Receivable was to make RGL look more profitable than it was.  Compl., ¶¶ 257-70.  Throughout the Refco Insiders' scheme, E&Y knowingly assisted the

3

Refco Insiders with their fraud by preparing false tax returns based on the phony financial results. Compl., ¶¶ 249-50, 276-77. Between 1999 and 2002, E&Y also helped the Refco Insiders structure various fraudulent transactions to hide Refco's losses. Compl., ¶¶ 251-256, 278. E&Y also provided advice related to the Refco Insiders' efforts to sell their Refco interests at inflated prices. Compl., ¶¶ 249-56, 276-80.

In November 2003, E&Y purported to resign from the Refco engagement due to E&Y's increasing concern over its potential liability. Compl., ¶¶ 273-74. However, E&Y continued to prepare tax returns for some Refco entities until 2005. *Id.* In October 2005, the public learned about the fraud at Refco. Compl., ¶ 105. Shortly thereafter, Refco filed for bankruptcy. *Id.*

### B.    The evidence submitted by E&Y regarding its engagement letters.

E&Y presents no evidence whatsoever that RGL, RCM or any other Refco entity agreed to arbitrate any claims related to services provided by E&Y during the period 1991 through May 2001. The only evidence submitted by E&Y in support of its motion is a declaration by an attorney, Sean Berkowitz, who has no personal knowledge of the relevant facts, which states that three engagement letters between E&Y and RGL, dated May 7, 2001, July 25, 2002, and September 7, 2003, are "true and correct" copies. Declaration of Sean M. Berkowitz, dated October 9, 2007 ("Berkowitz Dec.") at 2.

The first document provided by E&Y is a draft engagement letter dated May 7, 2001 between E&Y and RGL, which contains arbitration language. *See* Berkowitz Dec., Ex. 1. The arbitration language purports to incorporate an attached document entitled "Dispute Resolution Procedures" (referred to herein as the "Dispute Resolution Procedures"). *Id.* This engagement letter is not signed by RGL, and there is no evidence in the record that RGL agreed to the terms of this engagement letter or to the Dispute Resolution Procedures. *Id.* The Trustee's counsel has conducted a search of available Refco documents and has not located an executed copy of the

4

May 7, 2001 engagement letter or the Dispute Resolution Procedures purportedly attached to that letter. *See* Rand Dec. at ¶¶ 4-5.[1]

That the May 7, 2001 engagement letter was neither sent to Refco nor executed by RGL is confirmed by a July 17, 2002 cover letter from E&Y to Robert Trosten ("Trosten"), RGL's CFO, that was identified in the search of Refco's files. This July 17, 2002 cover letter attaches an unsigned "draft engagement letter" dated May 7, 2001 which is substantially similar to the May 7, 2001 unexecuted engagement letter submitted by E&Y as Berkowitz Dec., Ex. 1. The cover letter states "I have also included a <u>draft</u> engagement letter which includes some other schedules, etc. that are typically needed to be prepared . . . ." *See* Rand Dec., Ex. 1 at 1 (emphasis in original). If, as E&Y contends, there was a final and binding engagement letter in May 2001 similar in substance to the May 7, 2001 letter attached as Berkowitz Dec., Ex. 1, it would have been referenced in and attached to this July 17, 2002 cover letter. Instead, the July 17, 2002 cover letter merely referred to and attached an unsigned "draft" engagement letter.

The second engagement letter submitted by E&Y is dated July 25, 2002. *See* Berkowitz Dec., Ex. 2. This letter appears to be signed by Trosten on behalf of RGL. The arbitration language in the 2002 engagement letter states that RGL and E&Y agree to submit certain claims "arising out of or relating to" services "*now or hereafter provided*" by E&Y to mediation and, if mediation is not successful, to "binding arbitration, *in accordance with the dispute resolution*

---

[1] Prior and subsequent to the bankruptcy, the electronic as well as paper files maintained on-site at Refco's offices by Refco's key executive and operational personnel were preserved and were subsequently loaded into a document database. Counsel for the Trustee conducted a diligent search for E&Y engagement letters and Dispute Resolution Procedures in both this electronic database and relevant existing hard copy files. *See* Rand Dec. at ¶¶ 3-4. In the course of this search, counsel to the Trustee did identify an October 31, 2002 engagement letter addressed to Trosten which attached dispute resolution procedures. This letter, which was not signed by Trosten, related to the preparation of the "consent for composite filing for various jurisdictions, quarterly composite estimates and quarterly tax letters to the individual tax partners for Refco Group Ltd. LLC." *See* Exhibit B to the Rand Declaration. The dispute resolution procedures attached to this October 31, 2002 letter referenced an unidentified engagement letter dated September 26, 2002. *See id.*

*procedures we sent you previously*." *Id*. at 3 (emphasis added). E&Y has not, however, come forward with any evidence that that any Dispute Resolution Procedures were previously sent to RGL, and a search of Refco's available files has not located any Dispute Resolution Procedures provided by E&Y to RGL or any other Refco entity in connection with the July 25, 2002 or September 9, 2003 engagement letters. *See* Rand Dec. at ¶ 5.

The third engagement letter relied on by E&Y is dated September 9, 2003.[2] *See* Berkowitz Dec., Ex. 3. It also appears to be signed by Trosten on behalf of RGL. The arbitration language in the 2003 engagement letter states that RGL and E&Y agree to submit certain claims "arising out of or relating to" services "*now or hereafter provided*" by E&Y to mediation and, if mediation is unsuccessful, to arbitration "in accordance with the dispute resolution procedures *set forth in the attachment to this letter*." *Id*. at 3-4 (emphasis added). There was no attachment to the 2003 letter setting forth any arbitration procedures.

### C.    The lawsuit and E&Y's motion.

On August 21, 2007, the Trustee filed this lawsuit (the "Illinois Action") in the Circuit Court of Cook County, Illinois. On September 19, 2007, certain defendants ("Removing Defendants") removed the case to the Northern District of Illinois and filed a motion with the Judicial Panel on Multi-District Litigation ("MDL Panel") to transfer the Illinois Action to the Southern District of New York. On September 25, 2007, the Trustee moved to remand the case back to Illinois state court. On September 27, 2007, the Removing Defendants filed a motion to stay determination of the remand motion in the Illinois Action pending the MDL Panel's decision on transfer. On October 9, 2007, E&Y filed a motion to stay the case against it in

---

[2]  The first page of the document is dated September 9, 2003. The second, third and fourth pages of the document are dated May 7, 2001. The last page appears to be signed by Trosten on behalf of RGL and is dated September 15, 2003.

Illinois pending arbitration.[3]  The Northern District of Illinois granted the Removing Defendants'

motion to stay on November 16, 2007, and took all other matters, including E&Y's motion to

stay pending arbitration, under advisement pending the MDL's decision.  On December 28,

2007, the MDL Panel transferred the Illinois action to the Southern District of New York.

## ARGUMENT

### I.    E&Y HAS NOT PROVEN THE EXISTENCE OF ANY AGREEMENT TO ARBITRATE.

#### A.    The Court and not an arbitrator must decide whether the parties reached an agreement to arbitrate.

Questions regarding whether an agreement to arbitrate was formed are always for the

court to decide.  *AT&T Technologies, Inc., v. Communications Workers of America*, 475 U.S.

643, 649 (1986).  Similarly, the court, and not an arbitrator, must decide whether a non-signatory

to the purported arbitration agreement can be forced to arbitrate.  *Howsam v. Dean Witter*

*Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (gateway issues such as whether a non-signatory is bound

by an arbitration agreement are matters for the court to decide).

#### B.    E&Y has not proven a meeting of the minds regarding arbitration.

A party cannot be coerced into arbitration and will only be required to arbitrate those

claims that it previously has agreed to arbitrate.  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland*

*Stanford Junior Univ.*, 489 U.S. 468, 479 (1967) ("[a]rbitration under the Act is a matter of

consent, not coercion").  Before the arbitration language in the engagement letters can be

enforced, E&Y must demonstrate that, under the applicable state law,[4] there was a meeting of the

minds which created a binding agreement to arbitrate.  *John Handcock Life Ins. Co. v. Wilson*,

---

[3]   E&Y never gave any notice of mediation as required by the engagement letters attached to its motion and no mediation has occurred.  *See* Rand Dec. at ¶ 8.

[4]  Either New York or Illinois law applies.  As there is no material difference between them as to the issues raised by E&Y in its motion papers, the Court does not need to consider choice-of-law issues.

254 F.3d 48, 58 (2d Cir. 2001) (the court should apply state law to determine whether the parties formed a contract to arbitrate).

The only evidence cited by E&Y in support of its motion is the declaration of E&Y's counsel, Sean Berkowitz. Mr. Berkowitz attests that three engagement letters attached to his declaration are true and correct copies. This declaration falls woefully short of establishing that E&Y and RGL had a meeting of the minds regarding arbitration.

First, the 2001 engagement letter -- the only letter with Dispute Resolution Procedures attached -- was not signed by RGL, and E&Y presents no evidence that any Refco entity recived or agreed to it. The engagement letter itself says that "if these arrangements are acceptable," RGL is to sign and return a copy of it to E&Y. *See* Berkowitz Dec., Ex. 1 at 4. E&Y has presented no evidence that RGL ever did so. Indeed, the July 17, 2002 cover letter sent to Trosten, referencing and attaching only an unsigned *draft* May 7, 2001 engagement letter, establishes that there was, in fact, no executed May 7, 2001 engagement letter. *See* Rand Dec., Ex. 1. E&Y has not fulfilled its burden of demonstrating an agreement to arbitrate under the alleged 2001 engagement letter.

The 2002 engagement letter states that certain disputes will be submitted first to mediation and then to arbitration "in accordance with the dispute resolution procedures we sent you previously." Berkowitz Dec., Ex. 2 at 3. Although that letter appears to be signed by Trosten on behalf of RGL, there is no evidence that any Dispute Resolution Procedures were sent to RGL prior to (or with) the 2002 engagement letter. The 2003 engagement letter states that certain disputes will be submitted to mediation and then to arbitration "in accordance with the dispute resolution procedures set forth in the attachment to this letter." *Id.,* Ex. 3 at pp. 3-4. But there is no such attachment to that letter either.

8

The language in the 2002 and 2003 letters suggesting a purported agreement to arbitrate was expressly subject to the parties reaching an agreement regarding arbitration procedures, which were to be set forth in attachments to the engagement letters. Berkowitz Dec., Ex. 2 at 3 and Ex. 3 at 3-4. E&Y has not come forward with any evidence that these procedures were agreed to or that they were attached to any of the relevant engagement letters sent to RGL. Nor has a search of Refco records identified any copies of the Dispute Resolution Procedures attached to, or referenced by, the May 7, 2001, July 25, 2002 and September 9, 2003 engagement letters. Rand Dec. at ¶ 5.

The 2002 and 2003 engagement letters are, accordingly, not sufficiently definite and certain to form a contract regarding arbitration because the arbitration procedures were explicitly made an essential part of the letters and there is no evidence that the parties ever had a meeting of the minds regarding those procedures. *See Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 372 (2d Cir. 2003) (where parties signed different versions of an agreement calling for arbitration, they could not be forced to arbitrate because "there was no meeting of the minds as to an agreement to arbitrate."); *Milnes v. Salomon Smith Barney, Inc.*, 2002 WL 31940718, at *3 (N.Y. Sur. 2002) (agreement to arbitrate must be clear, explicit and unequivocal) (citation omitted); *Express Indus. and Terminal Corp. v. New York State Dept. of Transp.,* 93 N.Y.2d 584, 589 715 N.E.2d 1050, 1053 (N.Y. 1999) (in order for an agreement to have been formed, the parties must have agreed to definite and certain terms).

    **C.**    **At a minimum, factual issues exist regarding the existence of an agreement to arbitrate.**

At the very least, there are genuine issues of material fact as to whether RGL and E&Y agreed to arbitrate claims arising from services performed after the July 25, 2002 engagement letter was executed that preclude the entry of a stay at this stage of the proceedings. *Sands Bros.*

*& Co.*, 2004 WL 541846 at *3 (the party moving for a stay so that arbitration may occur must

meet the same standard as a party moving for summary judgment). These issues include (1)

whether the Dispute Resolution Procedures were ever sent to or received by Refco; and (2)

whether the Dispute Resolution Procedures are incorporated by reference into either the 2002 or

2003 engagement letters. *See Irving Trust Co. v. Nationwide Leisure Corp.*, 575 F. Supp. 261,

263 (S.D.N.Y. 1983) (whether a document is incorporated into an agreement by reference is a

question of fact that precludes summary judgment).[5]

## II. EVEN ASSUMING *ARGUENDO* THAT THE 2002 OR 2003 ENGAGEMENT LETTERS CONTAINED VALID ARBITRATION PROVISIONS, THE CLAIMS AGAINST E&Y ARE NOT ARBITRABLE UNDER THE PLAIN TERMS OF THE LETTERS.

### A. The claims asserted by the Trustee do not fall within the scope of the arbitration provisions.

Even if the Court were to conclude that the July 25, 2002 and September 9, 2003

engagement letters include enforceable arbitration language, the claims asserted against E&Y are

---

[5] Under the terms of the purported agreement to arbitrate, E&Y's motion to stay is premature. The engagement letters relied upon by E&Y each state that certain claims "shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration," in accordance with certain dispute resolution procedures. *See* Berkowitz Dec., Ex. 1 at 4, Ex. 2 at 3, Ex. 3 at 3-4. The Dispute Resolution Procedures attached to Berkowitz Ex. 1 go on to state that any dispute shall be submitted to mediation by written notice to the other party and that, if a dispute has not been resolved within 90 days after the written notice of mediation, "the mediation shall terminate and the dispute will be settled by arbitration." *Id.*, Ex. 1 at 5. Accordingly, an express condition to any purported right to arbitrate is the written demand to mediate and the expiration of a 90 day grace period. To date, no party has provided any written notice demanding mediation, no mediation has occurred, and the 90 day grace period has not expired. Rand Dec. at ¶ 8. Thus, for this independent reason, E&Y is not entitled to a stay. *See Kemiron Atlantic, Inc. v. Aguakem Int'l, Inc.*, 290 F.3d 1287, 1291 (11th Cir. 2002) (per curiam) (holding that where the parties had signed a contract providing for mediation upon written notice and, if the mediation failed, binding arbitration and neither party had sent the required written notice for mediation, the arbitration provision has not been activated and the FAA does not apply); *HIM Portland, LLC v. DeVito Builders, Inc.*, 317 F.3d 41, 44 (1st Cir. 2003) (motion to stay proceedings and compel arbitration denied as "[u]nder the plain language of the contract, the arbitration provision of the agreement is not triggered until one of the parties requests mediation.")

based, in large part, on services and conduct that pre-date July 25, 2002 and, thus, fall outside the temporal scope of the arbitration language in both executed engagement letters.[6]

The July 2002 and September 2003 engagement letters both provide that only controversies and claims "arising out of or relating to any tax and tax related services *now or hereafter provided* by [E&Y]" shall be submitted to mediation, and if mediation is not successful, then to binding arbitration. *See* Berkowitz Dec., Ex. 2 at 3, Ex. 3 at 3-4.

The bulk of the allegations regarding E&Y's wrongdoing relate to actions taken by E&Y prior to the July 25, 2002 engagement letter. *See, e.g.,* Compl., ¶¶ 251-269. Before July 25, 2002, E&Y (1) knew that the RGHI receivable was being used to commit a fraud and (2) actively aided the fraud by, among other things, not disclosing the fraud, preparing fraudulent tax returns, structuring transactions to hide Refco's losses, and helping insiders cash-out their Refco interests for far more than they were worth. Compl., ¶¶ 250-51, 255-258, 260-269, 276-280. Thus, the claims against E&Y are not arbitrable under the plain language of the engagement letters. E&Y cannot force the Trustee to arbitrate its claims simply because E&Y continued to conceal its participation in the fraud and to help others conceal the fraud after July 25, 2002.[7]

Recognizing that any possibly enforceable arbitration provision would only cover claims arising out of services performed after July 25, 2002, E&Y contends that the Court should ignore

---

[6] As set forth in Section I.B, the May 7, 2001 engagement letter was a draft, was not signed by RGL, and cannot be used to compel the arbitration of RGL's claims against E&Y.

[7] Even if the Court were to conclude that certain of RGL's claims are based on services provided after July 25, 2002, the claims based on prior services and conduct would not be subject to arbitration. *See Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) ("[W]e will sever those claims subject to arbitration from those adjudicable only in court. Indeed, there is no reason why, in a proper case, we cannot sever even a part of a claim."); *Klay v. All Defendants*, 389 F.3d 1191, 1203 (11th Cir. 2004) (holding that a party cannot force arbitration of claims related to conduct occurring prior to any contract requiring arbitration); *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372-73 (6th Cir. 1999) (holding that claims arising from products provided prior to a contract calling for arbitration of claims "arising out of or relating to" products provided under the contract are not arbitrable). *See also* discussion at II.C., *infra*.

the plain language of the engagement letters because arbitration agreements govern

"relationships and not timing." *See* E&Y Br. at 8. This meritless argument, however, has

already been rejected by another court.

Indeed, in *Fehribach v. Ernst & Young*, *LLP*, No. 1:02-CV-01270, 2003 WL 1906136, at

*6-7 (S.D. Ind. Jan. 6, 2003), the court rejected the exact same argument made by E&Y that

E&Y tries to advance again in this case. As the *Fehribach* court concluded, a temporal

restriction in an arbitration provision must be adhered to because "it is difficult to see how [the

arbitration provision] could have any application to claims arising out of conduct that preceded

the provision." *Fehribach,* 2003 WL 1906136, at *4 (holding that claims based on E&Y's

conduct prior to the date of the engagement letter could not be arbitrated where arbitration was

expressly limited to claims arising from or related to "services covered by this letter or hereafter

provided"). Moreover, the "services now or hereafter provided" language in the 2002 and 2003

letters at issue here is even narrower than the "services covered by this letter" language at issue

in *Fehribach*. *Id*. at *1. Nor do any of the cases cited by E&Y (E&Y Br. at 8-9) support a

different result. As the *Fehribach* court observed (*see* 2003 WL 1906136 at *7), none of the

cases E&Y cites gives a temporally limited arbitration clause retroactive effect and none address

the narrow "now or hereafter" arbitration language at issue here.[8]

---

[8]  *See, e.g., Mehler v. Terminix Int'l Co.*, 205 F.3d 44 (2d Cir. 2000) (finding dispute within scope of
arbitration provision where there was a unified agreement, subject to an arbitration provision, based on
both the oral agreement to perform extermination services and the written agreement to subsequently
provide continual protection from termites); *Whisler v. H.J. Meyers & Co.*, 948 F. Supp. 798, 802 (N.D.
Ill. 1996) (arbitration provision applied to "*any* controversy arising out of or relating to *any* of" the broker
accounts at issue in the dispute) (emphasis added); *Clark v. Kidder, Peabody & Co.*, 636 F. Supp. 195,
197 (S.D.N.Y. 1986) (arbitration provision applied to all disputes "arising out of or relating to accounts of
or transactions with or for me or to this agreement or the breach thereof . . ."); *In re Oil Spill by the
Amoco Cadiz,* 659 F.2d 789, 791-92 (7th Cir. 1981) (arbitration provision covered "any difference arising
out of" the agreement held to extend to tort claims related to subject matter of the agreement); *Zink v.
Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 331 (10th Cir. 1993) (arbitration provision
provided that "*any* controversy between [the parties] arising out of [plaintiff's] business or this agreement
shall be submitted to arbitration.")(emphasis added).

E&Y also argues that claims arising from its actions prior to July 2002 should be covered by the July 2002 engagement letter because some unspecified work was revisited by E&Y in 2002.[9]  This attempt to bootstrap claims based on earlier performed services into the narrow "now and hereafter" language in the 2002 and 2003 letters is a blatant attempt to end-run the express arbitration language prohibiting retroactive application, and should be rejected.  *See Fehribach*, 2003 WL 1906136, at *6 (rejecting E&Y's argument that the fact that some services were repeated after the engagement letter was signed brought the claims within the scope of the arbitration provision).

Further, contrary to E&Y's argument, the Court and not an arbitrator must decide whether the Trustee's claims fall within the temporal scope of the arbitration language.  It is well settled that whether a particular claim falls within the scope of an arbitration agreement is for the Court to decide unless there is "clear and unmistakable evidence" that the parties contracted to have the arbitrator decide this issue.  *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995); *Bell v. Cendant Corp*., 293 F.3d 563, 566 (2d Cir. 2002) (noting that a court, and not an arbitrator, ordinarily decides the question of arbitrability).  Here there is no "clear and unmistakable" evidence that the parties intended to have an arbitrator decide the threshold question of whether claims fall within the temporal scope of the arbitration language in the engagement letters.  E&Y's only evidence of such an intent is a clause in the Dispute Resolution Procedures attached to a May 7, 2001 draft engagement letter that, as discussed above in Section I.B., was *not* executed by any Refco entity.  E&Y Br. at 10.  Indeed, E&Y has presented no evidence that the Dispute Resolution Procedures were ever sent to or received by any Refco entity and a review of Refco's available documents failed to locate any such procedures related

---

[9]  It is notable that E&Y offers no evidence to support this factual assertion.  *See* E&Y Br. at 8.

to, referenced in, or attached to the July 25, 2002 or September 9, 2003 engagement letters. *See* Rand Dec. at ¶ 5.[10]

Moreover, E&Y cannot force arbitration regarding whether the Trustee's claims fall within the parties' purported agreement to arbitrate simply by asserting, without any basis, that they do. This would lead to the absurd result that E&Y could force the case into arbitration, no matter how obvious it is that the claims at issue are not arbitrable, by the simple act of claiming that there is a dispute about whether the claims fall within the arbitration language and declaring that any dispute regarding the scope of the language must be resolved by an arbitrator. *See Fehribach*, 2003 WL 1906136, at *4 (holding that E&Y could not force arbitration merely by contending that the arbitrator would decide issues regarding the scope of the agreement to arbitrate without first establishing that claims fell within the temporal scope of the arbitration language).

**B.    Because RCM is not a party to the engagement letters, it cannot be bound by arbitration language in those letters.**

None of the engagement letters bind RCM, which is not a party to the letters. Hence, the arbitration language does not cover claims that the Trustee is bringing against E&Y on behalf of RCM. E&Y argues that the 2002 and 2003 engagement letters were agreed to by Robert Trosten, RGL's CFO, "on behalf of RGL, RCM, and several other Refco entities." E&Y Br. at

---

[10]  Contrary to E&Y's claim, the Dispute Resolution Procedures were not incorporated by reference into the 2002 and 2003 engagement letters. A separate document will only be incorporated by reference into a contract if the intent to do so is clearly shown on the face of the contract and the reference to the document is specific. *New Moon Shipping Co., Ltd. v. Man B&W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997) (noting that a contract may only incorporate a document by "making clear reference to it and describing it in such terms that its identity may be ascertained beyond doubt"). The 2002 engagement letter does not refer specifically and clearly to the Dispute Resolution Procedures attached to the 2001 letter. The 2002 letter refers to "the dispute resolution procedures we sent you previously," Berkowitz Dec., Ex. 2 at 3, but there is no evidence that the Dispute Resolution Procedures (or any other procedures) were sent to RGL prior to July 25, 2002. *See* Rand Dec. at ¶ 5; *see also* Section I.B. above. Likewise, the 2003 engagement letter purports to incorporate dispute resolution procedures that it says are an

5.  However, E&Y provides no evidence to support this assertion, and the signature line on each engagement letter clearly states that Trosten's agreement is only on behalf of RGL.  *See* Berkowitz Dec., Ex. 2 at 4 and Ex. 3 at 4.

An agreement to arbitrate typically cannot be used to force a non-party to that agreement to arbitrate.  *Thompson-CSF, SA v. American Arbitration Assoc.*, 64 F.3d 773, 779-80 (2d Cir. 1995).  This is consistent with the fundamental concept that arbitration is contractual in nature.  "A nonsignatory may not be bound to arbitrate except as dictated by some accepted theory under agency or contract law."  *Thompson-CSF*, 64 F.3d at 780.  There are only a few theories whereby a non-signatory can be forced to arbitrate under an agreement: assumption, agency, estoppel, veil piercing, and when a document agreed to by the non-party incorporates by reference the document containing the arbitration provision.  *Thompson-CSF*, 64 F.3d at 776.  None of these exceptions apply here.

First, there is no evidence that RGL signed the letters as RCM's agent.  The fact that RGL appears to have executed the 2002 and 2003 engagement letters, and that the engagement letters state that the arbitration language covers all of RGL's affiliates, is insufficient to bind RCM to the agreement.  For example, in *Thompson-CSF*, the court held that a corporation was not bound by an arbitration agreement even though its subsidiary had signed an agreement which purported to bind all of its affiliates, including the corporation, to arbitrate their claims.  64 F.3d at 776.  Similarly, in this case, although RCM is RGL's indirect subsidiary, "a corporate relationship alone is not sufficient to bind a nonsignatory to an arbitration agreement."  *Thompson-CSF*, 64 F.3d at 777.

---

"attachment to this letter."  Berkowitz Dec., Ex. 3 at 3-4.  However, the 2003 letter has no Dispute Resolution Procedures attached to it.  *Id.*, Ex. 3.

Second, estoppel also does not apply here.  A non-party is estopped from avoiding arbitration under an agreement only if it receives a direct benefit from the contract containing the arbitration clause.  *Thompson-CSF*, 64 F.3d at 779 (district court improperly bound nonsignatory to arbitration agreement based on indirect benefit).  In other words, a non-party cannot sue under a contract and then try to avoid the arbitration provisions in the very contract on which it bases its claims.  *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (party only estopped from denying its obligation to arbitrate when it knowingly receives a direct benefit from a contract containing an arbitration clause); *Thompson-CSF*, 64 F.3d at 778 (same).  In this case, RCM's claims against E&Y are for aiding and abetting breach of fiduciary duty (11th Claim) and aiding and abetting fraud (12th Claim).  These claims are based on conduct that occurred *prior to* the executed engagement letters.  Moreover, the RCM claims are not based on the engagement letters, do not seek any direct benefit from them, and are not dependent on them.  Therefore, the Trustee is not bound to the engagement letters by estoppel. *Id.*

Third, E&Y has presented no evidence to suggest that assumption or veil piercing applies here and RCM has signed no document incorporating by reference the engagement letters.  Accordingly, E&Y is not entitled to a stay regarding the claims brought by the Trustee on behalf of RCM.  *Thompson-CSF*, 64 F.3d at 776-80.

### C.    If the Court finds that some of the claims must be arbitrated, it should not stay any claims that do not fall within the purported agreement to arbitrate.

E&Y argues that if some of the claims against it are found to be arbitrable and others are not, all claims against E&Y should be stayed pending arbitration "pursuant to the FAA" because the claims are "intertwined."  E&Y Br. at 11.  A party cannot compel arbitration of claims that are not subject to an agreement to arbitrate simply because they might potentially overlap with

claims subject to arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)

(holding that courts must enforce the terms of agreements to arbitrate and should stay only those

claims covered by the arbitration agreement even if the result is 'piecemeal' litigation); *Collins*,

58 F.3d at 20 (deeming argument that should stay non-arbitrable claims because they arose from

same facts as arbitrable claim "frivolous."). Staying claims that are not required to be stayed by

the relevant arbitration language would be inconsistent with the FAA's intent to require

arbitration only where the parties have agreed to do so. *Thompson-CSF*, 64 F.3d at 776 (a party

can only be compelled to arbitrate claims which it has agreed to arbitrate); *Prima Paint Corp. v.

Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) (the purpose of the FAA "was to

make arbitration agreements as enforceable as other contracts, but not more so.").

Furthermore, the "alternative estoppel" exception, which applies when a non-signatory

seeks to compel arbitration under a signatory's agreement, is entirely inapplicable. *Thompson-

CSF*, 64 F.3d at 779 ("[C]ircuits have been willing to estop a *signatory* from avoiding arbitration

with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are

intertwined with the agreement that the estopped party has signed.") (emphasis original). The

situation presented here is the direct opposite: the purported signatory, E&Y is improperly

attempting to compel the arbitration of RCM, a non-signatory. *United Steelworkers of America

v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ("a party cannot be required to

submit to arbitration any dispute which he has not agreed so to submit."). Thus, if the Court

decides that a stay is required as to the RGL claims but not the RCM claims, the FAA does not

authorize a stay of the non-arbitrable RCM claims.

17

## **CONCLUSION**

For all the foregoing reasons, E&Y's motion for a stay should be denied.


Dated: January 11, 2007                    Respectfully submitted,

                                           By: /s/ Richard I. Werder, Jr._____
                                                Richard I. Werder, Jr.
                                                Michael B. Carlinsky
                                                Susheel Kirpalani
                                                Sascha N. Rand
                                                Quinn Emanuel Urquhart Oliver &
                                                Hedges LLP
                                                51 Madison Avenue, 22nd Floor
                                                New York, New York  10010
                                                Tel:  (212) 849–7000
                                                Email:  *rickwerder@quinnemanuel.com*
                                                        *michaelcarlinsky@quinnemanuel.com*
                                                        *susheelkirpalani@quinnemanuel.com*
                                                        *sascharand@quinnemanuel.com*

                                           Attorneys for Plaintiff Marc S. Kirschner as Trustee
                                           of the Refco Litigation Trust