**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO, INC. SECURITIES LITIGATION | No. 07-MD-1902 (GEL) |

This Document Relates To:

| | |
|---|---|
| MARC S. KIRSCHNER, As Trustee of the Refco Litigation Trust, | No. 07-CV-11604 (GEL) |
| Plaintiff, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS BY PRICEWATERHOUSECOOPERS LLP** |
| -vs.- | |
| GRANT THORNTON LLP, et al., | |
| Defendants. | |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF**
**PRICEWATERHOUSECOOPERS LLP'S MOTION TO DISMISS**

In connection with its Motion to Dismiss, defendant PricewaterhouseCoopers LLP ("PwC") respectfully requests that the Court take judicial notice of each of the following public documents relating to the pleas and conviction of four Refco officers, pursuant to Federal Rule of Evidence 201:

(a) Indictment of Phillip R. Bennett, Robert C. Trosten, and Tone N. Grant, <u>United States v. Phillip R. Bennett, Robert C. Trosten, and Tone N. Grant</u>, No. S3 05 CR 1192 (NRB) (S.D.N.Y.), dated November 14, 2006. A true and correct copy of this document is attached hereto as Exhibit 1(a).

(b) Transcript of Phillip R. Bennett's guilty plea, No. 05 CR 1192 (NRB) (S.D.N.Y.), dated February 15, 2008. A true and correct copy of this document is attached hereto as Exhibit 1(b).

(c) Transcript of Robert C. Trosten's guilty plea, No. 05 CR 1192 (NRB) (S.D.N.Y.), dated February 20, 2008. A true and correct copy of this document is attached hereto as Exhibit 1(c).

(d) Superseding indictment of Tone N. Grant, No. S4 05 CR 1192 (NRB) (S.D.N.Y.), dated February 26, 2008.  A true and correct copy of this document is attached hereto as Exhibit 1(d).

(e) Transcript of Tone N. Grant's conviction, No. S4 05 CR 1192 (NRB) (S.D.N.Y.), dated April 17, 2008.  A true and correct copy of this document is attached hereto as Exhibit 1(e).

(f) Information regarding the United States Attorney's charges against Santo C. Maggio, United States v. Santo C. Maggio, No. 07 CR 1196 (S.D.N.Y.), dated December 19, 2007.  A true and correct copy of this document is attached hereto as Exhibit 1(f).

(g) Transcript of Santo C. Maggio's guilty plea, United States v. Santo C. Maggio, No. 07 SD 312 (RLE) (S.D.N.Y.), dated December 19, 2007. A true and correct copy of this document is attached hereto as Exhibit 1(g).

\*        \*        \*

The Second Circuit and this Court have routinely taken judicial notice of court records reflecting criminal indictments, pleas, and convictions.  Federal Rule of Evidence 201 generally permits a court to take judicial notice of any facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Bell v. Hubbard, No. 95 Civ. 10456 (RWS), 2007 WL 60513, at *1 (S.D.N.Y. Jan. 8, 2007) (citing Fed. R. Evid. 201(b)(2)).  Furthermore, "[j]udicial notice may be taken at any stage of the proceeding."  Fed. R. Evid. 201(f); see also Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d. Cir. 1991) (acknowledging that a court may take judicial notice of matters when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)).  It is therefore appropriate for the Court to take judicial notice of the documents attached hereto in Exhibit 1.

Courts in this jurisdiction have taken judicial notice of indictments.  See, e.g., In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 396 (S.D.N.Y.

2005) (taking judicial notice of indictments when considering a 12(b)(6) motion to dismiss).

Courts likewise have taken judicial notice of guilty pleas in similar actions to the present litigation. See In re Take-Two Interactive Sec. Litig., No. 06 CV. 803 (SWK), 2008 WL 1757823, at *44 n.44 (S.D.N.Y. Apr. 16, 2008) (taking judicial notice of guilty pleas of company's officers); SEC v. Aragon Capital Mgmt., LLC, No. 07 Civ. 919 (FM), 2008 WL 216320, at *2 (Jan. 16, 2008) (noting that a court may take judicial notice of a guilty plea for the purpose of deciding a Rule 12(b)(6) motion to dismiss); UCAR Int'l, Inc. v. Union Carbide Corp., No. 04-0741-CV, 119 F. App'x 300, 302, 2004 WL 2756998, at *2 (2d Cir. Dec. 2, 2004) (Summary Order) (affirming in pari delicto dismissal based in part on criminal plea of which district court took judicial notice) (attached hereto as Exhibit 2 in accordance Second Circuit Rule § 0.23).

Finally, courts in this jurisdiction have regularly taken judicial notice of court transcripts. See, e.g., Ricketts v. City of Hartford, 74 F.3d 1397, 1408 (2d Cir. 1996) (taking notice of hearing transcript); B.T. Produce Co., Inc. v. Robert A. Johnson Sales, Inc., 354 F. Supp. 2d 284, 286-87 n.3 (S.D.N.Y. 2004) (taking judicial notice of sentencing hearing transcript).


## CONCLUSION

For the foregoing reasons, defendant PwC respectfully requests that the Court take judicial notice of the documents attached hereto as Exhibits 1(a)-1(g).

Dated: New York, NY
      May 21, 2008

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: _____
    James J. Capra, Jr.
    James P. Cusick
    666 Fifth Avenue
    New York, New York 10103
    (212) 506-5000

    Kenneth Y. Turnbull (admitted *pro hac vice*)
    1152 15th Street, NW
    Washington, DC  20005
    (202) 339-8400

    *Attorneys for Defendant*
    *PricewaterhouseCoopers LLP*

# EXHIBIT
# 1(a)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**REDACTED**

------------------------------------x
                       :

UNITED STATES OF AMERICA    :

    -v-              :

PHILLIP R. BENNETT,     :
ROBERT C. TROSTEN and   :
TONE N. GRANT,        :

        Defendants.   :

------------------------------------x

**INDICTMENT**

S3 05 Cr. 1192 (NRB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-16-07

## COUNT ONE

(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)

    The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

    1.  At certain times relevant to this Indictment,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York.  From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets.  Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005.  Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held.  Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

2.   At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, directly and indirectly.

3.   At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco.  Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.   At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, GRANT was the President of Refco.  At certain times relevant to this Indictment, GRANT indirectly, held a significant ownership interest in Refco.

5.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in Austria.  BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).  At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

2

6.    At all times relevant to this Indictment, Refco
Group Holdings, Inc. ("RGHI") was a privately-held Delaware
corporation that held a substantial ownership interest in Refco.
At various times relevant to this Indictment, RGHI was owned in
whole or in part by PHILLIP R. BENNETT and TONE N. GRANT.

**THE SCHEME TO DEFRAUD**

7.    From at least as early as in or about the mid
1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT,
the defendants, together with others known and unknown, schemed
to hide the true financial health of Refco from its banks,
counterparties, auditors, and investors.  Starting at least as
early as the mid 1990s, BENNETT and GRANT embarked on a strategy
to mask the true performance of Refco's business in order to sell
the company for their own benefit and that of Refco's other
owners.  To that end, over the ensuing years, BENNETT, TROSTEN,
GRANT and others known and unknown systematically (1) covered up
both Refco's own losses and customer losses for which Refco
became responsible; (2) moved Refco operating expenses off the
company's books; and (3) padded Refco's revenues, all in an
effort to mislead Refco's banks, counterparties, auditors and
investors, with the goals of keeping Refco in business and then
selling it for the maximum benefit to its owners and senior
management.

8.    In furtherance of this scheme, PHILLIP R. BENNETT,

3

ROBERT C. TROSTEN, TONE N. GRANT, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC"). The scheme included obtaining, through fraud, the following:  lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57% of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

9.    In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by PHILLIP R. BENNETT, TONE N. GRANT and one other partner.  As of early 1997, RGHI owed Refco at least approximately $106 million.  Starting later in 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business.  In response to these losses, at various times between in or about May 1997 and in or about October 2005, BENNETT and

4

his coconspirators, including TONE N. GRANT and ROBERT C. TROSTEN, moved losses and expenses out of Refco and into RGHI, and artificially padded Refco's revenues at the expense of RGHI, in an effort to hide Refco's true liabilities, manipulate its reported earnings, and thereby seek to defraud a purchaser into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners.  This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion.  The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

10.  As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco.  In the later 1990s, certain

Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million.  These customer losses included the following:

### Asian Debt Crisis Customers

11.  In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### Customer 1

12.  In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call

6

from the CME, using the proceeds of an intra day loan from a
financial institution of at least approximately $90 million to
meet its margin requirements, and then using customer funds taken
from the unregulated segments of Refco's business to repay the
intra day loan.

13.   Recognizing that public acknowledgment of a loss
of more than $90 million would threaten Refco's continued
existence, PHILLIP R. BENNETT, TONE N. GRANT and others known and
unknown falsely represented to the public and other customers
that Refco had not sustained a significant loss as a result of
Customer 1's losses.  In addition, BENNETT, GRANT and ROBERT C.
TROSTEN significantly misrepresented the size of the loss to
Refco's auditors.

14.   PHILLIP R. BENNETT and TONE N. GRANT, having
misrepresented to third parties that Refco had not suffered a
significant loss as a result of Customer 1's trading activity,
caused at least $71 million of debt owed by Customer 1 from the
trading losses to be transferred to become a debt from RGHI to
Refco.

### Proprietary Trading Losses

15.   In the late 1990s, Refco also incurred substantial
losses from proprietary trades, or trades carried out on its own
behalf.  For example, in or about 1998, Refco suffered a loss of
at least approximately $40 million on its investment in Russian

bonds after the Russian Government defaulted on its obligations.
PHILLIP R. BENNETT, so as to avoid having to acknowledge this
loss on Refco's books, caused Refco to inflate the value of the
bonds in Refco's books and records to hide the full magnitude of
the loss.  Eventually, BENNETT caused those losses to be
transferred to RGHI, so that they appeared as a debt from RGHI to
Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, PHILLIP R.
BENNETT and others schemed to reduce Refco's expenses (therefore
falsely increasing Refco's apparent profitability) by moving
Refco expenses off of Refco's books and onto the books of RGHI.
For example:

a. From at least as early as February 1999, and
continuing until at least in or about February 2002, BENNETT and
others caused a total of approximately $46.3 million of computer
systems expenses incurred by Refco to be transferred to RGHI, in
the following years in the following amounts:

| Fiscal Year End | Amount Transferred to RGHI |
|-----------------|----------------------------|
| 2000 | $7,378,927.80 |
| 2001 | $8,797,189.98 |
| 2002 | $9,393,846.76 |
| 2003 | $7,002,153.65 |
| 2004 | $4,876,657.60 |
| 2005 | $5,028,053.21 |
| 2006 | $3,895,030.92 |

b. On or about August 9, 1999, BENNETT and others caused a total of approximately $1.5 million of expenses characterized as payroll expenses to be transferred from Refco to RGHI.

17. The result of these actions by PHILLIP R. BENNETT and his coconspirators was to create a large and growing debt owed by RGHI to Refco. By in or about February 1999, RGHI owed Refco at least approximately $252 million. In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary. Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

## Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, PHILLIP R. BENNETT and TONE N. GRANT caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, BENNETT, GRANT and others caused Refco to systematically fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, $100 million a day.  BENNETT, GRANT and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

## BAWAG Invests In Refco

19.  By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions.  In order to address that problem, in or about late 1998, PHILLIP R.

10

BENNETT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria.  In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

## Hiding The RGHI Receivable

20.  Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, PHILLIP R. BENNETT directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT or Refco. At certain times, BENNETT also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global

11

Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  BENNETT and, later, ROBERT C. TROSTEN, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004.  BENNETT and TROSTEN directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22.  In 1998 and 1999, PHILLIP R. BENNETT, and with respect to 1999, TONE N. GRANT, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|---------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23.  Beginning in 2000, PHILLIP R. BENNETT's year-end cover-up transactions were of two types:  transactions with Refco customers, and transactions with BAWAG.  In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August

12

2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|---------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.    These transactions typically followed standard patterns.  For example, in or about February 2000, PHILLIP R. BENNETT caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.    Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To

13

ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i).    On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

(ii).    On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI.  The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by BENNETT on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii).    On or about the same date, BENNETT signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b.    At or around the same time as the

14

transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash. RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound. Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI. RGHI then used the $300 million to pay off the loan from BAWAG. No loan documents were prepared to document this or any of the subsequent BAWAG transactions.

25. In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, PHILLIP R. BENNETT, TONE N. GRANT and ROBERT C. TROSTEN, and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable. For example, on or about April 30, 2003 and April 27, 2004, BENNETT and TROSTEN each signed letters to Refco's auditors in which they represented that "[r]elated party transactions and related amounts receivable," including "loans" and "transfers" had all "been properly recorded or disclosed in the consolidated financial statements," when in fact neither BENNETT nor TROSTEN had disclosed the true amount of the related party transactions or indebtedness.

## Refco Sells Notes Based On False Financial Information

26.  At various times prior to August 2004, PHILLIP R.
BENNETT and ROBERT C. TROSTEN, in furtherance of the scheme to
defraud Refco's potential investors, caused Refco to raise
capital through the private placement of certain notes.  These
notes were sold to investors based, in part, on the audited
financial statements prepared by Refco's auditors, which in turn
were rendered false and misleading by the year-end cover-up
transactions outlined above and the siphoning of Refco expenses
out of Refco and into RGHI.  In particular, BENNETT and TROSTEN
caused Refco to raise the following capital through the sale of
the following notes to investors, based on false and fraudulent
financial statements:

| Date | Note Coupon And Due Date | Approximate Capital Raised |
| --- | --- | --- |
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

## Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.  Because Refco was constantly in need of cash to
cover its transactions and meet settlement, Refco sought and

16

obtained credit from banks and other financial institutions,
including a revolving line of credit from a number of financial
institutions, including JP Morgan Chase, beginning in or about
1998, that eventually grew to more than $300 million.  For each
such transaction, including the annual renewal of the revolving
line of credit, Refco submitted to the proposed creditor the
fraudulent financial statements and made other false statements
which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted
PHILLIP R. BENNETT in hiding the RGHI receivable in the manner
described above, BENNETT caused Refco to assist BAWAG in hiding
its own balance sheet problem.  In or about early 2000, BAWAG
entrusted approximately €350 million of BAWAG's funds to an
investment advisor, who by the end of 2000 reported to the bank
that he had lost substantially all of those funds.  In order to
disguise this loss on its balance sheet, BAWAG arranged through
BENNETT to hold in an account at Refco certain worthless bonds
and other investments that Refco, at BENNETT's direction,
maintained at a false value that, over time, reached at least
approximately €500 million.  These fake assets were purportedly
housed at Refco and maintained at an inflated value for BAWAG's
benefit until 2005.

### BAWAG Invests Further In Refco

29.   In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2% of the proceeds of the sale of Refco and, together with its existing interest in 20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

### BENNETT's "Exit Strategy" Develops

30.   In or about 2003, PHILLIP R. BENNETT caused Refco to hire the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.  BENNETT asked CSFB to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, BENNETT directed CSFB to look for other purchasers for the company, with the understanding that it would be taken public.

31.   In connection with PHILLIP R. BENNETT's plan to sell Refco, BENNETT and ROBERT C. TROSTEN (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by BENNETT and others to disguise the ongoing operational problems at the company.

32.   For example, in or about March 2004, PHILLIP R.

18

BENNETT and others caused approximately $7.9 million in Refco consulting fee expenses to be transferred to RGHI. In addition, during the fiscal year that ended in February 2004, BENNETT and ROBERT C. TROSTEN caused approximately $4.8 million in Refco computer expenses to be shifted to RGHI.

33.    In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

## The Fraudulent Leveraged Buyout Transaction

34.    In or about 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction. As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

35.    As a precursor to this transaction, PHILLIP R. BENNETT purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50% interest in profits made by BENNETT in a future sale of BENNETT's interest in Refco.  As a result of their agreement, GRANT was no longer responsible for RGHI's debt to Refco, which as of February 2004 totaled more than approximately $1 billion, and BENNETT controlled all of RGHI immediately prior to the sale to the Lee entities.

### Lies To Thomas H. Lee Partners

36.    In connection with the leveraged buyout transaction, on or about July 9, 2004, PHILLIP R. BENNETT executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior fiscal year, BENNETT owned a substantial interest in RGHI, which had engaged in transactions worth more than $1.5 billion during the year-end cover-up transactions with Refco, and which owed Refco more than $1 billion as of late February 2004.

37.    In connection with the leveraged buyout transaction, on or about July 2, 2004, ROBERT C. TROSTEN executed an officer's questionnaire in which he falsely certified, among

20

other things, that there was no "material fact concerning the
business and operations of [Refco] which is not disclosed in the
Offering Circular provided to you or which you believe may be
inaccurately stated therein," even though TROSTEN knew that the
related party and expense shifting transactions had not been
disclosed in the offering documents related to the transaction.

38.    In connection with the leveraged buyout
transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others
caused Refco's audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  Those
audited financial statements were false and misleading in the
following respects, among others:

a.    The financial statements hid the size of the
related party receivable from RGHI, which at the end of February
2004 was, but for the cover-up loan transactions, at least
approximately $1 billion, whereas the financial statements
misleadingly reported that the "$105 million due from related
parties, included in loans receivable at February 28, 2003, was
received by February 29, 2004."

b.    The financial statements falsely reported
Refco's net income for the year as $187 million, when in fact
that number was inflated.

39.    In connection with the leveraged buyout
transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others

21

falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

40.    In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.    BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

41.    In connection with the leveraged buyout

transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

     a.  Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

     b.  BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

     c.  BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

     42.  The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, PHILLIP R. BENNETT caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| TROSTEN | $48 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $112 million |

43. In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN falsely represented to Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout. In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG. At the end of the leveraged buyout transaction, BENNETT distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

44. In or about August 2004, after completion of the leveraged buyout transaction, ROBERT C. TROSTEN left Refco.

24

PHILLIP R. BENNETT caused RGHI to pay TROSTEN approximately $48 million from the proceeds of the TH Lee transaction, in order to keep TROSTEN from revealing the ongoing fraud scheme.

### BENNETT Plans To Take Refco Public

45.  After the leveraged buyout, PHILLIP R. BENNETT, who remained the Chief Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

46.  Between the August 2004 leveraged buyout and the August 2005 IPO, PHILLIP R. BENNETT continued his manipulation of Refco's finances:  At each quarter and year-end period, BENNETT caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and BENNETT continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  BENNETT caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

47.  Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, BENNETT caused the following transactions, among others, to artificially inflate Refco's revenues:

a.  On or about November 17, 2004, BENNETT caused RGHI, in a total of approximately 50 transactions, to purportedly purchase a total of approximately $1.25 billion in US Treasury notes from Refco, and then reversed the transactions the same day, at a loss to RGHI and a profit to Refco of approximately $7.8 million.

b.  On or about February 11, 2005, BENNETT caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

c.  On or about February 17, 2005, BENNETT caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a

26

result of the transactions.  The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

48.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

49.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. PHILLIP R. BENNETT signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

50.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for

27

the year ended February 28, 2005 on Form 10K. PHILLIP R. BENNETT
signed the annual report on or about July 19, 2005 in New York,
New York. BENNETT also signed two certifications regarding the
annual report. In those certifications, BENNETT attested that he
had reviewed the annual report and (a) that it did "not contain
any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in light of
the circumstances under which such statements were made, not
misleading with respect to the period covered by th[e] report";
and (b) that "the information contained in the Report fairly
present[ed], in all material respects, the financial condition
and results of operations of the Company." As noted above, the
financial statements were fraudulent in that, among other things,
they failed to reflect the related party receivables, the padded
revenue, and the shifted expenses.

    51.  On or about August 8, 2005, Refco filed an S-1
registration statement with the SEC in connection with its
initial public offering of common stock. PHILLIP R. BENNETT
signed that registration statement on or about August 8, 2005, in
New York, New York.

    52.  The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by PHILLIP R. BENNETT each
required the disclosure of (a) certain transactions between Refco
and its management and (b) certain debts owed directly or

28

indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years.  These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

53.  The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above.  In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

54.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  PHILLIP R. BENNETT, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in

Refco.  Following the initial public offering, Refco's common
stock was listed on the New York Stock Exchange under ticker
symbol "RFX."

### End Of Quarter Transactions In August 2005

55.  In or about late August 2005, after the completion
of Refco's IPO, PHILLIP R. BENNETT caused Refco to carry out $420
million in cover-up transactions with a Refco customer that
temporarily transformed all or part of the RGHI receivable into a
receivable from that customer.  After the August 31, 2005 end of
Refco's second quarter, the $420 million in cover-up transactions
were unwound.

### Public Disclosure Of The Related Party Debt

56.  In or about early October 2005, Refco discovered
an approximately $430 million receivable on its books from RGHI.
It demanded repayment of the debt by PHILLIP R. BENNETT, who
repaid Refco approximately $430 million on or about October 10,
2005, having received an emergency loan in that approximate
amount from BAWAG.

57.  On or about October 10, 2005, Refco issued a press
release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

30

believes that the receivable was the result of the
assumption by an entity controlled by Mr. Bennett
of certain historical obligations owed by
unrelated third parties to the Company, which may
have been uncollectible. The Company believes that
all customer funds on deposit are unaffected by
these activities. Independent counsel and forensic
auditors have been retained to assist the Audit
Committee in an investigation of these matters.

58.    Following Refco's announcement of its discovery of
this related party receivable, the market price of Refco stock
plummeted, resulting in a loss of well more than $1 billion in
market capitalization.

59.    On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

60.    From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly did combine, conspire, confederate, and agree
together and with each other to commit offenses against the
United States, namely: (a) to commit fraud in connection with the
purchase and sale of securities issued by Refco, in violation of
Sections 78j(b) and 78ff of Title 15, United States Code, and

Section 240.10b-5 of Title 17, Code of Federal Regulations; (b)
to make and cause to be made false and misleading statements of
material fact in reports and documents required to be filed with
the SEC under the Securities Exchange Act of 1934, and the rules
and regulations promulgated thereunder, in violation of Title 15,
United States Code, Sections 78o(d) and 78ff; (c) to make and
cause to be made false statements in a registration statement
filed under the Securities Act of 1933, in violation of Title 15,
United States Code, Section 77x; (d) to commit wire fraud, in
violation of Section 1343 of Title 18, United States Code; (e) to
make and cause to be made false statements and omissions to
Refco's auditors, in violation of Title 15, United States Code,
Sections 78m and 78ff; Title 17, Code of Federal Regulations,
Section 240.13b2-2; (f) to commit bank fraud, in violation of
Section 1344 of Title 18, United States Code; and (g) to commit
money laundering, in violation of Section 1957(a) of Title 18,
United States Code, Section 1957.

### OBJECTS OF THE CONSPIRACY

### Securities Fraud

61.  It was a part and object of the conspiracy that
PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly, by the use of the means and instrumentalities of
interstate commerce, the mails, and facilities of national

securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## False Statements In SEC Filings - Exchange Act

62.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

33

## False Statements In SEC Filings - Securities Act

63.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## Wire Fraud

64.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

65.  It was further a part and object of the conspiracy

34

that PHILLIP R. BENNETT, the defendant, being an officer and
director of Refco, an issuer obligated to file reports pursuant
to section 15(d) of the Securities and Exchange Act of 1934 and
subsequently with a class of securities registered pursuant to
section 12 of the Securities Exchange Act of 1934, unlawfully,
willfully and knowingly, directly and indirectly, (a) made and
caused to be made materially false and misleading statements; and
(b) omitted to state, and caused others to omit to state,
material facts necessary in order to make statements made, in
light of the circumstances under which they were made, not
misleading to accountants in connection with (i) audits, reviews
and examinations of the financial statements of Refco required to
be filed under the Securities and Exchange Act of 1934; and (ii)
the preparation and filing of documents and reports required to
be filed with the SEC pursuant to rules and regulations
promulgated by the SEC.

### Bank Fraud

66.    It was further a part and object of the conspiracy
that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT,
the defendants, unlawfully, willfully and knowingly, would and
did execute, and attempt to execute, a scheme and artifice to
defraud a financial institution, to wit, HSBC, and to obtain
moneys, funds, credits, assets, securities and other property
owned by, and under the custody and control of, a financial

institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

## Money Laundering

67.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN and TONE N. GRANT, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

68.   Among the means and methods by which PHILLIP R. BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.   PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public the size of customer losses for which Refco was responsible.

b.   PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators

36

transferred losses incurred by Refco to BENNETT's company, RGHI.

   c. PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

   d. PHILLIP R. BENNETT, the defendant, and his coconspirators caused Refco to file false and fraudulent statements with the SEC.

   e. PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators, made and caused to be made material false statements and omissions to Refco's auditors.

   f. PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

   g. PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

## Overt Acts

69.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.  In or about late 1997, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.  On or about May 15, 1998, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.  On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.  On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an

approximately $720 million loan from a Refco customer to RGHI.

e.    On or about April 27, 2004, PHILLIP R.
BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to
Refco's auditors representing, among other things, that all
related party transactions and related party amounts receivable
had been fully disclosed to the auditors.

f.    On or about May 17, 2004, PHILLIP R. BENNETT
and TONE N. GRANT, the defendants, met at a hotel in lower
Manhattan to discuss the more than $1 billion debt that they, as
the owners of RGHI, owed to Refco.

g.    On or about August 5, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to ROBERT C.
TROSTEN, the defendant, approximately $48 million.

h.    On or about August 5, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT,
the defendant, approximately $4 million.

i.    On or about August 8, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT,
the defendant, approximately $12 million.

j.    On or about February 23, 2005, in New York,
New York, PHILLIP R. BENNETT, the defendant, signed a guaranty
letter on behalf of Refco Group Ltd., LLC. regarding an
approximately $345 million loan from a Refco customer to RGHI.

k.    On or about April 6, 2005, in New York, New

39

York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4 registration statement.

l.   On or about May 25, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $450 million loan from a Refco customer to RGHI.

m.   On or about July 19, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's annual report on Form 10K.

n.   On or about August 8, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1 registration statement.

(Title 18, United States Code, Section 371).

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

70.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

71.   From in or about the mid-1990s up to in or about 2004, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce,

the mails, and the facilities of national securities exchanges,
did use and employ, in connection with the purchase and sale of
securities, manipulative and deceptive devices and contrivances,
in violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices,
and courses of business which operated and would operate as a
fraud and deceit upon a person, in connection with the purchase
and sale of 9% Senior Subordinated Notes due 2012, issued by
Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

## COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

72.    The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

73.    From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and

41

knowingly, directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in connection with the purchase and sale of the
common stock of Refco, Inc.

> (Title 15, United States Code, Sections 78j(b) and 78ff; Title
> 17, Code of Federal Regulations, Section 240.10b-5; and
> Title 18, United States Code, Section 2).

## COUNT FOUR

(False Filing With The SEC - Exchange Act)

The Grand Jury further charges:

74.    The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

75.    On or about July 19, 2005, in the Southern
District of New York and elsewhere, PHILLIP R. BENNETT, the
defendant, unlawfully, willfully, and knowingly made and caused

42

to be made statements in a report and document required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., Refco's Form 10-K.

>(Title 15, United States Code, Sections 78o(d) and 78ff;
>Title 17, Code of Federal Regulations, Section 240.15d-2;
>and Title 18, United States Code, Section 2.)

## COUNTS FIVE AND SIX

(False Filing With The SEC - Securities Act)

The Grand Jury further charges:

76.    The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

77.    On or about the dates specified below, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York,

to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|------------------|------|
| FIVE  | April 6, 2005    | S-4  |
| SIX   | August 8, 2005   | S-1  |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

## COUNTS SEVEN THROUGH THIRTEEN

(Wire Fraud)

The Grand Jury further charges:

78.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

79.   On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

44

| Count | Defendant | Approximate Date | Wire Communication |
|-------|-----------|------------------|--------------------|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago, Illinois |
| TWELVE | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |
| THIRTEEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOURTEEN

(Material Misstatements To Auditors)

The Grand Jury further charges:

80.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

81.  From in or about April 2005 to in or about October

45

2005, in the Southern District of New York, PHILLIP R. BENNETT,

the defendant, being an officer and director of Refco, an issuer

obligated to file reports pursuant to section 15(d) of the

Securities and Exchange Act of 1934 and subsequently with a class

of securities registered pursuant to section 12 of the Securities

Exchange Act of 1934, unlawfully, willfully and knowingly,

directly and indirectly, (a) made and caused to be made

materially false and misleading statements; and (b) omitted to

state, and caused others to omit to state, material facts

necessary in order to make statements made, in light of the

circumstances under which they were made, not misleading to

accountants in connection with (i) audits, reviews and

examinations of the financial statements of Refco required to be

filed under the Securities and Exchange Act of 1934; and (ii) the

preparation and filing of documents and reports required to be

filed with the SEC pursuant to rules and regulations promulgated

by the SEC.

> (Title 15, United States Code, Sections 78m and
> 78ff; Title 17, Code of Federal Regulations, Section
> 240.13b2-2; and Title 18, United States Code, Section 2).

## COUNT FIFTEEN

(Bank Fraud)

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through

59, 68 and 69 of this Indictment are repeated and realleged as if

fully set forth herein.

83.  On or about August 5, 2004, in the Southern
District of New York, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and
TONE N. GRANT, the defendants, unlawfully, willfully and
knowingly, would and did execute, and attempt to execute, a
scheme and artifice to defraud a financial institution, to wit,
HSBC, and to obtain moneys, funds, credits, assets, securities
and other property owned by, and under the custody and control
of, a financial institution, to wit, HSBC, whose deposits were
insured by the Federal Deposit Insurance Corporation, by means of
false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

### COUNTS SIXTEEN THROUGH TWENTY

(Money Laundering)

The Grand Jury further charges:

84.  The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

85.  On or about the dates set forth below, in the
Southern District of New York, the defendants set forth below, in
an offense involving and affecting interstate and foreign
commerce, unlawfully, willfully and knowingly would and did
engage and attempt to engage in monetary transactions in
criminally derived property that was of a value greater than

47

$10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a):

| Count | Defendant | Approximate Date | Transaction |
|-------|-----------|------------------|-------------|
| SIXTEEN | PHILLIP R. BENNETT | August 5, 2004 | $25,322,810 transfer from RGHI's JP Morgan Chase account in New York, NY to BENNETT's JP Morgan Chase account in New York, NY |
| SEVENTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $46,069,300 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| EIGHTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $1,950,000 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| NINETEEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago Illinois |
| TWENTY | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |

(Title 18, United States Code, Sections 1957(a) and 2).

48

### FORFEITURE ALLEGATION WITH RESPECT TO
### COUNTS ONE THROUGH FOURTEEN

86.    As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five, Six and Fourteen; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of this Indictment, PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Two, Seven, and Eight), and TONE GRANT, the defendant (as to acts alleged in Counts One, Two, and Eleven) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following:

a.    At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendants are jointly and severally liable, including but not limited to:

1.    The contents of Account No. ███████6752,

49

in the name of Refco Group Holdings, Inc., held at JP Morgan Chase Bank, New York (approximately $63,393.20);

      2.    The contents of Account No. ████2791 in the name of Phillip R. Bennett And/or Valerie Bennett, held at JP Morgan Chase Bank, New York (approximately $905,314.91);

      3.    The contents of Account No. ████5-00-7, in the name of Phillip Bennett Grantor Retained Annuity Trust ("GRAT"), held at JP Morgan Chase Bank, New York (approximately $13,880,143.28);

      4.    All funds from the Liquidation of the Limited Capital Account for Sphinx Managed Futures Index Fund, LP, in the name of Philip Bennett, held at the BISYS Group, Inc. (approximately $974,533.91);

      5.    The contents of Account No. ████0832, in the name of Phillip Bennett, held at Citibank, N.A., New York, New York (approximately $13,810,347.00);

      6.    The contents of Account No. ████████0258, in the name of Valerie Bennett, held at Wachovia Bank, Charlotte, North Carolina (approximately $440,014.55);

      7.    The contents of Account No. ████7710, in the name of Valerie Bennett, held at Merrill Lynch, New York (approximately $1,828,492.00);

      8.    The contents of Account. No. ████ ████10-19, in the name of Zahava R. Trosten, held at JP Morgan

Chase Bank, New York (approximately $30,024,148.66);

9. The contents of Account No. ████████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

10. The contents of Account No. ████████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53);

11. Any and all funds in Account No. ████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

12. Any and all right, title and interest in the real property and appurtenances known as ███████████████, Sarasota, Florida 34236; and

13. A sum of at least $1,900,000.00 from Account Nos. ████████4805 and ████████0709, in the name of Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New Jersey.

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE AND FIFTEEN THROUGH TWENTY

87. As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts One and Fifteen of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts Sixteen through Twenty of this Indictment,

PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Fifteen, Seventeen, and Eighteen), and TONE GRANT, the defendant (as to acts alleged in Counts One, Fifteen, and Nineteen) shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.  At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 in the forfeiture allegation above; and

b.  At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 of the forfeiture allegation above.

## SUBSTITUTE ASSETS PROVISION

88.  If any of the above-described forfeitable

52

property, as a result of any act or omission of the defendants:

        (i)   cannot be located upon the exercise of due diligence;

        (ii)  has been transferred or sold to, or deposited with, a third party;

        (iii) has been placed beyond the jurisdiction of the court;

        (iv)  has been substantially diminished in value; or

        (v)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

        1.   Any and all right, title and interest in the real property and appurtenances known as ███████████, Gladstone, New Jersey 07934;

        2.   Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ██████ ███████████, New York, New York 10028; and

        3.   Any and all right, title and interest in the

53

real property and appurtenances known as 

 Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)


_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney


54

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

– v –

## PHILLIP R. BENNETT,
## ROBERT C. TROSTEN,
## TONE N. GRANT

**Defendants.**

## INDICTMENT

S3 05 Cr. 1192 (NRB)

(18 USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR § 240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR, §240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18 USC 1343, 2; 15 U.S.C. §78m and 78ff; 17 CFR §240.13b2-2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

# EXHIBIT 1(b)

Bennett Transcript.txt

1

```
82FVBENP                      Plea
```

 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  -----------------------------x
 2
 3
 3  UNITED STATES OF AMERICA,
 3
 4           v.                          05 CR 001192 (NRB)
 4
 5  PHILLIP BENNETT,
 5
 6               Defendant.
 6
 7  -----------------------------x
 7
 8                                  New York, N.Y.
 8                                  February 15, 2008
 9                                  5:40 p.m.
 9
10
10  Before:
11
11            HON. NAOMI REICE BUCHWALD,
12
12                              District Judge
13
13
14                  APPEARANCES
14
15  MICHAEL J. GARCIA
15       United States Attorney for the
16       Southern District of New York
16  NEIL M. BAROFSKY
17  CHRISTOPHER L. GARCIA
17       Assistant United States Attorneys
18
18  KRAMER LEVIN NAFTALIS & FRANKEL
19       Attorneys for Defendant
19  GARY P. NAFTALIS
20  DAVID S. FRANKEL
20  ADAM C. FORD
21  DARREN A. LAVERNE
21
22  ALSO PRESENT:  WILLIAM JOHNSON, Postal Inspector
22                 KRIS MOON, Postal Inspector
23                 ANNE RAILTON, Law Student
23
24
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

2

```
82FVBENP                      Plea
```

 1            (In open court)
 2            (Case called)
 3            THE DEPUTY CLERK:  The case is United States against
 4  Phillip Bennett; docket number 05 CR 1192.  Is the government
 5  ready to proceed?
 6            MR. BAROFSKY:  Yes.  Neil Barofsky for the government.
 7  With me at counsel table, with your Honor's permission, is
 8  Christopher Garcia of our office, our postal inspectors on the
                          Page 1

Bennett Transcript.txt
```
 9  case, William Johnson and Kris Moon, as well as our legal
10  intern, Annie Railton, who's been assisting the trial of this
11  matter.  Good evening, your Honor.
12          MR. GARCIA:  Good evening, your Honor.
13          THE DEPUTY CLERK:  Is the defense ready to proceed?
14          MR. NAFTALIS:  Yes, we are.  Gary Naftalis for
15  Mr. Bennett, along with David Frankel.
16          THE COURT:  Mr. Naftalis?
17          MR. NAFTALIS:  Your Honor, we have an application on
18  behalf of Mr. Bennett to withdraw his plea of not guilty to the
19  charges in the indictment and to offer to plead guilty to the
20  charges in the indictment.
21          THE COURT:  All right.  Mr. Bennett, would you stand
22  please.  Would you raise your right hand.
23          (Defendant sworn)
24          THE COURT:  And would you state your full name for me
25  please.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

```
    82FVBENP              Plea
 1          THE DEFENDANT:  Phillip Roger Bennett.
 2          THE COURT:  And Mr. Bennett, how old are you?
 3          THE DEFENDANT:  59, your Honor.
 4          THE COURT:  Why don't you sit down.  Mr. Bennett, what
 5  was the highest grade in school that you completed?
 6          THE DEFENDANT:  University.  Grade, twelfth grade, I
 7  think it is, your Honor.
 8          THE COURT:  You have the equivalent of a college
 9  degree.
10          THE DEFENDANT:  Yes, master of arts.
11          THE COURT:  And are you now or have you currently been
12  under the care of a doctor or psychiatrist?
13          THE DEFENDANT:  No, your Honor.
14          THE COURT:  And have you ever been hospitalized or
15  treated for alcoholism or narcotics addiction?
16          THE DEFENDANT:  No, your Honor.
17          THE COURT:  Are you under the influence of any drug or
18  alcohol today?
19          THE DEFENDANT:  I'm not, no, your Honor.
20          THE COURT:  And how are you feeling physically today?
21          THE DEFENDANT:  Fine, your Honor.  Thank you.
22          THE COURT:  Mr. Bennett, have you had the opportunity
23  to review the charges against you and your plea with
24  Mr. Naftalis and Mr. Frankel and perhaps some other lawyers, as
25  well?
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

```
    82FVBENP              Plea
 1          THE DEFENDANT:  I have, your Honor, yes.
 2          THE COURT:  And have you been satisfied with the
 3  advice and counsel that Messrs. Naftalis and Frankel have given
 4  to you?
 5          THE DEFENDANT:  I have, yes.
 6          THE COURT:  Are you ready to change your plea at this
 7  time?
 8          THE DEFENDANT:  I am, your Honor.
 9          THE COURT:  And what is your plea at this time, guilty
10  or not guilty?
11          THE DEFENDANT:  It's guilty, your Honor.
12          THE COURT:  Mr. Bennett, in order to determine whether
13  your plea is voluntary and made with a full understanding of
```
Page 2

Bennett Transcript.txt
14  the charges against you and the consequences of your plea, I
15  will make certain statements to you and I will ask you certain
16  questions.  I want you to understand that I need not accept
17  your plea unless I am satisfied that you are, in fact, guilty,
18  and that you fully understand your rights.  I'm tempted to ask
19  the government to pick a few favorite charges instead of all of
20  these, but, okay.
21          Mr. Bennett, you've been charged in the 20-count
22  indictment.
23          The first count charges you with a conspiracy to
24  commit securities fraud, wire fraud, bank fraud, and money
25  laundering, and to make false filings to the SEC.  This crime
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    5
    82FVBENP              Plea
1   carries a maximum sentence under the law of five years
2   imprisonment, a maximum fine of the greatest of $250,000 or
3   twice the gross pecuniary gain derived from the offense or
4   twice the gross pecuniary loss to persons other than yourself
5   as a result of the offense, and a $100 special assessment, and
6   a maximum term of supervised release of three years.
7           Do you understand that those are the charges in Count
8   One of the indictment and the maximum statutory penalties
9   applicable to those charges?
10          THE DEFENDANT:  I do, your Honor, yes.
11          THE COURT:  Counts Two and Three of the indictment
12  charge you with securities fraud.  Each of these counts carries
13  a maximum sentence of 20 years in prison, a maximum fine of
14  $5,000,000 or twice the gross pecuniary gain derived from the
15  offense or twice the gross pecuniary loss to a person other
16  than yourself as a result of the offense, a $100 special
17  assessment, and a maximum term of supervised release of three
18  years.
19          Do you understand that those are the charges in Counts
20  Two and Three and the maximum penalties under law for those
21  charges of securities fraud?
22          THE DEFENDANT:  I do, your Honor.
23          THE COURT:  Count Four charges you with making a false
24  filing with the Securities and Exchange Commission.  And this
25  crime carries a maximum statutory penalty of 20 years in
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    6
    82FVBENP              Plea
1   prison, a maximum fine of the greatest of $5,000,000 or twice
2   the gross monetary gain derived from the offense or twice the
3   gross monetary loss to a person other than yourself as a result
4   of the offense, a $100 special assessment, and a maximum term
5   of supervised release of three years.
6           Do you understand that those are the charges in Count
7   Four and the maximum penalties applicable to those charges?
8           THE DEFENDANT:  I do, your Honor.
9           THE COURT:  Counts Five and Six of the indictment
10  charge you with making a false filing with the Securities and
11  Exchange Commission -- excuse me, with the Securities and
12  Exchange Commission.  Each of these counts carries a maximum
13  sentence under the law of five years imprisonment, a maximum
14  fine of the greatest of $250,000 or twice the gross pecuniary
15  gain derived from the offense or twice the gross pecuniary loss
16  to a person other than yourself as a result of the offense, and
17  a $100 special assessment, and a maximum supervised release
18  term of three years.  Do you understand that those are the
                        Page 3

Bennett Transcript.txt
19  charges in Counts Five and Six of the indictment and the
20  maximum penalties provided for by law for those crimes?
21          THE DEFENDANT:  Yes, I do, your Honor.
22          THE COURT:  And Counts Seven through Thirteen of the
23  indictment charge you with wire fraud.  Each of these counts
24  carries a maximum possible sentence of 20 years in prison, a
25  maximum fine of the greatest of $250,000 or twice the gross
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    7

82FVBENP                    Plea
1   pecuniary gain derived from the offense or twice the gross
2   pecuniary loss to a person other than yourself as a result of
3   the offense, a $100 special assessment, and a maximum term of
4   supervised release of three years.
5           Do you understand that those are the charges in Counts
6   Seven through Thirteen, and the maximum penalties under the
7   statute for those charges?
8           THE DEFENDANT:  Yes, I do, your Honor.
9           THE COURT:  All right.  Count Fourteen charges you
10  with making material misstatements to auditors.  And this crime
11  carries a maximum sentence of 20 years imprisonment, a maximum
12  fine of $5,000,000 or twice the gross pecuniary gain derived
13  from the offense or twice the gross pecuniary loss to a person
14  other than yourself as a result of the offense, a $100 special
15  assessment, and a maximum term of supervised release of three
16  years.
17          Do you understand that that is the crime charged in
18  Count Fourteen of the indictment, and the maximum penalty
19  provided for by statute for Count Fourteen?
20          THE DEFENDANT:  Yes, I do, your Honor.
21          THE COURT:  Count Fifteen of the indictment charges
22  you with bank fraud.  And this crime carries a maximum sentence
23  of 30 years in prison, a maximum fine of the greatest of
24  $1,000,000 or twice the gross pecuniary gain derived from the
25  offense or twice the gross pecuniary loss to a person other
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    8

82FVBENP                    Plea
1   than yourself as a result of the offense, a $100 special
2   assessment, and a maximum term of supervised release of five
3   years.
4           Do you understand that that is the charge in Count
5   Fifteen, and that those are the maximum penalties provided for
6   by law?
7           THE DEFENDANT:  Yes, your Honor.  Forgive me, yes,
8   your Honor.
9           THE COURT:  Counts Sixteen through Twenty charge you
10  with money laundering.  Each of these counts carries a maximum
11  possible sentence of ten years imprisonment, a maximum fine of
12  the greatest of $250,000, twice the gross pecuniary gain
13  derived from the offense or twice the gross pecuniary loss to a
14  person other than yourself as a result of the offense, and a
15  $100 mandatory special assessment, and a maximum supervised
16  release term of five years.
17          Do you understand that those are the crimes charged in
18  Counts Sixteen through Twenty, and the maximum possible penalty
19  provided by law?
20          THE DEFENDANT:  Yes, your Honor.
21          THE COURT:  Do you also understand that the Court must
22  impose an order of restitution by law?
23          THE DEFENDANT:  Yes, your Honor.
                        Page 4

Bennett Transcript.txt

```
24          THE COURT:  And do you understand that you are also
25     subject to mandatory asset forfeiture?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    9
```
       82FVBENP              Plea
 1          THE DEFENDANT:  Yes, your Honor.
 2          THE COURT:  And do you understand that you have the
 3     right to plead not guilty and the right to a trial on the
 4     charges against you and, in fact, the right to a jury trial?
 5          THE DEFENDANT:  Yes, your Honor.
 6          THE COURT:  At this time, I'd ask the government to
 7     recite the elements of the crimes charged.
 8          MR. BAROFSKY:  Yes, your Honor.  For Count One,
 9     conspiracy, the government would have to prove the following
10     elements:
11          First, that an agreement or understanding existed to
12     commit the objects charged in the indictment.  Second, the
13     defendant knowingly became a member of that agreement or
14     understanding.  And third, that one of the conspirators
15     knowingly committed at least one overt act in furtherance of
16     the conspiracy during the life of the conspiracy.
17          With respect to Counts Two and Three, securities
18     fraud, the government would have to prove, first, that Bennett,
19     in connection with the purchase or sale of securities, and for
20     Count Two, that would be the notes described in the indictment,
21     and in Count Three, the common stock of Refco described in the
22     indictment, he did one or more of the following:  He either
23     employed a device, scheme, or artifice to defraud or made an
24     untrue statement of a material fact or omitted to state a
25     material fact which made what was said under the circumstances
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                   10
```
       82FVBENP              Plea
 1     misleading or engage in an act, practice, or course of business
 2     that operated or would operate as a fraud or deceit on a
 3     purchaser or seller.  Second, that Bennett acted knowingly,
 4     willfully, and with intent to defraud.  And, third, that he
 5     used or caused to be used any means or instruments of
 6     transportation or communication in interstate commerce, but he
 7     used the mails in furtherance of the fraudulent conduct.
 8          With respect to Count Four, which charges false filing
 9     under the Exchange Act, the first element the government would
10     have to prove is that Refco was required by the Securities
11     Exchange Act of 1934 to file the 10-K that's described in Count
12     Four.  And, second, the defendant knowingly and willfully made
13     or caused to be made a materially false or misleading statement
14     in that document or omitted to state any material fact required
15     to be stated therein or necessary to make the statements
16     therein not misleading.
17          With respect to Counts Five and Six, false filings
18     under the Securities Act, the government would have to prove,
19     again, first, that Refco was required under the Securities Act
20     of 1933 to file the S4, which is described in Count Five, and
21     the S1 registration statement described in Count Six.  And,
22     second, that Bennett knowingly and willfully made or caused to
23     be made a materially false or misleading statement in those
24     documents or omitted to state any material fact required to be
25     state therein or necessary to make the statements therein not
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                   11
                          Page 5

Bennett Transcript.txt

82FVBENP                    Plea
1  misleading.
2         With respect to Counts Seven through Thirteen of wire
3  fraud, the government would have to prove, first, that a scheme
4  to defraud must have existed; that Bennett must have
5  participated in the scheme with intent to defraud; that
6  misrepresentations or omissions must have related to material
7  facts were made in furtherance of the fraud; that the scheme
8  was executed to obtain money or property; and that in the
9  execution of the scheme, Bennett used or caused to be used the
10 interstate wires listed in the indictment.  And here for Count
11 Seven is the June 22nd of 2004 email from Robert Trosten; in
12 Count Eight, the August 3, '04 email from Robert Trosten; in
13 Count Nine, the April 6, '05 transmission of the S4 from New
14 York to Virginia; in Count Ten, the July 19th, 2005
15 transmission of 10-K from New York to Virginia; in Count
16 Eleven, the August 5th, 2004 transmission of $4,000,000 from
17 New York to Illinois; in Count Twelve, the August 5th, 2004
18 transmission of $40,000,000 from New York to Illinois; and in
19 Count Thirteen, the August 8th, 2005 transmission of the S1
20 registration statement from New York to Virginia.
21         For Count Fourteen, material misstatements to
22 auditors, the government would have to prove, first, that Refco
23 was a public company that was required to submit financial
24 statements to the SEC; second, that Bennett was a
25 director/officer of Refco; third, Bennett knowingly and
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

82FVBENP                    Plea
1  willfully made, caused to be made, a materially false or
2  misleading statement or omitted to state a material fact
3  necessary order to make the statements made in light of the
4  circumstances under which such statements were made not
5  misleading to an accountant, and that the statement was made in
6  connection with the audit or examination of the financial
7  statements of Refco required to be made pursuant to the Act.
8         Count Fifteen charges the defendant with bank fraud.
9  And specifically, that on August 5th, 2004, defrauded HSBC.
10 And the government would have to prove, first, there was a
11 scheme to defraud a bank by means of materially false or
12 fraudulent pretenses, representations, or promises; second,
13 that Bennett executed or attempted to execute the scheme with
14 intent to defraud the bank, here, again, HSBC; and third, at
15 the time of the execution of the scheme, HSBC had its deposits
16 insured by the FDIC.  And I'll represent to the Court that at
17 the relevant time periods, HSBC's deposits were insured by the
18 FDIC.
19         And finally, Counts Sixteen through Twenty charge the
20 defendant with money laundering.  And the government would have
21 to prove, first, that Bennett engaged or attempted to engage in
22 monetary transactions involving criminally derived property of
23 a value greater than $10,000; second, that the property
24 involved in the monetary transaction was, in fact, derived and
25 specified unlawful activity; third, that Bennett acted
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

82FVBENP                    Plea
1  knowingly.  And for these purposes, wire fraud, bank fraud, and
2  securities fraud are all specified unlawful activities and
3  would have to prove each of the transactions listed in the
4  indictment in Counts Sixteen through Twenty, basically the wire
                        Page 6

Bennett Transcript.txt

 5  transactions which are described therein.
 6          THE COURT:  Mr. Bennett, do you understand that if you
 7  pled not guilty and went to trial, that the burden would be on
 8  the government to prove each and every element of every crime
 9  charged beyond a reasonable doubt in order to convict you of
10  that crime?
11          THE DEFENDANT:  I do, your Honor.
12          THE COURT:  Do you understand that at a trial you
13  would have the right to be represented by an attorney at all
14  stages of the proceeding and, if necessary, an attorney would
15  be appointed for you?
16          THE DEFENDANT:  Yes, I do.
17          THE COURT:  And do you understand that at a trial you
18  would have the right to confront and cross-examine witnesses
19  and the right not to be compelled to incriminate yourself?
20          THE DEFENDANT:  I do, your Honor.
21          THE COURT:  And do you understand that at a trial you
22  would be presumed innocent until such time, if ever, the
23  government established your guilt by competent evidence to the
24  satisfaction of the trier of fact beyond a reasonable doubt?
25          THE DEFENDANT:  Yes, your Honor.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                            14

82FVBENP              Plea
 1          THE COURT:  And do you understand that at a trial you
 2  would have the right to testify and would also be entitled to
 3  compulsory process; in other words, the right to call other
 4  witnesses on your behalf?
 5          THE DEFENDANT:  Yes, your Honor.
 6          THE COURT:  And do you understand that if your plea is
 7  accepted, that there will be no further trial of any kind, so
 8  that by pleading guilty, you are waiving your right to a trial?
 9          THE DEFENDANT:  I do understand that, your Honor, yes.
10          THE COURT:  And do you understand that if you are
11  sentenced to a period of supervised release, and if you violate
12  the terms of your supervised release, that an additional period
13  of jail time may be imposed without credit for the time that
14  you've previously spent on supervised release?
15          THE DEFENDANT:  Yes, your Honor.
16          THE COURT:  Do you understand that in connection with
17  your plea of guilty, that the Court may ask you certain
18  questions about the offense to which you have pled; and if you
19  answer those questions under oath and on the record and in the
20  presence of your counsel, that your answers are false may later
21  be used against you in a prosecution against you for perjury or
22  false statement?
23          THE DEFENDANT:  Yes, your Honor.
24          THE COURT:  And I recall, Mr. Bennett, you're a
25  citizen of Great Britain.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                            15

82FVBENP              Plea
 1          THE DEFENDANT:  I am, your Honor, yes.
 2          THE COURT:  Do you understand that following any
 3  sentence that you receive, that you will likely be deported?
 4          THE DEFENDANT:  That is my understanding, your Honor,
 5  yes.
 6          THE COURT:  And do you understand that in determining
 7  your sentence, that the Court is obligated to calculate the
 8  applicable sentencing guidelines range, and to consider that
 9  range and any possible departures under the guidelines and
                      Page 7

Bennett Transcript.txt
```
10   other sentencing factors under the statute which entitles the
11   Court to consider the nature and circumstances of the offense
12   and the history and characteristics of the defendant?
13            THE DEFENDANT:  Yes, your Honor.
14            THE COURT:  And have you reviewed with your counsel
15   the government's letter to them of yesterday which explains the
16   government's position as to the sentence that you face if the
17   sentencing guidelines are applied to your case?
18            THE DEFENDANT:  I have reviewed it, your Honor,
19   correct.
20            THE COURT:  Actually, that was said very badly.  Let
21   me just try it again so that there's no confusion.
22            Have you reviewed that letter with your lawyers which
23   sets forth the government's calculation of the sentence that
24   you face under the sentencing guidelines?
25            THE DEFENDANT:  I have reviewed it.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    16
82FVBENP               Plea
```
 1            THE COURT:  And do you understand that the government
 2   calculates that under the guidelines, that you face a sentence
 3   of life imprisonment; and that it has calculated that the
 4   maximum possible statutory sentence is 315 years; and that the
 5   fine range is from 25,000 to $5,000,000?
 6            THE DEFENDANT:  I understand that, your Honor,
 7   correct.
 8            THE COURT:  And do you understand that that
 9   calculation by the guidelines -- that by the government is just
10   based on the information they currently have?
11            THE DEFENDANT:  Yes, your Honor.
12            THE COURT:  And do you further understand that the
13   government's letter doesn't bind either the Court or the
14   probation department, and that ultimately the sentence that you
15   receive will be determined by the Court?
16            THE DEFENDANT:  Yes, your Honor.
17            THE COURT:  Mr. Bennett, have any threats or promises
18   been made to you to make you plead guilty?
19            THE DEFENDANT:  No, your Honor.
20            THE COURT:  Have any understandings or promises been
21   made to you concerning the sentence that you will receive?
22            THE DEFENDANT:  None.
23            THE COURT:  Is your plea voluntary?
24            THE DEFENDANT:  It is, your Honor.
25            THE COURT:  Mr. Bennett, did you commit the crimes
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    17
82FVBENP               Plea
```
 1   that you've been charged with in the indictment?
 2            THE DEFENDANT:  I did, your Honor.
 3            THE COURT:  Would you tell me in your own words what
 4   you did?
 5            THE DEFENDANT:  Your Honor, during the period that I
 6   served as CEO of Refco, I agreed with other Refco executives to
 7   enter into a series of transactions at the end of Refco's
 8   financial reporting periods to make it appear as if a
 9   receivable due to Refco from Refco Upholdings, Inc., a related
10   party, was instead due from an independent third-party
11   customer.
12            The IGHI receivable was composed of, amongst other
13   things, historical customer losses, bad debts, and expenses
14   that IGHI had incurred on behalf of Refco.
```
                              Page 8

Bennett Transcript.txt

```
15          I, along with other Refco executives, have caused
16   Refco to enter into these transactions in order to conceal the
17   size and nature of the IGHI receivable.  We concealed the
18   receivable from, amongst others, Refco's auditors, Thomas H.
19   Lee Partners, various lenders who, in 2004, participated in
20   Refco's senior secured credit facility, and the issuance of 9
21   percent senior subordinated notes, and also investors in
22   Refco's common stock.
23          Among the lenders to whom I knowingly caused the IGHI
24   receivable to be misrepresented was HSBC Bank, referenced in
25   Count Fifteen of the indictment.  I and other Refco executives
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

                                                                    18

```
     82FVBENP              Plea
1    also used the interstate wires to accomplish these acts within
2    this district, as referenced in Counts Seven through Thirteen.
3    Furthermore, I caused funds obtained from the transaction with
4    Thomas H. Lee Partners, referenced in paragraph 34 of the
5    indictment, to be wired to various parties receiving proceeds
6    from the transaction, as referenced in Counts Sixteen through
7    Twenty, knowing that this money had been unlawfully obtained.
8          The IGHI receivable and related party transaction used
9    to conceal it were material information that Refco investors
10   and lenders would have wanted to have known prior to investing
11   in or lending money to Refco.  while I believed that I would be
12   able to pay the IGHI receivable down over time, and did, in
13   fact, ultimately pay off the receivable balance in its
14   entirety, I knew that failing to disclose the receivable was
15   wrong; I knew that obtaining funds from Refco's investors and
16   lenders based on misleading financial statements was also
17   wrong.
18         I also caused Refco to file documents with the SEC,
19   namely S1, S4, and 10-K that did not disclose the full extent
20   of the IGHI receivable or the transactions used to conceal it;
21   and, thus, were false and misleading with respect to material
22   facts.  I knew that failing to disclose these facts in public
23   filings and in connection with Refco's sale and registration of
24   Refco's notes and common stock was wrong, and I deeply regret
25   having done so.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

                                                                    19

```
     82FVBENP              Plea
1          Your Honor, I take full responsibility for my actions.
2    I wish to publicly apologize to my family and to all of those
3    who have been harmed by my conduct.  Thank you, your Honor.
4          THE COURT:  Mr. Barofsky, is there anything else you
5    would want me to ask the defendant?
6          MR. BAROFSKY:  Your Honor, can we just have a moment
7    to review?  There's a lot of elements.  Thank you, your Honor.
8          THE COURT:  Certainly.
9          (Pause)
10         MR. BAROFSKY:  Your Honor, just a couple of areas for
11   clarification.  First, if you can please ask the defendant to
12   confirm that he was a director or officer of Refco during this
13   relevant time period.  Should I go one-by-one?
14         THE COURT:  Mr. Bennett, can you confirm that?
15         THE DEFENDANT:  I was, your Honor.
16         MR. BAROFSKY:  Second, Your Honor, that the
17   misstatements made about Refco's auditor was in connection with
18   the auditor's preparation of a financial statement, and that
19   occurred after April of 2005.
                            Page 9
```

Bennett Transcript.txt
20      THE COURT:  Can you confirm that?
21      THE DEFENDANT:  That's correct, your Honor.
22      MR. BAROFSKY:  Your Honor, and if you can ask the
23  defendant to confirm he made reference to various wire
24  transfers and wire communications, as well as certain filings
25  in the indictment, if you could please confirm with the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

82FVBENP                    Plea
1  defendant that those acts occurred on or about the dates set
2  forth in the indictment.
3      THE DEFENDANT:  They did, your Honor.
4      MR. BAROFSKY:  And finally, your Honor, as I noted
5  earlier, I will represent to the Court that HSBC was --
6  deposits were insured by the FDIC during the relevant time
7  period; and also that Refco was an entity that was required to
8  file the various reports and documents and registration
9  statements under the Exchange Acts of 1933 and 1934, as well as
10  to file financial statements with respect to the 10-K and the
11  misstatement to auditors account.  Thank you, your Honor.
12      THE COURT:  Mr. Bennett, do you still wish to plead
13  guilty?
14      THE DEFENDANT:  I do, your Honor, yes.
15      THE COURT:  Mr. Naftalis, do you know of any reason
16  that Mr. Bennett ought not plead guilty?
17      MR. NAFTALIS:  No, your Honor.
18      THE COURT:  Mr. Bennett, I'm satisfied that you
19  understand the nature of the charge against you and the
20  consequences of your plea; and that your plea is made
21  voluntarily and knowingly; and that there is a factual basis
22  for it.  Accordingly, I will accept your plea of guilty and
23  direct that a presentence report be prepared.
24      THE DEFENDANT:  Thank you, your Honor.
25      THE COURT:  As for a sentencing date, can I just
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

82FVBENP                    Plea
1  basically count out the requisite number of days or does the
2  government have a view that it should be maybe a little bit
3  more off into the future in light of the trial that's still
4  upcoming?
5      MR. BAROFSKY:  Your Honor, we think we can be prepared
6  in three months.
7      THE COURT:  All right.  Why don't we set sentencing
8  for May 20th at 4 o'clock.  And since I would anticipate some
9  significant presentence submissions, I think we should set a
10  schedule for that.  Why don't we say that the government's
11  submission is due -- the defense submission is due on May 6th,
12  and the government's on May 13th.
13      MR. BAROFSKY:  That's fine, your Honor.
14      MR. NAFTALIS:  Your Honor, if there are things in the
15  government submission that we want to respond to, that's sort
16  of --
17      THE COURT:  Doesn't give you quite enough time.
18      MR. NAFTALIS:  We don't have -- you're having us
19  first, so we don't really sort of provide -- they could go
20  first, we could go second; we wouldn't object to that.
21      MR. BAROFSKY:  We could do simultaneous submissions,
22  as well, your Honor, on the 6th and then we could each respond.
23      THE COURT:  Sounds like fun.
24      MR. BAROFSKY:  Okay.
Page 10

Bennett Transcript.txt
25              MR. NAFTALIS:  It's a living.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

22

82FVBENP                      Plea
 1              THE COURT:  Let's not go there.  Okay?  Are we done?
 2              MR. BAROFSKY:  No, your Honor.  There is the issue of
 3      bail.  And at this time, your Honor, the government does
 4      request that defendant be remanded.  And if your Honor will let
 5      me, I would like to speak briefly on the topic.
 6              THE COURT:  Okay.
 7              MR. BAROFSKY:  Obviously the standard has changed
 8      under the Bail Act under 3143.  Before when we appeared before
 9      your Honor several years ago, the burden was ours to prove the
10      defendant was a risk of flight.  Now, of course, it is the
11      defendant's burden to prove by clear and convincing evidence
12      that he is not likely to flee.  And respectfully, we submit
13      that there have been some extremely significant changed
14      circumstances, that we respectfully submit the defendant cannot
15      meet the burden in this case.
16              First of all, under the current bond, which, as your
17      Honor may recall, is a $50,000,000 bond, secured by $5,000,000
18      in cash and two properties, that security is now essentially
19      worthless; it's essentially an unsecured bond, because all of
20      those properties and that money are subject to asset
21      forfeiture.  The $5,000,000 we have traced as direct proceeds
22      from the IPO, which the defendant has just admitted was money
23      that was fraudulently obtained, and we already have lis pendens
24      on both of the properties, because basically under substitute
25      assets, we'd be able to take those, as well.  Those are all
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

23

82FVBENP                      Plea
 1      subject to asset forfeiture and, therefore, don't provide any
 2      security for the existing bond.
 3              Secondly, the defendant is facing a $2.4 billion asset
 4      forfeiture.  We don't think he has $2.4 billion, but we do
 5      believe that will essentially -- through proceeds and
 6      substitute assets, once this conviction is final -- will
 7      basically deprive the defendant of all of his assets.  We have
 8      restrained a number of his assets pretrial, but we have not
 9      been able to restrain assets that we haven't been able to prove
10      are directly traceable.  And we don't know the exact amount of
11      those items, but we believe that they are in the $20,000,000
12      range, which would certainly facilitate the ability of the
13      defendant to flee.
14              Third, and I guess the most obvious point, is the
15      defendant now faces an advisory guideline range of 315 years of
16      imprisonment.  And that obviously changes the calculus a lot
17      from when we last appeared before your Honor.  We're not
18      suggesting that your Honor is going to --
19              THE COURT:  He always faced that, right?
20              MR. BAROFSKY:  Yes, your Honor; but before,
21      pretrial -- I'm sorry, pre-guilty plea, there was no certainty
22      that he was necessarily going to be convicted in this case.
23      Now, jail is an inevitability.  And I don't mean to presume
24      what the ultimate sentence will be in this case, because
25      there's obviously no way to predict what the precise sentence
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

24

82FVBENP                      Plea
                              Page 11

Bennett Transcript.txt

1   will be, but the best guess, I think, from anyone's
2   perspective, is that it will be a substantial prison sentence.
3   And for this defendant -- he is now with certainty facing such
4   a sentence that has -- under the guidelines is the equivalent
5   of a life sentence.
6           Defendant is 59 years old.  A sentence of -- a
7   significant sentence in this case may very well prove to be the
8   equivalent of a life sentence.  The defendant is facing certain
9   deportation after he serves that sentence.
10          THE COURT:  Not to a bad place though.
11          MR. BAROFSKY:  Not to a bad place, your Honor.  But it
12  does give the defendant a tremendous incentive to self-deport.
13  In other words, to flee the jurisdiction really with -- unlike
14  most cases, with very little downside.  The worse that happens
15  if he flees and gets caught is he's brought back to the United
16  States and does a jail sentence that probably will be the rest
17  of his life.  If he stays, he's facing pretty much the prospect
18  of the same result, a sentence that may, in fact, result in him
19  being in jail for the rest of his life, given his age.
20          And, your Honor, we respectfully submit that given the
21  shifting of the burden in these really remarkable circumstances
22  of a defendant who's not a U.S. citizen, who's facing the
23  equivalent of a life sentence, and who's now basically would be
24  free on an unsecured bond, that the circumstances dictate the
25  defendant should start serving his sentence, in effect,

82FVBENP                     Plea
1   immediately.  And the defendant should be remanded on the
2   grounds that he cannot meet his burden of demonstrating by
3   clear and convincing evidence that he is not a risk of flight.
4           THE COURT:  Mr. Naftalis.
5           MR. NAFTALIS:  Most respectfully, I find this
6   application most surprising and a baseless one.  And I say it
7   with -- most advisedly.
8           You have a situation here where our client, for almost
9   two and-a-half years, has met every single condition of the
10  bond that was set here.  Your Honor got a report today from the
11  office of pretrial services, which we were given a copy of when
12  we entered the room, in which the office of pretrial services
13  has pointed out that he has complied with the terms of his bail
14  all the way through.
15          And I can sort of punctuate that a little bit because,
16  in fact, if you check with Officer Forelli, who he deals with
17  in pretrial services, you could hear anecdotal information such
18  as Mr. Bennett was the one who has set up the monitoring system
19  in the house in New Jersey because, whatever, I guess they're
20  technophobes, like I, the marshals service, he actually set up
21  the monitoring service which passed their muster in the
22  electronic stuff.  Once, when his bracelet broke down, he
23  immediately reported it to Officer Forelli that it was
24  malfunctioning and he went in.  He's been meticulous in
25  reporting to these people.

82FVBENP                     Plea
1           And secondly, something that the government
2   consciously avoided bringing to your attention, his bond is
3   signed by the three immediate members of his family.  The three
4   of them who are American citizens:  His wife, his daughter, and
5   his son.  They have signed a $50,000,000 bond on his behalf,

Bennett Transcript.txt

 6  and these are people with roots in the community.  The daughter
 7  is a lawyer, works at a law firm; the son is an investment
 8  banker with a leading firm.  The notion that he would run away
 9  and do that to his family, I mean, is incomprehensible.  And
10  all we have is rhetoric from the government there.
11          You also have the strict monitoring conditions in
12  which he's under and which he's faithfully complied with for
13  the last two and-a-half years.  Of course, he has no passport;
14  his wife has given up his passport; he has no effective way of
15  leaving the country.
16          And with respect to other situations, in other
17  situations in high-profile cases where people were facing
18  enormous sentences, no such applications were ever granted.
19  For example, the Computer Associates case, where the CEO of
20  Computer Associates, Mr. Kumar, who, under the guidelines which
21  were then in effect, more applicable now, after the Gall case,
22  the guidelines are just, you know, one ingredient in the soup
23  for your Honor to consider under 3533.  He faced life
24  imprisonment under his guidelines.  After pleading guilty, he
25  continued to be free on bond, even though there were admissions
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                        27
82FVBENP          Plea
 1  of obstruction of justice in that case.
 2          After Kumar was sentenced or he got a 12-year
 3  sentence, he continued to be allowed to be -- remained free on
 4  bond to work out various issues of restitution and the like.
 5          In the case in front of Judge Sand, the Adelphia case,
 6  which is one of the cases, the Rigases, who got 15 and 20-year
 7  sentences, one of them was an eighty -- somewhere in his
 8  eighties, they were allowed to remain free on bond pending
 9  appeal, even though they had the same sort of issues.  Even
10  Mr. Ebbers, who received the largest sentence in history I've
11  ever heard of, a real outlier sentence, 25 years, he was
12  allowed to remain free on bond pending appeal and the like.
13          And apart from the fact that there is not the
14  slightest bit of evidence for this most unfair application,
15  it's also prejudicial.  As your Honor knows, we have to put in
16  sentencing submissions.  And under 3533, your Honor has a lot
17  of things which you can properly consider in determining in
18  your best judgment what's a fair and just sentence under the
19  case here.  And obviously it's very prejudicial to us in being
20  able to work with our client, who for the last two and-a-half
21  years has been coming to our office every day on a daily basis
22  to work on the case with us.  So I don't see any good-faith
23  basis for any change in bond here whatsoever.
24          THE COURT:  Mr. Barofsky.
25          MR. BAROFSKY:  Your Honor, if there's any specific
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                        28
82FVBENP          Plea
 1  points you'd like me to respond to.  The ones that jump out to
 2  me is, I mean the notion that a defendant can't chronically
 3  prepare for sentencing when he's incarcerated, obviously your
 4  Honor knows countless defendants who are able to prepare for
 5  sentencing when they are incarcerated; and having spent so much
 6  time with Mr. Naftalis, I think they are pretty much -- I'm
 7  sure they have contemplated this before, this is not the first
 8  time.
 9          As opposed to those other cases, defendants who are
10  released pending appeal after they've been convicted at trial
                        Page 13

Bennett Transcript.txt

11  is a different situation.  There's obviously provisions within
12  3143 when there are issues on appeal that the judge finds are
13  significant issues that need to be considered and possibly
14  could result in the reversal of a conviction.  That's a
15  different -- those are different facts, and that's a different
16  standard.  Here, we have a guilty plea.  I don't think that
17  Mr. Bennett is going to be challenging his conviction in this
18  case.  He just gave a very detailed guilty plea.
19      With respect to his assurances to his family, I don't
20  mean to minimize the bond between Mr. Bennett and his family,
21  but on the flip side, we're looking at a man who just admitted
22  to telling a series of lies to a large number of victims that
23  resulted in the defrauding of $2.4 billion.  1.7 or 8 billion,
24  which we will show for restitution at the time of sentencing,
25  has not been collected.  People are out all of this money.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            29
    82FVBENP              Plea
1       So this man maybe may have some allegiance to his
2   family, but I think you have to look at the flip side as to how
3   strong that may be by a man if he is willing to tell whatever
4   lie is necessary to -- you know, on proportions that are
5   mind-boggling, in the billions of dollars.
6       So we would respectfully submit that -- and we don't
7   contest the fact, by the way, to be clear, that Mr. Bennett has
8   complied with the conditions.  And that is certainly a relevant
9   factor that Mr. Naftalis points out and we don't contest it.
10  We just don't think that that's enough to meet his burden,
11  given his changed circumstances.  And that to allow a defendant
12  like this, who's also not a U.S. citizen, unlike those
13  individuals, out on what is essentially an unsecured bond, it
14  simply isn't the right course of action here.
15      MR. NAFTALIS:  Just one small point, which they
16  reminded me to mention.  Although Mr. Bennett never changed his
17  citizenship, like his wife, or became an American citizen like
18  his children, he's lived in the United States for more than 30
19  years; so it's not like he has any roots anyplace else.  So
20  it's a little unfair for this eleventh-hour application which
21  we heard about today to suggest as if he had someplace to go
22  to.
23      And the government ignored the situation in the Kumar
24  case.  He said that all these other cases where people were on
25  appeal.  In the Kumar case it was a plea of guilty with someone
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            30
    82FVBENP              Plea
1   facing, if one took the government's view of the thing, a life
2   sentence.  And he was allowed out, and he showed up.  Even
3   after he got his sentence of 12 years he remained out on bond
4   to work out the restitution things.
5       And we don't necessarily agree at all with the amount
6   of the forfeiture issues here.  I mean there's a forfeiture
7   issue in the case, but the numbers he tosses around are not
8   numbers that we have stipulated to or agreed to by any stretch
9   of the imagination, and he throws them around.
10      That's the only point I wanted to make.
11      THE COURT:  All right.  I'm not going to remand
12  Mr. Bennett, although I do think I can modify his bail
13  conditions to create greater security.  And I'm not going to do
14  so for a number of reasons, the most important of which is that
15  this indictment was filed in 2005.
                        Page 14

Bennett Transcript.txt

16     If Mr. Bennett had wanted to flee, he should have fled
17 before he paid his lawyers all the money, and kept it, and gone
18 to an appealing location.  In fact, having pled guilty, to
19 leave now, extraditing him will be much easier.  So there's a
20 balance there.
21     In addition, I note that just by statute, to release
22 someone on appeal requires the same finding as the finding now.
23 The judicial officer has to be persuaded by clear and
24 convincing evidence that the person is not likely to flee.
25 That's half of the standard.  The appellate issue is the other
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

82FVBENP               Plea
1 half, so it's the same standard.
2     And I also think that -- and I want to make it
3 clear -- that I don't make any prejudgments about the substance
4 of the case, but this is a case in which there has been a lot
5 of information, publicly, at least, from the bankruptcy
6 proceeding, and so this is a situation in which Mr. Bennett has
7 had the opportunity to see an examiner put the evidence
8 together.  This is not a situation where as the case approaches
9 trial, the government finally turns over information.  I think
10 Mr. Bennett has had a pretty good idea of the nature of the
11 case and the evidence for at least some time, which makes the
12 fact that he stays more significant.
13     The pretrial officer tells me that it would be easier
14 and more effective to monitor Mr. Bennett if he stayed in one
15 home or the other.  And, I guess -- and tells me that basically
16 the minute he leaves home they know about it.  So given that it
17 would take some time to -- since make an escape without a
18 passport, I think that if we modified the bail conditions to
19 limit his location, pretrial tells me that that makes it a more
20 secure situation.  In addition, if the government has any
21 particular practical economic conditions that you can think of,
22 I'm always willing to listen to those.
23     MR. BAROFSKY:  Your Honor, the posting of additional
24 assets by the defendant, they are largely forfeitable assets,
25 but to the extent that there are assets that have not been --
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

82FVBENP               Plea
1 as I said, we estimate that it's in the range of approximately
2 $20,000,000.  If we could at least secure those assets, these
3 are assets that we've not yet secured by having him posted for
4 the bond.
5     In addition, because, frankly, we're going to get
6 those assets anyhow at the conclusion of this case, perhaps the
7 posting the requiring of assets from the children.  He
8 mentioned that the children are successful, one's an investment
9 banker.  And if they have property, that may increase the
10 incentive for Mr. Bennett to stay.
11     THE COURT:  I think it's enough that he's -- the bond
12 mortgages their future if he flees.  We're not taking his kids'
13 money.
14     MR. BAROFSKY:  We aren't.  I wouldn't suggest that we
15 would take it other than if he fled.  We would only be posting
16 whatever interest.  Because really right now the problem, your
17 Honor, and I hear what your Honor is saying, is that he has an
18 unsecured bond, and that just causes us a great deal of
19 concern.  I don't know what the circumstances are in Kumar or
20 Ebbers, but this is a situation if there is a third party
Page 15

Bennett Transcript.txt
```
21  posting collateral --
22          THE COURT:  For all those people, the bottom line is
23  that for any defendant who was older and who was facing
24  sentencing, in, lets call it, the post-Enron era, the situation
25  was the same as for Mr. Bennett.  The possibility that their
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    33

82FVBENP                    Plea
```
 1  sentence would be -- that their residence in the Bureau of
 2  Prisons was the last residence they are going to have.
 3          So I don't think this is really dramatically
 4  different.  And I don't think the fact that he's a British
 5  citizen changes the situation, that he has to -- I think he
 6  gets the credit for having complied with all of his bail
 7  conditions and having had two and-a-half years to reflect.
 8          MR. BAROFSKY:  Your Honor, to be clear, I wasn't
 9  rearguing the bail application.  I was merely trying to respond
10  to your Honor's question whether there were additional economic
11  circumstances.
12          THE COURT:  I'm not asking his children, okay?
13          MR. BAROFSKY:  Well, your Honor, then I would ask that
14  in the alternative, if the defendant could post additional
15  property or money that has not been seized or frozen by the
16  government to secure this bond to at least increase so that
17  there's some notional security of the bond.  And I would ask
18  for a number of $10,000,000 in cash or property.
19          MR. NAFTALIS:  Your Honor, I just think there is no
20  basis whatsoever for the application.  His children, the most
21  important things in the world, are on the hook for $50,000,000
22  if he were to leave.  As they've indicated, they don't have any
23  evidence of anything that he's ever done anything which would
24  indicate he would leave.  As your Honor said, quite correctly,
25  we've known about the evidence in this case; your Honor
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    34

82FVBENP                    Plea
```
 1  remembers the litigation with respect to the bankruptcy trusts,
 2  these report the motion practice there.  There's no secret
 3  about that.  He's showed up all the time; he's complied with
 4  all the conditions.  And there's not a reason in the world and
 5  there's not a basis in the world for any change here
 6  whatsoever.
 7          MR. BAROFSKY:  Your Honor, respectfully, I don't see
 8  any harm in having him post additional property that could only
 9  be used at this time for the purposes to facilitate flight.  He
10  can't transfer these properties without violating the money
11  laundering laws at this point, and I don't see -- I don't even
12  understand how upping the collateral so as to prevent him from
13  fleeing prejudices him in any way.  And we're not asking even
14  for all of the money that we believe is out there, we're asking
15  for $10,000,000 to provide some additional security on what is
16  now an essentially an uncollateralized bond.  It doesn't really
17  move the ball tremendously for us, but it helps.  And at least
18  it would limit his ability to flee, should he make that
19  decision, that it makes more sense to self-deport, since he's
20  going to be going back to England anyhow before he has to face
21  the sentence.  I don't think the government's request is
22  shocking or surprising or terribly dramatic, but we do think it
23  would help, given the situation.
24          MR. NAFTALIS:  They have not shown anything for this
25  eleventh-hour request.  It's totally and absolutely baseless.
```
                            Page 16

Bennett Transcript.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

35

82FVBENP                    Plea
1   And I don't think -- I don't know what property may or may not
2   exist, but I don't think that there's any justification.  And
3   they just can't come into court without any basis whatsoever
4   and allege things where all the evidence shows that this
5   application is frivolous.
6           MR. BAROFSKY:  Your Honor, I've listened to this for a
7   fair amount of time now.  And to characterize our application
8   as frivolous and baseless and eleventh-hour I think is unfair.
9           THE COURT:  At least the eleventh hour.
10          MR. BAROFSKY:  I don't know when we were supposed to
11  have made this application.  I don't know if Mr. Naftalis would
12  have had us make it when he notified us about the intent to
13  change his plea yesterday afternoon, I don't think so.  I think
14  the only time we can make a plea based on the changed
15  circumstance of the defendant entering a guilty plea is after
16  he enters the guilty plea.
17          As far as it being baseless, the notion that a
18  defendant who's facing 315 years of prison time --
19          THE COURT:  He wishes.
20          MR. BAROFSKY:  -- is -- that it's baseless to seek his
21  remand when he is an English citizen subject to deportation --
22          THE COURT:  Excuse me.  We're not -- we're sending him
23  to one of the most civilized countries in the world.  It's not
24  punishment to live in England, all right?
25          MR. BAROFSKY:  Exactly, your Honor, which is why we
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

36

82FVBENP                    Plea
1   would ask for additional collateral.
2           THE COURT:  And there is an extradition treaty between
3   the United States and Great Britain, so...
4           MR. BAROFSKY:  Your Honor, I just don't understand the
5   harm --
6           THE COURT:  Because I'm not sure that the purpose of
7   bail is to help you collect, you know, whatever you claim is
8   your eventual restitution.
9           MR. BAROFSKY:  Your Honor, if I wasn't clear on this
10  argument, I apologize.  The reason why we're asking for this is
11  to assure the defendant's appearance.  If that money is posted
12  as a bond, it's not so that we can eventually seize it.  If
13  it's posted as a bond, it's not available for him to use to
14  facilitate flight.  It's also to secure the bond.  This
15  original bond was issued because it was secured by money and
16  property.  Right now it's essentially not secured by money and
17  property.
18          THE COURT:  But that argument applies to any
19  additional money that he would put up.  You would say it was
20  just as forfeitable to you.  So it then becomes unsecured, the
21  same way.
22          MR. BAROFSKY:  But it's unrestrained property, Judge,
23  that's the difference.  This property is actually restrained on
24  top of the fact that it's -- because it's their direct
25  proceeds.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

37

82FVBENP                    Plea
1           What I'm suggesting, these are other properties that
                            Page 17

Bennett Transcript.txt

```
 2   have not been restrained, because we're not able to restrain
 3   certain properties that are not proceeds.  So this is money
 4   that is available to the defendant for use if he wants to
 5   facilitate flight.
 6          The purpose of a bond, obviously security of a bond,
 7   and why your Honor endorsed the order of a secured bond, was
 8   because more security means less likelihood of flight.  And all
 9   we're suggesting is taking this property that is now available
10   to the defendant and posting it as security for the bond.  And
11   obviously if we are unable to prove, as Mr. Naftalis suggests,
12   that this is property that's subject to asset forfeiture or
13   restitution, he'll get it back when -- at the time of his
14   sentencing or the time that he reports.
15          So we're not taking anything; we're not putting our
16   hands on stuff that we're not entitled to; we're just asking
17   that this bond be really secured, because right now we're
18   basically -- it's the exact same situation we had in October of
19   2005, when he's going out on the same conditions, it's
20   essentially an unsecured bond.  And I don't think that your
21   Honor would have ordered an unsecured bond back then, and we're
22   just asking for some additional security:  Money that is
23   available for the defendant or property, and that we have that
24   to secure the bond in case the defendant flees, and to
25   encourage him not to flee.
```

38

82FVBENP          Plea

```
 1          MR. NAFTALIS:  Apart from the fact that the government
 2   has proffered not a single fact that anything has changed, I
 3   don't agree with the notion that this bond is unsecured.  One
 4   of the homes which is securing the bond -- there's $5,000,000
 5   cash, there's two residences, is in a trust.  So without going
 6   through all the legalities, I don't think it's so quickly
 7   forfeitable, as they say.
 8          And the notion of ignoring -- and that will be worked
 9   out; we're not here to litigate that issue, but I just -- and
10   the notion that they can continue to ignore the fact that his
11   wife and children have signed a $50,000,000 bond that they will
12   be on the hook for and their lives will be ruined, the notion
13   there's not the slightest reason to suppose that he would do
14   this to his children, he never has, and I have nothing else to
15   say.
16          THE COURT:  I think $50,000,000 is a lot of money.
17   And it does directly affect wife, children, inheritances.  So
18   what about the issue of where he's going to live?
19          MR. NAFTALIS:  If your Honor wants -- feels it would
20   be better, pretrial services --
21          THE COURT:  That's what pretrial tells me.
22          MR. NAFTALIS:  I think he would -- there's a residence
23   in New York and a residence in New Jersey.  I think he would
24   prefer to be in New Jersey where his wife is, and then subject
25   to the fact he could just come to our offices and work with us,
```

39

82FVBENP          Plea

```
 1   which I think he's allowed to do, I think that would be his
 2   preference in terms of the quality of the life until the
 3   sentence, if that's --
 4          THE COURT:  I get the high sign from pretrial; so
 5   he'll stay in New Jersey.
 6          MR. NAFTALIS:  Okay.
```

Page 18

Bennett Transcript.txt

```
 7              THE COURT:  Other than when he goes to you and also
 8    when you have to get him to pretrial for -- to probation for
 9    his interview.
10              MR. NAFTALIS:  Yes.
11              THE COURT:  Which we do need to do within the two
12    weeks so that the sentencing schedule can proceed.  And the
13    same is true for the government's description of the crimes.
14              Okay?  I think we're done then.
15              MR. NAFTALIS:  Thank you, your Honor.
16              MR. BAROFSKY:  Thank you, your Honor.
17              MR. GARCIA:  Thank you, your Honor.
18              THE DEFENDANT:  Thank you, your Honor.
19                            *    *    *
20
21
22
23
24
25
```

# EXHIBIT 1(c)

Trosten Transcript.txt

1

82KATROPps
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3
3  UNITED STATES OF AMERICA,
4
4          v.                          05 CR 1192 (NRB)
4
5  ROBERT TROSTEN,
5
6                  Defendant.
6
7  ------------------------------x
7
8                                      New York, N.Y.
8                                      February 20, 2008
9                                      5:30 p.m.
9
10
10  Before:
11
11                  HON. NAOMI REICE BUCHWALD
12
12                                      District Judge
13
13
14                      APPEARANCES
14
15  MICHAEL J. GARCIA
15          Acting United States Attorney for the
16          Southern District of New York
16  BY:  CHRISTOPHER GARCIA
17       NEIL BAROFSKY
17       Assistant United States Attorneys
18
18  MORVILLO, ABRAMOWITZ, GRAND, IASON,
19  ANELLO & BOHRER, P.C.
19          Attorneys for Defendant
20  BY:  ROBERT G. MORVILLO
20       CHRISTOPHER J. MORVILLO
21       RACHEL M. KORENBLAT
21
22
22  Also Present:  Robert W. Manchak, Criminal Investigator
23                 Rua M. Kelly, Assistant United States Attorney
23                 Mary Beth Allen, Paralegal
24                 United States Attorney's Office
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          2
82KATROPps
1           (In open court)
2           THE CLERK:  The case is United States v. Robert
3  Trosten, Docket No. 05 Crim. 1192.  Is the government ready to
4  proceed?
5           MR. GARCIA:  Yes.  Good afternoon, your Honor.
6  Christopher Garcia on behalf of the government.  With me at
7  counsel table is Assistant United States Attorney Neil
8  Barofsky.  And with the Court's permission, also at counsel
9  table:  Robert Manchak, criminal investigator with our office;
                              Page 1

Trosten_Transcript.txt

```
10   Mary Beth Allen, paralegal with our office; and also Rua Kelly,
11   also an Assistant United States Attorney with our office.
12           THE CLERK:  And is the defense attorney ready to
13   proceed?
14           MR. R. MORVILLO:  We are, your Honor.  Mr. Trosten is
15   here.  For the record, my name is Robert Morvillo.  I represent
16   Mr. Trosten.  And seated to my left is Christopher Morvillo, my
17   co-counsel.
18           THE DEFENDANT:  Good afternoon.
19           THE COURT:  Good afternoon, Mr. Morvillo.
20           MR. R. MORVILLO:  I think it's my application, your
21   Honor.  We would apply to the Court for permission to withdraw
22   our previously entered plea of not guilty as to Counts One,
23   Two, Seven, Fifteen, and Seventeen of the indictment and enter
24   a plea of guilty.
25           THE COURT:  Mr. Trosten, if you will remain standing
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              3
     82KATROPps
 1   for a moment, would you raise your right hand, please.
 2           Do you solemnly swear that the answers to the
 3   questions I am about to ask you will be the truth, the whole
 4   truth, and nothing but the truth, so help you God?
 5           THE DEFENDANT:  I do, your Honor.
 6           THE COURT:  Would you state your full name for me,
 7   please.
 8           THE DEFENDANT:  Robert Charles Trosten, Sr.
 9           THE COURT:  And, Mr. Trosten, how old are you?
10           THE DEFENDANT:  38.
11           THE COURT:  Why don't you sit down.
12           THE DEFENDANT:  Thank you.
13           THE COURT:  Mr. Trosten, what was the last grade or
14   level of school that you completed?
15           THE DEFENDANT:  I finished undergraduate college with
16   a B.S. in accounting.
17           THE COURT:  At this time are you under the care of a
18   doctor or psychiatrist?
19           THE DEFENDANT:  Yes, I am.
20           THE COURT:  Which?
21           THE DEFENDANT:  A doctor -- a psychiatrist.
22           THE COURT:  And what condition is he treating you for?
23           THE DEFENDANT:  Dr. Neiman is treating me for sleep
24   and anxiety on occasion.
25           THE COURT:  And are you taking any medicine as a
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              4
     82KATROPps
 1   result of or in connection with that treatment?
 2           THE DEFENDANT:  I take sleep medicine as needed and
 3   anxiety medicine as needed.
 4           THE COURT:  At the moment, are you under the influence
 5   of any drug or alcohol?
 6           THE DEFENDANT:  No, I'm not.
 7           THE COURT:  Have you in fact ever been hospitalized or
 8   treated for either alcoholism or narcotics addiction?
 9           THE DEFENDANT:  No, I have not.
10           THE COURT:  And how are you feeling physically today?
11           THE DEFENDANT:  I feel great.
12           THE COURT:  Have you had sufficient time to discuss
13   the charges against you and your proposed plea with your
14   counsel, the Messrs. Morvillo?
```
                              Page 2

Trosten Transcript.txt
```
15              THE DEFENDANT:  I have, yes.
16              THE COURT:  And have you been satisfied with the
17    advice and counsel that they have given to you?
18              THE DEFENDANT:  I am.
19              THE COURT:  And at this time, are you ready to change
20    your plea?
21              THE DEFENDANT:  I am indeed.
22              THE COURT:  And what is your plea at the moment?
23    Guilty or not guilty?
24              THE DEFENDANT:  Guilty.
25              THE COURT:  All right.  Mr. Trosten, in order to
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                5
```
82KATROPps
 1    determine whether your plea is voluntary and made with a full
 2    understanding of the charges against you and the consequences
 3    of your plea, I will make certain statements to you and I will
 4    ask you certain questions.  I want you to understand that I
 5    need not accept your plea unless I am satisfied that you are in
 6    fact guilty and that you fully understand your rights.
 7              Now, Count One of the indictment charges you with a
 8    conspiracy to commit securities fraud, wire fraud, bank fraud,
 9    and money laundering, and to make false filings with the SEC
10    and material misstatements to auditors.  This crime carries a
11    maximum statutory penalty of five years in prison, a maximum
12    fine of the greatest of $250,000 or twice the gross pecuniary
13    gain derived from the offense or twice the gross pecuniary loss
14    to a person other than yourself as a result of the offense, a
15    $100 special assessment, and a mandatory term of supervised
16    release of three years.  Do you understand that those are the
17    charges in Count One and the maximum statutory penalties
18    provided for that charge?
19              THE DEFENDANT:  I do.
20              THE COURT:  Count Two charges you with securities
21    fraud.  And this crime carries a maximum possible sentence of
22    20 years in prison, a maximum fine of the greatest of $5
23    million or twice the gross pecuniary loss derived from the
24    offense, or twice the gross pecuniary loss -- I'm sorry.  I
25    think I said twice pecuniary loss.  It's twice the gross
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                6
```
82KATROPps
 1    pecuniary gain derived from the offense or twice the gross
 2    pecuniary loss to a person other than yourself as a result of
 3    the offense, a $100 special assessment, and a maximum term of
 4    supervised release of three years.  Do you understand that
 5    those are the charges in Count Two and the maximum possible
 6    penalties provided by law?
 7              THE DEFENDANT:  I do.
 8              THE COURT:  Count Seven charges you with wire fraud,
 9    and this crime carries a maximum possible sentence of 20 years
10    in prison, a maximum fine of the greatest of $250,000 or twice
11    the gross pecuniary gain derived from the offense or twice the
12    gross pecuniary loss to a person other than yourself as a
13    result of the offense, a $100 special assessment, and a maximum
14    term of supervised release of three years.  Do you understand
15    that those are the charges in Count Seven and the maximum
16    statutory penalty provided for the crime of wire fraud?
17              THE DEFENDANT:  I do, your Honor.
18              THE COURT:  Count Fifteen charges you with bank fraud.
19    And this crime carries a maximum possible sentence of 30 years
                              Page 3
```

Trosten Transcript.txt

20  in prison, a maximum fine of the greatest of $250,000 or twice
21  the gross pecuniary gain derived from the offense or twice the
22  gross pecuniary loss to a person other than yourself as a
23  result of the offense, a $100 special assessment, and a
24  mandatory -- or a maximum term of supervised release of five
25  years.  Do you understand that those are the charges in Count
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

82KATROPps
1   Fifteen and the maximum statutory penalty provided therefor?
2           THE DEFENDANT:  I do, your Honor.
3           THE COURT:  Count Seventeen charges you with money
4   laundering, and this crime carries a maximum sentence of ten
5   years in prison, a maximum fine of the greatest of $250,000 or
6   twice the gross pecuniary gain derived from the offense or
7   twice the gross pecuniary loss to a person other than yourself
8   as a result of the offense, a $100 mandatory special
9   assessment, and a maximum supervised release term of three
10  years.  Do you understand that that is the charge in Count
11  Seventeen and the maximum penalty provided for it by statute?
12          THE DEFENDANT:  I do, your Honor.
13          THE COURT:  And do you understand that, in addition to
14  the punishments which I just described, that the Court must
15  order restitution with respect to the charges in the
16  indictment?
17          THE DEFENDANT:  I'm sorry, your Honor?
18          THE COURT:  I said, do you understand that in addition
19  to the punishments that I've just described, that the Court
20  must order restitution --
21          THE DEFENDANT:  I do.
22          THE COURT:  -- with respect to the charges to which
23  you are pleading?
24          THE DEFENDANT:  I do.
25          THE COURT:  Do you understand that as part of your
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

82KATROPps
1   plea agreement, that you have admitted the forfeiture
2   allegations in the indictment and that you agree to forfeit to
3   the United States the sum of $2,400,000,000, as well as all the
4   specific property listed in schedule A to your plea agreement?
5           THE DEFENDANT:  I do, your Honor.
6           THE COURT:  And that as part of this plea agreement,
7   that you have agreed to not file any claims for any of the
8   forfeited property, and also to take such steps as necessary to
9   clear title to the specific property?
10          THE DEFENDANT:  I do, your Honor.
11          THE COURT:  And do you understand that you have the
12  right to plead not guilty and the right to a trial on the
13  charges against you and in fact the right to a jury trial?
14          THE DEFENDANT:  I do.
15          THE COURT:  At this time, Mr. Garcia, I would ask you,
16  please, to recite the elements of the crimes to which
17  Mr. Trosten is pleading.
18          MR. GARCIA:  Yes, your Honor.  With respect to Count
19  One, there are three elements: first, that there existed an
20  agreement or understanding to commit the objects charged;
21  second, that Mr. Trosten knowingly became a member of that
22  agreement or understanding; and, third, that one of the
23  co-conspirators knowingly committed at least one overt act in
24  furtherance of the conspiracy during the life of the
Page 4

Trosten Transcript.txt
25    conspiracy.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

⚲

82KATROPps
1     With respect to Count Two, the securities fraud count,
2     the first element is that Mr. Trosten, in connection with the
3     purchase or sale of securities, here the notes described in
4     Count Two, did one or more of the following: employed a device,
5     scheme, or artifice to defraud; or made an untrue statement of
6     material fact; or omitted to state a material fact which made
7     what was said, under the circumstances, misleading; or engaged
8     in an act, practice, or course of business that operated or
9     would operate as a fraud or deceit upon a purchaser or seller.
10    Second, that Mr. Trosten acted knowingly, willfully, and with
11    intent to defraud.  And, third, that Mr. Trosten used or caused
12    to be used any means or instruments of transportation or
13    communication in interstate commerce, or the use of the mails,
14    in furtherance of the fraudulent conduct.
15    With respect to Count Seven, the wire fraud count,
16    there are five elements: first, that a scheme to defraud
17    existed; second, that Mr. Trosten must have participated in the
18    scheme with intent to defraud; third, that misrepresentations
19    or omissions must have related to material facts; fourth, that
20    the scheme was executed to obtain money or property; and
21    finally, that in executing the scheme, Mr. Trosten used or
22    caused to be used interstate wires, or the use of such wires
23    were reasonably foreseeable to him, as listed in the
24    indictment.  And here, your Honor, with respect to Count Seven,
25    it is alleged that on June 22, 2004, Mr. Trosten sent an
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

⚲

82KATROPps
1     e-mail.
2     With respect to Count Fifteen, the bank fraud charge,
3     your Honor, there are three elements: first, that there was a
4     scheme to defraud a bank by means of materially false or
5     fraudulent pretenses, representations, or promises; second,
6     that Mr. Trosten executed or attempted to execute the scheme
7     with intent to defraud the bank; and, third, that at the time
8     of the execution of the scheme, the bank had its deposits
9     insured by the Federal Deposit Insurance Corporation.
10    At this time, your Honor, the government would proffer
11    and represent that HSBC, which is identified in the indictment,
12    has its deposits, and had its deposits at the relevant period,
13    insured by the Federal Deposit Insurance Corporation.
14    Finally, your Honor, with respect to Count Seventeen,
15    the money laundering count, there are three elements: first,
16    that Mr. Trosten engaged or attempted to engage in monetary
17    transactions involving criminally derived property of a value
18    greater than $10,000; second, that the property involved in the
19    monetary transaction, or attempted transaction, was in fact
20    derived from specified unlawful activity; finally, that
21    Mr. Trosten acted knowingly.  And with respect to this count,
22    the specified unlawful activities are the wire fraud, bank
23    fraud, and securities fraud otherwise charged.
24    THE COURT:  Mr. Trosten, do you understand that if you
25    pled not guilty and went to trial, that the burden would be on
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

⚲

82KATROPps
Page 5

Trosten Transcript.txt

1   the government to prove each and every element of the crimes
2   charged beyond a reasonable doubt in order to convict you?
3           THE DEFENDANT:  Yes, your Honor.
4           THE COURT:  Do you understand that at a trial, you
5   would have the right to be represented by an attorney at all
6   stages of the proceeding and if necessary an attorney would be
7   appointed for you?
8           THE DEFENDANT:  I do, your Honor.
9           THE COURT:  Do you understand that at a trial you
10  would have the right to confront and cross-examine witnesses
11  against you and the right not to be compelled to incriminate
12  yourself?
13          THE DEFENDANT:  Yes, your Honor.
14          THE COURT:  And do you understand that at a trial you
15  would be presumed innocent until such time, if ever, the
16  government established your guilt by competent evidence to the
17  satisfaction of the trier of fact beyond a reasonable doubt?
18          THE DEFENDANT:  I do, your Honor.
19          THE COURT:  And do you understand that at a trial, you
20  would have the right to testify and would also be entitled to
21  compulsory process, in other words, the right to call other
22  witnesses on your behalf?
23          THE DEFENDANT:  I do, your Honor.
24          THE COURT:  And do you understand that if your plea is
25  accepted, that there will be no further trial of any kind, so
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                          12
    82KATROPps
1   that by pleading guilty, you are waiving your right to a trial?
2           THE DEFENDANT:  I do.
3           THE COURT:  Do you understand that if you are
4   sentenced to a period of supervised release and if you violate
5   the terms of your supervised release, that an additional period
6   of jail time may be imposed without credit for the time that
7   you had previously spent on supervised release?
8           THE DEFENDANT:  I do.
9           THE COURT:  And do you understand that in connection
10  with your plea of guilty, that the Court may ask you certain
11  questions about the offense to which you have pled, and if you
12  answer those questions under oath and on the record and in the
13  presence of your lawyer, that your answers if false may later
14  be used against you in a prosecution for perjury or false
15  statement?
16          THE DEFENDANT:  I do, your Honor.
17          THE COURT:  And do you understand that, in determining
18  your sentence, that the Court is obligated to calculate the
19  applicable sentencing guidelines range and to consider that
20  range and possible departures under the guidelines, as well as
21  other factors concerning the nature and circumstance of the
22  offense and the history and characteristics of the defendant?
23          THE DEFENDANT:  I do, your Honor.
24          THE COURT:  Mr. Trosten, did you sign a plea agreement
25  earlier today?
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                          13
    82KATROPps
1           THE DEFENDANT:  I did, your Honor.
2           THE COURT:  And before you signed it, did you discuss
3   it with your lawyers?
4           THE DEFENDANT:  I did.
5           THE COURT:  And before you signed it, did you read it?
                           Page 6

Trosten Transcript.txt
```
 6              THE DEFENDANT:  I did, your Honor.
 7              THE COURT:  Let's just put the plea agreement to one
 8    side for a moment.  Apart from the plea agreement, have any
 9    threats or promises been made to you to make you plead guilty?
10              THE DEFENDANT:  No, your Honor.
11              THE COURT:  Again, apart from the plea agreement, have
12    any understandings or promises been made to you concerning the
13    sentence that you will receive?
14              THE DEFENDANT:  No, your Honor.
15              THE COURT:  Is your plea voluntary?
16              THE DEFENDANT:  Yes, it is.
17              THE COURT:  I would like to review a few portions of
18    the plea agreement with you.  Do you understand that pursuant
19    to this plea agreement, that you have undertaken to truthfully
20    and completely disclose all information about yourself and
21    others as required of you by the U.S. Attorney's Office; and
22    that you have agreed to fully cooperate with the U.S.
23    Attorney's Office, the United States Postal Inspection Service,
24    the Securities and Exchange Commission, and any other law
25    enforcement agency designated by the Office; that you have
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                14
82KATROPps
```
 1    agreed to attend all meetings as your presence is requested,
 2    and to provide to the U.S. Attorney's Office any document or
 3    other tangible evidence relating to any inquiry from the U.S.
 4    Attorney's Office or other law enforcement agencies; that you
 5    have agreed to truthfully testify before the grand jury and at
 6    any other trial or court proceeding; that you have agreed to
 7    fully disclose to the U.S. Attorney's Office any crimes that
 8    you have committed and any civil or criminal proceedings in
 9    which you have been or are a subject target or a witness; and
10    that you have further agreed to commit no further crimes
11    whatsoever?
12              THE DEFENDANT:  Yes, your Honor.
13              THE COURT:  And do you understand that the U.S.
14    Attorney's Office has no authority to agree not to prosecute
15    you for any possible criminal tax violations?
16              THE DEFENDANT:  I do, your Honor.
17              THE COURT:  And do you understand that if you fully
18    comply with this agreement, that you will not be further
19    prosecuted by the U.S. Attorney's Office for any crime related
20    to your participation in the crimes described in the
21    indictment, Counts One, Two, Seven, Fifteen, and Seventeen,
22    except for a possible criminal tax violation?
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  And are you aware that this agreement
25    doesn't bind any other federal, state, or local prosecuting
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                15
82KATROPps
```
 1    office?
 2              THE DEFENDANT:  Yes, your Honor.
 3              THE COURT:  And do you understand further that the
 4    sentence that you will receive is within the sole discretion of
 5    the Court?
 6              THE DEFENDANT:  Yes, your Honor, I do.
 7              THE COURT:  And do you understand that if the United
 8    States Attorney's Office determines that you have provided
 9    substantial assistance in an investigation or prosecution and
10    fully complied with the understandings specified in this plea
```
                                Page 7

Trosten Transcript.txt

```
11    agreement, that the U.S. Attorney's Office will file a motion
12    pursuant to Section 5K1.1 of the guidelines, requesting that
13    you be sentenced in accordance with the factors set forth in
14    that section?
15              THE DEFENDANT:  I do, your Honor.
16              THE COURT:  And do you understand that even if the
17    U.S. Attorney makes such a motion, that the issue of sentencing
18    remains within the discretion of the Court?
19              THE DEFENDANT:  I do.
20              THE COURT:  And do you understand that if the U.S.
21    Attorney's Office determines that you have not provided
22    substantial assistance, that they are released of any
23    obligation to file a 5K1.1 letter?
24              THE DEFENDANT:  I do, your Honor.
25              THE COURT:  And do you understand that, should you
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

16

82KATROPps
```
1    commit any further crimes or should it be determined that you
2    have given false, incomplete, or misleading testimony or
3    information, that you are thereafter subject to prosecution for
4    additional federal crimes?
5              THE DEFENDANT:  I do, your Honor.
6              THE COURT:  Do you understand that if it is determined
7    that you have committed further crimes or given false or
8    misleading testimony or otherwise violated this agreement, that
9    all statements made by you to the United States Attorney's
10    Office can be used against you in a subsequent prosecution?
11              THE DEFENDANT:  Yes, your Honor.
12              THE COURT:  And are you entering this plea because you
13    are in fact guilty?
14              THE DEFENDANT:  I am, your Honor.
15              THE COURT:  And do you understand that as part of this
16    plea agreement, that you are waiving any right you might have
17    to have the government preserve any physical evidence for
18    future DNA testing or any right you might have for DNA testing
19    at the present time?
20              THE DEFENDANT:  Yes, your Honor.
21              THE COURT:  And do you understand that this agreement
22    takes the place of any prior understanding that you may have
23    reached with the United States Attorney's Office and that there
24    are no conditions beyond those set forth in this written
25    agreement and that there cannot be any additional
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

17

82KATROPps
```
1    understandings that are not entered into in writing and signed?
2              THE DEFENDANT:  Yes, your Honor.
3              THE COURT:  Mr. Trosten, did you commit the offenses
4    that you are pleading guilty to?
5              THE DEFENDANT:  I did, your Honor.
6              THE COURT:  Would you tell me, please, what you did.
7              THE DEFENDANT:  Your Honor, first, I just would like
8    to state for the record that, when I said I felt great, it was
9    relating to medicines that I had taken, as opposed to feeling
10    ill because of those medicines, not because of my conduct,
11    which I deeply regret, your Honor.
12              THE COURT:  I would just like -- are you under the
13    influence of any medicine today?
14              THE DEFENDANT:  I am not, no.  No.
15              THE COURT:  OK.  And you have not had any trouble
```
                              Page 8

Trosten Transcript.txt

16  following any of the questions I have asked you?
17      THE DEFENDANT:  No, I have not.  No, I have not.
18      Your Honor, while I was employed at Refco, I agreed
19  with other Refco executives to hide the true nature of Refco's
20  finances on Refco's financial statements.  I knew that Refco's
21  financial statements did not accurately reflect Refco's
22  financial condition, because the financial statements did not
23  disclose the full amount that Refco Group Holdings, Inc., a
24  related party, owed to Refco.  I understood that the RGHI
25  receivable was underreported because Philip Bennett, Refco's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

82KATROPps
1  former chief executive officer, and other Refco executives,
2  including me, were involved in a series of transactions at the
3  end of Refco's financial reporting periods to make it appear as
4  if a receivable was due from third-party customers rather than
5  from a related party.
6      The RGHI receivable was composed of, amongst other
7  things, historic customer losses, bad debts, and expenses that
8  RGHI incurred on behalf of Refco.
9      In addition, I participated in a number of
10  transactions that padded or inflated Refco's income.  For
11  example, I participated in transactions that shifted expenses
12  off the books of Refco and onto the books of Refco Group
13  Holdings, Inc.
14      I, along with other Refco executives, agreed to
15  conceal the true size and nature of the RGHI receivable from,
16  amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC,
17  which, in 2004, participated in Refco's senior secured credit
18  facility, as referenced in paragraph 14 -- I'm sorry --
19  paragraph 41 and Count Fifteen of the indictment; and investors
20  who purchased bonds that Refco issued in 2004, as referenced in
21  Count Two of the indictment.
22      I left the company in August of 2004, one year before
23  the IPO of Refco.  I and other Refco executives used the
24  interstate wires to accomplish these acts within this district,
25  as referenced in Count Seven of the indictment.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

82KATROPps
1      Furthermore, I received funds obtained from the
2  transaction with Thomas H. Lee Partners, referenced in
3  paragraph 34 of the indictment, which I knew were proceeds from
4  unlawful activity, as referenced in Count Seventeen.
5      The RGHI receivable and the transactions used to
6  conceal it were material information that Refco investors and
7  lenders would have wanted to know before investing in or
8  lending money to Refco.
9      I knew that obtaining funds from Refco investors and
10  lenders based on misleading financial information was wrong.
11      Excuse me.
12      Your Honor, I take full responsibility for my actions
13  and my conduct.
14      I wish to apologize to my family and those that I
15  harmed by my conduct, which I deeply and sincerely regret, your
16  Honor.
17      Thank you.
18      THE COURT:  Mr. Garcia, is there anything else that
19  you wish me to ask Mr. Trosten?
20      MR. GARCIA:  No, your Honor.

Page 9

Trosten Transcript.txt

21          THE COURT:  Mr. Trosten, do you still wish to plead
22    guilty?
23          THE DEFENDANT:  I do, your Honor.
24          THE COURT:  Mr. Morvillo, do you know of any reason
25    that Mr. Trosten ought not to plead guilty?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

82KATROPps

1          MR. R. MORVILLO:  I do not, your Honor.
2          THE COURT:  All right.  Mr. Trosten, I am satisfied
3     that you understand the nature of the charge against you and
4     the consequences of your plea, and that your plea is made
5     voluntarily and knowingly, and that there is a factual basis
6     for your plea.  I will therefore accept your plea of guilty.
7          Mr. Garcia, do you want to give me a control date?
8          MR. GARCIA:  Your Honor, respectfully, the government
9     would request about a year for a control date.
10          THE COURT:  Let's just see if -- OK.  Well, February
11    20, 2009 is a Friday.  So you can write to me then.
12          All right.  Is there anything else at this time?
13          MR. GARCIA:  Nothing more, your Honor, from the
14    government.
15          THE COURT:  Mr. Morvillo?
16          MR. R. MORVILLO:  Nothing, your Honor.  Thank you for
17    accommodating my schedule by sitting as late as you are.
18          THE COURT:  We're always here at this time.
19          MR. GARCIA:  Thank you, Judge.
20                          oOo
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 10

# EXHIBIT 1(d)

```
                                    ┌─────────────────────────────┐
                                    │ USDC SDNY                    │
UNITED STATES DISTRICT COURT        │ DOCUMENT                     │
SOUTHERN DISTRICT OF NEW YORK       │ ELECTRONICALLY FILED         │
------------------------------      │ DOC #: _____  │
                               x    │ DATE FILED:  FEB 2 6 2008    │
UNITED STATES OF AMERICA            └─────────────────────────────┘
```

UNITED STATES OF AMERICA

      -v-

TONE N. GRANT,

              Defendant.

:    INDICTMENT

:    S4 05 Cr. 1192 (NRB)

---

### COUNT ONE

(Conspiracy To Commit Securities Fraud, Wire Fraud,
Bank Fraud and Money Laundering)

The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

1.  At certain times relevant to this Indictment, Refco Inc. was a Delaware corporation with its principal place of business in New York, New York.  From at least the mid-1990s, the business of Refco Inc. and its predecessor entities included providing execution and clearing services for exchange-traded derivatives and providing prime brokerage services in the fixed income and foreign exchange markets.  Refco Inc. held its initial public offering of common stock on or about August 10, 2005.  Prior to on or about August 10, 2005, Refco Inc.'s predecessor entities were privately held.  Refco Inc. and its predecessor entities are referred to herein collectively as "Refco."

2.  At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at

Refco.  From at least in or about 1997 through in or about 1998, GRANT was the President of Refco.  At certain times relevant to this Indictment, GRANT indirectly held a significant ownership interest in Refco.

3.    At certain times relevant to this Indictment, Phillip R. Bennett, a coconspirator not named herein, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, Bennett had a substantial ownership interest in Refco, directly and indirectly.

4.    At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft, ("BAWAG"), was the fourth largest bank in Austria.  BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).  At various relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

5.    At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Indictment, RGHI was owned in whole or in part by TONE N. GRANT and Phillip R. Bennett.

2

**THE SCHEME TO DEFRAUD**

6.    From at least as early as in or about the mid-1990s, TONE N. GRANT, the defendant, and Phillip R. Bennett, together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors.  Starting at least as early as the mid-1990s, GRANT, Bennett and others embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners. To that end, over the ensuing years, GRANT, Bennett and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

7.    In furtherance of this scheme, Phillip R. Bennett, TONE N. GRANT, and others known and unknown, made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC").  The scheme included obtaining,

3

through fraud, the following:  lines of credit for Refco; the
private sale of notes prior to 2004; the sale of 57 percent of
Refco to a group headed by Thomas H. Lee Partners in 2004; the
sale of approximately $600 million of notes to the public in
2004; approximately $800 million of bank financing obtained in
2004; and the August 2005 initial public offering of stock
("IPO") in Refco Inc., in which the public purchased
approximately $583 million of Refco common stock based on a false
and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

        8.    In or about the mid-1990s, Refco was wholly owned
by RGHI, which in turn was owned by TONE N. GRANT, the defendant,
Phillip R. Bennett, and one other partner.  As of early 1997,
RGHI owed Refco at least approximately $106 million.  Starting
later in 1997, Refco directly and indirectly incurred a series of
substantial trading losses that threatened the continued
viability of Refco's business.  In response to these losses, at
various times between in or about May 1997 and in or about
October 2005, GRANT, Bennett, and their coconspirators, moved
losses and expenses out of Refco and into RGHI, and artificially
padded Refco's revenues at the expense of RGHI, in an effort to
hide Refco's true liabilities, manipulate its reported earnings,
and thereby seek to defraud a purchaser into buying the firm at a
price that would pay off the accumulated debt and ensure a profit

to Refco's owners.  This strategy resulted in an enormous
increase in the already large debt from RGHI to Refco that
eventually totaled more than $1 billion.  The debt by RGHI to
Refco, carried on Refco's books as a receivable from RGHI, was
over time comprised of, among other things, the following
principal components: (a) liabilities incurred by Refco when
brokerage customers to whom it had extended credit defaulted on
their obligations, which were later transferred to RGHI; (b)
Refco's proprietary trading losses; (c) various operating
expenses incurred by Refco and paid in the first instance by
Refco but later transferred to RGHI as an increase in RGHI's debt
to Refco; and (d) transactions designed to pad Refco's revenues
in which the benefits accrued to Refco and the associated costs
were incurred by RGHI.

        9.   As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.  In the later 1990s, certain
Refco customers to whom Refco had extended credit sustained
hundreds of millions of dollars of trading losses in their
accounts at Refco.  When the customers were unable to make
payments on the credit Refco had extended, Refco liquidated
certain of the positions and assumed the resulting losses in the
customers' accounts.  Refco sustained large losses of this type,

5

among other times, in 1997, totaling at least approximately $275 million.  These customer losses included the following:

### Asian Debt Crisis Customers

10.  In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### Customer 1

11.  In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call from the CME, using the proceeds of an intra day loan from a financial institution to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the intra day loan.

12.  Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued

6

existence, TONE N. GRANT and others falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses. In addition, GRANT and Bennett significantly misrepresented the size of the loss to Refco's auditors.

13. TONE N. GRANT and Phillip R. Bennett, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1 from the trading losses to be transferred to become a debt from RGHI to Refco.

### Proprietary Trading Losses

14. In the late 1990s, Refco also incurred substantial losses from proprietary trades, or trades carried out on its own behalf. For example, in or about 1998, Refco lost at least approximately $40 million in a related party account on an investment in Russian bonds after the Russian Government defaulted on its obligations.

### Refco Expenses Moved To RGHI

15. Beginning at least as early as 1998, Phillip R. Bennett and others, with the knowledge of TONE N. GRANT, the defendant, schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco computer expenses off of Refco's books and onto the books of

RGHI, in the following years in the following amounts:

| Fiscal Year End | Amount Transferred to RGHI |
|---|---|
| 2000 | $7,378,927.80 |
| 2001 | $8,797,189.98 |
| 2002 | $9,393,846.76 |
| 2003 | $7,002,153.65 |
| 2004 | $4,876,657.60 |
| 2005 | $5,028,053.21 |
| 2006 | $3,595,030.92 |

16.    The result of these actions was to create a large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $170 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.  Thus, a total of at least approximately $422 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

**Refco's Losses Funded By Use Of Customer Funds**

17.    Starting at least in or about 1997, Phillip R. Bennett, with the knowledge of TONE N. GRANT, and others, caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett

8

and others, with GRANT's knowledge, caused Refco to fail systematically to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, $100 million a day. Bennett, GRANT and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

### BAWAG Invests In Refco

18. By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions. In order to address that problem, in or about late 1998, Phillip R. Bennett and TONE N. GRANT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria. In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase

9

an additional ten percent of Refco.

## Hiding The RGHI Receivable

19.  Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and RGHI.

20.  Beginning at least as early as February 1998, Phillip R. Bennett, on behalf of RGHI, hid the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.  At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  Bennett and others, with the knowledge of TONE N. GRANT, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28,

10

1998 through the fiscal year-end on February 29, 2004. Bennett and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

21. In 1998 and 1999, Refco and RGHI carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
| --- | --- |
| February 1998 | $175 million |
| February 1999 | $265 million |

22. Beginning in 2000, Refco's year-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
| --- | --- | --- | --- |
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

11

23.  These transactions typically followed standard patterns.  For example, in or about February 2000, Phillip R. Bennett caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.  Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i).    On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by

12

Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

        (ii).    On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by Bennett on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

        (iii).    On or about the same date, Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

        b.    At or around the same time as the transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document

this or any of the subsequent BAWAG transactions.

24.   In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, TONE N. GRANT and others consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

25.   At various times prior to August 2004, Phillip R. Bennett, TONE N. GRANT and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes.  These notes were sold to investors based, in part, on audited financial statements prepared for Refco's auditors that were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

26.  Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about

14

1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements that materially misstated the financial health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

27.  Between 2000 and 2005, while BAWAG assisted Refco in hiding the RGHI receivable in the manner described above, Refco assisted BAWAG in hiding its own balance sheet problem.  In or about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG held in an account at Refco certain worthless bonds and other investments that Refco maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### BAWAG Invests Further In Refco

28.  In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,415,000.  In return, BAWAG received the right to approximately 27.2 percent of the proceeds of the sale of Refco and, together with its existing interest in

15

20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

### RGHI's "Exit Strategy" Develops

29.    In or about 2003, Phillip R. Bennett hired the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.

30.    In connection with RGHI's plan to sell Refco, Refco and RGHI management (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational problems at the company.

31.    In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, Refco management shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

### The Fraudulent Leveraged Buyout Transaction

32.    In or about 2003, Phillip R. Bennett and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  On or

about June 8, 2004, TONE N. GRANT and Bennett executed an Equity Purchase and Merger Agreement (the "EPMA") with Thomas H. Lee Partners that set forth the terms of the deal.  At the time that GRANT signed the EPMA, GRANT had full knowledge of the more than $1 billion of debt that RGHI owed to Refco, and knew and expected that as part of the leveraged buyout transaction, misrepresentations regarding Refco would be made to the participants in the leveraged buyout, including Thomas H. Lee Partners, banks and the purchasers of the notes.

33.    As a necessary part of this transaction, and as required by the EPMA, shortly prior to the closing of the leveraged buyout transaction, Phillip R. Bennett purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50 percent interest in profits made by Bennett in a future sale of Bennett's interest in Refco, not to exceed $275 million.  As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $511 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

### Lies To Thomas H. Lee Partners

34. In connection with the leveraged buyout transaction, Phillip R. Bennett and others caused Refco's audited

financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.    The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.    The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

35.    In connection with the leveraged buyout transaction, Phillip R. Bennett and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

36.    In connection with the leveraged buyout transaction, Phillip R. Bennett and others provided to the note underwriters and note purchasers the following false and

misleading information:

a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 34;

b.   Bennett and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets when, in fact, that collapse caused the Asian Debt Crisis Customer Losses; and

c.   Bennett and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

37.   In connection with the leveraged buyout transaction, Phillip R. Bennett and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 34;

b.   Bennett and others falsely represented that

19

Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets when, in fact, that collapse caused the Asian Debt Crisis Customer Losses; and

      c.  Bennett and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

    38.  The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into an RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
| --- | --- |
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $160 million |

    39.  In connection with the leveraged buyout transaction, Phillip R. Bennett and others falsely represented to

Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout.  In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG.  At the end of the leveraged buyout transaction, Bennett distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

## Bennett Plans To Take Refco Public

40.  After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, and others planned to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

41.  Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett continued his manipulation of Refco's finances:  At each quarter and year-end period, Bennett caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and Bennett continued to cause Refco expenses to be

21

assumed by RGHI and to artificially pad Refco's revenues by the
means previously described.  Bennett caused the following
quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

## Refco's Public Filings And Publicly Traded Securities

42.  In 2005, Refco registered certain of its
securities with the SEC and, with that registration, was required
to make certain additional public filings with the SEC.

43.  On or about April 6, 2005, Refco filed an S-4
registration statement with the SEC in connection with its offer
to exchange $600 million of the senior subordinated notes
originally issued in August 2004 for $600 million of senior
subordinated notes registered under the Securities Act of 1933.
Phillip R. Bennett signed the registration statement on or about
April 6, 2005 in New York, New York.  Registration of these notes
permitted them to be traded publicly.  The S-4 contained several
material misstatements about Refco, including the audited
financial statements which failed to reflect the related party

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above and falsely claimed that Refco did not engage in proprietary trading.

44.  On or about July 19, 2005, as required by the Securities Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10-K.  Phillip R. Bennett signed the annual report on or about July 19, 2005 in New York, New York.  Bennett also signed two certifications regarding the annual report.  As noted above, the financial statements contained in the annual report were fraudulent in that, among other things, they failed to reflect the related party receivable, the padded revenue, and the shifted expenses.

45.  On or about August 8, 2005, Refco filed an S-1 registration statement with the SEC in connection with its initial public offering of common stock.

46.  The S-4 registration statement, 10-K annual report, and S-1 registration statement required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal

23

years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

47. The S-4 registration statement, 10-K annual report, and S-1 registration statement each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

48. On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock. Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

49. In or about late August 2005, after the completion

24

of Refco's IPO, Phillip R. Bennett caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer. After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were unwound.

### Public Disclosure Of The Related Party Debt

50.    In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10, 2005, having received an emergency loan in that approximate amount from BAWAG.

51.    On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

52.  Following Refco's announcement of its discovery of
this related party receivable, the market price of Refco stock
plummeted, resulting in a loss of well more than $1 billion in
market capitalization.

53.  On or about October 17, 2005, Refco filed a
petition in bankruptcy in the United States Bankruptcy Court for
the Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

54.  From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
TONE N. GRANT, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
offenses against the United States, namely: (a) to commit fraud
in connection with the purchase and sale of securities issued by
Refco, in violation of Sections 78j(b) and 78ff of Title 15,
United States Code, and Section 240.10b-5 of Title 17, Code of
Federal Regulations; (b) to commit wire fraud, in violation of
Section 1343 of Title 18, United States Code; (c) to commit bank
fraud, in violation of Section 1344 of Title 18, United States
Code; and (d) to commit money laundering, in violation of Section
1957(a) of Title 18, United States Code.

## **OBJECTS OF THE CONSPIRACY**

### **Securities Fraud**

55.  It was a part and object of the conspiracy that
TONE N. GRANT, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon a person,
in connection with the purchase and sale of notes issued by Refco
and the common stock of Refco Inc., all in violation of Title 15,
United States Code, Sections 78j(b) and 78ff.

### **Wire Fraud**

56.  It was further a part and object of the conspiracy
that TONE N. GRANT, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, having devised and

intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Bank Fraud

57. It was further a part and object of the conspiracy that TONE N. GRANT, the defendant, and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

58. It was further a part and object of the conspiracy that TONE N. GRANT, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign

commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

59.   Among the means and methods by which TONE N. GRANT, the defendant, Phillip R. Bennett and their co-conspirators would and did carry out the conspiracy were the following:

a.   TONE N. GRANT, the defendant, misrepresented to the public the size of customer losses for which Refco was responsible.

b.   TONE N. GRANT, the defendant, Phillip R. Bennett, and their coconspirators transferred losses incurred by Refco to GRANT and Bennett's company, RGHI.

c.   TONE N. GRANT, the defendant, Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

d.   TONE N. GRANT, the defendant, and his

29

coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

e.    TONE N. GRANT, the defendant, and his coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

### Overt Acts

60.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, TONE N. GRANT, the defendant, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, TONE N. GRANT, the defendant, and others signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about February 20, 2004, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., LLC regarding an approximately $720 million

loan from a Refco customer to RGHI.

d.    On or about April 27, 2004, Phillip R. Bennett signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

e.    On or about May 17, 2004, TONE N. GRANT, the defendant, met with Phillip R. Bennett at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

f.    On or about August 5, 2004, RGHI caused the transfer of approximately $4 million to TONE N. GRANT, the defendant.

g.    On or about August 8, 2004, Phillip R. Bennett caused the transfer of approximately $12 million to TONE N. GRANT, the defendant.

h.    On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

(Title 18, United States Code, Section 371).

### COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

61.    The allegations contained in paragraphs 1 through

31

53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

      62.  In or about 2004, in the Southern District of New York and elsewhere, TONE N. GRANT, the defendant, and others, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc.

    (Title 15, United States Code, Sections 78j(b) and 78ff; Title
      17, Code of Federal Regulations, Section 240.10b-5; and
        Title 18, United States Code, Section 2).

## COUNT THREE

(Wire Fraud)

The Grand Jury further charges:

63. The allegations contained in paragraphs 1 through 53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

64. On or about August 5, 2004, in the Southern District of New York, TONE N. GRANT, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, in connection with the scheme set forth above, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GRANT caused a $4 million wire transfer to be sent from RGHI's JP Morgan Chase account in New York, New York to GRANT's Harris Trust Account in Chicago, Illinois.

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOUR

(Bank Fraud)

The Grand Jury further charges:

65. The allegations contained in paragraphs 1 through

33

53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

66. In or about 2004, in the Southern District of New York, TONE N. GRANT, the defendant, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

## COUNT FIVE

(Money Laundering)

The Grand Jury further charges:

67. The allegations contained in paragraphs 1 through 53, 59 and 60 of this Indictment are repeated and realleged as if fully set forth herein.

68. On or about August 5, 2004, in the Southern District of New York, TONE N. GRANT, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000, to wit, a

34

$4 million wire transfer to be sent from RGHI's JP Morgan Chase account in New York, New York, to GRANT's Harris Trust Account in Chicago, Illinois, and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1957(a) and 2).

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE THROUGH THREE

69.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 as alleged in Counts One and Two; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One and Three, TONE GRANT, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including without limitation at least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses.

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE, FOUR AND FIVE

70.   As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18, United States Code, Section 1344, as alleged in Counts One and Four of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts One and Five of this Indictment, TONE N. GRANT, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.   At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses; and

b.   At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property.

## SUBSTITUTE ASSETS PROVISION

71.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

36

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)


FOREPERSON


MICHAEL J. GARCIA
United States Attorney

37

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### TONE N. GRANT,

**Defendant.**

### INDICTMENT

S4 05 Cr. 1192 (NRB)

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 18 USC 1343, 2; 18 USC 1344,2: 18
USC 1957(a).)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

2/26/08 Filed Indictment.

s/ Hon. J. Katz

# EXHIBIT 1(e)

Grant Transcript.txt

3078

84H9GRAF
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,                  New York, N.Y.
3
4            v.                                 S4 05 Cr. 1192 (NRB)
4
5    TONE GRANT,
5
6                    Defendant.
6
7    ------------------------------x
7
8
8                                               April 17, 2008
9                                               @ a.m.
9
10
10   Before:
11
11                       HON. NAOMI REICE BUCHWALD,
12
12                                               District Judge
13
13
14                            APPEARANCES
14
15   MICHAEL J. GARCIA
15       United States Attorney for the
16       Southern District of New York
16   BY:  NEIL BAROFSKY
17       CHRISTOPHER GARCIA
17       Assistant United States Attorneys
18
18   ZUCKERMAN SPAEDER, LLP
19       Attorneys for Defendant
19   BY:  ROGER ZUCKERMAN
20       AITAN GOELMAN
20       NORMAN EISEN
21
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              3079

84H9GRAF
1         (In open court: jury not present; time noted:
2    11:53 a.m.)
3         THE COURT:  Why don't we begin by reporting for the
4    record the earlier notes that we received yesterday.
5         The first note arrived in chambers about 3:25 and
6    read:  "Maria Louisa Pedroza, Juror No. 8 voted as foreperson."
7         Second note which arrived in chambers about 4:00:  "Is
8    it possible to obtain a board with/an easel (and marker)?"
9         The third note arrived upstairs about 4:25 and said:
10   "Can we please use the props with the timeline of events?
11   Thank you, signed forelady."  And we sent back a note that said
                            Page 1

Grant Transcript.txt

```
12   that we couldn't provide those since they were not in evidence.
13        About 11:35 this morning we received a note which I
14   will read into the record and which I provided copies to
15   counsel:  "Is there anything in evidence other than..." I think
16   they mean the "...notes that were taken by Grant at the
17   Marriott Hotel meeting between Grant and Bennett on May 17,
18   2004?"
19        I assume that there is sort of a word missing, which I
20   would guess a way to rewrite it:  Is there anything else in
21   evidence?  But I'm not saying we have to guess, but that's --
22        MR. BAROFSKY:  Another possible interpretation is that
23   the A with the little circle means about instead of at.  It may
24   mean at or it may mean about.
25        MR. ZUCKERMAN:  It doesn't make much sense if it's
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```

                                                                3080

84H9GRAF
```
1    about.  Then it would be the notes that were taken by Grant
2    about.
3         MR. BAROFSKY:  About the meeting.
4         THE COURT:  I think actually if we're going to do a
5    little document analysis -- I'm sorry I didn't give you copies
6    of the earlier memos because they were so -- notes, because
7    they were so ministerial.  But I will show you so that you can
8    all see it, where the parenthesis and I wrote -- and I
9    translate "and marker," it's a similar three-dot thing, so if
10   you want to look at that.
11        MR. BAROFSKY:  Judge, clearly we need some
12   clarification, I think we agree, on what they're asking for.
13        MR. ZUCKERMAN:  I don't object to clarification.  I
14   mean if your Honor wants to write a request for a little
15   additional.
16        MR. BAROFSKY:  Obviously it could apply to large
17   amounts of testimony about the meeting, depending on what
18   they're asking for.
19        THE COURT:  We don't need to battle it out.  We can
20   just ask them.
21        Should we write:  We are uncertain about the meaning
22   of your last note.  Could you please clarify your request?
23        Is that okay?
24        MR. ZUCKERMAN:  Fine.
25        MR. GOELMAN:  Your Honor, when does the Court plan on
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```

                                                                3081

84H9GRAF
```
1    feeding them lunch?
2         THE COURT:  I think we ordered it for 1:00.
3         MR. BAROFSKY:  Your Honor, can we take lunch at the
4    same time?
5         THE COURT:  If you're assuming that they are going to
6    eat and not work -- there must be a space in time in there that
7    you can be excused, but just make sure we have a way to get
8    you.
9         See you in a few minutes.
10        (Recess pending verdict)
11        (Jury not present; time noted:  12:27).
12        THE COURT:  Let me just read the responsive note into
13   the record.  It's Court Exhibit 6:  "One of the jurors wants to
14   know if there is any other evidence entered about the substance
15   of the conversation for the meeting..." again repeated "...for
16   the meeting, at the Marriott with Tone and Phillip other than
```
                       Page 2

Grant Transcript.txt
```
17  Tone Grant's handwritten notes."
18       Counsel agree on a response or is there a discussion
19  about it?
20       MR. BAROFSKY:  Your Honor, I think that one of the
21  discussions that we've just had with Mr. Zuckerman is -- I
22  don't want to speak for Mr. Zuckerman.
23       MR. ZUCKERMAN:  Go ahead.
24       THE COURT:  He'll correct you if you aren't playing
25  the role properly.
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                            3082

84H9GRAF
```
 1       MR. BAROFSKY:  Its continued ambiguity on "evidence
 2  entered."  Our take from this was to think that it was
 3  testimonial as well as physical evidence.  Mr. Zuckerman
 4  believes that "entered" means just physical exhibits or
 5  documents that have been entered.
 6       MR. ZUCKERMAN:  That is correct.  And to amplify only
 7  briefly, I think there are some legal issues and a morass that
 8  we will enter, as the Court may hear if we continue to argue,
 9  about what exactly it means for the Court to search the record
10  for evidence that may relate to the substance of the meeting in
11  the form of testimony.  And you will hear, I think, a variety
12  of arguments from the government and from us about what may or
13  may not relate to the substance of the meeting in terms of the
14  inferences that are permissible for a juror to draw.
15       And we, as well, have some concerns about whether
16  that's a permissible undertaking for the Court; that is,
17  whether the Court can define for the jury what it believes to
18  be the evidence that the testimony -- the testimony that
19  relates to the substance of the meeting.
20       So, before entering that thicket, my thought was to
21  simply write another note and ask whether the evidence entered
22  that they are seeking relates to physical exhibits only or
23  whether it relates to physical exhibits and testimony.
24       If it relates to --
25       THE COURT:  Why would you think they would truly be
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                            3083

84H9GRAF
```
 1  asking at this stage for physical exhibits?  In other words,
 2  the government established that Mr. Bennett's secretary rented
 3  this room.  But now that there is no real dispute, I don't
 4  think, that the meeting occurred, it would seem a little odd to
 5  me that that was really what they were focused on.  I would
 6  have thought that -- I wouldn't have parsed the word "entered."
 7  To me, it's:  Is there any other evidence about the substance
 8  of the meeting which is in the record?
 9       MR. ZUCKERMAN:  If that is --
10       THE COURT:  That's the way I would view it.
11       MR. ZUCKERMAN:  Fair enough.  I don't think that's
12  obvious.  But if that's the Court's view, then I think we're at
13  an important and awkward spot because there is a variety of
14  testimony -- there's scads of testimony that jurors could look
15  at to allow them to draw inferences about the meeting that
16  occurred and what occurred in the meeting.
17       THE COURT:  The substance of the conversation is what
18  they have asked for.
19       MR. ZUCKERMAN:  But, for example, testimony or
20  evidence regarding the nature of the notes, their preservation
21  and the like, is, in our judgment, relevant to the substance of
```
                              Page 3

Grant Transcript.txt
22  the conversation that occurred and was argued as such.
23          THE COURT:  That's argument.
24          MR. BAROFSKY:  I don't think there is any testimony
25  regarding preservation.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3084

84H9GRAF
1           MR. ZUCKERMAN:  There's the subpoena.
2           MR. BAROFSKY:  They have -- they have the physical
3   documents back there.  That's why I think we were thinking that
4   this had to be testimonial is because they have every exhibit.
5           THE COURT:  Isn't really what -- finish.  It just
6   seems to me there's one -- I think there's one obvious bit of
7   testimony, and I assume that's what you're ultimately arguing
8   about.
9           MR. BAROFSKY:  We believe that --
10          MR. ZUCKERMAN:  I'll let the government make its point
11  and then we'll respond.  Why don't you go ahead.
12          MR. BAROFSKY:  Your Honor, we would point to our
13  interpretation is, would be the testimony of Earl Melamed, the
14  testimony of Sandy Maggio and the testimony of Robert Trosten.
15          THE COURT:  What did Melamed testify about what
16  happened at that meeting?  Was he there?
17          MR. BAROFSKY:  No, Judge, neither were any of these
18  three individuals.
19          THE COURT:  But the issue is what did -- I don't
20  have -- to me I assumed you were talking about the Santo Maggio
21  testimony as to whatever he said before he was going to be
22  talking about, and whatever he said afterwards that Bennett
23  told him.
24          MR. BAROFSKY:  Your Honor, I think clearly that as
25  well as Robert Trosten who has a similar conversation.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3085

84H9GRAF
1           THE COURT:  I can't say that I recall that but that's
2   okay.
3           MR. BAROFSKY:  Our recollection is that Mr. Trosten
4   has a similar conversation when he's asked to prepare a
5   schedule of the related party receivable.
6           THE COURT:  That's right.
7           MR. BAROFSKY:  I'm not looking to tilt at windmills on
8   the Melamed piece.  I'll tell you why I suggested it, was
9   because the numbers that are reflected in the Grant notes match
10  up with the substance of the testimony of Earl Melamed, but
11  seeing your Honor's reaction --
12          THE COURT:  I think that was a terrific argument but I
13  don't think that that's -- I do not read the note that way.  I
14  think they are talking a much more direct --
15          MR. GOELMAN:  This, I think, is one of the dangers of
16  kind of wading into this morass and deciding what testimony.
17          THE COURT:  We do this all the time, right,
18  Mr. Goelman.  This is not like the first time the jury has
19  asked for:  Is there any testimony in the record about X?
20          MR. GOELMAN:  This is the first time that I've ever
21  seen it.
22          THE COURT:  I have seen many, many times where jurors
23  say:  Can we please have the testimony of John Smith about Y or
24  about X and then you go and you try and identify what John
25  Smith said in direct and cross and you send that back.
SOUTHERN DISTRICT REPORTERS, P.C.
Page 4

Grant Transcript.txt
(212) 805-0300

3086

♀

84H9GRAF

1          MR. GOELMAN:  I have never before seen please identify
2    for us all the evidence, and if you interpret as testimony,
3    about a particular subject matter.  I think that takes it to an
4    entirely different level and it's dangerous for the parties and
5    for the Court to substitute for the jury's recollection about
6    what is and what is not related to a particular subject matter.
7          THE COURT:  I remember my husband used -- I don't
8    remember him, he's still here -- telling me the story once
9    about when he was a prosecutor and the juror asked:  what is
10   all the testimony related to Count 9 of the indictment, and the
11   note ultimately was there is no testimony about Count 9.  So
12   this is not the first time that jurors have asked this type of
13   question; maybe in your experience, but not in my experience.
14   And I understand that lawyers fight about this; that one side
15   wants a narrower interpretation, the other side wants a broader
16   interpretation.  And you each have your own -- oh, another
17   note -- and that there is a litigated reason for the argument.
18          "We need new jury verdict forms.  Also, does the
19   foreperson sign or both?  Or can someone come in and explain
20   the form to us?"
21          That's a first.  Okay, Mr. Goelman, we have a first
22   here.  I don't have any problem getting new forms -- clean
23   forms.  We can obviously print those out.
24          We could direct them to the part of the charge which
25   has the instruction.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

3087

♀

84H9GRAF

1          MR. GOELMAN:  On the verdict form?
2          THE COURT:  Yes.
3          MR. GOELMAN:  Your Honor, I don't know what --
4    obviously this changes things.
5          THE COURT:  I really don't know what the problem is.
6          MR. GOELMAN:  The first note that the jury sent out:
7    Is there anything in evidence other than the notes, I doubt
8    that the jury doesn't remember that there was testimony from
9    cooperators about this meeting.  So when you're saying is there
10   anything in evidence other than the notes, to me that is
11   looking for a tangible paper about the meeting.  And I don't
12   see the harm in just sending back:  Are you asking for -- a
13   note saying:  Do you want testimony or do you want exhibits?
14          THE COURT:  I don't need to battle that.  We can send
15   them another note about that.
16          But the question is maybe we should call them into the
17   courtroom and let me tell them.
18          MR. BAROFSKY:  About the verdict form?
19          THE COURT:  About the verdict form.
20          MR. ZUCKERMAN:  Fine.
21          THE COURT:  Josh, before we do, just go up and make
22   some new ones.
23          MR. BAROFSKY:  Judge, can we see the most recent note
24   by any chance?
25          THE COURT:  Absolutely.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

3088

♀

84H9GRAF

1          Is it all right if we call the jury in?
2          I will ask them before we talk about the verdict form,
                        Page 5

Grant Transcript.txt
3   on the earlier note whether they are looking for an exhibit or
4   they're looking for testimony as to the substance of the
5   conversation.
6           MR. BAROFSKY:  Judge, what -- an alternate suggestion
7   is that if, just to send a note back to them saying if you --
8   go ahead.
9           MR. GARCIA:  One way to read that note potentially,
10  and I don't have it in front of me now, but it may be just a
11  simple question of:  Does the foreperson have to sign or
12  everybody else have to sign?
13          THE COURT:  Yeah.
14          MR. GARCIA:  One suggestion.
15          THE COURT:  I give them like 14 copies of the verdict
16  form.  So my thought is that because I give them that many
17  copies that they think that they all have to sign it.  I do it
18  so that there's a piece of paper that they can all take notes
19  on essentially.  I think that's about all that this is about,
20  that question.  But I can clarify it.  I'm going to just let
21  you know what I'm going to tell them is as to the verdict form
22  the only person that signs the verdict form is the foreperson.
23  Each count you have to deal with separately.  You have to have
24  a unanimous decision on each count.  If you have not -- if you
25  have not reached a unanimous decision on each count, keep
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                          3089
    84H9GRAF
1   talking.
2           MR. BAROFSKY:  Your Honor, I think Mr. Garcia's
3   suggestion might be a good one and just to send a note back to
4   them with the first part; which is just that the way to -- the
5   foreperson only needs to sign the verdict form and sort of
6   without --
7           THE COURT:  But we have the other issue of the
8   testimony versus the exhibits.
9           MR. ZUCKERMAN:  I think it's appropriate for you to
10  clarify in their presence.
11          THE COURT:  Because they asked to have someone visit
12  them.  So I'm not going to go in there because that would be
13  not right.
14          MR. EISEN:  I had a case like that once.
15          MR. BAROFSKY:  Our concern --
16          THE COURT:  What's the concern?
17          MR. BAROFSKY:  It's not really a concern, it's just
18  that if they are close to a verdict, which they would suggest,
19  it may obviate a need to respond to the note.  That's all that
20  we --
21          THE COURT:  I'm not going to -- believe me, I'm going
22  to tell them -- the first thing I'll say:  Don't tell me
23  anything about where you are in your deliberations.  Let me
24  just ask you a question, let me tell you certain things.  Okay.
25          MR. BAROFSKY:  Thank you, your Honor.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                          3090
    84H9GRAF
1           (In open court; jury present; time noted:  12:49)
2           THE COURT:  Sit down, everyone.  I asked you to come
3   in, in the hopes that I can clarify by speaking to you some of
4   the notes that you've been sending.
5           First, one thing.  Absolutely do not say a word to me
6   now about where you are in terms of your deliberations, not a
7   word.  Okay.  I don't want to know any votes.  I don't want to
                          Page 6

Grant Transcript.txt

8    know anything.
9        Let me ask you first a question.  You asked in the
10   last note:  "One of the jurors wants to know if there is any
11   other evidence entered about the substance of the conversation
12   for the meeting at the Marriott with Tone and Phillip other
13   than Tone Grant's handwritten notes."
14       My question to you is:  Are you looking for other
15   testimony or are you looking for other exhibits?  Or possibly
16   both?
17       THE FOREPERSON:  I think both.
18       THE COURT:  Both.  Okay.
19       Then you had a question about the verdict forms and
20   you wanted to know if the foreperson signs -- it says "or
21   both."  I'm not sure what the "or both" is.  But let me just
22   explain to you that I give you lots of copies of the verdict
23   form just for you to keep track of your deliberations and your
24   vote.  The only person that signs the verdict form is the
25   foreperson.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3091

84H9GRAF
1        I want to remind you that you have to deal with each
2    count separately and that you can't return a verdict of guilty
3    or not guilty unless you are unanimous.  Unanimous means
4    everybody agrees.  And if you are not unanimous about anything
5    at this point, I tell you to just keep talking.
6        Does -- just ask does that clarify the questions about
7    the verdict form?
8        THE FOREPERSON:  Yes.
9        THE COURT:  Anybody still have a question about the
10   verdict form?
11       Okay.  So let me give you -- we made up another bunch
12   of forms.  Let me give them to you, and we'll -- and Josh for
13   some reason, some odd thing is happening on his printer that
14   there are little stars on these forms, some place, we don't
15   know why.  We put a new cartridge in and it's doing something
16   weird.  Ignore that.  Stars are irrelevant.  Just follow the
17   typewritten material.
18       So let me send you back and we'll focus on what other
19   testimonial or documentary evidence there is.
20       It's the focus, and just confirm for me, is on the
21   substance of the meeting; in other words, what was said?  Is
22   that what you mean by substance?  Okay.  Very good.  Thank you.
23       (Jury deliberations resumed; time noted:  12:54 p.m.)
24       (Continued on next page)
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3092

84H9GRAF
1        (In open court)
2        MR. BAROFSKY:  So, your Honor, we're going to look to
3    identify the relevant portions of Maggio and Trosten's
4    testimony about their conversations with Phil Bennett about the
5    substance of the meeting both before and afterwards, what he
6    planned to say and then whatever.
7        THE COURT:  To me that seems to be what they're asking
8    for.  Okay.  So obviously you'll try to agree and then you will
9    Xerox with just the portions on the pages, black out the other
10   stuff.
11       MR. BAROFSKY:  We'll redact out any objections.
12       THE COURT:  Any objections, just exactly what the
Page 7

Grant Transcript.txt
```
13   question and answer is.
14          MR. GARCIA:  Will do.  Thank you, your Honor.
15          THE COURT:  I'll be upstairs.
16          (Recess pending verdict)
17          (In open court; jury not present; time noted:
18   2:23 p.m.)
19          THE COURT:  First, we received another note.  If I'm
20   correct, we're up to Court Exhibit 8.  And the jury has dated
21   it at 1:44.  And it says:  "Judge Buchwald, the last piece of
22   information we need is what was requested earlier.  Once we
23   obtain this information we can continue our deliberations."
24          I guess the record should reflect that the jury has
25   very recently been given the agreed-upon segments of
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                3093
84H9GRAF
```
1    Mr. Maggio's testimony and the -- and been told that there's
2    more to come and that now the issue concerns Mr. Trosten's
3    testimony, and there is a dispute about page 1210, lines 8
4    through 17.
5           MR. ZUCKERMAN:  Your Honor, that was the finish of my
6    cross-examination designed to attack the credibility of
7    Mr. Trosten specifically as it related to his description of
8    these key events.
9           So, while the -- his description of the events is
10   elucidating, the fact that the events occurred approximately --
11   that he is describing in his material was used approximately
12   three days before May 20, 2004 when he stole money, the jury
13   could infer from this defendant, certainly is a circumstance
14   that allows the jury to conclude that he is not giving an
15   accurate description of the events on May 17.
16          MR. GARCIA:  Respectfully, your Honor, this piece on
17   NavTech has nothing to do with the conversation that happened
18   on May 17 or May, 2004.  NavTech wasn't discussed.  This is not
19   impeachment of Mr. Trosten's recollection of the conversation
20   that happened.  It's impeachment generally of:  Mr. Trosten is
21   not a great guy.
22          THE COURT:  There's a lot of things that might go to
23   that.  I agree on the government with that.  That was a
24   decision I reached just when I read it before hearing any
25   argument.  So do you have a copy of this ready to go without
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                3094
84H9GRAF
```
1    the six lines?
2           MR. GARCIA:  Yes, we do, your Honor.
3           MR. ZUCKERMAN:  Could I raise an unrelated point
4    that's no reflection on the Court's equipment but there is a --
5    one of the stars that appears on the jury verdict form that's
6    to go in is in the guilty box.
7           THE COURT:  Not on my copy.
8           MR. ZUCKERMAN:  It's like a bad omen.
9           THE COURT:  We didn't mean it.  You remember I did
10   tell them that it was Josh's new cartridge.
11          MR. ZUCKERMAN:  If we could erase it, I'll hand mine
12   up.
13          THE COURT:  I'll take your word for it.  I'm just
14   telling you if you look at mine, the -- it really --
15          MR. ZUCKERMAN:  Good.  On this one the star is in not
16   guilty.
17          THE COURT:  They are kind of random, and I think I did
```
                                Page 8

Grant Transcript.txt

18    explain that to them and I was glad after the -- Bernie told me
19    that someone was concerned about it down here that I had
20    explained it.  I otherwise wouldn't have thought.
21            MR. ZUCKERMAN:  Are they printed or Xeroxed, I guess?
22            THE DEPUTY CLERK:  They are Xeroxed.
23            MR. ZUCKERMAN:  So you Xeroxed them off of that?
24            THE DEPUTY CLERK:  Not the copy you have.
25            THE COURT:  I took one of the group that Josh made for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    3095

84H9GRAF
 1    the jury because I actually didn't have the verdict form.
 2            MR. ZUCKERMAN:  All right.
 3            THE COURT:  Josh, do you want to give this to
 4    Mr. Zuckerman.
 5            (Recess pending verdict)
 6            (In open court; jury not present)
 7            THE COURT:  The last note which is timed at 2:40,
 8    although the jurors apparently don't know what day it is
 9    because they said it was April 19.  The note reads:  "We have
10    reached our verdict."
11            So at this time call the jury back in.
12            (Jury renders verdict; time noted:  2:52 p.m.)
13            THE COURT:  Please be seated.  We have received your
14    note that you've reached a verdict.  And we will now proceed to
15    take that verdict.  Josh.
16            THE DEPUTY CLERK:  Will the jurors please answer
17    present when your name is called.
18            (Jury roll called; all present)
19            Will the foreperson please rise.
20            Has the jury agreed upon a verdict?
21            THE FOREPERSON:  Yes.
22            THE DEPUTY CLERK:  With respect to Count 1, conspiracy
23    to commit securities fraud, wire fraud, bank fraud and/or money
24    laundering, how do you find the defendant with respect to Count
25    1?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    3096

84H9GRAF
 1            THE FOREPERSON:  Guilty.
 2            THE DEPUTY CLERK:  Count 2, securities fraud.  How do
 3    you find the defendant with respect to Count 2?
 4            THE FOREPERSON:  Guilty.
 5            THE DEPUTY CLERK:  Count 3, wire fraud.  How do you
 6    find the defendant with respect to Count 3?
 7            THE FOREPERSON:  Guilty.
 8            THE DEPUTY CLERK:  Count 4, bank fraud.  How do you
 9    find the defendant with respect to Count 4?
10            THE FOREPERSON:  Guilty.
11            THE DEPUTY CLERK:  Count 5, money laundering.  How do
12    you find the defendant with respect to count five?
13            THE FOREPERSON:  Guilty.
14            THE DEPUTY CLERK:  Ladies and gentlemen of the jury,
15    listen to your verdict as it stands recorded.
16            With respect to Count 1, the defendant is found
17    guilty.
18            With respect to Count 2, the defendant is found
19    guilty.
20            With respect to Count 3, the defendant is found
21    guilty.
22            With respect to Count 4, the defendant is found
                            Page 9

Grant Transcript.txt
23    guilty.
24           With respect to Count 5, the defendant is found
25    guilty.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              3097
      84H9GRAF
1            THE COURT:  Ladies and Gentlemen, is that your
2     verdict?
3            THE JURY:  Yes.
4            THE COURT:  Is there any further request to poll the
5     jury?
6            MR. ZUCKERMAN:  Yes, your Honor, please poll jury.
7            (Jury polled; each juror answered in the affirmative)
8            THE DEPUTY CLERK:  Jury polled.  Verdict unanimous.
9            THE COURT:  Counsel, other than my thanking the jury
10    for their service, do we need to keep them any further?
11           MR. ZUCKERMAN:  No, your Honor.
12           MR. BAROFSKY:  No, your Honor.
13           THE COURT:  Ladies and Gentlemen, when I was talking
14    to you yesterday and excusing the alternate jurors, I told you
15    then that I thank you for your service.  I never thank a jury
16    for its particular verdict.  That is always your decision.  And
17    I think -- I explained fairly clearly yesterday why it is that
18    we thank you and it's for your service and taking the time out
19    of your lives and in your case for being such a really terrific
20    jury.  We never had to wait for you in the morning, and I know
21    some of you came from quite a distance.  And you were
22    attentive.  And you worked hard.  And we very much appreciate
23    your service.  And I thank you again.  And you're excused.
24    Okay.  Thank you very much.
25           (Jury discharged)
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              3098
      84H9GRAF
1            THE COURT:  Are there any applications that I should
2     be hearing?
3            MR. BAROFSKY:  No, your Honor.
4            THE COURT:  Okay.  Would someone remind me, because I
5     don't even think I know, what are Mr. Grant's bail conditions?
6            MR. GOELMAN:  He has a bond.  I forget the precise
7     amount of the bond.  I actually don't have my bail file with
8     me.  He has a bond that was entered when he was arraigned last
9     January.
10           MR. BAROFSKY:  Your Honor, we don't have any objection
11    to bail being continued.
12           THE COURT:  I'm not suggesting that you should.  I
13    just was curious as to what the bail condition.
14           MR. BAROFSKY:  Unfortunately, I don't have the file --
15    I think it was a ten million dollar bond.  Your Honor, there
16    were some cosigners and it was a ten million dollar bond, and I
17    think travel was restricted to the 48 states.  And as I said, I
18    don't think we -- we don't have any objection to being
19    continued as such.
20           THE COURT:  Other than setting a sentencing date, is
21    there anything else we need to do?
22           MR. ZUCKERMAN:  No, your Honor.
23           THE COURT:  What about July 23?
24           MR. BAROFSKY:  Your Honor, I'm going to be away.  If
25    we do it the following week, I'll be around.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

Grant Transcript.txt

3099

84H9GRAF

```
 1              THE COURT:  I'm hoping not to be here the following
 2  week.
 3              Is August 13 consistent with everyone's prior
 4  schedule?
 5              MR. ZUCKERMAN:  I don't have a calendar.  I'm sorry.
 6  I think it is.  Mr. Eisen says he is not going to be here.
 7              MR. BAROFSKY:  Nor is Mr. Garcia.
 8              THE COURT:  Before I do the more elaborate version of
 9  the schedule, August 7, does that work?
10              MR. BAROFSKY:  Fine for the government.
11              MR. ZUCKERMAN:  I think so, your Honor.
12              THE COURT:  I assume you're coming up from Washington
13  that morning.  Is something like 11:30 a good time?
14              MR. ZUCKERMAN:  I'm sure we'll come up the night
15  before.
16              THE COURT:  I don't think I have anything on that day
17  at this point.  So I'm just trying to get.
18              MR. ZUCKERMAN:  My sense is that, to allow for the
19  fullness of the proceeding, either the early afternoon or the
20  midmorning so that we have a fair amount of time.
21              THE COURT:  You've already learned that I work through
22  lunch.  Put it down for August 7 at 10:45.
23              MR. ZUCKERMAN:  Fine.
24              MR. BAROFSKY:  Fine, your Honor.
25              THE COURT:  I would like the defense submissions no
```
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

3100

84H9GRAF

```
 1  later than July 18 in hand in chambers, and the government's
 2  submission by July 31 in hand in chambers.  Okay.  I think
 3  that's it.  Okay.
 4              MR. BAROFSKY:  Thank you, your Honor.
 5              MR. GARCIA:  Thank you, your Honor.
 6              MR. ZUCKERMAN:  Thank you, your Honor.
 7              (Adjourned)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

Page 11

# EXHIBIT
# 1(f)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

     -v-

SANTO C. MAGGIO,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -x





INFORMATION

07 Cr.

# 07 CRIM 1196

## COUNT ONE

**(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make False Filings With The SEC, To Make Material Misstatements To Auditors, Bank Fraud and Money Laundering)**

The United States Attorney charges:

### RELEVANT ENTITIES AND PERSONS

1. At certain times relevant to this Information, Refco, Inc. was a Delaware corporation with its principal place of business in New York, New York. From at least the mid-1990s, the business of Refco, Inc. and its predecessor entities included providing execution and clearing services for exchange-traded derivatives and providing prime brokerage services in the fixed income and foreign exchange markets. Refco, Inc. held its initial public offering of common stock on or about August 10, 2005. Prior to on or about August 10, 2005, Refco, Inc.'s predecessor entities were privately held. Refco, Inc. and its predecessor entities are referred to herein collectively as "Refco."

2. At all times relevant to this Information, Phillip

R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco.   At all times relevant to this Information, Bennett had a substantial ownership interest in Refco, directly and indirectly.

3.   At certain times relevant to this Information, Robert C. Trosten, a coconspirator not named as a defendant herein, held senior management positions at Refco.   Among other positions, Trosten was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.   At certain times relevant to this Information, Tone N. Grant, a coconspirator not named as a defendant herein, held a senior management position at Refco.   From at least in or about 1997 through in or about June 1998, Grant was the President of Refco.   At certain times relevant to this Information, Grant indirectly held a significant ownership interest in Refco.

5.   At certain times relevant to this Information, SANTO C. MAGGIO, the defendant, held senior management positions at Refco.   Among other positions, MAGGIO was an Executive Vice President of Refco, and the President and Chief Executive Officer of Refco Securities LLC, a wholly owned subsidiary of Refco.

6.   At all times relevant to this Information, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in

2

Austria.  BAWAG was owned at various times by, among other
entities, the Austrian Trade Unions Association, formally known
as Österreichischer Gewerkschaftsbund (ÖGB).  At various times
relevant to this Information, BAWAG indirectly held a substantial
ownership interest in Refco.

7.    At all times relevant to this Information, Refco
Group Holdings, Inc. ("RGHI") was a privately-held Delaware
corporation that held a substantial ownership interest in Refco.
At various times relevant to this Information, RGHI was owned in
whole or in part by Phillip R. Bennett and Tone N. Grant.

### THE SCHEME TO DEFRAUD

8.    From at least as early as in or about the late
1990s, SANTO C. MAGGIO, the defendant, at the direction of
Phillip R. Bennett and together with others known and unknown,
schemed to hide the true financial health of Refco from its
banks, counterparties, auditors, and investors.  Starting at
least as early as the late 1990s, Bennett, MAGGIO, and their
coconspirators embarked on a strategy to mask the true
performance of Refco's business in order to sell the company for
Bennett and MAGGIO's own benefit and that of Refco's owners other
than Bennett.  To that end, over the ensuing years, Bennett,
MAGGIO, and others known and unknown systematically (1) covered
up both Refco's own losses and customer losses for which Refco
became responsible; (2) moved Refco operating expenses off the

3

company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

9.    In furtherance of this scheme, Phillip R. Bennett, SANTO C. MAGGIO, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC").  The scheme included obtaining, through fraud, the following:  lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57 per cent of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

10.    In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by Phillip R. Bennett, Tone N.

Grant and one other partner. As of early 1997, RGHI owed Refco at least approximately $106 million. Starting later in 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business. In response to these losses, at various times between in or about May 1997 and in or about October 2005, Bennett, and later, SANTO C. MAGGIO and their coconspirators, moved losses and expenses out of Refco and into RGHI, and artificially padded Refco's revenues at the expense of RGHI, in an effort to hide Refco's true liabilities, manipulate its reported earnings, and thereby seek to defraud a purchaser into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners. This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion (the "RGHI receivable"). The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed

5

to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

### Historical Losses

11.   As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco.  In the later 1990s, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million.  These customer losses included the following:

### Asian Debt Crisis Customers

12.   In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed

6

market conditions, they totaled approximately $185 million.

**Customer 1**

13.  In or about October 1997, a Refco customer to whom
Refco had extended credit ("Customer 1"), lost more than $90
million in a series of transactions carried out on the Chicago
Mercantile Exchange ("CME").  When Customer 1 could not cover his
margin requirements, Refco was forced to meet the margin call
from the CME, using the proceeds of a short-term loan from a
financial institution of at least approximately $90 million to
meet its margin requirements, and then using customer funds taken
from the unregulated segments of Refco's business to repay the
loan.

14.  Recognizing that public acknowledgment of a loss
of more than $90 million would threaten Refco's continued
existence, Phillip R. Bennett, Tone N. Grant, SANTO C. MAGGIO,
and others known and unknown falsely represented to the public
and other customers that Refco had not sustained a significant
loss as a result of Customer 1's losses.  In addition, Bennett
and others significantly misrepresented the size of the loss to
Refco's auditors.

15.  Philip R. Bennett, SANTO C. MAGGIO, and others,
having misrepresented to third parties that Refco had not
suffered a significant loss as a result of Customer 1's trading
activity, caused at least $71 million of debt owed by Customer 1

7

from the trading losses to be transferred to become a debt from RGHI to Refco.

### Refco Expenses Moved To RGHI

16. Beginning at least as early as 1999, Phillip R. Bennett and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI.

17. The result of these actions by Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators was to contribute to the large and growing debt owed by RGHI to Refco. By in or about February 1999, RGHI owed Refco at least approximately $252 million. In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary. Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

### Refco's Losses Funded By Use Of Customer Funds

18. Starting at least in or about 1997, Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators caused Refco to use customer funds to cover its losses. As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions. Accordingly, Bennett,

MAGGIO, and others caused Refco systematically to fail to meet
settlement on its customer transactions, often on a daily basis,
in amounts that exceeded, at times, approximately $100 million a
day.  Bennett, MAGGIO, and others then caused Refco to repeatedly
misrepresent to the financial institutions to whom Refco owed
money to settle Refco's customers' transactions that its failure
to make settlement was an error, when in fact Refco purposefully
selected, on a rotating basis, institutions with whom it would
fail to make settlement, and attempted to stagger its failures to
make settlement with each institution so as not to arouse
suspicion from the institutions that Refco was in fact unable to
fulfill its daily settlement obligations.

### BAWAG Invests In Refco

19.  By the end of 1998, Refco was in a precarious
financial condition, in light of the significant customer and
proprietary trading losses it had absorbed and the resulting
daily failure to make settlement on customer transactions.  In
order to address that problem, in or about late 1998, Bennett
sought a capital contribution from BAWAG.  In a transaction that
closed in 1999, BAWAG, through an affiliate, purchased a ten
percent ownership interest in Refco for approximately $95
million, and lent Refco approximately $85 million of additional
capital in return for an option to purchase an additional ten
percent of Refco.

9

## Hiding The RGHI Receivable

20. Throughout the period covered by this Information, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February. Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including Phillip R. Bennett. Refco and RGHI were related parties.

21. Beginning at least as early as February 1998, Phillip R. Bennett and SANTO C. MAGGIO, among others, directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco. At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end. Bennett and, later, MAGGIO and others, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end

10

on February 28, 1998 through the fiscal year-end on February 29, 2004. Bennett, MAGGIO and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, Phillip R. Bennett, SANTO C. MAGGIO and others, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, Phillip R. Bennett and SANTO C. MAGGIO's year-end, and starting in 2004, quarter-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to May 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |

| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.     These transactions typically followed standard patterns.  For example, in or about February 2000, SANTO C. MAGGIO, Phillip R. Bennett and others caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.     Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were reversed, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar

12

to the agreements that follow:

        (i).     On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

        (ii).     On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by Bennett on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

        (iii).     On or about the same date, Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

        b.    At or around the same time as the transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was reversed.  Refco lent

13

$300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI. RGHI then used the $300 million to pay off the loan from BAWAG.

25. In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, SANTO C. MAGGIO and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

26. At various times prior to August 2004, Phillip R. Bennett, SANTO C. MAGGIO, and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI. In particular, Bennett, MAGGIO and others caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

14

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|---|---|---|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

## Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.  Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

## Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted Phillip R. Bennett in hiding the RGHI receivable in the manner described above, Bennett and SANTO C. MAGGIO caused Refco to assist BAWAG in hiding its own balance sheet problems.  In or

15

about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG arranged through Bennett and MAGGIO to hold in an account at Refco certain worthless bonds and other investments that Refco, at Bennett and MAGGIO's direction, maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### Bennett's "Exit Strategy" Develops

29.  In or about 2003, Phillip R. Bennett caused Refco to hire an investment bank (the "Investment Bank"), to assist in selling Refco.  Bennett asked the Investment Bank to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, Bennett directed the Investment Bank to look for other purchasers for the company, with the understanding that it would be taken public.

30.  In connection with Phillip R. Bennett's plan to sell Refco, Bennett, SANTO C. MAGGIO, and others (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational

problems at the company.

### The Fraudulent Leveraged Buyout Transaction

31.    In or about 2003, Phillip R. Bennett, SANTO C.
MAGGIO, and others began negotiations with Thomas H. Lee
Partners, a private equity fund, regarding that entity's possible
purchase of a controlling stake in Refco as part of a leveraged
buyout transaction.  As ultimately carried out on or about August
5, 2004, the leveraged buyout was structured as follows:  Thomas
H. Lee Partners, through an affiliate, purchased a 57 percent
ownership interest in Refco, in return for approximately $507
million of new capital; simultaneously, Refco sold $600 million
in notes and obtained $800 million in financing from a syndicate
of banks.

#### *Lies To Thomas H. Lee Partners*

32.  In connection with the leveraged buyout
transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others
caused Refco's audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  Those
audited financial statements were false and misleading in the
following respects, among others:

a.    The financial statements hid the size of the
related party receivable from RGHI, which at the end of February
2004 was, but for the cover-up loan transactions, at least
approximately $1 billion, whereas the financial statements

misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

    b. The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

    33. In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

    34. In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the note underwriters and note purchasers the following false and misleading information:

    a. Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

    b. Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in

18

fact, caused the Asian Debt Crisis Customer Losses; and

      c.  Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

     35.  In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

      a.  Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

      b.  Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

      c.  Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to

<div align="center">19</div>

RGHI for the purpose of hiding them.

36.    The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.    Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| Trosten | $48 million |
| Grant | $16 million |
| Other Former Equity Partners | $81.5 million |
| MAGGIO | $5.75 million |
| Other Refco Officers, Employees, and Affiliated Parties | $106.25 million |

## Bennett Plans To Take Refco Public

37.    After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, SANTO C. MAGGIO, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

38.    Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett, SANTO C. MAGGIO, and others

20

continued their manipulation of Refco's finances:  At each quarter and year-end period, Bennett and MAGGIO caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and Bennett and MAGGIO continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  Bennett and MAGGIO caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|---|---|---|---|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

        39.  Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, Bennett and MAGGIO caused the following transactions, among others, to artificially inflate Refco's revenues:

        a.   On or about February 11, 2005, Bennett and

21

MAGGIO caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

b.    On or about February 17, 2005, Bennett and MAGGIO caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a result of the transactions. The $5 million loss was then added to the RGHI receivable.

## Refco's Public Filings And Publicly Traded Securities

40.    In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

41.    On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. Phillip R. Bennett signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party

22

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

42.    On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K.  Phillip R. Bennett signed the annual report on or about July 19, 2005, in New York, New York.  Bennett also signed two certifications regarding the annual report.  In those certifications, Bennett attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company."  As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

43.    On or about August 8, 2005, Refco filed an S-1

23

registration statement with the SEC in connection with its initial public offering of common stock. Phillip R. Bennett signed that registration statement on or about August 8, 2005, in New York, New York.

44. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

45. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party

24

transaction required to be disclosed in the public filings.

## Refco's August 2005 IPO

46.   On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Phillip R. Bennett, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in Refco.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

## End Of Quarter Transactions In August 2005

47.   In or about late August 2005, after the completion of Refco's IPO, Phillip R. Bennett and SANTO C. MAGGIO caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were reversed.

## Public Disclosure Of The Related Party Debt

48.   In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10,

25

2005, having received an emergency loan in that approximate amount from BAWAG.

49. On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

50. Following Refco's announcement, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

51. On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York.  Refco's common stock was subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

52. From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere,

26

SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely:  (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

53.  It was a part and object of the conspiracy that
SANTO C. MAGGIO, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon a person,
in connection with the purchase and sale of notes issued by Refco
and the common stock of Refco, Inc., all in violation of Title
15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

54.  It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, in reports and

documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

## False Statements In SEC Filings – Securities Act

55.   It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## Wire Fraud

56.   It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Material Misstatements To Auditors

57.    It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and Phillip R. Bennett, an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act of 1934 and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

### Bank Fraud

58.    It was further a part and object of the conspiracy

30

that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

59. It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

60. Among the means and methods by which SANTO C. MAGGIO, the defendant, and others known and unknown, and their co-conspirators would and did carry out the conspiracy were the

31

following:

        a.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to the public the size of customer losses for which Refco was responsible.

        b.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators transferred losses incurred by Refco to Bennett's company, RGHI.

        c.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

        d.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators caused Refco to file false and fraudulent statements with the SEC.

        e.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators made and caused to be made material false statements and omissions to Refco's auditors.

        f.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

### Overt Acts

61.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, Phillip R. Bennett and Tone N. Grant misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, Phillip R. Bennett and Tone N. Grant signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.    On or about February 20, 2004, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $720 million loan from Refco Capital Markets, Ltd., to a customer.

e.    On or about April 27, 2004, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party receivables had been fully disclosed to the auditors.

f.    On or about May 17, 2004, Phillip R. Bennett and Tone N. Grant met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

g.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Robert C. Trosten approximately $48 million.

h.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Tone N. Grant approximately $4 million.

i.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the defendant, approximately $5.75 million.

j.    On or about August 8, 2004, Phillip R. Bennett caused RGHI to transfer to TONE N. GRANT approximately

34

$12 million.

k.    On or about February 23, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $345 million loan from a Refco customer to RGHI.

l.    On or about April 6, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-4 registration statement.

m.    On or about May 25, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $450 million loan from a Refco customer to RGHI.

n.    On or about July 19, 2005, in New York, New York, Phillip R. Bennett signed Refco's annual report on Form 10K.

o.    On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

p.    On or about August 26, 2005, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $420 million loan from Refco Capital Markets, Ltd., to a customer.

q.    On or about September 6, 2005, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the

35

defendant, approximately $7,668,600.

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

62.   The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

63.   From in or about the late 1990s up to in or about 2004, in the Southern District of New York and elsewhere, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

36

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

    (Title 15, United States Code, Sections 78j(b) and 78ff; Title
      17, Code of Federal Regulations, Section 240.10b-5; and
          Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

      The United States Attorney further charges:

      64.  The allegations contained in paragraphs 1 through

51, 60 and 61 of this Information are repeated and realleged as

if fully set forth herein.

      65.  From in or about the late 1990s up to in or about

October 2005, in the Southern District of New York and elsewhere,

SANTO C. MAGGIO, the defendant, unlawfully, willfully, and

knowingly, directly and indirectly, by the use of means and

instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ,

in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing devices, schemes, and artifices to defraud; (b)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of

business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT FOUR

### (Wire Fraud)

The United States Attorney further charges:

66.   The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

67.   On or about July 19, 2005, in the Southern District of New York, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, the electronic transmission of Refco Form 10-K from New York, New York to Virginia.

(Title 18, United States Code, Sections 1343 and 2).

38

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOUR

68.    As a result of committing one or more of the
foregoing securities fraud offenses, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff; and Title 17, Code
of Federal Regulations, Sections 240.10b-5, as alleged in Counts
One, Two and Three; and wire fraud offenses, in violation of
Title 18, United States Code, Section 1343, as alleged in Counts
One and Four of this Information, SANTO C. MAGGIO shall forfeit
to the United States pursuant to Title 18, United States Code,
Section 981(a)(1)(C) and Title 28, United States Code, Section
2461, all property, real and personal, that constitutes or is
derived from proceeds traceable to the commission of the
securities and wire fraud offenses, including but not limited to
the following: At least $2.4 billion in United States currency,
representing the amount of proceeds obtained as a result of the
charged wire and securities fraud offenses, for which the
defendant is jointly and severally liable.

## SUBSTITUTE ASSETS PROVISION

69.    If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

(i)    cannot be located upon the exercise of due
diligence;

(ii)    has been transferred or sold to, or
deposited with, a third party;

39

          (iii)   has been placed beyond the jurisdiction of
the court;

          (iv)   has been substantially diminished in value;
or

          (v)   has been commingled with other property which
cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18,
United States Code, Section 982 and Title 21, United States Code,
Section 853(p), to seek forfeiture of any other property of said
defendants up to the value of the forfeitable property described
above.

    (Title 18, United States Code, Sections 371, 981, 982, 1343;
  Title 15, United States Code, Sections 78j(b), 78ff; Title 17,
Code of Federal Regulations, Sections 240.10b-5; Title 21, United
States, Section 853(p); and Title 28, United States Code, Section
                    2461.)


_Michael J. Garcia_
MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

- v -

## SANTO C. MAGGIO,

Defendant.

## INFORMATION

07 Cr.

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

12/19/07
Filed Inf
Ellis, J.

# EXHIBIT
# 1(g)

Maggio Transcript.txt

1

7CJAAMAGP                    Plea
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3
3   UNITED STATES OF AMERICA,
4              v.                        07 SD 312 (RLE)
4
5   SANTO C. MAGGIO,
5
6                   Defendant.
6
7   ------------------------------x
7
8                                        New York, N.Y.
8                                        December 19, 2007
9                                        11:30 a.m.
9
10
10  Before:
11
11                   HON. RONALD L. ELLIS,
12
12                                        Magistrate Judge
13
13
14                   APPEARANCES
14
15  JAMES B. COMEY
15      United States Attorney for the
16      Southern District of New York
16  NEIL BAROFSKY
17  CHRISTOPHER GARCIA
17      Assistant United States Attorney
18
18  PAUL SHECHTMAN
19      Attorney for Defendant Maggio
19
20  SCOTT E. HERSHMAN
20      Attorney for Defendant Maggio
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

7CJAAMAGP                    Plea
1           (Case called)
2           MR. BAROFSKY:  Neil Barofsky and Christopher Garcia
3   for the government.
4           Good morning, your Honor.
5           MR. SCHECTMAN:  Paul Shechtman, for Mr. Maggio, with
6   Scott Hershman, for Mr. Maggio.
7           THE COURT:  Okay.  I understand that he is going to be
8   pleading to an information.
9           MR. SCHECTMAN:  Correct, your Honor.
10          THE COURT:  Has he waived indictment yet?
11          MR. SCHECTMAN:  You have the paperwork.  We're ready
12  to waive.
Page 1

Maggio Transcript.txt

```
13              THE COURT:  We will do those separately.  Treat the
14  waiver as it should be and then I'll consider the taking of the
15  plea.
16              MR. SCHECTMAN:  Sounds right.
17              COURTROOM DEPUTY:  You are Santo Maggio?
18              THE DEFENDANT:  Yes.
19              COURTROOM DEPUTY:  Have you signed this waiver of
20  indictment.
21              THE DEFENDANT:  Yes.
22              COURTROOM DEPUTY:  Before you signed it did you
23  discussion it with your attorney?
24              THE DEFENDANT:  Yes.
25              COURTROOM DEPUTY:  Did he explain it to you?
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                        3
      7CJAAMAGP              Plea
```
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  Do you understand what you are doing?
 3              THE DEFENDANT:  Yes.
 4              COURTROOM DEPUTY:  Do you understand that you are
 5  under no obligation to waive indictment?
 6              THE DEFENDANT:  Yes.
 7              COURTROOM DEPUTY:  Do you understand that if you do
 8  not waive indictment, if the government wants to prosecute you
 9  they will have to present this case to a grand jury which may
10  or may not indict you?
11              THE DEFENDANT:  Yes.
12              THE COURT:  Do you realize by that by signing this
13  waiver of indictment you have given up your right to have this
14  case presented to a grand jury?
15              THE DEFENDANT:  Yes, I do.
16              COURTROOM DEPUTY:  Have you seen a copy of the
17  information?
18              THE DEFENDANT:  Yes, I did.
19              THE COURT:  Would you like for me to read it to you?
20              THE DEFENDANT:  No.
21              COURTROOM DEPUTY:  How do you plead?
22              THE DEFENDANT:  Guilty.
23              COURTROOM DEPUTY:  The case has already been assigned
24  to Judge Stein.
25              MR. SCHECTMAN:  Correct.
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                        4
      7CJAAMAGP              Plea
```
 1              MR. BAROVSKY:  Your Honor, we consent to the defendant
 2  being released on his own recognizance.
 3              MR. SCHECTMAN:  We don't object to that.
 4              THE COURT:  Technically to the information you are
 5  supposed to plead "not guilty".
 6              MR. SCHECTMAN:  I think that is right and it is my
 7  apologies.
 8              THE DEFENDANT:  I plead not guilty now and then later
 9  of guilty.
10              MR. SCHECTMAN:  Not guilty at this time, your Honor,
11  but we will be entering a guilty plea.
12              THE COURT:  Objection.  All right.  Now, the actual
13  plea has been referred by Judge Stein; is that it?
14              MR. BAROFSKY:  Yes, your Honor.
15              THE COURT:  And how many counts in the information?
16              MR. BAROFSKY:  Your Honor, there are four counts.
17              THE COURT:  What is he pleading to?
```
                              Page 2

Maggio Transcript.txt
```
18          MR. BAROFSKY:  All four counts, Judge.
19          THE COURT:  Okay.  Mr. Maggio, this matter has been
20     referred to me before Judge Stein for the purpose of taking
21     your plea.  Did you consent to proceed before a United States
22     magistrate judge on your felony plea allocution?
23          THE DEFENDANT:  Yes.
24          THE COURT:  Before you signed it did you discuss it
25     with your attorneys?
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                              5

7CJAAMAGP                    Plea
```
1          THE DEFENDANT:  Yes, your Honor.
2          THE COURT:  Did they explain it to you?
3          THE DEFENDANT:  Yes.
4          THE COURT:  Do you understand that you have an
5     absolute right to have this proceeding before a United States
6     district judge?
7          THE DEFENDANT:  Yes, I do.
8          THE COURT:  You are voluntarily proceeding before a
9     United States magistrate judge?
10          THE DEFENDANT:  Yes.
11          THE COURT:  Mr. Maggio, you are charged in a four
12     count information.  Count One of the information charges you,
13     well, conspiracy to commit securities fraud, wire fraud, bank
14     fraud and money laundering and to make false filings with the
15     SEC and material misstatements to auditors in violation of
16     Title 18 U.S.C. Sections 371.  This crime carries a maximum
17     sentence of five years imprisonment, a maximum fine which is
18     the greatest of either $250,5000 or twice the gross pecuniary
19     gain derived from the offense or twice the gross pecuniary loss
20     to persons other than yourself as a result of the offense.
21     There is a $100 special assessment and a term of supervised
22     release of three years.
23          Counts Two and Three of the information charge you
24     with securities fraud in violation of Title 15 U.S.C. Section
25     78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                              6

7CJAAMAGP                    Plea
```
1     Regulations Section 240, 10 (B) (5) and each of those counts
2     carries a maximum sentence of 20 years imprisonment, a maximum
3     fine which is the greatest of either five million dollars or
4     twice the gross pecuniary gain derived from the offense and
5     twice the gross pecuniary loss of persons other than yourself
6     as a result of the offense.  Each also has a $100 special
7     assessment and a term of supervised release of three years.
8          Count four of the information charges you with wire
9     fraud in violation of Title 18 U.S.C. Section 1343 and carries
10     a maximum sentence of 0 years imprisonment, a maximum fine
11     which is the greatest of either $250,000 or twice the gross
12     pecuniary gain derived from the offense, or twice the gross
13     pecuniary loss to person others than yourself as a result of
14     the offense.  It carries a $100 special assessment and a term
15     of supervised release of three years.
16          A total maximum sentence of incarceration on the
17     information is 65 years imprisonment.  In addition to the
18     foregoing the Court must order restitution with respect to the
19     information and in accordance with U.S.C.
20          In addition, if you are sentenced to any period of
21     supervised release and violate the conditions of your
22     supervised release you may be sentenced to all or part of the
```
                              Page 3

Maggio Transcript.txt
23    supervised release as authorized by statute without any credit
24    for time already served on supervised release.
25            Do you understand that?
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                     7

     7CJAAMAGP              Plea
 1            THE DEFENDANT:  Yes.
 2            THE COURT:  So you understand these penalties as I've
 3    read them to you?
 4            THE DEFENDANT:  Yes, I do.
 5            THE COURT:  Have you seen a copy of the information in
 6    which the government makes these charges against you?
 7            THE DEFENDANT:  Yes, I do.
 8            THE COURT:  Have you discussed it with your attorneys?
 9            THE DEFENDANT:  Yes, your Honor.
10            THE COURT:  Are you prepared to enter a plea today?
11            THE DEFENDANT:  Yes, I am.
12            THE COURT:  Santo Maggio, how do you plead?
13            THE DEFENDANT:  Guilty.
14            THE COURT:  Mr. Maggio, before I can recommend that
15    your plea be accepted I must determine that you understand the
16    plea and its consequences, that the plea is voluntary and that
17    there's a factual basis for the plea.  For that purpose I must
18    ask you a number of questions and your answers must be under
19    oath.  Do you understand that the answers you give under oath
20    may subject you to prosecution for perjury if you do not tell
21    the truth?
22            THE DEFENDANT:  Yes, I do.
23            THE COURT:  Raise your right hand.
24            (Defendant Santo C. Maggio sworn)
25            THE COURT:  Thank you.  Please state your full name
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                     8

     7CJAAMAGP              Plea
 1    for record.
 2            THE DEFENDANT:  Santo C. Maggio.
 3            THE COURT:  How far did you go in school?
 4            THE DEFENDANT:  I finished high school.
 5            THE COURT:  Are you currently being treated by a
 6    doctor or psychiatrist for any reason?
 7            THE DEFENDANT:  No.
 8            THE COURT:  Are you currently on any medications which
 9    might effect you in being alert for this proceeding?
10            THE DEFENDANT:  No.
11            THE COURT:  Are you any difficulty seeing, hearing or
12    understanding anything that I am saying?
13            THE DEFENDANT:  No.
14            THE COURT:  Have you had enough time to discuss with
15    your attorneys how you wish to plead?
16            THE DEFENDANT:  Yes.
17            THE COURT:  Are you satisfied with your attorneys?
18            THE DEFENDANT:  Yes.
19            THE COURT:  Do you understand what the government says
20    that you did?
21            THE DEFENDANT:  Yes.
22            THE COURT:  Do you understand that have you a right to
23    plead not guilty?
24            THE DEFENDANT:  Yes.
25            THE COURT:  Do you understand that you have a right to
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                           Page 4

Maggio Transcript.txt

9

7CJAAMAGP                    Plea
1  trial by jury on these charges?
2           THE DEFENDANT:  Yes.
3           THE COURT:  Do you understand that if you are to plead
4  not guilty and go to trial you would be presumed innocent until
5  the government proved your guilt beyond a reasonable doubt?
6           THE DEFENDANT:  Yes, I do.
7           THE COURT:  Do you understand that if you were to go
8  to trial you would have a number of important constitutional
9  rights including the right to be represented by counsel and to
10 have counsel appointed for you if you cannot afford an
11 attorney?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Do you understand that at trial you cannot
14 be forced to testify against yourself?
15          THE DEFENDANT:  Yes.
16          THE COURT:  Do you understand at a trial you would
17 have the right to confront and cross-examine witnesses called
18 by the government?
19          THE DEFENDANT:  Yes.
20          THE COURT:  Do you understand that at a trial you
21 would have the right to testify yourself and to call witnesses
22 on your behalf and to compel their attendance by subpoena if
23 necessary?
24          THE DEFENDANT:  Yes.
25          THE COURT:  Do you understand that if your guilty plea
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

10

7CJAAMAGP                    Plea
1  is accepted there will be no trial of any kind and the only
2  remaining steps in your case will be a presentence report and
3  sentencing by Judge Stein?
4           THE DEFENDANT:  Yes.
5           THE COURT:  Have you discussed with your attorney the
6  role that the sentencing guidelines play in sentencing?
7           THE DEFENDANT:  Yes.
8           THE COURT:  Do you understand that the district judge
9  will retain discretion regardless of what calculations there
10 are under the guidelines?
11          THE DEFENDANT:  Yes.
12          THE COURT:  Do you understand that the calculation
13 under the guidelines will take into account a number of factors
14 including the actual conduct in which you engaged, any victims
15 of the offense, the role that you played in the offense,
16 whether or not you have accepted responsibility for your acts,
17 whether you have any criminal history or whether you have
18 engaged in any obstruction of justice; do you understand that?
19          THE DEFENDANT:  Yes.
20          THE COURT:  Between now and the date of sentencing the
21 probation department will conduct an investigation and will
22 prepare a presentence report.  Your attorney, the government
23 and Judge Stein will receive copies.  Both your attorney and
24 the government will have the opportunity to object if they
25 believe anything in the report is inaccurate; do you understand
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

11

7CJAAMAGP                    Plea
1  that?
2           THE DEFENDANT:  Yes.
3           THE COURT:  Do you understand that until the
                          Page 5

Maggio Transcript.txt

4   presentence report is prepared neither your attorney nor the
5   government, nor Judge Stein will be able to determine precisely
6   what range of penalties will be calculated under the
7   guidelines.
8           THE DEFENDANT:  Yes.
9           THE COURT:  Do you understand than regardless of
10  calculation and the guidelines your sentence cannot exceed the
11  maximums that I advised you of earlier?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Do you understand that under certain
14  circumstances both you and the government may have the right to
15  appeal the sentence imposed.
16          THE DEFENDANT:  Yes.
17          THE COURT:  Do you understand that if the sentence is
18  more severe than you expected you will be bound by your guilty
19  plea and will not be permitted to withdraw it?
20          THE DEFENDANT:  Yes.
21          THE COURT:  You understand that parole has been
22  abolished and that if you are sentenced to any term of
23  imprisonment you will be required to serve the entire term?
24          THE DEFENDANT:  Yes.
25          THE COURT:  Mr. Maggio, are you a citizen of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    12
7CJAAMAGP                     Plea
1   United States?
2           THE DEFENDANT:  Yes, I am.
3           THE COURT:  Mr. Maggio, I have been handed up a plea
4   agreement from your case.  Have you had an opportunity to
5   review and go over this agreement with your attorneys?
6           THE DEFENDANT:  Yes.
7           THE COURT:  Do you understand that one of the
8   provisions in the plea agreement is that you admit the
9   forfeiture allegation in the information and that you agree to
10  forfeit to the United States a sum of money equal to two
11  billion, four hundred million dollars?
12          THE DEFENDANT:  Yes.
13          THE COURT:  That is what it says, right?
14          MR. BAROFSKY:  Yes, your Honor, that number is
15  correct.
16          Your Honor, the plea cooperation agreement also
17  provides, however, that in satisfaction of that amount there
18  are certain schedules attached to the plea agreement which the
19  government will accept in satisfaction of that judgment.
20          MR. SCHECTMAN:  We don't have quite that much, your
21  Honor.
22          THE COURT:  Okay.  I thought had I too many zeros
23  myself at first.
24          MR. SCHECTMAN:  No, you read it right.
25          THE COURT:  That represents the amount of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    13
7CJAAMAGP                     Plea
1   proceedings obtained as a result of the offense; do you
2   understand that?
3           THE DEFENDANT:  Yes.
4           THE COURT:  You also understand that any forfeiture
5   would not be treated as satisfaction of any fine, restitution,
6   cause of imprisonment or any other penalty the Court may
7   impose?
8           THE DEFENDANT:  Yes.
                              Page 6

Maggio Transcript.txt

```
 9          THE COURT:  And as indicated in the agreement, there
10     is a scheduled pay of assets.  You have seen the schedule and
11     you have gone over it with your attorneys?
12          THE DEFENDANT:  Yes.
13          THE COURT:  To make sure that it's accurate?
14          THE DEFENDANT:  Yes.
15          MR. SCHECTMAN:  Judge, I might point out for the
16     record there is a Schedule B as well, which are assets that are
17     in Mrs.~Maggio's name that are being forfeited as part of the
18     plea and there is a separate agreement that need not concern
19     your Honor in this matter involving Mrs.~Maggio.
20          THE COURT:  Is that correct, Mr. Maggio, there is also
21     a Schedule B?
22          THE DEFENDANT:  Yes.
23          THE COURT:  That's Mrs.~Maggio's assets?
24          THE DEFENDANT:  Yes.
25          THE COURT:  That is also covered by the agreement that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                      14
```
       7CJAAMAGP              Plea
 1     you made with the government?
 2          THE DEFENDANT:  Yes.
 3          THE COURT:  You are also understand the agreement
 4     provides that you cooperate fully with the United States
 5     attorney's office?
 6          THE DEFENDANT:  Yes.
 7          THE COURT:  And that in exchange for that cooperation,
 8     assuming that the office determines that you have made full and
 9     accurate disclosures to them, the government has agreed that it
10     will submit a motion pursuant to Section 5K1.1 of the
11     sentencing guidelines in your favor?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Do you understand that if for any reason
14     the government determines that it will not file such a motion
15     you will not be allowed to withdraw your plea?
16          THE DEFENDANT:  Yes.
17          THE COURT:  You understand that even if the government
18     files such a motion sentencing will still be at the sole
19     discretion of the Court?
20          THE DEFENDANT:  Yes, I did.
21          THE COURT:  Is there anything else in the agreement
22     that I might want to highlight?
23          MR. BAROFSKY:  No, your Honor.
24          THE COURT:  All right.  Other than the representations
25     in this agreement, have any promises been made to you by anyone
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                      15
```
       7CJAAMAGP              Plea
 1     to influence you to plead guilty?
 2          THE DEFENDANT:  No.
 3          THE COURT:  This constitutes the sole agreement that
 4     you have?
 5          THE DEFENDANT:  Yes.
 6          THE COURT:  Has anyone promised you a specific
 7     sentence if you plead guilty?
 8          THE DEFENDANT:  No.
 9          THE COURT:  Has anyone made any threats to you to
10     influence you to plead guilty?
11          THE DEFENDANT:  No.
12          THE COURT:  Are you making this plea voluntarily of
13     your own freewill and choice?
                         Page 7
```

Maggio Transcript.txt
```
14                THE DEFENDANT:  Yes, I am.
15                THE COURT:  The elements of the offense is?
16                MR. BAROFSKY:  Your Honor, for Counts One defendant's
17   is charged with conspiracy.  The government would be required
18   to prove each of the elements beyond a reasonable doubt.
19   First, that there is an assistance of a an agreement or
20   understanding to commit one of the objects charged in the
21   information.
22                Second, the defendant knowingly became a member of
23   that agreement or understanding.
24                And third, that one of the conspirators or
25   coconspirators or Mr. Maggio knowingly committed at least one
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

```
     7CJAAMAGP                    Plea
1    overt act in furtherance of the conspiracy during its life.
2                 With respect to the securities frauds counts in two
3    and three, first, the defendant in connection with the purchase
4    or sale of securities, here the notes that are described in
5    Count Two and the common stock of Revko that's referenced in
6    Count Three did one or more of the following:  Employed a
7    devise, scheme or artifice to defraud or made an untrue
8    statement of a material fact or admitted to state a material
9    fact which made what was said under the circumstances
10   misleading or engaged in an act, practice or course of business
11   that operated or would operate as a fraud or deceit upon a
12   purchase of a seller for securities.
13                Second the defendant acted knowingly, willfully with
14   the intent to defraud.
15                And third, the defendant used or caused to be used any
16   means or instruments of transportation or communication in
17   interstate commerce or use of the mails in furtherance of that
18   fraudulent conduct.
19                and with respect to the Count Four wire fraud, first,
20   that there was a scheme or artifice to defraud that existence
21   the defendant must have participated in the scheme with the
22   intent to defraud misrepresentations or omissions must have
23   related to a material fact, that the scheme was executed to
24   obtain money or property.
25                And finally, that in execution of the scheme the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

```
     7CJAAMAGP                    Plea
1    defendant used or caused to be used interstate wires or that
2    such use was reasonably foreseeable to him.
3                 THE COURT:  Mr. Maggio, did you hear that recitation?
4                 THE DEFENDANT:  Yes.
5                 THE COURT:  Did you understand that if the government
6    were to proceed to trial against you it would have the burden
7    of proving each element for each offense, that is, each count
8    beyond a reasonable doubt.
9                 THE DEFENDANT:  Yes.
10                THE COURT:  Did you commit the offenses for which you
11   have been charged, Mr. Maggio?
12                THE DEFENDANT:  Yes.
13                THE COURT:  Tell me what you did.
14                MR. SCHECTMAN:  Judge, if it's acceptable to you
15   Mr. Maggio has written out a statement that I think speaks to
16   all four crimes.
17                THE COURT:  Considering the complexities here I'll
18   allow him to read and then if it's not he could fill in the
```

Page 8

Maggio Transcript.txt

19    gaps.
20         THE DEFENDANT:  Your Honor, from the late 1990s to
21    October 2005 I was a senior executive at Revko Ink.  During
22    that period I participated with others to hide the true
23    financial health of Revko from banks, counter-parties, auditors
24    and investors.  With my knowledge and active participation
25    Revko's substantial losses were covered up as revenues padded
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    18

      7CJAAMAGP              Plea
1     and certain operating expenses were moved off its book.  Among
2     the acts I personally engaged in the signing of loan agreements
3     referencing paragraphs 61-D and 61-P of the indictment.
4          As a result of my conduct and that of my
5     coconspirators false financial statements were issued to obtain
6     debt financing from the public including 9 percent senior
7     subordinated notes referenced in Count Two of the indictment.
8          To consummate the sale of 57 percent of Revko to a
9     group headed by Thomas H. Lee in 2004 and to obtain $800
10    million in bank financing the same year and to effect the Revko
11    initial public offering in 2005.  Moreover, with my knowledge
12    false financial statements were filed with the SEC including
13    form 10K referencing Count Four.  The mails and interstate
14    wires were used as part of the fraudulent scheme.
15         I deeply regret my conduct and the harm that it has
16    caused.
17         THE COURT:  First of all, with respect to all of the
18    activities that you've indicate you participated in it
19    knowingly?
20         THE DEFENDANT:  Yes.
21         THE COURT:  Okay.  Where did this take place.
22         THE DEFENDANT:  In New York, New York.  Manhattan, New
23    York.
24         THE COURT:  You said coconspirators, so other people
25    had agreed with you to effectuate this scheme?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    19

      7CJAAMAGP              Plea
1          THE DEFENDANT:  Yes.
2          THE COURT:  And the intent of this scheme was to
3     defraud?
4          THE DEFENDANT:  Yes.
5          THE COURT:  Now, I know you mentioned the notes and I
6     think you mentioned the 2005 initial offering that was
7     addressed to Count Three of the information, that is, whether
8     or not you had a scheme to defraud people based on the value of
9     the stock?
10         THE DEFENDANT:  Correct, your Honor.
11         THE COURT:  Mr. Maggio?
12         THE DEFENDANT:  Yes.
13         THE COURT:  That did involve false statements?
14         THE DEFENDANT:  Yes.
15         THE COURT:  False filings that you've indicated?
16         THE DEFENDANT:  Yes.
17         THE COURT:  Now, you said you used the mails which
18    interstate -- I mean, you used the mails, a phone?  How did you
19    use --
20         THE DEFENDANT:  Yes, used regular mail.  We used
21    Express Mail.  We used e-mail all to effect the scheme.
22         THE COURT:  You submitted false statements in the
23    mail?
                              Page 9

Maggio Transcript.txt

24       THE DEFENDANT:  False statements, loan agreements as
25  referenced here, yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7CJAAMAGP        Plea

1        THE COURT:  Okay.  Any --
2        MR. BAROFSKY:  Your Honor, I'll just represent to the
3   Court that with respect to Count Four, the wire transmission
4   did in fact originate in the Southern District of New York in
5   Manhattan and was wired outside of the Southern District to
6   Virginia.
7        THE COURT:  Anything else?
8        MR. SCHECTMAN:  Nothing, your Honor.
9        MR. BAROFSKY:  No, your Honor.
10       THE COURT:  I am depending on you here.  Does any
11  either counsel know of any reason why I should not recommend
12  that this plea not be accepted?
13       MR. BAROFSKY:  No, your Honor.
14       MR. SCHECTMAN:  No, your Honor.
15       THE COURT:  Based on defendant's allocution and the
16  recommendations by the government I find that the defendant
17  understands the nature, the charges and consequences of his
18  guilty plea.  I also find that the plea is voluntary and that
19  there is a factual basis for the plea.  I, therefore, recommend
20  that the plea be accepted and direct that a presentence report
21  be reaped.
22       Sentencing will take place before Judge Stein on.
23       MR. BAROFSKY:  May 9, at 2 p.m.
24       THE COURT:  Is there anything else that needs to be
25  addressed today.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7CJAAMAGP        Plea

1        MR. BAROVSKY:  Not from the government, your Honor.
2        MR. SCHECTMAN:  Not from the offense.
3        THE COURT:  We are adjourned.
4                        o O o
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

# EXHIBIT 2

Westlaw.

119 Fed.Appx. 300                                                                                    Page 1
119 Fed.Appx. 300, 2004 WL 2756998 (C.A.2 (N.Y.)), 2004-2 Trade Cases P 74,625
**(Cite as: 119 Fed.Appx. 300, 2004 WL 2756998 (C.A.2 (N.Y.)))**

**H**UCAR Intern. Inc. v. Union Carbide Corp.
C.A.2 (N.Y.),2004.
This case was not selected for publication in the
Federal Reporter.RULINGS BY SUMMARY
ORDER DO NOT HAVE PRECEDENTICAL
EFFECT. CITATION TO SUMMARY ORDERS
FILED AFTER JANUARY 1, 2007, IS
PERMITTED AND IS GOVERNED BY THIS
COURT'S LOCAL RULE 0.23 AND FEDERAL
RULE OF APPELLATE PROCEDURE 32.1. IN A
BRIEF OR OTHER PAPER IN WHICH A
LITIGANT CITES A SUMMARY ORDER, IN
EACH PARAGRAPH IN WHICH A CITATION
APPEARS, AT LEAST ONE CITATION MUST
EITHER BE TO THE FEDERAL APPENDIX OR
BE ACCOMPANIED BY THE NOTATION:
"(SUMMARY ORDER)", UNLESS THE
SUMMARY ORDER IS AVAILABLE IN AN
ELECTRONIC DATABASE WHICH IS
PUBLICLY ACCESSIBLE WITHOUT PAYMENT
OF FEE (SUCH AS THE DATABASE
AVAILABLE AT
HTTP://WWW.CA2.USCOURTS.GOV), THE
PARTY CITING THE SUMMARY ORDER MUST
FILE AND SERVE A COPY OF THAT
SUMMARY ORDER TOGETHER WITH THE
PAPER IN WHICH THE SUMMARY ORDER IS
CITED. IF NO COPY IS SERVED BY REASON
OF THE AVAILABILITY OF THE ORDER ON
SUCH A DATABASE, THE CITATION MUST
INCLUDE REFERENCE TO THAT DATABASE
AND THE DOCKET NUMBER OF THE CASE IN
WHICH THE ORDER WAS ENTERED.Please use
FIND to look at the applicable circuit court rule
before citing this opinion. Second Circuit Rules §
0.23. (FIND CTA2 s 0.23.)
    United States Court of Appeals,Second Circuit.
    UCAR INTERNATIONAL INC., UCAR Global
Enterprises, Inc. and UCAR Carbon Company, Inc.,
                Plaintiffs-Appellants,
                        v.
    UNION CARBIDE CORPORATION, Mitsubishi
    Corporation, Mitsubishi International Corporation,
    Hiroshi Kawamura, and Robert D. Kennedy,
                Defendants-Appellees.
                **No. 04-0741-CV.**

                  Dec. 2, 2004.

**Background:** Corporation sued its two former
controlling shareholders, which had operated
corporation as joint venture, subsidiary of one former
controlling shareholder, and executives of former
controlling shareholders, seeking declaratory
judgment and recovery of payments allegedly made
to former controlling shareholders in violation of
state law, and also asserting claims for aiding and
abetting breaches of fiduciary duty and unjust
enrichment. The United States District Court for the
Southern District of New York, Daniels, J., 2002 WL
31519616, granted motion to disqualify plaintiff's
counsel and, subsequently, 2004 WL 137073, granted
motion to dismiss. Plaintiff appealed.

**Holding:** The Court of Appeals held that in pari
delicto doctrine precluded action brought by
corporation that pleaded guilty to criminal antitrust
violations against former controlling shareholders.
Affirmed.

                West Headnotes

**Corporations 101 🔑189(6)**

101 Corporations
    101IX Members and Stockholders
        101IX(A) Rights and Liabilities as to
Corporation
            101k189 Actions Between Members and
Corporation
                101k189(6) k. Estoppel, Waiver,
Limitations, and Laches. Most Cited Cases
In pari delicto doctrine, prohibiting suits in which
plaintiff was as or more culpable than defendant in
conduct forming basis for complaint, precluded
action brought by corporation against its two former
controlling shareholders, which had operated
corporation as joint venture, subsidiary of one former
controlling shareholder, and executives of former
controlling shareholders, for payments allegedly
made to former controlling shareholders in violation
of state law, where corporation pleaded guilty to
criminal antitrust violations and continued to
participate in price-fixing conspiracy long after
relationships with former shareholders and directors

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

119 Fed.Appx. 300                                                                                    Page 2
119 Fed.Appx. 300, 2004 WL 2756998 (C.A.2 (N.Y.)), 2004-2 Trade Cases P 74,625
**(Cite as: 119 Fed.Appx. 300, 2004 WL 2756998 (C.A.2 (N.Y.)))**

ended.

**\*300** Appeal from the United States District Court for the Southern District of New York (Daniels, J.). UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court be and it hereby is AFFIRMED.

Robert J. Mathias, Piper Rudnick LLP, New York, N.Y. (John J. Clarke and Arthur F. Ferguson, on the briefs), for Plaintiffs-Appellants.

Nathan P. Eimer, Eimer Stahl Klevorn & Solberg LLP, Chicago, IL (Scott C. Solberg, on the brief), and John E. Schmidtlein, Williams & Connolly LLP, Washington, DC (Jonathan B. Pitt, on the **\*301** brief), for Union Carbide Corp. and Robert D. Kennedy.

Theodore V. Wells, Jr., Paul Weiss, Rifkind, Wharton & Garrison LLP, New York, N.Y. (Daniel J. Leffell and David W. Brown, on the brief), for Mitsubishi Corp. and Mitsubishi Int'l Corp.

William J. Schwartz, Kronish Lieb Weiner & Hellman LLP, New York, N.Y. (Celia Goldwag Barenholtz and Jason M. Koral, on the brief), for Hiroshi Kawamura.

PRESENT: CALABRESI, B.D. PARKER, and RAGGI, Circuit Judges.

SUMMARY ORDER

**\*\*1** On February 23, 2000, plaintiff-appellant UCAR International Inc., along with two of its subsidiary companies, UCAR Global Enterprises Inc., and UCAR Carbon Co. Inc. (collectively, "UCAR"), filed suit against its previous controlling stockholders, Union Carbide Corp. ("Union Carbide") and Mitsubishi Corp. ("Mitsubishi"), as well as Mitsubishi International Corp., a Mitsubishi subsidiary; Hiroshi Kawamura, the executive vice president of Mitsubishi, who served as a UCAR director from June 1992 to January 1995; and Robert Kennedy, Union Carbide's former CEO and present UCAR director. In its complaint, UCAR asserted, pursuant to various provisions of Delaware statutory and common law, that the defendants inflicted substantial harm on UCAR by establishing an illegal stock repurchase plain in 1995. For several years prior to the stock repurchase, until a Department of Justice investigation in 1997 that culminated in UCAR's 2000 conviction for criminal antitrust

violations, UCAR was a participant in a global price-fixing scheme. UCAR's complaint alleged that the defendants, by executing the stock repurchase plan without informing UCAR's new controlling stockholders of the price-fixing conspiracy's existence, or the distorting effect of the conspiracy on UCAR's stock value, wrongfully obtained $ 750 million from UCAR's corporate treasury.

The defendants moved to dismiss the complaint for failure to state a claim. They also sought to disqualify William Blumenthal, UCAR's attorney (and Union Carbide's former antitrust advisor), along with his law firm, King & Spaulding. On November 7, 2001, the district court (Daniels, *J.*) disqualified Blumenthal and his firm. On January 26, 2004, UCAR's complaint was dismissed, in its entirety, for failure to state a claim. The court concluded, *inter alia,* that because UCAR was convicted of criminal antitrust violations for participating in the same price-fixing scheme that formed the basis for its complaint against defendants, plaintiff's claims were barred by the *in pari delicto* doctrine. UCAR now appeals the district court's order of dismissal, as well as its decision to disqualify attorney Blumenthal.

In reviewing the dismissal of a complaint under Rule 12(b)(6), we must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g., United States v. City of New York,* 359 F.3d 83, 91 (2d Cir.2004). "General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). In addition to the complaint itself, a court may consider "all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken." *Id.*

**\*\*2** Applying those standards to this case, the district court did not err in dismissing UCAR's complaint. The *in pari delicto* defense prohibits suits in which the plaintiff is as or more culpable than the defendant**\*302** in the conduct forming the basis for the complaint. *See Bateman Eichler, Hill Richards Inc. v. Berner,* 472 U.S. 299, 306-07, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). The pleadings, taken together with the facts of which the district court took judicial notice-including UCAR's admissions in its plea to criminal antitrust violations-establish that the defense

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

119 Fed.Appx. 300                                                                    Page 3
119 Fed.Appx. 300, 2004 WL 2756998 (C.A.2 (N.Y.)), 2004-2 Trade Cases P 74,625
**(Cite as: 119 Fed.Appx. 300, 2004 WL 2756998 (C.A.2 (N.Y.)))**

applies in this case. UCAR seeks to avoid this conclusion by arguing that defendants' wrongdoing-the alleged violation of Delaware law regarding dividend and stock purchase payments in excess of surplus-is distinct from the corporation's admitted antitrust violations. In fact, the law does not require defendants' and UCAR's wrongdoing to be of an identical nature for the *in pari delicto* defense to apply. *See Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082, 1090-91 (2d Cir.1997); *cf. Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990). In this case, it is undisputed that defendants' violation of Delaware law depends on proof of an antitrust conspiracy, in which UCAR was indisputably complicit. And although we recognized in *Kalb, Voorhis & Co. v. American Financial Corp.,* 8 F.3d 130 (2d Cir.1993), that the *in pari delicto* doctrine does not apply when a plaintiff is forced to act through "domination and control," *id. at 133,* UCAR's allegations of "domination and control" are belied by (1) its admission of willful behavior during its plea colloquy in its criminal case; and, most particularly, (2) the fact that UCAR continued to participate in the price-fixing conspiracy long after defendants were no longer its shareholders or directors. Under these circumstances, *Kalb* does not bar the application of the defense.

UCAR's challenge to the district court's disqualification order is also unavailing, and we reject it for substantially the reasons expressed by the district court.

We have considered all of UCAR's arguments and find them to be without merit. The judgment of the district court is therefore AFFIRMED.

C.A.2 (N.Y.),2004.
UCAR Intern. Inc. v. Union Carbide Corp.
119 Fed.Appx. 300, 2004 WL 2756998 (C.A.2 (N.Y.)), 2004-2 Trade Cases P 74,625

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.