SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                       :

In re REFCO, INC. SECURITIES LITIGATION :    07 MDL No. 1902 (GEL)
                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARC S. KIRSCHNER,               :
as Trustee of the Refco Litigation Trust,  :

              Plaintiff,   :    07 Civ. 11604 (GEL)
                       :

              v.           :

GRANT THORNTON LLP, MAYER, BROWN, :
ROWE & MAW LLP, et al., ERNST & YOUNG :
US LLP, PRICEWATERHOUSECOOPERS :
LLP, CREDIT SUISSE SECURITIES (USA) :
LLC (f/k/a CREDIT SUISSE FIRST BOSTON :
LLC), BANC OF AMERICA SECURITIES :
LLC, DEUTSCHE BANK SECURITIES INC., :
PHILLIP R. BENNETT, SANTO C. MAGGIO, :
ROBERT C. TROSTEN, TONE N. GRANT, :
REFCO GROUP HOLDINGS INC., LIBERTY :
CORNER CAPITAL STRATEGIES LLC, :
WILLIAM T. PIGOTT, EMF FINANCIAL :
PRODUCTS LLC, EMF CORE FUND LTD., :
DELTA FLYER FUND LLC, ERIC M. :
FLANAGAN, INGRAM MICRO INC., CIM :
VENTURES INC., BECKENHAM TRADING :
CO. INC., ANDREW KRIEGER, COAST :
ASSET MANAGEMENT LLC (f/k/a COAST :
ASSET MANAGEMENT LP), CS LAND :
MANAGEMENT LLC, and CHRISTOPHER :
PETITT, :

              Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF
# GRANT THORNTON LLP'S MOTION TO DISMISS

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

*Attorneys for Defendant Grant Thornton LLP*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ..................................................................................................................3

POINT ONE
The Trustee, standing in the shoes of Refco itself, cannot recover from Grant Thornton for failing to prevent the misconduct of Refco's own management.
(All Grant Thornton Counts: 3, 4, 5, 6, 23, 24, 25, 26, 41, and 42) ...........................5

  A.  The Wagoner rule bars the Trustee from suing Grant Thornton for injuries caused by the misconduct of corporate management.................................................................5

    1.  The Insiders' wrongdoing must be imputed to the Refco entities and, in turn, to the Trustee......................................................................................................6

    2.  There are no claims against Grant Thornton independent of the Refco Insiders' misconduct. ...............................................................................................11

  B.  The Trustee's claims are barred by the doctrine of in pari delicto...................12

POINT TWO
The Trustee's claims are preempted by New York's Martin Act.
(All Grant Thornton Counts: 3, 4, 5, 6, 23, 24, 25, 26, 41, and 42) .........................13

POINT THREE
The Trustee's claims are preempted by SLUSA.
(All Grant Thornton Counts: 3, 4, 5, 6, 23, 24, 25, 26, 41, and 42) .........................14

POINT FOUR
The claims for aiding and abetting must be dismissed for failure to state a claim.
(Counts 5, 6, 25, 26, and 42) ....................................................................................17

  A.  The Trustee has not pleaded and cannot plead that Grant Thornton actually knew about the torts it was supposedly aiding. ................................................................18

  B.  As a matter of law, Grant Thornton's audit opinions did not constitute "substantial assistance" with regard to the Insiders' torts.................................................22

POINT FIVE
The claims for negligent misrepresentation and malpractice also fail for lack of causation.
(Counts 3, 4, 23, 24, and 41) ....................................................................................24

POINT SIX
The claims for negligent misrepresentation and aiding and abetting breach of fiduciary duty should be dismissed as duplicative.
(Counts 4, 5, 24, 25, and 42) ....................................................................................25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
233 F.R.D. 327 (S.D.N.Y. 2005) (Lynch, J.)....................................................................11, 25

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007)..............................................................................................................19

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
754 F.2d 57 (2d Cir. 1985).......................................................................................................23

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975).................................................................................................................17

*BrandAid Marketing Corp. v. Biss*,
462 F.3d 216 (2d Cir. 2006).....................................................................................................12

*Breeden v. Kirkpatrick & Lockhart*,
268 B.R. 704 (S.D.N.Y. 2001).................................................................................................11

*Burton v. Exxon Corp.*,
583 F. Supp. 405 (S.D.N.Y. 1984)...........................................................................................19

*Cape Ann Investors LLC v. Lepone*,
296 F. Supp. 2d 4 (D. Mass. 2003) .....................................................................................15, 17

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001).....................................................................................................14

*Center v. Hampton Affiliates, Inc.*,
66 N.Y.2d 782, 497 N.Y.S.2d 898 (1985) ................................................................................9

*Chemtex, LLC v. St. Anthony Enterprises, Inc.*,
490 F. Supp. 2d 536 (S.D.N.Y 2007).......................................................................................18

*Citibank, N.A. v. K-H Corp.*,
968 F.2d 1489 (2d Cir. 1992)...................................................................................................23

*Cromer Fin. Ltd. v. Berger*,
No. 00 Civ. 2284, 2003 WL 21436164 (S.D.N.Y. Jun. 23, 2003)...........................................21

*Cromer Finance Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001).......................................................................................22

*Dacey v. Morgan Stanley Dean Witter & Co.*,
   263 F. Supp. 2d 706 (S.D.N.Y. 2003).................................................................15

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007)................................................................21

*Gordon Partners v. Blumenthal*,
   No. 02 Civ. 7377, 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007) *adopted,* 2007 WL
   1438753 (S.D.N.Y. May 16, 2007)......................................................................16

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998).............................................................13, 14

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995)..................................................................5, 6, 9, 12

*In re AlphaStar Insurance Group Ltd.*,
   383 B.R. 231 (Bankr. S.D.N.Y. 2008).............................................................8, 12

*In re Bennett Funding Corp.*,
   336 F.3d 94 (2d Cir. 2003).........................................................7, 10, 11, 12

*In re CBI Holding Co.*,
   318 B.R. 761 (S.D.N.Y. 2004).................................................................8, 9, 11

*In re Enron Corp. Securities, Derivative & "Erisa" Litigation*, Nos. H-01-3624 *et al.*,
   2006 WL 3716669 (S.D. Tex. Dec. 12, 2006).....................................................16

*In re Granite Partners, L.P.*,
   194 B.R. 318 (Bankr. S.D.N.Y. 1996)................................................................12

*In re Grumman Olson Indus.*,
   329 B.R. 411 (Bankr. S.D.N.Y. 2005).........................................................6, 8, 11

*In re Mediators, Inc.*,
   105 F.3d 822 (2d Cir. 1997)...................................................................6, 8, 12

*In re NYSE Specialists Securities Litigation*,
   405 F.Supp.2d 281 (S.D.N.Y.2005), *rev'd in part on other grounds*, 503 F.3d 89 (2d
   Cir. 2007) ...............................................................................................17

*In re Parmalat Securities Litigation*,
   *421 F. Supp. 2d 703 (S.D.N.Y. 2006)*.........................................................22, 24

*In re Parmalat Securities Litigation*,
   477 F. Supp. 2d 602 (S.D.N.Y. 2007).........................................................10, 12

iii

*In re Parmalat Securities Litigation*,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007)...................................................................................19

*In re Refco, Inc. Securities Litigation*,
    07 MDL No. 1902, No. 07 Civ. 11607, 2008 WL 1827644 (S.D.N.Y. Apr. 21, 2008)
    (Lynch, J.) ...............................................................................................................................7

*In re Wedtech Securities Litigation*,
    138 B.R. 5 (S.D.N.Y. 1992)................................................................................................8, 9

*In re WorldCom, Inc. Erisa Litigation*,
    263 F. Supp. 2d 745 (S.D.N.Y. 2003)...................................................................................17

*In re WorldCom, Inc. Securities Litigation*,
    308 F. Supp. 2d 236 (S.D.N.Y. 2004)..............................................................................15, 16

*Ingersoll v. Klein*,
    262 N.E.2d 593 (Ill. 1970) ......................................................................................................6

*Instituto de Prevision Militar v. Lehman Brothers, Inc.*,
    485 F. Supp. 2d 1340 (S.D. Fla. 2007) .................................................................................16

*Jana Master Fund, Ltd. v. JPMorgan Chase & Co.*,
    No. 604005/06, 2008 WL 746540 (N.Y. County Mar. 12, 2008) ..........................................14

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005)...................................................................................22

*Kaufman v. Cohen*,
    307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) ...........................................................18

*Kolbeck v. LIT America, Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996)........................................................................................18

*Krause v. Forex Exchange Market, Inc.*,
    356 F. Supp. 2d 332 (S.D.N.Y. 2005)...................................................................................18

*La Sala v. Lloyds TBS Bank*,
    514 F. Supp. 2d 447 (S.D.N.Y. 2007)...................................................................................15

*LaSala v. Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008)..................................................................................................15

*LaSala v. UBS, AG*,
    510 F. Supp. 2d 213 (S.D.N.Y. 2007)..............................................................................15, 17

*Lee v. Marsh & McLennan Cos., Inc.*, Nos. 06 Civ. 6523 (SWK), 06 Civ. 15448 (SWK),
    2007 WL 704033 (S.D.N.Y. Mar. 7, 2007) ...........................................................15

*Lerner v. Fleet Bank*,
    459 F.3d 273 (2d Cir. 2006)...........................................................................18

*Matanuska Valley Bank v. Arnold*,
    223 F.2d 778 (9th Cir. 1955) .........................................................................10

*Maxwell v. KPMG LLP*,
    520 F.3d 713 (7th Cir. 2008) ......................................................................1, 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71 (2006).....................................................................................15, 17

*Morgado Family Partners, LP v. Lipper*,
    6 Misc. 3d 1014(A), 800 N.Y.S.2d 350 (N.Y. County 2004)..................................12

*Munroe v. Harriman*,
    85 F.2d 493 (2d Cir. 1936)............................................................................10

*Nairobi Holdings, Ltd. v. Brown Brothers Harriman & Co.*,
    No. 02 CIV. 1230(LMM), 2002 WL 31027550 (S.D.N.Y. Sept. 10, 2002)............14

*National Westminster Bank v. Weksel*,
    124 A.D.2d 144, 511 N.Y.S.2d 626 (1st Dep't 1987) ......................................19, 20

*Norman v. Salomon Smith Barney, Inc.*,
    350 F. Supp. 2d 382 (S.D.N.Y. 2004)...............................................................17

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*,
    80 F. Supp. 2d 129 (S.D.N.Y. 1999).................................................................23

*Professional Management Associates Inc. Employees' Profit Sharing Plan v. KPMG
LLP*,
    335 F.3d 800 (8th Cir. 2003) .........................................................................17

*Ryan v. Hunton & Williams*,
    No. 99-CV-5938, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ..........................19

*Seippel v. Jenkens & Gilchrist, P.C.*,
    No. 03 Civ. 6942(SAS), 2004 WL 2403911 (S.D.N.Y. Oct. 26, 2004) ..................25

*Serino v. Lipper*,
    No. 0604396/2002, 2006 WL 5111623 (N.Y.County Sept. 28, 2006)....................25

v

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) ................................................................1, 5, 9

*Siepel v. Bank of Am., N.A.*,
    — F.3d —, 2008 WL 2079028 (8th Cir. 2008) ................................17

*Vine Street Clinic v. HealthLink, Inc.*,
    856 N.E.2d 422 (Ill. 2006) ................................................................12

*Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*,
    10 A.D.3d 267, 780 N.Y.S.2d 593 (1st Dep't 2004) ...........................25

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ................................................................6, 7, 16

*Winne v. Equitable Life Assurance Soc'y of U.S.*,
    315 F. Supp. 2d 404 (S.D.N.Y. 2003) ................................................16, 17


**STATUTES**

15 U.S.C. § 77p(b) ...................................................................................14

15 U.S.C. § 77p(f)(2)(C) ...........................................................................15

15 U.S.C. § 78bb(f)(5)(B) ........................................................................15, 16

Fed. R. C. P. Rule 9(b) .............................................................................2, 18

N.Y. Gen. Bus. Law, art. 23-A, §§ 352 *et seq.* ........................................13, 14


**OTHER AUTHORITIES**

David B. Newdorf, *Inside Fraud, Outside Negligence and the Savings & Loan Crisis:*
    *When Does Management Wrongdoing Excuse Professional Malpractice?*,
    26 Loy. L.A. L. Rev. 1165, 1198 (1993) ...............................................10

## PRELIMINARY STATEMENT

This extraordinary lawsuit concerns claims by Refco and its bankrupt affiliates for alleged injuries that they inflicted *on themselves* through their own deliberate fraud.  The plaintiff here is the Trustee of a Litigation Trust to which Refco and its affiliates assigned whatever claims they had against third parties.  In filing this suit, however, the Trustee has gone far beyond that.  His claims against Grant Thornton LLP ("Grant Thornton") are vastly more expansive than what the Refco entities could have asserted in their own names—seeking billions of dollars of damages based on Grant Thornton's failure to detect a fraud that the Refco entities themselves masterminded and deliberately concealed.  These claims show just the sort of overreaching identified recently by the Seventh Circuit, where the trustee of a defunct enterprise with "little to do besides filing claims" asserts a groundless and intimidating damages demand in the hope of forcing a settlement.  *Maxwell v. KPMG LLP*, 520 F.3d 713, 718 (7th Cir. 2008).

The Trustee cannot possibly recover on Refco's behalf for a wrong perpetrated by its own management—and, by imputation, by the Refco entities themselves.  Refco's executives were always acting in Refco's name and for its benefit—regardless of what personal aims may have played a role in their actions—as they worked to bolster the company's apparent health and enable it to access new infusions of capital.  Their actions propped Refco up and funded its operations for years, long after it had already suffered significant losses.  Accordingly, all the claims in this case fail as a matter of law under both the standing rule recognized in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991), and the common law doctrine of *in pari delicto*.

The Trustee's claims are also preempted by New York's Martin Act.  They all concern alleged misrepresentations or omissions that the Trustee contends were part of a single, cohesive,

and multi-step fraud culminating in an initial public offering of common stock ("IPO"). The Martin Act places authority to enforce New York law concerning such claims solely with the state attorney general and bars private claims like those here. And for similar reasons, the claims are also preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), which preempts state-law securities claims brought for the benefit of more than 50 persons—here, the many beneficiaries of the Litigation Trust.

The Trustee's various aiding and abetting claims also fail on their merits. His complaint does not allege that Grant Thornton had actual knowledge that the executives were defrauding Refco or breaching their fiduciary duties—knowledge that is essential for claims of aiding and abetting. Indeed, it is now clearer than ever that the scheme was designed specifically to *prevent* Grant Thornton from knowing the truth. Since the Refco litigation began, four of Refco's top executives have faced criminal charges of lying (or conspiring to lie) to Grant Thornton. One was recently convicted, and three others have pleaded guilty. Moreover, given the role played by these executives, it is unclear how Refco could have been defrauded in the first place. The allegations of fraud *on Refco* that underlie the claim of aiding and abetting fraud are not pleaded with any particularity—much less the level of detail required by Rule 9(b). And in any case, Grant Thornton's audits could not have caused harm to the Refco entities in the way the Trustee suggests. Accordingly, those audits cannot constitute the "substantial assistance" required for aiding and abetting.

The Trustee's claims for malpractice and negligent misrepresentation also fail for lack of causation. To the extent that any of these Refco entities suffered a loss, it was caused by a pattern of executive misconduct and mismanagement. The fact that Grant Thornton did not discover the fraud simply meant that Refco's executives succeeded in their efforts to ensure that

the audits would not detect or stop their scheme. That is insufficient as a matter of law to support the Trustee's claims against Grant Thornton.

## BACKGROUND

This action concerns claims by Refco Inc., Refco Group Ltd. ("RGL"), and Refco Capital Markets, Ltd. ("RCM") (collectively "Refco"), now being asserted by the Trustee of a post-bankruptcy Litigation Trust. Defendant Grant Thornton served as outside auditor to these three entities and issued audit opinions on their year-end financial statements.

In 1997—long before Grant Thornton became Refco's auditor—Refco found itself in trouble. It had suffered more than $100 million in losses as a result of the Asian market collapse. Compl. ¶ 62. If those losses had been disclosed in 1997, Refco's business would have been severely damaged and customer confidence decimated, and it would likely have suffered a run on its customer accounts. *Id*. ¶ 63. To prevent that, Refco's "Insiders" (Phil Bennett, Robert Trosten, Tone Grant, and Santo Maggio) engineered a scheme to hide these losses. *Id*. ¶ 59.

According to the complaint, this scheme had three parts. First, the Insiders cooked the companies' books to conceal Refco's losses from all outsiders, including Grant Thornton. They hid hundreds of millions of dollars in losses by transferring them to Refco Group Holdings Inc. ("RGHI"), the "alter ego" of executives Bennett and Grant. *Id*. ¶¶ 40, 63-64. The Insiders thus turned bad debt into a related-party receivable (the "RGHI Receivable"), which they increased over time by adding tens of millions of dollars of operating expenses incurred by various Refco entities. *Id*. ¶¶ 67-68. In addition, the Insiders shored up Refco's public appearance by inflating its revenues through fake transactions with RGHI. *Id*. ¶¶ 70-72.

The second part of the Insiders' fraudulent scheme involved an ongoing effort to conceal these losses through both related-company and third-party transactions. The Insiders concealed the magnitude and related-party nature of the RGHI Receivable through sham loans to unrelated

third parties at the end of each financial reporting period. *Id.* ¶ 74-77. These transactions were timed specifically to avoid detection by Grant Thornton as it performed its audits.[1] The Insiders also kept up the illusion of financial health by funding the operations of other Refco entities using assets from RCM. Compl. ¶¶ 95, 97, 99. According to the Trustee, the Insiders caused RCM to make intercompany loans to other Refco entities that never had the ability or the intent to pay them back. *Id.* ¶ 95. The proceeds of these loans benefited the affiliates (*id.* ¶ 189) and were used to fund operations.

The third part of the Insiders' scheme involved cashing out their own interests based on Refco's apparent success—using corporate transactions that benefited both the Refco entities themselves and the Insiders as equity holders. The first cash-out was achieved in August 2004 through a leveraged buyout by affiliates of T.H. Lee Partners, L.P. (the "LBO"). The LBO called for T.H. Lee to purchase 57% of Refco's stock from Bennett and Grant's RGHI. Refco also took on $1.4 billion in new debt as part of the LBO by selling $600 million in notes and obtaining $800 million in bank financing. *Id.* ¶ 113. Thus, this transaction generated hundreds of millions in new capital for Refco—over and above any amounts that went to the Insiders. *Id.*

One year later, the scheme came to a head when the Insiders arranged an initial public offering of Refco stock (the "IPO"), which raised hundreds of millions in equity for the company, while also benefiting the Insiders personally. From the proceeds, $231 million was used to pay down the $1.4 billion LBO debt. *Id.* ¶ 136. The Trustee complains that the IPO also burdened Refco with "hundreds of millions of dollars" in liability to its new stockholders based on Refco's own "false and misleading registration statement and prospectus." *Id.* ¶ 137.

---

[1] *See* Third Superseding Indictment, *U.S. v. Bennett*, No. 05 Cr 1192 (cited in Compl. p. 2), ¶¶ 8, 9, 21, 25, 46, 65 (scheme was designed to hide missing receivable from accountants) (Exh. A to Decl. of Ruth R. Braun ("Braun Decl."), filed today); Indictment, *U.S. v. Collins*, No. 07 Cr 1170, ¶ 9 (Bennett and others "schemed to hide the true financial health and economic structure of Refco" from Refco's "auditors," among others) (Exh. B to Braun Decl.).

There can no longer be any doubt that what the Insiders did was a crime, specifically aimed at concealing the truth from Grant Thornton.  Bennett, Trosten, and Maggio each pleaded guilty to criminal charges of making or conspiring to make material misstatements to Refco's auditors.[2]  Just last month, a federal jury convicted Grant on a criminal conspiracy charge that included material misstatements to auditors.  Indictment ¶¶ 6, 7, 25, 69(b) (Exh. A to Braun Decl.); Trial Transcript, *U.S. v. Grant*, No. 05 Cr 1192, at 3095-96 (Exh. F to Braun Decl.).

The complaint purports to assert 44 claims by RCM, RGL and Refco Inc.  Ten of those claims concern Grant Thornton—claims for malpractice and aiding and abetting breach of fiduciary duty by all three entities, as well as claims for negligent misrepresentation and aiding and abetting fraud by RCM and RGL.  The Trustee seeks damages for (1) RCM's transfer of over $2 billion to affiliates; (2) RGL's taking on debt, including $1.4 billion in new debt through the LBO; and (3) Refco Inc.'s payment of $231 million to RGL to satisfy part of its debt, and its alleged securities fraud liability to shareholders who bought through the IPO.

## POINT ONE
**The Trustee, standing in the shoes of Refco itself, cannot recover from Grant Thornton for failing to prevent the misconduct of Refco's own management. (All Grant Thornton Counts:  3, 4, 5, 6, 23, 24, 25, 26, 41, and 42)**

### A.    The *Wagoner* rule bars the Trustee from suing Grant Thornton for injuries caused by the misconduct of corporate management.

A bankruptcy trustee (or, in this case, the trustee of a litigation trust) "may only assert claims held by the bankrupt corporation itself."  *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).  Because a "trustee stands in the shoes of the debtors," he "can only maintain those actions that the debtors could have brought prior to the bankruptcy proceedings."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).

---

[2]  *See* 2/15/08 Plea Colloquy, *U.S. v. Bennett*, No. 05 Cr 1192, at 7 (Exh. C to Braun Decl.); 2/20/08 Plea Colloquy, *U.S. v. Trosten*, No. 05 Cr 1192, at 4, 5, 16, 18, 19 (Exh. D to Braun Decl.); 12/19/07 Plea Colloquy, *U.S. v. Maggio*, No. 07 Cr 1196, at 5, 7, 17 (Exh. E to Braun Decl.).

Consequently, a trustee may not sue third parties to recover for injuries caused by the misconduct of the debtor's own management:  "Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in."  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000).

*Wagoner* is routinely invoked to dismiss claims on the face of the complaint.  *See*, *e.g.*, *In re Mediators, Inc.* 105 F.3d 822, 826 (2d Cir. 1997); *Hirsch,* 72 F.3d at 1094-95; *In re Grumman Olson Indus.*, 329 B.R. 411, 423 (Bankr. S.D.N.Y. 2005).  Here, the complaint establishes that (1) the misconduct of the Insiders must be imputed to the Refco entities and the Trustee; and (2) the claims against Grant Thornton are all premised on the basic allegation that it assisted in that same misconduct.  The Trustee thus lacks standing under *Wagoner*.[3]

### 1.    The Insiders' wrongdoing must be imputed to the Refco entities and, in turn, to the Trustee.

The Trustee's own allegations make clear that the conduct of the Insiders must be imputed to the Refco entities themselves, thus depriving the Trustee (who stands in their shoes) of standing to sue.  This rule applies here even though the Trustee is no longer formally a bankruptcy trustee, given that he still occupies the same functional role.  *See Mediators*, 105 F.3d at 826 (applying *Wagoner* to suit brought by unsecured creditors' committee which, "while

---

[3]  New York law governs the Trustee's claims in this case.  Under the choice-of-law principles of Illinois, where this suit originated, this Court should apply the law of the state having the most significant contacts with the underlying conduct.  *Ingersoll v. Klein*, 262 N.E.2d 593, 594-95 (Ill. 1970).  That analysis points directly to New York.  Refco's headquarters were in New York, and that is where it conducted much of its business and suffered the injury alleged here.  Many of the events the Trustee complains of took place in New York—whereas the Trustee does not place any of the relevant events in Illinois.  And the Refco bankruptcy—which gave rise to the Litigation Trust—also proceeded in New York.  Indeed, when he filed another suit in this District based on the same events (in his capacity as Trustee of the Refco Private Actions Trust), the Trustee expressly acknowledged that "many of the acts and transactions" underlying the Insiders' fraud "occurred in substantial part" in the Southern District of New York.  *See* Complaint in *Kirschner v. Thomas H. Lee Partners, L.P.*, No. 07 Civ. 7074, at ¶ 15 (Exh. G to Braun Decl.); *see also* Complaint in *Kirschner v. Bennett*, No. 07 cv 8165, at ¶ 8 (Exh. H to Braun Decl.) (alleging venue in New York because "the appointment of the Trustee was approved by the U.S. Bankruptcy Court in New York County and RCM maintained its principal place of business and conducted its business with [its] Customers from Refco's global headquarters in New York County").

not a trustee in bankruptcy, is in a position analogous to a trustee").  Here, the Litigation Trust's "function is virtually indistinguishable from that of the bankruptcy estate itself: to gather the assets of a defunct debtor for distribution to its creditors"; it thus stands in the shoes of the debtor for the purpose of Wagoner analysis.  *In re Refco, Inc. Sec. Litig.*, 07 MDL No. 1902, No. 07 Civ. 11607, 2008 WL 1827644, at *8 (S.D.N.Y. Apr. 21, 2008) (Lynch, J.) (noting that "the Litigation Trustee 'shall be deemed the successor-in-interest to each of the Contributing Debtors'"); *id.* at *10 (noting that "the Trustee's claims in this case are precisely those that were transferred to it by the Refco Debtors" under the bankruptcy plan documents).

It is a "fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation."  *In re Bennett Funding Corp.*, 336 F.3d 94, 100 (2d Cir. 2003) (quoting *Wight*, 219 F.3d at 86).  The Insiders, among them, held the top leadership positions in RGL, Refco Inc., and RCM, as well as other directorships and officer positions.  Compl. ¶¶ 36-39.  Beginning in September 1998, Bennett was President, CEO, and Chairman of RGL.  *Id.* ¶ 36.  Maggio was the Executive Vice President of RGL; a director of RCM; and, the Trustee alleges, "ran the brokerage operations of . . . RCM and directed, orchestrated, and supervised the diversion of RCM assets."  *Id.* ¶ 37.  Robert Trosten was a member of Refco's corporate finance team from 1997 to 2001 and RGL's chief financial officer from 2001 through October 2004.  *Id.* ¶ 38.  And Tone Grant was President and CEO of RGL through 1998 and, until August 2004, held a significant ownership stake in Refco.  *Id.* ¶ 39. The complaint makes clear that these Insiders were acting within the scope of their employment; indeed, the gravamen of the complaint is that they used their positions of authority to steer Refco into fraudulent transactions and hide its liabilities—ultimately facilitating the IPO.  *See id.* ¶¶ 5-10.  Their misconduct must therefore be imputed to Refco and, in turn, to the Trustee.

This case does not fall within the "adverse interest" exception to the *Wagoner* rule.

Under that "very narrow exception," if the corporate insider "*totally* abandon[s] his principal's

interest and act[s] entirely for his own or another's benefit," a court will *not* impute the insider's

acts to the corporation. *In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231, 272-73 (Bankr. S.D.N.Y.

2008) (emphasis in original); *see also Mediators*, 105 F.3d at 827; *Grumman Olson*, 329 B.R. at

425. "It is not enough that the agent has a conflict of interest or does not act primarily for his

principal." *AlphaStar*, 383 B.R. at 273; *see also Grumman Olson*, 329 B.R. at 425. In other

words, the adverse interest exception does not apply where corporate insiders are

"simultaneously serving their own interests and the company's interests." *In re CBI Holding

Co.*, 318 B.R. 761, 765 (S.D.N.Y. 2004). Further, in determining whether this exception applies,

"[t]he relevant issue is short term benefit or detriment to the corporation, not any detriment to the

corporation resulting from the unmasking of the fraud." *In re Wedtech Sec. Litig.*, 138 B.R. 5, 9

(S.D.N.Y. 1992).

The complaint makes clear that the Insiders' fraud provided a substantial benefit to

Refco, at least temporarily. As the complaint recites,

> in 1997, Refco was exposed to over $100 million in losses when some of its
> customers were over-extended in the Asian market collapse. In the same
> time frame, other over-extended Refco customers trading in other markets incurred
> additional staggering losses in the $100 million range. Refco was simultaneously
> suffering substantial losses in its own proprietary trading and lost $50 million in a
> single transaction in 1998 on an investment in Russian securities and bonds.

Compl. ¶ 62. These losses, if disclosed, would have "severely eroded" Refco's customer

goodwill, "severely damaged Refco's business," and caused a "run" on customer accounts. *Id.*

¶ 63. The Insiders' concealment of these losses avoided these adverse effects (at least

temporarily) by helping to "maintain[] the illusion that Refco was a highly successful, financially

secure broker-dealer." *Id.* ¶ 2. Moreover, when RCM assets were "loaned" to other Refco

entities, those entities used the cash inflow to make acquisitions, fund operations, and otherwise further their business. *See id.* ¶¶ 94-105, 189. And the LBO and IPO undeniably generated hundreds of millions of dollars for the Refco entities' use and benefit. *See supra* at 4. The adverse interest exception does not apply in such circumstances. *See CBI Holding*, 318 B.R. at 765 (adverse interest exception did not apply where manager's false representations to banks helped prevent triggering event of default); *Wagoner*, 944 F.2d at 177 (no standing even where complaint alleged that insider "engaged in conduct intended to strip [the debtor] of its assets").

The Trustee cannot avoid this basic rule merely by asserting that the Insiders "totally abandon[ed] the Company's interests at every turn" and "confer[red] absolutely no benefit" on the debtor companies. Compl. ¶ 12. Such "conclusory allegations" of adverse interest are not enough to avoid application of *Wagoner* where, as here, the complaint alleges facts showing that the companies enjoyed a benefit from their managers' wrongdoing. *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785, 497 N.Y.S.2d 898, 900 (1985); *see also Hirsch*, 72 F.3d at 1092 ("conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint"). Nor do the Trustee's conclusory allegations of "looting" (*e.g.*, Compl. ¶ 3) defeat *Wagoner*. There is no allegation that the Insiders were stealing cash out of Refco's revenues. Rather, the Trustee alleges that the Insiders schemed to bolster Refco's appearance of financial health in the market, which in turn enabled them to receive more value for their equity. This is no more an adverse interest than in any case where executives personally own a stake in the company's performance. By allowing the company to succeed despite its massive losses, the Insiders acted for the benefit of Refco—and for themselves only as equity holders of the company itself.

- 9 -

Moreover, the adverse interest exception does not apply where the corporation and its wrongdoers were, in effect, one and the same—in other words, functioning as a "sole actor." "[W]here a principal [*i.e.*, the company] is 'completely dominated by [the agent/executive] and habitually [does] whatever he request[s],' such that the agent has been permitted to act without meaningful oversight or control, the principal is deemed to have abdicated its control of its agents and will be held accountable for the agents' actions." *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 610 (S.D.N.Y. 2007) (citing *Munroe v. Harriman*, 85 F.2d 493, 494 (2d Cir. 1936)). Here—despite passing references to certain "Outside Directors" and "innocent officers and agents"—the complaint makes clear that the four Insiders dominated both Refco's leadership and its corporate ownership: Bennett and Grant together owned RGHI, which in turn owned 90% of RGL and (indirectly) RCM prior to the LBO. The remaining 10% was owned by "a foreign financial institution closely tied to Bennett." *Id.* ¶¶ 35, 40. And the complaint sets forth in massive detail the Insiders' unfettered discretion to structure, document, and report corporate transactions. These facts clearly support application of the "sole actor" caveat. *See Bennett*, 336 F.3d at 101 (imputation applies unless at least one corporate decisionmaker is innocent *and* could have stopped the fraud); *Munroe*, 85 F.2d at 494 (imputing self-dealing CEO's knowledge to corporation where officers and directors "were completely dominated" and "did whatever he requested"); *Matanuska Valley Bank v. Arnold*, 223 F.2d 778, 781 (9th Cir. 1955) (same where agent "was in complete charge of [the business'] affairs").[4]

New York law does not support—and the Second Circuit has not recognized—an exception to the *Wagoner* standing rule in cases where some "innocent insiders" remained within

---

[4] *Cf.* David B. Newdorf, *Inside Fraud, Outside Negligence and the Savings & Loan Crisis: When Does Management Wrongdoing Excuse Professional Malpractice?*, 26 Loy. L.A. L. Rev. 1165, 1198 (1993) (sole actor caveat "should apply to a case in which not one, but several members of . . . top management constitute the dominant, controlling force. When the co-conspirators are at the very highest level of an organization, there is no meaningful 'duty' to convey their knowledge to higher-ups and no need to conceal their fraud from other top managers").

the company and might have stopped the fraud had they known about it.[5]  But even if that

exception were available, it would not apply here.  The complaint does not identify anyone

within any of the Refco entities who would actually have had the power to stop the fraud, given

the extent to which the Insiders dominated the companies' affairs.  Thus the Trustee's passing

references to "Outside Directors" cannot save his ability to state a claim against Grant Thornton.

> **2.    There are no claims against Grant Thornton
> independent of the Refco Insiders' misconduct.**

The claims against Grant Thornton in this case are undeniably based on allegations of

assisting corporate management in defrauding the corporation—and thus they all fall squarely

within *Wagoner*'s bar on standing.  Indeed, several of the claims are expressly styled as "aiding

and abetting" claims.  "[T]he *Wagoner* Rule bars . . . aiding and abetting claims even where the

corporation is the victim of the insider's fraud."  *Grumman Olson*, 329 B.R. at 425.

For purposes of *Wagoner*, the claims against Grant Thornton for malpractice and

negligent misrepresentation are "indistinguishable from the aiding and abetting claim[s]"

because they "assert a 'single form of wrongdoing under different names.'"  *Id.* at 426.  The

factual allegations giving rise to these claims are "virtually identical" to those supporting the

aiding and abetting claims, in that "all of [the] claims are premised on allegedly deficient

auditing by [Grant Thornton] that failed to discover fraudulent acts" committed by corporate

management.  *CBI Holding*, 318 B.R. at 766 (barring analogous claims by a bankruptcy trustee

against a different audit firm).

---

[5] *See*, *e.g.*, *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 233 F.R.D. 327, 329-30 (S.D.N.Y. 2005) (Lynch, J.) (rejecting "innocent insider" exception to *Wagoner* rule); *CBI Holding*, 311 B.R. at 372 (same); *Bennett*, 336 F.3d at 101 ("we need not resolve the question of whether the presence of innocent directors would provide the trustee with standing where fewer than all shareholders are implicated in the fraud").  *But see Breeden v. Kirkpatrick & Lockhart*, 268 B.R. 704, 710 (S.D.N.Y. 2001) (recognizing "innocent insider" exception where "at least one decisionmaker in a management role or amongst the shareholders is innocent and could have stopped the fraud").

The claims against Grant Thornton here are strikingly similar to those dismissed in *Hirsch v. Arthur Andersen & Co.*, 72 F.3d at 1095. There, the debtor's principals, like the Insiders here, had pleaded guilty to fraud in connection with a massive Ponzi scheme. *Id.* at 1088-90. When the scheme collapsed and the debtor entered bankruptcy, the trustee sued the debtor's accountants for malpractice. The Second Circuit held that even if "some independent financial injury to the Debtors might be established," the trustee was "precluded from asserting the professional malpractice claims . . . because of the Debtors' cooperation with the [accountants] in promulgating and promoting the [debtor's] Ponzi schemes." *Id.* at 1094. Here, of course, the complaint alleges that the Insiders did far more than "cooperate" with Grant Thornton. It confirms that they were the masterminds and prime movers of the scheme. Even on the Trustee's telling, Grant Thornton did nothing more than fail to catch them in the act.[6]

**B.    The Trustee's claims are barred by the doctrine of *in pari delicto*.**

The Trustee's claims are also barred by the separate but related common-law doctrine of *in pari delicto*, which precludes a plaintiff from recovering damages where it participated in the same wrongdoing as the defendant and where its wrongdoing was at least substantially equal to that of the defendant.[7] *BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218-19 (2d Cir. 2006). For all the reasons discussed above, the misdeeds of the Insiders must be imputed to the Refco entities and, in turn, to the Trustee. *See Morgado Family Partners, LP v. Lipper*, 6 Misc. 3d

---

[6] *See also Bennett*, 336 F.3d at 102 (bankruptcy trustee had no standing to bring malpractice, breach of fiduciary duty, and negligence claims against debtor's accountants for failing to report insiders' Ponzi scheme); *Mediators*, 105 F.2d at 826-27 (creditors' committee had no standing to bring claims against professional defendants for aiding and abetting breach of fiduciary duty by debtor's management); *Parmalat*, 477 F. Supp. 2d at 610 (companies in liquidation had no standing to bring claim against auditor alleging that false audits enabled fraud by corporate agent); *AlphaStar Ins. Group Ltd.*, 383 B.R. at 271-73 (bankruptcy trustee had no standing to bring claim against investment bank for aiding and abetting breach of fiduciary duty by debtor's management); *In re Granite Partners, L.P.*, 194 B.R. 318, 328-31 (Bankr. S.D.N.Y. 1996) (bankruptcy trustee had no standing to bring mismanagement, waste, and breach of fiduciary duty claims for allegedly aiding and abetting insiders' improper investments).

[7] This doctrine would bar the Trustee's claims no matter which state's law applies. *See, e.g.*, *Vine Street Clinic v. HealthLink, Inc.*, 856 N.E.2d 422, 436 (Ill. 2006) (applying *in pari delicto* defense under Illinois law: "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing").

1014(A), 800 N.Y.S.2d 350 (N.Y. County 2004) (analyzing imputation for purpose of *in pari delicto* defense under *Wagoner* framework). And there is no question that the wrongdoing of the Insiders was several orders of magnitude more serious than Grant Thornton's alleged misdeeds. Indeed, the aiding and abetting claims against Grant Thornton are entirely derivative of the allegations against the Insiders, and the claims for malpractice and negligent misrepresentation are expressly based on negligence, not intentional wrongdoing.

The chasm between the admitted wrongdoing of Refco's own management and Grant Thornton's actions is dramatically illustrated by the recent guilty pleas and convictions of the Insiders on charges of actively deceiving or conspiring to deceive Grant Thornton. *See supra* at 5. As these developments make clear, Grant Thornton was far less than a junior partner in the Refco scheme; it was itself a primary target.

## POINT TWO
### The Trustee's claims are preempted by New York's Martin Act.
### (All Grant Thornton Counts: 3, 4, 5, 6, 23, 24, 25, 26, 41, and 42)

The Trustee's claims must also be dismissed as preempted by New York's Martin Act. N.Y. Gen. Bus. Law, art. 23-A, §§ 352 *et seq.* This Act gives the state attorney general the power to regulate and enforce the state's laws against fraud and deception in the sale of securities. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 291 (S.D.N.Y. 1998). Only he can bring a claim under those laws: "It is well established that there exists no private right of action for claims that are within the purview of the Martin Act." *Id.*

The Martin Act prohibits various deceptive practices in the distribution and exchange of securities but does not require proof of intent to defraud or scienter. *Id.* As a result, common law "claims for breach of fiduciary duty and negligent . . . misrepresentation, for example, which do not require a plaintiff to plead and provide intentional deceit, are covered by the Martin Act

- 13 -

and cannot be asserted by private litigants." *Id.*[8] And "a plaintiff cannot convert a nonexistent

Martin Act claim into another state law cause of action by artful pleading." *Id.*

Whether styled as claims for malpractice, negligent misrepresentation, or aiding and

abetting the Insiders' torts, the Trustee essentially alleges that Grant Thornton made negligent

but deceptive misrepresentations and omissions in connection with the purchase or sale of

securities—which the Martin Act defines broadly to include "stocks, bonds, notes [and]

evidences of interest or indebtedness." N.Y. Gen. Bus. Law § 352[1]. The complaint describes a

single fraudulent scheme which allegedly culminated in the Refco Insiders' ultimate cashout—

which, the Trustee alleges, "was always the plan"—through "the fraudulent sale of more than

$583 million of shares of common stock." Compl. ¶ 10. Every claim against Grant Thornton is

thus based on alleged omissions and misrepresentations that "maintained the illusion of Refco's

financial health" and thus made the IPO stock sale possible. *Id.* ¶¶ 9-10. Because New York

law does not recognize a private right of action for such claims, they must be dismissed.

### POINT THREE
### The Trustee's claims are preempted by SLUSA.
### (All Grant Thornton Counts: 3, 4, 5, 6, 23, 24, 25, 26, 41, and 42)

The claims against Grant Thornton are also preempted by federal law. SLUSA preempts

any "covered class action" that asserts a state law claim alleging a misrepresentation or omission

in connection with the purchase or sale of a covered security. 15 U.S.C. § 77p(b). To be

preempted under SLUSA, a lawsuit must be: (1) a "covered class action"; (2) based on state law;

(3) in which the plaintiff alleges a misrepresentation or omission of a material fact; (4) in

---

[8] *See also, e.g., Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (dismissing claim for breach of fiduciary duty under Martin Act); *Nairobi Holdings, Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230 (LMM), 2002 WL 31027550 (S.D.N.Y. Sept. 10, 2002), at *10 (same for negligent misrepresentation and breach of fiduciary duty); *Jana Master Fund, Ltd. v. JPMorgan Chase & Co.*, No. 604005/06, 2008 WL 746540, at *5 (N.Y. County Mar. 12, 2008) (same for negligent misrepresentation and aiding and abetting breach of fiduciary duty).

connection with the purchase or sale of a covered security. *See Dacey v. Morgan Stanley Dean Witter & Co.*, 263 F. Supp. 2d 706, 709 (S.D.N.Y. 2003). Each of these criteria is satisfied here.

Under SLUSA, the term "covered class action" includes any lawsuit where "damages are sought on behalf of more than 50 persons." 15 U.S.C. § 78bb(f)(5)(B). That encompasses this action, given that the plaintiff here is suing for the benefit of all of Refco's creditors and equity holders—far more than 50 individuals. As its name implies, the Litigation Trust was established to prosecute litigation claims assigned by the various Refco bankruptcy estates. Compl. ¶ 31. Under SLUSA, this entity—like any created for the primary purpose of litigation—is not considered a single entity in determining whether the statute's 50-person threshold has been met. 15 U.S.C. § 77p(f)(2)(C); *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 234 (S.D.N.Y. 2007). Because the Trust was established to pursue litigation, "the beneficiaries of damages that would accrue" to it may "be counted towards the 50-person limit." *Id.*; *see also La Sala v. Lloyds TBS Bank*, 514 F. Supp. 2d 447, 468 (S.D.N.Y. 2007) (post-bankruptcy trust sought damages on behalf of more than 50 persons); *Cape Ann Investors LLC v. Lepone*, 296 F. Supp. 2d 4, 9-10 (D. Mass. 2003) (same effect); *Lee v. Marsh & McLennan Cos., Inc.*, Nos. 06 Civ. 6523 (SWK), 06 Civ. 15448 (SWK), 2007 WL 704033, at *4 (S.D.N.Y. Mar. 7, 2007) ("A trust whose primary purpose is to pursue causes of action on behalf of its beneficiaries is not entitled to entity treatment, whether or not the trust was formed with particular litigation in mind.").[9]

---

[9] While this approach has been accepted by district courts in this Circuit and elsewhere, at least one other Circuit has applied a different analysis. Relying largely on legislative history, *LaSala v. Bordier et Cie*, 519 F.3d 121 (3d Cir. 2008), held that SLUSA's reference to "persons" referred "to the assignors of a claim"—that is, the bankruptcy estate—"not to the assignee (or, if the assignee is a trust, to its beneficiaries)." *Id.* at 134. The Court should decline to follow *Bordier* for at least two reasons. First, the Third Circuit's reasoning conflicts with the plain language of the statute focusing on whether "*damages are sought on behalf of* more than 50 persons." 15 U.S.C. § 78bb(f)(5)(B) (emphasis added). There is no question here that the Trust seeks damages "on behalf of" more than 50 beneficiaries. Second, *Bordier*'s reading of the term "person" disregards the Supreme Court's recognition that "Congress envisioned a broad construction" of SLUSA to reach all procedural devices that might be used to circumvent the class action definition. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 86 (2006); *see also In re*

Alternatively, this lawsuit independently qualifies as a "covered class action" because that term also encompasses any "group of lawsuits" (1) pending in the same court, (2) involving common questions of law or fact, (3) in which damages are sought on behalf of more than 50 persons, and (4) that are "joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C. §§ 77p(f)(2), 78bb(f)(5)(B). "SLUSA does not require that the group of lawsuits be consolidated for trial, or for 'all' purposes; rather, it refers to the cases proceeding 'as a single action for *any* purpose.'" *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377, 2007 WL 431864, at *18 (S.D.N.Y. Feb. 9, 2007) (magistrate recommendation) (emphasis in original), *adopted,* 2007 WL 1438753 (S.D.N.Y. May 16, 2007).[10] That is certainly the case here, given the wide range of lawsuits (including traditional putative class actions) that have been consolidated for pretrial purposes in this Court.

Substantively, all of the Trustee's claims against Grant Thornton fall squarely within the category of state-law claims that SLUSA preempts. The claims of aiding and abetting fraud are based expressly on alleged misrepresentation of a material fact. *See Wight*, 219 F.3d at 91. The malpractice and negligent misrepresentation claims—which assert that Grant Thornton issued unqualified audit opinions that failed to disclose the fraud (*see*, *e.g.*, Compl. ¶¶ 373, 379, 504, 510, 610)—are also based "squarely on allegations of untrue statements or omission of material facts." *Winne v. Equitable Life Assurance Soc'y of U.S.*, 315 F. Supp. 2d 404, 413-15 (S.D.N.Y. 2003).[11] The claim for aiding and abetting breach of fiduciary duty is no different, as the only

---

*WorldCom, Inc. Secs. Litig.*, 308 F. Supp. 2d 236, 242 (S.D.N.Y. 2004) (addressing the scope of the "covered class action" definition: "Congress specifically directed the courts to interpret SLUSA in an expansive fashion").

[10] *See also Instituto de Prevision Militar v. Lehman Bros., Inc.*, 485 F. Supp. 2d 1340, 1344 (S.D. Fla. 2007) (action qualifies as "'covered class action' when it has been joined with another qualifying action even if only for pretrial or discovery purposes"); *WorldCom*, 308 F. Supp. 2d at 247 (applying "group of lawsuits" provision to actions consolidated for pretrial purposes); *In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, Nos. H-01-3624 *et al.*, 2006 WL 3716669, at *7 (S.D. Tex. Dec. 12, 2006) (same).

[11] Because "[n]othing in the language of [SLUSA] suggests that it bars only state law claims that plead a certain level of scienter," the Trustee's "decision to assert only a negligence as opposed to a fraud claim . . . is ineffective if

"aid" that Grant Thornton provided was its alleged failure to disclose the falsity in the Refco

entities' financial statements. *In re NYSE Specialists Sec. Litig.,* 405 F. Supp. 2d 281, 308

(S.D.N.Y. 2005) (SLUSA preempts claim of aiding and abetting breach of fiduciary duty), *rev'd*

*in part on other grounds*, 503 F.3d 89 (2d Cir. 2007); *see also Prof'l Mgmt. Assocs. Inc.*

*Employees' Profit Sharing Plan v. KPMG LLP*, 335 F.3d 800, 802 (8th Cir. 2003); *UBS*, 510 F.

Supp. 2d at 244 n.16.

Finally, there can be no doubt that these claims all relate to the purchase or sale of a

covered security, as the Trustee himself alleges that Grant Thornton's failure to disclose made

possible the Insider's fraudulent scheme, which culminated in the IPO of covered Refco stock.[12]

*See*, *e.g.*, Compl. ¶¶ 612, 617. This allegation—whether it is true or not—is more than sufficient

to satisfy SLUSA's "in connection with" requirement. *See Prof'l Mgmt.*, 335 F.3d at 805 (aiding

and abetting breach of fiduciary duty and negligent misrepresentation claims against auditor that

reviewed issuer's financial statements satisfied "in connection with" requirement); *Cape Ann*,

296 F. Supp. 2d at 11-12 (same for claims of auditor fraud, malpractice and misrepresentation).

The Trustee's claims must therefore be dismissed on this basis as well.

## POINT FOUR
### The claims for aiding and abetting must be dismissed for failure to state a claim.
### (Counts 5, 6, 25, 26, and 42)

The aiding and abetting claims must also be dismissed on their merits because the Trustee

has failed to plead that Grant Thornton actually knew about and substantially assisted the

Insiders' fraud and breaches of fiduciary duty.

---

asserted in an effort to insulate the claim from SLUSA." *In re WorldCom, Inc. Erisa Litig.*, 263 F. Supp. 2d 745, 769-70 (S.D.N.Y. 2003); *see also Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 386 (S.D.N.Y. 2004); *Winne*, 315 F. Supp. 2d at 415.

[12] The Supreme Court has held that the term "in connection with" must be given a "broad interpretation"—broader than the inquiry for standing to sue under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). Under SLUSA, "it is enough that the fraud 'coincide' with a securities transaction—whether by the plaintiff or someone else." *Dabit*, 547 U.S. at 86; *cf. Siepel v. Bank of Am., N.A.*, — F.3d —, 2008 WL 2079028, *4 (8th Cir. 2008).

**A.    The Trustee has not pleaded and cannot plead that Grant Thornton actually knew about the torts it was supposedly aiding.**

To establish aiding and abetting liability under New York law, a plaintiff must plead *actual knowledge* of the tortious act; constructive knowledge is insufficient, even at the pleading stage. *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996); *Krause v. Forex Exch. Market, Inc.*, 356 F. Supp. 2d 332, 338-39 (S.D.N.Y. 2005); *Kaufman v. Cohen*, 307 A.D.2d 113, 125-26, 760 N.Y.S.2d 157, 169-70 (1st Dep't 2003). Conclusory allegations cannot satisfy this requirement, nor can allegations of "general suspicion" or knowledge of improper conduct that was not a tort. *See Lerner v. Fleet Bank*, 459 F.3d 273, 292-93 (2d Cir. 2006); *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546-47 (S.D.N.Y 2007).

The Trustee has failed to plead that Grant Thornton had actual knowledge of any fraud by the Insiders—and thus he cannot possibly recover against Grant Thornton for aiding and abetting that fraud. Indeed, the Insiders themselves have admitted to (or have been convicted of) charges of concealing or conspiring to conceal the facts about the companies' financial condition from Grant Thornton. *See supra* at 5. And for this claim, the Trustee would have to allege that Grant Thornton not only knew about the wrongdoing but also was aware that Refco's management was somehow defrauding Refco itself. Even the Trustee cannot articulate how that could be so. The complaint does not specify what fraudulent statements were made by whom—nor does it say which (if any) decisionmakers at the Refco entities heard and relied on such statements. Thus, the claim for aiding and abetting fraud fails both for failure to plead fraud with particularity under Rule 9(b) and for failure to plead Grant Thornton's actual knowledge of that fraud.

The same analysis applies to the Trustee's claims for aiding and abetting breach of fiduciary duty. The Trustee does not allege that Grant Thornton actually knew that any particular conduct by Bennett and Maggio would constitute a breach of their duties. Selling

one's own equity interest in a company is not necessarily a breach of fiduciary duty, nor is causing a company to engage in intercompany loans or to take on debt. *See*, *e.g.*, *Burton v. Exxon Corp.*, 583 F. Supp. 405, 420-21 (S.D.N.Y. 1984) (intercompany loans).  What made these actions a "breach" was the company's concealed financial weakness—which allegedly rendered the affiliates unable to repay the RCM loans and LBO debt and led to the company's alleged securities fraud liability.  Yet again, that was the same financial weakness that Refco was working so hard to conceal.

The Trustee does assert, with little elaboration, that Grant Thornton "knew" or "consciously avoided knowing" about the RGHI Receivable, the sham third-party loans, and the diversion of RCM assets.  But these conclusory allegations are wholly insufficient, in that they fail to describe how Grant Thornton discovered the fraud or otherwise knew about it.  A plaintiff cannot merely speculate about the facts supporting his claim;  rather, he must allege facts that make such a claim plausible.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965-66 (2007).  Nor can the Trustee establish knowledge by claiming that Grant Thornton: (1) ignored red flags, Compl. ¶¶ 155, 173, 182, 200; (2) failed to properly audit Refco, *id.* ¶¶ 164-65, 185-86; 202-03; (3) failed to perform sufficient fieldwork, *id.* ¶ 200; or (4) had access to material information which would have revealed the fraud, *id.* ¶¶ 154, 189.  At best, these allegations amount to claims of negligence, which cannot satisfy the actual knowledge requirement.  *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 584 (S.D.N.Y. 2007) ("Allegations that an auditor failed to follow GAAS or other auditing procedures do not alone support a claim of fraud."); *Ryan v. Hunton & Williams*, No. 99-CV-5938, 2000 WL 1375265, at **8-9 (E.D.N.Y. Sept. 20, 2000) (notice of red flags was insufficient to constitute actual knowledge of the underlying primary conduct); *Nat'l Westminster Bank v. Weksel*, 124 A.D.2d 144, 149-50, 511 N.Y.S.2d

626, 630 (1st Dep't 1987) (allegation of access to material information inadequate to establish actual knowledge of fraud).

The Trustee relies on only three specific allegations to show "actual knowledge"—none of which survives scrutiny. Those allegations are (1) that Grant Thornton partner Mark Ramler was, at some point in time, aware of a large receivable from RGHI, Compl. ¶ 159, 162; (2) that Grant Thornton drafted a Management Letter that identified certain deficiencies at Refco, *id.* ¶¶ 190-93; and (3) the contents of a vague and undated handwritten note by Ramler, *id.* ¶ 179.

First, the claim that Ramler's knowledge of the RGHI Receivable evidences Grant Thornton's actual knowledge of the fraud is refuted by the Trustee's acknowledgement that Bennett promised Ramler that the RGHI Receivable would be paid off in fiscal year 2003. *Id.* ¶ 165. Although the Complaint alleges that Grant Thornton did not properly verify Bennett's representations, this does nothing to show actual knowledge that the representations were false.

The Trustee's allegations regarding the Management Letter not only fail to raise a strong inference of actual knowledge; they actually contradict the Trustee's theory of liability. The fact that Grant Thornton identified, in writing, areas needing improvement to Refco's management belies the Trustee's contention that Grant Thornton was aware of the fraud and wanted to "keep a marquee customer happy" at any cost. *Id.* ¶ 181. If Grant Thornton intentionally turned a blind eye to fraud to keep the company happy, why, at the same time, would it author a letter to management criticizing Refco's internal controls? *Id.* ¶ 190.

Finally, the Trustee's reliance on a single handwritten note cannot establish Grant Thornton's actual knowledge of the sham loans at the time. Compl. ¶ 179. The Trustee speculates that this note refers to an end-of-period third-party loan from May 2005, but the

document is vague and undated and could be interpreted in any number of ways.  The Trustee's mere conjecture is plainly insufficient to allege actual knowledge of the underlying torts.

The Trustee attempts to circumvent the "actual knowledge" requirement by asserting that Grant Thornton "consciously avoided knowing" the details of the underlying fraud.  But simply repeating the "conscious avoidance" mantra does not remedy the defects in the Trustee's pleadings.  While two courts in this jurisdiction have found that allegations of a "culpable state of mind" (*i.e.*, that a defendant consciously avoided learning the truth about an underlying tort) may satisfy the knowledge prong of an aiding and abetting charge, the burden of demonstrating such a state of mind remains "a heavy one."  *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007); *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2284, 2003 WL 21436164, at *9 (S.D.N.Y. Jun. 23, 2003).  Specifically, conscious avoidance only "occurs when 'it can almost be said that the defendant actually knew' because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge."  *Fraternity Fund*, 479 F. Supp 2d at 368.

Here, the Trustee has failed to allege any facts showing that Grant Thornton even suspected the underlying fraud, much less thought that it was a probability.  Instead, he merely alleges that had Grant Thornton properly audited Refco or performed a "competent analysis" of transactions underlying the fraud, it would have "revealed the fraud."  Compl. ¶¶ 169-72, 200-03.  The Trustee, once again, attempts to cloak what are patently allegations of negligence (and unfounded ones at that) in the mantle of "willful blindness."  *See id.* ¶¶ 170, 172 (alleging that Grant Thornton's alleged audit failures "can only be evidence of . . . willful blindness").

A defendant cannot be held liable for aiding and abetting a tort that he did not know about.  It is not possible to negligently aid and abet.  The Trustee fails to allege any facts

supporting the inference that Grant Thornton was aware of the fraud or alleged breaches of fiduciary duty at Refco.  This by itself is a sufficient basis for dismissing these claims.

### B.    As a matter of law, Grant Thornton's audit opinions did not constitute "substantial assistance" with regard to the Insiders' torts.

Aiding and abetting claims also require allegations that the defendant provided "substantial assistance" in achieving the wrongful conduct.  *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005).  "Whether the assistance is substantial or not is measured, in turn, by whether the 'action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'"  *Id.* at 256-57; *see also Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).  The Trustee's allegations cannot meet this test.

First, as for the aiding and abetting claims by RCM (Counts 5 and 6), the Trustee has alleged no facts to suggest that Grant Thornton's audits played any role in causing the Insiders to steal RCM's assets.  Compl. ¶¶ 95, 99(d) (Insiders "stole" money from RCM and its customers, loaning it to entities that "lacked both the intention and the financial wherewithal to repay").  Grant Thornton was not involved in making these intercompany loans.  To the contrary, the Trustee alleges that the loans were made without "compensation, security, or collateral" and without "any analysis, much less informed and objective analysis, on behalf of RCM of the ability of the Refco entities to which the funds were 'loaned' to repay the funds on demand or at all."  *Id.* ¶¶ 99(c), 386.  Given his claim that RCM made these loans without any "analysis," the Trustee's complaint provides no reason to believe that anyone at RCM relied on Grant Thornton's audit opinions to conclude that the loans were, in fact, collectible.  It is not sufficient that Grant Thornton's audits did not discover or disclose the broader scheme; at most, the Trustee alleges that the audit opinions "merely furnished the condition or occasion for the occurrence of the event rather than one of its causes."  *Sheehan v. City of N.Y.*, 40 N.Y.2d 496,

503, 387 N.Y.S.2d 92, 96 (1976); *see also Maxwell v. KPMG LLP*, 520 F.3d 713, 716 (7th Cir.

2008) (cautioning against the conflation of a "necessary condition" with a "real 'cause'" under

the law); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir. 1985).

Moreover, the Trustee has not explained how or why these intercompany loans were

uncollectible in the first place—nor has he made any effort to connect that uncollectibility with

Grant Thornton. His basic story is that the entities that received these loans always "lacked both

the intention and the financial wherewithal to repay." Compl. ¶ 99(d). But if the problem was

someone's subjective lack of intent, Grant Thornton could not possibly have known about that,

much less caused it. And to the extent that the problem was lack of ability to repay, that too was

beyond Grant Thornton's knowledge or control. The Trustee does not explain how or when

these affiliates lost the "financial wherewithal" to repay, but it must have been some time after

the loans were extended. There is no allegation that Grant Thornton had anything to do with any

mismanagement of loan proceeds that ultimately made it impossible for the affiliates to repay.

*See Bloor*, 754 F.2d at 63 (no causation where trustee alleged that firm helped management

acquire "large amounts of money" and then insiders mismanaged and looted it).[13] Thus, Grant

Thornton's audits could not have "substantially assisted" the Insiders' wrongdoing against RCM.

The aiding and abetting claims on behalf of RGL and Refco Inc. (Counts 25, 26, and 42)

fail for similar reasons. These claims are based on alleged harm to these Refco entities when

they entered into the LBO and IPO, respectively. Compl. ¶¶ 515, 520, 614. As an initial matter,

it is unclear whether either the LBO or the IPO caused these entities any injury independent of

---

[13] *See also Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) (no proximate cause where plaintiff bank merely stated that it would not have extended uncollectible loan had it known of undisclosed side agreement that reduced value of collateral; bank did not allege "a causal connection between the fraud alleged and the subsequent loss that it suffered"); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80 F. Supp. 2d 129, 139 (S.D.N.Y. 1999) (allegation that, had auditor disclosed negative financial conditions, outside directors could have taken steps to salvage company failed adequately to plead proximate cause).

what their creditors suffered: RGL's alleged inability to repay its $1.4 billion in notes and specific bank loans may represent a loss to specific lenders but it is not a $1.4 billion loss to RGL itself, and Refco Inc.'s alleged securities fraud liability to its shareholders is self-evidently a claim by creditors alone, as the company has never been required to pay it. More important, however, the complaint cannot explain what role Grant Thornton's audit opinions played in causing these transactions in the first place. It does not allege any facts suggesting that Grant Thornton's failure to disclose the fraud induced either RGL or Refco Inc. to agree to these transactions. To the contrary, these Refco entities entered into the LBO and IPO with their eyes wide open. Their management pressed these transactions (according to the Trustee) precisely because of the fraud so successfully concealed from Grant Thornton. *See* Compl. ¶¶ 106, 121, 136 (alleged purpose of LBO/IPO was to enable Insiders to cash out at artificially high value). Again, the mere suggestion that Grant Thornton "furnished the condition" for the alleged injury by failing to tell others about the fraud is not a sufficient causal link for claims by the Refco entities themselves. *Sheehan*, 40 N.Y.2d at 503, 387 N.Y.S.2d at 96. And without proximate cause, the Trustee cannot claim that Grant Thornton substantially assisted the Insiders' torts.

## POINT FIVE
### The claims for negligent misrepresentation and malpractice also fail for lack of causation. (Counts 3, 4, 23, 24, and 41)

The causation analysis discussed above also dooms the direct tort claims against Grant Thornton. The Trustee has not alleged any facts supporting his bare contention that Grant Thornton's alleged malpractice and negligent misrepresentation caused RCM, RGL, and Refco Inc. to suffer harm. To the contrary, his own factual allegations show that any injury to these entities was not caused by anything Grant Thornton did or did not do. In causing the Refco entities to engage in the intercompany loans, the IPO, and the LBO, the Insiders acted with full

- 24 -

knowledge of the truth about Refco. Thus there is no factual allegation to support the Trustee's conclusory statements of transaction causation—for example, that Refco Inc. "undertook an IPO based on an inaccurate understanding of its financial condition." Compl. ¶ 612; *see also Am. Tissue, Inc. v. Arthur Andersen*, 275 F. Supp. 2d 398, 405 (S.D.N.Y. 2003) (corporation could not reasonably have relied on financial reports that its insiders had falsified). And as for RCM, while the Trustee does assert that its outside directors and "innocent" agents "would and did reasonably rely" on the audit opinions (Compl. ¶ 381), there is no allegation that those individuals made any decisions with respect to the intercompany loans in the first place. Again, the Trustee has failed to allege any plausible causal link between the losses he claims and Grant Thornton's audit opinions. This is a fatal flaw, even at the pleading stage.

## POINT SIX

**The claims for negligent misrepresentation and aiding and abetting breach of fiduciary duty should be dismissed as duplicative. (Counts 4, 5, 24, 25, and 42)**

Under New York law, claims for breach of fiduciary duty or negligent misrepresentation that are "premised on the same facts and seeking the identical relief sought in [a] . . . malpractice cause of action, [are] redundant and should be dismissed." *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.,* 10 A.D.3d 267, 271, 780 N.Y.S.2d 593, 596 (1st Dep't 2004).[14] Here, the claims of negligent misrepresentation and aiding and abetting breach of fiduciary duty are based on the same allegations and seek the same relief as the malpractice claims. If this suit proceeds at all, the duplicative claims should be dismissed.

## CONCLUSION

For all these reasons, Grant Thornton respectfully urges this Court to dismiss each of the claims against it with prejudice.

---

[14] *Accord Seippel v. Jenkens & Gilchrist, P.C.,* No. 03 Civ. 6942(SAS), 2004 WL 2403911, at *1 (S.D.N.Y. Oct. 26, 2004); *Serino v. Lipper*, No. 0604396/2002, 2006 WL 5111623, at *6 (N.Y.County Sept. 28, 2006).

Dated:  May 21, 2008                          Respectfully submitted,
        New York, New York
                                              WINSTON & STRAWN LLP

                                              _____/s/_____
*Of Counsel:*                                 By:  David E. Mollón

Margaret Maxwell Zagel                        David E. Mollón (dmollon@winston.com)
Tracy Berry                                   WINSTON & STRAWN LLP
Kenneth Cunningham                            200 Park Avenue
GRANT THORNTON LLP                            Ph: 212-294-6700
175 West Jackson, 20th Floor                  Fax: 212-294-4700
Chicago, Illinois 60604
Ph: 312-856-0001                              Bradley E. Lerman (blerman@winston.com)
Fax: 312-565-3473                             Catherine W. Joyce (cjoyce@winston.com)
                                              Linda T. Coberly (lcoberly@winston.com)
                                              WINSTON & STRAWN LLP
                                              35 W. Wacker Drive
                                              Chicago, Illinois 60601
                                              Ph: 312-558-5600
                                              Fax: 312-558-5700

                                              *Attorneys for Grant Thornton LLP*

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.))

▷

Cromer Finance Ltd. v. Berger
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CROMER FINANCE LTD. and Prival N.V., et al.,
Plaintiffs,
v.
Michael BERGER, Fund Administration Services
(Bermuda) Ltd., Ernst & Young International, Ernst
& Young Bermuda, Kempe & Whittle Associates
Limited, Deloitte & Touche (Bermuda), Deloitte
Touche Tohmatsu, Deloitte & Touche L.L.P., Bear
Stearns & Co., Inc., Bear Stearns Securities Corp.,
Financial Asset Management, Inc., and John Does
1-100, Defendants.
No. 00 Civ.2284 DLC.

June 23, 2003.

Investors in investment fund sued Bermuda based
auditor, alleging securities fraud under § 10(b) and
common law fraud. Auditor moved for summary
judgment. The District Court, Cote, J., held that: (1)
court had jurisdiction over auditor; (2) fact issues
regarding causality precluded summary judgment
for auditors on § 10(b) claim; (3) fact issues pre-
cluded summary judgment that auditor did not aid
or abet fraud, under New York law; (4) fact issues
precluded summary judgment that auditor was not
liable for negligence.

Motion denied.

West Headnotes

[1] Federal Courts 170B ☞86

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk86 k. Aliens or Alien Corporations.
Most Cited Cases
Federal district court sitting in New York had sub-
ject matter jurisdiction over Bermuda auditor, al-

leged to have participated in securities fraud in-
volving investment fund managed in New York,
even though none of named plaintiffs or beneficial
owners of shares of fund were United States resid-
ents. Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j.

[2] Federal Civil Procedure 170A ☞2511

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2511 k. Securities Cases in Gen-
eral. Most Cited Cases
Material issues of fact, as to whether purchasers of
interests in investment fund relied on auditor's rep-
resentations in deciding to purchase, precluded
summary judgment that transactional causality was
lacking in § 10(b) securities fraud suit by pur-
chasers against auditor. Securities Exchange Act of
1934, § 10(b), 15 U.S.C.A. § 78j.

[3] Federal Civil Procedure 170A ☞2511

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2511 k. Securities Cases in Gen-
eral. Most Cited Cases
Material issues of fact, as to whether investment
losses were foreseeable consequence of false state-
ments made by auditor precluded summary judg-
ment that auditor had not committed securities
fraud in violation of § 10(b). Securities Exchange
Act of 1934, § 10(b), 15 U.S.C.A. § 78j.

[4] Accountants 11A ☞9

11A Accountants
    11Ak9 k. Duties and Liabilities to Third Per-
sons. Most Cited Cases
Federal district court sitting in New York would ap-
ply law of forum, rather than law of Bermuda, to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

question whether Bermuda auditor aided and abetted commission of common law fraud in connection with sale of beneficial interests in investment fund.

**[5] Federal Civil Procedure 170A** ☜2515

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2515 k. Tort Cases in General.
Most Cited Cases
Material issues of fact, as to whether auditor consciously avoided confirming existence of fraud being perpetrated by manager of investment fund and his breach of fiduciary duty, precluded summary judgment that auditor did not aid and abet fraud, under New York law.

**[6] Accountants 11A** ☜9

11A Accountants
    11Ak9 k. Duties and Liabilities to Third Persons. Most Cited Cases
Bermuda based auditors were precluded from asserting that Bermuda law did not recognize tort of gross negligence on part of accountants, when negligence action against them had been conducted over period of years under assumption that negligence claims were governed by law of New York.

**[7] Federal Civil Procedure 170A** ☜2515

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2515 k. Tort Cases in General.
Most Cited Cases
Material issues of fact, as to whether auditors preparing financial report for investment fund had knowledge of fraud on part of manager, and whether they intended report to be relied upon by investors, precluded summary judgment that auditors were not liable for negligent report preparation under New York law.

**[8] Federal Civil Procedure 170A** ☜2515

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2515 k. Tort Cases in General.
Most Cited Cases
Material issues of fact, as to whether investors relied upon allegedly false auditors' statement when deciding to invest in beneficial interests of investment fund, precluded summary judgment that auditors were not liable to investors for negligence, under New York law.

Steven S. Honigman, Richard P. Swanson, Jonathan E. Polonsky, Veronica E. Rendon, Alexandra Khlyavich, Irena S. Brobston, Thelen Reid & Priest LLP, New York, N.Y., for Plaintiffs Cromer Finance, Ltd. et al.
Jeffrey H. Squire, Richard L. Stone, Mark A. Strauss, Kirby, McInerney & Squire, LLP, New York, N.Y., for Plaintiffs Cromer Finance, Ltd. et al.
Michael J. Dell, David S. Frankel, Gregory A. Horowitz, Yehudis Lewis, Kramer Levin Naftalis & Frankel LLP, New York, NY, for Defendant Deloitte & Touche Bermuda.
Wesley G. Howell, Jr., John T. Behrendt, Mark B. Holton, Aric H. Wu, Denise McGinn, Gibson, Dunn & Crutcher LLP, New York, N.Y., for Defendant Deloitte Touche Tohmatsu.

*OPINION AND ORDER*

COTE, J.
**\*1** This litigation, which commenced on March 24, 2000, stems from the collapse of the Manhattan Investment Fund (the "Fund"), and the fraudulent acts of the Fund's manager, Michael Berger ("Berger"). Lead plaintiffs in this class action, Cromer Finance Ltd. ("Cromer") and Prival N.V. ("Prival") (collectively, "plaintiffs"), allege that the Fund lost over $400,000,000.

Plaintiffs' suit names as defendants, among others,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Bermuda-based accounting firm that audited the Fund, Deloitte & Touche Bermuda ("DTB"). DTB now moves for summary judgment of the claims brought against it. Its motion is denied, with the exception of its motion to require proof of actual reliance for the common law claims. Plaintiffs have also moved to strike two affidavits of foreign law proffered by DTB; decision on that motion is reserved.

## BACKGROUND

The facts of this case, as well as many of the legal issues raised in this motion, have been discussed in the many prior Opinions in this litigation. *See* *Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452 (S.D.N.Y.2001) (decision on first motions to dismiss); *Cromer Finance Ltd. v. Berger,* 2001 WL 506908 (S.D.N.Y. May 14, 2001) (motion for reconsideration); *Cromer Finance Ltd. v. Berger,* 158 F.Supp.2d 347 (S.D.N.Y.2001) (*forum nonconveniens* ); *Cromer Finance Ltd. v. Berger,* 2001 WL 935475 (S.D.N.Y. Aug.16, 2001) (motion to permit interlocutory appeal); *Cromer Finance Ltd. v. Berger,* 2001 WL 1112548 (S.D.N.Y. Sept.19, 2001) (second motion to dismiss); *Cromer Finance Ltd. v. Berger,* 205 F.R.D. 113 (S.D.N.Y.2001) (class certification); *Cromer Finance Ltd. v. Berger,* 2002 WL 826847 (S.D.N.Y. May 2, 2002) (motion to amend); *Cromer Finance Ltd. v. Berger,* 245 F.Supp.2d 552 (S.D.N.Y.2003) (Deloitte Touche Tohmatsu's motion for summary judgment). Facts relevant to particular claims are discussed below; a brief summary follows.

The Fund, incorporated in the British Virgin Islands, began trading United States securities in 1996. The Fund was based in New York. When the Fund began losing money, Berger hid losses from investors by manufacturing false monthly account statements. DTB, which is a member of the Swiss verein Deloitte Touche Tohmatsu International ("Deloitte"), became the Fund's auditor in 1997, and issued its first audit, for the 1996 fiscal year, on May 27, 1997. The 1996 audit is addressed to "the

Shareholders of Manhattan Investment Fund Ltd.," and the cover letter for the audit represents that the audit was conducted "in accordance with auditing standards generally accepted in the United States of America."Audits for the fiscal years 1997 and 1998, with similar cover letters, were issued on March 20, 1998 and March 16, 1999, respectively. All three of DTB's audits were "clean" audits.

DTB withdrew their three audits in January 2000, after the Securities and Exchange Commission ("SEC") initiated an investigation of the Fund. Plaintiffs, who generally contend that DTB ignored evidence of Berger's fraud and failed their responsibilities as auditor, have asserted seven causes of action against DTB: violation of Section 10(b) of the Securities Exchange Act ("Section 10(b)") and Rule 10b-5 promulgated thereunder, aiding and abetting common law fraud, aiding and abetting breach of fiduciary duty, common law fraud, gross negligence, negligence and professional malpractice.

## DISCUSSION

*2 Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings.Rule 56(e), Fed.R.Civ.P.; *accord* *Burt Rigid Box, Inc. v. Travelers Property Cas. Corp.,* 302 F.3d 83, 91 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.2002). Thus, in determining whether to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on evidence in the record; and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

I. Subject Matter Jurisdiction

[1] As they did in three prior motions, DTB continues to challenge the existence of subject matter jurisdiction. DTB asserts that the allegations supporting the prior analysis of the "conduct" and "effects" tests have proven to be baseless. It argues that discovery has shown that none of the beneficial owners of shares in the Fund were United States residents, which it contends eliminates any possible "effects" in the United States. DTB emphasizes that neither named plaintiff resides in the United States, contending that their absence prevents the entire class from showing the existence of any effect of the fraud in the United States. It also claims that none of plaintiffs' losses were caused by DTB's conduct in the United States, and that it is inappropriate to aggregate DTB's conduct with that of other participants in the fraud. DTB request a hearing on this issue prior to trial.

The issue of subject matter jurisdiction has already been addressed at length in this case. See Cromer, 137 F.Supp.2d 452 at 479 (motion to dismiss); Cromer, 2001 WL 506908, at *6-*7 (motion for reconsideration); Cromer, 2001 WL 935475, at *2 (motion for interlocutory appeal). The standard applied in prior Opinions has not changed. In brief,

The Second Circuit has developed two tests to determine whether the Court should entertain subject matter jurisdiction over a particular transnational securities fraud claim, the conduct test and the effects test. Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 121-22 (2d Cir.1995). The two tests need not be applied "separately and distinctly," and "an admixture or combination of the two often gives a better picture of whether there is sufficient United

States involvement to justify the exercise of jurisdiction by an American court." Id. at 122. Indeed, certain facts, such as making telephone calls or sending investment information to the United States, can be "characterized as either conduct or effects in the United States." [Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 128 & n. 13 (2d Cir.1998).]

*3 Cromer, 137 F.Supp.2d at 479.

DTB's aggregation argument has already been addressed as follows:

The [Motion to Dismiss] Opinion noted that even were the Court to accept the defendants' argument regarding aggregation, the individual actions on the part of [the Fund administrator] and DTB are sufficient for subject matter jurisdiction under undisputed law.... DTB argues that no evidence exists that its conduct had any "effects" in the United States and that its conduct occurred entirely outside of the United States. DTB ignores the myriad of contacts which the Court detailed in its [Motion to Dismiss] Opinion (and reiterated in its [Motion for Reconsideration] Opinion) sufficient under an "admixture" of the conduct and effect tests to find subject matter jurisdiction over DTB. For example, DTB won the right to act as auditor for the Fund by sending a "Proposal of Professional Services" to Berger in New York, and DTB's annual audit reports-allegedly containing material, false information regarding the Fund-were exported by mail from Bermuda to the United States. See Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 128 (2d Cir.1998) ("Telephone calls and facsimile transmissions conveying offers to sell securities and investment information could be characterized as either conduct or effects in the United States."). DTB does not dispute that, as it indicated in its own audit reports, the Fund was designed for both foreign investors and "tax exempt United States investors" nor that when it addressed its audit reports to "the Shareholders of the Manhattan Investment Fund Ltd.," it understood that its allegedly fraudulent audits would be mailed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to the Fund's shareholders, even if [the Fund's Administrator] did the actual mailing. *See Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 262 (2d Cir.1989) (holding the transmittal of tender offer documents to the United States was an "effect" in that it was "a direct and foreseeable result of the conduct outside the territory of the United States"). In addition, the audits themselves were created using information emanating from the United States for a Fund which DTB understood was managed entirely from New York, and DTB chose to rely at least in part on its United States-based affiliates to perform aspects of its audit work.... This fact intensive inquiry does not create an appropriate basis for certification.

*Cromer,* 2001 WL 935475, at *3.

Recently, in addressing the existence of subject matter jurisdiction in an action brought by the SEC in connection with this very fraud, the Second Circuit reaffirmed the use of the effects and conduct test and the existence of subject matter jurisdiction for "claims involving transnational securities frauds." *S.E.C. v. Berger,* 322 F.3d 187, 192 (2d Cir.2003). In particular, relying on the conduct test alone, it held that there was a sufficient basis to find subject matter jurisdiction over the fraud. *Id.* at 195."[W]hile operating entirely from New York, Berger executed a massive fraud upon hundreds of investors involving transaction on United States exchanges."*Id.* at 195.In so ruling, the Second Circuit rejected the arguments made by the defendant-Berger-that his actions in the United States were merely preparatory to the fraud, that jurisdiction did not exist because the investors were largely if not exclusively foreign, and that the false financial statements were prepared and mailed from abroad. *Id.* at 194-94.DTB has not shown why the reasoning in *Berger* should not control here.

*4 In particular, it is noteworthy that the Second Circuit cited with approval two of its prior opinions in ways that have particular resonance with DTB's arguments. It quoted a prior decision's comment that there is " 'jurisdiction over a predominantly

foreign securities transaction under the conduct test when, in addition to communications or meetings in the United States, there has also been a transaction in a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress' ".*Id.* at 194 (citing *Banque Paribas,* 147 F.3d at 130 & n. 16). Drawing on a quotation from *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.1975), it noted that " 'Congress did not mean the United States to be used as a base for fraudulent securities schemes even when the victims are foreigners, at least in the context of suits by ... named foreign plaintiffs.' " *Berger,* 322 F.3d at 195 (citing *Bersch,* 519 F.2d at 987).

Taking a cue from the *Berger* decision, the conduct test so clearly presents a sufficient basis for finding subject matter jurisdiction over this action, that it is unnecessary to consider the effects test as well. Indeed, Berger himself is one of the defendants in this action, as is Financial Asset Management, Inc. ("FAM"), which Berger used as an "introducing broker", and Deloitte, the foreign auditing organization which is run from its headquarters located in New York City. There is no dispute that DTB is properly joined as a party to this action under traditional joinder principles. All of the causes of action and defendants are tied together through their connection to the single scheme which was the fraud committed by Berger in New York. It matters not, therefore, whether any beneficial owner of shares in the Fund or the two named plaintiffs are United States residents.

DTB's remaining argument is that the issue of subject matter jurisdiction is defendant specific and that its conduct cannot be aggregated with the conduct of any other defendant in assessing jurisdiction. Even if that were true, the undisputed facts described in the decision denying the motion for an interlocutory appeal and quoted above, *Cromer,* 2001 WL 935475, at *3, provide a more than sufficient basis for finding subject matter jurisdiction under the conduct test over an action against DTB.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 6
Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.))

DTB, however, is wrong about the standard for subject matter jurisdiction. The issue is whether the court has jurisdiction over the transaction, not whether it separately has jurisdiction over the particular acts committed by each defendant in connection with the transaction. Indeed, it is the simple fortuity of litigation that Berger himself will not be sitting as a defendant at the upcoming trial.[FN1] Were he still an active participant in this litigation, the flaw in DTB's reasoning would be even more apparent.

> FN1. Berger became a fugitive after entering a guilty plea to the fraud that forms the basis for this action. *Berger,* 322 F.3d at 191.

DTB has not cited any Second Circuit decision that leads to any other conclusion. In *Itoba Ltd. v. LEP Group PLC,* 54 F.3d 118, 124-35 (2d Cir.1995), the single Second Circuit decision cited by DTB, the plaintiff, an off-shore entity, sued a foreign holding company, LEP Group PLC, and four individuals. One of the individual defendants, William Berkley, was a LEP director and a United States citizen. While the other claims were based on an alleged failure to disclose material information in SEC filings, the claim against Berkley arose from his sale of LEP shares on the same day the plaintiff purchased shares. *Id.* at 121. The Second Circuit reversed the dismissal of the complaint, which had been dismissed for a lack of subject matter jurisdiction. *Id.* The Second Circuit held that there was subject matter jurisdiction based on a combination of the conduct and effects test. *Id.* at 124. In doing so, it examined all of the relevant facts, but did not engage in a defendant by defendant analysis. *Id.* at 123-24. It then observed

*5 For some reason that is not clear to us, the magistrate judge did not consider it necessary to address specifically Itoba's causes of action against any of the individual defendants. She simply recommended a blanket dismissal of the complaint as to all defendants, which recommendation was adopted without discussion by the district court. We find this particularly troublesome with respect to the defendant Berkley.

*Id.* at 124. Read in context, this passage does not dictate that the relevant facts regarding a transaction should not be considered in the aggregate to determine whether subject matter jurisdiction exists over all defendants connected to the transaction. It instead expresses surprise at the lower court's decision to "silently" dismiss without any analysis the quite separate insider trading claims against Berkley. *Id.* at 125.[FN2]

> FN2. DTB cites two other cases to support its contention that an aggregation approach is disfavored in the Second Circuit, although neither provide such support. DTB cannot rely on *Department of Econ. Dev. v. Arthur Andersen & Co.,* 683 F.Supp. 1463 (S.D.N.Y.1988); the court there found sufficient domestic activity in the performance of the audits at issue to find subject matter jurisdiction over two foreign accounting firms in a suit brought by a foreign plaintiff. *Id.* at 1470-71. In *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27 (D.C.Cir.1987), West German plaintiffs sued one defendant, an American accounting firm. The case, therefore, did not address the aggregation of contacts with the United States for separate defendants, and its *dicta* regarding the aggregation of activities by non-party participants has no relevance to the issues here. *See id.* at 36.

In sum, DTB has not shown that there is a basis to revisit the prior determinations that there is subject matter jurisdiction. There is no need for a pre-trial hearing.

## II. Securities Law Claims

[2] DTB argues that plaintiffs cannot prove two essential elements of the federal securities fraud claim: loss causation and transaction causation. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 7
Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.))

legal framework for analyzing these two elements has been described in several prior opinions in this action, including the Opinion certifying a class:

It is well settled in the Second Circuit that:

"Causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered....*Transaction causation is based upon the plaintiff's reliance upon the defendant's deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment.*Loss causation is somewhat different. It has been likened to the tort concept of proximate cause, meaning that in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation."

*Cromer,* 205 F.R.D. at 128 (class certification) (*citing*Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95-96 (2d Cir.2001) (emphasis added and in original)).

a. Transaction Causation

Plaintiffs are entitled to a rebuttable presumption of reliance.

It is difficult to imagine an investor putting money into a fund without relying on the integrity of the process for calculating the fund's NAV, as supported by auditor review. Just as the [fraud on the market theory] presumes that investors rely on the integrity of a process-namely, that the market will incorporate material information about a security into its price-the theory advanced by the plaintiffs in this case also presumes that investors rely on the integrity of a process-namely, the processes by which the NAV of a private fund is determined and then confirmed by that fund's auditor.

*6 *Cromer,* 205 F.R.D. at 131.

DTB argues that the presumption of reliance is inappropriate, because its audits do not in fact confirm the process used by the Fund's administrator to calculate the NAV or net asset value. Although its year-end audit included the net asset figure, the number of shares issued and outstanding, and the year-end net asset value per share, it asserts that as the audit reports do not describe the NAV calculation process, plaintiffs could not reasonably have relied on them to confirm the accuracy of the monthly NAV contained in the Fund's monthly statements. Without proof that the audits functioned as an approval of the NAV calculation process, it contends that allowing the federal securities fraud claim to proceed would amount to reviving aiding and abetting liability. In addition, without a presumption of reliance, DTB argues that the claim must be dismissed since it can be shown as a matter of law that the named plaintiffs did not actually rely on the audits in making investment decisions. DTB next argues that it will be able to show that the plaintiffs did not exercise the minimal due diligence required to succeed before the jury since DTB will be able to establish at trial that the audits disclosed that the Fund had not abided by the Fund's own sector concentration limits, a fact that was material to the decision of both named plaintiffs to invest in the Fund. Finally, DTB argues that Cromer's federal law claim is time-barred because it was on notice as of 1998 that the sector concentration limits had been violated, and the lawsuit was filed more than one year thereafter.

Each of DTB's arguments raises inherently fact intensive questions that are inappropriate for summary judgment. Only one of these issues requires any comment in this Opinion. It is undisputed that the annual audit confirmed the reported year-end financial statements for the Fund, including the year-end NAV. That is sufficient to support the presumption of reliance.

As the Fund's Offer Memorandum explained, in what will probably be shown to be the customary

Not Reported in F.Supp.2d

Page 8

Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.))

definition for a NAV, the "Net Asset Value per Share is equal to the relevant Net Asset Value divide[d] by the number of Shares outstanding ... expressed in U.S. dollars."The assets, of course, are principally the value of the securities held by the Fund. The financial statements in the audits themselves make the calculation of the NAV transparent. The assets and liabilities are itemized and the net assets calculated. Next, the shares issued and outstanding are listed. Finally, the net asset value per share is identified. One of the class representatives has further testified that he specifically relied on the fact that the NAV number was audited. The plaintiffs hotly contest the facts and inferences on which DTB relies in this motion; a jury will have to decide whether transaction causation has been established.

b. Loss Causation

[3] The legal framework for loss causation has been previously described in this action. *Cromer,* 205 F.R.D. 113 at 128 (*citingSuez Equity,* 250 F.3d at 98-99). Loss causation, however, has not been previously disputed by DTB. *SeeCromer,* 205 F.R.D. at 128.

*7 Loss causation is akin to the concept of "proximate cause" in tort law, "meaning that in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation."*Suez E quity,* 250 F.3d at 96;*see alsoManufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 21 (2d Cir.1986). The Second Circuit has noted that "[a] foreseeability finding turns on fairness, policy, and ... 'a rough sense of justice.' " *AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 217 (2d Cir.2000) (quoting *Palsgraf v. Long Island R. Co.,* 248 N.Y. 229, 352 (1928)). Determining whether a loss was a foreseeable consequence of a particular defendant's actions is, ultimately, a public policy question, which asks how far back along the causal chain should liability for the plaintiffs' losses extend. *Suez Equity,* 250 F.3d at 96;*AUSA Life Ins. Co.,* 206 F.3d at 210. In

assessing loss causation allegations, courts ask "[w]as the damage complained of a foreseeable result of the plaintiff's reliance on the fraudulent misrepresentation?" *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir.1992) (citation omitted).

On this issue as well, DTB has not raised any arguments that are appropriate for summary judgment. DTB argues that the true causes of plaintiffs' losses were the fraudulent monthly NAVs that the Fund administrator calculated and the Fund's investment strategy of short-selling technology securities before the market moved against that sector. The plaintiffs intend to introduce evidence at trial which, if accepted by the jury, would establish that the DTB audits contained material misstatements of fact regarding the Fund, and that the losses suffered by the plaintiffs were a foreseeable consequence of the inaccuracies in the audits.

DTB's related argument, that it did not "intend or reasonably expect" investors to rely on the audits, is not a complete defense to a claim of loss causation since the issue of loss causation is an objective one: a reasonable foreseeability. In any event, to the extent that it is relevant for a jury to consider the defendant's subjective intent on this issue, the jury would be entitled to consider whether the testimony of DTB's witnesses in this regard is credible.[FN3]After all, independent audits of investment funds, conducted in compliance with recognized international standards, are generally understood to be essential if a fund is to obtain any investors. Consequently, it would be quite surprising if a fund's auditors didn't understand that potential investors in a fund would require a fund to have an independent and reputable auditor before choosing to invest, and that they would rely on the annual audit to present an accurate description of the fund's financial condition. In this case, the Fund's Offer Memo explained that "Deloitte & Touche", at a Bermuda address, would be the Fund's independent auditor. It does not require a long step from there to find that an investor's losses are a reasonably foreseeable consequence of misstatements in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.))

the audit that go directly to the investment quality of a fund.

> FN3. This contention is based on DTB's argument that under British law, negligently performed audits may not generally be used by shareholders as a basis for a lawsuit against a corporation's auditors. Whether DTB had a reasonable and good faith belief that it could not be sued under British law for the misstatements in its audits is a separate question from whether the plaintiffs can show the existence of loss causation. This issue is discussed in more detail in connection with th negligence claim, *infra*.

**\*8** Finally, DTB contends that the loss was suffered by the Fund and that the plaintiff-investors cannot recover for that loss. This argument is quickly rejected. While the Fund suffered a loss through Berger's fraud, the investors did so too.

III. Aiding and Abetting Claims

DTB argues that the claims that it aided and abetted a fraud and that it aided and abetted a breach of fiduciary duty are governed by Bermuda law. This Court has already held that one of those claims-the claim of aiding and abetting a fraud-would not survive when measured against the Bermuda law of aiding and abetting. The Court also found, however, that New York law applied to the claim and that it survived the motion to dismiss. *Cromer,* 137 F.Supp.2d at 492-93. DTB reargues that choice of law decision, and argues that summary judgment is appropriate even if New York law applies.

*Choice of Law*

[4] There is no "significant federal policy, calling for the imposition of a federal conflicts rule" in this case that would require the application of federal choice of law principles. *Cromer,* 137 F.Supp.2d at 492 (*quotingIn re Gaston & Snow,* 243 F.3d 599,

607 (2d Cir.2001)). The forum state's choice of law rules will, therefore, apply. Under New York law, the first question is whether there is a conflict between the laws of the relevant fora. As previously found, the elements of the aiding and abetting fraud claim under New York and Bermuda law are in conflict. "A claim for aiding and abetting fraud would only survive in Bermuda if the pleading alleged that DTB had conspired with Berger or procured or induced his fraud or that DTB joined in the common design of the fraud, none of which is alleged here."*Id.* The same conflict exists with respect to the claim of aiding and abetting a breach of fiduciary duty.

This Court has held that, as the forum in which the primary tort occurred, New York has the greatest interest in applying its law to the claim of aiding and abetting fraud. *Id.* at 492-93.DTB urges the Court to follow the reasoning of *Solow v. Stone,* 994 F.Supp. 173, 177-78 (S.D.N.Y.1998), *aff'd,*163 F.3d 151 (2d Cir.1998), which it contends suggests application of the law of Bermuda to both of the aiding and abetting claims.

In *Solow,* the district court was confronted with claims arising from the breach of a lease agreement for commercial office space in Manhattan. The plaintiff was the lessee. The parties agreed that the court should apply the law of the place of incorporation-Delaware-to the claim that the directors of the lessor corporation breached their fiduciary duties to the plaintiff, a creditor of the insolvent corporation. The court applied a different analysis to the secondary tort claims brought against British "administrators" (a position equivalent to a trustee in bankruptcy) for aiding and abetting the directors' breach of fiduciary duty by causing the corporation to squander its assets, and for tortious interference with plaintiff's rights under the lease, as these were "not directed against the administrators in their capacity as officers or directors [of the Delaware corporation], but rather as independent actors."*Id.* at 177.Because the "acts giving rise" to the secondary claims occurred "in significant part" in New York,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the court found that New York had the greatest interest in having its law applied, or at least that there was "no jurisdiction with an interest greater than New York's with respect to these tort claims."*Id.* There is no indication in the opinion whether the issue of choice of law with respect to these two claims was disputed or even addressed by the parties.

*9 DTB argues that a similar bifurcation is appropriate and that, following *Solow,* this Court should apply different law to the secondary tort claims than to the torts DTB is accused of aiding and abetting. *Solow,* however, provides little comfort to DTB.

First, the aiders and abettors were British, and yet the *Solow* court applied New York law to their conduct. Second, although the fiduciary duty was owed to a corporation whose affairs were governed by Delaware law, the *Solow* court did not apply Delaware law to the claims against those who aided and abetted the breach of fiduciary duty. This suggests that there is no barrier to applying New York law to the aiding and abetting claims even though the Fund was incorporated in the British Virgins Islands. Third, *Solow* made its decision by conducting an interest analysis, as has already been done here. Accordingly, for the reasons already explained, *Cromer,* 137 F.Supp.2d at 492-93, New York law will apply to both aiding and abetting claims.

*Knowledge*

[5] DTB contends that it is entitled to summary judgment on the aiding and abetting claims even under New York law for two reasons. The first is that New York law requires that a defendant have "knowledge" of the underlying fraud, *seeCromer,* 137 F.Supp.2d at 470, 494, and DTB argues that there is no evidence that it had knowledge of the underlying fraud or breach of fiduciary duty.

In criminal law, proof of willful blindness, or conscious avoidance, is a well-established substitute for proof of knowledge when knowledge is the required culpable state of mind. *See,e.g.,United States v. Reyes,* 302 F.3d 48, 54-55 (2d Cir.2002). While constructive knowledge, that is knowledge that would have been acquired from a reasonably diligent investigation, is insufficient, *Kolbeck v. LIT America, Inc.,* 939 F.Supp. 240, 245-46 (S.D.N.Y.1996), there is no reason to believe that New York law would not accept willful blindness as a substitute for actual knowledge in connection with aiding and abetting claims. DTB has not directly confronted the plaintiffs' argument that willful blindness is an alternative means of proving actual knowledge.FN4 Instead, it has addressed whether a showing of recklessness will suffice. As this Court has already held, a showing of recklessness will not suffice. *Cromer,* 137 F.Supp.2d at 495 n. 28.

> FN4. The plaintiffs rely principally on *In re JWP Inc. Securities Litigation,* 928 F.Supp. 1239 (S.D.N.Y.1996), to support their theory that proof of willful blindness is sufficient evidence of scienter. That case does not support their point. The court described the willful blindness standard as sufficient to satisfy the scienter requirement of a Section 10(b) claim, *id.* at 1256, but in fact relied on a showing of recklessness to deny summary judgment. *Id.* at 1256.When it applied its scienter finding under Section 10(b) to the aiding and abetting claim, *id.* at 1258, its discussion necessarily incorporated the recklessness standard, which is not sufficient to establish scienter for an aiding and abetting claim.

The plaintiffs have presented evidence raising questions of fact as to whether DTB consciously avoided confirming the existence of the fraud and the breach of fiduciary duty by Berger. While it may very well be that their evidence, even if believed, will only be sufficient to support a finding of recklessness, that is not a determination that can

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be made on summary judgment.

*Proximate Cause*

Finally, DTB argues that the plaintiffs have failed to present evidence that their actions proximately caused the plaintiffs' losses. Both aiding and abetting claims require proof that the aider/abettor "proximately caused the harm on which the primary liability is predicated."*Cromer*, 137 F.Supp.2d at 470. This argument, which is similar to DTB's attack on the loss causation element of plaintiffs' federal securities law claims, is dealt with and rejected above.

IV. Negligence

**\*10** [6] DTB moves to dismiss the negligence claim, arguing that Bermuda law applies to the claim and that the claim does not survive under Bermuda law. This is the first time DTB has raised this issue specifically in the context of the negligence claim.

In its first motion to dismiss, filed in October 2000, DTB argued that the *gross* negligence claim was governed by Bermuda law and that Bermuda did not recognize the tort of gross negligence. Based on the evidence submitted by the parties on that motion, evidence that concerned the law of *negligence* under Bermuda law, the Opinion on that motion found that

Bermuda, a common law jurisdiction, apparently has no authority directly addressed to the common law negligence and fraud claims asserted here, but would follow British law and to a lesser extent United States law. Based primarily on an analysis of British precedent, and the degree to which Bermuda courts adhere to it, it appears that there would be liability under Bermuda law for a claim of negligence against DTB for their audits of the Fund if the plaintiff alleged that DTB knew that its audits would be communicated to the plaintiffs individually or as an identifiable class in connection with a

specific transaction, such as, an investment in the Fund, and also knew that those audits would very likely be relied upon by those persons in deciding whether to engage in the transaction.

*Cromer*, 137 F.Supp.2d at 492. Because there did not appear to be a difference between New York and Bermuda law, the Opinion did not conduct a choice of law analysis, but applied New York law to the gross negligence claim. See*Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir.2001) (choice of law analysis only necessary when there is a difference in the law of the jurisdictions). In its motion for reconsideration, DTB reargued the holding that New York law applied to the aiding and abetting claim, but did not reargue the finding regarding gross negligence (or negligence).

In the extensive motion practice that followed in the succeeding months, DTB did not again argue that Bermuda law should govern the gross negligence or negligence claim. For example, in a motion to certify an interlocutory appeal from the denial of its motion to dismiss based on *forumnonconveniens*, DTB argued that the domestic law of each plaintiff's country of residence would govern two of the state law claims pleaded against DTB if the Court followed the choice of law analysis it applied when it concluded that New York law would govern the aiding and abetting fraud claim. *Cromer*, 2001 WL 1135627, at \*3.

The motion to dismiss discussed above addressed the first amended complaint, which included, *interalia*, common law claims of aiding and abetting both common law fraud and breach of fiduciary duty, fraud, gross negligence, negligence and professional malpractice. As noted, DTB's choice of law motion was addressed solely to two of these six common law claims: the claim for aiding and abetting fraud and gross negligence. When the plaintiffs filed a second amended complaint, DTB brought another motion to dismiss even though the pleading added no new claims against it. *Cromer*, 2001 WL 1112548, at \*1. This time, DTB argued with respect to the claims of negligence and gross

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

negligence, that they were barred by the Martin Act, and that New York law does not recognize a separate cause of action for gross negligence by an accountant. *Id.* at \*3. After a detailed discussion of the Martin Act and precedent applying that statute, the Opinion concluded that the Martin Act did not bar the negligence claim against DTB. *Id.* at \*4. The Opinion briefly addressed DTB's remaining arguments that the complaint failed to state a claim under New York's law of negligence. *Id.* at \*5. With respect to the gross negligence claim, the Opinion agreed that New York law does not recognize a cause of action for gross negligence against accountants that is independent from a fraud claim. *Id.* DTB's additional arguments concerning the other common law claims, all based on the application of New York law to the complaint's allegations, were denied. *Id.* at \*2-\*5. DTB did not move to apply Bermuda law to any RR the claims.

\*11 In the context of opposing certification of a class, DTB argued that New York law would not accept a presumption that the plaintiffs had relied on its audits. *Cromer,* 205 F.R.D. at 132 n. 25. DTB did not argue that Bermuda law would or should apply to the common law claims.

Then, in a letter of October 25, 2002, DTB disclosed to plaintiffs the identity of two foreign law experts. On November 27, 2002, plaintiffs filed a motion to strike the affidavits on the law of the case doctrine and because of the "unreasonable" amount of expense and resources that it would take at this stage of the litigation to address the issue.

As the recitation above makes clear, DTB has repeatedly litigated the plaintiffs' pleadings without challenging the application of New York law to most of the common law claims. Only in the context of the gross negligence and the aiding and abetting of common law fraud claims has DTB ever directly litigated the application of New York law to the common law claims. Therefore, to this point, the Court and the parties have expended significant resources based on the assumption that New York law would govern here. To give but one example,

the analysis of DTB's Martin Act argument may have been unnecessary if DTB had tried to and succeeded in convincing the Court at that time that there was a difference between New York and Bermuda negligence law and that Bermuda law applies. It is simply too late in this litigation to raise the choice of law issues again based on new affidavits of foreign law.[FN5]

> FN5. This is not a case where DTB can point to any change in British or Bermuda law since 2001 which could excuse its delay. Nor can DTB excuse its delay by pointing to the need to conduct discovery. The existence of any difference in the New York and Bermuda law of negligence is a question of law, not fact.

It is not, in any event, clear even now (and even without the benefit of any foreign law affidavits that the plaintiffs wish to present if their motion to strike is not granted) that there is any difference between New York and Bermuda negligence law. DTB admits that English cases since the seminal House of Lords decision on which it relies, *Caparo Industries PLC v. Dickman,* [1990] 2 A.C. 605, have held that "an auditor may be liable to an investor under circumstances evidencing an 'assumption of responsibility' which is *similar* to the New York law requirement that an accountant must intend plaintiff's reliance for a particular purpose as 'a primary, if not the end and aim of auditing' its client."(Emphasis supplied.)

[7]*Caparo,* itself, as described by DTB, only supplies a "general" rule and explains that audit reports are generally addressed to shareholders so that they can exercise their corporate governance rights, such as the election of directors. *Caparo* recognized that "special factors" may create a duty from the auditors to individual shareholders as investors. DTB describes exceptions as circumstances where the audit was prepared for a corporation in the context of a "special purpose" to attract investors, or where the auditors knew that it would be relied upon by a lender for its decision about the level of lending it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should make to the company. Furthermore, it is unclear to what extent the "general" rule in *Caparo* has applicability to the "shareholders" of an investment fund like that at issue here. It does not appear that the Fund's shareholders were participating in corporate governance other than through maintaining their investment position, buying additional shares or liquidating their shares, that is, removing their investment from the Fund.

**\*12** DTB argues that even if New York law applies, the extraordinarily restrictive standard that governs negligence claims against accountants under New York law entitles them to summary judgment. The parties agree that *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), sets forth the standard that governs here. In *Credit Alliance,* the New York Court of Appeals reaffirmed the tests first articulated in opinions of the court written by Chief Judge Cardozo. *Credit Alliance* summarizes the requirements for accountant liability as the following:

(1) *the accountants must have been aware* that the financial reports were to be used for a particular purposes or purposes; (2) in the furtherance of which a known party or parties was *intended to rely;* and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Id.* at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110 (emphasis supplied). Drawing from the articulation in earlier precedent, the use of the audit by the plaintiff cannot have been *"an indirect or collateral consequence".Id.* at 549, 493 N.Y.S.2d 435, 483 N.E.2d 110 (citing *Glanzer v. Shepard,* 233 N.Y. 236, 238-39, 135 N.E. 275 (1922) (emphasis added by *Credit Alliance* )). Based on the accountant's knowledge, the consequence must have been *"the end and aim of the transaction."Id.* (same). The bond between the accountant and plaintiff must be *"so close as to approach that of privity."Id.* at 550, 493 N.Y.S.2d 435, 483 N.E.2d 110 (citing *Ultramares Corp. v. Tou che,* 2 55 N.Y. 170, 182-83,

174 N.E. 441 (1931) (emphasis added by *Credit Alliance* )).

DTB has offered affidavit and deposition evidence that those at DTB who were principally responsible for the audits did not intend the Fund's shareholders to rely on its audit reports even though they were addressed to the Fund's shareholders. They point out that plaintiffs have not offered any contrary testimony or evidence.

The plaintiffs have raised issues of fact regarding whether DTB was aware that the Fund's shareholders would rely on the audits in making their investment decisions, whether it intended that the audits be used for that purpose, and whether DTB took steps that link them to the shareholders, steps which evidence DTB's understanding that the Fund's shareholders would and could rely on the audits. Among other things, the audits were prepared for an investment fund and DTB made copies of the audits so that they could be distributed to each of the shareholders or their investment advisors. The fact that DTB's witnesses, including a former employee, deny any intention that shareholders rely on the audits for investment purposes can be tested by the circumstantial evidence that the plaintiffs may offer to refute the denial.

Finally, in this connection, DTB argues that it should be permitted at trial to present evidence of foreign law, specifically, evidence about the *Caparo* decision, to corroborate the testimony of its witnesses that they had no intention or expectation that the Fund's shareholders would rely on the audits in making investment decision. In particular, they wish to use evidence regarding *Caparo* to undercut any inference that may be drawn from the fact that the audits were addressed to the Fund's shareholders. The DTB partner in charge of the Fund's audit has testified the he was familiar with the *Caparo* decision, and because of that decision, did not intend or foresee that investors would rely on the audit in making investment decision.

**\*13** Because knowledge and intent are at issue on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the negligence claim, the participants in the audit will have an opportunity to describe their knowledge and intent to the jury. That testimony may even include their understanding of the *Caparo* decision. To the extent that the actual meaning of the *Caparo* decision is a collateral issue, however, extrinsic evidence should not be admitted to either bolster or attack their credibility on this issue. *See,e.g.,United States v. Purdy,* 144 F.3d 241, 245-46 (2d Cir.1998). The issue here is not what *Caparo* actually held, or even whether an accounting firm believed that it had immunity under British law from a lawsuit by a shareholder, but what it is that DTB employees knew and intended about shareholder reliance. Because the parties have not briefed this precise issue in the context of its admissibility at trial, however, it is premature to rule on the point. Decision on plaintiffs' motion to strike is therefore reserved.

V. Elements Common to Common Law Claims

[8] DTB contends that the plaintiffs will not be able to rely on a presumption of reliance in connection with the negligence claim, or indeed any of their common law claims. DTB is correct. To the extent a common law claim requires proof of reliance, "actual" reliance must be shown. *Securities Investor Protection v. BDO Seidman, LLP,* 222 F.3d 63, 73 (2d Cir.2000).

The principal New York authority on this issue is *Ackerman v. Price Waterhouse,* 252 A.D.2d 179, 683 N.Y.S.2d 179 (1st Dep't 1998). In *Ackerman,* the First Department endorsed a presumption of reliance for a claim of negligence brought against an accounting firm that had been retained by a company to provide tax schedule K-1s to limited partners who had invested in real estate limited partnerships. The court approved the certification of a class composed of the New York limited partners, and distinguished those New York cases that had found that a presumption of reliance could not be used in common law fraud or misrepresentation cases.

The common thread running through most of these cases is the issue of whether a purchaser relied on the misrepresentations of the sellers in making the decision to purchase or retain shares. In contrast, no purchasing decision was involved here; this was an express contract to perform specific services.

*Id.* at 193, 683 N.Y.S.2d 179. Here, of course, the activity is precisely that distinguished by *Ackerman,* the purchase and retention of shares. There is no principled basis on which to distinguish *Ackerman.*Where the New York Court of Appeals has not yet addressed the issue, *seeSumitomo Copper Litigation v. Credit Lyonnais Rouse, Ltd.,* 262 F.3d 134, 142 (2d Cir.2001), it is the responsibility of a court to predict how it would rule. *SeeGibbs-Alfano v. Burton,* 281 F.3d 12, 18-19 (2d Cir.2002).*Ackerman'* s recent, extensive and careful discussion of the issue is a strong basis to predict that the New York Court of Appeals would not accept a presumption of reliance in the circumstances presented here.

*14 On the record presented with this motion, however, the Court cannot say, as a matter of law, that plaintiffs did not actually rely on the audits in making their investment decisions. Lead plaintiffs, in their deposition testimony, have stated that they did so actually rely, and their testimony creates a question of fact for trial on this issue. Even as framed by DTB, the issue of plaintiffs' actual reliance will come down to a question of credibility that is ill-suited for summary judgment.

Finally, DTB urges dismissal of plaintiffs' causes of action for fraud, gross negligence and negligence because the plaintiffs cannot demonstrate the proximate causation that is required for these claims under New York law.[FN6] For the reasons discussed above, there are sufficient questions of material fact on the issue of proximate cause to merit a trial, and this part of DTB's motion is therefore denied.

> FN6. For the fraud and gross negligence claims, DTB states in its brief that Bermuda law is "controlling," but does not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21436164 (S.D.N.Y.))

Page 15

provide a choice of law argument. With re-
gard to the fraud claim, DTB states that the
crucial elements are the same in both juris-
dictions, vitiating the need for any conflict
analysis. The gross negligence claim is an
alternative statement of the fraud claim.
*See Cromer,* 2001 WL 1112548, at *5.

The Court has considered DTB's remaining argu-
ments and finds them without merit.

## CONCLUSION

Deloitte Touche Bermuda's motion for summary
judgment is denied with the exception of its motion
to bar any presumption of reliance for the common
law claims. Decision is reserved on plaintiffs' mo-
tion to strike the affidavits of foreign law.

SO ORDERED:

S.D.N.Y.,2003.
Cromer Finance Ltd. v. Berger
Not Reported in F.Supp.2d, 2003 WL 21436164
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

**H**
Gordon Partners v. Blumenthal
S.D.N.Y.,2007.

United States District Court,S.D. New York.
GORDON PARTNERS, Frederick L. Gordon, and
Sam D. Gordon, Plaintiffs,
v.
George S. BLUMENTHAL, Barclay Knapp, John
F. Gregg, and NTL, Inc., Defendants.
No. 02 Civ. 7377(LAK)(AJP).

Feb. 9, 2007.

### REPORT AND RECOMMENDATION

ANDREW J. PECK, United States Magistrate Judge.
*1 To the Honorable Lewis A. Kaplan, United
States District Judge:

Plaintiffs Frederick L. Gordon, Sam D. Gordon,
and Gordon Partners (collectively, the "Gordon
plaintiffs") bring this securities action against de-
fendants NTL, Inc. ("NTL"), and George S. Blu-
menthal, Barclay Knapp, and John F. Gregg
(collectively, the "individual defendants"), pursuant
to, *inter alia*, Sections 10(b) and 20(a) of the Secur-
ities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) &
78t(a), and Rule 10b-5 promulgated thereunder, 17
C.F.R. § 240.10b-5. (Dkt. No. 16: Second Amended
Complaint ["2d Am. Compl."].) Presently before
the Court is defendants' summary judgment motion.
(Dkt. No. 59.)The Court heard oral argument on
February 9, 2007.

For the reasons set forth below, defendants' sum-
mary judgment motion should be GRANTED and
plaintiffs' complaint dismissed.

### FACTS

The Gordon plaintiffs' action is based upon the
same basic underlying facts as those alleged by the
class action plaintiffs against NTL and the indi-
vidual defendants in *In re NTL, Inc. Sec. Litig.*. (See
Dkt. No. 16: 2d Am. Compl. ¶¶ 1-155.) Indeed, the
Gordon plaintiffs' complaint adopts by reference in
its entirety the September 23, 2002 Consolidated
Class Action Complaint filed in *In re NTL, Inc. Sec.
Litig.*. (2d Am. Compl. ¶ 50; Dkt. Nos. 59 & 67:
Defs. & Pls. Rule 56.1 Stmts. ¶ 47; *see also* 02 Civ.
3013, Dkt. No. 21: Consolidated Am. Class Action
Compl.; 02 Civ. 3013, Dkt. No. 28: Am. Class Ac-
tion Compl.) The facts in the Consolidated Class
Action Complaint, and in the Gordon plaintiffs'
second amended complaint, are summarized in
Judge Kaplan's decision on defendants' motion to
dismiss, *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d
15 (S.D.N.Y.2004), and my Report and Recom-
mendation on the class certification motion, *In re
NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL
330113 at *1-3 (S.D.N.Y. Feb. 14, 2006) (Peck,
M.J.), *report & rec. adopted,* 2006 WL 568225
(S.D.N.Y. Mar. 9, 2006), familiarity with both of
which is assumed. [FN1]

> On January 30, 2007, this Court issued an
> Opinion granting the Gordon plaintiffs an
> adverse inference instruction and attorneys'
> fees as a spoliation sanction. *In re NTL,
> Inc. Sec. Litig.,* 02 Civ. 3013 & 7377, 2007
> WL 241344 (S.D.N.Y. Jan. 30, 2007)
> (Peck, M.J .); *see* discussion at pages
> 28-29 n. 8 below.

The Gordon plaintiffs' action differs from that of
the class action plaintiffs in that plaintiff Frederick
Gordon was close friends with the individual de-
fendants, particularly George Blumenthal, and
therefore enjoyed a greater degree of access to
NTL's management than the average investor. (See
2d Am. Compl. ¶¶ 27-33; Dkt. No. 67: Gordon Aff.
¶¶ 18-34.) As Frederick Gordon explained: "My re-
lationship with NTL and the individual defendants
was long-standing. I was a fraternity brother of
George Blumenthal in the 1960's, a social friend for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 2
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

decades and an investor in his business ventures. I stayed at his London apartment. I went to all three of George's weddings."(Gordon Aff. ¶ ¶ 18-19, citations omitted; *see also* Dkt. No. 67: Pls. Rule 56.1 Stmt. ¶ 87.)

Frederick Gordon was the founder of Gordon Partners, a hedge fund that concentrated in long-term investments in a handful of select companies. (Defs. & Pls. Rule 56.1 Stmts. ¶ 1; Gordon Aff. ¶ 4; Dkt. No. 68: Pls. Br. at 4; Dkt. No. 63: Burdette Aff. Ex. 2: Gordon Dep. 11.) Frederick Gordon was the single largest investor in Gordon Partners and made all of the investment decisions for Gordon Partners. (Defs. & Pls. Rule 56.1 Stmts. ¶¶ 2-3; Gordon Dep. 12 .) Frederick Gordon also made all personal investment decisions for his son, plaintiff Sam Gordon. (Defs. & Pls. Rule 56.1 Stmts. ¶ 4; Gordon Aff. ¶ 4; Gordon Dep. 13-14.) Most of the value of the Gordon plaintiffs' assets consisted of NTL stock, which as of January 12, 2000 was worth approximately $30 million. (Gordon Dep. 14-15.)

*2 The Gordon plaintiffs allege that Frederick Gordon "was one of the substantial investors the defendants called on to vouch for their ability and honesty to other Wall Street professionals assessing the company's strategy and finances."(Gordon Aff. ¶ 8 .) The Gordon plaintiffs explain:

At times, NTL investor relations staff asked [Frederick] Gordon to do tasks for the company, such as contact researchers at investment firms about analysts' reports NTL was unhappy with, which Gordon did. Gordon performed other services for the company, of which it was aware. Gordon vouched for NTL's top management, with its knowledge and a[t] times at its request, to investment professionals.

(Pls. Rule 56.1 Stmt. ¶ 91, record citations omitted.) The Gordon plaintiffs contend that "[i]f Gordon had sold his stock and told people he had done so, it would have called into question the credibility of Blumenthal and Knapp as managers."(Pls. Rule

56.1 Stmt. ¶ 101.) The Gordon plaintiffs suggest that Frederick Gordon's close involvement with NTL and its managers was a motivating factor behind defendants' alleged attempts to mislead him about the true state of the company. (*See* Pls. Rule 56.1 Stmt. ¶¶ 97-112.)

### Defendants' Alleged Misstatements Between May 8, 2001 and April 16, 2002

The Gordon plaintiffs allege that were it not for defendants' fraudulent and misleading statements to the investing public in general and to Frederick Gordon specifically, the Gordon plaintiffs would not have continued to hold the NTL shares that they already owned prior January 12, 2000 and would not have purchased additional NTL shares between January 12, 2000 and April 16, 2002. (Dkt. No. 67: Gordon Aff. ¶ 10-12.) Frederick Gordon stated: "I am prepared to accept that the decline from the $100 share price in early January 2000 to not only the $44 price in early August 2000 but also the $31 share price in early May 2001 was *not* attributable to perceived misstatements or omissions by defendants."(Gordon Aff. ¶ 12.) FN2 The Gordon plaintiffs claim that Frederick Gordon "would have sold all of plaintiffs' holdings by no later than the three trading days between May 8 and May 11, 2001, had the defendants not made material misstatements and omissions up to and at that time."(Dkt. No. 68: Gordon Aff. Ex. 3: Pls. Am. Interrog. Ans. at 5; Gordon Aff. ¶ 11.)

Frederick Gordon also conceded that "there was zero inflation in NTL's stock price" after November 28, 2001. (Dkt. No. 63: Burdette Aff. Ex. 2: Gordon Dep. 142.)

On May 8, 2001, NTL's stock was selling for approximately $31 per share on the New York Stock Exchange. (Dkt. No. 67: Pls. Rule 56.1 Stmt. ¶ 81.) If Frederick Gordon would have sold all the Gordon plaintiffs' NTL stock in the days after May 8, 2001, he would have sold it for an average price of $27.50 per share. (Pls. Rule 56.1 Stmt. ¶ 83.) The Gordon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs state that "[t]here was no inflation in the share price of $27.50 attributable to the misrepresentations and omissions, because in 1999, before the material misstatements and omissions, the stock had always traded above that amount."(Pls. Rule 56.1 Stmt. ¶ 84; Pls. Am. Interrog. Ans. at 5-6.)

*3 On May 8, 2001, NTL announced a 32% increase in quarterly EBITDA from the fourth quarter of 2000, and defendant Barclay Knapp, NTL's president and chief executive officer, stated in a press release that: " 'We are very proud of this quarter's financial results. Revenue and EBITDA for the quarter have exceeded our previously stated expectations and we are on track to meet or exceed our 2001 financial targets for Revenue (£ 2,600 million) and EBITDA (£ 385 million).' " (Gordon Aff. ¶ 59 & Ex. 19.) A May 10, 2001 publication quoted defendant Knapp as stating: " 'We are very pleased with our strong performance this quarter and believe that we have made an excellent start to achieve our goals for the year. We are improving customer service and choice, enhancing revenue, cutting costs and increasing liquidity faster than anticipated.' " (Gordon Aff. Ex. 20 at 2.)

The Gordon plaintiffs allege that NTL made similar statements from the time it acquired "ConsumerCo" in May 2000 up until it announced the restructuring in January 2002. (Gordon Aff. ¶ 62 & Exs. 1, 21, 22.) The Gordon plaintiffs allege that these statements

were false and misleading because the defendants knew by May 2001, and partially admitted in filings made in 2002 and 2003, that (i) ConsumerCo continued to be plagued by high rates of churn caused by non-paying customers, multiple billing systems, and intractable difficulties in meshing the separate companies' customer service and support; (ii) in order to mask these problems, NTL was employing deceptive practices, such as ignoring non-payers and extending disconnect times; and (iii), NTL would not have "excess funding through 2002," "financing into 2003" or "available" bank lines unless it continued to meet

its EBITDA targets into 2002, which it could not do without employing deceptive practices.

(Gordon Aff. ¶ 63.) The Gordon plaintiffs claim, for example, that NTL never disclosed that on May 23, 2001, defendant Knapp directed NTL " 'to run low balance customers ... a further 30 days out,' rather than disconnect them for nonpayment, which in turn lowered reported churn."(Gordon Aff. ¶ 65 & Ex. 7: Knapp Dep. 468-71.)

During a breakfast on September 21, 2001, defendant Knapp told Frederick Gordon that "between the time NTL had agreed to acquire ConsumerCo in 1999 and the time the transaction closed in May 2000, ConsumerCo had gone from having a positive to a negative cash flow."(Gordon Aff. ¶ 80; Pls. Rule 56.1 Stmt. ¶ 103.) The Gordon plaintiffs allege that this had never been disclosed to the public or to Frederick Gordon himself. (Gordon Aff. ¶ 80.) A September 24, 2001 news report regarding NTL stated: "Perceptions that the company may not be fully funded fuelled the drop in share price to an all time low of $1.50 last week."(Gordon Aff. Ex. 24.)

Around the end of November 2001, Frederick Gordon visited NTL's offices in New York, and defendant Blumenthal told him that NTL was going to have to restructure. (Gordon Aff. ¶ 92; Gordon Dep. 73-76; Defs. & Pls. Rule 56.1 Stmts. ¶ 27.) NTL's stock was trading at approximately $3 per share at that time. (Gordon Aff. ¶ 92.) In December 2001 and January 2002, NTL issued a series of press releases stating that "[i]t was fully able to meet all of its current trade obligations and interest payments" (Gordon Aff. Ex. 27), it was "introducing a series of cost cutting initiatives" (Gordon Aff. Ex. 28), "[t]he company has sufficient liquidity to approach the [planned] recapitalization process in a considered manner" (Gordon Aff. Ex. 30), and "[t]he company expects to be able to pay its bills, including interest payments" (Gordon Aff. Ex. 31).

*4 Frederick Gordon stated that:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

The clearest proof that I believed what the defendants were assuring me and others during the latter part of 2001 is that, as the stock price then dropped, I bought on fifteen separate occasions a total of more than $800,000 of NTL stock for Gordon Partners, and on ten separate occasions I bought a total of more than $300,000 of NTL stock for myself. That included several purchases in December 2001, even after I had heard that the company was going to restructure, when the stock was below $1. I did so because the defendants continued to affirm that NTL would meet its EBITDA guidance and loan payments.

(Gordon Aff. ¶ 101.) Frederick Gordon continued:

The notion that I would never have sold NTL stock, no matter what was revealed about the company, makes no sense. The defendants claim that, however, for three reasons. First, even after Barclay [Knapp] told me in September 2001 that ConsumerCo had negative cash flow when acquired in May 2000, I did not sell any NTL stock. Barclay[Knapp]'s disclosure, however, came a year and a half after the fact, and he at the same time claimed to me, and to others, as he had in 2001, that, as the "GM of London," he had fixed the problems that caused the lack of cash flow, and NTL was fully funded into 2003. Second, even after George [Blumenthal] told me in November 2001 that NTL would have to restructure, I did not sell NTL stock (which in December was selling for less than $1). George [Blumenthal], however, did not know what the restructuring might amount to, and NTL, as I noted, continued to claim to me and to the world that its EBITDA projections were on target, it could make its interest payments and it had ample liquidity. Third, of course I knew in December 2001 that the stock could go to zero; it was quite close to that then. There was, however, little point by December 2001 in *not* continuing to believe the defendants. A better plan at year-end 2001, I thought, was to hang on, in the belief that a restructuring, with Barclay [Knapp] at the helm, would not necessarily wipe out plaintiffs' equity

position. Barclay [Knapp] told a reporter on or about December 9, 2001 that NTL was determined to avoid a major restructuring that would transfer equity to the bondholders. That was very welcome and important news to me, and confirmed my decision not to sell shares that had lost more than 99% of their value in two years.

(Gordon Aff. ¶ 102, citations omitted.)

On December 11, 2001, Frederick Gordon e-mailed Aizad Hussain, NTL's head of corporate finance, expressing the hope that Hussain's confidence about the company was "grounded in the numbers." (Gordon Aff. ¶ 103 & Ex. 33.) Hussain replied, "They've all given up-helps turn the business around since it gives me and the rest of George a I[sic] more leverage to get the changes we need done. Can't say more."(Gordon Aff. ¶ 103 & Ex. 33.)

On January 31, 2002, NTL announced the restructuring that defendant Blumenthal had told Gordon in late November 2001 was coming. (Gordon Aff. ¶ 105.) An NTL press release stated that NTL had "appointed Credit Suisse First Boston, JP Morgan and Morgan Stanley to advise on strategic and recapitalization alternatives to strengthen the company's balance sheet and reduce debt."(Gordon Aff. ¶ 105 & Ex. 30.)

*5 On March 28, 2002, NTL announced that its stock would be de-listed from the New York Stock Exchange, but that the de-listing would have no effect on business operations or customer service. (Gordon Aff. Ex. 38.) On April 10, 2002, Bloomberg News reported that Barclay Knapp was facing calls to resign as CEO, stating that he "turned NTL into a $30 billion company, and then saw its market value evaporate as he racked up $17.5 billion of debt and failed to turn a profit."(Gordon Aff. Ex. 39.) On April 11, 2002, Bloomberg News published an update entitled "NTL Is Losing Disgruntled Customers as Well as Money."(Gordon Aff. Ex. 40.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

On April 16, 2002, before the securities market opened, NTL announced that it was entering into Chapter 11 bankruptcy. (2d Am.Compl.¶ 4.) The Bankruptcy Court confirmed a plan of reorganization for NTL on September 5, 2002. (2d Am.Compl.¶ 4.) As part of the bankruptcy, the Gordon plaintiffs' equity was eliminated. (Gordon Aff. ¶ 106.)

In January 2003, Frederick Gordon received 3,470 warrants, which he sold for $21,036 in 2004; Gordon Partners received 5,638 warrants, which it sold for $39,990 in 2004; and Sam Gordon received and owns 264 warrants. (Gordon Aff. 171; Pls. Am. Interrog. Ans. at 2.) In addition, Frederick Gordon received 2,972 NTL Europe shares, liquidated by the company for $29.72; Gordon Partners received 4,382 shares, liquidated by the company for $43.82; and Sam Gordon received 250 shares, liquidated by the company for $2.50. (Gordon Aff. ¶ 172; Pls. Am. Interrog. Ans. at 2.)

### The Gordon Plaintiffs' NTL Holdings

The Gordon plaintiffs' claims are based on a period of time between January 12, 2000 through and inclusive of April 16, 2002 (the "Applicable Period"), during which they "acquired or were induced to retain NTL securities."(Dkt. No. 16: 2d Am. Compl. ¶ 1.) The Gordon plaintiffs divide their claims based on three time periods: (1) Period 1 Claims, which relate to NTL securities that the Gordon plaintiffs owned before January 12, 2000, specifically, 234,375 NTL shares owned by Gordon Partners, 46,875 NTL shares owned by Frederick Gordon, and 17,188 NTL shares owned by Sam Gordon (Dkt. No. 68: Gordon Aff. Ex. 3: Pls. Am. Interrog. Ans. at 7; Dkt. Nos. 59 & 67: Defs. & Pls. Rule 56.1 Stmts. ¶¶ 12-16); (2) Period 2 Claims, which relate to 30,625 NTL shares that Gordon Partners purchased during the second half of 2000 and up to May 8, 2001 (Pls. Am. Interrog. Ans. at 7); and (3) Period 3 Claims, which relate to NTL securities that the Gordon plaintiffs purchased between May 8, 2001 and the end of the Applicable Period, April

16, 2002 (Pls. Am. Interrog. Ans. at 8). The Period 3 Claims relate to 390,000 NTL shares purchased by Frederick Gordon in June and July 2001 and 427,000 NTL shares purchased by Gordon Partners after May 8, 2001. (Pls. Am. Interrog. Ans. at 8; Dkt. No. 67: Gordon Aff. ¶ 15.) The Period 3 purchases include purchases on fifteen separate occasions of more than $800,000 of NTL stock for Gordon Partners, and on ten separate occasions, more than $300,000 of NTL stock for Frederick Gordon. (Pls. Rule 56.1 Stmt. ¶ 113; Defs. & Pls. Rule 56.1 Stmts. ¶ 21.) "That included several purchases in December 2001, even after [Frederick] Gordon had heard that the company was going to restructure, when the stock was below $1" per share. (Pls. Rule 56.1 Stmt. ¶ 113.) During Period 3, Frederick Gordon also sold 36,000 of the 46,875 NTL shares that he had purchased during Period 1. (Pls. Am. Interrog. Ans. at 8; Gordon Aff. ¶ 15; Defs. & Pls. Rule 56.1 Stmts. ¶ 21.)

*6 The Gordon plaintiffs claim that their net damages are $9,206,800 and that their net loss of invested capital is $7,533,000. (Pls. Rule 56.1 Stmt. ¶ 85; Pls. Am. Interrog. Ans. at 9.) Their damage calculations assume that for all previously-owned stock that plaintiffs did not sell during the Applicable Period, the damages consist of the entire price they paid for that stock because the stock's value eventually became zero as NTL went through the bankruptcy reorganization. (Pls. Am. Interrog. Ans. at 7.) The NTL shares that Frederick Gordon purchased prior to 2000 were priced at an average of less than $17 per share, and eventually traded as high as $100 per share. (Pls. Rule 56.1 Stmt. ¶ 96; Gordon Aff. ¶ 4.)

### The Gordon Plaintiffs' Alternative Theory of Damages

In addition to their claim that Frederick Gordon would have sold all of the Gordon plaintiffs' NTL holdings directly following May 8, 2001, the Gordon plaintiffs argue in the alternative that as the value of NTL stock sank lower and lower during

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

the Applicable Period, their investment plan "was to ride things out," but that a large part of their damages arise because they "were forced under the [bankruptcy] reorganization plan to give up their common stock and receive in exchange for it nearly worthless warrants and stock."(Dkt. No. 67: Gordon Aff. ¶ 14; see alsoDkt. No. 68: Gordon Aff. Ex. 3: Pls. Am. Interrog. Ans. at 2.)

### Defendants' Expert Reports and Gordon's Response

The Gordon plaintiffs did not submit an expert report. (Dkt. Nos. 59 & 67: Defs. & Pls. Rule 56.1 Stmts. ¶ 6; Dkt. No. 67: Gordon Aff. ¶ 107.)

Defendants submitted an expert report regarding damage calculations by Dr. Denise Neumann Martin dated July 31, 2006. (Dkt. No. 63: Burdette Aff. ¶ 20 & Ex. 16: Martin Rep.; see Dkt. Nos. 59 & 67: Defs. & Pls. Rule 56.1 Stmts. ¶ 24.) Dr. Martin is a Senior Vice President at National Economic Research Associates, Inc., the securities practice of which employs approximately 150 professionals with degrees in economics, finance and mathematics. (Martin Rep. at 2.) Dr. Martin has been retained as an expert in over 200 securities lawsuits, in which she has opined on such issues as loss causation, materiality and damages. (Martin Rep. at 2.) Dr. Martin reviewed the Gordon plaintiffs' Second Amended Complaint and Frederick Gordon's deposition in order to comment on the Gordon plaintiffs' damage calculation method. (Martin Rep. at 1.) Dr. Martin's report summarized her conclusions, as follows:

We concluded that the [Gordon's] proposed method, which assumes that the Gordon Plaintiffs are entitled to recover the full value of their investments as of August 3, 2000 or sometime shortly thereafter, lacks any reliable basis. More specifically, the method makes no adjustment for market, industry or company-specific factors that were affecting NTL's price during the relevant period but were unrelated to the alleged fraud.

This failure is demonstrated by an analysis of the stock prices of other companies in the telecommunication industry, in combination with contemporaneous comments by analysts. These sources document that a marked industry decline-necessarily unrelated to the alleged fraud-occurred over this period. According to Mr. Gordon's own deposition testimony, a myriad of such unrelated forces drove NTL's price down during 2000 and 2001. Reliable principles and methods, adopted in numerous judicial decisions, require that this type of unrelated price decline be removed from any estimate of alleged damages. The Gordon Plaintiffs' proposed approach, however, would book all such declines into their measure of alleged damages.

*7 Separately, we were asked to review the three alleged categories of misrepresentations enumerated in the Gordon Complaint, and to assess whether, using a reliable approach, any alleged damages could stem from these allegations. To conduct this assessment, we prepared and reviewed a comprehensive chronology of information that was publicly-available about NTL during the relevant period. We then used regression analysis to conduct an event study on the materiality of each announcement. We reached two conclusions: (1) many of the announcements related to the alleged misrepresentations were not associated with a material, negative price reaction, so these announcements cannot be the source of any alleged damages; and (2) because the market was, in fact, provided with frequent updates regarding the allegedly withheld or misrepresented information, the few significant price reactions that are observed should be viewed as the timely reaction to the realization of a known risk. On the basis of this analysis, we concluded that the Gordon Plaintiffs did not suffer any damages as a result of the alleged misrepresentations and omissions.

(Martin Rep. 1-2.)

The Gordon plaintiffs respond to Dr. Martin that

decline in the telecommunications sector cannot explain the ninety percent decline in NTL's stock price between May 2001 and September 2001 because "the relevant sectors did not decline anywhere near that much."(Dkt. No. 67: Gordon Aff. ¶ 168; Dkt. No. 68: Martin Aff. Ex. 3: Pls. Am. Interrog. Ans. at 3-5.) A Bloomberg index of telecommunications stocks showed a nineteen percent decline during that period, and a Bloomberg index of cable stocks showed a thirty-three percent decline. (Gordon Aff. ¶ 168 & Ex. 58.) The Gordon plaintiffs submit that sector decline "cannot explain why NTL's stock went to zero," and state that when their stock was converted into warrants during the bankruptcy reorganization, they were stripped of their opportunity to benefit from the subsequent rise in the telecommunications and cable sectors. (Gordon Aff. ¶ 169.) The Gordon plaintiffs claim that, had they been able to keep their shares through the bankruptcy reorganization, "plaintiffs' shares would today have value in the once-again prosperous, growing NTL." (Gordon Aff. ¶ 170.)

The Gordon plaintiffs also appear to disagree with any attempt to quantify their damages as a percentage of inflation in NTL's stock. Frederick Gordon noted that he believed that any attempt to calculate the percentage of inflation in NTL's stock price caused by defendants' alleged misstatements and omissions was "an academic exercise," and "nonsense." (Dkt. No. 63: Burdette Aff. Ex. 2: Gordon Dep. 138; see also id. at 139-43.)In Frederick Gordon's opinion, based on his "39 years of experience in Wall Street," "[y]ou can't determine" the percentage of inflation in a stock, and an expert's report that attempted to do so "was based on a whole bunch of ... academic assumptions that are not related to the real world, to the real market."(Gordon.Dep.139.) Frederick Gordon stated that the "real world" determines causation of a drop in the price of stock by "a combination of facts, rumors, euphoria, fear, psychology, all of these things contribute to[o]. They are not quantifiable in some precise way."(Gordon Dep. 139-40.)

*The Causes of Action Asserted in the Gordon Plaintiffs' Second Amended Complaint*

*8 The Gordon plaintiffs' Second Amended Complaint alleges seven causes of action: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants (Dkt. No. 16: 2d Am. Compl. ¶¶ 156-67); (2) violation of 17 C.F.R. § 229.303 against all defendants (2d Am.Compl.¶¶ 168-73); FN3 (3) violation of Section 20(a) of the Exchange Act against all defendants (2d Am.Compl.¶¶ 174-77); (4) common law fraud against all defendants (2d Am.Compl.¶¶ 178-81); (5) common law fraud against defendant Gregg (2d Am.Compl.¶¶ 182-86); (6) common law fraud against defendant Knapp (2d Am.Compl.¶¶ 187-91); and (7) common law fraud against defendant Blumenthal (2d Am.Compl.¶¶ 192-200).

> Judge Kaplan dismissed the Gordon plaintiffs' 17 C.F.R. § 229.303 claim. *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 37-38 (S.D.N.Y. Dec. 6, 2004) (Kaplan, D.J.).

### *ANALYSIS*

### I. *SUMMARY JUDGMENT STANDARD*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v.. S.H. Kress & Co.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356;*Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (At summary judgment, "[t]he time has come ...'to put up or shut up.'") (citations omitted), *cert. denied,*540 U.S. 811, 124 S.Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513. [FN4]The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,*484 U.S. 977, 108 S.Ct. 489 (1987)."If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."*Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

    *See also, e.g., Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004); *Chambers v.*

    *TRM Copy Ctrs. Corp.,* 43 F.3d at 36;*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223.

*9 In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,*480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted."*Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

## II. THE GORDON PLAINTIFFS' SECTION 10(B) AND RULE 10B-5 CLAIMS *SHOULD BE DISMISSED*

### A. *The Standard for Section 10(b) and Rule 10b-5 Claims*

"To state a claim for relief under § 10(b) and Rule 10b-5, plaintiffs must allege that [defendants] '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.' " *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.) (quoting *In re IBM Corp. Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998)), *cert. denied,*126 S.Ct. 421 (2005); *see also, e.g., Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S.Ct. 1627, 1631 (2005); *Lattanzio v. Deloitte & Touche LLP,* No. 05-5805-CV, ---F.3d ----, 2007 WL 259877 at *3 (2d Cir. Jan. 31,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007).

**B. The Gordon Plaintiffs' Holder Claims Under Section 10(b) and Rule 10b-5 *Should Be Dismissed***

"Section 10(b) and Rule 10b-5 prohibit securities fraud 'in connection with the purchase or sale' of securities. Accordingly, to state a claim thereunder, a plaintiff must allege that he was an actual purchaser or seller of securities. Among the potential plaintiffs barred by this rule are persons injured by 'decisions to hold or refrain from trading.' " *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 402 (S.D.N.Y.2005) (Kaplan, D.J.) (fns. citing cases omitted); *see also, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 126 S.Ct. 1503, 1509-10 (2006); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749, 95 S.Ct. 1917, 1931-32 (1975); *Caiola v. Citibank, N.A.,* 295 F.3d 312, 322 (2d Cir.2002) ("Under the first element-fraud committed 'in connection with the purchase or sale of any security'-standing is limited to actual purchasers or sellers of securities."); *Gurary v. Winehouse,* 235 F.3d 792, 799 (2d Cir.2000); *First Equity Corp. v. Standard & Poor's Corp.,* 869 F.2d 175, 180 n. 2 (2d Cir.1989) ("Under *Blue Chip,* plaintiffs suing under Section 10(b) of the Securities Exchange Act of 1934 may recover only for losses that result from decisions to buy or sell, not from decisions to hold or refrain from trading."); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC,* 446 F.Supp.2d 163, 189-90 (S.D.N.Y.2006) ( "Defendants argue that plaintiffs may only bring a section 10(b) claim with respect to actual purchases or sales of securities, and may not bring any claims that relate to the retention of securities. Defendants are correct." Court dismissed plaintiffs' claims that they "were damaged by the decision to 'purchase and hold ... and/or retain ... shares' " purchased before defendants' alleged fraud.)

**\*10** Although the Gordon plaintiffs originally claimed that defendants' alleged misstatements or omissions occurred between January 12, 2000 and April 12, 2002, Frederick Gordon conceded that none of the declines in NTL's share price prior to May 8, 2001 were attributable to any omissions or misstatements by defendants. (Dkt. No. 67: Gordon Aff. ¶ 12; *see* page 4 above.) It follows, then, that the Gordon plaintiffs' Section 10(b) and Rule 10b-5 claims must relate only to purchases and sales of NTL stock during the period between May 8, 2001 and April 12, 2002. All of the Gordon plaintiffs' Period 1 and Period 2 NTL share purchases occurred prior to May 8, 2001. (*See* page 10 above.) Therefore, to the extent that the Gordon plaintiffs still owned any Period 1 or Period 2 NTL shares as of April 12, 2002, any Section 10(b) and Rule 10b-5 claims relating to those shares should be dismissed because they do not relate to the purchase or sale of securities. [FN]*See, e.g., Gurary v. Winehouse,* 235 F.3d at 799 ("Gurary's complaint alleges a violation of 10b-5 with respect to his first purchase on October 31, 1996, although Gurary concedes that the alleged manipulation of Nu-Tech's stock did not begin until at least November 6, 1996. Based on the plain language of section 10(b) and well-settled case law, Gurary's October 31, 1996 purchase could not under any circumstances give rise to a Rule 10b-5 cause of action because that purchase occurred before any alleged deception began, and therefore could not be in connection with the purchase or sale of a security."); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC,* 446 F.Supp.2d at 189-90 (dismissing plaintiffs' claims to the extent that they bought the shares prior to the start of defendants' alleged omissions and misstatements); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d at 402 & n. 101 (dismissing plaintiffs' claims relating to shares purchased prior to the start of defendants' alleged omissions and misstatements, and noting that "[i]ndeed, plaintiffs who purchased before the alleged fraud and sold during it would have benefitted from the inflated prices."); *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,* 02 Civ. 1230, 2002 WL 31027550

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

at *3-4 (S.D.N.Y. Sept. 10, 2002) (dismissing plaintiff's claims where plaintiff conceded that its investments were " 'made prior to the first of defendants' misrepresentations and omissions' ").

> According to the Gordon plaintiffs' submissions, their Period 1 claims relate to 234,375 NTL shares owned by Gordon Partners, 46,875 NTL shares owned by Frederick Gordon, and 17,188 NTL shares owned by Sam Gordon. (*See* page 10 above.) The only Period 1 shares that the Gordon plaintiffs sold prior to April 12, 2002 were 36,000 shares owned by Frederick Gordon that he sold during Period 3. (*See* page 10 above.) Therefore, all claims relating to the Gordon plaintiffs' claims relating to Period 1 purchases should be dismissed, with the exception of the 36,000 shares sold during Period 3. The Gordon plaintiffs' only purchase of NTL shares during Period 2 was of 30,625 shares purchased by Gordon Partners previous to May 8, 2001. (*See* page 10 above.) These shares were not sold prior to April 12, 2002. Therefore, all of the Gordon plaintiffs' claims relating to Period 2 purchases should be dismissed.

## C. The "Forced Sale" Doctrine On Which The Gordon Plaintiffs Rely Is Not *Applicable To Bankruptcy Proceedings*

The Gordon plaintiffs argue in the alternative that their claims, particularly their claims relating to NTL shares purchased in Period 1 or Period 2, are not "holder" claims because they were forced to sell their NTL shares (in return for warrants and shares in New NTL) as part of the bankruptcy reorganization. (Dkt. No. 68: Pls. Opp. Br. at 4-7.) However, the conversion of their shares when NTL entered into bankruptcy did not constitute a "forced sale." As the Ninth Circuit has explained:

> **\*11** The forced sale doctrine provides a cause of action under the securities laws to plaintiffs who are forced to convert their shares for money or other consideration, or forced to fundamentally change the nature of plaintiffs' investments as the result of a fraudulent scheme....

> ....

> The forced sale doctrine relaxes the requirement that only traditional purchasers or sellers of securities have standing to bring a Section 10(b) claim. A shareholder who is forced to sell or alter her securities as the result of a fraudulent scheme is deemed a seller for purposes of the securities laws. The forced sale doctrine also eliminates the reliance requirement. Since a fraudulent scheme forced the sale or alteration of securities, a shareholder bringing an action under the forced sale doctrine need not prove reliance because she made no investment decision to participate in the transaction-the sale was forced by the operation of some rule (e.g., a short-form merger)

> ....

> But the forced sale doctrine does not cut a wide swath. Although recognized by the Ninth Circuit, we have rarely encountered instances where it applies....

> ....

> Inasmuch as Chapter 11 [bankruptcy] gives shareholders the right to participate strategically and effectively in shaping the plan of reorganization, *a judicially supervised Chapter 11 reorganization,* as we have in this case, *presents us with a very different scenario than those presented by the forced sale cases* wherein the investors had no opportunity to participate.

*Jacobson v. AEG Capital Corp.,* 50 F.3d 1493, 1498-500 (9th Cir.1995) (emphasis added). The Ninth Circuit, relying on Second Circuit precedent, therefore declined to apply the forced sale doctrine to a bankruptcy reorganization. *Id.* at 1501-02 ("A forced sale involves no communication with and no volitional acts by the plaintiff shareholder before

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　Page 11
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

the shares are eliminated or altered. A properly conducted Chapter 11 reorganization requires both. Chapter 11 clearly provides equity security interests an opportunity to participate in the reorganization process.... Were the forced sale doctrine made applicable to Chapter 11 it is conceivable that nearly every confirmed Chapter 11 reorganization could be converted into a securities fraud suit by understandably unhappy shareholders simply by alleging a predicate of fraud.").

The Second Circuit also explicitly held that the conversion of stockholders' shares during a bankruptcy proceeding is not a forced sale that triggers Section 10(b) coverage. *Rand v. Anaconda-Ericsson, Inc.,* 794 F.2d 843, 847-48 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579 (1986). In *Rand,* the Second Circuit held that "[t]he 'forced sale' doctrine is of no aid to appellants, however, because its application has been limited to securities transactions resulting in an intra-firm freeze-out of one group of investors by another. These cases involve conventional transactions in the capital market where the transaction allegedly involves fraud, and some securities holders are forced by other investors in the same firm to trade their investments for cash."794 F.2d at 847-48 (citations omitted). In rejecting application of the forced sale doctrine to a bankruptcy reorganization, the Second Circuit explained that plaintiffs' argument was "based upon a virtually limitless legal theory that would convert any fraudulent conduct resulting in a corporate bankruptcy into securities fraud.... The artificiality of the theory is further demonstrated by the fact that the securities laws would come into play only when a bankruptcy occurs. Shareholders injured by the very same conduct but whose company was merely diminished in value rather than destroyed would have no right of action."*Id.* at 848.

**\*12** Accordingly, conversion of the Gordon plaintiffs' NTL shares into warrants or shares in New NTL during the bankruptcy reorganization did not constitute a "forced sale." Therefore, the Gordon plaintiffs' Period 1 and Period 2 shares that

were not sold prior to April 12, 2002 are "holder" shares, not "in connection with the purchase or sale of securities," and thus the Gordon plaintiffs' Period 1 and Period 2 share claims are not actionable under Section 10(b) or Rule 10b-5. Those claims should be dismissed.

**D. The Gordon Plaintiffs' Remaining Section 10(b) and Rule 10b-5 Claims Should *Be Dismissed For Failure to Demonstrate Loss Causation***

Defendants argue that the Gordon plaintiffs' claims regarding Period 3 NTL sales and purchases are deficient because they have not clearly delineated their losses, and thus have not adequately demonstrated loss causation. (*See* Dkt. No. 62: Defs. SJ Br. at 11-21.) The Court agrees.

To prove that their reliance on defendants' misstatements or omissions was the proximate cause of their injury, the Gordon plaintiffs " 'must prove both transaction and loss causation.' " *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.) (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728 (1995)), *cert. denied,* 126 S.Ct. 421 (2005). [FN6] Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d at 197. [FN7]

> *Accord, e.g., Lattanzio v. Deloitte & Touche LLP,* No. 05-5805-CV, --- F.3d ----, 2007 WL 259877 at \*7 n. 2 (2d Cir. Jan. 31, 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196-97 (2d Cir.2003); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001); *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992); *In re NTL , I nc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at \*8 (S.D.N.Y. Feb. 14, 2006) (Peck,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 12
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

M.J.), *report & rec. adopted,* 2006 WL 568225 (S.D.N.Y. Mar. 9, 2006).

*Accord, e.g., Lattanzio v. Deloitte & Touche LLP,* 2007 WL 259877 at *7;*Lentell v. Merrill Lynch & Co.,* 396 F.3d at 172;*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d at 95-96;*In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *9;15 U.S.C. § 78u-4(b)(4).

To establish loss causation in a case involving allegations of material misrepresentations and omissions, "a plaintiff must allege ... that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."*Suez Equity Investors, L .P. v. Toronto-Dominion Bank,* 250 F.3d at 95;*accord, e.g., Lentell v. Merril Lynch & Co.,* 396 F.3d at 173;*In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *9;*see also, e.g., Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 1633-34 (2005). It is not enough for a plaintiff to merely allege that, at the time of plaintiff's purchase of a security, the price of that security was artificially inflated as a result of a defendant's misrepresentation. *Dura Pharm., Inc. v. Broudo,* 544 U.S. at 346, 125 S.Ct. at 1633-34;*Lentell v. Merril Lynch & Co.,* 396 F.3d at 174;*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d at 198;*In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *9. Instead, a plaintiff "may do one of two things to sufficiently allege loss causation.'Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss,' a plaintiff may plead that it is 'the materialization of the undisclosed condition or event that causes the loss.'Alternatively, a plaintiff may identify particular 'disclosing event[s]' that reveal the false information, and tie dissipation of artificial price inflation to those events."*Catton v. Def. Tech. Sys., Inc.,* 05 Civ. 6954, 2006 WL 27470 at *5 (S.D.N.Y. Jan. 3, 2006) (quoting *In re Initial Pub. Offering Sec. Litig.,* 399 F.Supp.2d 298, 307 (S.D.N.Y.2005), *aff'd,*2006 WL 1423785 (2d Cir. May 19, 2006), *cert. denied,*127 S.Ct. 733 (2006));

*accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *9 & n. 12 (citing cases).

*13 Proving actual loss is crucial to a plaintiff's case: "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."*Dura Pharm., Inc. v. Broudo,* 544 U.S. at 347, 125 S.Ct. at 1634. "For example, [to show loss causation] the plaintiff would have to prove that the price at which the plaintiff bought the stock was artificially inflated as the result of the misstatement or omission."*In re Initial Pub. Offering Sec. Litig.,* 241 F.Supp.2d 281, 373 n. 134 (S.D.N.Y.2003) (quoting H.R. Conf. Rep. No. 104-369 at 41, alteration in original). However, "if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established."*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d at 197;*accord, e.g., Lentell v. Merril Lynch & Co.,* 396 F.3d at 174;*In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *9 n. 11;*see also, e.g., Dura Pharm., Inc. v. Broudo,* 125 S.Ct. at 1631-32. If the Gordon plaintiffs cannot provide evidence showing what their losses are as a result of an inflation in NTL's stock price caused by defendants' misstatements or omissions, then summary judgment is appropriate. *See In re N. Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446, 456 (S.D.N.Y.2000).

Here, the Gordon plaintiffs have not demonstrated what their Period 3 losses were in relation to the alleged inflation in NTL's share price. The Gordon plaintiffs have not submitted an expert report on damages in opposing defendants' summary judgment motion. (*See* page 11 above.) Frederick Gordon has conceded that there was no inflation in NTL's stock price as a result of defendants' misstatements or omissions prior to May 8, 2001. (*See* page 4 above.) Frederick Gordon also conceded that "there was zero inflation in NTL's stock price" after November 28, 2001. (*See* page 4 n. 2 above.) As to the remainder of the applicable period, *i.e.,* May 8,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 through November 28, 2001, the Gordon plaintiffs have not provided this Court with any evidence of their damages, other than that their damages consist of the entire price they paid for NTL stock because the stock's price eventually became zero as NTL went through the bankruptcy reorganization. (*See* page 11 above.) Indeed, Frederick Gordon testified at his deposition that he believes it is "nonsense" to try to calculate the percentage of inflation in NTL's stock price caused by defendants' alleged misstatements and omissions. (*See* pages 13-14 above.)

It is improper, however, for the Gordon plaintiffs to seek the entire price they paid for NTL stock between May 8, 2001 and November 28, 2001. "[D]amages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions."*In re Executive Telecard, Ltd. Sec. Litig.,* 979 F.Supp. 1021, 1025 (S.D.N.Y.1997.) Determining the difference between those prices typically requires "elimination of that portion of the price decline that is the result of forces unrelated to the wrong."*Id.*"Such forces can be broadly categorized into: (1) company risk-the unique risk that is peculiar to the particular stock at issue, and (2) market risk-the risk associated with market wide variations generally."*Id.* An accepted method for calculating damages based on these principles is an "event study" which "uses regression analysis and other statistical techniques to model the effect that public statements have on a particular company's trading experience and normalizes that experience to factor out performance of the stock market generally or of stocks in relevant related indices."*In re N. Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d at 456-57;*see, e.g., Carpe v. Aquila, Inc.,* No. 02-0388-CV, 2005 WL 1138833 at *3-4 (W.D.Mo. Mar. 23, 2005) ("[T]he accepted means of distinguishing between fraud-related and non-fraud-related changes in a stock's behavior is an 'event study.' "); *In re Oracle Sec. Litig.,* 829 F.Supp. 1176, 1181 (N.D.Cal.1993) ("Use of an event study or similar analysis is neces-

sary more accurately to isolate the influences of information specific to Oracle which defendants allegedly have distorted.") The Gordon plaintiffs have not provided the Court with an event study or any similar analysis of their damages. (*See* pages 11-14 above.)

*14 Because the Gordon plaintiffs have not provided this Court with any evidence as to what their true damages are and therefore cannot show loss causation, defendants are entitled to summary judgment as to the remaining Period 3 claims. *See, e.g., JSMS Rural LP v. GMG Capital Partners III, LP,* 04 Civ. 8591, 2006 WL 1867482 at *3, *4 (S.D.N.Y. July 6, 2006) ("plaintiff has neglected to indicate exactly how it suffered a *loss*.... Thus, plaintiff's Rule 10b-5 claim fails as a matter of law.""Plaintiff has provided no evidence concerning the extent to which its partnership interest has lost value, nor has it provided any method by which a factfinder could determine what portion of such loss is attributable to defendants' fraud."Summary judgment granted for defendants.), *aff'd on reconsideration,*2006 WL 2239681 (S.D.N.Y. Aug. 4, 2006); *Carpe v. Aquila, Inc.,* 2005 WL 1138833 at *3-4, *7-9 (Where plaintiffs' expert did not take any market forces into account in his calculation of plaintiffs' loss, the court excluded plaintiffs' expert and ruled that: "In a Section 10(b) and Rule 10b-5 case, expert testimony is required in order for plaintiffs to meet their burden of proof in establishing the fact of damages and the means of calculation of same. Therefore, summary judgment should be granted in defendants' favor as to plaintiffs' Section 10(b) and Rule 10b-5 claims.") (citations omitted); *In re Imperial Credit Indus., Inc. Sec. Litig.,* 252 F.Supp.2d 1005, 1014-16 (C.D.Cal.2003) (defendants were entitled to summary judgment because plaintiffs did not provide any reliable evidence regarding their loss, indeed, "even if [plaintiff] could properly assume that SPFC's stock had zero value during the Class Period, the question would still arise as to the extent to which the difference between the true value and the market value of SPFC's stock during the Class Period was fraud-re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 14
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

lated or non-fraud related. By failing to provide an event study or similar analysis, Plaintiffs cannot carry their burden of proof on this issue."), *aff'd*,145 Fed. Appx. 218 (9th Cir.2005); *In re N. Telecom. Ltd. Sec. Litig.,* 116 F.Supp.2d at 460-62 (plaintiffs' expert's "testimony is fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert.... Plaintiffs' expert is not prepared to rule out such alternative causes or attack the opposing conclusions of defendants' expert. Accordingly, plaintiffs have not met their burden of coming forward with evidence creating a triable issue of fact on whether the statements or omissions at issue inflated or manipulated Nortel's stock price.").

Summary judgment is the time to " 'put up or shut up.' " (*See* page 16 above.) The Gordon plaintiffs have offered no event study or similar analysis to show whether any loss (and if so how much) was caused by defendants' conduct as opposed to other market factors. In the absence of proof of loss causation, defendants are entitled to summary judgment dismissing the Gordon plaintiffs' § 10(b) and Rule 10b-5 claims. [FN8]

> As discussed above, this Court issued an Opinion granting the Gordon plaintiffs an adverse inference as a spoliation sanction, and stated that such an inference would be applied to the analysis of this summary judgment motion. (*See* page 2 n. 1 above.) While in some instances it is appropriate to deny summary judgment based on an adverse inference, there must be "some showing indicating that the destroyed evidence would have been relevant to the contested issue."*Kronisch v. United States,* 150 F.3d 112, 127 (2d Cir.1998). Here, the adverse inference relates to defendants' knowledge about the company's financial and business operations between May 8, 2001 and April 16, 2002. The adverse in-

ference thus goes to issues of whether defendants made material misstatements or ommisions and if so whether they acted with scienter. Those issues are not before the Court on defendants' present summary judgment motion. The adverse inference as to those facts is irrelevant to the separate element of loss causation. Thus, the adverse inference is moot as to the Court's summary judgment loss causation analysis. *See Kronisch v. United States,* 150 F.3d at 128 ("[T]he destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence-or utterly inadequate evidence-in support of a given claim to survive summary judgment on that claim."); *see also, e.g., Jeffreys v. Rossi,* 275 F.Supp.2d 463, 478 n. 24 (S.D.N.Y.2003), *aff'd*,426 F.3d 549 (2d Cir.2005); *A.I.A. Holdings, S .A. v . Lehman Bros., Inc.,* 97 Civ. 4978, 2002 WL 987297 at \*1 (S.D.N.Y. May 10, 2002).

### III. *THE GORDON PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED*

**\*15** In addition to their Section 10(b) and Rule 10b-5 claims, the Gordon plaintiffs also allege control person violations against defendants under Section 20(a) of the Exchange Act. (*See* page 14 above.) Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."15 U.S.C. § 78t(a)."In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant."*SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 15
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))

Cir.1996), *cert. denied,*522 U.S. 812, 118 S.Ct. 57 (1997); *accord, e.g., Rombach v. Chang,* 355 F.3d 164, 177-78 (2d Cir.2004). Here, since the Court should grant defendants summary judgment dismissing the Gordon plaintiffs' primary Section 10(b) and Rule 10b-5 claim, the Gordon plaintiffs therefore have not successfully alleged a Section 20(a) claim. *See, e.g., Rombach v. Chang,* 355 F.3d at 178 ("Because we have already determined that the district court properly dismissed the primary securities claim against the individual defendants, these [§ 20(a) ] secondary claims must also be dismissed."); *Nadoff v. Duane Reade, Inc.,* 107 Fed. Appx. 250, 253 (2d Cir.2004) ("Having concluded that the consolidated amended complaint fails to set forth a primary violation of the securities laws, the plaintiffs claims of secondary liability under Section 20(a) must be dismissed as well."); *In re Yukos Oil Co. Sec. Litig.,* 04 Civ. 5243, 2006 WL 3026024 at *23 (S .D.N.Y.2006) ("[T]he Complaint fails to state a claim for primary liability on either the Political Activity Allegations or the Tax Scheme Allegations. As such, no defendant can be subject to [§ 20(a) ] control person liability on those claims."); *In re Axis Capital Holdings Ltd. Sec. Litig.,* 456 F.Supp.2d 576, 596 (S.D.N .Y.2006) ( "Because plaintiffs have not sufficiently alleged primary liability here under Section 10(b), plaintiffs have not alleged control person liability under Section 20 of the Exchange Act."); *In re GlaxoSmithKline PLC Sec. Litig.,* 05 Civ. 3751, 2006 WL 2871968 at *14 (S.D.N.Y. Oct. 6, 2006) ("Plaintiff has failed to state a primary violation of the securities laws under section 10(b). Without a primary violation, there can be no secondary, or derivative, violation under Section 20(a). Accordingly, Plaintiff's Section 20(a) claim is also dismissed.").

Accordingly, the Gordon plaintiffs' Section 20(a) claim should be dismissed.

**IV. THE GORDON PLAINTIFFS' COMMON LAW FRAUD CLAIMS ARE *PREEMPTED BY SLUSA AND SHOULD BE DISMISSED***

*16 Defendants argue that the Gordon plaintiffs' remaining New York state common law fraud claims are preempted by SLUSA and should be dismissed. (*See*Dkt. No. 62: Defs. SJ Br. at 26-31.)

*A. Statutory Interpretation Principles*

"Statutory construction begins with the plain text, and, 'where the statutory language provides a clear answer, it ends there as well.' " *Raila v. United States,* 355 F.3d 118, 120 (2d Cir.2004) (quoting *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 760 (1999)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 846 (1997); *accord, e.g., Saks v. Franklin Covey Co.,* 316 F.3d 337, 345 (2d Cir.2003).

*B. Preemption under SLUSA*

The Securities Litigation Uniform Standards Act, known as SLUSA, provides that:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging-
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). Thus, "[u]nder the statutory scheme, four conditions must be satisfied to trigger SLUSA's removal and preemption provisions: (1) the underling suit must be a 'covered class action'; (2) the action must be based on state or local law;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) the action must concern a 'covered security'; and (4) the defendant must have misrepresented or omitted a material fact or employed a manipulative device or contrivance 'in connection with the purchase or sale' of that security."*Felton v. Morgan Stanley Dean Witter & Co.,* 429 F.Supp.2d 684, 690-91 (S.D.N.Y.2006) (fns.omitted); *accord, e.g., In re Worldcom, Inc. Sec. Litig .,* 308 F.Supp.2d 236, 243 (S.D.N.Y.2004).

## C. *The Gordon Plaintiffs' Action is a "Covered Class Action"*

The term "covered class action" means-

  (i) any single lawsuit in which-

    (I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

    (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

  *17 (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which-

    (I) damages are sought on behalf of more than 50 persons; and

    (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

The Gordon plaintiffs' action fulfills the second definition of "covered class action." Both the Gordon plaintiffs' action and the class action were filed in the Southern District of New York and both were assigned to Judge Kaplan and myself, and therefore it is obvious that both cases are "pending in the same court." The Gordon plaintiffs' complaint adopts by reference in its entirety the September 23, 2002 Consolidated Class Action Complaint (*see* page 2 above), and both generally asserted fraud claims relating to the period leading up to NTL's bankruptcy in April 2002. (*See* pages 2, 4-9 above.) Therefore, it is clear that the Gordon plaintiffs' action and the class action involve common questions of law and fact . [FN8]It is uncontested that the class action was brought on behalf of more than fifty people. Indeed, the class action was brought on behalf of "thousands of [NTL] shareholders geographically located throughout the United States and abroad."*In re NTL , Inc. Sec. Litig.,* 0 2 Civ. 3013, 2006 WL 330113 at *6 (S.D.N.Y. Feb. 14, 2006) (quoting 02 Civ. 3013, Dkt. No. 69: 9/7/05 Pls. Class Cert. Br. at 8), *report & rec. adopted,* 2006 WL 568225 (S.D.N.Y. Mar. 9, 2006). (*See also* 02 Civ. 3013, Dkt. No. 21: Consol. Am. Class Action Compl. ¶ 15(a).)

> Indeed, in seeking consolidation for discovery, the Gordon plaintiffs stated that "[i]nsofar as Gordon's claims overlap those of the class, we believe consolidation for discovery purposes is warranted...." (Dkt. No. 9: Gordon Pls. Consolidation Br. at 11.)

The remaining issue, therefore, is whether the two lawsuits were "joined, consolidated, or otherwise proceed[ed] as a single action for any purpose."15 U.S.C. § 78bb(f)(5)(B)(ii)(II). The Court finds that condition satisfied.

The Gordon plaintiffs moved for "conditional consolidation of [their] action with the consolidated class actions."(Dkt. No. 9: Gordon Pls. Consolidation Br. at 1; *see also*Dkt. No. 8: Gordon Pls. Consolidation Motion.) Specifically, the Gordon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs informed the Court that "[o]ur position is, in brief, that consolidation of this case with the Consolidated [Class] Action for discovery purposes, with certain common-sense conditions, is appropriate ... [but] that consolidation for motion and/ or trial purposes is not warranted or necessary at this juncture."(Gordon Pls. Consolidation Br. at 2.) As a result of the Gordon plaintiffs' consolidation motion and the parties' stipulation, on October 30, 2002, Judge Kaplan ordered that the Gordon plaintiffs' action be "consolidated with the Consolidated [Class] Action for pre-trial purposes."(02 Civ. 3013, Dkt. No. 27.)Since that date, the Gordon plaintiffs' action and the class action have proceeded as a single action for pre-trial purposes. (*See generally* Status Conf. Trs.) Indeed, counsel for the Gordon plaintiffs has asserted that he is entitled to attorneys' fees from the class because of his efforts in discovery that he asserts benefitted the class. (02 Civ. 3013, Dkt. Nos. 117-18.)

*18 SLUSA does not require that the group of lawsuits be consolidated for trial, or for "all" purposes; rather, it refers to the cases proceeding "as a single action for *any* purpose."15 U.S.C. § 77bb(f)(5)(B)(ii)(II) (emphasis added). Consolidation for discovery satisfies the "any purpose" language. Therefore, based on SLUSA's plain language, the Gordon plaintiffs' action is a "covered class action" for SLUSA purposes. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* No. H-01-3624, 2006 WL 3716669 at *7 (S.D.Tex. Dec. 12, 2006) (holding SLUSA preemption proper where there were "identical complaints of exclusively Texas state-law claims by fewer than fifty plaintiffs filed in various Texas jurisdictions, removed on 'related to' bankruptcy jurisdiction, consolidated or coordinated with *Newby* [class action] without objection from the Plaintiffs for pretrial purposes, and prosecuted 'in unison' in the filing of identical motions and briefs"); *In re Worldcom, Inc. Sec. Litig.,* 308 F.Supp.2d 236, 245-46 (S.D.N.Y.2004) (where ten non-class actions were transferred to the same court in which the main class action was pending, and consolidated "for

pretrial purposes," the non-class actions were a covered group of lawsuits for purposes of SLUSA preemption); *but cf. Ventura v. AT & T Corp.,* 05 Civ. 5718, 2006 WL 2627979 at*1 (S.D.N.Y. Sept. 13, 2006) (declining to apply SLUSA preemption to state law claims in individual action that was not formally consolidated with the related class action, and operated "on a separate procedural track").

**D. *The Gordon Plaintiffs' Action is Based on New York State Law***

The second condition is that the actions must be based on state law. (*See* pages 31-32 above.) All of the Gordon plaintiffs' common law fraud claims are based on New York state common law. (*See*Dkt. No. 16: 2d Am. Compl. ¶¶ 178-200.) Therefore, the Gordon plaintiffs' action is based on state law for SLUSA preemption purposes.

**E. *The Gordon Plaintiffs' Action Concerns a "Covered Security"***

The third condition is that the action concerns a "covered security." (*See* pages 31-32 above.) "A 'covered security' is one traded nationally and listed on a regulated national exchange." [FN10]*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 126 S.Ct. 1503, 1512 (2006)."NTL's common stock successively traded in two efficient markets: (i) the Nasdaq National Market System ('NASDAQ'), until October 27, 2000, at which time NTL's common stock was delisted from that exchange; and (ii) the New York Stock Exchange ('NYSE'), until March 28, 2002, at which time NTL's common stock was delisted from that exchange."(02 Civ. 3013, Dkt. No. 21: Consol. Am. Class Action Compl. ¶ 15(a); Dkt. No. 16: 2d Am. Compl. ¶ 152(a).) NTL's stock therefore is a "covered security" for SLUSA purposes.

> Formally under SLUSA, a "covered security" is "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the

Securities Act of 1933 [15 U.S.C.A. § 77r(b) ], at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred."15 U.S.C. § 78bb(f)(5)(E). Under Section 18(b) of the Securities Act, "covered securities" include securities listed on the New York Stock Exchange or the Nasdaq Exchange. 15 U.S.C. § 77r(b).

**F. The Gordon Plaintiffs' Action Concerns the "Purchase or Sale" of a Security *for SLUSA Purposes***

*19 The Gordon plaintiffs suggest that because holder claims are not cognizable under federal law, their state common law fraud claims [FN11] against defendants are not eligible for SLUSA preemption to the extent that their claims do not involve the direct purchase or sale of covered securities. (SeeDkt. No. 68: Gordon Pls. Opp. Br. at 30-31.) However, the Supreme Court recently clarified that state holder claims are included within SLUSA preemption: "The holder class action that respondent tried to plead ... is distinguishable from a typical Rule 10b-5 class action in only one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA preemption, that distinction is irrelevant; the identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale' of securities."*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 126 S.Ct. 1503, 1515 (2006). Therefore, the Gordon plaintiffs' state common law fraud holder claims (as well as their other common law fraud claims) are preempted by SLUSA and should be dismissed. *See In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F.Supp.2d 579, 603-04 (S.D.N.Y.2006) (after *Dabit,* dismissing state holder claims as preempted by SLUSA); *Felton v. Morgan Stanley Dean Witter & Co.,* 429 F.Supp.2d 684, 691-92, 695 (S.D.N.Y.2006) (after *Dabit,* dismissing state holder claims as preempted by SLUSA); *In re Edward Jones Holders Litig.,* 453 F.Supp.2d 1210, 1215-17 (C.D.Cal.2006) (after

*Dabit,* dismissing state holder claims as preempted by SLUSA); *In re Hollinger Int'l, Inc. Sec. Litig.,* No. 04C 0834, 2006 WL 1806382 at *17 (N.D. Ill. June 28, 2006) (after *Dabit,* dismissing state holder claims as preempted by SLUSA).

New York recognizes "holder" claims. *See, e.g., Fraternity Fund, Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 407 & n. 133 (S.D.N.Y.2005) (Kaplan, D.J.) (citing New York cases).

The Gordon plaintiffs' state law claims are preempted by SLUSA.

### *CONCLUSION*

For the reasons set forth above, defendants' summary judgment motion should be GRANTED and the Gordon plaintiffs' complaint dismissed with prejudice.

### *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also*Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 1310, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal.*Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,*513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,*506 U.S. 1038, 113 S.Ct. 825

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.))**


(1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2007.
Gordon Partners v. Blumenthal
Not Reported in F.Supp.2d, 2007 WL 431864 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,315, Fed. Sec. L. Rep. P 94,154

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 1438753 (S.D.N.Y.)
(Cite as: 2007 WL 1438753 (S.D.N.Y.))

Page 1

**H**
Gordon Partners v. Blumenthal
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
GORDON PARTNERS, et al., Plaintiffs,
v.
George S. BLUMENTHAL, et al., Defendants.
No. 02 Civ. 7377(LAK).

May 16, 2007.

**MEMORANDUM AND ORDER**

LEWIS A. KAPLAN, District Judge.
*1 In a thorough and thoughtful report and recommendation, dated February 9, 2007 (the "R & R"), Magistrate Judge Andrew J. Peck recommended that defendants' motion for summary judgment dismissing the complaint be granted. Plaintiffs object in part, contending that the dismissal of their federal securities fraud claims with respect to their purchases in Period 3, as defined in the report and recommendation, and their state law claims would be inappropriate. They argue that there are genuine issues of fact as to loss causation with respect to Period 3 purchases and that the state law claims are not preempted by The Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1).

I have concluded, after careful consideration, that plaintiffs' objections are without merit. Indeed, they rest in significant part upon distortion of Magistrate Judge Peck's reasoning. As I already have described this lawsuit in detail in *Gordon Partners v. Blumenthal,* 347 F.Supp.2d 15 (S.D.N.Y.2004), and as the R & R is quite complete, I write only to emphasize two points that, in my view, alone are fatal to plaintiffs' objections.

**I**

Plaintiffs argue first that the R & R "recommends

dismissal of Plaintiffs' Period 3 claims ... because the 'Gordon Plaintiffs have not submitted an expert report on damages in opposing defendants' summary judgment motion.'Report at 25. *According to the Report, an expert report containing an event study, and nothing less, is required to defeat summary judgment.*"Pl. Obj. 11 (emphasis added). The entire fragment of the R & R quoted in the foregoing statement is taken out of context. The italicized statement in plaintiffs' objections is inaccurate.

In fact, Judge Peck recommended dismissal of the federal securities fraud claim concerning Period 3 purchases "[b]ecause the Gordon plaintiffs have not provided this Court with *any* evidence as to what their true damages are and therefore cannot show loss causation,"[FN1] not because they failed to submit an expert report containing an event study. What he said was this:

FN1. R & R at 28 (emphasis added).

" '[D]amages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions.'[citation omitted] Determining the difference between those prices typically requires 'elimination of that portion of the price decline that is the result of forces unrelated to the wrong.'[citation omitted] 'Such forces can be broadly categorized into (1) company risk-the unique risk that is peculiar to the particular stock at issue, and (2) market risk-the risk associated with market wide variations generally.'[citation omitted] *An* accepted method for calculating damages based on these principles is an 'event study' which 'uses regression analysis and other statistical techniques to model the effect that public statements have on a particular company's trading experience and normalizes that experience to factor out performance of the stock market generally or of stocks in relevant related indices.'[citation omitted]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1438753 (S.D.N.Y.)
(Cite as: 2007 WL 1438753 (S.D.N.Y.))

*2 "Because the Gordon have not provided this Court with *any* evidence as to what their true damages are and therefore cannot show loss causation, defendants are entitled to summary judgment as to the remaining Period 3 claims. * * *

"Summary judgment is the time to 'put up or shut up.' * * * The Gordon plaintiffs have offered no event study *or similar analysis* to show whether any loss (and if so how much) was caused by defendants' conduct as opposed to other market factors. In the absence of proof of loss causation, defendants are entitled to summary judgment dismissing the Gordon plaintiffs' § 10(b) and Rule 10b-5 claims."R & R at 26-28 (emphasis added) (footnote omitted).

Thus, Judge Peck did not say that summary judgment was appropriate because plaintiffs had not submitted an event study. He said that it was appropriate because plaintiffs had submitted *no evidence* on the issue of loss causation.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,248 (1986); *White v. ABCOEng'g Corp.,* 221 F.3d 293,300 (2d Cir.2000); *see also*Fed.R.Civ.P. 56©. Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir .2001). In that event, the nonmoving party must come forward with admissible evidence, *see, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123-24 (2d Cir.2001); *Raskin v.. Wyatt Co.,* 125 F.3d 55, 65-66 (2d Cir.1997), sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment, *e.g., Nebraska v. Wyoming,* 507 U.S. 584, 590(1993) (holding that when the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment

if the nonmovant fails to make a showing on an essential element of its claim); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex,* 477 U.S. at 322-23).

Loss causation is an issue on which plaintiffs would have had the burden of proof at trial. Once defendants questioned their ability to raise a genuine issue of fact, plaintiffs were obliged to come forward with admissible evidence that, if credited, would be sufficient to justify a finding in their favor on that issue.[FN2]This they completely failed to do, either by expert or competent lay evidence.[FN3]

> FN2. This would have been true even if defendants had not submitted their own expert report on the issue, as defendants were not obliged to "prove the negative" to put plaintiffs to their proof. Accordingly, even serious questions as to the admissibility or credibility of the evidence of defendants' expert, and I see none, would be insufficient to create a genuine and material issue for trial. I note also that plaintiffs' objections to the defendants' expert's report (docket item 68, at 21-24) were without merit.

> FN3. I agree entirely with Judge Peck's rejection of plaintiffs' contention that the adverse inference sanctions Judge Peck imposed on defendants for spoliation of evidence suffices to raise an issue of fact as to loss causation. R & R 28 n. 8.

II

*3 As Judge Peck pointed out, SLUSA provides in substance that no "covered class action" based upon state law and alleging misrepresentations or omissions in connection with the purchase or sale of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

covered securities may be maintained in any court. R & R 31-32. He recommended dismissal of plaintiffs' state law claims on the ground that they are foreclosed by this statute.

Plaintiffs apparently acknowledge that this is a "class action" within the meaning of SLUSA, but object that it is not a "covered class action." Once again, however, the argument is based upon a distortion, this time of the statutory language.

The statute defines a "covered class action" in relevant part as:

"any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which-

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action *for any purpose.* "15 U.S.C. § 78bb(f)(5) (B) (emphasis added).

This action is based principally upon the same underlying facts alleged by class action plaintiffs against NTL and the individual defendants in *In re NTL, Inc., Secur. Litig.*, No. 02-3013(LAK). While this action includes some allegations not found in the class action complaint, the overlap between the two is extensive. The class action concededly was brought on behalf of more than 50 people. The cases quite plainly involve common questions of law and fact. *See generally In re NTL, Inc., Sec. Litig.*, 347 F.Supp.2d 15. Hence, the question whether this case is part of a "covered class action" turns on whether it is "joined, consolidated, or otherwise proceed[s with the class action] as a single action *for any purpose.*"

As Judge Peck pointed out, the Gordon plaintiffs stipulated to the consolidation of this action with the class action for pretrial purposes.R & R 34. In consequence, the plain language of the statute compels the conclusion that plaintiffs' state law claims are precluded by SLUSA.

Plaintiffs nevertheless argue that I should ignore the language of the statute in favor of their interpretation of the legislative history. But it is the plain language of the statute that controls.

### III

I have considered all of plaintiffs' objections, regardless of whether I thought it necessary to discuss them here. All are without merit. The defendants' motion for summary judgment dismissing the complaint [docket item 59] is granted and plaintiffs' objections overruled.

SO ORDERED.

S.D.N.Y.,2007.
Gordon Partners v. Blumenthal
Slip Copy, 2007 WL 1438753 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 3716669 (S.D.Tex.)
(Cite as: 2006 WL 3716669 (S.D.Tex.))

**H**
In re Enron Corp. Securities, Derivative & "Erisa"
Litigation
S.D.Tex.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas,Houston
Division.
In re ENRON CORPORATION SECURITIES, DE-
RIVATIVE & "ERISA" LITIGATION
Mark Newby, et al., Plaintiffs,
v.
Enron Corporation, et al., Defendants.
David Jose, et al., Plaintiffs,
v.
Arthur Andersen, L.L.P., et al., Defendants.
Richard Choucroun, et al., Plaintiffs,
v.
Arthur Andersen, L.L.P., et al., Defendants.
Mary Bain Pearson and John Mason, Plaintiffs,
v.
Andrew S. Fastow, et al., Defendants.
Fred A. and Marian Rosen, et al., Plaintiffs,
v.
Andrew S. Fastow, et al., Defendants.
Harold and Frances Ahlich, et al., Plaintiffs,
v.
Andrew S. Fastow, et al., Defendants.
Ruben and Irene Delgado, et al., Plaintiffs,
v.
Andrew S. Fastow, et al., Defendants.
Don L. Guy, Trustee for the Guy Family Living
Trust, et al., Plaintiffs,
v.
Arthur Andersen, L.L.P., et al., Defendants.
Cynthia Adams, et al., Plaintiffs,
v.
Arthur Andersen, L.L.P., et al., Defendants.
Jane Bullock, et al., Plaintiffs,
v.
Arthur Andersen, L.L.P., et al., Defendants.
John and Peggy Odam, et al., Plaintiffs,
v.
Enron Corporation, Inc., Defendants.

Civil Action Nos. H-01-3624, H-03-1087, H-
03-3320, H-03-5332, H-03-5333, H-03-5334, H-
03-5335, H-04-3330, 04-3331, 04-4455, H- 01-3914.

Dec. 12, 2006.

Gregory Sean Jez, George M. Fleming, Fleming &
Asoc. LLP, Houston, TX, for Plaintiffs.
Alicia A. Pell, Latham & Watkins LLP, Los
Angeles, CA, Andrew Ramzel, Rusty Hardin & As-
sociates, P.C., Houston, TX, George W. Billy Shep-
herd, III, Cruse Scott Henderson & Allen LLP,
Houston, TX, Michael P. Carroll, Sharon Katz,
Davis Polk et. al., New York, NY, Barry G. Flynn,
Attorney at Law, Houston, TX, Craig Smyser,
Smyser Kaplan & Veselka, Houston, TX, James E.
Coleman, Jr., Carrington Coleman et. al., Dallas,
TX, Robert M. Stern, O. Melveny Myers LLP,
Washington, DC, Jeremy L. Doyle, Robin C.
GibbsGibbs & Bruns, Houston, TX, Jacks C. Nick-
ens, Nickens Keeton et. al., Houston, TX, Carl
Robert Mace, Tekell Book et. al., Houston, TX,
Eric J. R. Nichols, Beck Redden & Secrest, Hous-
ton, TX, John J. McKetta, III, Graves Dougherty et.
al., Austin, TX, Thomas R McDade, Mcdade & Fo-
gler, Houston, TX, H. Bruce Golden, Golden &
Owens LLP, Houston, TX, Tom P. Allen, McDaniel
& Allen, Houston, TX, Robert Hayden Burns,
Liskow & Lewis, Houston, TX, Aundrea Kristine
Frieden, Brian Turner Ross, Gibbs & Bruns LLP,
Houston, TX, Gregory A. Markel, Cadwalader
Wickersham et. al., New York, NY, Charles G.
King, III, King & Pennington LLP, Houston, TX,
Barry Abrams, Abrams Scott et. al., Houston, TX,
David Elliott Miller, Hugh R. Whiting, Jones Day,
Houston, TX, Mark Daniel Manela, Mayer Brown
et. al., Houston, TX, Jacalyn D. Scott, Wilshire
Scott et. al., Houston, TX, Lawrence David Finder,
Haynes & Boone LLP, Houston, TX, Richard War-
ren Mithoff, Jr., Mithoff Law Firm, Houston, TX,
Taylor M. Hicks, Jr., Hicks Thomas et. al., Hous-
ton, TX, Claude L. Stuart, III, Phelps Dunbar LLP,
Houston, TX, Jessica Lynne Wilson, Nickens Kee-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ton et. al., Houston, TX, Richard Bruce Drubel, Jr., Boies Schiller et. al. Hanover, NH, Diane M Sumoski, Carrington Coleman Sloman & Blumenthal, Dallas, TX, Bruce Hiler, O. Melveny Myers LLP, Washington, DC, Ronald Gene Woods, Attorney at Law, Houston, TX, William F. Martson, Tonkon Torp LLP, Portland, OR, Roger E. Zuckerman, Deborah J. Jeffrey, Zuckerman Spaeder LLP, Reid M. Figel, Kellogg Huber et. al., Washington, DC, Barnes H. Ellis, Stoel Rives LLP, Portland, OR, David R. Jones, Porter and Hedges LLP, Derek Hollingsworth, Rusty Hardin & Asoc., Houston, TX, Kurt M. Rupert, Lincoln C. McElroy, Hartzog Conger Cason & Neville, Ryan S. Wilson, Charles E. Geister, III, Drew Neville, Hartzog Conger et. al., Oklahoma City, OK, David J. Beck, Beck Redden and Secrest, Houston, TX, Robert P. Trout, Trout & Richards PLLC, Washington, DC, for Defendants.

### OPINION AND ORDER OF DISMISSAL WITH PREJUDICE

MELINDA HARMON, United States District Judge.
*1 Pending before the Court are Fleming & Associates, L.L.P. Plaintiffs' motions for leave to amend their complaints pursuant to the Court's July 11, 2003 scheduling order [FN1] in the following cases: H-03-5334, *Ahlich, et al. v. Fastow, et. al.,* # 77, amended # 97; H-04-4455, *Bullock, et al., v. Arthur Andersen, L.L.P., et al .,* # 62; H-03-3320, *Choucroun et al., v. Arthur Andersen, L.L.P.,* # 136; H-03-5335, *Delgado, et al. v. Fastow, et al.,* # 68; H-03-1087, *Jose, et. al. v. Arthur Andersen, L.L.P., et al.,* # 15; H-03-5332, *Pearson, et a l. v. Fastow, et al.,* # 50; and H-03-5333 *Rosen, et al. v. Fastow, et a l.,* # 58; H-04-3331, *Adams, et a l v . Arthur Andersen, L.L.P., et al.,* # 32; and H-04-3330, *Guy, et al. v. Arthur Andersen, L.L.P., et al.,* # 33. The same pleadings, both in support of and in opposition to the motion, have been filed in these nine cases.[FN2] After reviewing them carefully, the Court finds that the motions for leave to amend should be denied as futile, that the exclus-

ively state-law claims in these nine cases are preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), and that the cases should therefore be dismissed with prejudice. Moreover, H-01-3914, *Odam v. Enron Corporation,* is preempted for the same reasons and the case should also be dismissed.

> FN1. Instrument # 4836, amended by July 11, 1006 order (# 4848).

> FN2. Fleming & Associates also represents Plaintiffs in H-01-3914, *Odam v. Enron Corp., et al.,* which was originally filed in the Southern District of Texas and in which an amended complaint asserting Texas state-law claims, virtually identical to the proposed complaints in the other actions, was filed as of right, before any responsive pleadings, as allowed by Fed.R.Civ.P. 15(a).

These nine actions, originally filed in Texas state court, assert Texas state-law claims against Defendants and were removed to this Court on "related to" bankruptcy jurisdiction, not under the Securities Litigation Uniform Standards Act (SLUSA), 15 U.S.C. § 77p(b)(1) and § 78bb(f)(1) ("No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging-... an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security"), and coordinated or consolidated with *Newby.* The proposed amended complaints are identical except for identification of the individual plaintiffs. They replead claims against several former Enron directors and officers, Arthur Andersen, L.L.P. ("Andersen") and some former Andersen partners for fraud, fraud on the market, civil conspiracy, aiding and abetting, negligent misrepresentation, and violations of the Texas Business and Commerce Code § 27.01 (Fraud in Stock Transactions) and Texas Securities Act art. 581-33; they add a claim for negligence against Andersen; and they also assert the first six

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims against the Financial Institutions and Bank of America Corporation, Bank of America, N.A., and Banc of America Securities LLC (collectively, "Bank of America") for the first time.

### Standard of Review under Rule 15(a)

Federal Rule of Civil Procedure 15(a) p rovides in relevant part,

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

*2 A court has discretion in deciding whether to grant leave to amend. *Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Since the language of the rule " 'evinces a bias in favor of granting leave to amend," the court must find a "substantial reason" to deny such a request.*Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Ins. Co.,* Civ. A. No. H-05-4389, 2006 WL 2521411, *3 (S.C.Tex. Aug. 29, 2006), *quoting Smith v. EMC Corp.,* 393 F.3d 590, 595 (5th Cir.2004), and *Mayeaux v. La. Health Serv. & Indem. Co.,* 376 F.3d 420, 425 (5th Cir.2004). Factors for the court to consider in determining whether a substantial reason to deny a motion for leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment."*Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir.1993).

While Rule 15(a) does not establish a time limit for filing a motion for leave to amend, " 'at some point, time delay on the part of a plaintiff can be proced-

urally fatal.' " *Smith v. EMC Corp.,* 393 F.3d at 595,*quoting Whitaker v. City of Houston,* 963 F.2d 831, 836 (5th Cir.1992), *in turn quoting Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir.1981). If there is substantial delay, the plaintiff bears the burden of demonstrating that it was due to oversight, inadvertence or excusable neglect, *Id., citing Gregory,* 634 F.2d 203.

Where the proposed new claims are time-barred, allowing amendment is futile.*Williams v. Simmons,* 185 F.Supp.2d 665, 674 (N.D.Tex.2001); *Columbraria Ltd. v. Pimenta,* 110 F.Supp.2d 542, 549 (S.D.Tex.2000).

### Opposition to Amendment

#### I. Financial Institutions

Under SLUSA, 15 U.S.C. §§ 77p(b) (applicable to remedies under the Securities Act of 1933) and 77bb(f)(1-2) (applicable to remedies under the Securities Exchange Act of 1934), a securities action is preempted if the following requirements are satisfied:

1. The action is a "covered class action" as defined in the statute.

2. The claims are based upon state law.

3. The action involves a "covered security" as defined by the statute.

4. The defendant is alleged to have misrepresented or omitted a material fact in connection with the purchase or sale of the security.[FN3]

> FN3. The Private Securities Litigation Reform Act ("PSLRA"), codified in part at 15 U.S.C. §§ 77z-1 and 78u-4, amending the Securities Act of 1933, 15 U.S.C. §§ 77a*et seq.,* and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a*et seq.,* was passed in 1995 "in response to an increase in se-

curities fraud suits perceived as frivolous...."*Newby v. Enron Corp.,* 338 F.3d 467, 471 (5th Cir.2003). To protect defendants from strike suits, the PSLRA imposed a stay on discovery and established heightened pleading requirements in federal securities suits in an effort to screen out frivolous complaints before they triggered unnecessary costly discovery and disruption of business activities. *Id.* When the PSLRA failed, in part because plaintiffs turned to state court to file their securities suits to avoid the more stringent federal court requirements, Congress passed SLUSA in 1998. SLUSA's purpose was " 'to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than Federal court.'...This problem was addressed in SLUSA in two ways: (1) by preempting certain securities fraud class actions brought under state law, and (2) by granting power to federal court judges to quash discovery in state court actions if discovery in the state case conflicted with an order of the federal court."*Id., citing*House Report 105-640 (1998).

In the definition section of SLUSA, 15 U.S.C. § 77p(f)(2) or § 78bb(f)(5)(b), the statute defines a "covered class action" in two ways:

(I) any single lawsuit in which-

(I) damages are sought on behalf or prospective class members, fact common to those persons the prospective class ... of more than 50 persons and questions of law or or members of predominate ...; or

(II) one or more named parties seek to recover damages on a representative basis ... and questions of law or fact common to those persons or members of the prospective class predominate ...; or

*3 (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.....

Subsection 77p(f)(1)(D) or 78bb(f)(5)(F), "Rule of construction" for the term "covered class action," provides,
Nothing in this paragraph shall be construed to affect the discretion of a State court in determining whether actions filed in such court should be joined, consolidated, or otherwise allowed to proceed as a single action.

Here there is no dispute that the Fleming & Associates Plaintiffs' suits are based on Texas state law, that they involve "covered securities" issued by Enron and sold on a major stock exchange, and that they allege misrepresentations in connection with Plaintiffs' purchase of Enron securities. Disputed is whether these individual suits constitute "covered class actions" within the meaning of the statute.

The Financial Institutions argue that since these suits have all been removed to this one Court and have been consolidated for pretrial purposes, they now fall under SLUSA's second definition of "covered class action" ("any group of lawsuits filed in or pending in the same court and involving common questions of law or fact in which (i) damages are sought on behalf of more than 50 persons; and (ii) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose."15 U.S.C. § 77p(2)(A)(ii)). Therefore they are preempted by SLUSA and should be dismissed with prejudice. The Financial Institutions rely on Judge Cote's decision in *In re WorldCom, Inc. Sec. Litig. (Bell v. Ebbers),* 308 F.Supp.2d 236 (S.D.N.Y.2004) (finding that ten Mississippi state-law securities fraud suits, filed in different counties in Mississippi, with identically worded pleadings, each naming less than fifty plaintiffs, removed on "related

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5
Slip Copy, 2006 WL 3716669 (S.D.Tex.)
**(Cite as: 2006 WL 3716669 (S.D.Tex.))**

to" bankruptcy jurisdiction, 28 U.S.C. § 1334(b), and consolidated in federal court for MDL pretrial proceedings, constituted a "group of lawsuits" within SLUSA's second definition of "covered class action," and therefore their actions were preempted and dismissal with prejudice was warranted).

In a reply, Fleming & Associates respond that each of the cases except for *Odam* was filed in state court in complete compliance with SLUSA so as to be nonremovable. Fleming & Associates argue that the Financial Institutions' interpretation of the second prong of the "covered class action" provision is erroneous (1) in construing "pending in the same court" as referring to federal as well as to state court and (2) in arguing that the cases are "joined, consolidated" or coordinated in this MDL court and "proceed[ing] as a single action for any purpose", and thus must be dismissed, making amendment futile. Fleming & Associates object that the Financial Institutions are relying on the second part of 15 U.S.C. § 77p(f)(2)(A)(ii), SLUSA's definition section, ignoring the rest of the statute. For example, Fleming & Associates point to Section 2, "FINDINGS", subsection 5, to argue that the Financial Institutions have ignored this plain and unambiguous expression of the statute's object and policy to subject only securities-related class actions, and not individual actions, to SLUSA removal and preemption:

**\*4** (5) in order to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act of 1995, it is appropriate to enact national standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators and not changing the current treatment of individual lawsuits.

They contend that the Financial Institutions did not examine Subsection D ("Rule of Construction") of the definitional section for "covered class action": "Nothing in this paragraph shall be construed to af-

fect the discretion of the State court in determining whether actions filed in such court should be joined, consolidated or otherwise allowed to proceed in a single action," especially when read against the repeated juxtaposition of "federal" and "state" throughout the statute where both jurisdictions were meant to be included. 15 U.S.C. § 77p(f)(2)(D) (emphasis added). They also quote *Merrill Lynch, Fenner & Smith v. Dabit*, --- U.S. ----, ----, 126 S.Ct. 1503, 1514, 164 L.Ed.2d 179 (2006): "SLUSA preempts state-law ... class-action claims ... [by denying] plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist."

Fleming and Associates point out that this Court long ago recognized the restrictions on SLUSA preemption, as have many others. *See, e.g., In re Enron Corp. Securities, Derivative & ERISA Litig.,* No. Civ. A. H-01-3624, 2002 WL 32107216, \*3 (S.D.Tex. Aug.12, 2002) ("SLUSA in essence made the federal court the exclusive venue for securities fraud class actions meeting its definitions and ensured they would be governed exclusively by federal law...."; "in SLUSA Congress did not evidence an intent to occupy the entire field as securities regulation, but expressly delineated the scope of preemption"); *In re Enron Corp. Securities, Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 632-33 (S.D.Tex.2003) ("SLUSA does not completely preempt the field of securities regulation; instead its preemptive scope is limited by the substantive requirements of its removal provisions, its unique definition of class action, and its automatic dismissal of certain kinds of securities-related claims."). The firm also quotes from the legislative history to support its contention that SLUSA "curbs only securities class actions bringing state claims-not individual securities actions (# 106 at 11)":

The definition of class action originally drafted as part of [SLUSA] would inadvertently include cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that were beyond the intent of the legislation-such as certain types of individual state private securities actions.... In order to ensure that individual state actions would not be included as part of the bill's definitions.... the committee specifically included a threshold number of 50 or more persons as part of the definition of a class action under this legisla- tion.

*5 S.Rep. No. 105-182 (1998), available at 1998 WL 226714 at *6 (May 4, 1998).[FN4]

> FN4. This Court notes that Fleming and Associates fails to address the fact that the statute created a unique definition of "covered class action" that does not comport with the traditional definition of "individual" versus "class" action.

Fleming & Associates insist, "Given its express statutory purpose, any construction of SLUSA that would allow for after-the-fact, de facto preemption and dismissal of cases originally unremovable under SLUSA is a nonsensical interpretation that runs afoul of the statute."H-03-5334, # 106 at 11.

**Court's Determination**

In *WorldCom,* 308 F.Supp.2d at 240, the same lawyers filed identical complaints ("verbatim copies of each other right down to the typographical errors"), except for the names of plaintiffs and of the counties in which they were filed, in ten different individual actions commenced in nine separate Mississippi counties, each case with fewer than fifty plaintiffs and asserting exclusively state law claims. Altogether in the ten suits there were a total of 293 plaintiffs. The cases were removed by WorldCom to the Northern District of Mississippi based on "related to" WorldCom's bankruptcy jurisdiction, some on additional grounds. The individual actions were then transferred by the Judicial Panel on Multidistrict Litigation to the Southern District of New York, where they were consolidated for pre-trial proceedings with class action securities suits

against WorldCom on Judge Cote's finding that they shared common questions of law and fact and that consolidation was necessary for purposes of economy and substantial justice.

Motions to dismiss were filed in the individual actions, *inter alia* arguing for SLUSA preemption and dismissal of the ten individual actions because, taken together, they constituted a "covered class action." *Id.* at 241.Judge Cote noted that not only did the same attorneys file the same complaint in the ten actions, but they "continued to act in unison following their filing" by submitting identical court papers, and that it was "undisputed that the attorneys ... coordinated the filing" of the ten actions "with the intention of evading SLUSA's preemption provision."*Id.* at 240, 241.

Judge Cote set out several established canons of statutory construction and applied them in ruling on the motions pending before her: (1) where the statute's meaning is clear and unambiguous, as determined by the reference to the language itself, the specific context in which it is used, and the statute as a whole, it should be followed; (2) the court must give effect, if possible to each clause and word of the statute; and (3) the court should turn to legislative history only when the meaning is ambiguous. 308 F.Supp.2d at 244.

Judge Cote first determined that plaintiffs' attorneys had succeeded in circumventing the reach of the first definition of a covered class action because none of the ten suits satisfied the element of an unambiguous "single lawsuit" brought on behalf of more than fifty persons. 308 F.Supp.2d at 245,*citing*15 U.S.C. § 78bb (f)(5)(b)(I). She further pointed out that because the second prong addresses a "group" of lawsuits, Congress could not have intended that the first prong's "single lawsuit" encompass more than one action. *Id.* Although she observed that "the courts in this circuit have consistently rejected plaintiffs' attempts through artful pleading to avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages," nevertheless she opined, "The existence

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of a calculated strategy to avoid SLUSA preemption does not, by itself, permit a finding of a preemption."*Id.* at 245, 246,*citing Newby v. Enron Corp.*, 302 F.3d 295 (5th Cir.2002).[FN5]

> FN5. In affirming an earlier injunction issued by this Court under the All Writs Act enjoining Fleming & Associates from filing without permission from this Court any future state court actions that disrupted the federal securities class action, the Fifth Circuit indicated that Fleming & Associates's multiple actions, each crafted on behalf of less than fifty plaintiffs to avoid the reach of SLUSA, "are not themselves an abuse of the courts" and therefore this court could not "predicate future denials of leave [to file additional lawsuits] solely upon Fleming's desire" to circumvent that statute and its preemption provision. *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir.2002). The panel pronounced, "We do not question the filing of suits tailored to avoid federal jurisdiction. Nor do we countenance any preemptive federal dominion. The parallel exercise of state and federal judicial power is inherent in our government of dual sovereignty."*Id.* at 303.

**\*6** She then turned to the also clear and unambiguous "second prong of the SLUSA test: the " 'group of lawsuits' category" where the actions were " 'filed in or pending in the same court' in which damages are sought on behalf of more than 50 persons and the lawsuits are 'joined, consolidated, or otherwise proceed as a single action for any purpose.' " *Id., citing*15 U.S.C. § 78bb(f)(5) (b)(ii). She reasoned that since the complaints asserting the same causes of action under Mississippi law were identical, they necessarily involve common questions of fact, the ten actions were all pending in one court and had been since their initial removal from Mississippi state courts, and they were consolidated, without opposition from the plaintiffs, after

transfer by the Judicial Panel on Multidistrict Litigation and would remain consolidated for the entirety of pre-trial proceedings. Thus she found that they were joined, consolidated, and "unquestionably 'proceed[ing] as a single action' " for pretrial purposes. *Id.* at 246.The plaintiffs in those ten actions argued, like Fleming & Associates Plaintiffs here, that the second prong is satisfied only when the lawsuits proceed in a single action in state court. Judge Cote rejected the argument, concluding that the statute did not require the actions to be pending in the same state court or joined, consolidated or otherwise proceed as a single action in state court; instead it used the phrase, "same court." *Id.* at 246,*citing*15 U.S.C. § 78bb(f)(5)(b)(ii). Moreover, SLUSA elsewhere expressly provides, "Class Action Limitations.-No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party ...."*Id., citing*15 U.S.C. § 77p(1)(b). Judge Cote further observed that since there was "related to" bankruptcy jurisdiction over the ten actions, they would remain in federal court for all purposes. She highlighted the fact that removal pursuant to SLUSA was not being used to bootstrap a finding of SLUSA preemption.

As for § 77p(f)(2)(D) and § 78bb(f)(5)(F), regarding construction of the preemption provisions, Judge Cote explained,

This passage, and other SLUSA provisions, simply underscore the explicit determination by Congress that SLUSA not change the 'current treatment of individual lawsuits,' or the enforcement power of state security regulators..... This passage does not require that any court action that results in lawsuits proceeding as a single action occur only in state court. To read this passage as the plaintiffs suggest would create an inconsistency with the statutory directive quoted above, to wit, that "no covered class action ... may be maintained ... in Federal court."

308 F.Supp.2d at 247,*citing* SLUSA, Pub.L. No.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3716669 (S.D.Tex.)
(Cite as: 2006 WL 3716669 (S.D.Tex.))

Page 8

105-353 §§ 2(5). Furthermore, Judge Cote quoted from the Senate Banking Committee report on SLUSA,

The Committee does not intend for the bill to prevent plaintiffs from bringing bona fide individual actions simply because more than fifty persons commence the actions in the same state court against a single defendant. However, the provisions of the bill would apply where the court orders that the suits be joined, consolidated, or otherwise proceed as a single action *at the state court level.*

*7 308 F.Supp.2d at 247,*quoting*S. Rept. 105-182 at 7-8 (emphasis supplied by Judge Cote. She concludes the passage "underscores congressional intent to preempt state court litigation whenever separately filed suits are consolidated, even where the suits are 'bona fide individual actions' and does not distinguish between a federal and a state court action. *Id.*

The Court finds Judge Cote's opinion to be well reasoned and very persuasive. The same procedural and factual scenario that Judge Cote addressed is paralleled by the Fleming & Associates' individual actions here: identical complaints of exclusively Texas state-law claims by fewer than fifty plaintiffs filed in various Texas jurisdictions, removed on "related to" bankruptcy jurisdiction, consolidated or coordinated with *Newby* without objection from the Plaintiffs for pretrial purposes, and prosecuted "in unison" in the filing of identical motions and briefs. Moreover Fleming even filed the *Odam* suit in this court, asserting "related to" bankruptcy jurisdiction, and filing identical pleadings in it. Thus the Court finds that all these actions are preempted by SLUSA, that therefore the motions for leave to amend in the nine actions should be denied as futile, and that all ten cases should be dismissed with prejudice.

**II. Bank of America Defendants**

Bank of America joins the SLUSA preemption argument asserted by the Financial Institutions. Al-

though the Court had determined that the actions are preempted by SLUSA and therefore subject to dismissal with prejudice, in the event of reversal upon appeal, it issues the following ruling on the other issues raised in Bank of America's opposition.

Bank of America, which also was not named as a defendant before the proposed amended complaint, further maintains that amendment should be denied as futile because the proposed claims against Bank of America are either time-barred and not rescued by the *American Pipe* tolling doctrine or are insufficient to withstand dismissal under the Court's earlier orders.

**Court's Determination**

In issuing the July 11 2003 scheduling order (# 4836) and its amendment by the July 11, 1006 order (# 4848), this Court fully intended to toll the statute of limitations from running in the *Newby* consolidated and coordinated cases from entry of the order until it certified the class in *Newby* and gave plaintiffs in the consolidated and coordinated cases a schedule to opt out and to file motions for leave to amend; otherwise Plaintiffs would have been deprived of their right to pursue their claims.[FN6]Thus any claims not time-barred as of July 11, 2003, not July 18, 2006 when Fleming & Associates filed its motion for leave to amend, were timely asserted and statutes of limitations were tolled by the order.

> FN6. The Court certified the *Newby* class on July 5, 2003. Fleming & Associates Plaintiffs, in accordance with the amended scheduling order, on July 18, 2006 timely filed its statement indicating it was opting out and choosing to proceed independently and on August 17 or 18, 2006 timely filed the motions for leave to amend.

Indeed, under Bank of America's own analysis as to when the alleged causes of action accrued, which the Court will not reiterate, the common law claims against it with statutes of limitations that begin to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3716669 (S.D.Tex.)
(Cite as: 2006 WL 3716669 (S.D.Tex.))

Page 9

run only as of inquiry notice to Plaintiffs, such as civil conspiracy and fraud, are not time-barred. For example, Bank of America maintains that inquiry notice of claims based on the Bammel transaction was given by the public distribution of Court Appointed Enron Bankruptcy Examiner Neal Batson's Second Interim Report on March 5, 2003 or the proposed amended complaint filed in the *Silvercreek* action on March 28, 2003; in either case, limitations was tolled until now by the July 6, 2003 scheduling order and Plaintiffs' timely filing of its motion for leave to amend after giving notice of opt out. Bank of America claims that the statute of limitations for claims under Article 581-33 of the Texas Securities Act (no more than three years after discovery of the untruth or omission or after discovery should have been made, but in no event more than five years after the sale of the relevant securities) began to run for claims based on its alleged investment in LJM2, participation in Bammel, and provision of analyst reports with the filing of the April 8, 2002 *Newby* complaint; again, the July 6, 2003 scheduling order tolled the statute of limitations until the present.

*8 Moreover, although Bank of America seeks to have claims against its analyst reports dismissed based on the Court's finding that similar allegations in the complaint in *Silver Management, Inc. v. Salomon Smith Barney, Inc.,* H-02-3185, were insufficient to state a claim, the Court must examine each complaint by itself. Sufficiency of pleading should properly be raised in motions to dismiss filed in response to the proposed amended complaint.

Bank of America further argues that Texas has not clearly recognized a cause of action for aiding and abetting common law fraud. *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.,* 51 S.W.3d 573, 583 n. 7 (2001) (not reaching issue of whether Texas law recognizes a cause of action for 'aiding and abetting' fraud separate and apart from a conspiracy claim"),[FN7]*reversing on other grounds and citing Pacific Mutual Life Ins. Co. v. Ernst & Young, L.L.P.,* 10 S.W.3d 798, 809 n. 12 (Tex.App.-Dallas

2000) ("For purposes of this opinion, we assume, without deciding, that such a claim may be asserted in Texas, but our decision should not be construed as a holding that such a claim exists in Texas separate and apart from a conspiracy claim.").*See also Prospect High Income Fund v. Grant Thorton, L.L.P.,* 203 S.W.3d 602, 616 (Tex.App.-Dallas 2006) ("The Texas Supreme Court has not recognized a separate tort of aiding and abetting fraud.").FN8 This Court agrees.

> FN7. Fleming & Associates Plaintiffs argue that they have pleaded both conspiracy to commit fraud and aiding and abetting. The Court's response then is that, as a separately pleaded claim, the aiding and abetting claim is redundant and unnecessary.

> FN8. In contrast the Texas Securities Act does expressly provide for aider liability, jointly and severally with the primary violator.Tex.Rev.Civ. Stat. Ann. art. 581-33F(2). It defines an aider as one "who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security."*Id.* at art. 581-33F(1)-(2). The Texas Supreme Court has held that the Act's "scienter requirement of 'reckless disregard for the truth or the law' standard means that an alleged aider can only be liable if it rendered assistance 'in the face of a perceived risk,' that its assistance would facilitate untruthful or illegal activity by the primary violator.... In order to perceive such a risk, the alleged aider must possess a ' 7Fgeneral awareness that his role was part of an overall activity that is improper.' ' " *Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 842 (Tex.2005). The Act does not require the aider to have had direct dealing with the defrauded investor. *Id.* at 843.

Furthermore, the Court observes that the Texas Supreme Court also has not recognized liability for in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

juries under the "concert of action" theory, a version <sup>FN9</sup> o f which is embodied in the Restatement (Second) of Torts § 876 (1977) ("Persons Acting in Concert"), "imposing liability on a person for the conduct of another which causes harm" if the defendant:

> FN9. The Texas Supreme Court also discusses the version of concert of action in W. Page Keeton, et al., *Prosser and Keeton o n th e Law o f Torts* § 46 at 323 (5th ed. 1984): "All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit, are equally liable."*Juhl,* 936 S.W.2d at 643. *See also Shinn v, Allen,* 984 S.W.2d 308, 310 (Tex.App.-Houston [1st Dist.] 1998).

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Juhl v. Airington,* 936 S.W.2d 640, 643 (Tex.1996) ("whether such a theory of liability is recognized in Texas is an open question.").*See also Shinn v. Allen,* 984 S.W.2d 308, 310-11 (Tex.App.-Houston [1st Dist.] 1998). In particular, regarding § 876(b), which "imposes liability not for an agreement [as in subsection (a) ], but for substantially assisting and encouraging a wrongdoer in a tortious act" and which "requires that the defendant have 'an unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's

actions,' " the Texas Supreme Court listed a number of jurisdictions that have recognized that provisions in at least some circumstances, even though not all formally adopted it. *Id.* at 644.The high court observed that "[t]he purpose of the concert of action theory is to deter antisocial or dangerous behavior," such as a group assault on an individual, high way drag racing, "conduct imposing a high degree of risk to others," or "highly dangerous, deviant, or anti-social group activity which was likely to cause serious injury or death to a person or certain harm to a large number of people." *Id.* at 644-45.None of these concerns appears applicable to the claims against the banks in the Fleming & Associates' cases.

*9 Finally, Bank of America urges that the proposed amendment, if permitted, would be severely prejudicial to it because the new complaints assert claims based on different facts and legal theories than those raised in *Newby.*Because new plaintiffs would be added, additional discovery would be required. It also reserves the right to file a motion to dismiss.

Fleming & Associates respond that Bank of America has already been named as a third-party defendant in *Bullock,* charged with substantially similar claims as in the Fleming & Associates Plaintiffs' amended complaints. (Bank of America replies that it was only so named in *Bullock* for a short time, after Arthur Andersen LLP filed a third-party petition for contribution against it, but then the parties resolved the issue before discovery.) The firm contends that Bank of America is not a newly added party because it has been involved as a defendant in MDL 1446 and the Enron litigation for a long time. In the course of that litigation, moreover, Bank of America has had the opportunity to participate in all discovery in MDL 1446. Fleming & Associates explain that the "new plaintiffs" are not new parties, but merely corrected names or substituted estates for deceased plaintiffs, and the claims against them are the same as those pleaded in the original complaint and identified during discovery.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 11
Slip Copy, 2006 WL 3716669 (S.D.Tex.)
(Cite as: 2006 WL 3716669 (S.D.Tex.))

If the Court were not dismissing these suits based
on SLUSA preemption, with respect to any claimed
prejudice, if Bank of America demonstrated to the
Court that specific discovery was needed, the Court
would allow additional necessary depositions.

Accordingly, for the reasons indicated above, the
Court

ORDERS that Fleming & Associates Plaintiffs' mo-
tions for leave to amend are DENIED as futile and
all ten cases listed in the style of this opinion and
order are DISMISSED with prejudice because they
are preempted by SLUSA.

S.D.Tex.,2006.
In re Enron Corp. Securities, Derivative & ""Erisa"
Litigation
Slip Copy, 2006 WL 3716669 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                               Page 1
Slip Copy, 2008 WL 1827644 (S.D.N.Y.)
(Cite as: 2008 WL 1827644 (S.D.N.Y.))

**C**
In re Refco, Inc. Securities Litigation
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re REFCO, INC. SECURITIES LITIGATION.
Marc S. Kirschner, As Trustee of the Refco Litiga-
tion Trust, Plaintiff,
v.
Grant Thornton LLP, Mayer Brown, Rowe & Maw,
LLP, et al., Ernst & Young U.S. LLP, Pricewater-
housecoopers LLP, Credit Suisse Securities (USA)
LLC (f/k/a Credit Suisse First Boston LLC), Banc
of America Securities LLC, Deutsche Bank Securit-
ies Inc., Philip R. Bennett, Santo C. Maggio, Robert
C. Trosten, Tone N. Grant, Refco Group Holdings,
Inc., Liberty Corner Capital Strategies, LLC, Willi-
am T. Pigott, EMF Financial Products, LLC, EMF
Core Fund, Ltd., Delta Flyer Fund, LLC, Eric M.
Flanagan, Ingram Micro, Inc., CIM Ventures, Inc.,
Beckenham Trading Co., Inc., Andrew Krieger,
Coast Asset Management, LLC (f/k/a Coast Asset
Management LP), CS Land Management, LLC, and
Christopher Petitt, Defendants.
07 MDL No. 1902 (GEL).
No. 07 Civ. 11604(GEL).

April 21, 2008.

Richard I. Werder, Jr., Michael B. Carlinsky,
Susheel Kirpalani, Sascha N. Rand, Quinn Emanuel
Urquhart Oliver & Hedges LLP, New York, NY,
for Plaintiff.
Philip D. Anker, Robert B. McCaw, Lori A. Martin,
John V.H. Pierce, Dawn M. Wilson, Michael L.
Feinberg, Ross E. Firsenbaum, Wilmer Cutler Pick-
ering Hale and Dorr LLP, New York, NY, for De-
fendants Credit Suisse Securities (USA) LLC
(formerly Credit Suisse First Boston LLC), Banc of
America Securities LLC, and Deutsche Bank Secur-
ities Inc.
David E. Mollón, Bradley E. Lerman, Catherine W.
Joyce, Linda T. Coberly, Winston & Strawn LLP,
New York, NY, and Chicago, IL, for Defendant

Grant Thornton LLP.
James J. Capra, Jr., Orrick Herrington & Sutcliffe
LLP, New York, NY, for Defendant Pricewater-
houseCoopers LLP.
Craig D. Singer, John K. Villa, Michael S. Sunder-
meyer, Thomas G. Ward, Williams & Connolly
LLP, Washington, DC, for Defendant Mayer Brown
LLP.
Anthony M. Candido, Joel M. Cohen, Clifford
Chance U.S. LLP, New York, NY, for Defendant
UK Limited Liability Partnership Mayer Brown In-
ternational LLP.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.
*1 Plaintiff Marc S. Kirschner, in his capacity as
Trustee of the Refco Litigation Trust, originally
filed this action in the Circuit Court of Cook
County, Illinois, asserting claims under Illinois
state law against certain Refco insiders, profession-
als, and advisors for, *inter alia,* fraud, breach of fi-
duciary duty, and malpractice. Certain defendants
(the "Removing Defendants" [FN1]) removed the ac-
tion to the United States District Court for the
Northern District of Illinois on the ground that the
case is "related to" Refco's Chapter 11 bankruptcy,
28 U.S.C. 1334(b); *see id.* § 1452(a), [FN2] and con-
currently petitioned the Panel on Multidistrict Litig-
ation ("MDL Panel") to transfer the case to the
United States District Court for the Southern Dis-
trict of New York, where the Refco bankruptcy is
pending, *see In re Refco, Inc.,* No. 05-60006(RDD)
(Bankr.S.D.N.Y.). The Trustee opposed the transfer
petition and moved the Northern District of Illinois
to remand the action to Illinois state court, or in the
alternative, to abstain. Upon application by the Re-
moving Defendants, the Northern District of Illinois
stayed proceedings pending the MDL Panel's de-
cision. The MDL Panel subsequently transferred
the action to this Court for coordinated pretrial pro-
ceedings with the multitude of other Refco-related
actions already pending on the Court's docket.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 1827644 (S.D.N.Y.)
(Cite as: 2008 WL 1827644 (S.D.N.Y.))

FN1. The Removing Defendants are Credit Suisse Securities (USA) LLC, Bank of America Securities LLC, Deutsche Bank Securities, Inc., Grant Thornton LLP, Mayer Brown LLP, Mayer Brown International LLP, and PricewaterhouseCoopers LLP.

FN2. *See California Pub. Employees' Ret. Sys. v. WorldCom, Inc.,* 368 F.3d 86, 103 (2d Cir.2004) (noting that "removal under [§ 1452(a) ], unlike removal under Section 1441(a), does not require the unanimous consent of the defendants").

The MDL Panel's transfer of this action to this Court effectively lifts the stay imposed by the Northern District of Illinois. This Opinion addresses the Trustee's pending motion to remand for lack of subject matter jurisdiction, or in the alternative, to abstain under 28 U.S.C. §§ 1334(c)(1) and (c)(2). For the reasons stated below, the Trustee's motion will be denied.

## BACKGROUND

### I. Events Leading to Refco's Bankruptcy

Prior to its collapse in the fall of 2005, Refco was among the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets. (Compl.¶ 56.FN3) Beginning in the late 1990s, members of Refco's senior management, with the aid of certain of Refco's professionals and financial advisors (collectively, the "defendants"), allegedly orchestrated a fraudulent scheme to artificially boost Refco's performance and conceal Refco's true financial condition so that these senior executives, through the company's August 2004 leveraged-buy-out and August 2005 initial public offering ("IPO"), could cash out their interests in Refco on lucrative terms. (*Id.* ¶¶ 4-7, 32, 59-149.)Defendants allegedly carried out this scheme by "concealing substantial Refco trading losses and operating ex-

penses, recording hundreds of millions in fictitious Refco income, and funding Refco's operating expenses and acquisitions with misappropriated customer assets."(P. Mem. 2-3, citing Compl. ¶¶ 59-149.)

FN3. All references to the complaint in this opinion are to the complaint originally filed in the Circuit Court of Cook County, Illinois. (Kirschner Decl. Ex. A.) All factual allegations in the complaint are assumed to be true for purposes of this motion. *See Merritt v . S huttle, I nc.,* 245 F.3d 182, 186 (2d Cir.2001).

On October 10, 2005, just two months after its IPO, Refco announced that it had discovered an undisclosed $430 million receivable due from an entity controlled by Refco's CEO, Philip R. Bennett. (Comp.¶¶ 147-48.) As a result, the company announced that its financial statements for the preceding four years could no longer be relied upon. (*Id.* ¶ 148.)Following these disclosures, Refco's stock plummeted and was de-listed by the New York Stock Exchange, leading to over $1 billion in lost market capitalization. (*Id.* ¶¶ 148-49.)On October 17, 2005, Refco Inc. and over twenty of its subsidiaries filed for protection under Chapter 11 of Title 11 of the United States Code. (*See id.* ¶¶ 32, 34.)

### II. The Refco Litigation Trust

*2 On December 15, 2006, approximately fourteen months after Refco filed for bankruptcy, the United States Bankruptcy Court for the Southern District of New York confirmed the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan"). (*See* Kirschner Decl. Exs. B, C.) The Plan provided for the establishment of a Litigation Trust and the appointment of a Litigation Trustee to pursue such "claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any [Refco] Debtor or RCM [ (Refco Capital Markets Ltd.) ] may hold against any Person."(*Id.* Ex. B

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

§ 1.112; *see id.* § 5.7(a)).

Pursuant to the Plan, all "Contributed Claims," defined as "any and all Litigation Claims of the Debtors, RCM or their estates," would be irrevocably transferred to the Litigation Trust on the effective date of the Plan. (*Id.* Ex. B §§ 1.48, 5.7(b).) In exchange, "the Litigation Trust Beneficiaries," who are the holders of allowed general unsecured claims against the Refco Debtors, would receive "Litigation Trust Interests," which would be allocated on the basis of the beneficiaries' allowed claims under the confirmed Plan.[FN4](*Id.* Ex. B § 5.7(b); *see id.* ¶¶ 10-11, 13, 15.)The Plan expressly provided that "[u]pon transfer of the Contributed Claims to the Litigation Trust, the Debtors, RCM, and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust."[FN5](*Id.* Ex. B § 5.7(b).)

> FN4. Although the estate of RCM was originally listed as a Litigation Trust Beneficiary, the RCM plan administrator "irrevocably instructed the Litigation Trustee to distribute beneficial interests in the Litigation Trust directly to creditors of RCM," and thus no recoveries on the claims asserted by the Trustee in this case will be distributed to RCM creditors through the RCM estate. (Kirschner Decl. ¶ 13 n. 2.)

> FN5. Similarly, § 1.2(a) of the Litigation Trust Agreement provides that, as of the effective date of the Plan, RCM and the Refco Debtors "hereby transfer, assign, and deliver to the Litigation Trustee, without recourse, all of their respective rights, title, and interest in and to the Contributed Claims free and clear of any and all liens."(Kirschner Decl. Ex. D § 1.2(a).)

The establishment of the Litigation Trust, plaintiff Marc S. Kirschner's appointment as Trustee of the Litigation Trust, the transfer of Contributed Claims to the Litigation Trust, and the allocation of Litiga-

tion Trust Interests to the Litigation Trust Beneficiaries, became effective on December 26, 2006. (*Id.* ¶¶ 2, 9, 10.)

### III. Procedural History

On August 21, 2007, nine months after the Plan was confirmed, the Trustee filed this action in the Circuit Court of Cook County, Illinois, asserting state-law claims against defendants for breach of fiduciary duty, fraud, aiding and abetting breach of fiduciary duty and fraud, malpractice, and negligent misrepresentation. As noted above, certain defendants removed the case to the federal district court in the Northern District of Illinois and simultaneously petitioned the MDL Panel to transfer the case to this Court. The Trustee opposed the transfer petition and moved to remand the case on the ground that the federal court lacked subject matter jurisdiction over its purely state law claims. *See* 28 U.S.C. § 1447(c). The Trustee also asserted that even if the court had subject matter jurisdiction, abstention was both mandatory and warranted in the exercise of discretion under 28 U.S.C. § 1334(c). Upon the Removing Defendants' motion, the Northern District of Illinois stayed the action pending the decision of the MDL panel. On December 28, 2007, the MDL Panel transferred the action to this Court pursuant to 28 U.S.C. § 1407, thus effectively lifting the stay imposed by the Northern District of Illinois and bringing the Trustee's motion to remand and/or abstain, to this Court's consideration.[FN6]

> FN6. I n conjunction with the pending motion, the parties have submitted both the briefing materials originally filed in the Northern District of Illinois and supplemental briefs addressing the applicable legal standards in light of the MDL Panel's transfer of the action to this Court.

### DISCUSSION

*3 The Trustee contends that (1) the Court lacks subject matter jurisdiction because the claims asser-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ted in this case are not "related to" the Refco bankruptcy within the meaning of 28 U.S.C. § 1334(b); and (2) even if jurisdiction exists, abstention is both mandatory and warranted in the exercise of discretion pursuant to 28 U.S.C. § 1334(c). These arguments will be addressed in turn.

## I. Subject Matter Jurisdiction

### A. *Removal and Jurisdiction in Bankruptcy Cases*

The party seeking removal of an action from state to federal court bears the burden of proving federal jurisdiction. *See In re WorldCom, Inc. Secs. Litig.,* 293 B.R. 308, 316 (S.D.N.Y.2003), citing *Linardos v. Fortuna,* 157 F.3d 945, 947 (2d Cir.1998). With regard to bankruptcy-related claims, 28 U.S.C. § 1452(a) provides that "[a] party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."28 U.S.C. § 1452(a); *see Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 131-32 (1995) (Ginsburg, J., concurring) (finding that § 1452 was "meant to enlarge, not to rein in, federal trial court removal/remand authority for claims related to bankruptcy cases").

The propriety of removal under § 1452(a) is predicated on the scope of federal jurisdiction under 28 U.S.C. § 1334, which provides, in relevant part:

> [N]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under title 11, or arising in or related to cases under title 11.*

28 U.S.C. § 1334(b) (emphasis added). None of the parties contends that this action is a proceeding "arising under" Title 11 or "arising in" a Title 11 case. Thus, the crux of the jurisdictional dispute is whether the Trustee's claims, which arise solely under Illinois state law, are sufficiently "related to"

the Refco bankruptcy to establish federal jurisdiction.

### 1. *Applicable Legal Standard*

As a threshold matter, the parties disagree as to whether the Second or Seventh Circuit's standard for "related to" jurisdiction governs this case. The Second Circuit applies the expansive test for "related to" jurisdiction articulated by the Third Circuit in *In re Pacor, Inc.,* 743 F.2d 984 (3d Cir.1984), which has been adopted by the vast majority of other circuits, *see In re WorldCom,* 293 B.R. at 317 (noting that "[t]he dominant standard for 'related to' jurisdiction is that set forth by the Third Circuit in *In re Pacor*" );*Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n. 6 (1995) (collecting cases). Under *Pacor:*

> [T]he test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in b ankruptcy.*Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*\*4 In re Pacor, Inc.,* 743 F.2d at 994 (citations omitted); *see In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir.1992). The Seventh Circuit, in contrast, has explicitly rejected the "sweeping" *Pacor* test and established a more restrictive standard in which federal jurisdiction exists only where a dispute "affects the amount of property for distribution [*i.e.,* the debtor's estate] or the allocation of property among creditors."*In re FedPak Sys., Inc.,* 80 F.3d 207, 213-14 (7th Cir.1996) (alteration in original) (internal quotation marks omitted).

The Trustee contends that the Court should apply

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"Seventh Circuit law" in this case because "[u]pon remand of this action to the Northern District of Illinois for trial, that court (or the Seventh Circuit in the context of any appeal) will have to reevaluate whether there is federal jurisdiction over the action under the Seventh Circuit's narrower 'related to' standard."(P. Supp.Mem.2, 4.) According to the Trustee, even if this Court were to find subject matter jurisdiction under "Second Circuit law," "when this action is returned to the Northern District of Illinois for trial it will still be subject to remand to Illinois state court," and "[f]orcing the parties to conduct federal pretrial discovery without first determining that there is federal subject matter jurisdiction to try the action would be grossly inefficient and would substantially prejudice the parties."(*Id.* at 2, 4.) To support this contention, the Trustee cites the different evidentiary rules for fact depositions in federal court and Illinois state court and argues that "much of the federal discovery may be rendered inadmissible at trial in Illinois state court" should the case ultimately be remanded by the Northern District of Illinois. (*Id.* at 4 & n. 4) Such an outcome, according to the Trustee, would undermine the MDL transfer statute's goal of promoting the "just and efficient conduct" of the transferred case. 28 U.S.C. § 1407(a).

Preliminarily, the issue of whether to apply Second or Seventh Circuit "law," as the Trustee frames it, is not a proper "choice of law" question. Although it is meaningful to ask whether New York or Illinois state law governs a case-because New York and Illinois are distinct sovereignties, each with power to regulate transactions within the scope of its legislative jurisdiction as it sees fit-there is no such thing as "Second Circuit law" or "Seventh Circuit law" in this sense, as intermediate federal courts of appeals have no such sovereignty. As the Second Circuit has put it, "[f]ederal courts comprise a *single* system applying a *single* body of law, and no litigant has a right to have the interpretation of one federal court rather than that of another determine his case."*Desiano v. Warner-Lambert & Co.,* 467 F.3d 85, 91 (2d Cir.2007) (emphasis ad-

ded), quoting *Menowitz v. Brown,* 991 F.2d 36, 40 (2d Cir.1993) ("Although federal courts sometimes arrive at different constructions of federal law, federal law (unlike state law) is supposed to be *unitary.*"(emphasis added)). References to "the law of this Circuit," while common and appropriate, are essentially figures of speech, reflecting the fact that federal courts are part of a hierarchy of precedential authority, in which lower courts are bound by the precedents of the appellate courts to which they are subject. While these precedents may vary, due to human frailty and the occasional difficulty of interpreting the applicable laws, every federal court in the land is obliged to apply this "unitary" federal law, interpreted as best that court can in light of the precedents that bind it. *Menowitz,* 991 F.2d at 40.

*5 Moreover, "[t]his obligation does not change in the context of transferred cases."*Desiano,* 467 F.3d at 91. The Second Circuit has specifically instructed that although district judges should "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever [they] can," a "transferee federal court" has an independent obligation to "apply its [own] interpretations of federal law, not the constructions of federal law of the transferor circuit."*Id.,* quoting *Menowitz,* 991 F.2d at 40. Indeed, if "a federal court simply accepts the interpretation of another circuit without [independently] addressing the merits, it is not doing its job."*Id.* (alteration in original), quoting *Menowitz,* 991 F.2d at 40.

There may be questions on which prudence dictates reference to the decisions of other circuits. Where, for example, as in cases transferred under the MDL process, a case will be returned to the transferor court for trial, *see Lexecon v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 40 (1998), it may make sense for the transferee court to consult the "law" of another circuit to anticipate how the trial will be conducted, and to make rulings that will facilitate such a trial.[FN7]But this principle can have little application to a matter as fundamental as subject matter jurisdiction. A federal court is oblig-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2008 WL 1827644 (S.D.N.Y.)
(Cite as: 2008 WL 1827644 (S.D.N.Y.))

ated to assure itself of its own jurisdiction, *sua sponte* if necessary, and in doing so it must apply the law as it understands it, and as it is bound by precedent. The converse of the present situation illustrates the point: if the circuit with authority over the transferor court took a broad view of a jurisdictional statute, it would be extraordinary if a transferee court should accept jurisdiction of a case, where its own considered view, after according respectful attention to the non-binding prior decision of an out-of-circuit court, was that it lacked subject matter jurisdiction, simply because some other court erroneously believed that jurisdiction was present. The same would be all the more true if the circuit court by whose precedents the transferee court was bound had authoritatively held that jurisdiction was lacking under the circumstances. In this case, it is the transferor circuit that takes the narrower view of the jurisdictional question, but the need for this Court to undertake its own inquiry of subject matter jurisdiction is no less necessary.

> FN7. The Trustee cites *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation,* a case from this district which distinguished between pretrial and trial issues and held that "in the context of class certification and other issues inherently enmeshed with the trial,""the law of the transferor circuit controls."241 F.R.D. 435, 441 (S.D.N.Y.2007), cited at P. Supp. Mem. 4. Even assuming *arguendo* that this distinction between pretrial and trial issues is correct, however, the *MTBE* court itself recognized that "pretrial issues such as whether the court has *subject matter*... jurisdiction over the action" are governed by "the law of the *transferee* circuit."*Id.* at 439 (emphasis added).

The Trustee argues that this Court must defer to the Seventh Circuit's views because, when the case is returned to the Northern District of Illinois for trial, that court will, in turn, be required to revisit the jurisdictional question, and it may then find itself obliged to remand the case in light of Seventh Circuit precedent. But it would be no more appropriate for this Court to decline to exercise jurisdiction that it believes Congress has given it, and that has been properly invoked by a litigant, because the Seventh Circuit has held to the contrary, than it would be for this Court to find no jurisdiction out of anticipation that the particular district judge to whom the case was assigned for trial might disagree with its ruling on a matter of first impression.

*6 To do so, in fact, would be imprudent as well as conceptually inappropriate. The Trustee's claim that applying the Second Circuit's jurisdictional standard would be "grossly inefficient" (P. Supp.Mem.4) rests on the inherently dubious business of forecasting the future course of litigation. And indeed, the Trustee's prediction in this case is especially dubious. Its concerns are based fundamentally on the expectation that the case will be returned to the Seventh Circuit for trial. In the real world of litigation, upwards of 95% of civil cases *never* reach trial, but are settled without a trial or otherwise resolved by the parties or the court. *See* Stephen C. Yeazell, *The Misunderstood Consequences of Modern Civil Process,* 1994 Wis. L.Rev. 631, 633 (observing that in 1990, "only 4.3% of the filed civil cases resulted in trials"); *Marc Galanter, The Hundred-Year Decline of Trials and the Thirty Years War,* 57 Stan. L.Rev. 1255, 1259 (2005) (noting that in 2003, "only 1.7% of civil terminations occurred during or after trial"). And any experienced litigator knows that complex civil litigation of this particular sort even more rarely requires trial. It is a virtual certainty not only that these matters will, at some point, settle, but that they will necessarily settle by virtue of some comprehensive resolution of all of the claims pending against defendants in this matter, the vast majority of which are pending before this Court. Moreover, if the cases do proceed to trial someday, there is hardly a guarantee that current Seventh Circuit precedent will provide the rule of decision by which the transferor court will assess its jurisdiction at the trial stage. The circuit conflict may by then be resolved

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by the Supreme Court; the Seventh Circuit may, by *en banc* decision, bring its view into line with that of the other circuits, or, by future panel decisions, refine its rule in a manner more favorable to the position of the defendants here; facts may emerge that warrant a change of venue for trial; or other litigation contingencies presently unforeseeable may in some other way alter the case. All this Court can do is to decide the issue presently before it on the strength of the arguments that appear most persuasive to it, based on the binding precedents that must shape its judgment.[FN8]

> FN8. Moreover, the Trustee's allegedly practical concern about what would happen if the Northern District of Illinois did decide to remand the case for trial is singularly unpersuasive. The Trustee argues that the parties should not be compelled to conduct discovery under federal rules if the case will be tried under state rules of procedure. It is hardly rare for parties to conduct discovery in one proceeding that will eventually be used in a trial in another matter in a different jurisdiction. The bulk of discovery is conducted for purposes of information-gathering that will not be affected by the venue or rules governing a subsequent trial. To the extent that depositions are expected to be used at trial in lieu of live testimony, it is easy enough for the depositions to be conducted in the manner necessary to meet the most conservative of potential trial rules. Indeed, in its supplemental brief, the Trustee admits as much by acknowledging that if this action were remanded, "the Trustee still has every intention of coordinating discovery with the Refco-related actions pending in this Court, but would do so under the supervision of, and pursuant to procedures approved by, the Illinois state trial court in which the action would be pending and tried."(P. Supp. 4 n. 4.) If the Trustee can conduct effective discovery even after a re-

mand to state court, there is no reason he cannot do so now.

Accordingly, notwithstanding the Trustee's contention that "Seventh Circuit law" governs this case, this Court will undertake its own independent analysis of subject matter jurisdiction, informed by the precedents of the Second Circuit, to determine whether the Trustee's claims are sufficiently "related to" the Refco bankruptcy to establish federal jurisdiction.

### 2. *"Related to" Jurisdiction*

The Removing Defendants contend that "related to" jurisdiction exists in this case because: (1) the Trustee is the "representative" of the Refco Debtors' bankruptcy estates, on whose "behalf he acts, and thus the resolution of this action, which seeks to recover more than $2 billion to distribute to the Refco Debtors' creditors, "will, most assuredly, affect those estates"; (2) defendant Grant Thornton LLP has filed a proof of claim in the Refco bankruptcy for unpaid fees, contribution, and indemnification, and "the outcome of this action will directly impact how much Grant Thornton and the other defendants will receive from the estates"; and (3) several of the defendants, who are former Refco executives, are seeking access to the Refco Debtors' directors and officers' liability insurance policies, which are treated in the Plan as property of the bankruptcy estates, to pay their defense costs. (D.Mem.2, 9-12.) The Trustee asserts that none of these grounds provides a basis for federal jurisdiction.

*7 As described above, the general test for "related to" jurisdiction under § 1334(b) examines whether the outcome of an action "might have *any conceivable effect* on the bankrupt estate."*In re Cuyahoga,* 980 F.2d at 114 (emphasis added) (internal quotation marks omitted); *see In re Pacor,* 743 F.2d at 994. Although the reach of the *Pacor* test is broad, it is not "limitless," *Celotex,* 514 U.S. at 308, and some courts have held that federal jurisdiction

Slip Copy                                                                 Page 8
Slip Copy, 2008 WL 1827644 (S.D.N.Y.)
(Cite as: 2008 WL 1827644 (S.D.N.Y.))

"shrinks once bankruptcy plan confirmation has oc-curred,"*Guccione v. Bell,* No. 06 Civ. 492, 2006 WL 2032641, at *4 (S.D.N.Y. July 20, 2006); *see In re General Media, Inc.,* 335 B.R. 66, 73 (S.D.N.Y.2005). The rationale for diminished fed-eral jurisdiction post-confirmation rests on the no-tion that a reorganized debtor is "emancipated" by confirmation and that "just like any other corpora-tion[,] it must protect its interests in the way provided by the applicable non-bankruptcy law, without any special swaddling."*In re Boston R eg'l Med. Ctr ., I nc.,* 4 10 F.3d 100, 106 (1st Cir.2005) (internal quotation marks omitted); *see In re Gener-al Media,* 335 B.R. at 73 (" 'Since the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper its activities and throw doubt upon its responsibility,' " quoting *North Am. Car Corp. v. Peerless Weighing & Vend-ing Mach. Corp.,* 143 F.2d 938, 940 (2d Cir.1944)).

Given the broad sweep of the *Pacor* test, courts have observed that

> applying the general [*Pacor* ] rule without quali-fication after the confirmation of a reorganization plan easily could result in the bankruptcy court retaining jurisdiction of all cases affecting the re-organized debtor for many years thereafter. This prospect not only would work an unwarranted ex-pansion of federal court jurisdiction but also would unfairly advantage reorganized debtors by allowing such firms to funnel virtually all litiga-tion affecting them into a single federal forum.

*In re Boston Reg'l Med. Ctr.,* 410F.3d at 106.Accordingly, numerous courts both in this and other circuits have held that "the scope of bank-ruptcy court jurisdiction diminishes with plan con-firmation."*In re Resorts Int'l, Inc.,* 372 F.3d 154, 165 (3d Cir.2004); *accord In re Pegasus Gold Corp.,* 394 F.3d 1189, 1194 (9th Cir.2005); *Guc-cione,* 2006 WL 2032641, at *4;*In re General Me-dia,* 335 B.R. at 73.

The First Circuit, however, has distinguished, between reorganization plans and liquidation plans, holding that in the latter scenario,

> when a debtor (or a trustee acting to the debtor's behoof) commences litigation designed to mar-shal the debtor's assets for the benefit of its cred-itors pursuant to a *liquidating* plan of reorganiza-tion, the compass of related to jurisdiction per-sists undiminished after plan confirmation.

*8 *In re Boston Reg'l Med. Ctr.,* 410 F.3d at 107 (emphasis added). In a liquidation plan, "the reor-ganized debtor's sole purpose is to wind up its af-fairs, convert its assets to cash, and pay creditors a pro rata dividend."*Id.* at 106.Accordingly, the First Circuit has reasoned that "there is much less reason to depart from the general [*Pacor* ] rule for related to jurisdiction" when the plan at issue is a liquidat-ing plan because "the specter of endless bankruptcy jurisdiction and a kindred concern about unfairly advantaging reorganized debtors" does not exist. *Id.*

This case, which involves a liquidation plan, well illustrates the force of the First Circuit's distinction. The plaintiff here is not a reorganized corporation that has put its debts behind it, but a Trustee whose function is virtually indistinguishable from that of the bankruptcy estate itself: to gather the assets of a defunct debtor for distribution to its creditors. *See* Kirschner Decl. Ex. B § 5.7(b) (providing that "the Litigation Trustee shall be a representative of the Estates ... with respect to the Contributed Claims"); *id.*Ex. C ¶ 23 (specifying that the Contributed Claims "shall be deemed asserted on behalf of each applicable Estate holding such claim immediately prior to contribution," and that the Litigation Trust-ee "shall be deemed the successor-in-interest to each of the Contributing Debtors"). To permit this litigation to escape the usual test of federal jurisdic-tion would further none of the purposes underlying a more restrictive jurisdictional test in post-confirmation cases. Rather, it would permit credit-ors, through the vehicle of a post-confirmation litig-ation trust, to pursue potential assets in fragmented litigation, undermining the goal of unified adminis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tration of bankruptcy cases.

Several courts in this circuit have cited the First Circuit's approach approvingly, *see, e.g., In re Cross Media Mktg. Corp.,* 367 B.R. 435, 444 (Bankr.S.D.N.Y.2007); *In re Agway, Inc.,* Adv. Pro. No. 04-80269, slip op. at 7-8 (Bankr.N.D.N.Y. Mar. 6, 2006); *In re General Media,* 335 B.R. at 73 n. 7, but the Second Circuit has not yet addressed the issue squarely. Although the First Circuit's reasoning is persuasive, it is unnecessary for the resolution of this case to adopt its distinction between reorganization and liquidation plans because, even if federal jurisdiction is diminished post-confirmation, the Trustee's claims here are nevertheless still sufficiently "related to" the Refco bankruptcy to support jurisdiction.

According to the line of decisions holding that federal jurisdiction shrinks post-confirmation,

a party invoking the bankruptcy court's post-confirmation jurisdiction must satisfy two requirements. First, the matter must have a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution or administration of the confirmed plan and second, the plan must provide for the retention of jurisdiction over the dispute.

*9 *In re Kassover,* 336 B.R. 74, 79 (S.D.N.Y.2006); *see Guccione,* 2006 WL 2032641, at *4;*In re General Media,* 335 B.R. at 73;*see also In re Resorts,* 372 F.3d at 168-69. In this case, both requirements for post-confirmation jurisdiction are satisfied. With regard to the "retention of jurisdiction" requirement, it is undisputed that the Plan expressly preserves jurisdiction over any "causes of action by or on behalf of ... the Litigation Trustee."(Kirschner Decl. Ex. B § 11.1(k)). This action, moreover, clearly shares a "close nexus" to the Refco bankruptcy as the claims asserted in this case do not "belong[ ] to the litigation trust personally,"*In re Premium Escrow Servs., Inc.,* 342 B.R. 390, 399 (Bankr.D.Colo.2006), but rather, are precisely those

causes of action that were transferred by the Refco Debtors to the Litigation Trust pursuant to the Plan and the Litigation Trust Agreement. Accordingly, the "implementation" and "execution" of the confirmed Plan are directly at issue as the very claims being prosecuted by the Trustee "arise under the Plan." *In re General Media,* 335 B.R. at 73, 75;*see In re Agway,* slip op. at 9 (finding "sufficient nexus" for "related to" jurisdiction where, *inter alia,*"the Liquidating Trust was given the power to prosecute the action under the terms of the Debtor's Plan"). Any funds recovered by the Trustee in this case will be distributed to Refco's general unsecured creditors, thus further evidencing the "close nexus" between the Trustee's claims and the bankruptcy proceeding. *See In re Railworks Corp.,* 325 B .R. 709, 723 (Bankr.D.Md.2005) (finding that "the implementation of the payment of unsecured creditors through claims prosecuted by the Litigation Trustee is precisely at issue, and falls squarely in the realm of limited jurisdiction that a bankruptcy court may hear"); *see also In re Tyson,* No. 03-41900, 2007 WL 2379624, at *3 (Bankr.S.D.N.Y. Aug. 17, 2007); *In re Boston Reg'l Med. Ctr.,* 410 F.3d at 107;*In re AstroPower Liquidating Trust,* 335 B.R. 309, 325 (Bankr.Del.2005).

The Trustee nevertheless contends that "related to" jurisdiction does not exist because, upon confirmation of the Plan, the Refco Debtors irrevocably assigned all of their causes of action to the Litigation Trust. As a result, any recovery of funds will be distributed directly to the Litigation Trust Beneficiaries, not to the Refco Debtors, and thus adjudication of the claims cannot affect the Refco Debtors' estates. The Trustee's arguments, however, are premised on the Seventh Circuit's narrower standard for "related to" jurisdiction, which, as explained above, does not control here.[FN9]In contrast to the Seventh Circuit's approach, which considers only whether a dispute "affects the amount of property for distribution [*i.e.,* the debtor's estate] or the allocation of property among creditors,"*In re FedPak Sys.,* 80 F.3d at 213-14 (alteration in original)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                      Page 10
Slip Copy, 2008 WL 1827644 (S.D.N.Y.)
(Cite as: 2008 WL 1827644 (S.D.N.Y.))

(internal quotation marks omitted), the applicable test in this case is significantly broader, examining whether the action has "a close nexus to the bankruptcy plan or proceeding,"*In re Kassover*, 336 B.R. at 79;*see Celotex*, 514 U.S. at 308 (observing that "related to" jurisdiction encompasses "more than simple proceedings involving the property of the debtor or the estate").

> FN9. The Trustee's citation to two decisions by the bankruptcy court for the Northern District of Illinois, *see In re Commercial Loan Corp.*, 363 B.R. 559 (Bankr.N.D.Ill.2007); *In re Federalpha Steel LLC*, 341 B.R. 872 (Bankr.N.D.Ill.2006), are thus inapposite because both decisions applied the Seventh Circuit's narrower standard for "related to" jurisdiction.

*10 Even accepting as true the Trustee's contention that no property of the Refco Debtors' estates will be affected by this action, that fact alone is not dispositive of the jurisdictional inquiry. As described above, the Trustee's claims in this case are precisely those that were transferred to it by the Refco Debtors pursuant to the Plan and the Litigation Trust Agreement. The Trustee's claims thus "arise under the Plan," and prosecution of this action directly implicates the "implementation" and "execution" of the "confirmed plan [and] incorporated litigation trust agreement."*In re General Media*, 335 B.R. at 73, 75 (internal quotation marks omitted). Under the governing legal standard, these facts are sufficient to establish the "close nexus" required for post-confirmation jurisdiction.

The Court's exercise of jurisdiction in this case, moreover, is entirely consistent with Congress's intent in enacting § 1344(b) "to grant *comprehensive* jurisdiction to the bankruptcy courts so that they might deal *efficiently and expeditiously with all matters* connected with the bankruptcy estate."*Celotex*, 5 14 U.S. at 308 ( emphasis added) (internal quotation marks omitted); *see In re Boston Reg'l Med. Ctr.*, 410 F.3d at 105 ("Congress delib-

erately allowed the cession of wide-ranging jurisdiction to the bankruptcy courts to enable them to deal efficiently and effectively with the *entire universe of matters* connected with bankruptcy estates."(emphasis added)). The efficiency gains that result from asserting jurisdiction in this case are particularly striking in light of the multitude of other Refco-related actions currently pending before this Court, many of which involve many of the same parties and arise out of the same set of facts as those described in the Trustee's complaint.

In addition, as a practical matter, adopting the Trustee's position would effectively extinguish federal jurisdiction in all cases where a litigation trustee prosecutes claims specifically assigned to it by a confirmed bankruptcy plan. *See In re LGI, Inc .*, 322 B.R. 95, 104 (Bankr.D.N.J.2005) (noting that "[d]efendants' overstated position would recharacterize the nature of a post-confirmation trust litigation so that every post-confirmation trust case would fail the 'close nexus' test by virtue of having an identity separate from the debtor's estate"). The legitimate function of a litigation trust is not to serve as a vehicle for escaping federal jurisdiction, but rather, to "allow a Chapter 11 debtor to focus preconfirmation on the more pressing needs of its reorganization or liquidation while deferring issues regarding ... causes of action ... until after confirmation of its plan."Andrew M. Thau *et al., Postconfirmation Liquidation Vehicles (Including Liquidating Trusts and Postconfirmation Estates): An Overview,* 16 J. Bankr.L. & Prac. 201, 204 (April 2007); *see id.* at 205 (noting that post-confirmation liquidation vehicles such as litigation trusts "serve to enable confirmation notwithstanding that certain matters remain[ ] unsettled," including "the litigation of claims and/or the recovery ... of all of the debtor's ... causes of action"); *In re Resorts,* 372 F.3d at 169 ( observing that the "Litigation Trust was created in part so that the Plan could be confirmed and the debtor freed from bankruptcy court oversight without waiting for the resolution of the litigation claims"). It is not at all surprising, then, that courts in both this and other circuits have recognized, con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 11

trary to the Trustee's position, that "[l]itigation trusts, which serve a valid purpose in the bankruptcy process, may continue long after a reorganization plan has been confirmed and the debtor has emerged from bankruptcy[,][a]nd yet bankruptcy jurisdiction may still obtain if there is sufficient connection to the bankruptcy."*In re Resorts,* 372 F.3d at 164;*accord In re AstroPower Liquidating Trust* 335 B.R. at 325;*In re Railworks Corp.,* 325 B.R. at 723;*Rahl v. Bande,* 316 B.R. 127, 134 (S.D.N.Y.2004).

**\*11** In sum, even assuming *arguendo* that federal jurisdiction diminishes post-confirmation, the existence of a "close nexus" between the Trustee's claims and the Refco bankruptcy, coupled with the Plan's express retention of jurisdiction over those claims, suffices to establish "related to" jurisdiction in this case.[FN10]Accordingly, the Trustee's motion to remand on the ground of lack of subject matter jurisdiction must be denied.

> FN10. Accordingly, the Court need not address the Removing Defendants' alternative arguments for jurisdiction.

## II. Abstention

### A. *Mandatory Abstention*

The Trustee asserts that even if subject matter jurisdiction exists, abstention is required by 28 U.S.C. § 1334(c)(2).Section 1334(c)(2) provides, in relevant part:

> [u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court *shall abstain* from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2) (emphasis added). A party seeking mandatory abstention under § 1334(c)(2) thus must demonstrate that:

> (1) the motion to abstain was timely; (2) the action is based on a state law claim; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) Section 1334 provides the sole basis for federal jurisdiction; (5) an action is commenced in state court; [and] (6) that action can be "timely adjudicated" in state court.

*In re Worldcom,* 293 B.R. at 331. "A party is not entitled to mandatory abstention if it fails to prove any one of the statutory requirements."*Id.; see Mt. McKinley Ins. Co. v. Corning Inc.,* 399 F.3d 436, 446-47 (2d Cir.2005) (holding that mandatory abstention can be applied in a case that has already been removed from state court).

In this case, mandatory abstention is not warranted because, as the Removing Defendants correctly contend, the Trustee has not met its burden of proving that its claims can be "timely adjudicated" in Illinois state court. 28 U.S.C. § 1334(c)(2). The Trustee relies on the declaration of a former judge of the Cook County Circuit Court, who states that it is his "impression that cases assigned to the commercial calendar are, by and large, handled efficiently and expeditiously."(Schiller Decl. ¶ 9.) The Trustee also presents statistics showing that in recent years, the average time to trial in Cook County has dropped significantly and cites a case from this district which purportedly found that the average "time from filing to date of trial in the Cook County courts was only longer than the comparable period in the Northern District of Illinois by a matter of months."(P. Reply Mem. 13, quoting *Bondi v. Grant Thornton Int'l,* 322 B.R. 44, 50 (S.D.N.Y.2005)).

**\*12** As the *Bondi* court itself recognized, however, "[t]hese statistics ... do not tell the whole story."322 B.R. at 50. Whatever might be true in the general run of cases filed in Illinois state court, this action is clearly distinguishable, constituting "but one

piece of a much larger, extremely complex litiga-tion puzzle."*Id.* As this Court has explained:

[Section] 1334(c)(2) is intended to require federal courts to defer to the state courts to handle law-suits which, although "related to" a bankruptcy, can be promptly resolved in state court without interfering with the proceedings pending in the federal courts. That intention simply has no ap-plication to litigation of this sort, in which a case properly removed to federal court is intertwined both with complex bankruptcy proceedings and equally complex securities class actions pending in federal court.

*In re Global Crossing, Ltd. Sec. Litig.,* 311 B.R. 345, 349 (S.D.N.Y.2003); *see Bondi,* 322 B.R. at 50;*In re WorldCom,* 293 B.R. at 331. Indeed, far from promoting "timely adjudicat[ion]" of the Trustee's claims, to remand this action to the Illinois state court "would simply complicate and slow down the resolution of those claims, as well as of the matters already pending before this Court."*In re Global Crossing,* 311 B.R. at 349 (alteration in original). For these reasons, mandatory abstention pursuant to § 1334(c)(2) is clearly unwarranted.

### B. *Discretionary Abstention*

Neither is discretionary abstention appropriate. Sec-tion 1334(c) (1) provides that "[n]othing in this sec-tion prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hear-ing a particular proceeding ... related to a case un-der title 11."28 U.S.C. § 1334(c)(1). Federal courts, however, must be "sparing" in their exercise of dis-cretionary abstention, *Winstar Holdings, LLC v. Blackstone Group L.P.,* No. 07 Civ. 4634, 2007 WL 4323003, at *5 (S.D.N.Y. Dec. 10, 2007), because they possess a "virtually unflagging obligation ... to exercise the jurisdiction given them,"*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976); *see id.* at 813 (observing that federal courts may abstain only for a few

"extraordinary and narrow exception[s]"). Relevant considerations in determining whether to abstain pursuant to § 1334(c)(1) include "comity and feder-alism, judicial economy, and efficiency."*In re Worldcom,* 293 B.R. at 332.

In this case, "there is little basis to invoke comity to the state courts, and every reason to invoke ... fed-eral jurisdiction."*Winstar,* 2007 WL 4323003, at *5. Although the Trustee's claims are based entirely on Illinois state law, the state law claims are straightforward common-law claims that do not in-volve arcane or idiosyncratic provisions of state law that would "warrant abstention based on comity concerns."*In re Worldcom,* 293 B.R. at 332;*see Rahl,* 316 B.R. at 135. As the case was promptly re-moved, moreover, Illinois state courts have inves-ted little or no time in the case. *See Winstar,* 2007 WL 4323003, at *5. This action also shares a close relationship with the Refco bankruptcy proceeding as the claims being prosecuted by the Trustee are the very causes of action that were assigned to it by the Refco Debtors pursuant to the confirmed Plan. *See supra* at 17-21.Finally, as Judge Cote astutely observed in a substantially similar case:

*13 it is beyond cavil that judicial economy and efficiency are best served by exercising the juris-diction that so clearly exists. The MDL panel has consolidated scores of cases before this Court to promote the expeditious and efficient resolution of the claims arising from the collapse of World-Com. The litigation is proceeding apace. Motions to remand ... and to dismiss have been fully briefed, and ... important discovery issues ad-dressed. With the consolidation of the litigation in one court, the motion practice and discovery process can be managed to protect the rights of all parties and to preserve, to the extent possible, the maximum amount of assets for recovery by plaintiffs with meritorious claims.

*In re Worldcom.* 293 B.R. at 333. Given the "scores" of other Refco-related actions consolidated by the MDL Panel and currently pending before this Court, the Trustee has advanced no persuasive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reason why a different outcome should result here. *Id.* Accordingly, the Trustee's request for discretionary abstention under § 1334(c)(1) must be denied.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to remand, or in the alternative, to abstain, is denied.

SO ORDERED.

S.D.N.Y.,2008.
In re Refco, Inc. Securities Litigation
Slip Copy, 2008 WL 1827644 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                    Page 1
Slip Copy, 19 Misc.3d 1106(A), 2008 WL 746540 (N.Y.Sup.), Blue Sky L. Rep. P 74,695, 2008 N.Y. Slip Op.
50571(U)
(Cite as: 2008 WL 746540 (N.Y.Sup.))

C

Jana Master Fund, Ltd. v. JPMorgan Chase & Co.
N.Y.Sup.,2008.
NOTE: THIS OPINION WILL NOT BE PUB-
LISHED IN A PRINTED VOLUME. THE DIS-
POSITION WILL APPEAR IN A REPORTER TA-
BLE.
    Supreme Court, New York County, New York.
  JANA MASTER FUND, Ltd., Jana Piranha Master
  Fund, Ltd., Springfield Associates LLC, and Kens-
    ington International Limited, Plaintiffs,
                      v.
    JPMORGAN CHASE & CO., Damian Berry,
  Christopher Janes, Terry Martin, and Chase Secur-
             ities, Inc., Defendants.
                No. 604005/06.

              March 12, 2008.

Quinn Emanuel Urquhart Oliver & Hedges, LLP by
Peter E. Calamari, Esq., New York, for Plaintiff.
Winston & Strawn LLP by David E. Mollon, Esq.,
Ruth A Braun, Esq., New York, for Defendants.
BERNARD J. FRIED, J.
*1 This action is before me in connection with de-
fendant Christopher Janes' motion to dismiss for
lack of personal jurisdiction, motion sequence
No.004, and the combined defendants' motion to
dismiss for failure to state a cause of action, and
based on plaintiffs' lack of standing, motion se-
quence # 005.

Motion sequences # 004 and # 005 are consolidated
for disposition.

Plaintiffs (collectively, Jana Funds), a group of four
hedge funds that specialize in buying up debt secur-
ities of financially distressed or insolvent issuers,
are known in the trade as "vulture funds." See
Gryphon Domestic VI, LLC v. APP Intl. Finance
Co., B .V., 41 A.D.3d 25, 836 N.Y.S.2d 4 (1st Dept
2007). Three of the plaintiff funds are Cayman Is-
lands exempted companies. The fourth fund is a
Delaware limited liability corporation. All four

funds have their principal place of business in New
York. After these funds acquire distressed assets,
plaintiffs then sue "deep-pocket" defendants in or-
der to recover a better return on their investment
than the one that they bargained for at the time the
securities were purchased at distressed prices.

This action appears to have been commenced by
these vulture funds in furtherance of this type of ag-
gressive, high-stakes, winner-take-all litigation
strategy.The complaint alleges that Jana Funds ac-
quired ownership of a series of notes that had been
issued by Sons of Gwalia (Gwalia), an Australian
mining company, after Gwalia had entered into
bankruptcy. Jana Funds did not purchase these
notes directly from Gwalia, but, rather, from third
parties who had originally invested in Gwalia, and
who then sold the notes to Jana Funds at rates far
below their original value.

Jana Funds alleges that defendants are related to
Gwalia's original lender on the notes: JPMorgan
Chase & Co. (Chase), formerly known as The
Chase Manhattan Corporation (Chase Corporation),
is alleged to have directed its subsidiary, Chase Se-
curities, Inc. (Chase Securities) to conduct two
private placements in the United States totaling
$170 million in senior Gwalia notes. The first
private placement is alleged to have occurred in
November 2000, in the total amount of $120 mil-
lion. The second private placement is alleged to
have occurred in January 2002, resulting in the
placement of notes totaling $50 million.

The record contains the following relevant facts:
Gwalia was a corporation chartered under the laws
of Australia and based in Perth, Australia. Its busi-
ness consisted of mining gold and industrial miner-
als from several mines in Western Australia.
Gwalia allegedly obtained commercial loans from a
non-party lender, which eventually became Chase,
the defendant in this action. Chase is also alleged to
have entered into some derivative contracts with
Gwalia that hedged the delivery of gold or U.S. dol-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 19 Misc.3d 1106(A), 2008 WL 746540 (N.Y.Sup.), Blue Sky L. Rep. P 74,695, 2008 N.Y. Slip Op.
50571(U)
(Cite as: 2008 WL 746540 (N.Y.Sup.))

lars. The individual defendants, Damian Berry (Berry) and Christopher Janes (Janes), are alleged to have been employees of an affiliate of non-party Chase Bank, beginning in 1998.

*2 The individual defendant Terry Martin (Martin) is alleged to have been the managing director of Chase Securities, and to have been primarily responsible for the promotion and sale of the notes in issue.

The complaint alleges five causes of action, in fraud, negligent misrepresentation, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and civil conspiracy. Jana Funds seek the amount due and outstanding on the notes and the note purchase agreements, plus unspecified compensatory damages allegedly incurred, not by these plaintiffs, but by the original purchasers of the Gwalia notes, and punitive damages.

In the complaint, the Chase subsidiary, defendant Chase Securities, is alleged to have conducted the private placements while having actual knowledge that Gwalia had undisclosed contingent liabilities in excess of $443 million, and to have prepared a private placement memorandum (PPM) for each of the two private placements. It is these PPMs which form the crux of the Jana Funds' lawsuit.

The text of the PPMs are referenced in the complaint, and attached as an exhibit to the defendants' moving papers.

The record shows that each PPM contained a disclaimer which admonished potential investors against relying on statements, financial projections or other forecasts made by the placement agent or its representatives, and disclaimed liability from any third parties' reliance on such statements. Additional disclaimer language stated:

The securities are being offered only to a limited number of institutional accredited investors that are willing and able to conduct an independent investigation of the risks associated with

ownership of the securities. By accepting delivery of this memorandum, prospective investors will be deemed to have acknowledged the need to conduct their own thorough investigation of the company and to exercise their own due diligence before considering an investment in the securit- ies.

Affirmation of Ruth A. Braun dated July 19, 2007, exh.s B and C, referenced at

Complaint, ¶¶ 61 and 108.

Despite this strong cautionary language, Jana Funds alleges that certain original note purchasers, from whom Jana Funds purchased, relied upon the PPMs, and were injured by alleged misrepresentations and omissions in the disclosures in that document.

Jana Funds alleges that Gwalia had entered into gold hedging contracts, called "indexed put options" (IGPOs); that Gwalia had restructured its foreign currency hedging contracts; and that Gwalia's chief financial officer had been terminated for engaging in unauthorized treasury trading. This misconduct is alleged to have led to Gwalia filing for bankruptcy in 2004 (several years after the two PPMs had been issued, in 2000 and 2002). Plaintiffs also allege that Gwalia was operating in an insolvent condition as early as 2000.

In support of the defendants' motion to dismiss the complaint, defendants claim that plaintiffs lack standing to prosecute the instant claims because they have failed to properly allege standing with sufficient particularity."Whether a person seeking relief is a proper party to request an adjudication is an aspect of justiciability which must be considered at the outset of any litigation."*Matter of Dairylea Coop. v. Walkley,* 38 N.Y.2d 6, 9, 377 N.Y.S.2d 451, 339 N.E.2d 865 (1975).

*3 Standing to sue requires an interest in the lawsuit that the law will recognize as a sufficient predicate for determining the issue. *Caprer v. Nussbaum,* 36 A.D.3d 176, 825 N.Y.S.2d 55 (2nd Dept

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 19 Misc.3d 1106(A), 2008 WL 746540 (N.Y.Sup.), Blue Sky L. Rep. P 74,695, 2008 N.Y. Slip Op.
50571(U)
(Cite as: 2008 WL 746540 (N.Y.Sup.))

2006). The relevant inquiry is whether the plaintiffs' status in relation to each asserted claim permits them to present some or all of their grievances for judicial review. *Id.* Plaintiffs may not proceed in the absence of standing, since standing goes to the jurisdictional basis of a court's authority to adjudicate a dispute. *See Stark v. Goldberg,* 297 A.D.2d 203, 204, 746 N.Y.S.2d 280, (1st Dept 2002).

Plaintiffs have allegations are sufficient to support their relationship to each of the asserted claims, for purposes of this motion to dismiss, by alleging that they obtained Gwalia notes through assignments from original owners, and they identify the original owners in the complaint (cf. *Bluebird Paratners, L.P. v. First Fidelity Bank, N.A.,* 97 N.Y.2d 456 [2002] ). This satisfies the requirement for pleading a relationship to the claims asserted. Although defendants would place a burden of pleading standing with the same particularity that is required for a fraud claim, neither the CPLR, nor any of the cases cited by defendants imposes such a high burden of pleading on plaintiffs. The fact that plaintiffs have not alleged that the assignments were executed in accordance with New York law, and that other states may have regulations which prohibit the assignments in issue, has no bearing on the issue of standing.

The cases cited by defendants to support a finding of lack of standing arose in disputes involving the statutory automatic assignment of bonds, under General Obligations Law § 13-107. *See Racepoint Partners, LLC v. JPMorgan Chase Bank,* 2006 U.S. Dist LEXIS 78046, 2006 WL 3044416, (S.D.N.Y.2006); *Semi-Tech Litig., LLC v. Bankers Trust Co.,* 272 F Supp2d 319, 330 (S.D.N.Y.2003). These cases are not directly applicable to the contractual assignment of notes at issue here. Gwalia's notes were not traded on an open market, and were not governed by a deed of trust.

That branch of the motion which seeks dismissal of the complaint based on plaintiffs' lack of standing is denied. However, the complaint fails to state a

cause of action, and it is this issue which is dispositive of this lawsuit.

On a motion to dismiss for failure to state a cause of action, every fact alleged must be assumed to be true, and the complaint is to be liberally construed. *M. Sobol, Inc. v. Goldman,* 259 A.D.2d 526, 686 N.Y.S.2d 477 (2nd Dept 1999). A complaint should not be dismissed so long as a cause of action exists. *Id.*

The material elements which must be alleged to sufficiently plead a claim of fraud are allegations of defendants' misrepresentation of a material fact, falsity of that misrepresentation, the defendants' scienter, the plaintiffs justifiable reliance on the misrepresentation, and plaintiffs injury occasioned by the misrepresentation. *Small v. Lorillard Tobacco Co.,* 9 4 N.Y.2d 43, 57, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999).

*4 A claim of aiding and abetting fraud requires all of the allegations of a claim for fraud, with the additional allegation of a fiduciary duty owed by defendant(s) to plaintiff(s).

Where liability for fraud is to be extended beyond the principal actors, to those who, although not participants in the fraudulent scheme, are said to have aided in and encouraged its commission, it is especially important that the command of CPLR 3016(b) be strictly adhered to.

*National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 149, 511 N.Y.S.2d 626 (1st Dept 1987).

Because reasonable reliance upon a misrepresentation is an essential element of a cause of action for fraud, it must always be pleaded with "sufficient specificity." *Goldstein v. CIBC World Mkts. Corp.,* 6 A.D.3d 295, 296, 776 N.Y.S.2d 12 (1st Dept 2004).

Due to the "more stringent standard of pleading" imposed by CPLR 3016(b), conclusory allegations fail to satisfy the statutory requirement of pleading

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 19 Misc.3d 1106(A), 2008 WL 746540 (N.Y.Sup.), Blue Sky L. Rep. P 74,695, 2008 N.Y. Slip Op.
50571(U)
(Cite as: 2008 WL 746540 (N.Y.Sup.))

with specificity. *Megaris Furs, Inc. v. Gimbel Bros., Inc.,* 172 A.D.2d 209, 210, 568 N.Y.S.2d 581 (1st Dept 1991) (citation omitted).

The complaint summarizes categories of misrepresentations allegedly made by Chase in the PPM, including: a representation in the PPM that Gwalia's hedging in the gold market amounted to "classic hedging," when it is alleged that Gwalia engaged in unreasonable and highly risky speculation in gold; a characterization, in the PPM, of foreign exchange fund hedge contracts as insurance against the risk of adverse currency movements, when it is alleged that Gwalia was placing speculative bets on future currency exchange rates; and a characterization in the PPM that Gwalia was involved in off-balance sheet risk in the normal course of business, when it is alleged that Gwalia's CFO was engaged in unauthorized trading activities for which he was ultimately fired.

The allegations of defendants' scienter may be found in paragraph 58-61 of the Complaint:

As part of its scheme to squeeze every penny from [Gwalia] while reducing its exposure to the failing company, Chase directed its subsidiary, Chase Securities, to assist Gwalia in raising capital through a private placement of senior notes to U.S. institutional investors.... In order to induce potential U.S. investors to purchase the notes, Chase Securities knowingly and fraudulently misrepresented the true state of affairs at [Gwalia]....

With respect to reasonable reliance, plaintiffs alleged that the language of the PPMs, the road show presentations, and various other "conversations and correspondence with prospective purchasers" consisted of intentional misrepresentations. However, nowhere do plaintiffs particularize the reasonableness of any purchaser's reliance on anything said or communicated by defendants, other than in these generalized allegations of reasonable reliance.

All of these allegations have been pleaded in a conclusory fashion. The plaintiffs' failure to allege any

of the terms or details of Jana Funds' alleged purchases of Gwalia's notes from the original purchasers of those notes, their failure to specify the details of the alleged fraud by either on information and belief, or by someone with personal knowledge of the facts, the failure to sufficiently allege a confidential, fiduciary, or special relationship between the defendants and the original note purchasers, all constitute substantial omissions in pleading the first and third causes of action. The claims for fraud, and for aiding and abetting fraud, found in the first and third causes of action are, therefore, dismissed.

*5 A claim for negligent misrepresentation requires allegations that defendant owed plaintiffs a duty of reasonable care in supplying information to them; that the representations made were false; and that the plaintiffs reasonably relied on the information to their detriment. *Heard v. City of New York,* 82 N.Y.2d 66, 74, 603 N.Y.S.2d 414, 623 N.E.2d 541 (1993).

"[t]he relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care."

*Id.,* at 74, 603 N.Y.S.2d 414, 623 N.E.2d 541 (citation omitted).

Although plaintiffs have pleaded a duty of care owed to the original purchasers, these allegations are entirely conclusory as they are based on plaintiffs' conjecture as to what the relationship was between the original purchasers and defendants when the PPMs were issued. The express language of the PPM admonished potential investors against relying on statements, financial projections or other forecasts made by the placement agent or its representatives, and disclaimed liability from any third parties' reliance on such statements.

The PPMs are referred to in the complaint, and their provisions, even when read in the light most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 5
Slip Copy, 19 Misc.3d 1106(A), 2008 WL 746540 (N.Y.Sup.), Blue Sky L. Rep. P 74,695, 2008 N.Y. Slip Op.
50571(U)
(Cite as: 2008 WL 746540 (N.Y.Sup.))

favorable to plaintiffs, directly contradict the conclusory claims of a duty owed to the original purchasers. The second cause of action, for negligent misrepresentation is, therefore, dismissed.

The claim for aiding and abetting breach of fiduciary duty requires allegations of a breach of fiduciary obligations to another, that the defendant knowingly induced or participated in the breach, and, that the plaintiff suffered damage as a result of the breach, must be dismissed based on the conclusory nature of the pleadings. *See Kaufman v. Cohen,* 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dept 2003). This claim is also dismissed, since plaintiffs' failures with respect to pleading the existence of a fiduciary duty, are equally fatal to this claim.

The Martin Act, New York General Business Law Art. 23-A, § 352, et seq., provides a further ground for dismissal of the claims for negligent misrepresentation and aiding and abetting breach of fiduciary duty. The Martin Act prohibits various deceitful practices in the distribution, exchange, sale and purchase of securities which do not involve proof of scienter, and confers exclusive jurisdiction on the state's Attorney General to regulate and enforce its provisions. GBL § 352-c (1). There is no implied private right of action under the Martin Act. *CPC Intl. Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987); *Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs.,* 191 A.D.2d 621, 595 N.Y.S.2d 492 (2nd Dept 1993). Thus, the Act bars private common-law claims where the facts alleged would provide the Attorney General with grounds for instituting an action. *See Keh Ksin Shen v. Astoria Fed. Sav. & Loan,* 295 A.D.2d 319, 744 N.Y.S.2d 336 (2d Dept 2002).

Claims for negligent misrepresentation and breach of fiduciary duty in connection with the purchase and sale of securities have been found to be barred by the Martin Act. *See Horn v. 440 East 57th Co.,* 151 A.D.2d 112, 547 N.Y.S.2d 1 (1st Dept 1989). Here, the claims for negligent misrepresentation and aiding and abetting breach of fiduciary duty al-

lege that the defendants negligently misrepresented and concealed material from unspecified original note purchasers regarding Gwalia's true financial condition, inducing the note purchasers to enter into the purchases, and that defendants facilitated the issuance of the notes even though they knew the true state of Gwalia's finances. These claims clearly fall within the purview of the Martin Act, and are, therefore, dismissed.

*6 Civil conspiracy claims are only permitted to proceed in New York for the limited purpose of connecting the actions of separate defendants with an otherwise actionable tort, and to show that those acts flowed from a common scheme or plan. *American Baptist Churches of Metropolitan New York v. Galloway,* 271 A.D.2d 92, 710 N.Y.S.2d 12 (1st Dept 2000). Here, the plaintiffs have alleged that all of the defendants participated in the underlying torts, and the claim for civil conspiracy is merely repetitive of those other causes of action and must be dismissed. *See Blue Cross & Blue Shield of Western New York, Inc. v. Preferred Assurance Co.,* 212 A.D.2d 888, 622 N.Y.S.2d 368 (3d Dept 1995).

Defendant Janes's motion to dismiss is denied, as moot. Accordingly, it is ordered

ORDERED that motion sequence # 004 is denied, as moot; and it is further

ORDERED that motion sequence # 005 is granted, and the complaint is dismissed, with prejudice; and it is further

ORDERED that the motion to dismiss is granted and the complaint is dismissed with costs and disbursements to defendant as taxed by the Clerk of the Court; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

N.Y.Sup.,2008.
Jana Master Fund, Ltd. v. JPMorgan Chase & Co.
Slip Copy, 19 Misc.3d 1106(A), 2008 WL 746540 (N.Y.Sup.), Blue Sky L. Rep. P 74,695, 2008 N.Y.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6
Slip Copy, 19 Misc.3d 1106(A), 2008 WL 746540 (N.Y.Sup.), Blue Sky L. Rep. P 74,695, 2008 N.Y. Slip Op.
50571(U)
**(Cite as: 2008 WL 746540 (N.Y.Sup.))**

Slip Op. 50571(U)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                      Page 1
Slip Copy, 2007 WL 704033 (S.D.N.Y.)
(Cite as: 2007 WL 704033 (S.D.N.Y.))

**H**
Lee v. Marsh & McLennan Companies, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Frank A. LEE, Jr., et al., Plaintiffs
v.
MARSH & MCLENNAN COMPANIES, INC., et
al., Defendants.
No. 06 Civ. 6523(SWK), 06 Civ. 15448(SWK).

March 7, 2007.

*OPINION AND ORDER*

KRAM, J.
*1 This litigation was initiated in the Supreme
Court of New York, Nassau County, and removed
to federal court under the Securities Litigation Uni-
form Standards Act of 1998 ("SLUSA") by the de-
fendants, Marsh & McLennan Companies, Inc.
("MMC"), Marsh, Inc., and MMC's CEO, Jeffrey
Greenberg (together, "Defendants"). The Court
now has before it a motion to remand brought by
the plaintiffs-members of the Lee family and vari-
ous trusts, corporations, and partnerships owned
and controlled by them (collectively, "Plaintiffs").
For the reasons that follow, the Court grants
Plaintiffs' motion in its entirety.

I. BACKGROUND

Plaintiffs filed three actions in the Supreme Court
of New York, Nassau County, each of which al-
leges the same basic claims. To wit, these actions
advance claims under the laws of New York state,
alleging that Plaintiffs refrained from selling their
equity position in MMC due to Defendants' false
and misleading statements. Although Plaintiffs'
three actions contain largely identical claims and
supporting allegations, each names a different num-
ber of plaintiffs. As SLUSA only applies to actions
brought on behalf of more than 50 persons, *see*15

U.S.C. § 77p(f)(2)(A)(i)(I) & (ii), the discrepancy
in the number of persons named in Plaintiffs' three
actions has engendered sharp controversy over
SLUSA's applicability to this litigation.

Plaintiffs' first action was brought on September 27,
2005, on behalf of fifty-eight [FN1] persons (the
"First Action"). On November 4, 2005, Defendants
removed the First Action to the Eastern District of
New York, pursuant to 28 U.S.C. § 1441(b) and
SLUSA, 15 U.S.C. §§ 77p(c) and 78bb(f)(2).
Shortly thereafter, Plaintiffs moved to remand the
First Action to state court on the grounds that
SLUSA did not cover "holder actions" such as
theirs. Moreover, Plaintiffs stated that they intended
to file an amended complaint, modifying the cap-
tion in the First Action to clarify that they were
fewer than fifty-one in number, thus providing an
additional ground for SLUSA's inapplicability. On
April 18, 2006, the Judicial Panel on Multidistrict
Litigation transferred the First Action to this Court
for coordinated and consolidated treatment with
other actions pending here. Rather than press the
claim that theirs was a holder action not covered by
SLUSA, or amend the caption to clarify their num-
ber, Plaintiffs voluntarily dismissed the First Action
on June 6, 2006.

> FN1. Throughout this Opinion, the Court
> calculates the number of persons on behalf
> of whom actions were brought by referring
> to the names listed in the captions of these
> actions.

Ten days later, Plaintiffs filed a second action in
the Supreme Court, Nassau County, this time on be-
half of only thirty-three persons (the "Second Ac-
tion"). The Second Action was removed to the
Eastern District on July 19, 2006, under 28 U.S.C.
§ 1441(b) and SLUSA, and transferred to this Court
on August 8, 2006. Plaintiffs moved to remand on
August 18, 2006, contending, among other things,
that their action was outside SLUSA's scope be-
cause it was a holder action and because it was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 704033 (S.D.N.Y.)
(Cite as: 2007 WL 704033 (S.D.N.Y.))

brought on behalf of only thirty-three persons. On September 25, 2006, Plaintiffs informed the Court that they had erroneously excluded five persons from the Second Action, and that these five persons should be considered in determining the applicability of SLUSA to their claims. Subsequently, Plaintiffs filed a third action in the Supreme Court, Nassau County, on behalf of five excluded, trust-entity plaintiffs (the "Third Action"). The Third Action was removed to the Eastern District and transferred to this Court for coordinated and consolidated treatment with other pending actions on December 22, 2006.

**\*2** Now before the Court is Plaintiffs' motion to remand this litigation to state court. For purposes of resolving this motion, the Court will treat the Second and Third Actions as one action (collectively, the "Present Action").

## II. DISCUSSION

SLUSA was enacted in 1998 in order to prevent plaintiffs from circumventing the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") by alleging state law securities claims in state court. *See* Pub.L. No. 105-353, § 2(5), 112 Stat. 3227 (1998). SLUSA provides that claims governed by the Act may not "be maintained in any State or Federal court" and are "removable to ... Federal district court...." *See* 15 U.S.C. §§ 77p(b) & (c). SLUSA preemption applies to claims that: (1) meet the definition of a "covered action"; (2) are based on state or local law; (3) concern a "covered security"; and (4) involve the misrepresentation or omission of a material fact or the employment of a manipulative device or contrivance "in connection with the purchase or sale" of that security. *Felton v. Morgan Stanley Dean Witter & Co.,* 429 F.Supp.2d 684, 690-91 (S.D.N.Y.2006).

Plaintiffs contend that their suit was not properly removed under SLUSA because it does not meet the first or fourth criterion of this four-factor test. As the Court finds that the Present Action fails

SLUSA's first criterion for applicability, insofar as the Action is not brought on behalf of more than 50 persons, the Court holds that this litigation was not properly removed. [FN2]

> FN2. In light of this holding, the Court declines to address Plaintiffs' contention that their claims are not in connection with the sale or purchase of securities, as required by SLUSA.

Although SLUSA must be given a liberal interpretation, it is beyond cavil that the Act only covers actions brought on behalf of more than fifty persons. *See, e.g.,* 15 U.S.C. § 77p(f)(2)(A)(i)(I) & (ii); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 126 S.Ct. 1503, 1512 (2004); *accord Spehar v. Fuchs,* 02 Civ. 9352(CM), 2003 WL 23353308, at *9 (S.D.N.Y. June 18, 2003) ("Not even the most liberal interpretation of SLUSA could conclude that the phrase 'more than fifty' in the definition of a [covered action] includes an action brought on behalf of fifty [or fewer] plaintiffs.").[FN3] A review of the filings in the Present Action reveals that there are presently thirty-eight plaintiffs, including members of the Lee family and various trusts, corporations, and partnerships owned and controlled by them.[FN4] *See* 15 U.S.C. § 77p(f)(2)(C) (indicating that "a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person"). Inasmuch as Plaintiffs properly bring the Present Action on behalf of only thirty-eight persons, their action is clearly not a covered action, and must be remanded to state court.

> FN3. As Plaintiffs have not brought their claims in a representative capacity, the provisions of SLUSA governing representative claims are inapposite. *See* 15 U.S.C. § 77p(f)(2)(A)(i)(II).
>
> FN4. The Second Action, which was transferred to this Court on August 8, 2006, identified thirty-three plaintiffs, while the Third Action, which was transferred to this Court on December 22, 2006, named five

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 704033 (S.D.N.Y.)
(Cite as: 2007 WL 704033 (S.D.N.Y.))

additional, trust-entity plaintiffs.

Nonetheless, Defendants raise several reasons to doubt that the Present Action is properly brought on behalf of thirty-eight persons. First, Defendants contend that Plaintiffs have engaged in impermissible procedural maneuvering in order to circumvent SLUSA's coverage provisions. On this theory, Plaintiffs avoided the inevitable dismissal of the First Action, which was brought on behalf of fifty-eight persons, only through an eleventh-hour voluntary dismissal. Subsequently, Plaintiffs disingenuously filed the Present Action on behalf of twenty fewer persons only to avoid SLUSA preemption. Second, Defendants claim that the trust-entity plaintiffs are not entitled to entity treatment because one of their co-trustees, Frank A. Lee, Jr., was appointed solely for the purpose of bringing this litigation. Thus, the beneficiaries, both vested and contingent, of these entities must be counted as persons on behalf of whom the Present Action has been brought. Third, Defendants claim that Plaintiffs lacked the power to voluntarily dismiss the First Action. Therefore, Defendants contend that the First Action, with its fifty-eight named plaintiffs, is in essence still pending, and must be dismissed with prejudice to subsequent filings, including the Present Action.

*3 In the sections that follow, the Court considers and rejects these three arguments. As a result, the Court concludes that the present suit is brought on behalf of fewer than fifty-one persons and is not removable under SLUSA.

A. Plaintiffs Have Not Used Impermissible Procedural Maneuvering to Evade SLUSA's Requirements

The Senate Banking Committee Report on SLUSA states that the Act was meant to be "interpreted broadly to reach mass actions and all other procedural devices that might be used to circumvent [its dictates]."S.Rep. No. 105-182, at 8 (1998). In keeping with this language, some courts have found that SLUSA may not be circumvented through procedural maneuvers aimed at evading the Act's substance. See, e.g.,In re Worldcom, Inc. Sec. Litig., 02 Civ. 3288(DLC), 2004 WL 692746, at *5 (S.D.N.Y. Apr. 2, 2004) (refusing to allow the plaintiffs to avoid SLUSA preemption through voluntary withdrawal of 244 of their members); In re Worldcom, Inc. Sec. Litig., 308 F.Supp.2d 236, 245-47 (S.D.N.Y.2004) (holding that SLUSA preempted ten state actions each brought on behalf of fewer than fifty plaintiffs because these actions constituted a "group of lawsuits," as SLUSA defines that term); Gibson v . P S Group Holdings, Inc., 00-CV-0372 W(RBB), 2000 WL 777818, at *3 (S.D.Cal. Mar. 8, 2000) (ruling that SLUSA preempted suit that would have been within letter of Act if plaintiffs had not inexplicably removed request for damages from prayer for relief).

Defendants draw on these decisions, claiming that Plaintiffs have employed impermissible procedural maneuvers to reduce their number from the fifty-eight persons identified in the First Action to the thirty-eight named in the Present Action. Plaintiffs' exclusion of twenty persons named in the First Action may raise the specter of impermissible gamesmanship. SeeIn re Worldcom, 2004 WL 692746, at *5. Nevertheless, after thoroughly reviewing the parties' submissions, the Court finds that Plaintiffs properly dropped at least nineteen names from the caption of the First Action because their inclusion did not reflect the number of persons interested in the outcome of this litigation. As the following discussion demonstrates, the nineteen omitted names correspond to persons who: (1) were named more than once in the First Action; (2) were deceased; or (3) did not own MMC stock.

1. Plaintiffs Properly Excluded Eight Duplicative or Triplicative Names

The First Action duplicated, in slightly altered form, the names of six persons, and triplicated that of a seventh individual. (Pls.' Reply, Affidavit of Jerome M. Congress ("Congress Aff.") ¶¶ 12, 8). In order to rectify these multiple listings, Plaintiffs

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 704033 (S.D.N.Y.)
(Cite as: 2007 WL 704033 (S.D.N.Y.))

properly excluded eight names appearing in the First Action from the Present Action.

### 2. Plaintiffs Properly Removed Name of Deceased Individual

The First Action named Frank A. Lee as a plaintiff. However, Frank A. Lee was deceased and no longer an MMC shareholder at the time the events giving rise to the First Action took place. (Congress Aff. ¶ 10.) Therefore, Plaintiffs properly omitted his name from the Present Action, as he has no interest in its outcome.

### 3. Plaintiffs Properly Omitted Names of Ten Persons Who Did Not Personally Own MMC Stock

\*4 The First Action listed the names of four persons, including one trust, lacking an ownership interest in MMC shares or in a trust that held such shares. (Congress Aff. § 11.) Plaintiffs properly omitted the names of these four persons from the Present Action, since they have no interest in the matter.

The First Action also included the names of six persons who did not hold MMC shares during the relevant period of time, but were beneficiaries of Lee family trusts that owned such shares. (Congress Aff. ¶ 8.) [FN5] These Lee family trusts were separately identified as plaintiffs in the First Action. For purposes of calculating the number of persons on behalf of whom an action is brought, entities such as trusts are counted as a single individual unless they were formed to participate in the action. See 15 U.S.C. § 77p(f)(2)(C). As demonstrated in Part II.B., *infra*, the Lee family trusts were not formed in order to pursue the Present Action. Thus, these trusts are entitled to entity treatment and their beneficiaries should not be separately counted under SLUSA unless they personally owned MMC stock at relevant times. Therefore, the Present Action properly excludes six persons who did not own shares in MMC, but were beneficiaries of trusts that owned such shares.

> FN5. The Congress Affidavit identifies eight names falling into this category. (Congress Aff. ¶ 8.) Nevertheless, two of these names, Paul Lee and Mr. Alberto Van der Mije, are actually duplicative of names already appearing the First Action, and thus fall into the category set forth in section 1, *supra*.

In light of the foregoing discussion, Plaintiffs properly excluded from the Present Action nineteen names that were erroneously included in the First Action. The inclusion of these names in the First Action did not accurately reflect the number of persons on behalf of whom this litigation is brought.[FN6] As Plaintiffs' removal of these nineteen names rested on sound legal footing, the Court declines to credit Defendants' claim that Plaintiffs were less than candid in rectifying these names' erroneous inclusion in the First Action.

> FN6. The Present Action omits twenty names originally included in the First Action. Although Plaintiffs adequately justified the omission of nineteen of these names, they have failed to explain the exclusion of the twentieth. Plaintiffs' submissions demonstrate that either George Hribar or Dr. George Hribar should have been excluded because they are the same person, (Congress Aff. ¶ 12,) but Plaintiffs inexplicably excluded both names from the Present Action.

### B. The Lee Family Trusts Are Entitled to Entity Treatment

Under the plain language of SLUSA, the propriety of granting entity treatment to a given trust turns on the purpose for which the trust was created. See 15 U.S.C. § 77p(f)(2)(C). A trust whose primary purpose is to pursue causes of action on behalf of its beneficiaries is not entitled to entity treatment, whether or not the trust was formed with particular litigation in mind. See LaSala v. Bordier et CIE, 452 F.Supp.2d 575, 582-83 (D.N.J.2006); Cape Ann In-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 704033 (S.D.N.Y.)
(Cite as: 2007 WL 704033 (S.D.N.Y.))

*vestors LLC v. Lepone,* 296 F.Supp.2d 4, 10 (D.Mass.2003). Conversely, a typical Chapter 11 trust established to represent a bankrupt estate for all purposes, including the litigation of outstanding causes of action, is entitled to entity treatment. *SeeSmith v. Arthur Andersen LLP,* 421 F.3d 989, 1008 (9th Cir.2005). Here, the trust instruments establishing the relevant Lee family trusts demonstrate that the trusts were created with the primary purpose of managing certain Lee family property, not engaging in litigation. (Pls.Resp., Exs.A-V.) Therefore, the trusts meet SLUSA's requirements for entity treatment.

\*5 Nevertheless, Defendants claim that these trusts should not be afforded entity treatment because their trustee, Frank A. Lee, Jr. ("Mr.Lee"), was appointed solely to bring the Present Action. Relying on Plaintiffs' submissions, Defendants indicate that the Merrill Lynch Trust Company ("Merrill Lynch") was listed as the plaintiff trustee suing on behalf of the various Lee family trusts in the First Action. Subsequently, Merrill Lynch realized that counsel for Plaintiffs, Milberg Weiss Bershad & Schulman LLP ("Milberg Weiss"), represented other clients in matters adverse to Merrill Lynch. (Congress Aff. ¶ 13.) In order to obviate its potential conflict with Milberg Weiss, Merrill Lynch obtained from the Surrogate's Court of the State of New York, County of Nassau, an order: (1) appointing Mr. Lee as co-trustee for the purpose of pursuing the trusts' claims against Defendants; and (2) providing that litigation expenses would be paid out of the trusts' share of the amount recovered, with any excess to be borne by Mr. Lee. (Pls.Reply, Ex. G.) Accordingly, the Present Action's caption lists Mr. Lee as the plaintiff trustee, rather than Merrill Lynch.

Although the record clearly shows that Mr. Lee was appointed co-trustee of the Lee family trusts solely to facilitate the prosecution of the Present Action, the trusts are nonetheless entitled to entity treatment. The relevant inquiry under SLUSA is the purpose for which the trust was formed, not the

purpose for which its trustee was appointed. *See*15 U.S.C. § 77p(f)(2)(C). The appointment of Mr. Lee did not affect the purpose of the Lee family trusts, which was clearly defined in the relevant trust instruments as the management of certain Lee family property. *See* George G. Bogert et al., *Bogert's Trusts and Trustees* § 541 (2d ed.2006) (indicating that a trustee has a "fundamental duty ... to carry out the directions of the testator or settlor as expressed in the terms of the trust"). Even if the appointment of Mr. Lee made possible the prosecution of the Present Action, it did so not by altering the trusts' purpose, but by removing the potential conflict between Merrill Lynch and Milberg Weiss.FN7The prosecution of the Present Action has, from its commencement, fallen well within the general asset-managing purpose of the Lee family trusts. *See, e.g.,*N.Y. Est. Powers & Trusts Law § 11-1.1(a)(13) (McKinney 2007) (indicating that unless trust instrument provides to contrary, trustee has power "[t]o contest, compromise or otherwise settle any claim in favor of the ... trust").

> FN7. The Court expresses no opinion as to whether this conflict would have interfered with the prosecution of the instant litiga- tion.

As the Lee family trusts were not formed for the purpose of engaging in litigation, the twenty-six Lee family trusts listed in the Present Action should be counted, without reference to the number of beneficiaries, as twenty-six persons under SLUSA.FN8

> FN8. Plaintiffs also argue that SLUSA preemption of the Present Action would be inappropriate even if the trusts were not entitled to entity treatment because there are fewer trust beneficiaries than trusts. Thus, piercing the trusts' "veil" would decrease the total number of persons on behalf of whom the Present Action is brought to eighteen. (Pls. Resp., Supplemental Aff. of Jerome M. Congress ¶¶ 3-5.) Defendants dispute this calculation, claiming that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the relevant beneficiaries must include an undefined (and unknowable) number of contingent beneficiaries. Given the Court's holding that the trusts should receive entity treatment, it finds no occasion to enter this arithmetic fray.

C. Voluntary Dismissal of First Action Was Proper

Under the Federal Rules of Civil Procedure, plaintiffs may voluntarily dismiss an action without a court order "by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment...."Fed.R.Civ.P. 41(a)(1)(i). Here, Plaintiffs filed a notice of dismissal of the First Action on June 6, 2006. At that time, Defendants had yet to serve an answer or motion for summary judgment in the First Action. Since the Federal Rules of Civil Procedure apply to actions removed from state court, *see*Fed.R.Civ.P. 81(c), Plaintiffs' voluntary dismissal of the First Action fell squarely within their procedural rights.

*6 Nevertheless, Defendants invite the Court to carve out an exception to Federal Rule of Civil Procedure 41(a)(1)(i), which would prevent the voluntary dismissal of any action removed under SLUSA. Defendants argue that suits falling within SLUSA's ambit are subject to immediate dismissal, without any litigation on their merits. Thus, answers and motions for summary judgment are never filed, thereby precluding the sensible application of Rule 41(a)(1)(i). As Defendants envision a conflict between the application of SLUSA and Rule 41(a)(1)(i), they argue that the latter, by its own terms, must give way to the former. The Court is unpersuaded by Defendants' position. In fact, the Court finds no authority for the existence of a conflict between Rule 41(a)(1)(i) and SLUSA. Furthermore, the Court holds that even if there were such a conflict, it is inapposite here because the First Action was not within SLUSA's ambit.

The existing authority, while minimal, suggests that there is no conflict between SLUSA and Rule 41(a)(1)(i). In a case nearly identical to that before the Court, Judge Cote conceded that the plaintiffs were "entirely correct that a plaintiff may voluntarily dismiss a complaint before an answer or motion for summary judgment has been filed."*SeeIn re Worldcom, Inc. Sec. Litig.,* 03 Civ. 4496(DLC), 2003 WL 23095478, at *3 (S.D.N.Y. Dec. 30, 2003). Although Judge Cote rejected the plaintiffs' effort to voluntarily dismiss, she did so because an answer had previously been filed in the consolidated action, not because of an abstract conflict between Rule 41(a)(1)(i) and SLUSA. *Seeid.*Moreover, in another analogous case in this District, Judge McMahon permitted the plaintiffs to amend their complaint as a matter of right, even though the amendment would reduce the number of plaintiffs from fifty-two to fifty, thereby bringing the suit outside the scope of SLUSA. *SeeSpehar,* 2003 WL 23353308, at *6. Judge McMahon explicitly found that the exercise of procedural rights created by the Federal Rules does not necessarily conflict with SLUSA, even when such rights are used to avoid dismissal with prejudice under that Act. *Seeid.* at *10-*11 (remanding suit even though plaintiffs were "playing games to avoid appearing in federal court and being subjected to the stringent requirements of the PSLRA"); *cf.In re Worldcom,* 308 F.Supp.2d at 245 ("The existence of a calculated strategy to avoid SLUSA preemption does not, by itself, permit a finding [of] preemption.").

Moreover, even if there were a conflict between SLUSA and Rule 41(a)(1)(i), as envisaged by Defendants, that conflict would have no relevance because the First Action was not preempted by SLUSA. The First Action was effectively brought on behalf of the same persons as is the Present Action. It listed fifty-eight plaintiffs, rather than the thirty-eight identified in the Present Action, because of the erroneous duplication of names and inclusion of parties with no actual interest in the litigation. *Seesupra* Parts II.A.1.-3. As the duplicated names and uninterested plaintiffs did not reflect persons on behalf of whom the First Action was brought, that Action was advanced on behalf of no

more than thirty-nine persons, just as is the Present Action. *See supra* Part II.A. Thus, given the plain language of SLUSA, the First Action was not covered by the Act. *See* 15 U.S.C. § 77p(f)(2)(A)(i)(I) & (ii); *Dabit,* 126 S.Ct. at 1512. Therefore, the alleged conflict between SLUSA and Rule 41(a)(1)(i) never materialized. Consequently, the Court finds that Plaintiffs were within their rights when they voluntarily dismissed the First Action.[FN9]

> FN9. Even if the First Action was not properly dismissed, it should be remanded to state court for the same reasons supporting remand of the Present Action.

*7 In sum, the Present Action is a not covered action within the meaning of SLUSA. As Plaintiffs properly removed the names of nineteen persons appearing in the First Action, the Present Action is brought on behalf of at most thirty-nine persons. Given that the Present Action falls outside SLUSA's scope, the Court must remand the Present Action to state court. *See Kircher v. Putnam Funds Trust,* 126 S.Ct. 2145, 2155 (2006).

III. CONCLUSION

The Present Action is hereby remanded to the Supreme Court of the State of New York, Nassau County. As there was an objectively reasonable basis for Defendants' removal of this litigation, in light of Plaintiffs' erroneous inclusion of superfluous names in the caption of the First Action, the Court will not order Defendants to pay Plaintiffs' costs and actual expenses under 28 U.S.C. § 1447(c). *See Martin v. Franklin Capital Corp.,* 126 S.Ct. 704, 711 (2005). The Clerk of Court is ordered to transfer the file to the Supreme Court of the State of New York, Nassau County, and to close these cases.

SO ORDERED.

S.D.N.Y.,2007.
Lee v. Marsh & McLennan Companies, Inc.

Slip Copy, 2007 WL 704033 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.))

**H**
Nairobi Holdings Ltd. v. Brown Bros. Harriman &
Co.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
NAIROBI HOLDINGS LIMITED, Plaintiff,
v.
BROWN BROTHERS HARRIMAN & CO. and
Lawrence Tucker, Defendants.
No. 02 CIV. 1230(LMM).

Sept. 10, 2002.

Investor in telecommunications company that went
bankrupt brought § 10(b) securities fraud action
against investment advisor and partner of advisor
who was on board of company. Defendants moved
to dismiss. The District Court, McKenna, J., held
that: (1) investor could not sue regarding shares ac-
quired prior to date of first alleged misrepresenta-
tion; (2) investor stated claim of financial condition
misrepresentation; (3) statute of limitations had not
run on financial condition misrepresentation claim;
(4) investor stated claim that failure to disclose in-
tention to fire management was major omission; (5)
claim was stated that assertion of strong position in
European telecommunications sector was fraudu-
lent; (6) statement that Fall was good time to invest
was not actionable; (7) scienter and causality re-
quirements were satisfied; and (8) New York blue
sky law preempted state claims of negligent misrep-
resentation and breach of fiduciary duty.

Motion granted in part.

West Headnotes

**[1] Securities Regulation 349B ☞60.15**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.11 Transactions Subject to

Regulation
            349Bk60.15 k. Connection with
Purchase or Sale. Most Cited Cases

**Securities Regulation 349B ☞60.37**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.35 Persons Entitled to Sue or
Recover
            349Bk60.37 k. Buyers or Sellers.
Most Cited Cases
Shareholder acquiring interest prior to date of al-
leged misrepresentations regarding stock could not
bring securities fraud claim under § 10(b), alleging
it was dissuaded from selling stock as result of false
optimistic statements of officers of issuer and in-
vestment advisors; misrepresentations were not
made in connection with purchase or sale of securi-
ties. Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[2] Securities Regulation 349B ☞60.27(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
            349Bk60.27 Misrepresentation
               349Bk60.27(1) k. In General.
Most Cited Cases
Investor stated claim of securities fraud, based on
statement of investment advisor who was also dir-
ector of company issuing securities, that no other
company in field had equal financial strength, com-
pany had cash and marketable securities of $500
million, and had substantial unused bank facility.
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.))

Page 2

**[3] Limitation of Actions 241 ⬅️100(11)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud,
and Concealment or Discovery of Cause of Action
            241k98 Fraud as Ground for Relief
                241k100 Discovery of Fraud
                241k100(11) k. Diligence in Dis-
covering Fraud. Most Cited Cases
Statute of limitations had not run on investor's
claim of false representation, arising from state-
ment that no other company in field had equal fin-
ancial strength, company had cash and marketable
securities of $500 million, and had substantial un-
used bank facility, even though suit was not filed
until more than one year after statement; no data
available at time of statement was sufficient to
place investor on inquiry notice of possible fraud.
Securities Exchange Act of 1934, §§ 9(e), 10(b), 15
U.S.C.A. §§ 78i(e), 78j(b); 17 C.F.R. § 240.10b-5.

**[4] Securities Regulation 349B ⬅️60.28(4)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
                349Bk60.28 Nondisclosure; Insider
Trading
                349Bk60.28(2) Duty to Disclose
or Refrain from Trading
                349Bk60.28(4) k. Corporate
Officers or Directors; Insiders. Most Cited Cases
Investor in company stated claim, that investment
advisor committed securities fraud in violation §
10(b) by failing to disclose that sacking of senior
management of company was under consideration
and was not carried out due to feared affect on
stock; as advisor was general partner of limited
partnership making investment, and investor was
limited partner, advisor owed investor fiduciary
duty to make disclosure in question. Securities Ex-
change Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b);

17 C.F.R. § 240.10b-5.

**[5] Securities Regulation 349B ⬅️60.27(1)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
                349Bk60.27 Misrepresentation
                349Bk60.27(1) k. In General.
Most Cited Cases

**Securities Regulation 349B ⬅️60.45(1)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses
to Liability
                349Bk60.45 Scienter, Intent,
Knowledge, Negligence or Recklessness
                349Bk60.45(1) k. In General.
Most Cited Cases
Investors stated securities fraud claim, under §
10(b), that investment promoters falsely stated that
telecommunications company was uniquely well-
positioned to weather and benefit from difficulties
in European telecommunications sector; in view of
simultaneous misrepresentation of financial condi-
tion of company, and plan to fire management that
was under consideration at time, it was possible
that speakers did not believe in truth of statements.
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[6] Securities Regulation 349B ⬅️60.27(4)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.))**

349Bk60.27 Misrepresentation
349Bk60.27(4) k.  Facts or Opinions. Most Cited Cases

Investor failed to state securities fraud claim, under § 10(b), based upon statements of issuing company's officer and investment advisor that Fall was particularly propitious time to invest; only nonactionable expressions of opinion were involved. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[7] Securities Regulation 349B ☞60.45(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
            349Bk60.45     Scienter,     Intent, Knowledge, Negligence or Recklessness
            349Bk60.45(1)  k.  In  General. Most Cited Cases

Investor in securities of telecommunications company satisfied scienter requirement, for stating claim of securities fraud under § 10(b), by alleging deliberate misstatement of financial condition and issuance of optimistic statements at time when confidence in management was lost, conduct manifesting conscious misbehavior or recklessness. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[8] Securities Regulation 349B ☞60.47**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
            349Bk60.47  k.  Causation;  Existence of Injury. Most Cited Cases

Investor in stock of telecommunications company satisfied causality requirement, for statement of se-

curities fraud claim under §10(b), by alleging that there was causal connection between material misrepresentations and omissions and ultimate failure of business. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[9] Fraud 184 ☞31**

184 Fraud
   184II Actions
      184II(A) Rights of Action and Defenses
         184k31 k.  Nature and Form of Remedy. Most Cited Cases

New York blue sky law preempted claims of negligent misrepresentation and breach of fiduciary duty, made by investor against investment advisor or company issuing stock. McKinney's General Business Law § 352.

## MEMORANDUM AND ORDER

MCKENNA, D.J.

*1 Plaintiff Nairobi Holdings Limited ("NHL") commenced this action against corporate defendant Brown Brothers Harriman & Co. ("BBH") and individual defendant Lawrence Tucker ("Tucker") alleging federal securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), violations of the Investment Advisers Act of 1940, and various state tort law claims. Presently before the Court is a motion brought by defendants to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). For the reasons set forth below, the motion to dismiss is granted regarding: 1) the Section 10(b) claim based on pre-September 2000 allegations; 2) the Section 10(b) claim based on the allegation that the fall of 2000 was a propitious time to invest; and 3) the state law claims of breach of fiduciary duty and negligent misrepresentation.

## Background

Plaintiff NHL is an investment company incorpor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 4
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.))

ated under the laws of Bermuda with its principal place of business in Bermuda. (Compl.¶ 7.) Defendant BBH is a privately held investment bank with its principal place of business in New York. (Id.¶ 8.) World Access, Inc. ("WAXS") is a telecommunciations company with its headquarters in Atlanta, Georgia and is now bankrupt. (Id.¶¶ 3, 13.)Defendant Tucker was a partner in BBH and a member of the Board of Directors of WAXS and acted as an investment advisor to NHL. (Id.¶ 9.)

In 1998, BBH created the 1818 Fund III, LLP (the "Fund"), a limited partnership, as a vehicle for private investment in certain equities. (Id.¶ 10.)BBH, as general partner of the Fund, sold partnership interests in the Fund and used the proceeds to invest in securities that BBH deemed promising.(Id.) On March 31, 1998, NHL entered into an investment advisory agreement with BBH. (Id.¶ 7.) Between June 1998 and December 11, 2000, NHL acquired various interests in WAXS. In June 1998, upon the solicitation of BBH, plaintiff purchased a limited partnership interest in the Fund for $5 million (Id.¶¶ 1, 7, 12.) and in April, 1999, the Fund invested $50 million in WAXS. (Id.¶ 14.)On or about February 11, 2000, plaintiff purchased 459,777 shares of WAXS in a private placement at a price of $10 million. (Id.¶ 23.)In June, 2000, the Fund invested another $20 million in WAXS and in July, 2000, plaintiff purchased an additional $200,000 limited partnership interest in the Fund (Id.¶¶ 14, 25.)Between September 2, 2000 and December 11, 2000, NHL purchased 520,230 shares of WAXS at a total cost of $3,105,230.59. (Id.¶ 33.)

On April 24, 2001, WAXS filed for bankruptcy in the United States District Court for the Northern District of Illinois. (Id.¶ 38.)Three weeks before the filing, the Fund wrote off its entire $70 million investment in WAXS.(Id.)

Plaintiff alleges that defendants made "fraudulent and negligent misrepresentations" that "fraudulently induced NHL to invest in WAXS and/or decline to liquidate NHL's position in the

shares of WAXS."(Id.¶ 3.) The alleged purpose of the misrepresentations was to hide from NHL the rapidly deteriorating condition of WAXS during 2000 and early 2001.(Id.)

*2 According to plaintiff, defendants BBH and Tucker made four false and materially misleading statements and omissions (Id.¶ 39.)First, plaintiff alleges that defendants misrepresented WAXS' financial strength, and in particular its reserves of cash and cash equivalents. (Id.) On or about September 15, 2000, Stephen Owen of BBH forwarded a letter from defendant Tucker via e-mail to plaintiff (the "September 15 e-mail"), in which Mr. Tucker represented that no other company in WAXS' sector had "WAXS' financial strength-at 6/30/00, WAXS had cash and marketable securities of $500 million and a substantial unused bank facility."(Id.¶ 42.)However, plaintiff alleges that WAXS' 10-Q for the second quarter of 2000 shows that as of June 30, 2000, WAXS held only $329,279,000 in cash and equivalents. (Id.¶ 43).

Second, plaintiff alleges that defendants repeatedly asserted "that WAXS' management was performing well, when BBH and Tucker knew or should have known that the contrary was true."(Id.¶ 3 9.)In the September 15 e-mail, defendants represented that no other company in WAXS' sector had "experienced telecom senior management of the caliber of WAXS'." (Id.¶¶ 30, 42.)In addition, on February 14, 2001, by letter from defendant Tucker, defendants stated that they "continued to have confidence in the operational and management ability of WAXS management."(Id.¶¶ 34, 45.)Furthermore, on or about March 1, 2001, defendant Tucker stated at a meeting with NHL representatives that "he had been considering sacking senior management of WAXS since the last quarter of 2000, but that he had not revealed this to NHL and had not acted on his loss of confidence in management for fear of adversely affecting the value of WAXS' shares."(Id.¶ 46.)

Third, plaintiff alleges that defendants misrepresented WAXS' ability "to weather and benefit from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

difficulties in the European telecommunications market, when BBH knew or should have known that WAXS' position was as precarious as that of any firm in that market."(Id.¶ 39.)In its September 15 e-mail, defendants represented to NHL that "WAXS' stock price was disappointingly low because the entire telecommunications market was down, not because of any financial or other problems specific to WAXS" and that "other companies in WAXS' 'peer group' were all highly leveraged and that WAXS suffered not from its own financial and management problems but from association with other companies in its sector."(Id.¶ 44.)Yet, plaintiff alleges that BBH and defendant Tucker had known for months that WAXS' management team and strategy were not performing very well, that WAXS' financial position had deteriorated seriously and that defendants were "aware in late 2000 that WAXS' position was not any stronger than that of other companies in the European telecommunications sector and that WAXS was therefore in as vulnerable condition as any such firm."(Id.¶ 47.)

Fourth, plaintiff alleges that defendants fraudulently "assert[ed] and/or failed to correct the misrepresentation that, as of September 2000, it was a particularly propitious time to make additional investments in WAXS' equities, when, in fact defendants knew that WAXS then found itself in dire financial condition."(Id.¶ 39.)Plaintiff states that, as part of a solicitation of further investments by NHL in WAXS, Jack Phillips of WAXS and Senior Partners of BBH, including defendant Tucker met with representatives of NHL in the week preceding September 14, 2000. (Id.¶ 40.)According to plaintiff, these individuals "stated that a recovery was more than likely and that it was then a propitious time for NHL to make further investments."(Id.) Plaintiff asserts that defendants knew, by Fall of 2000, that WAXS was overleveraged, in "dire financial straits", and that there was a "risk of a catastrophic default on the company's debt."(Id.¶ 41).

**\*3** Plaintiff filed this action on February 14, 2002.

As a result of alleged damages sustained by plaintiff due to the foregoing facts, plaintiff brings the following claims: (1) violations of Section 10(b) and Rule 10b-5 promulgated thereunder against both defendants; (2) violations of Investment Advisers Act of 1940 against corporate defendant BBH; (3) breach of fiduciary duty against corporate defendant BBH; (4) common law fraud against both defendants; and (5) negligent misrepresentation against both defendants.

Discussion

I. 12(b)(6) Motion

Under Rule 12(b)(6), a complaint will be dismissed if there is a failure "to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)."A court should only dismiss a suit under Rule 12(b)(6) if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

On a Rule 12(b)(6) motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."*Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (citations omitted).

II. Section 10(b) and Rule 10(b)(5)

To state a cause of action for securities fraud under

section 10(b) and Rule 10b-5, " 'a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." ' *Rothman,* 220 F.3d at 89 (2d Cir.2000) (quoting *Chill v. General Electric Co.,* 101 F.3d 263, 266 (2d Cir.1996)).

A complaint asserting securities fraud must also meet the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires fraud to be alleged with particularity. Fed.R.Civ.P. 9(b)("In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity."); *see also Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001).

A) Standing to Sue for Pre-September 2000 Investments

[1] A "purchase or sale" of a security is a prerequisite for standing to sue under 10(b)(5).17 C.F.R. § 240.10b-5. A plaintiff must allege material misstatements or omissions indicating an intent to deceive or defraud "in connection with the purchase or sale of [a] security."Id.;*Gurary v. Winehouse,* 235 F.3d 792, 799 (2d Cir.2000). Defendants argue that the Complaint fails to allege a "purchase or sale" of a security in relation to NHL's investments before September 2000. The Court agrees.

*4 Plaintiff concedes that its pre-September 2000 investments were "made prior to the first of defendants' misrepresentations and omissions."(Opp. at 5). The general rule established by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) is that actual shareholders have no standing to assert a claim that "they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material."421 U.S. at 737-8. Plaintiff is essentially asking for an exception from this rule on the basis that it also inves-

ted *after* defendants' alleged fraud, stating that defendants "*at once* induced plaintiff to retain earlier investments *and* to make further purchases of WAXS stock." (Opp. at 8) (emphasis in original).

The mere fact that NHL made further purchases of WAXS stock after the fraud, however, is insufficient to establish standing. The Second Circuit has considered this precise question in a case not addressed by plaintiff in its briefing. In *Gurary v. Winehouse,* 235 F.3d 792 (2d Cir.2000), the plaintiff alleged violations of 10(b)(5) relating to multiple purchases of stock both before and after the date of the alleged deception. The court explicitly held that the plaintiff's pre-fraud purchase "could not under any circumstances give rise to a Rule 10b-5 cause of action because that purchase occurred before any alleged deception began, and therefore could not be in connection with the purchase or sale of a security."*Id* at 799.The court also rejected plaintiff's argument for a change in existing law. *Id.* The pre-fraud claim was dismissed and was also held to be sanctionable pursuant to the PSLRA and Rule 11(b).*Id* at 800.In fact, the Second Circuit recently upheld its decision that this claim was sanctionable referring to the pre-fraud claim as being "frivolous." *Gurary v. Nu-Tech Bio-Med, Inc., and Isaac Winehouse,* Nos. 01-7969, 01-9000, 2002 WL 1961271, at *3, *9 (2d Cir. Aug.23, 2002).

As a result, plaintiff's claims must be dismissed as to purchases prior to September 15, 2000 when the alleged deception commenced.

B) Post-September 2000 Investments and Misrepresentations

1) Allegation that defendants misrepresented WAXS' financial health and reserves

[2] In the Complaint, plaintiff alleges that defendants misrepresented WAXS' financial health and reserves. Specifically, plaintiff refers to a letter written by defendant Tucker on August 14, 2000 that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.))

was forwarded by BBH via e-mail to plaintiff on September 15, 2000 (the "September 15 e-mail") which represented that no other company in WAXS' sector had its "financial strength ---- at 6/30/00, WAXS had cash and marketable securities of c. $500 mm and a substantial unused bank facility."(Harper Decl. Exh A, at 2) FN1.

> FN1. Since the Complaint incorporates and relies heavily upon the September 15 e-mail, we may consider its text. *Rothman,* 220 F.3d at 88. The Court is also permitted to consider WAXS' 10-Q that was filed in due course with the SEC. *Id.*

Defendants first argue that plaintiff, a sophisticated investor, cannot claim that it reasonably relied on the August 14, 2000 letter because it was "addressed to another investor, dated a month before plaintiff received it, and stat[ed] that important additional information relating to WAXS' financial status would be forthcoming within the early fall."(Dfts' Mem. at 8, 16). This argument is not persuasive. In response to plaintiff's direct request for current information about WAXS, Stephen Owen of BBH sent the e-mail forwarding defendant Tucker's letter. BBH was clearly representing to plaintiff that the information contained in the letter was accurate and current. There is simply no reason for plaintiff, even if it is a sophisticated investor, to think that it could not rely on such information from its investment advisor and partner.

*5 Yet, defendants make a more fundamental challenge to this claim: that the representation made by defendant Tucker in the letter was not actually false. The Complaint points to WAXS' 10-Q for the second quarter of 2000 and alleges that the 10-Q shows that-as opposed to defendant Tucker's representation that WAXS had approximately $500 million in cash and *marketable securities* as of June 30, 2000-WAXS held only $329,279,000 in cash and equivalents. (Id.¶ 43). Upon an examination of the 10-Q, it becomes clear that WAXS had $329,279,000 in "cash and equivalents," $31,095,000 in "restricted cash," and $160,211,000

in "short-term investments" for a total of $520.6 million of cash and short-term investments. (Harper Decl. Exh. B, at 1, 26).

Defendants represent that the description of WAXS' short-term investments in the 10-Q shows that those investments are, in fact, marketable securities. (Dfts' Mem. at 10). This is simply not the case. The 10-Q makes it very clear that "[s]hort-term investments include shares of BATM Advanced Communications Limited...and other securities with an original maturity of more than three months and a remaining maturity of less than one year."(Harper Decl. Exh. B at 7). The shares of BATM stock held by WAXS and included in the $160,211,000 worth of short-term investments had an estimated value of $76.9 million. (Harper Decl. Exh. B at 25). WAXS was not permitted to "sell, transfer or otherwise monetize these shares until April 5, 2001 without the consent of BATM."(Id.) These shares are clearly not marketable securities. Plaintiff's allegation is well-pleaded.

[3] Defendants' final argument with regard to this allegation is that it is time-barred because more than one year passed between plaintiff's receipt of the September 15 e-mail and its filing of this Complaint on February 14, 2002. Section 9(e) of the Exchange Act provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."15 U.S.C. § 78i(e); *see also Rothman,* 220 F.3d at 96 (Section 9(e) applies to 10(b) and Rule 10b-5 claims). The Second Circuit has said that discovery of the facts under the Section 9(e) limitations standard " 'includes constructive or inquiry notice, as well as actual notice." ' *Rothman,* 220 F.3d at 96 (quoting *Menowitz v. Brown,* 991 F.2d 36, 41-42 (2d Cir.1993)). For the purposes of inquiry notice, a plaintiff is "deemed to have discovered fraud ... when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Secs. Inc.,* 12 F.3d 346, 350 (2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1993), *cert. denied,*511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). If the probability of fraud exists, "a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id.* In assessing whether a plaintiff should have been put on inquiry notice, courts examine, among other things, "any financial, legal, or other data ... available to the plaintiff providing him 'with sufficient storm warnings' ...." *Dietrich v. Bauer,* 76 F.Supp.2d 312, 343 (S.D.N.Y.1999) (quoting *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 664 (S.D.N.Y.1987)).

*6 The defendants here contend that the statements made in the September 15 e-mail placed plaintiff on inquiry notice because they were contradictory to previously publicly disclosed representations made by WAXS in the 10-Q. Defendants rely on two cases decided by this court that found that plaintiffs were placed on inquiry notice by a company's public disclosures: *In Re Warnaco Group, Inc. Sec. Litig.,* No. 00-6266, 2002 WL 764980 (S.D.N.Y. Apr.29, 2002); *Ezra Charitable Trust v. Frontier Ins. Group, Inc.,* No. 00-5361, 2002 WL 87723 (S.D.N.Y. Jan.23, 2002). This reliance is misplaced. In *Warnaco,* a company's 10-K "dramatically reversed" the previously disclosed financial data and, as a result, would have placed a reasonable investor on inquiry notice.*Warnaco,* 2002 WL 764980, at *4-*5. In *Ezra Charitable Trust,* a company made two announcements regarding large reserve charges. This court held that "[a]fter the second large reserve charge announcement, plaintiffs should plainly have strongly suspected that something was not right."*Ezra Charitable Trust,* 2002 WL 87723, at *5. These cases involved significant revisions to previously made statements. The September 15 e-mail contains no such significant, publicly announced revisions.

As this court held in *Backhaus v. Streamedia Communications,* 2002 WL 1870272 (S.D.N.Y. Aug.14, 2002), "[m]isleading statements in the Prospectus or in other public statements, without an event that

would reveal the misleading nature of the statements, are not enough to put investors on inquiry notice."*Backhaus,* 2002 WL 1870272, *3. The earliest event that could have put NHL on notice was the February 14, 2001 letter from defendants disclosing WAXS' serious decline in corporate liquidity. This claim is timely pleaded.

2) Allegation that defendants misrepresented the quality and performance of WAXS' management

[4] Plaintiff alleges that, while defendants had continually expressed confidence in the quality and performance of WAXS' management, defendants omitted to advise plaintiff that they had been considering firing WAXS' management since the last quarter of 2000. (Compl.¶¶ 30, 34, 39, 42, 45, 46.) The Complaint specifically refers to an admission by defendant Tucker at a meeting with NHL on or about March 1, 2001, that "he had been considering sacking senior management of WAXS since the last quarter of 2000, but that he had not revealed this to NHL and had not acted on his loss of confidence in management for fear of adversely affecting the value of WAXS' shares."(Id.¶ 46.) Defendants argued that the alleged omission of this information does not suffice to state a section 10(b) and Rule 10(b)5 claim.

As defendants correctly point out, omissions are only actionable if they cause the statements actually made to be misleading or if there is a duty to disclosure the information. *Castillo v. Dean Witter Discover & Co.,* No. 97-1272, 1998 WL 342050, at *8 (S.D.N.Y. June 25, 1998). Here, defendants were under a duty to disclose such information. Plaintiff and defendants were in privity of contract arising out of the investment advisory contract between them, but most importantly, were partners in the Fund, giving rise to fiduciary duties of candor and fair dealing. The Supreme Court has held that a duty to disclose arises from a fiduciary relationship or similar relationship of trust-in this case, a partnership. *Chiarella v. United States,* 445 U.S. 222, 228-229, 100 S.Ct. 1108, 63 L.Ed.2d 348

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.))

(1980). This claim, then, is well pleaded.

3) Allegation that defendants falsely asserted that
WAXS was uniquely well-positioned to weather
and benefit from difficulties in the European tele-
communications sector

*7 [5] Plaintiff alleges that defendants falsely asser-
ted that WAXS was uniquely well-positioned to
weather and benefit from difficulties in the
European telecommunications sector. (Compl.¶ 39.)
Plaintiff specifically refers to the September 15 e-
mail which represented that WAXS suffered not
from its own financial and management problems
but from association with other companies in the
telecommunications sector. (Id.¶ 44). It is evident
from the September 15 e-mail that defendants at-
tempted to make distinctions between WAXS and
the other companies in the sector. For example, de-
fendants stated that none of the other companies
"have experienced telecom senior management of
the caliber of WAXS' and none have WAXS' finan-
cial strength...." (Harper Decl. Exh. A. at 2).

Defendants argue that these representations were
merely opinions and predictions of future perform-
ance and are not actionable unless " 'they are
worded as guarantees or are supported by specific
statements of fact, or if the speaker does not genu-
inely or reasonably believe them." ' *Faulkner v. Ve-
rizon Communications, Inc.*, 156 F.Supp.2d 384,
398 (S.D.N.Y.2001) (quoting *In re International
Bus. Mach s. Corp. S ec. Litig.*, 1 63 F.3d 102, 107
(2d Cir.1998)). Even if defendants are correct in
their determination that these statements fit under
the rubric of opinion or predictions of future per-
formance, plaintiff has sufficiently alleged that
there is reason to question whether defendants
genuinely or reasonably believed them.

As we have already discussed, it appears that de-
fendants may have misrepresented the financial
strength of WAXS by stating that it had approxim-
ately $500 million in cash and *marketable* securit-
ies. Furthermore, as discussed above, plaintiff prop-

erly alleges that defendants may have been consid-
ering firing WAXS' management in the last quarter
of 2000. It is indeed possible, then, that at the time
these statements were made, defendants did not
genuinely or reasonably believe that WAXS was
financially stronger than the other companies in its
sector or that WAXS had more experienced telecom
senior management than the other companies in its
sector. These issues should be ultimately decided
by the trier of fact.

Thus, even if considered to be based on an
"opinion" or "prediction," this claim is properly al-
leged.

4) Allegation that the fall of 2000 was a particularly
propitious time to invest

[6] Plaintiff alleges that during the week preceding
September 14, 2000, "Jack Phillips of WAXS and
Senior Partners of BBH, including defendant Tuck-
er...stated that a recovery was more than likely and
that it was then a propitious time for NHL to make
further investments."(Compl.¶ 40.) This claim is
not properly alleged.

In this instance, it is evident that defendants were
expressing an "opinion" and/or a "prediction of fu-
ture performance." Unfortunately, it is not clear to
the court as to what the term "recovery" was meant
to apply. A reasonable interpretation appears to be
that defendants were saying "in our opinion, the
sector will recover and WAXS will recover with
it."If this is the case, plaintiff has not alleged any
facts to the effect that defendants did not genuinely
or reasonably believe that such a sector recovery
would occur. Another possible interpretation,
however, is that defendants were saying "in our
opinion, recovery of WAXS is likely."In that case,
one could argue that defendants may not have reas-
onably believed such a statement due to its alleged
lost confidence in WAXS' management and know-
ledge of WAXS' lack of financial strength.

*8 In the end, it is not for the court to choose

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

between these equally plausible interpretations. It is not sufficient for the Complaint to make such a generalized and vague allegation regarding a mere expression of optimism. This particular claim should be dismissed.

## B) Scienter

[7] To properly allege scienter in a securities fraud claim, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."*Rothman,* 220 F.3d at 90;*Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 84 (2d Cir.1999). The scienter requirement will be met if the allegations satisfy either of these prongs. *Stevelman,* 174 F.3d at 84.

With regard to the first three claims discussed above (WAXS' financial health, the performance of WAXS' management, and WAXS' unique strength as compared to other companies), the Complaint does indeed allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. As the Second Circuit has explained, to establish reckless conduct or conscious misbehavior, the facts pled must allege "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."*Kalnit,* 264 F.3d at 142 (quoting *Honeyman v. Hoyt (In Re Carter-Wallace, Inc. Secs. Litig.,* 220 F.3d 36, 39 (2d Cir.2000)); see *also Rothman,* 220 F.3d at 90.

Plaintiff adequately alleges that defendants acted recklessly in misrepresenting WAXS' financial health. The fact that nearly $77 million of WAXS' securities holdings were represented by defendants as being "marketable" when a review of the 10-Q indicates this to be patently untrue indicates that defendants must have been aware of or recklessly disregarded these facts. In addition, plaintiff alleges

that defendants admitted that they had lost confidence in WAXS' management. This is an explicit admission of conscious misbehavior on the part of defendants. Finally, if defendants were aware that WAXS was not in as strong an economic condition as represented, and that it had lost confidence in management, plaintiff has adequately pleaded that defendants recklessly disregarded these alleged facts in representing that WAXS was in better shape than other companies in its sector due to its financial strength and strong management.

## C) Loss Causation

[8] Causation in a federal securities fraud action requires both: (1) transaction causation (but for the fraudulent statement or omission the plaintiff would not have entered into the transaction); and 2) loss causation (the subject of the fraudulent statement or omission was the cause of the actual loss suffered).*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001); *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,* 195 F.Supp.2d 551, 559 (S.D.N.Y.2002). The PSLRA similarly requires a plaintiff to demonstrate that the act complained of "caused the loss for which the plaintiff seeks to recover damages."15 U.S.C. § 78u-4(b)(4). At issue here is loss causation.

*9 Loss causation is similar to the tort concept of proximate cause.*Emergent Capital Investment Management,* 195 F.Supp.2d at 559. Thus, "in order for the plaintiff to recover it must prove the damages it suffered were a forseeable consequence of the misrepresentation."*Suez Equity Investors, L.P.,* 250 F.3d at 96;*Emergent Capital Investment Management,* 195 F.Supp.2d at 559. Related factors include whether intervening causes are present such as industry-wide phenomena like a recession or whether there is a time lapse between the fraudulent statement and the loss. *Id.* In *Suez Equity Investors, L.P.,* the Second Circuit identified two types of recognized losses: (1) the plaintiff's loss at the time of purchase, due to the decreased "investment qual-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.))

ity" of the stock, and (2) the eventual loss due to the group's financial failure.

Plaintiff does not sufficiently allege the decreased "investment quality" of the stock. It is theoretically possible to do so. Like the plaintiff in *Emergent Capital Investment Management*, if NHL had known that defendants had lost confidence in management, it would have valued its investment in the company very differently. But, plaintiff would need to have alleged that the defendants' misrepresentations regarding management induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction. Plaintiff has not done so.

However, plaintiff has sufficiently alleged a causal connection between the defendants' alleged omissions and misrepresentations and the failure of the business. For example, defendants could reasonably have foreseen that the alleged management problems or the lower cash reserves may be the causal precursor to the business' failure. On the other hand, defendants point out that in a February 14, 2001 letter to plaintiff, defendants represented that "WAXS' current problems are not the result of poor management, a loss of financial control, excessive leverage or of a failed business plan" (Harper Decl. Exh. C at 2), but rather, it was the sudden termination of the company's short term bank lines by WAXS' commercial banks that was causing such problems. The letter also stated that the capital markets tightened and the telecom industry as a whole suffered a significant decline. (Id.)

This is a very fact-intensive inquiry and the Court is not able to and should not determine here, as a matter of law, what caused the company's demise and hence, the plaintiff's loss. On a motion to dismiss, all inferences are to be drawn in favor of the pleader. *Suez Equity Investors, L.P.* at 99.Loss causation has been sufficiently pleaded.

III. Violations of Investment Advisers Act of 1940

Plaintiff seeks rescission of the investment advisory contract between NHL and BBH under Section 215 of the 1940 Act, and for the return of all fees paid under that contract for the period January 29, 1999 through June 30, 2001 totaling $113, 301.80. (Compl.¶ 62). Both parties agree that because this claim is predicated on an allegation of fraud, plaintiff's Section 215 claim must satisfy the heightened pleading requirements of Fed R. Civ. P. 9(b).*Washington v. Baenziger*, 656 F.Supp. 1176, 1177 (N.D.Cal.1987) (dismissing Investment Advisers Act claim for failure to satisfy Rule 9(b)). Plaintiff may proceed with this claim with regards to those allegations determined to be well-pleaded as discussed above.

IV. Plaintiff's State Law Claims

A) Plaintiff's Common Law Fraud Claim

*10 Plaintiff's state law fraud claim is subject to the pleading requirements of Fed R. Civ. P. 9(b).*Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96-3231, 1998 WL 167330, at *7 (S.D.N.Y. Apr.8, 1998). This claim should be permitted to the extent it is consistent with the findings made above concerning the well-pleaded federal securities fraud allegations.

B) Plaintiff's Negligent Misrepresentation and Breach of Fiduciary Duty Claims

[9] Plaintiff's negligent misrepresentation and breach of fiduciary duty claims are precluded by New York's version of the blue sky laws, the Martin Act, N.Y. Gen. Bus. Law, art 23-A, § 352, *et seq.* and should be dismissed. Courts have deemed claims for negligent misrepresentation and breach of fiduciary duty in the context of sales of securities to come within the purview of the Martin Act. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir.2001) (breach of fiduciary duty [FN2] claim precluded by Martin Act); *Spirit Partners, L.P. v. Audiohighway.Com*, No. 99-9020, 2000 WL 685022, at *6 (S.D.N.Y. May 25, 2000) (negligent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

misrepresentation claim precluded by Martin Act); *Bibeault v. Advanced Health Corp.,* No. 97-6026, 1999 WL 301691, *10 (S.D.N.Y. May 12, 1999) (negligent misrepresentation and breach of fiduciary duty claims precluded by Martin Act); *Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.,* 919 F.Supp. 149, 153 (S.D.N.Y.1996) (same). As the court in *Spirit Partners, L.P.* stated: "The Martin Act provides that the attorney general shall regulate and enforce New York's securities laws. Accordingly, it is well established that there exists no private right of action for claims that are within the purview of the Act."*Spirit Partners, L.P.* at *6.

> FN2. The district court in *Castellano* also found that the negligent misrepresentation claim was precluded, but this was not appealed to the Second Circuit and thus, not considered. *Castellano,* 257 F.3d at 190, n. 9.

### Conclusion

For the foregoing reasons, the Court grants the defendants' motion to dismiss in part with leave for plaintiffs to replead, consistently with Fed.R.Civ.P. 11, within 45 days of the date of this Memorandum and Order.

So Ordered.

S.D.N.Y.,2002.
Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.
Not Reported in F.Supp.2d, 2002 WL 31027550 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

▷
Ryan v. Hunton & Williams
E.D.N.Y.,2000.
Only the Westlaw citation is currently available.
    United States District Court, E.D. New York.
    Peter F. RYAN, PRD Corp., Dale W. Ryan, PDR
Holdings, Inc., PDR Corp. Defined Benefit Plan &
Trust, Ryan Realty Trust, Loperena Trust, Jaquith
Holdings, Inc., Peter F. Ryan Irrevocable Trust, Re-
search & Finance Corp., Glen Guillet, DOIT Corp.,
Zayin Investments, Ltd., Beny Primm, RPE Man-
agement, Inc., Daniel Langer, Jay Sicklen, Myker-
inus Holdings, Inc., and Charles Schmidt, Plaintiffs,
                            v.
  HUNTON & WILLIAMS, Scott J. McKay Wolas,
  Franklin H. Stone, Christopher M. Mason, Kathy
  McClesky Robb, Jerry E. Whitson, Tardino &
  Tardino, Victor J. Tardino, Jr., Victor J. Tardino,
  Sr., Crystal Waters, N.V., Crystal Distributors,
  L.P., Crystal Distributors, L.P. II, Chase Manhattan
  Bank f/k/a Chemical Bank, Fleet Bank f/k/a Nation-
  al Westminster Bank, and Gregory Wolas, Defend-
                          ants.
              No. 99-CV-5938 (JG).

                    Sept. 20, 2000.

Sigmund S. Wissner-Gross, Esq., Heller, Horowitz
& Feit, P.C., New York, for Plaintiffs.
Andrew R. Kosloff, Esq., The Chase Manhattan
Bank Legal Department, New York, for Defendant
Chase Manhattan Bank.

             MEMORANDUM AND ORDER

GLEESON, District J.
*1 The plaintiffs initiated this action to recover for
injuries they sustained as a result of their invest-
ment in a "Ponzi" scheme operated by Scott J. Mc-
Cay Wolas ("Wolas"), a partner at the New York
office of Hunton & Williams ("H & W"). Defend-
ant Chase Manhattan Bank ("Chase") has moved to
dismiss the claims against it for failure to state a

claim upon which relief can be granted and for fail-
ure to plead fraud with particularity pursuant to
Rules 12(b)(6) and Rule 9(b) of the Federal Rules
of Civil Procedure. For the following reasons, the
motion is granted.

                    BACKGROUND

The following factual background is based on the
allegations contained in the plaintiffs' complaint,
which are assumed to be true for the purposes of
this motion.

From 1989 to 1995, Wolas ran a "Ponzi" scheme.
He induced the plaintiffs and others to invest with
him by misrepresenting that their investments
would be used to purchase large shipments of
Scotch whiskey in Scotland for resale in the Orient.
In fact, there were no such purchases; instead,
Wolas used the funds to pay prior "investors" and
for other unknown purposes. In 1995, Wolas ab-
sconded, and his whereabouts are still unknown.
(See Compl. ¶ 1.)

In 1994 Chemical Bank [FN1] ("Chemical") was on
notice of various of "red flags" that indicated fraud-
ulent conduct by Wolas and/or those with whom he
was associated. For example, in May 1994, John
Dolan, a cohort of Wolas, tried to open an account
at Chemical in the name of SEV Enterprises, Inc.
("SEV"). Chemical, however, declined to open the
account because Patrick J. Connor, of Chemical's
in-house fraud investigative unit, suspected that
SEV was probably running an "advance fee scam."
(Id. ¶ ¶ 1 11-12.)Then, on June 29, 1994, a lawyer
representing a former associate at H & W contacted
Mark E. Segal, Assistant General Counsel of
Chemical, and informed him that Wolas fraudu-
lently overbilled Manufacturers Hanover Trust,
Chemical's predecessor, for work done on a litiga-
tion matter. Later that year, Chemical shut down
accounts maintained by Wolas and Albert H.
Wolas, Inc., a family business owned by Wolas's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

father and brother, after a $950,000 check to Wolas, drawn on one of the business accounts, bounced. (*See id.* ¶¶ 113-14.)

> FN1. Chemical Bank has since merged with Defendant Chase Manhattan Bank.

On March 16, 1995, just three months before the "Ponzi" scheme collapsed, Dolan opened a primary account in the name of SEV and Wolas opened a sub-account (to the SEV account) at a Chemical branch on Third Avenue in Manhattan. Although the sub-account was an attorney escrow account, Wolas authorized Dolan, a non-lawyer, to have signing authority over the sub-account. Wolas and/or Dolan further informed Chemical in-house counsel Manuel Gottlieb that the sub-account was an attorney escrow account and that all of the money passing through the sub-account was escrow money. (*See id.* ¶¶ 110, 115-16.)

From the accounts' inception, branch officer Kevin O'Dea suspected that they were a vehicle for fraudulent activity and immediately referred them to Chemical's in-house fraud investigative unit. On May 2, 1995, an employee of the fraud unit notified O'Dea and Gottlieb of the unit's concerns one year earlier when Dolan tried to open an account in the name of SEV, and urged that Chemical immediately shut down the primary and subaccounts. Then, on May 5, 1995, O'Dea notified Dolan and SEV that the accounts had to be closed by June 5, 1995, one month later.[FN2](*See id.* ¶¶ 115, 117-18.)

> FN2. On May 30, 1995, a grand jury in the Southern District of Texas issued a subpoena, in part, to one of the two SEV subaccounts. This subpoena was faxed to inhouse counsel Gottlieb on June 1, 1995. (*See* Compl. ¶ 124.)

### A. *The Account Activity*

**\*2** In April and May of 1995, O'Dea and his assistant signed or approved bank checks and transfers out of Wolas's sub-account and into the SEV

primary account. Specifically, O'Dea effected the following transactions:

(i) Beginning on April 27, 1995, O'Dea personally signed bank checks drawn on the Wolas subaccount;

(ii) On April 25, 1995, O'Dea personally approved the internal transfer of $1 million of investor funds from the sub-account to the SEV primary account, and such transfer occurred on April 27, 1995; and

(iii) On May 2, 1995, O'Dea's assistant approved the transfer of $1.6 million from the sub-account to the SEV primary account.

(*See* Compl. ¶ 119.)

Then, on April 27, 1995, O'Dea personally approved the issuance of two Chemical checks drawn on the SEV primary account, each in the amount of $100,000, and certified another SEV primary account check, in the amount of $28,459. Several days later, O'Dea approved a May 2, 1995, certified check for $200,000 drawn on the SEV primary account. This check was immediately altered to indicate that it was drawn on the sub-account. By no later than May 10, 1995, O'Dea knew that this certified check had been altered, and relied on this information in insisting that the accounts be closed. (*See id.* ¶ 120.)

By May 2, 1995, O'Dea was also aware that $10 million was to be wired into another SEV subaccount at Chemical. (*See id.* ¶ 121 .)O'Dea (and/or another Chemical employee or officer) specifically approved multiple wire transfers that resulted in the theft of investor funds. For example, O'Dea approved the following transactions:

(i) the May 2, 1995, wire transfer of $50,000 from the SEV primary account to Kehle & Co., Inc. in Florida;

(ii) the May 4, 1995, wire transfer of $40,000 to a "Keeco" entity in Washington;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

(iii) the May 4, 1995, wire transfer of $50,000 for credit to Warley, Inc.;

(iv) the May 4, 1995, wire transfer of $7,500 to Jim Roma in Washington, with "special instructions" from "F. Kelly," which O'Dea knew was false and fraudulent since the funds did not come from F. Kelly;

(v) the May 12, 1995, wire transfer of $10,000 to "David J. Friednbach" in Oregon; and

(vi) the May 12, 1995, wire transfer of $500,000 to "Jack Vita, Esq. Client Trust Account," with "special instructions" from "Warley, Inc.," which O'Dea knew was false and fraudulent since the funds did not come from Warley, Inc.

(See id. ¶ 122.)

B. *The Relevant Plaintiffs*

1. *DOIT Corp.*

O'Dea was aware that several million dollars had been wired from the Florida Cordova Law Center ("Cordova"), in April and May 1995, to the Wolas sub-account at Chemical. However, neither O'Dea nor anyone else at Chemical contacted Cordova regarding the purpose of those transfers or alerted it of Chemical's concerns. On May 16, 1995, Plaintiff DOIT Corp. ("DOIT") deposited $500,000 in escrow with the Cordova, with the expectation that the funds would then be transferred to the Wolas sub-account at Chemical. DOIT was never advised that Chemical had already taken steps to shut down the sub-account. (See id. ¶ 125.)

2. *Research & Finance Corp.*

**\*3** In late May 1995, the Chairman of the Research & Finance Corp. ("RFIN"), who maintained personal accounts at Chemical, contacted Chemical's Private Banking Group to confirm the status of what he believed was an H & W Client Funds account before he transferred $500,000 out of his per-

sonal account on behalf of RFIN to that account. The Chairman was advised that the H & W Client Funds account was in good standing, but was not told, among other things, (i) that the escrow account was a sub-account of SEV; (ii) that the sub-account was Wolas's and that H & W did not maintain the firm's principal attorney escrow account at Chemical; (iii) that Chemical had notified Wolas and SEV in early May 1995 to close the primary and subaccounts; and (iv) that Chemical believed that primary and subaccounts were being used for fraudulent purposes. (See id. ¶ 126.)

On June 29, 1995, pursuant to H & W's instructions, RFIN's accountant attempted to transfer $500,000 on RFIN's behalf to the Wolas sub-account at Chemical, believing it to be an escrow account maintained by H & W. As the SEV account and Wolas sub-account had already been closed at that point, the transfer did not go through. Chemical did not disclose to RFIN, however, why the Wolas sub-account had been closed. Believing it to be an administrative matter and that H & W had moved its escrow account to another bank, RFIN transferred the funds on July 13, 1995, to an account at National Westminster Bank ("Nat West"), now known as Fleet Bank, maintained by Wolas. (See id. ¶ 127.)

C. *This Action*

On September 24, 1999, various investors in Wolas's "Ponzi" scheme commenced this action for damages against H & W, Wolas, and other defendants for violations of the Securities Exchange Act of 1934, the Racketeering Influenced and Corrupt Organization Act, and New York common law. Relevant to the motion before me now are the claims by DOIT and RFIC against Chase (formerly Chemical) for fraud, aiding and abetting fraud, and commercial bad faith.[FN9] Chase has moved to dismiss these claims for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity, pursuant to Rules 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Proced-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

Page 4

ure.

> FN3. Although Plaintiff Glen Guillet ori-
> ginally asserted these claims against Chase
> as well, I was informed at oral argument
> on May 26, 2000, that Guillet's claims had
> been settled.

### DISCUSSION

#### A. *The Rule 12(b)(6) Standard*

In a 12(b)(6) motion, a federal court's task in de-
termining the sufficiency of a complaint is
"necessarily a limited one." *Scheuer v. Rhodes,* 416
U.S. 232, 236 (1974). The inquiry focuses not on
whether a plaintiff might ultimately prevail on her
claim, but on whether she is entitled to offer evid-
ence in support of the allegations in the complaint.
*See id.*"Indeed it may appear on the face of the
pleadings that a recovery is very remote and un-
likely but that is not the test."*Id.*Rule 12(b)(6) war-
rants a dismissal only if "it appears beyond doubt
that the plaintiff can prove no set of facts in support
of his claim which would entitle him to relief."*Con-
ley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also
Hamilton Chapter of Alpha Delta Phi, Inc. v.
Hamilton College,* 128 F.3d 59 (2d Cir.1997). In
considering a defendant's motion, the Court must
accept as true all the factual allegations in the com-
plaint and must draw all reasonable inferences in
favor of the plaintiff. *See Hamilton,* 128 F.3d at 59
(citing *Hospital Bldg. Co. v. Trustees of Rex Hosp.,*
425 U.S. 738, 740 (1976)).

#### B. *Common Law Fraud*

**\*4** Chase contends that RFIN's fraud or fraudulent
concealment claims must be dismissed because it
has failed to allege the elements of the claims and
sufficient facts to give rise to a strong inference of
fraudulent intent under Rule 9(b).[FN4]

> FN4. DOIT has abandoned its fraud claim
> against Chase. (*See* Pls.' Mem. of Law in

Opp'n at 3 n. 2.)

To state a claim of common law fraud under New
York law, plaintiff must establish, by clear and con-
vincing evidence, that (i) the defendant made a ma-
terial misrepresentation; (ii) with knowledge of its
falsity; (iii) with the intent to defraud the plaintiff;
(iv) on which the plaintiff reasonably relied; and (v)
that caused damage to the plaintiff as a result. *See
Schlaifer Nance & Co. v. Estate of Andy Warhol,*
119 F.3d 91, 98 (2d Cir.1997); *Banque Arabe et In-
ternationale D'Investissement v. Maryland National
Bank,* 57 F.3d 146, 153 (2d Cir.1995).

#### 1. *Proximate Cause*

RFIN alleges that Chemical made a material false
misrepresentation when it represented to RFIN's
Chairman that the Wolas sub-account was in good
standing. It further alleges that it reasonably relied
on this representation and suffered at least
$500,000 in damages when its investment was later
misappropriated by Wolas from his account at Nat-
West. In response, Chase contends that RFIN has
failed to establish that Chemical's statement was the
proximate cause of RFIN's injury. I agree.

"The absence of adequate causation is ... fatal to a
common law fraud claim under New York
law."*Bennett v. United States Trust Co.,* 770 F.2d
308, 316 (2d Cir.1985). A plaintiff may establish
proximate cause if an injury "is the natural and
probable consequence of the defrauder's misrepres-
entation or if the defrauder ought reasonably to
have foreseen that the injury was a probable con-
sequence of his fraud.'" *Citibank, N.A. v. K-H
Corp.,* 968 F.2d 1489, 1496 (2d Cir.1992) (quoting
*Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037,
1044 (2d Cir.1986))."The requisite causation is es-
tablished only where the loss complained of is a
direct result of the defendant's wrongful actions and
independent of other causes."*Revak v. SEC Realty
Corp.,* 18 F.3d 81, 89-90 (2d Cir.1994) (citing *Ben-
nett,* 770 F.2d at 316).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　Page 5
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

In *Bennett,* the plaintiffs used the proceeds of a series of loans from the defendant bank to purchase public utility stock and then deposited the stock with the bank as collateral for the loans. *See*770 F.2d at 310. In negotiating the loans, the bank misrepresented to the plaintiffs that the Federal Reserve's margin rules do not apply when public utility stock is deposited as collateral. The stock subsequently generated insufficient dividends to cover the interest, and its market value decreased. Thus, in addition to the plaintiffs' loss of the equity itself, they owed the bank the outstanding interest and principal in excess of the stock's depreciated value. *See id.*The district court dismissed the plaintiffs' common law fraud claim for lack of causation and the Second Circuit affirmed, concluding that the plaintiffs had only alleged "but for" causation, *i.e.,* that they would not have purchased the stock if the bank had denied the loans. *See id.* at 314-16.Noting that the plaintiffs' common law fraud and securities fraud claims were equally flawed, the court stated that there was "simply no direct or proximate relationship between the loss and the misrepresentation."*Id.* at 314, 316.The court emphasized that the plaintiffs approached the bank for a loan with the plan to purchase the public utility stock; the bank recommended neither public utility stock in general, that stock in particular, nor the investment value of any such stock. *See id.* at 313-14.Accordingly, the court concluded that the "loss at issue was caused by the [plaintiffs'] own unwise investment decisions, not by [the bank's] misrepresentation." *Id.* at 314.

*5 RFIN's fraud claim fails for precisely the same reasons. RFIN approached Chemical with the intention of investing in Wolas's whiskey scheme. Indeed, RFIN's Chairman contacted Chemical's Private Banking Group only to confirm the status of Wolas's account at Chemical prior to directing the transfer of $500,000 into the account. (*See* Compl. ¶ 126.) At that time, the Chairman was told that Wolas's account was in good standing. (*See id.*)Although RFIN insists that it would not have invested with Wolas (by depositing $500,000 in his

account at Nat West after learning that the Chemical account was closed) if the Chemical officer had not made that representation or had told RFIN's Chairman of Chemical's concerns about the Wolas sub-account, these allegations at most establish "but for" causation. Simply put, the direct and proximate cause of RFIN's loss was Wolas's fraud, not Chemical's representation about the status of the Wolas sub-account.

### 2. *Duty to Disclose*

In addition, RFIN asserts that it has a claim of fraudulent concealment based on Chemical's failure to disclose to RFIN's Chairman that (i) Chemical had notified Wolas and SEV that it would close the accounts as of June 5, 1995; (ii) Chemical suspected fraudulent activity in the accounts; (iii) H & W did not maintain an escrow account at Chemical; and (iv) Wolas's escrow account was a sub-account of the SEV account.

To establish a claim of fraudulent concealment under New York law, the plaintiff must prove the aforementioned elements of common law fraud *and* that "the defendant had a duty to disclose the material information."*Banque Arabe,* 57 F.3d at 153. A duty to disclose may arise in two circumstances: (i) "where the parties enjoy a fiduciary relationship" and (ii) "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984).

RFIN claims that Chemical's duty to disclose arose from its superior information about the status of the Wolas sub-account. It argues that such information was not readily available to RFIN, and that Chemical knew that RFIN was acting, or attempting to act, on the basis of mistaken knowledge when RFIN attempted to transfer $500,000 to the account after it was closed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 6
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

As an initial matter, I question whether RFIN may bring a fraudulent concealment claim against Chase since such a claim "ordinarily arises only in the context of business negotiations where parties are entering a contract."*Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,* No. 89 Civ. 2809(BSJ), 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996); *see also Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 2000 WL 781081, at *9 n. 5 (S.D.N.Y. June 14, 2000) (questioning in *dicta* whether defendant bank had duty to disclose where plaintiff neither conducted business nor negotiated contracts with bank or bank employee); *Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), 1998 WL 397887, at *8 (S.D .N.Y. July 15, 1998) (questioning in *dicta* whether insurance company receiver had standing to bring fraudulent concealment claim where defendant bank and insurance company "never stood on opposite sides of the same transaction").

*6 However, even if RFIN can state a fraudulent concealment claim in these circumstances, it has not done so. Chase cannot properly be held accountable for failing to disclose information about the Wolas's sub-account to RFIN. "[A] bank should keep its own customers' affairs confidential."*Aaron Ferer,* 731 F.2d at 123 (citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,*411 N.Y.S.2d 756 (4th Dep't 1978)); *see also Graney,* 400 N.Y.S.2d at 719 ("It is implicit in the contract of the bank with its customer or depositor that no information may be disclosed by the bank or its employees concerning the customer's or depositor's account.") (internal quotation marks and citations omitted); *Renner,* 2000 WL 781081, at *9 (citing *Aaron Ferer* and *Graney* and noting that bank officer had no duty to respond to plaintiff's letters inquiring about bank customers); *cf. Young v. United States Dep't of Justice,* 8 82 F.2d 633, 640-43 (2d Cir.1989) (encouraging New York courts to recognize duty of confidentiality between bank and customer). Thus, Chemical had no duty to volunteer to RFIN additional information about the alleged suspicious activity in the Wolas sub-account.

Finally, even if Chemical was obligated to disclose this additional information, there is no indication that Chemical knew that RFIN was acting on the basis of mistaken knowledge concerning the financial transaction between Wolas and RFIN. According to the plaintiff's allegations, Chemical knew only that RFIN inquired about the sub-account and attempted to transfer funds to the account after it had been closed. This attempted transfer does not support an inference that RFIN was acting on its mistaken information that Wolas was not engaging in fraud. For all Chemical knew, assuming Chemical knew of the scheme at all, RFIN was a cohort of Wolas, not a potential defrauded investor. Accordingly, RFIN has not stated claim for fraudulent concealment.[FN5]

> FN5. RFIN's fraudulent concealment claim also fails due to the absence of proximate cause. *See supra.*

### 3. *Intent to Defraud Under Rule 9(b)*

Lastly, RFIN's fraud claim must also be dismissed for the failure to plead Chemical's intent to defraud with the requisite particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rule9(b) provides, in pertinent part, that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). The rule is designed to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."*Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)) (internal quotation marks omitted). Allegations of fraud, therefore, must be specific enough to provide a defendant with "a reasonable opportunity to answer the complaint and ... adequate information to frame a response."*Ross v. A.H. Robins Co.,* 607 F.2d 545, 557-58 (2d Cir.1979).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

Page 7

*7 Four essential requirements comprise Rule 9(b). A plaintiff must (i) " 'specify the statements that the plaintiff contends were fraudulent' "; (ii) " 'identify the speaker' "; (iii) " 'state where and when the statements were made' "; and (iv) " 'explain why the statements were fraudulent." ' *Acito,* 47 F.3d at 51 (quoting *Mills v. P olar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Although a plaintiff need not plead detailed evidentiary matters, *see Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981), it must plead "facts that give rise to a strong inference of fraudulent intent," *see Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). This inference may be established either (i) "by alleging facts to show that defendants had both motive and opportunity to commit fraud," o r (ii) "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

RFIN concedes that it does not rely on evidence of motive and opportunity to commit fraud to satisfy its burden under Rule 9(b). Accordingly, I will restrict my analysis to whether RFIN's allegations establish circumstantial evidence of recklessness to give rise to the requisite inference of fraudulent intent.

Recklessness is established by conduct which is " 'highly unreasonable and which represents an extreme departure from the standard of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ' *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)) (alteration in *Rolf* ). In some instances, an inference of recklessness may be raised by " '[a]n egregious refusal to see the obvious, or to investigate the doubtful." ' *Id.* (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989)). Nonetheless, the plaintiff bears a "significant burden ... in stating a fraud claim based on recklessness." *Id.* at 270.

Here, RFIN has failed to allege facts that constitute

strong circumstantial evidence of recklessness. First, in March 1995, when the accounts were opened, Chemical had no actual knowledge that Dolan and Wolas had previously engaged in fraudulent activity. Rather, Chemical's officer, Bruce Whitcomb, had been "suspicious" of fraud in 1994, and had referred the matter to the fraud unit, which had concluded that it was "probably an advance fee scam." (Compl.¶ 112.) Likewise, neither the anonymous report to Chemical's Assistant General Counsel, Mark Segall, that Wolas had fraudulently overbilled Chemical's predecessor on a litigation matter nor the allegation that Chemical closed down a Wolas family business account due to a bounced check (both of which occurred in 1994) establishes that Chemical knew Wolas was engaged in fraud in 1995. (*See* Com pl. ¶¶ 113-14.) Thus, these allegations do not give rise to any inference of Chemical's fraudulent intent.

*8 Second, the allegations that Chemical's branch officer, Kevin O'Dea, approved various internal transfers between the SEV account and the sub-account, (*see* Compl. ¶¶ 1 19-20), similarly do not satisfy Rule 9(b)'s requirement. *See Williams v. Bank Leumi Trust Co.,* No. 96 Civ. 6695(LMM), 1997 WL 289865, at *3 (S.D.N.Y. May 30, 1997) (mere transfer of funds between accounts was insufficient to raise inference of knowledge of check-kiting scheme to satisfy Rule 9(b) or Rule 12(b)(6) for claim of fraudulent concealment).

Third, as soon as Chemical's fraud investigative unit alerted O'Dea of the prior suspected advance fee scam and urged that Chemical shut down the accounts, O'Dea notified Dolan that the SEV account and the Wolas sub-account would be closed in one month. (*See* Compl. ¶¶ 117-18.) Although Chemical may have shown greater vigilance by closing the accounts immediately, rather than continuing to approve transfers and bank checks until the accounts were closed one month later, this failing does not establish recklessness sufficient to raise a strong inference of Chemical's intent to defraud RFIN. *See Chill,* 101 F.3d at 269;*see also*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

*Renner*, 2000 WL 781081, at *14 (bank's failure to detect fraud sooner insufficient to satisfy Rule 9(b) burden of pleading fraudulent intent for aiding and abetting fraud claim); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960(MBM), 1999 WL 558141, at *7-*8 (S.D.N.Y. July 30, 1999) (bank's negligent failure to investigate several red flags and to prevent additional wire transfers after second fraudulent transfer uncovered by transferring bank did not give rise to strong inference of fraudulent intent to satisfy Rule 9(b) for claims of commercial bad faith and aiding and abetting fraud).

Finally, in light of the aforementioned case law concerning the confidential nature of bank customer information, Chemical's failure to provide information to RFIN about Wolas's sub-account beyond the representation that it was in good standing cannot give rise to an inference of an intent to defraud.

In sum, RFIN has failed its significant pleading burden. Its allegations do not raise any inference, let alone a strong inference, of an intent to defraud. Accordingly, RFIN's fraud and fraudulent concealment claims must be dismissed.

## C. Aiding and Abetting Fraud

To establish a claim of aiding and abetting fraud under New York law, a plaintiff must establish (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of this violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Chase contends, and I agree, that RFIN and DOIT have failed to allege either Chemical's knowledge of Wolas's fraud or that Chemical substantially assisted in the commission of the fraud.

## 1. Actual Knowledge

New York law requires a plaintiff to establish that

the alleged aider and abettor had " 'actual knowledge' ' of the primary wrong. *Renner*, 2000 WL 781081, at *6 (quoting *Kolbeck v. LIT Am., Inc .*, 939 F.Supp. 240, 246 (S.D.N.Y.1996)); *see also Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir.2000) (stating that "knowledge of the underlying wrong" is "required element" under New York law).

*9 Here, the plaintiffs have failed to allege that Chemical had actual knowledge of Wolas's fraud. As explained *supra*, the allegations that Chemical suspected that Dolan and SEV were running an advance fee scam in 1994, (*see* Compl. ¶ 112), that Wolas allegedly overbilled Chemical's predecessor in connection with litigation, (*see id.* ¶ 113), and that Chemical shut down a Wolas family account in 1994 due to a bounced check, (*see id.* ¶ 114), do not establish that Chemical had actual knowledge of Wolas's fraudulent scheme in 1995.

Turning to the allegations in 1995, O'Dea requested Chemical's fraud investigation unit to review the SEV account and the Wolas sub-account based on suspicions-not actual knowledge-of fraudulent activity. (*See id.* ¶ 115, 117.)Subsequently, upon receiving the recommendation of the fraud unit that the accounts be closed, O'Dea informed Dolan that Chemical would close the accounts in one month. (*See id.* ¶ 117-18.)Allegations that Chemical suspected fraudulent activity, however, do not raise an inference of actual knowledge of Wolas's fraud.FN6

> FN6. This case is closely analogous to Judge Haight's opinion in *Renner*, 2000 WL 781081. In that case, the plaintiff alleged that Chase aided and abetted a prime bank guarantee scam. The allegation of actual knowledge on the part of Chase was based on, *inter alia,* its officials' rejection of a letter of credit proposal based on their suspicion that the letters were potential vehicles for fraud. *See id.* at *12. The court rejected this argument, however, and concluded that there was "no factual basis for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

Page 9

the assertion that Chase officials actually knew the fraud [they suspected] was, in fact, occurring." *Id.*

Finally, O'Dea's authorization of transfers between the SEV account and the sub-account, (*see id.* ¶ 119), and his approval of multiple wire transfers, (*see id.* ¶ 122), do not create an inference of knowledge of the scheme. In *Williams,* 1997 WL 289865, a statutory receiver for an insurance company brought an action for, *inter a lia,* aiding and abetting fraud, and alleged that the defendant bank had actual knowledge of a check-kiting scheme where the bank had approved various bank transfers. *See id.* at *4. The court rejected this argument, concluding that the account transfers and other allegations established only constructive knowledge on the part of the bank, which is insufficient to state a claim for aiding and abetting fraud. *See id.* Similarly, in this case, the plaintiffs have failed to establish that Chemical had any actual knowledge of Wolas's fraud, and thus, their aiding and abetting fraud claim must be dismissed.[FN7]

> FN7. The plaintiffs' remaining allegations, that Chemical improperly permitted Dolan, a non-lawyer, to be a signatory on the Wolas's attorney escrow account, (*see* Compl. ¶ 116), that Chemical knew that a check drawn on the SEV account had been altered to reflect that it was issued from the Wolas sub-account, (*see id.* ¶ 120), and that Chemical knew that H & W did not maintain a firm escrow account at Chemical, (*see id.* ¶ 123), do not establish that Chemical knew of Wolas's fraud. These allegations only support a finding that Chemical had constructive notice of the fraud.

### 2. *Substantial Assistance*

The second element of an aiding and abetting fraud claim is substantial assistance. "A defendant provides substantial assistance only if it 'affirmatively assists, helps conceal, or by virtue of

failing to act when required to do so enables [the fraud] to proceed." ' *Nigerian Nat'l,* 1999 WL 558141, at *8 (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992)) (alteration in *Nigerian Nat'l* ).

Again, the plaintiffs have failed to allege that Chemical substantially assisted Wolas's fraud. The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance. In *Williams,* the court considered whether the use of bank accounts by the participants in the fraudulent scheme constituted substantial assistance by the bank in the participants' fraud. *See* 1997 WL 289865, at *4. Rejecting the claim, the court held that "the mere fact that all the participants in the alleged scheme used accounts at [the bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability." *Id.; see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's execution of repeated wire transfers for millions of dollars did not constitute substantial assistance for an aiding and abetting fraud claim); *Renner,* 2000 WL 781081, at *12 (Chase did not give substantial assistance to participants of prime bank guarantee scam simply because participants used accounts at Chase).

*10 Turning to the plaintiffs' allegations of Chemical's inaction, *e.g.,* failing to shut down the accounts sooner or to inform the plaintiffs about the suspected fraud, these omissions likewise do not rise to the level of substantial assistance. As previously stated, a defendant may provide substantial assistance by failing to act only when it was required to act. *See Nigerian Nat'l,* 1999 WL 558141, at *8. Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability. *See King v. George Schonberg & Co.,* 650 N .Y.S.2d 107, 108 (1st Dep't 1996); *see also Renner,* 2000 WL 781081, at *12 ("[A]bsent a fiduciary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

duty, inaction does not constitute substantial assistance."). Here, the plaintiffs and Chemical do not have a fiduciary relationship. The relationship between a bank and its depositor is not a fiduciary one, but only that of a debtor and creditor. *See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984). Thus, RFIN or RFIN's Chairman, who had an account at Chemical's Private Banking Group, did not have a fiduciary relationship with Chemical. DOIT is not even a client of Chemical. Moreover, even assuming that RFIN had a confidential relationship with Chemical by virtue of its status as a customer, *see id.* at 123 ("[A] bank should keep its own customers' affairs confidential."(citing *Graney Dev. Corp. v. Taksen,* 400 N.Y.S.2d 717, 719 (Sup.Ct.), *aff'd,*411 N.Y.S.2d 756 (4th Dep't 1978))), Chemical was under no obligation to disclose confidential information about Wolas, another customer. The plaintiffs, therefore, have failed to establish that Chemical substantially assisted in Wolas's fraud. Accordingly, their aiding and abetting fraud claim must be dismissed.

## D. *Commercial Bad Faith*

A claim for commercial bad faith against a depository bank will lie if the "bank acts dishonestlywhere it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme."*Prudential-Bache Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 275 (1989). Thus, "knowledge of the underlying wrong" is a "required element" of commercial bad faith under New York law. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000).

As I have already concluded that the complaint fails adequately to allege that Chemical had actual knowledge of Wolas's fraud, the plaintiffs' claim for commercial bad faith must also be dismissed. At most, the plaintiffs have alleged that Chemical negligently failed to monitor the accounts adequately and close them promptly. However, pleading " 'merely a lapse of wary vigilance or even suspi-

cious circumstances which might well have induced a prudent banker to investigate" ' is insufficient to state a claim of commercial bad faith.*Renner,* 2000 WL 781081, at *17 (quoting *Prudential-Bache,* 73 N.Y.2d at 275);*see also Nigerian Nat'l,* 1999 WL 558141, at *8 (bank's alleged failure to investigate "red flags" and negligent approval of additional wire transfers, even after bank was alerted to fraudulent transfer, insufficient to state commercial bad faith claim).

*11 The plaintiffs' reliance on *Prudential-Bache,* 73 N.Y. 263, and *Peck v. Chase Manhattan Bank, N.A.,* 593 N.Y.S. 509 (1st Dep't 1993), to support their contention that Chemical had actual knowledge of Wolas's fraud is unpersuasive. Indeed, these cases support Chase's position. In *Prudential-Bache,* two bank officers were convicted of accepting bribes in connection with participation in a fraudulent scheme. The bank officers set up accounts without proper opening records and corporate resolutions, and with fictitious corporate officers, and also agreed not to prepare certain records required to be filed with the Internal Revenue Service. *See*73 N.Y.2d at 267. To implement the embezzlement scheme, one of the co-conspirators cashed several checks on a single day and often left the branch with large quantities of cash or cashiers' checks. Furthermore, other bank employees, including managers, were also allegedly aware of the fraud due to a co-conspirator's frequent visits to the bank, his repeated large cash withdrawals at teller windows, and his conversations with other bank employees. *See id.* at 268.Although the bank argued that the conduct of its agents, the convicted officers, could not be imputed to it under the adverse agent doctrine, the New York Court of Appeals declined to decide that issue and held that the plaintiff had stated a commercial bad faith claim against the bank. *See id.* at 276-77.In *Peck,* the plaintiff alleged that an internal bank memorandum reflected that bank employees actually knew that checks payable to third parties were being deposited into the thief's account, but no action was taken. 593 N.Y.S.2d at 511. The trial court granted the bank's motion to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                            Page 11
Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1375265 (E.D.N.Y.))

dismiss, but the Appellate Division reversed, hold-
ing that the allegations of actual knowledge ad-
equately stated a claim for commercial bad faith.
*See id.*

Here, the plaintiffs' allegations fall short of these
cases, which involved either active participation in
the fraud by bank officials or actual knowledge on
their part of the ongoing fraud, as they have failed
to allege either on the part of Chemical. Accord-
ingly, their commercial bad faith claim must be dis-
missed.

E. *Leave to Amend*

The plaintiffs argue, in the alternative, that if I
grant Chase's motion I should give them leave to
replead. I decline to do so.

A district court may deny leave to amend a com-
plaint if the amendment would be futile. *See Foman
v. Davis,* 371 U.S. 178, 182 (1962). As the
plaintiffs drafted their complaint well after discov-
ery had been taken in a related case, *see Accousti v.
Wolas,* 95-CV-5267 (JG) (E.D.N.Y. filed Dec. 20,
1995), an opportunity to amend would be futile. *See
Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d
Cir.1982) (denial of leave to amend not abuse of
discretion where plaintiff had "access to full dis-
covery" in a related case).

CONCLUSION

For the aforementioned reasons, Chase's motion to
dismiss is granted.

*12 So Ordered.

E.D.N.Y.,2000.
Ryan v. Hunton & Williams
Not Reported in F.Supp.2d, 2000 WL 1375265
(E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.))

**H**

Seippel v. Jenkens & Gilchrist, P.C.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
William H. SEIPPEL and Sharon A. Seippel,
Plaintiffs,

v.

JENKENS & GILCHRIST, P.C.; Paul M. Dauger-
das; Sidley, Austin, Brown & Wood, LLP; R.J.
Ruble; Deutsche Bank, A.G.; and Deutsche Bank
Securities, Inc., d/b/a Deutsche Bank Alex Brown,
Defendants.
No. 03 Civ. 6942(SAS).

Oct. 26, 2004.

Blair C. Fensterstock, Maureen McGuirl, J osiah
Greenberg, Fensterstock & Partners, L.L.P., New
York, New York, for Plaintiffs.
Laurence M. Hill, Seth C. Farber, Dewey Ballan-
tine, L.L.P., New York, New York, for Defendants
Deutsche Bank AG and Deutsche Bank Securities.
Ann E. Schofield, McDermott, Will & Emery, New
York, New York, for Defendants Jenkens & Gil-
christ and Paul Daugerdas.
Aaron R. Marcu, Andrew A. Ruffino, Jason P.
Criss, Covington & Burling, New York, New York,
Bruce A. Abbott, Munger, Tolles & Olson, L.L.P.,
Los Angeles, California, for Defendant Sidley Aus-
tin Brown & Wood.
Stuart Abrams, Frankel & Abrams, New York, New
York, for Defendant R.J. Ruble.

*MEMORANDUM OPINION AND ORDER*

SCHEINDLIN, J.

I. INTRODUCTION

*1 This case arises out of tax and consulting ser-
vices provided by several professional law, finan-
cial services and accounting firms. Plaintiffs, Willi-
am and Sharon Seippel, filed this suit on September
10, 2003, alleging violations of the Racketeer Influ-
enced and Corrupt Organizations Act ("RICO"), 18
U.S.C. § 1962, and various state law claims. De-
fendants Sidley, Austin, Brown & Wood L.L.P.,
joined by R.J. Ruble (collectively, "the Sidley De-
fendants") moved to dismiss. In an Opinion and Or-
der dated August 25, 2004 (the "August 25 Order"),
the Court granted the Sidley Defendants' motion in
part. Applying New York limitations principles, the
Court determined that the Seippels' state law mal-
practice claim against the Sidley Defendants was
time-barred. The Court further determined that the
Seippels' state law claims against the Sidley De-
fendants for negligent misrepresentation, breach of
contract, and breach of fiduciary duty were duplic-
ative of and merged into the malpractice claim, and
so were also time-barred. The August 25 Order dis-
missed all of these claims, but, at the request of the
Seippels, stated that the Seippels should have leave
to refile these claims "in another jurisdiction in
which they would not be time-barred."[FN1]

FN1. August 25 Order at 53.

The Sidley Defendants now move for reconsidera-
tion of the August 25 Order, requesting that the
Court amend that Order to "clarify that Plaintiffs
are not entitled to 'leave to refile elsewhere' their
[time-barred] claims against [the Sidley Defend-
ants] and that Plaintiffs are precluded from filing
those claims in another jurisdiction."[FN2]For the
following reasons, the motion for reconsideration is
granted.

FN2. Memorandum of Law in Support of
Sidley Defendants' Motion for Reconsider-
ation ("Mem.") at 4. The Seippels have
filed a brief in opposition. *See* Memor-
andum of Law in Opposition to Motion for
Reconsideration ("Opp'n Mem.").

II. LEGAL STANDARD

Motions for reconsideration are governed by Local
Civil Rule 6.3 and are committed to the sound dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 2
Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.))

cretion of the district court.[FN3]Reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."[FN4]

> FN3.*See AT & T Corp. v. Microsoft Corp.,* No. 01 Civ. 4872, 2004 WL 309150, at *1 (S.D.N.Y. Feb. 19, 2004).

> FN4.*In re Health Mgmt. Sys., Inc. Secs. Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (quotation marks and citation omitted).*See also Range Road Music, Inc. v. Music Sales Corp.,* 90 F.Supp.2d 390, 392 (S.D.N.Y.2000) ("The ... limitation on motions for reconsideration is to ensure finality and to prevent the practice of a losing party examining a decision and then plugging the gaps of the lost motion with additional matters.") (quotation marks and citation omitted).

Under Local Civil Rule 6.3, "the moving party must demonstrate controlling law or factual matters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision."[FN5]The standard for granting a motion for reconsideration is strict so as to prevent repetitive arguments on issues that have been thoroughly considered by the court.[FN6]But the court may grant a motion for reconsideration to "correct a clear error or prevent manifest injustice."[FN7]

> FN5.*Montanile v. National Broad. Co.,* 216 F.Supp.2d 341, 342 (S.D.N.Y.2002), *aff'd,*2003 WL 328825 (2d Cir. Feb.13, 2003) (unpublished).

> FN6.*See In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

> FN7.*Doe v. New York City Dep't of Social Servs.,* 709 F.2d 782, 789 (2d Cir.1983).

A motion for reconsideration is not a substitute for appeal.[FN8]Nor is it a vehicle "to reargue those is-

sues already considered when a party does not like the way the original motion was resolved."[FN9]Accordingly, the moving party may not "advance new facts, issues or arguments not previously presented to the Court."[FN10]

> FN8.*See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 207 F.Supp.2d 292, 296 (S.D.N.Y.2002).

> FN9.*In re Houbigant, Inc.,* 914 F.Supp. at 1001.

> FN10.*Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland,* 768 F.Supp. 115, 116 (S.D.N.Y.1991).

III. DISCUSSION

Under New York law, a judgment dismissing a claim as barred by the statute of limitations is treated as a judgment on the merits for *res judicata* purposes, and has full claim preclusive effect.[FN11]Under *Semtek International Inc. v. Lockheed Martin Corp.,*"the claim-preclusive effect of [a New York] federal court's dismissal 'upon the merits' of petitioner's action on statute-of-limitations grounds is governed by a federal rule that in turn incorporates [New York's] law of claim preclusion."[FN12]If the Seippels were to refile the claims dismissed by this Court as time-barred in a court of another jurisdiction, that court would be required to apply New York preclusion rules, and to dismiss their claims on the basis of *res judicata.*The Court overlooked the effect of *Bray, Garguil, Smith* and *Semtek* in granting the Seippels leave to refile elsewhere.

> FN11.*See Bray v. New York Life Insurance Co.,* 851 F.2d 60, 64 (2d Cir.1988); *Garguil v. Tompkins,* 790 F.2d 265, 269 (2d Cir.1986); *Smith v. Russell Sage College,* 54 N.Y.2d 185, 194, 445 N.Y.S.2d 68, 429 N.E.2d 746 (1981). The Seippels argue, citing practice commentaries, that "the theory of the statute of limitations generally

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.))

Page 3

followed in New York is that the passing of the applicable limitations period does not wipe out the substantive right; it merely suspends the remedy."Opp'n Mem. at 2 (citing D. Seigel, N.Y. Prac. § 34, p. 40 (1999)). However, this Court is bound by the holdings of *Bray, Garguil,* and *Smith.*

FN12.*Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 509, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001).

**\*2** The Sidley Defendants' memorandum reiterates, clearly and at length, arguments made obliquely and allusively in their original papers.[FN13]For that reason, the Court might, as the Seippels urge, deny the motion for reconsideration. However, reconsideration, in this case, will contribute to the "conservation of scarce judicial resources." [FN14]If the Seippels were to file their claims in another court, that court would have no choice but to dismiss them. No purpose would be served by requiring another court to engage in that useless exercise. Nor should the Sidley Defendants be put to the burden of responding to a doomed suit. Accordingly, the Sidley Defendants' motion for reconsideration is granted.

FN13.*See* Jenkens & Gilchrist Reply Memorandum of Law in Further Support of Motion to Dismiss at 10 (citing *Semtek* ). The Sidley Defendants incorporated the arguments of Jenkens & Gilchrist into their reply memorandum. *See* Sidley Defendants Reply Memorandum of Law in Further Support of Motion to Dismiss at 7, n. 3.

FN14.*In re Health Mgmt. Sys., Inc. Secs. Litig.,* 113 F.Supp.2d at 614.

At first blush, this result may seem unfair. It was only by the operation of New York's borrowing statute that the Seippels' malpractice claim was found to be time-barred; had the Seippels originally brought that claim in another jurisdiction (*e.g.,* Vir-

ginia), it would not have been time-barred.[FN15]On initial consideration, it appeared to the Court that fairness required that the Seippels be allowed to refile their claims in a jurisdiction where they might proceed to a determination on the merits. Having given the matter further thought, however, the result urged by the Sidley Defendants, though it may seem harsh, is justified by important policy concerns. Plaintiffs should not be encouraged or permitted to forum shop, by bringing a claim in New York that is likely time-barred, safe in the knowledge that if it is found to be untimely, they are free to pursue it elsewhere. Indeed, it is the clear purpose of New York's borrowing statute to discourage such forum-shopping.[FN16]

FN15.*See*N.Y. C.P.L.R. § 202 (McKinney 2003). Under New York's borrowing statute, where a plaintiff who is not a resident of New York sues based upon a cause of action that accrued outside New York, the court must apply the shorter limitations period of either New York or the state where the cause of action accrued.

FN16.*See Man ning v . Utils . Mut. I ns. Co.,* 254 F.3d 387, 396 (2d Cir.2001) (stating that purpose of borrowing statute is to "discourage forum shopping").

## IV. CONCLUSION

For the foregoing reasons, the Sidley Defendants' motion for reconsideration is granted. The August 25 Order is hereby amended to clarify that the Seippels' time-barred claims against the Sidley Defendants for malpractice, negligent misrepresentation, breach of contract, and breach of fiduciary duty are dismissed with prejudice; the Seippels are *precluded* from refiling these claims in another jurisdiction.

SO ORDERED:

S.D.N.Y.,2004.
Seippel v. Jenkens & Gilchrist, P.C.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2403911 (S.D.N.Y.))**

Not Reported in F.Supp.2d, 2004 WL 2403911
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 5111623                                                              Page 1
2006 WL 5111623 (N.Y.Sup.) (Trial Order), 2006 N.Y. Slip Op. 30220(U) (Trial Order)

▷

                         Supreme Court, New York.
                            New York County
      Matthew SERINO and Lucille Serino, individually and on behalf of all others
                         similarly situated, Plaintiffs,
                                      v.
       Kenneth LIPPER, Lipper Holdings, LLC, Pricewaterhouse Coopers LLP, Lipper &
       Company, Inc., Abraham Biderman, Lawrence Block, Edward Strafaci and Michael
                              Visovsky, Defendants;
       Lipper Holdings, LLC, Lipper & Company, L.P., Jerome Services Corp. LDC and
                          Kenneth Lipper, Plaintiffs,
                                      v.
        Pricewaterhousecoopers LLP, and Pricewaterhousecoopers LLP (Netherlands
                            Antilles), Defendants.
                              No. 0604396/2002.
                            September 28, 2006.
Index No. 600150/2005

                            Decision and Order
      [This opinion is uncorrected and not selected for official publication.]

Moskowitz, J.

*1 Motion sequence numbers 017 (in *Serino v Lipper, et al.* [Index No. 604396/02]
[the *Serino* Action]) and 001 and 002 (*in Lipper Holdings, LLC, et al. v Pricewa-
terhouseCoopers LLP, et al.* [Index No, 600150/05] [the *Lipper* Action]) are consol-
idated for disposition.

These two actions are among several lawsuits resulting from the demise of Lipper
*2 Convertibles, L.P. (Lipper Convertibles) and other investment funds. Plaintiffs
seek damages for, among other things, the defendant accounting firms' improper
audits of the funds' financial statements including the firms' failure to discover
that the funds had overstated their earnings.

The five-count amended complaint in the *Serino* Action asserts causes of action
for breach of fiduciary duty, money had and received and unjust enrichment, breach
of contract, negligence, negligent misrepresentation and malpractice, and aiding
and abetting breach of fiduciary duty. Defendant PricewaterhouseCoopers LLP (PWC)
answered the amended complaint, asserting five contribution-based cross claims,
including claims for fraud, negligent misrepresentation, negligence, breach of fi-
duciary duty, and breach of contract. Defendants Kenneth Lipper (Lipper), Lipper
Holdings, LLC (Lipper Holdings), and Lipper & Company, Inc. (Lipper, Inc.)
answered PWC's cross claims, asserting cross claims against PWC for fraud, negli-
gence and malpractice, breach of fiduciary duty, breach of contract, negligent

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

misrepresentation and contribution. Defendant Abraham Biderman (Biderman) answered
PWC's cross claims, asserting cross claims against PWC for fraud, and contribution
and negligence.

The *Lipper* Action involves the defendant accounting firms' independent audits of
the following investment funds: Lipper Convertibles, from 1989 through the second
quarter of 2002; Lipper Offshore Convertibles, L.P. (Lipper Offshore), from 1993
through the second quarter of 2002; Lipper Convertibles Series II, L.P. (Lipper
Series II), from 1998 through the second quarter of 2002; and Lipper Fixed Income
Fund, L.P. (Lipper Fixed Income), from 1993 through the second quarter of 2002.
The six-count complaint contains causes of action for fraud, negligence and mal-
practice, breach of fiduciary duty, breach of contract, negligent misrepresenta-
tion, and contribution and indemnification.

**\*3** In motion sequence number 017 in the *Serino* Action, PWC moves to dismiss the
cross claims of Lipper, Lipper Holdings, Lipper, Inc. (together, Lipper Parties)
and Biderman, except for the cross claims for contribution.

In motion sequence number 001 in the *Lipper* Action, PWC moves to dismiss the com-
plaint. In motion sequence number 002 in the *Lipper* Action, defendant Pricewater-
houseCoopers LLP (Netherlands Antilles) (PWC NA) moves to dismiss the complaint.

The court discussed the facts underlying both the Serino and Lipper Actions in
detail in prior decisions in the related action *Jones v PriceWaterhouseCoopers LLP*
(6 Misc 3d 1014[A], 2004 WL 3140909 [Sup Ct, NY County 2004]) and the prior de-
cision of *Morgado Family Partners, LP v Lipper* (6 Misc 3d 1014[A], 2004 WL 3142198
[Sup Ct, NY County 2004], *affd* 19 AD3d 262 [1st Dept 2005]). Therefore, the court
presumes familiarity with the facts and will only discuss new facts to the extent
that they are relevant to this decision.

*Discussion*

        *PWC's Motion to Dismiss Cross claims in the Serino Action*
*Motion to Dismiss Lipper Parties' Cross claims*

In motion sequence number 017 in the *Serino* Action, PWC argues that the court
should dismiss the Lipper Parties' cross claims because these claims are identical
to the claims the Lipper Parties assert in the *Lipper* Action. In opposition, the
Lipper Parties argue that PWC has already agreed that consolidation of their cross
claims in this action and the *Lipper* Action is appropriate, that statute of limit-
ations differences exist between this action and the *Lipper* Action and that there
is not complete identity of parties.

**\*4** CPLR 3211 (a) (4) permits dismissal of an action where "there is another ac-
tion pending between the same parties for the same cause of action in a court of
any state or the United States; the court need not dismiss upon this ground but
may make such order as justice requires." (*See Employers Ins. of Wausau v Primer-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2006 WL 5111623                                                                          Page 3
2006 WL 5111623 (N.Y.Sup.) (Trial Order), 2006 N.Y. Slip Op. 30220(U) (Trial Order)

*ica Holdings, Inc.*, 199 AD2d 178, 178 [1st Dept 1993] [dismissing action under CPLR 3211 (a) (4) based upon "the identity of issues" and a "substantial identity of the parties"]; *see also Screen Gems-Columbia Music, Inc. v Hansen Publ., Inc.*, 42 AD2d 897, 898 [1st Dept 1973], *affd* 35 NY2d 885 [1974]).

On January 13, 2005, after plaintiffs filed their amended complaint in the *Serino* Action, the Lipper Parties commenced the *Lipper* Action against PWC and PWC NA. On February 15, 2006, PWC moved to dismiss the *Lipper* Action, and the Lipper Parties served their answers to PWC's cross claims and their own cross claims against PWC. The complaint in the *Lipper* Action and the Lipper Parties' cross claims against PWC in the *Serino* action are all based upon PWC's alleged failure to properly audit the financial statements of certain investment funds and PWC's alleged failure to discover and/or disclose overvaluations and problems with internal controls after conducting audits of those funds. The Lipper Parties' cross claims in the *Serino* Action are identical to the claims that they assert against PWC in the *Lipper* Action. Thus, PWC has shown that "[t]here is another action pending by defendants for the same relief and the issues raised may properly be considered in such action." (See *Screen Gems-Columbia Music, Inc.*, 42 AD2d at 898).

The Lipper Parties argue that the court should consolidate claims in the *Lipper* Action with the Lipper Parties' cross claims in the *Serino* Action, because PWC already agreed to this consolidation. PWC moved to consolidate the six Lipper-related actions for trial. On May 4, *5 2006, the court heard oral argument on PWC's consolidation motion and denied the motion from the bench, with leave to renew. (5/4/06 Tr., at 6-7).

As a preliminary matter, the Lipper Parties have not cross-moved for consolidation of their claims in the *Lipper* Action and the *Serino* Action. Moreover, the Lipper Parties' argument assumes that PWC's motion to consolidate six actions is tantamount to an admission that consolidation of two actions, the *Lipper* and *Serino* Actions, is appropriate. However, PWC did not contemplate in its motion carving out the claims in these two actions for consolidation and the Lipper Parties fail to show that PWC consented to the consolidation. Therefore, the Lipper Parties' argument is unpersuasive.

The Lipper Parties argue that their cross claims in the *Serino* Action are timely under CPLR 203 (d); whereas, if the continuous representation doctrine does not apply to their claims in the *Lipper* Action, dismissal of the *Serino* Action could deprive them of remedies that might be available in the *Lipper* Action.

CPLR 203 (d) provides that "[a] defense or counterclaim is interposed when a pleading containing it is served. A defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed ...."

That the Lipper Parties may have timely asserted their cross claims in the *Serino*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Action does not alter the fact that their cross claims in the *Serino* Action seek recovery for the same injuries as their claims in the *Lipper* Action. As discussed above, in the two actions, the parties, the causes of action and the injury are all substantially identical. Moreover, because they are the same claims, the same statutes of limitations apply in both actions. Therefore, the Lipper Parties' argument is unpersuasive.

*6 The Lipper Parties claim that the dismissal of this action pursuant to  CPLR 3211 (a) (4) might substantially prejudiced them. However, the Lipper Parties made a strategic decision to commence the *Lipper* Action and assert their claims as plaintiffs. The Lipper Parties did not cross-move to consolidate the two actions. Nor did they seek to withdraw their complaint in the *Lipper* Action in favor of their cross claims in the *Serino* Action. The court fails to see how the Lipper Parties might prejudice their own litigation strategy. In any event, as discussed below, a majority of the Lipper Parties' claims are not time-barred in the *Lipper* Action.

The Lipper Parties argue that dismissal under CPLR 3211 (a) (4) is inappropriate, because there is not complete identity of the parties.

Under New York law, courts may dismiss claims based upon "the identity of issues" and the "substantial identity of the parties." *Employers Ins. of Wausau,* 199 AD2d at 178.
 [I]t is necessary that there be sufficient identity as to both the parties and the causes of action asserted in the respective actions. With respect to the parties, the requirement is that there be substantial identity .... The presence of additional parties, however, will not necessarily defeat a motion pursuant to CPLR 3211 (a) (4) where, as here, both suits arise out of the same subject matter or series of alleged wrongs.
(*White Light Prod., Inc. v On The Scene Prod., Inc.,* 231 AD2d 90, 93-94  [1st Dept 1997] [internal citations and quotation marks omitted]).

A review of the overlapping Lipper Parties between the *Lipper* and *Serino* Actions reveals that only Lipper, Inc. is a defendant in the *Serino* Action but not a plaintiff in the *Lipper* Action. Thus, there is a substantial identity of parties. Moreover, the court takes note of PWC's assertion that Lipper Convertibles' former general partner, Lipper & Company, L.P represents the interests of Lipper, Inc. (Lipper Holding's managing member) in the *Lipper* Action. Further, *7 the progression of two actions "involving substantially the same parties and issues" would be an "indefensible ... waste of judicial energies." (See *Krisel v Phillips Petroleum Co.,* 32 AD2d 628, 629 [1st Dept 1969]}. Accordingly, the court grants PWC's motion to dismiss the Lipper Parties' cross claims, except the cross claims for contribution.

*Motion to Dismiss Biderman's Cross claims*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Biderman is a defendant and cross claimant in the *Serino* Action, but not a party
in the *Lipper* Action. Biderman asserts two cross claims against PWC, one for fraud
and one for contribution. Motion sequence number 017 seeks dismissal of Biderman's
fraud cross claim, for failure to state a cause of action. As discussed above, PWC
does not seek dismissal of the contribution claim.

According to PWC, Biderman fails to allege that PWC had any interest in knowingly
failing to disclose a misstatement in the financial statement and that he reason-
ably relied upon PWC's misrepresentations.

"In order to recover for fraud, plaintiffs must show a representation of material
fact, the falsity of that representation, knowledge by the party who made the rep-
resentation that it was false when made, justifiable reliance by the plaintiff,
and resulting injury." (*See Pope v Saget,* 29 AD3d 437, 441 [1st Dept 2006]).

Here, Biderman alleges that he served as executive vice-president of Lipper &
Company, L.P. and Lipper Holdings, and as co-manager of Lipper Convertibles. His
cross claim for fraud avers that PWC failed to inform him or the other Lipper
Parties that Lipper Convertibles' portfolio manager overvalued Lipper Convert-
ibles' securities and that PWC falsely represented that it audited Lipper Convert-
ibles' financial statements in accordance with its obligations.

*8 Specifically, Biderman's cross claim alleges that PWC's audit papers reveal
that PWC discovered significant discrepancies in the valuations of Lipper Convert-
ibles' portfolio manager, defendant Edward Strafaci (Strafaci). Strafaci's over-
valuation ultimately caused Lipper Convertibles to reduce its net equity value by
approximately $400 million (about 40%). Biderman avers that PWC nevertheless con-
tinued to issue clean audit *opinions* and failed to inform Biderman or the Lipper
Parties of the discrepancies, even though PWC was aware of information that con-
tradicted its own work papers. Biderman claims that PWC knew of the importance of
Lipper Convertibles valuations and assured Biderman and the Lipper Parties that
PWC would confirm the valuations through its audit.

Biderman alleges that PWC falsely represented that it had audited Lipper Convert-
ibles in accordance with Generally Accepted Auditing Standards (GAAS), that Lipper
Convertibles' financial statements were prepared in conformity with Generally Ac-
cepted Accounting Principles (GAAP), that Lipper Convertibles' financial state-
ments fairly represented its financial position in all material respects, and that
Lipper Convertibles' portfolio had been confirmed against third-party sources'
market information. Biderman claims that he relied upon the financial statements
in operating and managing Lipper Convertibles. These allegations support a claim
for fraud. (*See e.g. Houbigant, Inc. v Deloitte & Touche, LLP,* 303 AD2d 92, 97
[1stDept 2003] [fraud claim sustained where accountant certified the accuracy of
financial statements when it knew, but failed to acknowledge, that the "statements
actually contained numerous serious irregularities and inaccuracies, which it knew
could have a material impact on the accuracy of the financial statements' recita-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion of the corporation's net worth"]).

PWC argues that Biderman cannot bring a fraud claim because he annually represen-
ted to *9 PWC in letters that he was "responsible for the fair presentation in the
financial statements of financial position, results of operations, and cash flows
in conformity with generally accepted accounting principles." (Hannon Aff, Ex. B).
However, Biderman maintains that he was an innocent member of Lipper Convertibles'
management and that he was unaware of misstatements on financial statements. PWC
cites no legal authority in support of its argument that the fraud claim should be
dismissed under these circumstances. Moreover, according to Biderman, the law firm
Fried Frank Harris Shriver & Jacobsen, LLP, after an investigation, concluded that
Lipper Convertibles' management, including Biderman, was not aware of Strafaci's
wrongdoing. If anything, Biderman's awareness of the misstatements raises a ques-
tion of fact inappropriate for resolution on a motion to dismiss for failure to
state a cause of action. (See *Gutierrez v Bernard*, 27 AD3d 377, 378 [1st Dept
2006] ["issues of fact ... should not have been resolved on a motion to dis-
miss"]). Therefore, PWC's argument is unpersuasive. For the foregoing reasons, the
court denies PWC's motion to dismiss Biderman's cross claim for fraud.

            *PWC's Motion to Dismiss Complaint in Lipper Action*
*Statute of Limitations*

In motion sequence number 001 in the *Lipper* Action, PWC argues that plaintiffs'
claims for negligence/malpractice, negligent misrepresentation and breach of con-
tract are all time-barred, because they are subject to the three-year malpractice
statute of limitations in CPLR 214(6). In opposition, plaintiffs argue that the
continuous representation doctrine tolled the statute of limitations with respect
to these claims.

A three-year statute of limitations governs malpractice claims, "regardless of
whether the underlying theory is based in contract or tort." CPLR 214(6). "[T]he
Statute of Limitations *10 begins to run on the date the accountant's work product
is received by the client since this is the first time the client can rely on the
alleged negligent work product." (See *Ackerman v Price Waterhouse*, 84 NY2d 535,
538 [1994]).

However, the continuous representation doctrine operates to toll the statute of
limitations if facts supporting its application exist. (*Ackerman v Price Water-
house*, 252 AD2d 179, 205 [1st Dept 1998]. For the doctrine to apply, the "continu-
ous representation must be in connection with the specific matter directly in dis-
pute, and not merely the continuation of a general professional relationship. The
mere recurrence of professional services does not constitute continuous represent-
ation where the later services performed were not related to the original ser-
vices." (*Id.* [citations and internal quotation marks omitted]). However, on a mo-
tion to dismiss, the plaintiff must be given an "opportunity to develop through
discovery, and to establish, the asserted fact that each audit was merely a step

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in a continuous and interrelated service that PwC provided through the years in question." (*Williamson v PricewaterhouseCoopers LLP,* 817 NYS2d 61, 2006 NY Slip Op 05116, *2 [1st Dept 2006]).

As conceded by PWC in its opening brief, the facts of the *Lipper* Action are "precisely the same facts" alleged in *Williamson*. (PWC Mem. of Law, at 10). In *Williamson,* the First Department determined that "the firm's alleged reliance each year on its faulty conclusions from the prior year in conducting each year's audits may well support a factual conclusion that the accounting firm's services for [Lipper Convertibles] were continuous." (*Williamson,* 817 NYS2d at 65, 2006 NY Slip Op 05116, at *5). The court concluded that, therefore, the otherwise time-barred claims "should not have been dismissed prior to a full exploration of the facts." (*Id.*).

The complaint in the *Lipper* Action avers that PWC continued to provide accounting and *11 audit-related services with respect to the funds at issue through the second quarter of 2002. (Lipper Complaint, ¶¶ 146-150). Thus, under *Williamson,* if the continuous representation doctrine applies to toll the statute of limitations, plaintiffs' claims would be timely through the second quarter of 2005. The *Lipper* Action was commenced on January 15, 2005, which would be prior to the expiration of the statute of limitations.

As the First Department stated in *Williamson,* "[w]e cannot yet tell whether the circumstances here actually warrant the application of the doctrine. But the ... claims should not [be] dismissed prior to a full exploration of the facts." (817 NYS2d at 65, 2006 NY Slip Op 05116, at *5). Thus, PWC's motion to dismiss plaintiffs' claims based upon a three-year statute of limitations is denied. Plaintiffs are, therefore, afforded an "opportunity to develop through discovery, and to establish, the asserted fact that each audit was merely a step in a continuous and interrelated service that PwC provided through the years in question." (*Id., at 61, *2.).

*Duplicative Claims*

A. *Fraud*

PWC argues that the court should dismiss the first cause of action for fraud as duplicative of the second cause of action for malpractice.

"An action for fraud requires that the plaintiff demonstrate the making of a material misrepresentation, known to be false, made with the intention of inducing reliance on the part of the victim, on which the victim does in fact rely and, as a result of which, he sustains damages." (*National Union Fire Ins. Co. of Pittsburgh, Pa. v Robert Christopher Assoc.,* 257 AD2d 1, 9 [1st Dept 1999] [quotation marks and citation omitted]). When the plaintiff asserts claims for both malpractice and fraud:
   *12 [i]t is only when the alleged fraud occurs separately from and subsequent to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the malpractice that a plaintiff is entitled to allege and prove a cause of action
for intentional tort ... and then only where the fraud claim gives rise to damages
separate and distinct from those flowing from the malpractice.
(*Abbondandolo v Hitzig*, 282 AD2d 224, 225 [1st Dept 2001] [quotation marks and
citation omitted]). CPLR 3014 provides that "[c]auses of action ... may be stated
alternatively or hypothetically."

The allegations of the complaint show that "PWC knew or recklessly disregarded
that Strafaci was ascribing values to securities held in the Convertibles Funds
that were substantially greater than values provided by independent third-party
sources." (Complaint, ¶¶ 166, 114-16, 126-28, 138-40, 164-73.). PWC's own work pa-
pers allegedly reflected its knowledge of discrepancies between Strafaci's valu-
ations and valuations of independent sources, and, notwithstanding this knowledge,
PWC allegedly issued clean opinions and assurances that there were no problems
with the funds at issue. (*Id.*).

As in *Williamson*, these allegations, if proved, show that PWC concealed its dir-
ect knowledge of the alleged overvaluations while repeatedly issuing clean audit
opinions, thereby satisfying the element of scienter, an element that distin-
guishes plaintiffs' fraud claim from their malpractice claim. A fraud claim is not
vitiated just because a plaintiff alleges some of the same acts and misrepresenta-
tions in connection with its malpractice claim as with its fraud and breach of fi-
duciary duty claims. (*See Serio v PricewaterhouseCoopers LLP*, 9 AD3d 330, 331 [1st
Dept 2004] [fraud claim sustained where defendant accounting firm allegedly
"failed to undertake even the most minimal audit," thereby showing that defendant
allegedly "had notice of particular circumstances raising doubts as to the vera-
city of such information" [quotation marks and *13 citation omitted]); *see also
Houbigant, Inc. v Deloitte & Touche, LLP*, 303 AD2d at 97 [fraud claim sustained
where plaintiff alleged that defendant accountant certified accuracy of financial
statements, even though it knew, but failed to acknowledge, that the statements
contained "serious irregularities and inaccuracies, which it knew could have a ma-
terial impact on the accuracy of the financial statements' recitation of the cor-
poration's net worth"]).

For the foregoing reasons, plaintiffs' fraud claim is not duplicative of their
malpractice claim. Accordingly, at this juncture in the litigation, dismissal of
the fraud claim is unwarranted, and plaintiffs are entitled to plead their fraud
and malpractice claims in the alternative, in accordance with CPLR 3014. There-
fore, PWC's motion to dismiss the first cause of action for fraud is denied.

B. *Breach of Contract*

PWC argues that plaintiffs' fourth cause of action for breach of contract is du-
plicative of their malpractice claim, based upon this court's reasoning in the
*Williamson* decision. In opposition, plaintiffs argue that PWC made a contractual
promise to achieve a particular result or perform a particular task, and then

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2006 WL 5111623                                                                                    Page 9
2006 WL 5111623 (N.Y.Sup.) (Trial Order), 2006 N.Y. Slip Op. 30220(U) (Trial Order)

breached that promise.

The elements of a cause of action for breach of contract are the formation of a
contract between plaintiff and defendant, performance by plaintiff, defendant's
failure to perform, and resulting damage. (*See Furia v Furia*, 116 AD2d 694 [2d
Dept 1986]). However, a breach of contract claim premised on "the ... failure to
exercise due care or to abide by general professional standards is nothing but a
redundant pleading of the malpractice claim." (*See Sage Realty Corp. v Proskauer
Rose L.L.P.*, 251 AD2d 35, 38-39 [1st Dept 1998]). "In order to bring both a mal-
practice claim and a breach of contract claim the plaintiff must allege that the
professional *14 promised to achieve a specific result or to perform a particular
task and then breached that promise." (*See Common Fund for Non-profit Org. v KPMG
Peat Marwick LLP*, 2000 WL 124819, *1 [SDNY, Feb. 2, 2000] [citation and internal
quotation marks omitted]).

Here, the complaint alleges that PWC specifically agreed "that if it were to en-
counter or discover any problem relating to the Convertibles Funds or any other
investment fund, it would inform Mr. Lipper directly of such problems."
(Complaint, ¶¶ 64, 189). Plaintiffs argue that PWC's engagement letters reflect
PWC's commitment to report any evidence that fraud may exist, as uncovered by
PWC's audits. Plaintiffs submit a PWC engagement letter, dated January 19, 2001,
stating that PWC "will communicate to you, as appropriate, any illegal act, mater-
ial errors, or evidence that fraud may exist identified during our audit."
(Abramowitz Aff., Ex. K).

However, the essence of this cause of action is that PWC failed to abide by gen-
eral professional standards. Throughout the complaint, plaintiffs allege that PWC
was required to report Strafaci's fraud to management in order to comply with the
professional standards governing audits. Plaintiffs claim that PWC's failure to
inform them of the improper conduct constituted a breach of the proper level of
due professional care. Specifically, plaintiffs allege that, "[h]ad PWC adhered to
standard accounting and auditing procedures, and if it had employed the proper
level of due professional care, PWC would have informed Plaintiffs of Strafaci's
malfeasance ...." (Complaint, ¶¶ 84, 108, 120, 132, 144). The complaint also
claims that "PWC became aware of significant differences between Strafaci's valu-
ations and those prices provided by independent third-party sources. PWC failed to
inform Plaintiffs of these discrepancies in violation of its audit responsibilit-
ies under GAAS." (*Id.*, ¶ 160.). Thus, plaintiffs' own allegations assert that PWC
was required to make these disclosures in order to comply with the *15 profession-
al standards governing PWC's audits.

Moreover, the scope of the engagement letter relates to PWC's agreement to
"audit the financial statements of the Companies," and, upon completion of the
audit, "to provide [its] audit report on the financial statements ...."
(Abramowitz Aff., Ex. K). PWC agreed to "be responsible for performing the audit
in accordance with [GAAS]," and to:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2006 WL 5111623                                                                    Page 10
2006 WL 5111623 (N.Y.Sup.) (Trial Order), 2006 N.Y. Slip Op. 30220(U) (Trial Order)

consider the Companies' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audit will be communicated to you.

Nothing in this language shows that PWC agreed to go beyond auditing the financial statements.

Citing *Common Fund for Non-profit Org.* (2000 WL 124819, *supra*), plaintiffs argue that PWC's promises were separate from general professional standards. *Common Fund for Non-profit Org.* was based upon an accountant's annual letters planning for each year's year-end audits. One of the letters stated that the accountant's " 'risk assessment is designed to go beyond the financial statements and to address the business risks that may adversely affect your organization.' " (*Id.* [citation omitted]). The client's accounting expert stated that " 'going beyond the financial statements is something more than an audit in accordance with Generally Accepted Auditing Standards.' " (*Id.* [citation omitted]).

Here, conversely, as discussed above, PWC's obligation to report material internal control deficiencies discovered during its audits is not distinct from its obligation to perform audit work. Thus, the language of the engagement letter did not obligate PWC "to go beyond a *16 typical audit" (*id.*), and, therefore, *Common Fund for Non-profit Org.* is distinguishable on its facts.

For the foregoing reasons, plaintiffs' fourth cause of action for breach of contract is duplicative of their second cause of action for malpractice. Accordingly, PWC's motion to dismiss the fourth cause of action is granted.

C. *Negligent Misrepresentation*

PWC next argues that plaintiffs' fifth cause of action for negligent misrepresentation is duplicative of their malpractice cause of action.

A cause of action for negligent misrepresentation is duplicative of a malpractice cause of action if the two causes of action allege the same operative facts. (*See Sonnenschine v Giacomo*, 295 AD2d 287, 288 [1st Dept 2002]).

Here, plaintiffs' claims rely on the same alleged misrepresentations and non-disclosure as plaintiffs' malpractice claim and plaintiffs do not argue to the contrary. (*See* Pl. Opp. Mem at 19). Therefore, the court dismisses the claim of negligent misrepresentation as duplicative. The decision of this court in *Jones v PWC* (6 Misc 3d1014, 800 NYS 2d 3118) is distinguishable because there the plaintiffs argued that the malpractice claim was not entirely duplicative because it did not cover that part of plaintiffs' claim arising from their initial investment.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Finally, PWC did argue that plaintiffs asserted their fraud, negligent misrepresentation and breach of fiduciary duty claims in order to revive their time-barred malpractice claim. However, this argument is moot, because, as discussed above, plaintiffs' malpractice claim is not time-barred.

*Failure to State a Cause of Action*

**\*17** PWC next moves to dismiss plaintiffs' third cause of action for breach of fiduciary duty, based upon this court's decision in *Williamson v Pricewaterhouse-Coopers LLP* (Sup Ct, NY County, March 18, 2005, Moskowitz, J., Index No. 602106/04) (*Williamson* Decision). In opposition, plaintiffs argue that their breach of fiduciary duty cause of action is distinguishable from the claim in *Williamson,* because they had a relationship with PWC beyond the accountant-client relationship.

As stated in the *Williamson* Decision, generally, the duty owed by an accountant to a client is not fiduciary in nature. (*See DG Liquidation, Inc. v Anchin, Block & Anchin, LLP,* 300 AD2d 70, 71 [1st Dept 2002]). However, courts have recognized limited circumstances where an accountant-client relationship may become a fiduciary relationship. (*Id.*). For example, in *Lavin v Kaufman. Greenhut, Lebowitz & Forman* (226 AD2d 107 [1st Dept 1996]), the First Department sustained a cause of action for breach of fiduciary duty where the complaint alleged that the defendant-accountant engaged in a series of acts, representations and/or omissions relating to 16 specific investments; made all investment decisions for the plaintiff for 16 years; recommended specific investments and concealed pertinent information about those investments. Similarly, in *Kanev v Turk* (187 AD2d 395 [1st Dept 1992]), the First Department concluded that the plaintiff stated a cause of action for breach of fiduciary duty, where the defendant-accountant advised the plaintiff to loan $25,000 to another one of his clients and that there was no need to secure the loan, that he knew of the borrower's insolvency and intentionally deceived the plaintiff, and that the plaintiff relied on the defendant's advice.

Here, none of the allegations show that PWC's conduct went beyond the scope of the traditional accountant-client relationship. As in *Williamson,* the complaint alleges, at most, that **\*18** PWC knew of the misconduct of the general partner's employee that led to Lipper Convertibles' collapse, but failed to advise senior management of the misconduct. These allegations do not rise to the level of the type of loss of independence contemplated in *Lavin* (226 AD2d 107, *supra*) and *Kanev* (187 AD2d 395, *supra*), where the plaintiffs relied upon the defendant-accountants' recommendations of specific investments, while at the same time concealing material information concerning the investments. Therefore, these cases are distinguishable on their facts, and plaintiffs fail to show that the claim for breach of fiduciary duty falls within the limited circumstances where the duty an accountant owes to a client is fiduciary in nature. Accordingly, PWC's motion to dismiss the third cause of action for breach of fiduciary duty is granted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PWC next seeks dismissal of the fraud claims that plaintiff Jerome Services Corp.
LDC (Jerome Services), the general partner of Lipper Offshore, asserts. PWC argues
that PWC NA (not PWC) issued the audit reports from 1998 through 2000 and that any
claim relating to audits performed from 1995 through 1997 are time-barred. In op-
position, plaintiffs argue that PWC performed substantial audit work for Lipper
Offshore from 1998 through 2002.

As discussed above, claims for fraud require a showing that there was a misrep-
resentation. (See Pope, 29 AD3d at 437, supra; Grammar, 271 AD2d 644, supra; FAB
Industries, Inc., 252 AD2d 367, supra). As documentary evidence, PWC submits "Re-
ports of Independent Accountant" that PWC NA issued. (Fink Aff., Exs. K-M). These
reports demonstrate that PWC NA issued audit opinions for Lipper Offshore in 1998,
1999 and 2000. These documents show that PWC NA performed audits in these years,
and they support PWC's argument that, therefore, PWC could not have made any mis-
representations upon which Jerome *19 Services could have relied in connection
with audits performed in these years.

In opposition, plaintiffs submit a PWC engagement letter, dated December 20,
2001. This letter relates to PWC's audit of Lipper Offshore, among other entities.
However, this document relates to services PWC performed for Lipper Offshore in
2001, not 1998 through 2000. Therefore, this document fails to rebut PWC's showing
that PWC NA performed audits for Lipper Offshore during this time period.

However, plaintiffs also refer to PWC NA's memorandum of law in support of motion
sequence number 002 in the Lipper Action. That memorandum refers to "MUTUAL CON-
SENT LETTERS," dated February 25, 1999 and February 18, 2000, between the offices
of PWC and PWC NA. These letters are printed on letterhead from PWC NA. They were
sent by PWC NA to PWC, are signed by partners from each firm's office, and purport
to "set out the professional responsibilities of [PWC and PWC NA's] respective of-
fices and Firms in connection with the audit of the financial statements of
[Lipper Offshore]," for the years ended December 31, 1998 and 1999, respectively.
(Greilsheimer Aff., Exhs. A and B). The 1999 letter states, in pertinent part,
that PWC NA:
 will act as the performing office and will complete all audit work necessary for
issuance of the audit report and financial statements, except for audit work ne-
cessary with respect to the matters referred to in the next paragraph. Our office
will act as the signing office as well.
 Your office will prepare the Net Capital Schedule of the partnership and perform
all work necessary related to report/schedules which need to be prepared and filed
with US regulatory agencies (SEC, NASD et. [sic]).
 Our office accepts all responsibility for the engagement under International
Policy Statement A-4100, except as related to the *20 matters for which your of-
fice is responsible.
 Your office will indemnify our office and Firm for all costs and losses related
to claims which may arise as a result of the performance of those elements of the
audit work for which you have accepted responsibility.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(*Id.*, Exh. A).

The 2000 letter states that PWC "will act as the performing office and will complete all audit work necessary for issuance of the audit report and financial statements, except for audit work necessary with respect to the matters referred to in the next paragraph." (*Id.*, Exh. B). PWC NA remained the signing office and agreed to complete audit work necessary to assess compliance with legal requirements of the Netherlands Antilles. PWC accepted "all responsibility for the engagement, as stipulated in the legacy Coopers & Lybrand International Policy Statement A-4100," except as relating to compliance with legal requirements of the Netherlands Antilles. (*Id.*). In the 2000 letter, PWC NA also states that "[w]e would like to underline here that your office is responsible for assuring that [Lipper Offshore] is in compliance with all the necessary requirements to safeguard its off-shore tax status." (*Id.*).

These letters clearly show that PWC did participate in the audits performed on behalf of Lipper Offshore in the years 1998 and 1999. Therefore, these documents refute PWC's showing that it could not have made misrepresentations during the years in question. Accordingly, PWC's motion to dismiss Jerome Services' fraud and negligent misrepresentation claims, as asserted against PWC, is denied with respect to audits conducted in the years 1998, 1999 and 2000.

PWC argues that, in the event that plaintiffs' fraud claims are not subject to the three-year malpractice statute of limitations, these claims are nevertheless time-barred with respect to *21 claims that arose more than six years before January 13, 2005 (the date that plaintiffs commenced this action), including claims arising out of the audits that PWC performed in 1995, 1996 and 1997. In opposition, plaintiffs argue that the continuous representation doctrine tolls the statute of limitations with respect to these claims.

Under CPLR 213 (8), a fraud cause of action must be commenced "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." However, "once fraud ... is discovered after the expiration of the six-year period provided in CPLR 213 (8), the client has two years in which to commence an action and no continuous representation after such discovery would toll this period." (*See Endervelt v Slade*, 162 Misc 2d 975, 982-983 [Sup Ct, NY County 1994], *affd* 214 AD2d 456 [1st Dept 1995]).

Thus, plaintiffs' argument that the continuous representation doctrine applies to their fraud claim is without merit. Plaintiffs do not argue that the discovery rule saves their fraud claim. Rather, the limitations period for plaintiffs' fraud claim "expires six years from the date of the [alleged] fraud" (Alexander Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C213:8), that, here, was the date that "the accountant's work product [was] received by the client since this [was] the first time the client [could] rely on the alleged [fraudulent] work

product" (*Ackerman,* 84 NY2d at 538).

The complaint alleges that, in February 1998, PWC issued Lipper Convertibles and
Lipper Offshore audit reports for the year ending December 31, 1997. Plaintiffs do
not dispute PWC's assertion that it did not issue an audit report for Lipper
Series II for the years 1997 or *22 earlier. Therefore, the statute of limitations
for plaintiffs' fraud claims based on these reports expired in February 2004, ap-
proximately 11 months before plaintiffs commenced this action. Accordingly, the
court dismisses plaintiffs' fraud claim with respect to audits conducted for the
years ended 1997 and earlier. Because the court dismissed plaintiffs' claims for
negligent misrepresentation as duplicative, it will not address PWC'S argument for
dismissal of that claim on the grounds that plaintiffs have failed to state a
cause of action.

Finally, PWC argues that the claims of plaintiff Lipper & Company, L.P.  (Lipper
& Co.) should be dismissed, because it served as Lipper Convertibles' general
partner only through 1997 and that, therefore, Lipper & Co.'s claims are time
barred. Plaintiffs do not dispute PWC's contention that Lipper & Co. served as
Lipper Convertibles' general partner only through 1997. As discussed above,
plaintiffs' fraud claim is dismissed with respect to audits conduct for the years
ended 1997 and earlier. Therefore, the court dismisses Lipper & Co.'s fraud claim
in its entirety.

*Standing*

PWC argues that Lipper, as owner of the plaintiff entities, does not have stand-
ing to bring claims for malpractice, breach of contract, negligent misrepresenta-
tion and breach of fiduciary duty, because he is not in privity with PWC.

"When accountants conduct a traditional financial audit, they undertake a duty of
due care in the performance of their engagement to the party which has contracted
for their services." (*See Security Pacific Bus. Credit, Inc. v Peat Marwick Main &
Co.,* 79 NY2d 695, 702 [1992]). However, in certain circumstances, "accountants may
also incur liability to injured third parties who rely on their work, even in the
absence of a direct contractual relationship between the *23 accountants and the
third party." (*Id.*). These circumstances are as follows:
 (1) the accountants must have been aware that the financial reports were to be
used for a particular purpose or purposes; (2) in the furtherance of which a known
party or parties was intended to rely; and (3) there must have been some conduct
on the part of the accountants linking them to that party or parties, which
evinces the accountants' understanding of that party or parties' reliance. The in-
dicia, while distinct, are interrelated and collectively require a third party
claiming harm to demonstrate a relationship or bond with the once-removed account-
ants sufficiently approaching privity based on some conduct on the part of the ac-
countants.
(*Id.* at 702-03 [citations and internal quotation marks omitted]; *see also  Secur-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*ities Inv, Protection Corp. v BDO Seidman, L.L.P.,* 95 NY2d 702, 711 [2001] [same]).

For example, in *Credit Alliance Corp. v Arthur Andersen & Co.* (65 NY2d 536, 554 [1985]), the complaint alleged that "the [defendant] accountants knew the identity of the specific nonprivy party [the plaintiff-lender] who would be relying upon the audit reports," as well as "the accountants' awareness of a particular purpose for their services and certain conduct on their part creating an unmistakable relationship with the reliant plaintiff." The complaint averred that the lender and the accountant "remained in direct communication, both orally and in writing," and met together throughout the course of the lender's lending relationship with the borrower, "for the very purpose of discussing the latter's financial condition and [lender's] need for [the accountant's] evaluation." (*Id.*). Plaintiff also alleged that the accountant "made repeated representations personally to representatives of [the lender] ..., concerning the value of [the borrower's] assets." (*Id.*).

The Court of Appeals determined that the plaintiff-lender had made a showing that the accountant was aware "that a primary, if not the exclusive, *end and aim* of auditing its client ... *24 was to provide [the lender] with the financial information it required." (*Id.* [emphasis in original]). The Court held that, because of the parties' "direct communications and personal meetings," the relationship between the accountant and the lender "was the practical equivalent of privity." (*Id.*).

Here, Lipper does not claim any contractual relationship between himself and PWC. Rather, Lipper's claims are based upon his allegations that he initially hired PWC to audit the funds after meeting with PWC representatives; that PWC knew that Lipper owned a majority of the plaintiff-entities; that, throughout the relationship, Lipper informed PWC of the assets he and his family had invested in the funds and the plaintiff-entities; and that Lipper told PWC to immediately bring to his attention any issues regarding the funds so that he could correct any problems in a timely fashion. (Complaint, ¶¶ 62-66; Lipper Aff., ¶¶ 7-12).

Lipper claims that PWC performed certain non-audit services for him personally, such as preparation of personal balance sheets, tax returns and valuations of the plaintiff-entities. (Complaint, ¶ 66; Lipper Aff., ¶ 10). Lipper alleges that this work "incorporated PWC's audit work," and that he relied upon this work "in making personal decisions." (Complaint, ¶ 176).

However, plaintiffs' allegations fail to show that the "primary, if not the exclusive, end and aim of auditing" the funds at issue was to provide Lipper with information personally. (*See Credit Alliance Corp.,* 65 NY2d at 554; *Security Pacific Bus. Credit, Inc.,* 79 NY2d 695, *supra*). Moreover, Lipper does not claim that the work PWC performed for him personally was negligent, but rather, he claims that PWC's audit work was "incorporated" into these personal services. However, because the audit work was not for Lipper's personal benefit, this argument is un-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

persuasive. For the foregoing reasons, the pleading fails to show that Lipper has
a *25 relationship with PWC sufficient to support claims for malpractice, breach
of contract, negligent misrepresentation and breach of fiduciary duty. Accord-
ingly, the court grants PWC's motion to dismiss Lipper's claims.

*Ripe Contribution and Indemnification Claims*

PWC argues that plaintiffs cannot assert contribution and indemnification claims
as a separate action because plaintiffs have not alleged that they made any pay-
ments that could serve as a basis for such separate claims. In opposition,
plaintiffs refer to their arguments asserted in opposition to PWC NA's motion to
dismiss, in which plaintiffs claim that their claims are permitted under CPLR 1401
and under a theory of implied indemnification.

Under CPLR 1401, "two or more persons who are subject to liability for damages
for the same ... injury ... may claim contribution among them whether or not an
action has been brought or a judgment has been rendered against the person from
whom contribution is sought."

However, a claim in an action separate from the underlying tort is not viable un-
til there is payment. (*See Stein v Whitehead,* 40 AD2d 89, 91 [2d Dept 1972] ["If
all (defendants) have not been sued *and the one sued has paid the full amount of
the plaintiff's damages* he can bring an *independent action* against the other tort-
feasors to recover from them their fair shares of the damages and in that inde-
pendent action the court or jury will determine the proportions of the parties'
liability for the damages."] [emphasis added]; *see also* Siegel New York Practice §
173 [4th Ed. 2005] and *Berlin v Jones, Inc.* 85 Misc 2d 970 976 [Ct. Claims 1976]
noting that "[when related to separate and independent actions for contribution"
nothing has changed the general rule "that the action accrues not at the time of
the commission of the tort for which indemnity is sought but at the time of pay-
ment"]).

*26 Here, the complaint fails to allege that plaintiffs made payments that could
provide a basis for their indemnification or contribution claims against PWC.
While plaintiffs allege in their opposition brief that a judgment has been
entered, and partially satisfied, against Lipper Holdings, plaintiffs fail to al-
lege the amount paid by Lipper Holdings, or that any such payments exceed its por-
tion of liability. Thus, this court dismisses plaintiffs' claim for contribution
and indemnity.

Nor do plaintiffs allege that PWC contractually agreed to indemnify them. In ad-
dition, plaintiffs do not claim that any unique, special factors existed demon-
strating the parties' intention that PWC was to bear the ultimate responsibility
for the obligations of the funds. (*See Pennisi v Standard Fruit & S.S. Co.,* 206
AD2d 290 293 [1st Dept 1994] [internal citations and quotations marks omitted]).
Nor have plaintiffs alleged facts supporting the existence of a special relation-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ship or circumstances that might give rise to such a duty, as discussed above in
the context of the dismissal of plaintiffs' claim for breach of fiduciary duty.

For the foregoing reasons, the allegations of the complaint fail to show valid
contribution or indemnification claims. Accordingly, PWC's motion to dismiss the
sixth cause of action is granted.

The court notes that PWC asserts contribution cross claims against these co-
defendants in the *Serino* Action. Similarly, Lipper, Lipper Holdings, Lipper, Inc.
and Biderman all assert contribution cross claims against PWC in the *Serino* Ac-
tion, that PWC does not seek to dismiss. Therefore, these claims remain before the
court in the *Serino* Action.

> ### *PWC NA's Motion to Dismiss Complaint in the Lipper Action*
In motion sequence number 002 in the *Lipper* Action, PWC NA argues that the court
*27 should dismiss the complaint for its failure to allege PWC NA's wrongdoing
with sufficient particularity, pursuant to CPLR 3013. PWC NA claims that the com-
plaint does not distinguish between PWC and PWC NA, and that it fails to identify
which plaintiffs relied upon PWC NA's reports (as opposed to PWC's reports).

CPLR 3013 provides that, "[s]tatements in a pleading shall be sufficiently par-
ticular to give the court and parties notice of the transactions, occurrences, or
series of transactions or occurrences, intended to be proved and the material ele-
ments of each cause of action or defense." The complaint must "enable the defend-
ant to determine the nature of the plaintiff's grievances and the relief he seeks
in consequence of the alleged wrongs." *Shapolsky v Shapolsky*, 22 AD2d 91 (1st Dept
1964).

The complaint avers that PWC NA performed audit work for Lipper Offshore from
1998 through 2002. (Complaint, ¶ 15). There is no allegation that PWC NA performed
audit work, or issued any reports, for the onshore funds, Lipper Convertibles or
Lipper Series II. Yet, the first paragraph of the complaint states that PWC and
PWC NA will be referred to together as "PWC." (Complaint, ¶ 1). The complaint then
claims that "PWC" knew of, disregarded, or negligently failed to ascertain the im-
pact of significant discrepancies between values that Strafaci assigned to secur-
ities in the various funds and prices that "PWC" obtained during its audits.

According to the mutual consent letters, discussed above, both PWC and PWC NA
performed work for Lipper Offshore. However, because the complaint refers to these
entities together as "PWC," it is not clear what part of PWC NA's work plaintiffs
are questioning. Plaintiffs must provide "specific factual averments ... as to
when and what wrongful acts are attributed to each defendant" that the complaint
fails to do. (See *28DiPace v Figueroa*, 128 AD2d 942, 943 [3d Dept 1987]; see
also *Shapolsky*, 22 AD2d at 92-93 [complaint dismissed under CPLR 3013 where
plaintiff failed to specify which allegation referred to each corporation at issue
and how the plaintiff acquired the right to bring suit]; *Megna v Becton Dickinson*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*& Co.,* 215 AD2d 542, 542 [2d Dept 1995] [complaint dismissed where "it was devoid
of specific factual allegations"]).

By way of illustration, with respect to PWC's 1999 audit of Lipper Convertibles,
the complaint alleges specific details concerning Strafaci's overvaluation of that
fund's total net market value, net income and total partners' capital. (Complaint,
¶¶ 122-28). The complaint identifies specific securities that Lipper Convertibles
held and the percentage difference between Strafaci's valuation and each secur-
ity's market value. Plaintiffs assert similar, specific allegations concerning the
1998 and 2000 audits of Lipper Convertibles. (Complaint, ¶¶ 110-21 and ¶¶ 134-45).
These allegations "give the court and parties notice of the ... series of transac-
tions or occurrences, intended to be proved and the material elements" of
plaintiffs' claims concerning the audit of Lipper Convertibles. (CPLR 3013).

By contrast, however, the complaint does not identify a single security held in
the investment portfolio of Lipper Offshore, the amount by which that security was
allegedly overvalued, or any alleged impact on Lipper Offshore's financial state-
ments. Rather, immediately following plaintiffs' detailed analyses of the securit-
ies Lipper Convertibles held and the resulting overvaluations of those securities,
the complaint summarily states that "PWC also issued unqualified audit opinions
with respect to [Lipper Offshore and Lipper Series II]. In auditing these funds,
PWC failed to report differences between the values Strafaci ascribed to securit-
ies in the portfolios of those funds, and the actual market values of those secur-
ities." *29 (Complaint, ¶ 129; *see also* Complaint, ¶¶ 81, 91, 103, 117, 141
[same]). This allegation fails to give PWC NA notice of the transactions that
plaintiffs intend to prove and the material elements of each cause of action.

Plaintiffs argue that, "because the Complaint makes clear that PWC NA started to
perform work in connection with the 1998 audit, it is clear that Plaintiffs are
only alleging misconduct by PWC NA beginning with that audit, and Plaintiffs only
seek to recover against PWC NA for damages suffered starting with that audit."
(Plaintiffs' Opp. Mem. of Law, at 10). However, plaintiffs fail to identify a
single, specific instance of PWC NA's improper conduct. Instead, the complaint as-
serts the vague, blanket allegation that plaintiffs "learned that Strafaci had
overvalued the securities held by [Lipper Convertibles] and [Lipper Offshore] be-
ginning in 1995." (Complaint, ¶¶ 3, 50). Such "vague, general allegations of
wrongdoing ... do not meet the minimum requirements of CPLR 3013." (*DiPace,* 128
AD2d at 943). Plaintiffs apparently seek to attribute damages to PWC NA resulting
from Strafaci's oversight, but they fail to allege any details concerning PWC NA's
involvement in their claims.

Plaintiffs argue that PWC acted as PWC NA's agent, and that, therefore, PWC's
wrongful conduct should be imputed to PWC NA. Plaintiffs' argument is based upon
the "MUTUAL CONSENT LETTERS," discussed above.
 Agency ... is a fiduciary relationship which results from the manifestation of
consent of one person to allow another to act on his or her behalf and subject to

2006 WL 5111623                                                                        Page 19
2006 WL 5111623 (N.Y.Sup.) (Trial Order), 2006 N.Y. Slip Op. 30220(U) (Trial Order)

his or her control, and consent by the other so to act. The agent is a party who
acts on behalf of the principal with the latter's express, implied, or apparent
authority.
(*Maurillo v Park Slope U-Haul,* 194 AD2d 142, 146 [2d Dept 1993]).

Here, however, the complaint fails to allege that PWC NA controlled PWC, or that
PWC *30 acted at PWC NA's request or for PWC NA's benefit. To the contrary, the
complaint expressly claims that plaintiffs, not PWC NA, retained PWC to conduct
the audits. (Complaint, ¶¶ 1, 14, 56, 73, 169; Plaintiffs' Opp. Mem. of Law, at 2,
3, 5). The mutual consent letters explain the division of labor and responsibility
between PWC NA and PWC, but plaintiffs fail to show how these letters establish a
principal-agent relationship between PWC NA and PWC.

Moreover, plaintiffs allege that they paid PWC for auditing Lipper Offshore, not
PWC NA. (Lipper Complaint, ¶ 73). Plaintiffs concede that "[a]lthough PWC NA is-
sued audit opinions for [Lipper Offshore's] financial statements ..., Plaintiffs
never specifically retained PWC NA." (Plaintiffs' Opp. Mem. of Law, at 3). Thus,
based on the papers before the court, it appears that, if anything, PWC NA was
working at the direction of PWC, not vice versa, and, therefore, PWC was not PWC
NA's agent. Therefore, plaintiffs have not shown that PWC was the agent of PWC NA.
(*See Melbourne v New York Life Ins. Co.,* 271 AD2d 296, 297 [1st Dept 2000] ["where
the evidence on the issue of control presents no conflict, the matter may properly
be determined by the court as a matter of law"]).

For the foregoing reasons, with respect to PWC NA, the allegations of the com-
plaint are not "sufficiently particular to give the court and parties notice of
the transactions, occurrences, or series of transactions or occurrences." (CPLR
3013). Accordingly, the court grants PWC NA's motion to dismiss, with leave to re-
plead.

Accordingly, it is hereby

ORDERED that the court grants motion sequence number 017 (in *Serino v Lipper, et
al.,* [Index No. 604396/02]) to the extent that the first, second, third, fourth
and fifth cross claims of defendants Kenneth Lipper, Lipper Holdings, LLC and Lip-
per & Company, Inc., asserted against *31 defendant PricewaterhouseCoopers LLP,
are severed and dismissed and the court otherwise denies the motion; and it is
further

ORDERED that the court grants motion sequence number 001 (in *Lipper Holdings,
LLC, et al. v PricewaterhouseCoopers LLP, et al.* [Index No. 600150/05] to the ex-
tent that the third, fourth and fifth causes of action are severed and dismissed;
the court dismisses the first cause of action as time-barred with respect to
audits conducted in the years ended 1997 and earlier and the court severs and dis-
misses the first cause of action with respect to plaintiff Lipper & Company, L.P.;
the court severs and dismisses the second, fourth and fifth causes of action with

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2006 WL 5111623
2006 WL 5111623 (N.Y.Sup.) (Trial Order), 2006 N.Y. Slip Op. 30220(U) (Trial Order)

respect to plaintiff Kenneth Lipper; the court severs and dismisses the sixth
cause of action; and the court otherwise denies the motion; and it is further

ORDERED that the court grants motion sequence number 002 (in *Lipper Holdings,
LLC, et al. v PricewaterhouseCoopers LLP, et al.* [Index No. 600150/05]) and the
court dismisses the complaint, as to defendant PricewaterhouseCoopers LLP
(Netherlands Antilles), with leave to replead; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly; and it is fur-
ther

ORDERED that the remainder of the action is severed and shall continue.

Dated: September 28, 2006

ENTER: <<signature>>

J.S.C.

GNRL
Serino v. Lipper
2006 WL 5111623
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

--- F.3d ----                                                                                    Page 1
--- F.3d ----, 2008 WL 2079028 (C.A.8 (Mo.))
(Cite as: --- F.3d ----, 2008 WL 2079028 (C.A.8 (Mo.)))

**H**
Siepel v. Bank of America, N.A.
C.A.8 (Mo.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Eighth Circuit.
George SIEPEL; Phyllis Siepel; H. Craig Williams;
Elinor Tama Williams; Constance Elaine Williams;
Donna N. Reinke; Robert Cohen; Carl M. Page; and
all others similarly situated, Plaintiffs-Appel-
lants/Cross-Appellees,
v.
BANK OF AMERICA, N.A., Defendant-Ap-
pellee/Cross-Appellant,
andColumbia Funds Series Trust, formerly known
as Nations Funds Trust; Bank of America Corpora-
tion; Columbia Management Advisors, LLC;
Columbia Management Distributors, Inc.; Bank of
America Investment Services, Inc., Defendants-Ap-
pellees.
Nos. 07-1899, 07-1906.

Submitted: Jan. 17, 2008.
Filed: May 19, 2008.

Appeals from the United States District Court for
the Eastern District of Missouri.

Richard A. Lockridge, argued, Minneapolis, MN,
Gregg M. Fishbein, Minneapolis, MN, Richard D.
Greenfield, Easton, MD, and Steven M. Hamburg,
St. Louis, MO, on the brief, for appellants/
cross-appellees.
James C. Martin, argued, Pittsburgh, PA, Gregory
S. Spencer, San Francisco, CA, Gregory B. Jordan,
Mary J. Hackett, and Christopher J. Soller, Pitts-
burgh, PA, and Jeffrey Scott Russell and Elizabeth
C. Carver, St. Louis, MO, on the brief, for Ap-
pellee/Cross-Appellant Bank of America and Ap-
pellees Bank of America Corp., Columbia Manage-
ment Advisors, Columbia Management Distribut-
ors, and Banc of America Investments.
Stephen M. Colangelo, argued, Washington, D.C.,
Laurie A. Hand and Tim A. O'Brien of Washington,
D.C. and Barry Short, St. Louis, MO, on the brief,

for Appellee Columbia Funds Series Trust.

Before COLLOTON and SHEPHERD, Circuit
Judges, and GOLDBERG,[FN1] Judge.

> FN1. The Honorable Richard W. Goldberg,
> United States Court of International Trade,
> sitting by designation.

SHEPHERD, Circuit Judge.
*1 Several beneficiaries of trust accounts main-
tained by Bank of America, N.A., filed a class ac-
tion complaint against the Bank, its holding corpor-
ation, and affiliated investment companies. In addi-
tion to alleging claims under federal securities laws,
the Plaintiffs alleged state-law claims that the De-
fendants were unjustly enriched and breached fidu-
ciary duties they owed to the beneficiaries. On the
Defendants' motion, the district court [FN2] dis-
missed the federal claims on the *merits and dis-
missed the state-law claims as preempted by the Se-
curities Litigation Uniform Standards Act of 1998
(SLUSA), 15 U.S.C. § 78bb(f).

> FN2. The Honorable Paul A. Magnuson,
> United States District Judge for the District
> of Minnesota, sitting by designation in the
> Eastern District of Missouri.

In this appeal, the Plaintiffs mainly call upon us to
answer whether SLUSA preempts state-law claims
that a trustee breached its fiduciary duty by failing
to disclose conflicts of interest in its selection of
nationally-traded investment securities. As a dis-
missal for failure to state a claim, we review the
district court's decision *de novo. Sofonia v. Princip-
al Life Ins. Co.,* 465 F.3d 873, 876 (8th Cir.2006).
The Supreme Court's broad holding in *Merrill
Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547
U.S. 71 (2006), compels us to conclude that
SLUSA applies.

I.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On review of a dismissal for failure to state a claim, we assume that the allegations in the Amended Complaint are true and construe them in the light most favorable to the Plaintiffs' claims. *See Kottschade v. City of Rochester,* 319 F.3d 1038, 1040 (8th Cir.2003). According to the complaint, the Bank implemented a plan to consolidate the trust management activities of other banks it had acquired. Existing and prospective trust customers were allegedly led to believe that their assets were being managed on an individualized basis, when in fact the assets were being invested in shares of the Nations Funds mutual fund, managed by an investment company substantially owned by the Bank. Even though higher-yielding and better-managed mutual funds were available in the marketplace, according to the Plaintiffs, the Bank favored Nations Funds because it could then indirectly extract additional fees and profits.

To help effectuate this plan, the Bank allegedly sent misleading letters to co-trustees and beneficiaries touting the advantages of the move to Nations Funds and threatening "adverse tax consequences" if the recipients objected. Not disclosed were the conflicts of interest, higher expenses, and increased tax liability that would result from the Bank's diversion of trust assets to Nations Funds. Consequently, the Plaintiffs claim, the Bank acted in its own self-interest to the detriment of the trust beneficiaries, in breach of its fiduciary duties under state law.

The Plaintiffs filed this class action, alleging: breach of fiduciary duty; unjust enrichment; and violations of the Investment Advisers Act of 1940, Securities Exchange Act of 1934, and Securities Act of 1933. They asserted federal jurisdiction over the state-law claims based on the minimum diversity provisions of the Class Action Fairness Act of 2005, and as supplemental to the federal claims. 28 U.S.C. §§ 1332(d)(2), 1367(a). On behalf of themselves and all others similarly situated, the Plaintiffs seek class certification, money damages, attorneys' fees, and injunctive relief.

*2 The Defendants moved to dismiss the action for

several reasons. Because the Plaintiffs and their lawyers had already filed at least five class actions in various jurisdictions seeking redress for the same alleged injuries, the Defendants asked the court to decline jurisdiction based on impermissible judge shopping. Further, the Defendants requested an award of costs and attorneys' fees they had incurred in defending one of those actions in a Florida court. They also moved to dismiss the federal claims on the merits, and the state-law claims as preempted by SLUSA. The Plaintiffs opposed all of the motions except as to the federal claims, which they proposed to eliminate by moving for leave to file a Second Amended Complaint.

Finding "ample evidence that Plaintiffs are forum shopping," the district court awarded $71,972.79 in costs and $923,990.35 in attorneys' fees to the Bank. Thereafter, the court was notified that the Florida court had already entered a decision on the same issue. To prevent a duplicative recovery, the district court vacated the award so that the Florida court could determine the appropriate amount of costs and attorneys' fees.

Due to the Plaintiffs' failure to oppose, the court dismissed the federal claims with prejudice and denied leave to amend based on futility. As for the issue of SLUSA preemption, the district court found that misrepresentations and omissions of material facts were central to the Plaintiffs' state-law claims. The court further held that, regardless of the Plaintiffs' status as trust beneficiaries and not purchasers or sellers, the alleged misrepresentations and omissions were "in connection with the purchase or sale of a covered security" as defined by *Dabit,* 547 U.S. 71. As such, the court concluded that SLUSA mandated dismissal of the state-law claims.

On appeal, the Plaintiffs argue that the district court erred in concluding that SLUSA preempts their state-law claims. They also protest that they were improperly denied an opportunity to file a second amended complaint to delete the federal claims. In the event we reverse, the Bank counters with a pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tective cross-appeal to restore the award of costs and attorneys' fees.

## II.

There has long been tension between the federal interest of protecting investors in nationally traded securities and the practical need to protect normal business activity from vexatious litigation. *See Dabit,* 547 U.S. at 78–82; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 739–44 (1975). Federal regulation of the securities market is anchored by the Securities Act of 1933 and the Securities Exchange Act of 1934, both of which Congress passed in the wake of the 1929 stock market collapse. *Dabit,* 547 U.S. at 78. Rule 10b-5, promulgated under Section 10(b) of the 1934 Act, makes it unlawful for any person, in connection with the purchase or sale of any security, to (a) employ any device, scheme or artifice to defraud, (b) make an untrue statement of material fact or omit material facts from a statement, or (c) engage in a fraudulent or deceptive course of business. 17 C .F.R. § 240.10b-5; see 15 U.S.C. § 78j. In 1946, federal courts began to hold that Section 10(b) of the 1934 Act implicitly granted a private right of action to individual investors. *See Blue Chip Stamps,* 421 U.S. at 729-30. The Supreme Court confirmed this holding in 1971. *Superintendent of Ins. v. Bankers Life & Cas. Co .,* 404 U.S. 6, 13 n. 9 (1971).

*3 With the recognition of a private right of action, it became desirable to delimit the scope of that right. Due to the costs of discovery and the risk of a massive judgment, even a meritless lawsuit could extract a sizeable settlement from a defendant. *See Blue Chip Stamps,* 421 U.S. at 740-41. Aiming to deter such nuisance actions, the Supreme Court adopted a rule that excluded Section 10(b) claimants who were not purchasers or sellers of securities. *Id.* at 749. As a limitation resting on considerations of policy, *see id.,* the rule of *Blue Chip Stamps* had no effect on the scope of criminal liability under Section 10(b) and Rule 10b-5. *United States v. O'Hagan,* 521 U.S. 642, 655 (1997); *see Dabit,* 547

U.S. at 84.

For reasons similar to those underlying *Blue Chip Stamps,* Congress passed the Private Securities Litigation Reform Act of 1995 (PSLRA),[FN3] enacting "procedural reforms to enable district courts to weed out meritless class actions alleging fraud in the purchase and sale of securities."*Dudek v. Prudential Sec., Inc.,* 295 F.3d 875, 877 (8th Cir.2002); *see Dabit,* 547 U.S. at 81. Although the PSLRA met its goal of reducing the number of federal securities class actions, it had an unintended consequence of herding plaintiffs into state courts, where they filed class actions based on state laws. *Dabit,* 547 U.S. at 82; *Dudek,* 295 F.3d at 877. Congress responded to this phenomenon by enacting SLUSA, Pub.L. 105-353, 112 Stat. 3227 (1998) (codified as amended in scattered sections of 15 U.S.C.).

> FN3. Pub.L. No. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77z-1, 78u-4).

## III.

An amendment to the 1933 and 1934 Acts, SLUSA expressly preempts all "covered" state-law class actions that allege: (1) an untrue statement or omission of a material fact, or (2) use of a manipulative or deceptive device or contrivance, "in connection with the purchase or sale of a covered security."15 U.S.C. §§ 77p(b), 77bb(f)(1); *Dudek,* 295 F.3d at 879. There is no dispute that the Plaintiffs' action seeks damages on behalf of 50 or more people, and thus is a "covered class action" under SLUSA. 15 U.S.C. §§ 77p(f)(2), 78bb(f)(5)(B). Likewise, there is no dispute that the Nations Funds mutual fund described in the Plaintiffs' Amended Complaint is traded nationally and listed on a regulated national exchange, thereby meeting SLUSA's definition of "covered security." 15 U.S.C. §§ 77p(f)(3), 77r(b), 78bb(f)(5)(E); *Dabit,* 547 U.S. at 83 n. 9. In their reply brief, the Plaintiffs concede that the Amended Complaint contains allegations that the Bank misrepresented and omitted material facts.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2079028 (C.A.8 (Mo.))
(Cite as: --- F.3d ----, 2008 WL 2079028 (C.A.8 (Mo.)))

The controversy is whether the alleged misrepresentations and omissions were "in connection with" the purchase or sale of securities. Because the same phrase appears in the Section 10(b) of the 1934 Act, we rely on judicial interpretations of Section 10(b) and Rule 10b-5 when construing "in connection with" as used in SLUSA. *Dabit,* 547 U.S. at 85-86;*Sofonia,* 465 F.3d at 878. The rules governing private Rule 10b-5 actions, however, followed a different path than the law defining substantive violations of Rule 10b-5. *See Dabit,* 547 U.S. at 80. The private right of action is a judicially-created remedy, fashioned in the image of Rule 10b-5 but also shaped by policy considerations. *See Blue Chip Stamps,* 421 U.S. at 737, 749;*Karson v. Nat'l Gypsum Co.,* 69 F.Supp. 512, 514 (E.D.Pa.1946) (relying on general principles of tort law, in addition to statutory interpretation). For policy reasons, courts limited the private right of action, so as to minimize the danger of vexatious litigation. *E.g., Blue Chip Stamps,* 421 U.S. at 740-41. Such dangers do not exist in the context of criminal liability, so the Supreme Court deemed those limitations to not apply in the criminal context. *E.g., O'Hagan,* 521 U.S. at 664-65. Thus, the question that faced the Supreme Court: Do judicial limitations on private actions also limit the scope of SLUSA?

\*4 In *Dabit,* the Supreme Court instructed that SLUSA should be read with the "presumption that Congress envisioned a broad construction," so that the most troublesome class actions would be subject to the PSLRA's procedural reforms. *Dabit,* 547 U.S. at 86. The Plaintiffs contend that *Dabit* only decides whether SLUSA preemption is confined to claims by plaintiffs who have standing to meet the purchaser-seller limitation of *Blue Chip Stamps.See Dabit,* 571 U.S. at 84. Asserting that the "in connection with" iss ue was not before the Court, *see id.* at 77 n. 3, the Plaintiffs posit that we may rely on cases interpreting "in connection with" narrowly, as in the context of private Rule 10b-5 actions. *E.g., Green v. Ameritrade, Inc.,* 279 F.3d 590 (8th Cir.2002).

When it rejected the *Blue Chip Stamps* limitation, the Supreme Court rejected wholesale the proposition that limitations on private Rule 10b-5 actions may be applied to limit the scope of SLUSA. To the extent that we have suggested, pre-*Dabit,* that the scope of SLUSA preemption is equal to that of the right to a private Rule 10b5 action, *see Green,* 279 F.3d at 597-98, the Court has corrected our course. *Dabit,* 547 U.S. at 85-86. SLUSA's coverage follows the contours of Section 10(b) and Rule 10b-5 when enforced by an agency of the United States. *See id.*

Separated from the policy considerations that can limit the private right of action, the "in connection with" stan dard of Section 10(b) is construed flexibly, not technically or restrictively. *SEC v. Zandford,* 535 U.S. 813, 819 (2002); *Sofonia,* 465 F.3d at 878. It applies to a fiduciary who misappropriates information, and then uses that information to gain no-risk profits through a securities transaction. *O'Hagan,* 521 U.S. at 656. It covers allegations that an agent made unauthorized sales of a customer's securities for his own benefit. *Zandford,* 535 U.S. at 820-21. According to the Plaintiffs, the Bank purchased securities as a trustee on their behalf without disclosing that the Bank profited from the transactions.

The Plaintiffs argue that the Bank's non-disclosure was not "in connection with" the purchase of the securities, such that the non-disclosure did not relate to a decision whether to purchase a security. *See O'Brien v. Cont'l Ill. Nat'l Bank & Trust Co.,* 593 F.2d 54, 60 (7th Cir.1979). Under *Dabit,* however, "it is enough that the fraud alleged 'coincide' with a securities transaction-whether by the plaintiff or by someone else."*Dabit,* 547 U.S. at 85. The Plaintiffs' complaint alleges nondisclosures that clearly coincided with the Bank's purchase of shares in the Nations Funds mutual fund. Given the identical coverage of Section 10(b) and SLUSA, it follows that the Plaintiffs' state-law claims are preempted.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2079028 (C.A.8 (Mo.))
(Cite as: --- F.3d ——, 2008 WL 2079028 (C.A.8 (Mo.)))

Page 5

## IV.

We briefly address the Plaintiffs' argument that they were erroneously denied leave to amend their complaint. The proposed Second Amended Complaint would have eliminated the federal claims that had been asserted. Although leave to amend should ordinarily be granted, a party should at least show how the complaint could be amended to save a meritless claim. *Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir.1999). When leave is denied on grounds of futility, we review *de novo* the underlying legal conclusion of whether the proposed amendment would have been futile. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 755 (8th Cir.2006). In their brief, the Plaintiffs admit that they made no changes to the state-law claims, and that their challenge to the futility finding is wrapped up in the district court's SLUSA determination. Having already determined that SLUSA was correctly applied, we affirm the denial of leave to amend.

## V.

*5 We dismiss the Bank's protective cross-appeal as moot. In all other respects, we affirm the judgment of the district court.

C.A.8 (Mo.),2008.
Siepel v. Bank of America, N.A.
--- F.3d ----, 2008 WL 2079028 (C.A.8 (Mo.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.