UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                       :

In re REFCO, INC. SECURITIES LITIGATION :    07 MDL No. 1902 (GEL)
                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARC S. KIRSCHNER,             :
as Trustee of the Refco Litigation Trust,  :
                       :    07 Civ. 11604 (GEL)
                 Plaintiff,  :
                       :
                  v.     :
                       :

GRANT THORNTON LLP, MAYER, BROWN, :    **DECLARATION OF**
ROWE & MAW LLP, <u>et al.</u>, ERNST & YOUNG :    **RUTH A. BRAUN**
US LLP, PRICEWATERHOUSECOOPERS   :    **IN SUPPORT OF**
LLP, CREDIT SUISSE SECURITIES (USA)  :    **GRANT THORNTON LLP'S**
LLC (f/k/a CREDIT SUISSE FIRST BOSTON :   **MOTION TO DISMISS**
LLC), BANC OF AMERICA SECURITIES  :    <u>**THE COMPLAINT**</u>
LLC, DEUTSCHE BANK SECURITIES INC., :
PHILLIP R. BENNETT, SANTO C. MAGGIO, :
ROBERT C. TROSTEN, TONE N. GRANT,  :
REFCO GROUP HOLDINGS INC., LIBERTY :
CORNER CAPITAL STRATEGIES LLC,   :
WILLIAM T. PIGOTT, EMF FINANCIAL   :
PRODUCTS LLC, EMF CORE FUND LTD.,  :
DELTA FLYER FUND LLC, ERIC M.     :
FLANAGAN, INGRAM MICRO INC., CIM  :
VENTURES INC., BECKENHAM TRADING :
CO. INC., ANDREW KRIEGER, COAST   :
ASSET MANAGEMENT LLC (f/k/a COAST  :
ASSET MANAGEMENT LP), CS LAND    :
MANAGEMENT LLC, and CHRISTOPHER  :
PETITT,                        :
                       :
               Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Ruth A. Braun, under penalty of perjury, hereby declares as follows:

        1.      I am an attorney at Winston & Strawn LLP, attorneys for Grant Thornton

LLP ("Grant Thornton") in the above-captioned action, and am admitted to practice before the

courts of the State of New York and the United States District Court for the Southern District of

New York.  I submit this declaration in support of Grant Thornton's Motion To Dismiss the Complaint.

2.     Attached hereto as Exhibit A is a true and correct copy of the Third Superseding Indictment against Phillip R. Bennett, Robert C. Trosten and Tone N. Grant (*United States v. Bennett*, 05 Cr. 1192 (S.D.N.Y.)).

3.     Attached hereto as Exhibit B is a true and correct copy of the Indictment against Joseph P. Collins (*United States v. Collins*, 07 Cr. 1196 (S.D.N.Y.)).

4.     Attached hereto as Exhibit C is a true and correct copy of the transcript of Phillip R. Bennett's Plea Colloquy in *United States v. Bennett*, 05 Cr. 1192 (S.D.N.Y. Feb. 15, 2008).

5.     Attached hereto as Exhibit D is a true and correct copy of the transcript of Robert C. Trosten's Plea Colloquy in *United States v. Trosten*, 05 Cr. 1192 (S.D.N.Y. Feb. 20, 2008).

6.     Attached hereto as Exhibit E is a true and correct copy of the transcript of Santo C. Maggio's Plea Colloquy in *United States v. Maggio*, 07 Cr. 1196 (S.D.N.Y. Dec. 19, 2007).

7.     Attached hereto as Exhibit F is a true and correct copy of the April 17, 2008 transcript from Tone Grant's criminal trial in *United States v. Grant*, 05 Cr. 1192 (S.D.N.Y.).

8.     Attached hereto as Exhibit G is a true and correct copy of the complaint filed in *Kirschner v. Thomas H. Lee Partners, L.P.*, 07 Civ. 7074 (GEL) (S.D.N.Y.).

9.     Attached hereto as Exhibit H is a true and correct copy of the complaint filed in *Kirschner v. Bennett*, 07 Civ. 8165 (GEL) (S.D.N.Y.).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 21, 2008

_____/s/_____
Ruth A. Braun

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :    <u>INDICTMENT</u>
        -v-                         :
                                    :    S3 05 Cr. 1192 (NRB)
PHILLIP R. BENNETT,                 :
ROBERT C. TROSTEN and               :
TONE N. GRANT,                      :
                                    :
            Defendants.             :
                                    :
------------------------------------x

<u>**COUNT ONE**</u>

(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)

        The Grand Jury charges:

<u>**RELEVANT ENTITIES AND PERSONS**</u>

        1.  At certain times relevant to this Indictment,

Refco, Inc. was a Delaware corporation with its principal place

of business in New York, New York.  From at least the mid-1990s,

the business of Refco, Inc. and its predecessor entities included

providing execution and clearing services for exchange-traded

derivatives and providing prime brokerage services in the fixed

income and foreign exchange markets.  Refco, Inc. held its

initial public offering of common stock on or about August 10,

2005.  Prior to on or about August 10, 2005, Refco, Inc.'s

predecessor entities were privately held.  Refco, Inc. and its

predecessor entities are referred to herein collectively as

"Refco."

2.    At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, directly and indirectly.

3.    At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco.  Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.    At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, GRANT was the President of Refco.  At certain times relevant to this Indictment, GRANT indirectly, held a significant ownership interest in Refco.

5.    At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in Austria.  BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).  At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

2

6.    At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Indictment, RGHI was owned in whole or in part by PHILLIP R. BENNETT and TONE N. GRANT.

## THE SCHEME TO DEFRAUD

7.    From at least as early as in or about the mid 1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors.  Starting at least as early as the mid 1990s, BENNETT and GRANT embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners.  To that end, over the ensuing years, BENNETT, TROSTEN, GRANT and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

8.    In furtherance of this scheme, PHILLIP R. BENNETT,

3

ROBERT C. TROSTEN, TONE N. GRANT, and others known and unknown
made and caused Refco and others on its behalf to make false and
fraudulent statements to Refco's banks, counterparties,
customers, auditors, and investors, and to create false audited
financial statements and false public filings with the United
States Securities and Exchange Commission ("SEC").  The scheme
included obtaining, through fraud, the following:  lines of
credit for Refco; the private sale of notes prior to 2004; the
sale of 57% of Refco to a group headed by Thomas H. Lee Partners
in 2004; the sale of approximately $600 million of notes to the
public in 2004; approximately $800 million of bank financing
obtained in 2004; and the August 2005 initial public offering of
stock ("IPO") in Refco, Inc., in which the public purchased
approximately $583 million of Refco common stock based on a false
and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

9.    In or about the mid-1990s, Refco was wholly owned
by RGHI, which in turn was owned by PHILLIP R. BENNETT, TONE N.
GRANT and one other partner.  As of early 1997, RGHI owed Refco
at least approximately $106 million.  Starting later in 1997,
Refco directly and indirectly incurred a series of substantial
trading losses that threatened the continued viability of Refco's
business.  In response to these losses, at various times between
in or about May 1997 and in or about October 2005, BENNETT and

4

his coconspirators, including TONE N. GRANT and ROBERT C.
TROSTEN, moved losses and expenses out of Refco and into RGHI,
and artificially padded Refco's revenues at the expense of RGHI,
in an effort to hide Refco's true liabilities, manipulate its
reported earnings, and thereby seek to defraud a purchaser into
buying the firm at a price that would pay off the accumulated
debt and ensure a profit to Refco's owners.  This strategy
resulted in an enormous increase in the already large debt from
RGHI to Refco that eventually totaled more than $1 billion.  The
debt by RGHI to Refco, carried on Refco's books as a receivable
from RGHI, was over time comprised of, among other things, the
following principal components: (a) liabilities incurred by Refco
when brokerage customers to whom it had extended credit defaulted
on their obligations, which were later transferred to RGHI; (b)
Refco's proprietary trading losses; (c) various operating
expenses incurred by Refco and paid in the first instance by
Refco but later transferred to RGHI as an increase in RGHI's debt
to Refco; and (d) transactions designed to pad Refco's revenues
in which the benefits accrued to Refco and the associated costs
were incurred by RGHI.

          10.  As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.  In the later 1990s, certain

Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million.  These customer losses included the following:

### Asian Debt Crisis Customers

11.  In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### Customer 1

12.  In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call

from the CME, using the proceeds of an intra day loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the intra day loan.

13.    Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, PHILLIP R. BENNETT, TONE N. GRANT and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses.  In addition, BENNETT, GRANT and ROBERT C. TROSTEN significantly misrepresented the size of the loss to Refco's auditors.

14.    PHILLIP R. BENNETT and TONE N. GRANT, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1 from the trading losses to be transferred to become a debt from RGHI to Refco.

### Proprietary Trading Losses

15.    In the late 1990s, Refco also incurred substantial losses from proprietary trades, or trades carried out on its own behalf.  For example, in or about 1998, Refco suffered a loss of at least approximately $40 million on its investment in Russian

bonds after the Russian Government defaulted on its obligations.
PHILLIP R. BENNETT, so as to avoid having to acknowledge this
loss on Refco's books, caused Refco to inflate the value of the
bonds in Refco's books and records to hide the full magnitude of
the loss.  Eventually, BENNETT caused those losses to be
transferred to RGHI, so that they appeared as a debt from RGHI to
Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, PHILLIP R.
BENNETT and others schemed to reduce Refco's expenses (therefore
falsely increasing Refco's apparent profitability) by moving
Refco expenses off of Refco's books and onto the books of RGHI.
For example:

a. From at least as early as February 1999, and
continuing until at least in or about February 2002, BENNETT and
others caused a total of approximately $46.3 million of computer
systems expenses incurred by Refco to be transferred to RGHI, in
the following years in the following amounts:

| Fiscal Year End | Amount Transferred to RGHI |
|-----------------|----------------------------|
| 2000            | $7,378,927.80              |
| 2001            | $8,797,189.98              |
| 2002            | $9,393,846.76              |
| 2003            | $7,002,153.65              |
| 2004            | $4,876,657.60              |
| 2005            | $5,028,053.21              |
| 2006            | $3,895,030.92              |

b. On or about August 9, 1999, BENNETT and others caused a total of approximately $1.5 million of expenses characterized as payroll expenses to be transferred from Refco to RGHI.

17. The result of these actions by PHILLIP R. BENNETT and his coconspirators was to create a large and growing debt owed by RGHI to Refco. By in or about February 1999, RGHI owed Refco at least approximately $252 million. In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary. Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

**Refco's Losses Funded By Use Of Customer Funds**

18.  Starting at least in or about 1997, PHILLIP R. BENNETT and TONE N. GRANT caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, BENNETT, GRANT and others caused Refco to systematically fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, $100 million a day.  BENNETT, GRANT and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

**BAWAG Invests In Refco**

19.  By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions.  In order to address that problem, in or about late 1998, PHILLIP R.

BENNETT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria.  In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

### Hiding The RGHI Receivable

20.  Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, PHILLIP R. BENNETT directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT or Refco. At certain times, BENNETT also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global

Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  BENNETT and, later, ROBERT C. TROSTEN, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004.  BENNETT and TROSTEN directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22.  In 1998 and 1999, PHILLIP R. BENNETT, and with respect to 1999, TONE N. GRANT, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23.  Beginning in 2000, PHILLIP R. BENNETT's year-end cover-up transactions were of two types:  transactions with Refco customers, and transactions with BAWAG.  In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August

12

2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|---------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.    These transactions typically followed standard patterns.  For example, in or about February 2000, PHILLIP R. BENNETT caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.    Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million.  As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To

13

ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i).     On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

(ii).     On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI.  The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by BENNETT on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii).     On or about the same date, BENNETT signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b.    At or around the same time as the

14

transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document this or any of the subsequent BAWAG transactions.

25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, PHILLIP R. BENNETT, TONE N. GRANT and ROBERT C. TROSTEN, and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.  For example, on or about April 30, 2003 and April 27, 2004, BENNETT and TROSTEN each signed letters to Refco's auditors in which they represented that "[r]elated party transactions and related amounts receivable," including "loans" and "transfers" had all "been properly recorded or disclosed in the consolidated financial statements," when in fact neither BENNETT nor TROSTEN had disclosed the true amount of the related party transactions or indebtedness.

**Refco Sells Notes Based On False Financial Information**

      26. At various times prior to August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI. In particular, BENNETT and TROSTEN caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

**Refco Obtains Credit Counterparty Relationships Based On False Financial Information**

      27. Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and

16

obtained credit from banks and other financial institutions,
including a revolving line of credit from a number of financial
institutions, including JP Morgan Chase, beginning in or about
1998, that eventually grew to more than $300 million.  For each
such transaction, including the annual renewal of the revolving
line of credit, Refco submitted to the proposed creditor the
fraudulent financial statements and made other false statements
which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted
PHILLIP R. BENNETT in hiding the RGHI receivable in the manner
described above, BENNETT caused Refco to assist BAWAG in hiding
its own balance sheet problem.  In or about early 2000, BAWAG
entrusted approximately €350 million of BAWAG's funds to an
investment advisor, who by the end of 2000 reported to the bank
that he had lost substantially all of those funds.  In order to
disguise this loss on its balance sheet, BAWAG arranged through
BENNETT to hold in an account at Refco certain worthless bonds
and other investments that Refco, at BENNETT's direction,
maintained at a false value that, over time, reached at least
approximately €500 million.  These fake assets were purportedly
housed at Refco and maintained at an inflated value for BAWAG's
benefit until 2005.

### BAWAG Invests Further In Refco

29.   In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2% of the proceeds of the sale of Refco and, together with its existing interest in 20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

### BENNETT's "Exit Strategy" Develops

30.   In or about 2003, PHILLIP R. BENNETT caused Refco to hire the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.  BENNETT asked CSFB to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, BENNETT directed CSFB to look for other purchasers for the company, with the understanding that it would be taken public.

31.   In connection with PHILLIP R. BENNETT's plan to sell Refco, BENNETT and ROBERT C. TROSTEN (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by BENNETT and others to disguise the ongoing operational problems at the company.

32.   For example, in or about March 2004, PHILLIP R.

18

BENNETT and others caused approximately $7.9 million in Refco consulting fee expenses to be transferred to RGHI.  In addition, during the fiscal year that ended in February 2004, BENNETT and ROBERT C. TROSTEN caused approximately $4.8 million in Refco computer expenses to be shifted to RGHI.

33.   In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

### The Fraudulent Leveraged Buyout Transaction

34.   In or about 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

19

35.   As a precursor to this transaction, PHILLIP R. BENNETT purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50% interest in profits made by BENNETT in a future sale of BENNETT's interest in Refco.  As a result of their agreement, GRANT was no longer responsible for RGHI's debt to Refco, which as of February 2004 totaled more than approximately $1 billion, and BENNETT controlled all of RGHI immediately prior to the sale to the Lee entities.

### *Lies To Thomas H. Lee Partners*

36.   In connection with the leveraged buyout transaction, on or about July 9, 2004, PHILLIP R. BENNETT executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior fiscal year, BENNETT owned a substantial interest in RGHI, which had engaged in transactions worth more than $1.5 billion during the year-end cover-up transactions with Refco, and which owed Refco more than $1 billion as of late February 2004.

37.   In connection with the leveraged buyout transaction, on or about July 2, 2004, ROBERT C. TROSTEN executed an officer's questionnaire in which he falsely certified, among

20

other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the Offering Circular provided to you or which you believe may be inaccurately stated therein," even though TROSTEN knew that the related party and expense shifting transactions had not been disclosed in the offering documents related to the transaction.

38.    In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.    The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.    The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

39.    In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others

falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

40.    In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.    BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

41.    In connection with the leveraged buyout

22

transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

       a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

       b.   BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

       c.   BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

       42.  The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion. Thereafter, PHILLIP R. BENNETT caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| TROSTEN | $48 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $112 million |

43.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN falsely represented to Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout.   In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG.   At the end of the leveraged buyout transaction, BENNETT distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

44.   In or about August 2004, after completion of the leveraged buyout transaction, ROBERT C. TROSTEN left Refco.

24

PHILLIP R. BENNETT caused RGHI to pay TROSTEN approximately $48 million from the proceeds of the TH Lee transaction, in order to keep TROSTEN from revealing the ongoing fraud scheme.

### BENNETT Plans To Take Refco Public

45.   After the leveraged buyout, PHILLIP R. BENNETT, who remained the Chief Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

46.   Between the August 2004 leveraged buyout and the August 2005 IPO, PHILLIP R. BENNETT continued his manipulation of Refco's finances:  At each quarter and year-end period, BENNETT caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and BENNETT continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  BENNETT caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|---|---|---|---|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

47.    Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, BENNETT caused the following transactions, among others, to artificially inflate Refco's revenues:

a.    On or about November 17, 2004, BENNETT caused RGHI, in a total of approximately 50 transactions, to purportedly purchase a total of approximately $1.25 billion in US Treasury notes from Refco, and then reversed the transactions the same day, at a loss to RGHI and a profit to Refco of approximately $7.8 million.

b.    On or about February 11, 2005, BENNETT caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

c.    On or about February 17, 2005, BENNETT caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a

26

result of the transactions.  The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

48.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

49.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. PHILLIP R. BENNETT signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

50.  On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for

27

the year ended February 28, 2005 on Form 10K.  PHILLIP R. BENNETT
signed the annual report on or about July 19, 2005 in New York,
New York.  BENNETT also signed two certifications regarding the
annual report.  In those certifications, BENNETT attested that he
had reviewed the annual report and (a) that it did "not contain
any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in light of
the circumstances under which such statements were made, not
misleading with respect to the period covered by th[e] report";
and (b) that "the information contained in the Report fairly
present[ed], in all material respects, the financial condition
and results of operations of the Company."  As noted above, the
financial statements were fraudulent in that, among other things,
they failed to reflect the related party receivables, the padded
revenue, and the shifted expenses.

        51.  On or about August 8, 2005, Refco filed an S-1
registration statement with the SEC in connection with its
initial public offering of common stock.  PHILLIP R. BENNETT
signed that registration statement on or about August 8, 2005, in
New York, New York.

        52.  The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by PHILLIP R. BENNETT each
required the disclosure of (a) certain transactions between Refco
and its management and (b) certain debts owed directly or

28

indirectly by any executive officer of Refco to Refco, during
Refco's past fiscal year and, for the registration statements,
during Refco's prior two fiscal years.  These disclosures were
required in order to apprize investors of, among other things,
potential conflicts of interest by management.

53.  The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by PHILLIP R. BENNETT each
failed to disclose the related party transactions and the related
party indebtedness between Refco and RGHI outlined above.  In
particular, these public filings failed to disclose: (a) the
existence of hundreds of millions of dollars of indebtedness by
RGHI to Refco during 2004 and 2005; (b) the transactions at
quarter- and fiscal year-end during 2004 and 2005 by which RGHI
temporarily paid down its debt to Refco, the guaranties by Refco
of the third party lenders' loans to RGHI, and the subsequent re-
assumption of the debt by RGHI, each of which was a related party
transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

54.  On or about August 10, 2005, in reliance on, among
other things, Refco's public filings and the accompanying audited
financial statements, the public bought approximately $583
million of Refco's common stock.  PHILLIP R. BENNETT, through
RGHI, sold Refco stock in the IPO valued at more than $100
million, while retaining a substantial ownership interest in

29

Refco.  Following the initial public offering, Refco's common
stock was listed on the New York Stock Exchange under ticker
symbol "RFX."

### End Of Quarter Transactions In August 2005

55.  In or about late August 2005, after the completion
of Refco's IPO, PHILLIP R. BENNETT caused Refco to carry out $420
million in cover-up transactions with a Refco customer that
temporarily transformed all or part of the RGHI receivable into a
receivable from that customer.  After the August 31, 2005 end of
Refco's second quarter, the $420 million in cover-up transactions
were unwound.

### Public Disclosure Of The Related Party Debt

56.  In or about early October 2005, Refco discovered
an approximately $430 million receivable on its books from RGHI.
It demanded repayment of the debt by PHILLIP R. BENNETT, who
repaid Refco approximately $430 million on or about October 10,
2005, having received an emergency loan in that approximate
amount from BAWAG.

57.  On or about October 10, 2005, Refco issued a press
release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

30

believes that the receivable was the result of the
assumption by an entity controlled by Mr. Bennett
of certain historical obligations owed by
unrelated third parties to the Company, which may
have been uncollectible. The Company believes that
all customer funds on deposit are unaffected by
these activities. Independent counsel and forensic
auditors have been retained to assist the Audit
Committee in an investigation of these matters.

58.   Following Refco's announcement of its discovery of
this related party receivable, the market price of Refco stock
plummeted, resulting in a loss of well more than $1 billion in
market capitalization.

59.   On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

60.   From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly did combine, conspire, confederate, and agree
together and with each other to commit offenses against the
United States, namely: (a) to commit fraud in connection with the
purchase and sale of securities issued by Refco, in violation of
Sections 78j(b) and 78ff of Title 15, United States Code, and

31

Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act of 1933, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code, Section 1957.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

61.  It was a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT the defendants, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national

securities exchanges, directly and indirectly, would and did use
and employ, in connection with the purchase and sale of
securities, manipulative and deceptive devices and contrivances,
in violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading; and (c) engaging in acts,
practices, and courses of business which operated and would
operate as a fraud and deceit upon a person, in connection with
the purchase and sale of notes issued by Refco and the common
stock of Refco, Inc., all in violation of Title 15, United States
Code, Sections 78j(b) and 78ff.

## False Statements In SEC Filings – Exchange Act

62.  It was further a part and object of the conspiracy
that PHILLIP R. BENNETT, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, in reports and
documents required to be filed with the SEC under the Exchange
Act, and the rules and regulations promulgated thereunder, would
and did make and cause to be made statements which were false and
misleading with respect to material facts, in violation of Title
15, United States Code, Sections 78o(d) and 78ff.

**<u>False Statements In SEC Filings – Securities Act</u>**

63.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

**<u>Wire Fraud</u>**

64.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

**<u>Material Misstatements To Auditors</u>**

65.   It was further a part and object of the conspiracy

that PHILLIP R. BENNETT, the defendant, being an officer and
director of Refco, an issuer obligated to file reports pursuant
to section 15(d) of the Securities and Exchange Act of 1934 and
subsequently with a class of securities registered pursuant to
section 12 of the Securities Exchange Act of 1934, unlawfully,
willfully and knowingly, directly and indirectly, (a) made and
caused to be made materially false and misleading statements; and
(b) omitted to state, and caused others to omit to state,
material facts necessary in order to make statements made, in
light of the circumstances under which they were made, not
misleading to accountants in connection with (i) audits, reviews
and examinations of the financial statements of Refco required to
be filed under the Securities and Exchange Act of 1934; and (ii)
the preparation and filing of documents and reports required to
be filed with the SEC pursuant to rules and regulations
promulgated by the SEC.

## Bank Fraud

66.  It was further a part and object of the conspiracy
that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT,
the defendants, unlawfully, willfully and knowingly, would and
did execute, and attempt to execute, a scheme and artifice to
defraud a financial institution, to wit, HSBC, and to obtain
moneys, funds, credits, assets, securities and other property
owned by, and under the custody and control of, a financial

35

institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

## Money Laundering

67.   It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN and TONE N. GRANT, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

68.   Among the means and methods by which PHILLIP R. BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.   PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public the size of customer losses for which Refco was responsible.

b.   PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators

36

transferred losses incurred by Refco to BENNETT's company, RGHI.

        c.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

        d.    PHILLIP R. BENNETT, the defendant, and his coconspirators caused Refco to file false and fraudulent statements with the SEC.

        e.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators, made and caused to be made material false statements and omissions to Refco's auditors.

        f.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

        g.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

## Overt Acts

69.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.    On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an

38

approximately $720 million loan from a Refco customer to RGHI.

e.   On or about April 27, 2004, PHILLIP R.
BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to
Refco's auditors representing, among other things, that all
related party transactions and related party amounts receivable
had been fully disclosed to the auditors.

f.   On or about May 17, 2004, PHILLIP R. BENNETT
and TONE N. GRANT, the defendants, met at a hotel in lower
Manhattan to discuss the more than $1 billion debt that they, as
the owners of RGHI, owed to Refco.

g.   On or about August 5, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to ROBERT C.
TROSTEN, the defendant, approximately $48 million.

h.   On or about August 5, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT,
the defendant, approximately $4 million.

i.   On or about August 8, 2004, PHILLIP R.
BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT,
the defendant, approximately $12 million.

j.   On or about February 23, 2005, in New York,
New York, PHILLIP R. BENNETT, the defendant, signed a guaranty
letter on behalf of Refco Group Ltd., LLC. regarding an
approximately $345 million loan from a Refco customer to RGHI.

k.   On or about April 6, 2005, in New York, New

York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4
registration statement.

l.   On or about May 25, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter
on behalf of Refco Group Ltd., LLC. regarding an approximately
$450 million loan from a Refco customer to RGHI.

m.   On or about July 19, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed Refco's annual
report on Form 10K.

n.   On or about August 8, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1
registration statement.

(Title 18, United States Code, Section 371).

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

70.   The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

71.   From in or about the mid-1990s up to in or about
2004, in the Southern District of New York and elsewhere, PHILLIP
R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants,
unlawfully, willfully, and knowingly, directly and indirectly, by
the use of means and instrumentalities of interstate commerce,

the mails, and the facilities of national securities exchanges,
did use and employ, in connection with the purchase and sale of
securities, manipulative and deceptive devices and contrivances,
in violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices,
and courses of business which operated and would operate as a
fraud and deceit upon a person, in connection with the purchase
and sale of 9% Senior Subordinated Notes due 2012, issued by
Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
   17, Code of Federal Regulations, Section 240.10b-5; and
            Title 18, United States Code, Section 2).

### COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

72.   The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

73.   From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and

41

knowingly, directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in connection with the purchase and sale of the
common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

## COUNT FOUR

(False Filing With The SEC – Exchange Act)

The Grand Jury further charges:

74.    The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

75.    On or about July 19, 2005, in the Southern
District of New York and elsewhere, PHILLIP R. BENNETT, the
defendant, unlawfully, willfully, and knowingly made and caused

42

to be made statements in a report and document required to be
filed with the SEC under the Exchange Act, and the rules and
regulations promulgated thereunder, which statements were false
and misleading with respect to material facts, to wit, BENNETT
and others caused Refco to submit, and aided and abetted the
submission of, in New York, New York, to the SEC in Washington,
D.C., Refco's Form 10-K.

> (Title 15, United States Code, Sections 78o(d) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.15d-2;
> and Title 18, United States Code, Section 2.)

## COUNTS FIVE AND SIX

(False Filing With The SEC – Securities Act)

The Grand Jury further charges:

76.   The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

77.   On or about the dates specified below, in the
Southern District of New York and elsewhere, PHILLIP R. BENNETT,
the defendant, unlawfully, willfully, and knowingly made and
caused to be made, in a registration statement filed with the SEC
under the Securities Act of 1933, untrue statements of material
facts and omitted to state material facts required to be stated
therein and necessary to make the statements therein not
misleading, to wit, BENNETT and others caused Refco to submit,
and aided and abetted the submission of, in New York, New York,

43

to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|:---:|:---:|:---:|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

## COUNTS SEVEN THROUGH THIRTEEN

(Wire Fraud)

The Grand Jury further charges:

78.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

79.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

44

| Count | Defendant | Approximate Date | Wire Communication |
|---|---|---|---|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago, Illinois |
| TWELVE | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |
| THIRTEEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOURTEEN

(Material Misstatements To Auditors)

The Grand Jury further charges:

80.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

81.   From in or about April 2005 to in or about October

45

2005, in the Southern District of New York, PHILLIP R. BENNETT,
the defendant, being an officer and director of Refco, an issuer
obligated to file reports pursuant to section 15(d) of the
Securities and Exchange Act of 1934 and subsequently with a class
of securities registered pursuant to section 12 of the Securities
Exchange Act of 1934, unlawfully, willfully and knowingly,
directly and indirectly, (a) made and caused to be made
materially false and misleading statements; and (b) omitted to
state, and caused others to omit to state, material facts
necessary in order to make statements made, in light of the
circumstances under which they were made, not misleading to
accountants in connection with (i) audits, reviews and
examinations of the financial statements of Refco required to be
filed under the Securities and Exchange Act of 1934; and (ii) the
preparation and filing of documents and reports required to be
filed with the SEC pursuant to rules and regulations promulgated
by the SEC.

> (Title 15, United States Code, Sections 78m and
> 78ff; Title 17, Code of Federal Regulations, Section
> 240.13b2-2; and Title 18, United States Code, Section 2).

## COUNT FIFTEEN

(Bank Fraud)

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if

fully set forth herein.

83.  On or about August 5, 2004, in the Southern District of New York, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

## COUNTS SIXTEEN THROUGH TWENTY

(Money Laundering)

The Grand Jury further charges:

84.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

85.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than

47

$10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a):

| Count | Defendant | Approximate Date | Transaction |
|-------|-----------|------------------|-------------|
| SIXTEEN | PHILLIP R. BENNETT | August 5, 2004 | $25,322,810 transfer from RGHI's JP Morgan Chase account in New York, NY to BENNETT's JP Morgan Chase account in New York, NY |
| SEVENTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $46,069,300 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| EIGHTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $1,950,000 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| NINETEEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago Illinois |
| TWENTY | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |

(Title 18, United States Code, Sections 1957(a) and 2).

<u>FORFEITURE ALLEGATION WITH RESPECT TO</u>
<u>COUNTS ONE THROUGH FOURTEEN</u>

86.  As a result of committing one or more of the
foregoing securities fraud offenses, in violation of Title 15,
United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.15d-2, as alleged in Counts One, Two, Three, Four, Five, Six
and Fourteen; wire fraud offenses, in violation of Title 18,
United States Code, Section 1343, as alleged in Counts One,
Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of this
Indictment, PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN,
the defendant (as to the acts alleged in Counts One, Two, Seven,
and Eight), and TONE GRANT, the defendant (as to acts alleged in
Counts One, Two, and Eleven) shall forfeit to the United States
pursuant to Title 18, United States Code, Section 981(a)(1)(C)
and Title 28, United States Code, Section 2461, all property,
real and personal, that constitutes or is derived from proceeds
traceable to the commission of the securities and wire fraud
offenses, including but not limited to the following:

a.  At least $2.4 billion in United States
currency, representing the amount of proceeds obtained as a
result of the charged wire and securities fraud offenses, for
which the defendants are jointly and severally liable, including
but not limited to:

1.  The contents of Account No. ████6752,

49

in the name of Refco Group Holdings, Inc., held at JP Morgan Chase Bank, New York (approximately $63,393.20);

   2.   The contents of Account No. ████2791 in the name of Phillip R. Bennett And/or Valerie Bennett, held at JP Morgan Chase Bank, New York (approximately $905,314.91);

   3.   The contents of Account No. ████5-00-7, in the name of Phillip Bennett Grantor Retained Annuity Trust ("GRAT"), held at JP Morgan Chase Bank, New York (approximately $13,880,143.28);

   4.   All funds from the Liquidation of the Limited Capital Account for Sphinx Managed Futures Index Fund, LP, in the name of Philip Bennett, held at the BISYS Group, Inc. (approximately $974,533.91);

   5.   The contents of Account No. ████0832, in the name of Phillip Bennett, held at Citibank, N.A., New York, New York (approximately $13,810,347.00);

   6.   The contents of Account No. ████████0258, in the name of Valerie Bennett, held at Wachovia Bank, Charlotte, North Carolina (approximately $440,014.55);

   7.   The contents of Account No. ████7710, in the name of Valerie Bennett, held at Merrill Lynch, New York (approximately $1,828,492.00);

   8.   The contents of Account. No. ██████████10-19, in the name of Zahava R. Trosten, held at JP Morgan

Chase Bank, New York (approximately $30,024,148.66);

9.   The contents of Account No. ███████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

10.   The contents of Account No. ███████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53);

11. Any and all funds in Account No. ████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

12. Any and all right, title and interest in the real property and appurtenances known as ████████████, Sarasota, Florida 34236; and

13.   A sum of at least $1,900,000.00 from Account Nos. ██████4805 and ██████0709, in the name of Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New Jersey.

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE AND FIFTEEN THROUGH TWENTY

87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts One and Fifteen of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts Sixteen through Twenty of this Indictment,

PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Fifteen, Seventeen, and Eighteen), and TONE GRANT, the defendant (as to acts alleged in Counts One, Fifteen, and Nineteen) shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.  At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 in the forfeiture allegation above; and

b.  At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 of the forfeiture allegation above.

### SUBSTITUTE ASSETS PROVISION

88.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

1.  Any and all right, title and interest in the real property and appurtenances known as ███████████, Gladstone, New Jersey 07934;

2.  Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ██████ ███████████, New York, New York 10028; and

3.  Any and all right, title and interest in the

53

real property and appurtenances known as

, Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)

FOREPERSON

MICHAEL J. GARCIA
United States Attorney

54

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

- v -

## PHILLIP R. BENNETT,
## ROBERT C. TROSTEN,
## TONE N. GRANT

**Defendants.**

## INDICTMENT

S3 05 Cr. 1192 (NRB)

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA                    :

         -v-                                :          **INDICTMENT**

JOSEPH P. COLLINS,                          :

                    Defendant.              :

------------------------------------x

**07 CRIM 1170**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **DEC 1 8 2007**

                           **COUNT ONE**

**(Conspiracy To Commit Securities Fraud, Wire Fraud, Bank Fraud,
And Money Laundering, To Make False Filings With The SEC, And To
Make Material Misstatements To Auditors)**

         The Grand Jury charges:

                 **RELEVANT ENTITIES AND PERSONS**

         1.   At certain times relevant to this Indictment,

Refco, Inc. was a Delaware corporation with its principal place

of business in New York, New York.  Starting from at least the

mid-1990s, the business of Refco, Inc. and its predecessor

entities included providing execution and clearing services for

exchange-traded derivatives and providing prime brokerage

services in the fixed income and foreign exchange markets.

Refco, Inc. held its initial public offering ("IPO") of common

stock on or about August 10, 2005.  Prior to on or about August

10, 2005, Refco, Inc.'s predecessor entities were privately held.

Refco, Inc. and its predecessor entities are referred to herein

collectively as "Refco."

2.  At all times relevant to this Indictment, Refco
Group Holdings, Inc. ("RGHI") was a privately held Delaware
corporation that held a substantial ownership interest in Refco.

3.  At all times relevant to this Indictment, Refco was
represented by a large, well-known law firm (the "Law Firm").  At
all times relevant to this Indictment, the Law Firm maintained
offices throughout the United States and the world, including New
York, New York.

4.  At all times relevant to this Indictment, JOSEPH P.
COLLINS, the defendant, was a partner at the Law Firm.  At all
times relevant to this Indictment, COLLINS served as the
principal outside counsel to Refco and RGHI and, indeed, brought
Refco with him as a client when he joined the Law Firm in 1994.
As such, COLLINS worked closely with executives and officers of
both companies, providing them with legal advice and services
with regard to a wide range of matters.  At all times relevant to
this Indictment, Refco was the most significant client of JOSEPH
P. COLLINS, the defendant, and he billed more time to matters for
Refco than he did to matters for any other client and generated
more fees for the Law Firm through his work for Refco than he did
through any other client.  From in or about 1997 through in or
about 2005, COLLINS's relationship with Refco resulted in at
least approximately $40 million in fees being invoiced by the Law
Firm to Refco.

5.   At certain times relevant to this Indictment, Phillip R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco. At certain times relevant to this Indictment, Bennett also owned between 24.5 percent to 100 percent of RGHI and served as President and Chief Executive Officer of RGHI.  As a result of his ownership interest in RGHI, at all times relevant to this Indictment, Bennett also had a substantial indirect ownership interest in Refco.

6.   At certain times relevant to this Indictment, Robert C. Trosten, a coconspirator not named as a defendant herein, held senior management positions at Refco.  Among other positions, Trosten was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004.

7.   At certain times relevant to this Indictment, Tone N. Grant, a coconspirator not named as a defendant herein, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, Grant was the President of Refco.  At certain times relevant to this Indictment, Grant also had a direct ownership interest in RGHI.  As a result of his ownership interest in RGHI, at certain times relevant to this Indictment, Grant held a significant indirect ownership interest in Refco.

3

8.   At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft was the fourth largest bank in Austria.   At various times relevant to this Indictment, it indirectly held a substantial ownership interest in Refco and made investments in Refco through affiliates it controlled. The bank and its various subsidiaries and affiliates are referred to collectively herein as "BAWAG".

### THE SCHEME TO DEFRAUD

9.   From at least as early as in or about 1997 through in or about October 2005, JOSEPH P. COLLINS, the defendant, together with Phillip R. Bennett, Robert C. Trosten, Tone N. Grant, and others known and unknown, schemed to hide the true financial health and economic structure of Refco, including the existence of a large debt owed to Refco by RGHI and the full extent of BAWAG's economic interest in Refco, from Refco's banks, counterparties, auditors, investors and potential investors.   In furtherance of this scheme, COLLINS, Bennett, Trosten, Grant, and others known and unknown, made and caused to be made false and fraudulent statements to Refco's banks, counterparties, auditors, investors, and potential investors, and made and caused to be made false public filings with the United States Securities and Exchange Commission ("SEC").

4

10.  JOSEPH P. COLLINS, the defendant, as Refco's
principal outside counsel, actively participated in this scheme
to hide the true financial health of Refco and to conceal BAWAG's
economic interest in Refco.  Acting hand-in-hand with Bennett,
COLLINS made affirmative misrepresentations, material omissions,
and told deceptive half-truths, all to assist Bennett's scheme to
steal more than $2.4 billion from potential investors and
lenders.  These misrepresentations, omissions, and half-truths --
as well as misrepresentations, omissions, and half-truths told by
coconspirators that COLLINS confirmed and furthered -- were
believed by Refco's investors and lenders in part because
COLLINS's status as a partner with a well-known law firm and as
Refco's long-time counsel gave them confidence that such
representations were truthful, accurate, and complete.
Furthermore, COLLINS documented and caused to be documented
transactions that concealed the existence of the large, material
debt owed to Refco by RGHI.  COLLINS's and the Law Firm's role in
documenting these fraudulent transactions helped third parties
gain comfort in participating in them.  Furthermore, in meetings,
telephone calls, and correspondence, COLLINS lied about this debt
and the existence of these and other transactions -- as well as
other matters relating to Refco's financial health -- to Refco's
banks, investors, potential investors, and their advisers.
COLLINS also knowingly negotiated and drafted fraudulent

agreements and public filings that resulted in the investment of
more than $2.4 billion in Refco by banks, investors, and the
public.  COLLINS also schemed with Bennett to conceal from
potential investors the size of the investment BAWAG had made in
Refco.  As a result of COLLINS's lies on behalf of Refco, COLLINS
and Bennett were able to achieve the ultimate objective of the
scheme, that is, obtaining, through fraud: the sale of
approximately 57 percent of Refco to a group headed by Thomas H.
Lee Partners in 2004; the sale of approximately $600 million of
notes to private investors in 2004; the acquisition of
approximately $800 million of bank financing in 2004; and the
August 2005 IPO of stock in Refco, in which the public purchased
approximately $583 million of Refco common stock.

### Origins Of Refco's Financial Problems

11.  In or about the mid-1990s, Refco was wholly owned
by RGHI.  As of in or about early 1997, RGHI owed Refco at least
approximately $106 million.  Starting later in or about 1997,
Refco directly and indirectly incurred a series of substantial
trading losses that threatened the continued viability of Refco's
business.  In response to these losses, at various times between
in or about May 1997 and in or about October 2005, Refco
transferred losses from Refco to RGHI in an effort to hide
Refco's true liabilities and thereby seek, among other things, to
defraud potential purchasers into buying the firm at a price that

6

would pay off the accumulated debt and ensure a profit to Refco's owners.  This practice resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion, which was carried on Refco's books as a receivable from RGHI (the "RGHI Receivable").

12.  For example, in or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1") lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was ultimately forced to use customer funds taken from the unregulated segments of Refco's business to cover the loss.

13.  Recognizing that public acknowledgment of the actual loss amount would threaten Refco's continued existence, Refco falsely represented to the public that Refco had not sustained significant losses as a result of Customer 1's losses when in fact it had lost in excess of $90 million.  In fact, with the assistance and knowledge of JOSEPH P. COLLINS, the defendant, Refco had assumed at least $71 million of debt owed by Customer 1 from the trading losses. Refco then transferred that debt to RGHI, thereby making it appear on Refco's books as a $71 million receivable from RGHI.

7

14.  At all times relevant to this Indictment, JOSEPH
P. COLLINS, the defendant, knew that Refco had sustained
significant losses in connection with the trading activities of
its customers; knew that senior Refco management and others known
and unknown had lied to the public and others about Refco having
sustained such losses; and knew that such losses were transferred
from Refco to RGHI.

## BAWAG Invests In Refco

15.  By the end of 1998, significant customer and other
losses sustained by Refco placed Refco in a precarious financial
condition and caused Refco management to seek an infusion of
capital from BAWAG, a long-time Refco customer. In a transaction
that closed in or about 1999 and that JOSEPH P. COLLINS, the
defendant, and others negotiated and documented, BAWAG purchased
a ten percent ownership interest in Refco for approximately $95
million and lent Refco approximately $85 million of additional
capital in return for an additional ten percent economic interest
in Refco.

16.  At all times relevant to this Indictment,
JOSEPH P. COLLINS, the defendant, knew that, even with the
infusion of capital provided by BAWAG in 1999, RGHI continued to
owe Refco hundreds of millions of dollars. Indeed, in or about
1999, COLLINS received information that RGHI owed Refco at least
approximately $252 million.

8

**Hiding The RGHI Receivable**

17.   Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis with a fiscal year-end on the last day of February, as JOSEPH P. COLLINS, the defendant, knew.  Among the items the auditors examined each year were "related party transactions" and, in particular, transactions between and among Refco and members of Refco's management and owners.  As COLLINS also knew, Refco and RGHI were related parties.

18.   In order to hide the size of the large and growing RGHI Receivable from, among others, Refco's auditors, Refco carried out a series of transactions in order temporarily to pay down all or part of the RGHI Receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Refco.  The transactions were carried out in order to hide the existence of the related party RGHI Receivable and the underlying causes of its existence from Refco's auditors, banks, investors, potential investors, and others.

19.   In or about 1998 and 1999, these transactions were undocumented.  However, beginning in or about 2000, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm working at his direction, were responsible for drafting the legal

9

documents that effectuated the transactions that Refco used to
pay down, temporarily, all or part of the RGHI Receivable over
Refco's fiscal year-ends and replace it with a receivable from
one or more other entities not related to Refco (the "Round Trip
Loan Transactions").  In summary, these year-end transactions
were carried out in the following approximate amounts during the
2000 to 2003 period:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Feb. 2000 | $310 million |
| Feb. 2001 | $450 million |
| Feb. 2002 | $625 million |
| Feb. 2003 | $650 million |

        20.  These transactions followed a standard pattern.
For example, in or about 2000, JOSEPH P. COLLINS, the defendant,
along with senior Refco management and other attorneys at the Law
Firm who were working at COLLINS's direction, caused the
following transactions to occur with several customers for the
purpose of paying down a portion of the RGHI Receivable over the
February 2000 year-end.  Three different customers (collectively,
the "Three Customers") lent a total of approximately $310 million
to RGHI, which RGHI then used to pay down its obligation to
Refco.  At the same time, Refco lent to the Three Customers
approximately $310 million.  As a result, it appeared on Refco's
books and records that Refco had approximately $310 million in
receivables from the Three Customers, and the debt from RGHI

10

appeared to be reduced by approximately $310 million. In or about March 2000, the transactions were reversed, with Refco lending approximately $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan. To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers was memorialized in loan agreements, prepared by the Law Firm's attorneys at COLLINS's direction, between Refco, RGHI and the Three Customers, similar to the agreements that follow:

    a.    On or about February 25, 2000, through a loan document prepared at COLLINS's direction, Refco Capital Markets, Ltd., a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million. The loan was to be repaid on March 9, 2000.

    b.    On or about the same day, February 25, 2000, through a loan document prepared by COLLINS and another Law Firm attorney, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000. The loan agreement for this loan was executed by Phillip R. Bennett on behalf of RGHI. The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco

11

Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

c.    On or about the same day, Phillip R. Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.  The letter of guaranty signed by Bennett was prepared by a Law Firm attorney.

d.    On or about the same day, Phillip R. Bennett signed a letter of indemnity to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that Refco Group, Ltd. would defend and indemnify Customer 2 against any claims brought against Customer 2, or with respect to any loss suffered by Customer 2, as a result of Customer 2's loan to RGHI.  The letter of indemnity signed by Bennett was prepared by COLLINS and another Law Firm attorney.

21.    At all times relevant to this Indictment, JOSEPH P. COLLINS, the defendant, knew that Refco's fiscal year ended the last day of February, and that the fiscal year-end Round Trip Loan Transactions described above had the effect of paying down, temporarily, all or part of a large receivable owed to Refco by RGHI.

22.    In addition to the customer Round Trip Loan Transactions, Refco also engaged in undocumented year-end

transactions with BAWAG, in which BAWAG lent hundreds of millions of dollars to RGHI, which it then used to pay down its obligation to Refco (the "BAWAG Round Trip Loan Transactions"). At the same time, Refco lent to BAWAG a large amount of money. As a result, it appeared on Refco's books and records that Refco had hundreds of millions of dollars in receivables from BAWAG, while the RGHI Receivable appeared to be reduced. After Refco's fiscal year-end, the transactions were reversed. In summary, these BAWAG Round Trip Loan Transactions were carried out in the following approximate amounts during the 2000 to 2004 period:

| Date | Approximate BAWAG Round Trip Loans to RGHI |
|------|--------------------------------------------|
| Feb. 2000 | $300 million |
| Feb. 2001 | $300 million |
| Feb. 2002 | $300 million |
| Feb. 2003 | $250 million |
| Feb. 2004 | $250 million |

## BAWAG Invests Further in Refco

23. Because Refco continued to falter financially, Refco management sought additional infusions of capital, turning again to BAWAG for assistance. To that end, in or about July 2002, Refco, with the assistance of JOSEPH P. COLLINS, the defendant, entered into an agreement with BAWAG whereby BAWAG agreed to provide Refco with the needed capital infusions in exchange for the right to receive proceeds of a future sale of

Refco.   Specifically, under the terms of the agreement (called
the "Proceeds Participation Agreement" or "PPA"), BAWAG promised
to make capital contributions to Refco at or about Refco's fiscal
year-ends in 2003, 2004, and 2005 in exchange for a percentage of
any proceeds paid in connection with a sale or public offering of
Refco (identified in the agreement as the "Participation Right").
The percentage of proceeds BAWAG was entitled to under the terms
of the PPA increased with each periodic contribution of capital.
Alternatively, the PPA gave BAWAG the right to convert the
Participation Right into ownership shares of Refco upon making
the payments to Refco as specified in the PPA.   The agreement
also contemplated that RGHI would guarantee Refco's performance
under the terms of the PPA and otherwise secure the Participation
Right.   Under the terms of the PPA and related agreements, as
COLLINS well knew, Refco agreed to use $350 million of the
purchase price for the Participation Right to pay down the
ballooning debt owed to Refco by RGHI. In accordance with the
terms of the PPA, BAWAG made two contributions to Refco totaling
approximately $467,480,000.   In return, BAWAG received the right
to approximately 27.2 percent of the proceeds of the sale of
Refco and, together with BAWAG's existing economic interest in 20
percent of Refco, possessed the economic rights to approximately
47 percent of the proceeds of the sale of Refco.

24.    Having negotiated, drafted, and caused to be
drafted the PPA, JOSEPH P. COLLINS, the defendant, was familiar
with all of the terms of the PPA, including the economic interest
BAWAG had in Refco through the right conferred upon BAWAG to
participate in the proceeds of a sale or public offering of Refco
-- or convert its Participation Right into ownership shares of
Refco -- as well as RGHI's role guaranteeing Refco's performance
and securing BAWAG's Participation Right under the PPA.  COLLINS
was also aware that the PPA required Refco to execute amended
corporate documentation to reflect the existence of the PPA and
that incorporated certain terms of the PPA.

25.    Indeed, as contemplated by the PPA, JOSEPH P.
COLLINS, the defendant, drafted and caused to be drafted,
simultaneously with the drafting of the PPA, the two agreements
through which RGHI, a party related to Refco, agreed to guarantee
the performance of Refco under the PPA and to secure BAWAG's
Participation Right.  As part of the drafting of the PPA, the Law
Firm's attorneys also prepared amended corporate documentation
for Refco that reflected the existence of the PPA and
incorporated into the governance of Refco some of its terms.

26.    As set forth in paragraph 23 above, under the
terms of the PPA, BAWAG made two contributions to Refco totaling
approximately $467,480,000.  At the time of the payments, under
the terms of the PPA, BAWAG had the right to convert this

15

Participation Right into ownership shares in Refco. Also as a result of the payments, Refco and BAWAG executed Refco's amended corporate documentation that had been prepared as part of the PPA. As set forth in paragraph 32 below, COLLINS helped conceal this amended corporate documentation from potential investors in Refco, thereby hiding the terms of the PPA from them.

27. As further set forth in paragraphs 32, 36, 37, 39 and 41 below, JOSEPH P. COLLINS, the defendant, schemed generally with Phillip R. Bennett to conceal the existence of the terms of the PPA from potential investors in Refco because COLLINS and Bennett knew such terms were material to potential investors. Through affirmative misrepresentations and omissions, COLLINS and others concealed from Refco's potential investors: (1) the terms of the Participation Right conferred upon BAWAG under the PPA and the resulting obligation Refco would have to BAWAG upon the sale or public offering of Refco; (2) the role that RGHI, a related party to Refco, played in guaranteeing and securing BAWAG's Participation Right; (3) BAWAG's ability to convert its Participation Right into ownership shares in Refco; (4) the existence of at least $350 million in related party debt owed from RGHI to Refco in or about 2002, less than half of which was disclosed in Refco's audited 2002 financial statements; and (5) that Refco required an infusion of more than $450 million in cash from BAWAG to conduct its business.

16

## The Fraudulent Leveraged Buyout Transaction

28.  As contemplated by the PPA, Refco management made efforts to sell Refco soon after the PPA was executed.  In or about 2003, Refco hired an investment bank ("Investment Bank A") to assist in selling the Company.  Refco asked Investment Bank A to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After these initial efforts to sell Refco failed, Refco directed Investment Bank A to look for other purchasers for the company with the understanding that it would later hold an IPO.

29.  In or about 2003, Refco, assisted by JOSEPH P. COLLINS, the defendant, began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout (the "LBO") was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $507 million in cash; simultaneously, Refco sold approximately $600 million in notes and obtained approximately $800 million in financing from a syndicate of banks.  When the transaction was completed, RGHI was left with a 43 percent ownership interest in Refco.

17

30.   In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, and other attorneys at the Law Firm represented both Refco and RGHI.  In relation to this representation, COLLINS drafted and negotiated representations that appeared in documents and correspondence provided to Thomas H. Lee Partners and discussed the transaction with persons representing Thomas H. Lee Partners.  In such documents, correspondence, and discussions, COLLINS made representations relating to the financial condition of Refco, among other matters, that COLLINS knew to be false and misleading and omitted information necessary to make his statements concerning the same not misleading.  For example, among other things, COLLINS concealed from Thomas H. Lee Partners the existence of the terms of the PPA.

31.   In connection with the LBO transaction, Phillip R. Bennett, through RGHI, purchased from BAWAG the Participation Right that BAWAG had previously obtained in connection with the PPA.  Bennett acquired the Participation Right by purchasing all of the stock of the BAWAG entity that owned the Participation Right.  According to agreements drafted, and terms negotiated by, JOSEPH P. COLLINS, the defendant, the purchase price for this acquisition was approximately $676 million.  The purchase price was paid partly out of proceeds of the LBO transaction paid to RGHI.

18

**Lies To Thomas H. Lee Partners**

**Lies about the PPA and payments to BAWAG**

32.    In connection with the negotiations with Thomas H. Lee Partners, by no later than in or about March 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett, in addition to agreeing to conceal from Thomas H. Lee Partners the terms of the PPA, also agreed to conceal that Bennett, through RGHI, was planning to pay approximately $676 million to purchase the Participation Right from BAWAG, including using approximately $566 million from the proceeds of the LBO transaction. Accordingly, Bennett and COLLINS both took affirmative steps to conceal the existence of the terms of the PPA and of the agreements relating to RGHI's acquisition of the Participation Right for the stated reason that investors would pay less money for Refco if they were aware of such terms.  Such steps included, but were not limited to, Bennett and COLLINS making false representations directly to Thomas H. Lee Partners, and COLLINS himself specifically directing others not to disclose information relating to RGHI's buyout of the Participation Right from BAWAG. Furthermore, when asked by Thomas H. Lee Partners to further amend the corporate documentation for Refco, COLLINS prepared new amended corporate documentation that fraudulently concealed the fact that previous corporate documentation had been executed by

BAWAG and Refco as part of the PPA, as set forth in paragraph 26
above.

33.    JOSEPH P. COLLINS, the defendant, and Phillip R.
Bennett made similar misrepresentations to Thomas H. Lee Partners
that misled Thomas H. Lee Partners about the amount of money that
BAWAG was to receive at the closing of the LBO transaction.
Specifically, COLLINS and Bennett represented that BAWAG was
receiving many hundreds of millions of dollars less than the
approximately $952 million that BAWAG was to receive for its
various interests in Refco and the approximately $390 million
that BAWAG was to receive as repayment of the overdraft discussed
in paragraph 37 below.

### Lies about related party debt and related party transactions

34.    JOSEPH P. COLLINS, the defendant, Phillip R.
Bennett, and others also made affirmative representations and
drafted and negotiated contract terms that misled Thomas H. Lee
Partners and its representatives to believe that RGHI owed Refco
no more than approximately $108 million, all of which amount
COLLINS and Bennett knowingly and falsely represented to Thomas
H. Lee Partners would be repaid by the time the LBO transaction
closed.  In fact, by the time the LBO transaction closed, COLLINS
knew that RGHI actually owed Refco at least $1 billion (which had
been hidden from Refco's auditors through the Round Trip Loan
Transactions), and that even after the LBO, RGHI would continue

20

to owe Refco at least $300 million.  Accordingly, COLLINS
continued to help Bennett conceal the existence of this related
party debt by documenting and causing to be documented year-end
and quarter-end Round Trip Loan Transactions similar to those
described above in the following approximate amounts at the same
time that COLLINS was negotiating the terms of the LBO
transaction:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Feb. 2004 | $720 million |
| May 2004 | $700 million |

35.  In connection with the LBO transaction, Refco
caused its audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  As
JOSEPH P. COLLINS, the defendant, well knew, those audited
financial statements were false and misleading in that they,
among other things, hid the size of the related party RGHI
Receivable, which at the end of January 2004 was, but for the
Round Trip Loan Transactions, at least $1 billion, whereas the
financial statements falsely and misleadingly reported that there
was no related party debt, and that the "$105 million due from
related parties, included in loans receivable at February 28,
2003, was received by February 29, 2004."

36.  As part of the LBO, Thomas H. Lee Partners made
numerous inquiries to JOSEPH P. COLLINS, the defendant, and

Phillip R. Bennett, about the existence of related party transactions involving Refco. COLLINS and others made representations and drafted documents (or caused other Law Firm attorneys to draft documents), and negotiated contract terms that concealed from Thomas H. Lee Partners and its representatives the following related party transactions, among others, which Thomas H. Lee Partners and its representatives asked be disclosed:

        a.    The Round Trip Loan Transactions, which included documented loans made simultaneously by Refco to customers and by the same customers to RGHI at Refco's fiscal year-end and quarter-ends that, taken together, effectuated a related party transaction between Refco and RGHI;

        b.    The guarantees from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to guarantee the repayment of hundreds of millions of dollars in loans that customers made to RGHI, a related party, in connection with the Round Trip Loan Transactions;

        c.    The indemnification agreements from the Round Trip Loan Transactions executed by Bennett, on behalf of Refco, that obligated Refco to indemnify customers making loans to RGHI, a related party, against claims made against them, or losses suffered by them, in connection with such loans;

d.     Payments made by RGHI to Refco in connection with the Round Trip Loan Transactions in order to pay down, temporarily, the receivable owed to Refco by RGHI; and

e.     The agreements through which RGHI agreed to guarantee the performance of Refco under the terms of the PPA and to secure BAWAG's right to participate in the proceeds of the future sale of Refco under the same agreement.

### Lies about $500 million in working capital at Refco

37.     JOSEPH P. COLLINS, the defendant, and others also drafted and negotiated contract terms that misled Thomas H. Lee Partners and its representatives into believing that Refco possessed approximately $500 million in excess working capital.

a.     Under contract terms that COLLINS negotiated, Refco was required to deposit $500 million in working capital it purportedly possessed into a segregated account at BAWAG until the LBO transaction closed, at which time the money was to be distributed to Bennett's company, RGHI.

b.     In reality, as COLLINS well knew, the segregated account established at BAWAG for purposes of holding the $500 million was not working capital, but was funded by, among other sums, an overdraft from BAWAG totaling approximately $390 million.

c.     At closing, COLLINS furthered this misrepresentation by approving closing documents that falsely

23

reported that the $500 million in purportedly excess working capital would be transferred to an RGHI account at a bank other than BAWAG, when in fact, as COLLINS well knew, the $500 million was going to remain at BAWAG and be used, in part, to repay the $390 million overdraft.  COLLINS knew that if the true nature of these payments had been disclosed, Thomas H. Lee Partners would have learned of the existence of the terms of the PPA, the large capital infusions Refco received under the terms of the PPA, the large payments being made to BAWAG, and that $390 million of the $500 million that had been represented to Thomas H. Lee Partners as excess working capital and profits of Refco was in fact money borrowed from BAWAG.

**Lies To The Bank Syndicate**

38.  At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $800 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco's borrowing from a bank syndicate.

39.  In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten, and others known and unknown caused the following false and misleading information to be provided to the bank syndicate, including HSBC Bank USA, N.A., that was raising the approximately

$800 million in loans for Refco as part of the LBO transaction and its representatives:

   a.   Contract documents relating to the LBO transaction that failed to disclose the guaranty and indemnity agreements that Bennett entered into in connection with the Round Trip Loan Transactions;

   b.   Refco's audited financial statements for the fiscal year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 35;

   c.   Representations that Refco had not suffered significant historical customer losses; and

   d.   Omissions relating to the terms of the PPA and the planned payment of $952 million to BAWAG in connection with the LBO transaction.

**Lies To The Note Purchasers**

   40.   At all times during the negotiations relating to the LBO transaction, JOSEPH P. COLLINS, the defendant, understood that approximately $600 million of the funds that Bennett and RGHI would be receiving during the LBO would be raised through Refco selling 9% Senior Subordinated Notes due 2012 to private investors (the "LBO Notes").

   41.   In connection with the LBO transaction, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten, and others known and unknown caused the following false and

misleading information to be provided to the underwriters and purchasers of the LBO Notes and their advisers:

a.    Contract documents relating to the LBO transaction that failed to disclose the guaranty and indemnity agreements that Bennett entered into in connection with the Round Trip Loan Transactions;

b.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 35;

c.    Representations that Refco did not suffer significant historical customer losses; and

d.    Omissions relating to the terms of the PPA and the planned payment of $952 million to BAWAG in connection with the LBO transaction.

## RGHI's Continued Debt To Refco After The LBO

42.    RGHI used the proceeds of the fraudulent LBO transaction in part to pay down a portion of the approximately more than $1 billion RGHI owed to Refco at the time of the transaction.  Even after the proceeds were applied in this manner, however, RGHI continued to owe Refco a substantial sum. Indeed, after the transaction proceeds were applied, RGHI owed Refco more than at least approximately $300 million, as JOSEPH P. COLLINS, the defendant, well knew.

## Securities Fraud in Connection with the Fraudulent Leveraged Buyout Transaction

43.   The LBO transaction included Refco raising approximately $600 million through the sale of the LBO Notes. The LBO Notes were sold privately pursuant to an offering circular, which provided prospective purchasers of the LBO Notes material information about Refco's business and finances.   Refco completed the sale of the LBO Notes in or about August 2004.

44.   JOSEPH P. COLLINS, the defendant, advised Refco in connection with the sale of the LBO Notes.   To that end, COLLINS participated in the drafting of the offering circular that was provided to prospective purchasers of the LBO Notes.

45.   Specifically, JOSEPH P. COLLINS, the defendant, participated in drafting two sections of the offering circular entitled "Risk Factors" and "Certain Relationships and Related Transactions," among other sections.

46.   The "Risk Factors" section purported to warn potential investors about myriad risks relating to Refco's business, including, among other things: indebtedness and cash flow needs; credit risks; and conflicts of interest on the part of controlling members of Refco, including Bennett.

47.   As JOSEPH P. COLLINS, the defendant, well knew, the "Risk Factors" section of the offering circular contained material misstatements and omissions.   COLLINS was aware at the time that he participated in the drafting of the offering

27

circular that, after the LBO transaction occurred, hundreds of millions of dollars would still be owed to Refco by RGHI, which at that time would be solely owned and controlled by Bennett, Refco's Chief Executive Officer.  Furthermore, COLLINS knew that Refco, in connection with the quarter-end and year-end Round Trip Loan Transactions, periodically assumed hundreds of millions of dollars in obligations by guaranteeing and indemnifying the performance of RGHI (and ultimately Bennett) with respect to loans extended to RGHI by Refco customers.  The offering circular was materially misleading and omissive, as COLLINS knew, because it failed to disclose risks posed to Refco's business by: (1) Refco being owed hundreds of millions of dollars by a related party, RGHI, that was solely owned and operated by Bennett; and (2) Refco periodically incurring hundreds of millions of dollars in obligations guaranteeing and indemnifying the performance of a related party, RGHI, that was solely owned and operated by Bennett.

48.  The "Certain Relationships and Related Transactions" section of the offering circular included a discussion of various agreements and documents relating to the LBO transaction.  Specifically, that section disclosed, among other things: various ownership interests and rights in Refco that would exist after the LBO was completed; the existence of a management agreement between Refco and an affiliate of Thomas H.

28

Lee Partners pursuant to which Refco would pay the affiliate for consulting services and indemnify the same; and an agreement that would entitle management, after the close of the LBO transaction, to receive ownership interests in Refco.

49.   As JOSEPH P. COLLINS, the defendant, well knew, the "Certain Relationships and Related Transactions" section of the offering circular contained material misstatements and omissions.  COLLINS was aware at the time that he participated in the drafting of the offering circular that, after the LBO transaction occurred, hundreds of millions of dollars would still be owed to Refco by RGHI, which at that time would be solely owned and controlled by Phillip R. Bennett, Refco's Chief Executive Officer.  Furthermore, COLLINS knew that Refco, in connection with the quarter-end and year-end Round Trip Loan Transactions, regularly loaned hundreds of millions of dollars to third parties that, in turn, were obligated to loan equal amounts simultaneously to RGHI, an entity controlled by Bennett. Finally, COLLINS knew that Refco, again in connection with the Round Trip Loan Transactions, periodically assumed hundreds of millions of dollars in obligations by guaranteeing and indemnifying the performance of RGHI (and ultimately Bennett) with respect to loans extended to RGHI by Refco customers.  As COLLINS well knew, RGHI's indebtedness to Refco, the loan transactions that involved Refco's loaning hundreds of millions

29

of dollars through third party customers, and the
indemnifications and guaranties that Refco extended with regard
to RGHI's performance in relation to those loans were all related
party transactions.  As COLLINS understood, they were related
party transactions both because RGHI and Refco were related
parties through RGHI's ownership interest in Refco and also
because Bennett was simultaneously an officer of Refco and an
owner-officer of RGHI.  COLLINS knew that these related party
transactions ought to have been disclosed in the "Certain
Relationships and Related Transactions" section and yet omitted
them from that section when participating in its drafting.

### Refco Plans to Offer Notes Publicly and Take Refco Public

50.  At all times during the negotiations relating to
the LBO transaction, JOSEPH P. COLLINS, the defendant, understood
that Refco planned to register approximately $600 million of
senior subordinated notes under the Securities Act of 1933
("Securities Act") and to offer to exchange them for the LBO
Notes issued at the time of the LBO transaction.  The
registration of notes permitted them to be traded publicly.
Refco registered the notes under the Securities Act (the
"Registered Notes") on or about April 6, 2005, pursuant to a Form
S-4 registration statement filed with the SEC.

51.  At all times during negotiations of the LBO
transactions, JOSEPH P. COLLINS, the defendant, also understood

that Phillip R. Bennett and others intended to sell a portion of
Refco to the public through an IPO of stock sometime after the
LBO transaction closed.  The IPO occurred on or about August 10,
2005.

52.  During the entire period after the close of the
LBO transaction and while efforts were being made to register the
Registered Notes and to accomplish Refco's IPO, Refco's finances
continued to be manipulated through quarter-end and year-end
Round Trip Loan Transactions designed to hide the existence and
size of the RGHI Receivable from Refco's auditors and investors.
JOSEPH P. COLLINS, the defendant, continued to be responsible for
drafting, or causing to be drafted, the documents that
effectuated the transactions. COLLINS, along with other Law Firm
attorneys acting at COLLINS's direction, drafted documents for
the quarter- and year-end Round Trip Loan Transactions, similar
to those described above, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| Aug. 2004 | $485 million |
| Nov. 2004 | $545 million |
| Feb. 2005 | $345 million |
| May 2005 | $450 million |

53.  In addition, in February 2005, Refco engaged in an
additional BAWAG Round Trip Loan Transaction in the amount of
approximately $250 million.

31

54.  From in or about 2000 until in or about October 2005, JOSEPH P. COLLINS, the defendant, drafted and caused to be drafted documents for at least 17 separate Round Trip Loan Transactions -- effecting loans from Refco to RGHI, through third party customers, of more than approximately $5.5 billion -- each of which concealed the existence of the large related party debt owed from RGHI to Refco from Refco's investors, potential investors, banks, and auditors.

## Refco's Public Filings And Publicly Traded Securities

55.  In connection with the upcoming IPO, Refco filed registration statements on Forms S-4 and S-1 with the SEC on or about April 6, 2005, and August 8, 2005, respectively.  Each form required the disclosure of, among other things: (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco.  These disclosures were required in order to apprise investors of, among other things, potential conflicts of interest by management.

56.  The Form S-4 registration statement was based on the offering circular that JOSEPH P. COLLINS, the defendant, helped draft in connection with Refco's sale of the LBO Notes in or about August 2004.  The Form S-4 registration statement, like the offering circular, contained sections entitled "Risk Factors" and "Certain Relationships and Related Transactions."  The Form

32

S-4 registration statement likewise contained the material misstatements and omissions included in the offering circular, as described in paragraphs 47 and 49 above.  In addition to those material misstatements and omissions, the Form S-4 registration statement also contained Refco's audited financial statements, which likewise failed to reflect any of the related party transactions described above, including the debt owed to Refco from RGHI.

57.  JOSEPH P. COLLINS, the defendant, also participated in the drafting of Form S-1 registration statement. Among other sections, COLLINS helped draft the section entitled "Risk Factors."  Refco was required in this section to discuss the most significant factors that might make an investment in Refco common stock speculative or risky.  As COLLINS well knew, this section of the Form S-1 registration statement contained material misstatements and omissions because it failed to disclose that: (1) Refco was owed hundreds of millions of dollars by a related party, RGHI, that was solely owned and operated by Bennett; and (2) as part of the Round Trip Loan Transactions, Refco periodically incurred hundreds of millions of dollars in obligations guaranteeing and indemnifying the performance of a related party, RGHI, that was solely owned and operated by Bennett.  Despite his participation in the drafting of the "Risk Factors" section, COLLINS did not include these significant

33

undisclosed additional risk factors.  In addition to those
material misstatements and omissions, the Form S-1 registration
statement also contained Refco's audited financial statements,
which likewise failed to reflect any of the related party
transactions, including the debt owed to Refco from RGHI.

### Refco's August 2005 IPO

58.  On or about August 10, 2005, the public bought
approximately $583 million of Refco's common stock.  Following
the IPO, Refco's common stock was listed on the New York Stock
Exchange under the ticker symbol "RFX."

### End Of Quarter Round Trip Loan Transaction In August 2005

59.  In or about late August 2005, after the completion
of its IPO, Refco engaged in a final Round Trip Loan Transaction
in the amount of approximately $420 million with a Refco customer
that temporarily transformed all or part of the RGHI Receivable
into a receivable from that customer.  On or about August 31,
2005, after the end of Refco's second quarter, the approximately
$420 million Round Trip Loan Transaction was reversed.

### Refco's Public Disclosure Of Related Party Debt

60.  In or about early October 2005, an employee of
Refco who was not a coconspirator discovered that a receivable
from RGHI of approximately $430 million existed on Refco's books.
This discovery was brought to the attention of the audit
committee of Refco's board of directors, which demanded repayment

34

of the debt by Phillip R. Bennett.   Bennett repaid Refco

approximately $430 million on or about October 10, 2005, having

received an emergency loan in that approximate amount from BAWAG.

      61.   On or about October 10, 2005, Refco issued a press

release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company
> believes that the receivable was the result of the
> assumption by an entity controlled by Mr. Bennett
> of certain historical obligations owed by
> unrelated third parties to the Company, which may
> have been uncollectible. The Company believes that
> all customer funds on deposit are unaffected by
> these activities. Independent counsel and forensic
> auditors have been retained to assist the Audit
> Committee in an investigation of these matters.

      62.   Following Refco's announcement, the market price

of Refco stock plummeted, resulting in an aggregate decline in

shareholder value and market capitalization of more than

approximately $1 billion.

      63.   On or about October 17, 2005, Refco, Inc. and

twenty-three of its subsidiaries or affiliates filed a petition

in bankruptcy in the United States Bankruptcy Court for the

Southern District of New York.   Refco's common stock was

subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

64.    From at least as early as in or about 1997 up to in or about October 2005, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten, Tone N. Grant, and others known and unknown unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely: (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections

36

78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

65.    It was a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and sale of notes

37

issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

66.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings – Securities Act

67.   It was further a part and object of the conspiracy that Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## **Wire Fraud**

68.    It was further a part and object of the conspiracy
that JOSEPH P. COLLINS, the defendant, and others known and
unknown unlawfully, willfully, and knowingly, having devised and
intending to devise a scheme and artifice to defraud and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme and
artifice, all in violation of Title 18, United States Code,
Section 1343.

## **Material Misstatements To Auditors**

69.    It was further a part and object of the conspiracy
that Phillip R. Bennett, being an officer and director of Refco,
an issuer obligated to file reports pursuant to section 15(d) of
the Exchange Act and with a class of securities registered
pursuant to section 12 of the Exchange Act, unlawfully, willfully
and knowingly, directly and indirectly, and with the assistance
of JOSEPH P. COLLINS, the defendant, (a) made and caused to be
made materially false and misleading statements; and (b) omitted
to state, and caused others to omit to state, material facts
necessary in order to make statements made, in light of the
circumstances under which they were made, not misleading to

39

accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be made under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

### Bank Fraud

70.  It was further a part and object of the conspiracy that JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

71.  It was further a part and object of the conspiracy that certain members of Refco management, with the assistance of JOSEPH P. COLLINS, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully

and knowingly would and did engage and attempt to engage in
monetary transactions in criminally derived property that was of
a value greater than $10,000 and that was derived from specified
unlawful activity, to wit, securities fraud, bank fraud, and wire
fraud, in violation of Title 18, United States Code, Section
1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

72. Among the means and methods by which JOSEPH P.
COLLINS, the defendant, and his coconspirators would and did
carry out the conspiracy were the following:

a. Refco management, with the full knowledge of
JOSEPH P. COLLINS, the defendant, misrepresented to the public
the size of customer losses for which Refco was responsible.

b. Refco management, with the assistance of
JOSEPH P. COLLINS, the defendant, transferred losses incurred by
Refco to Bennett's company, RGHI.

c. JOSEPH P. COLLINS, the defendant, helped
Refco management conceal the size and related party nature of
debt owed by RGHI to Refco by effectuating Round Trip Loan
Transactions on behalf of Refco over fiscal year-end and fiscal
quarter-end periods to move the RGHI Receivable to one or more
Refco customers.

41

d.    Phillip R. Bennett, with the assistance of JOSEPH P. COLLINS, the defendant, caused Refco to file materially false and fraudulent statements with the SEC.

e.    Phillip R. Bennett, with the assistance of JOSEPH P. COLLINS, the defendant, helped Refco management make and cause to be made material false statements and omissions to Refco's auditors.

f.    JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, and their coconspirators concealed from Thomas H. Lee Partners and its representatives the size of the related party debt owed to Refco by RGHI, associated related party transactions, and the terms of Refco's relationship with, and obligations to, BAWAG;

g.    JOSEPH P. COLLINS, the defendant, Phillip R. Bennett, Robert C. Trosten and their coconspirators, used facilities of interstate commerce, including the use of interstate telephone calls, email, and interstate wire transfers, in furtherance of the objects of the conspiracy.

### Overt Acts

73.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about 1997, Refco management, with the full knowledge of JOSEPH P. COLLINS, the defendant,

misrepresented to the public the size of customer losses for
which Refco was responsible.

        b.  On or about February 26, 2001, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett executed a guaranty letter on behalf of Refco that JOSEPH
P. COLLINS, the defendant, prepared regarding an approximately
$200 million loan from a Refco customer to RGHI.

        c.  On or about February 26, 2001, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett executed an indemnity letter on behalf of Refco that
JOSEPH P. COLLINS, the defendant, prepared regarding an
approximately $200 million loan from a Refco customer to RGHI.

        d.  On or about February 20, 2004, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett signed a guaranty letter on behalf of Refco that was
prepared or caused to be prepared by JOSEPH P. COLLINS, the
defendant, regarding an approximately $720 million loan from a
Refco customer to RGHI.

        e.  On or about February 20, 2004, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett signed an indemnity letter on behalf of Refco that was
prepared or caused to be prepared by JOSEPH P. COLLINS, the
defendant, regarding an approximately $720 million loan from a
Refco customer to RGHI.

f.    By no later than in or about March 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett, agreed to conceal the terms of the PPA from Thomas H. Lee Partners and to conceal RGHI's approximately $676 million buy out of BAWAG's right to participate in a sale of Refco under the terms of that agreement.

g.    During a telephone conference in or about March 2004, JOSEPH P. COLLINS, the defendant, misled a representative of Thomas H. Lee Partners about the nature and size of the receivables owed to Refco by related parties at the time the LBO transaction was being negotiated.

h.    During a telephone conference in or about March 2004, JOSEPH P. COLLINS, the defendant, concealed from a representative of Thomas H. Lee Partners the role of Phillip R. Bennett in guaranteeing and indemnifying loans made by third parties to RGHI in connection with period-end and year-end Round Trip Loan Transactions.

i.    In or about April 2004, JOSEPH P. COLLINS, the defendant, and Phillip R. Bennett met with representatives of Thomas H. Lee Partners in New York, New York and made misrepresentations relating to the financial condition of Refco to those representatives.

j.    On or about April 13, 2004, JOSEPH P. COLLINS caused an email to be sent from the Chicago, Illinois offices of

the Law Firm to New York, New York attaching a document
containing misrepresentations relating to the financial condition
of Refco.

k.    On or about May 6, 2004, JOSEPH P. COLLINS,
the defendant, caused two emails to be sent from the New York,
New York offices of the Law Firm to a representative of Thomas H.
Lee Partners located in Texas that concealed the existence of the
terms of various agreements, including agreements concerning
related party transactions, the disclosure of which was requested
by Thomas H. Lee Partners.

l.    In or about June 2004, JOSEPH P. COLLINS, the
defendant, directed others not to disclose RGHI's planned
approximately $676 million buyout from BAWAG of its Participation
Right under the PPA.

m.    On or about June 7, 2004, JOSEPH P. COLLINS,
the defendant, caused an email to be sent from the New York, New
York office of the Law Firm to representatives of Thomas H. Lee
Partners in Texas that concealed the existence of the terms of
various agreements, including agreements concerning related party
transactions, the disclosure of which was requested by Thomas H.
Lee Partners.

n.    On or about February 23, 2005, in New York,
New York, as part of a Round Trip Loan Transaction, Phillip R.
Bennett signed a guaranty letter on behalf of Refco that was

45

prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

o.   On or about February 23, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was prepared or caused to be prepared by JOSEPH P. COLLINS, the defendant, regarding an approximately $345 million loan from a Refco customer to RGHI.

p.   On or about May 25, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed a guaranty letter on behalf of Refco that was drafted or caused to be drafted by JOSEPH P. COLLINS, the defendant, regarding an approximately $450 million loan from a Refco customer to RGHI.

q.   On or about May 25, 2005, in New York, New York, as part of a Round Trip Loan Transaction, Phillip R. Bennett signed an indemnity letter on behalf of Refco that was drafted or caused to be drafted by JOSEPH P. COLLINS, the defendant, regarding an approximately $450 million loan from a Refco customer to RGHI.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

74.    The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

75.    From at least as early as in or about 1997 through in or about 2004, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

47

sale of 9% Senior Subordinated Notes due 2012, issued by Refco
Group Ltd., LLC and Refco Finance, Inc.

  (Title 15, United States Code, Sections 78j(b) and 78ff; Title
     17, Code of Federal Regulations, Section 240.10b-5; and
           Title 18, United States Code, Section 2.)

### COUNT THREE

### (Securities Fraud)

        The Grand Jury further charges:

        76.  The allegations contained in paragraphs 1 through
63, 72 and 73 of this Indictment are repeated and realleged as if
fully set forth herein.

        77.  From at least as early as in or about 1997 through
in or about October 2005, in the Southern District of New York
and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully,
willfully, and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, the mails,
and the facilities of national securities exchanges, did use and
employ, in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of

48

business which operated and would operate as a fraud and deceit
upon persons and entities, in connection with the purchase and
sale of the common stock of Refco, Inc.

 (Title 15, United States Code, Sections 78j(b) and 78ff; Title
  17, Code of Federal Regulations, Section 240.10b-5; and
   Title 18, United States Code, Section 2.)

### COUNT FOUR

### (False Filing With The SEC – Exchange Act)

 The Grand Jury further charges:

 78.  The allegations contained in paragraphs 1 through
63, 72 and 73 of this Indictment are repeated and realleged as if
fully set forth herein.

 79.  On or about July 19, 2005, in the Southern
District of New York and elsewhere, JOSEPH P. COLLINS, the
defendant, unlawfully, willfully, and knowingly made and caused
to be made statements in a report and document required to be
filed with the SEC under the Exchange Act, and the rules and
regulations promulgated thereunder, which statements were false
and misleading with respect to material facts, to wit, COLLINS
and others caused Refco to submit, and aided and abetted the
submission of, in New York, New York, to the SEC in Washington,
D.C., Refco's annual report on Form 10-K.

 (Title 15, United States Code, Sections 78o(d) and 78ff;
 Title 17, Code of Federal Regulations, Section 240.15d-2;
  and Title 18, United States Code, Section 2.)

49

## COUNTS FIVE AND SIX

### (False Filing With The SEC – Securities Act)

The Grand Jury further charges:

80.  The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

81.  On or about the dates specified below, in the Southern District of New York and elsewhere, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, COLLINS and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|-----------------|------|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x; and Title 18, United States Code, Section 2.)

## COUNTS SEVEN THROUGH TEN

### (Wire Fraud)

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

83.  On or about the dates set forth below, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

| Count | Approximate Date | Wire Communication |
|-------|------------------|--------------------|
| SEVEN | April 13, 2004 | Email from Chicago, Illinois office of the Law Firm to New York, New York attaching clean and marked versions of April 13, 2004 letter to Phillip R. Bennett from Thomas H. Lee Partners |
| EIGHT | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning indemnifications |
| NINE | May 6, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas regarding due diligence concerning material contracts |

| Count | Approximate Date | Wire Communication |
|-------|------------------|--------------------|
| TEN | June 7, 2004 | Email from New York, New York office of the Law Firm to representatives of Thomas H. Lee Partners in Texas and representatives of the bank syndicate and LBO Note purchasers |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT ELEVEN

### (Bank Fraud)

The Grand Jury further charges:

84.   The allegations contained in paragraphs 1 through 63, 72 and 73 of this Indictment are repeated and realleged as if fully set forth herein.

85.   On or about August 5, 2004, in the Southern District of New York, JOSEPH P. COLLINS, the defendant, and others known and unknown unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC Bank USA, N.A., and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC Bank USA, N.A., whose deposits were insured by the Federal Deposit Insurance

Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2.)

## FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE THROUGH TEN

86.   As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five and Six of this Indictment; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine and Ten of this Indictment, JOSEPH P. COLLINS, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to at least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses.

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE AND ELEVEN

87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18, United States Code, Section 1344, as alleged in Counts One and Eleven of this Indictment, JOSEPH P. COLLINS, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses, including but not limited to at least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses.

## SUBSTITUTE ASSETS PROVISION

88.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

54

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982 and Title 21, United States Code,

Section 853(p), to seek forfeiture of any other property of said

defendant up to the value of the forfeitable property described

above.

(Title 18, United States Code, Sections 371, 981, 982, 1343,
1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d),
78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5,
240.15d-2; Title 21, United States, Section 853(p); and Title 28,
United States Code, Section 2461.)


FOREPERSON


MICHAEL J. GARCIA
United States Attorney

55

82FVBENP                          Plea

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                    05 CR 001192  (NRB)

5   PHILLIP BENNETT,

6                    Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           February 15, 2008
9                                          5:40 p.m.

10

11  Before:

                    HON. NAOMI REICE BUCHWALD,
12
                                           District Judge
13

14                        APPEARANCES

15  MICHAEL J. GARCIA
         United States Attorney for the
16       Southern District of New York
    NEIL M. BAROFSKY
17  CHRISTOPHER L. GARCIA
         Assistant United States Attorneys
18
    KRAMER LEVIN NAFTALIS & FRANKEL
19       Attorneys for Defendant
    GARY P. NAFTALIS
20  DAVID S. FRANKEL
    ADAM C. FORD
21  DARREN A. LAVERNE

22  ALSO PRESENT:   WILLIAM JOHNSON, Postal Inspector
                    KRIS MOON, Postal Inspector
23                  ANNE RAILTON, Law Student

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

82FVBENP                    Plea

1          (In open court)

2          (Case called)

3          THE DEPUTY CLERK:  The case is United States against

4    Phillip Bennett; docket number 05 CR 1192.  Is the government

5    ready to proceed?

6          MR. BAROFSKY:  Yes.  Neil Barofsky for the government.

7    With me at counsel table, with your Honor's permission, is

8    Christopher Garcia of our office, our postal inspectors on the

9    case, William Johnson and Kris Moon, as well as our legal

10   intern, Annie Railton, who's been assisting the trial of this

11   matter.  Good evening, your Honor.

12         MR. GARCIA:  Good evening, your Honor.

13         THE DEPUTY CLERK:  Is the defense ready to proceed?

14         MR. NAFTALIS:  Yes, we are.  Gary Naftalis for

15   Mr. Bennett, along with David Frankel.

16         THE COURT:  Mr. Naftalis?

17         MR. NAFTALIS:  Your Honor, we have an application on

18   behalf of Mr. Bennett to withdraw his plea of not guilty to the

19   charges in the indictment and to offer to plead guilty to the

20   charges in the indictment.

21         THE COURT:  All right.  Mr. Bennett, would you stand

22   please.  Would you raise your right hand.

23         (Defendant sworn)

24         THE COURT:  And would you state your full name for me

25   please.

82FVBENP                          Plea

1          THE DEFENDANT:  Phillip Roger Bennett.

2          THE COURT:  And Mr. Bennett, how old are you?

3          THE DEFENDANT:  59, your Honor.

4          THE COURT:  Why don't you sit down.  Mr. Bennett, what

5    was the highest grade in school that you completed?

6          THE DEFENDANT:  University.  Grade, twelfth grade, I

7    think it is, your Honor.

8          THE COURT:  You have the equivalent of a college

9    degree.

10          THE DEFENDANT:  Yes, master of arts.

11          THE COURT:  And are you now or have you currently been

12    under the care of a doctor or psychiatrist?

13          THE DEFENDANT:  No, your Honor.

14          THE COURT:  And have you ever been hospitalized or

15    treated for alcoholism or narcotics addiction?

16          THE DEFENDANT:  No, your Honor.

17          THE COURT:  Are you under the influence of any drug or

18    alcohol today?

19          THE DEFENDANT:  I'm not, no, your Honor.

20          THE COURT:  And how are you feeling physically today?

21          THE DEFENDANT:  Fine, your Honor.  Thank you.

22          THE COURT:  Mr. Bennett, have you had the opportunity

23    to review the charges against you and your plea with

24    Mr. Naftalis and Mr. Frankel and perhaps some other lawyers, as

25    well?

82FVBENP                        Plea

1          THE DEFENDANT:  I have, your Honor, yes.

2          THE COURT:  And have you been satisfied with the

3    advice and counsel that Messrs. Naftalis and Frankel have given

4    to you?

5          THE DEFENDANT:  I have, yes.

6          THE COURT:  Are you ready to change your plea at this

7    time?

8          THE DEFENDANT:  I am, your Honor.

9          THE COURT:  And what is your plea at this time, guilty

10   or not guilty?

11         THE DEFENDANT:  It's guilty, your Honor.

12         THE COURT:  Mr. Bennett, in order to determine whether

13   your plea is voluntary and made with a full understanding of

14   the charges against you and the consequences of your plea, I

15   will make certain statements to you and I will ask you certain

16   questions.  I want you to understand that I need not accept

17   your plea unless I am satisfied that you are, in fact, guilty,

18   and that you fully understand your rights.  I'm tempted to ask

19   the government to pick a few favorite charges instead of all of

20   these, but, okay.

21         Mr. Bennett, you've been charged in the 20-count

22   indictment.

23         The first count charges you with a conspiracy to

24   commit securities fraud, wire fraud, bank fraud, and money

25   laundering, and to make false filings to the SEC.  This crime

82FVBENP                    Plea

1    carries a maximum sentence under the law of five years

2    imprisonment, a maximum fine of the greatest of $250,000 or

3    twice the gross pecuniary gain derived from the offense or

4    twice the gross pecuniary loss to persons other than yourself

5    as a result of the offense, and a $100 special assessment, and

6    a maximum term of supervised release of three years.

7          Do you understand that those are the charges in Count

8    One of the indictment and the maximum statutory penalties

9    applicable to those charges?

10         THE DEFENDANT:  I do, your Honor, yes.

11         THE COURT:  Counts Two and Three of the indictment

12   charge you with securities fraud.  Each of these counts carries

13   a maximum sentence of 20 years in prison, a maximum fine of

14   $5,000,000 or twice the gross pecuniary gain derived from the

15   offense or twice the gross pecuniary loss to a person other

16   than yourself as a result of the offense, a $100 special

17   assessment, and a maximum term of supervised release of three

18   years.

19         Do you understand that those are the charges in Counts

20   Two and Three and the maximum penalties under law for those

21   charges of securities fraud?

22         THE DEFENDANT:  I do, your Honor.

23         THE COURT:  Count Four charges you with making a false

24   filing with the Securities and Exchange Commission.  And this

25   crime carries a maximum statutory penalty of 20 years in

82FVBENP                    Plea

 1    prison, a maximum fine of the greatest of $5,000,000 or twice

 2    the gross monetary gain derived from the offense or twice the

 3    gross monetary loss to a person other than yourself as a result

 4    of the offense, a $100 special assessment, and a maximum term

 5    of supervised release of three years.

 6             Do you understand that those are the charges in Count

 7    Four and the maximum penalties applicable to those charges?

 8             THE DEFENDANT:  I do, your Honor.

 9             THE COURT:  Counts Five and Six of the indictment

10    charge you with making a false filing with the Securities and

11    Exchange Commission -- excuse me, with the Securities and

12    Exchange Commission.  Each of these counts carries a maximum

13    sentence under the law of five years imprisonment, a maximum

14    fine of the greatest of $250,000 or twice the gross pecuniary

15    gain derived from the offense or twice the gross pecuniary loss

16    to a person other than yourself as a result of the offense, and

17    a $100 special assessment, and a maximum supervised release

18    term of three years.  Do you understand that those are the

19    charges in Counts Five and Six of the indictment and the

20    maximum penalties provided for by law for those crimes?

21             THE DEFENDANT:  Yes, I do, your Honor.

22             THE COURT:  And Counts Seven through Thirteen of the

23    indictment charge you with wire fraud.  Each of these counts

24    carries a maximum possible sentence of 20 years in prison, a

25    maximum fine of the greatest of $250,000 or twice the gross

82FVBENP                    Plea

1    pecuniary gain derived from the offense or twice the gross

2    pecuniary loss to a person other than yourself as a result of

3    the offense, a $100 special assessment, and a maximum term of

4    supervised release of three years.

5            Do you understand that those are the charges in Counts

6    Seven through Thirteen, and the maximum penalties under the

7    statute for those charges?

8            THE DEFENDANT:  Yes, I do, your Honor.

9            THE COURT:  All right.  Count Fourteen charges you

10   with making material misstatements to auditors.  And this crime

11   carries a maximum sentence of 20 years imprisonment, a maximum

12   fine of $5,000,000 or twice the gross pecuniary gain derived

13   from the offense or twice the gross pecuniary loss to a person

14   other than yourself as a result of the offense, a $100 special

15   assessment, and a maximum term of supervised release of three

16   years.

17           Do you understand that that is the crime charged in

18   Count Fourteen of the indictment, and the maximum penalty

19   provided for by statute for Count Fourteen?

20           THE DEFENDANT:  Yes, I do, your Honor.

21           THE COURT:  Count Fifteen of the indictment charges

22   you with bank fraud.  And this crime carries a maximum sentence

23   of 30 years in prison, a maximum fine of the greatest of

24   $1,000,000 or twice the gross pecuniary gain derived from the

25   offense or twice the gross pecuniary loss to a person other

82FVBENP                          Plea

1    than yourself as a result of the offense, a $100 special

2    assessment, and a maximum term of supervised release of five

3    years.

4         Do you understand that that is the charge in Count

5    Fifteen, and that those are the maximum penalties provided for

6    by law?

7         THE DEFENDANT:  Yes, your Honor.  Forgive me, yes,

8    your Honor.

9         THE COURT:  Counts Sixteen through Twenty charge you

10   with money laundering.  Each of these counts carries a maximum

11   possible sentence of ten years imprisonment, a maximum fine of

12   the greatest of $250,000, twice the gross pecuniary gain

13   derived from the offense or twice the gross pecuniary loss to a

14   person other than yourself as a result of the offense, and a

15   $100 mandatory special assessment, and a maximum supervised

16   release term of five years.

17        Do you understand that those are the crimes charged in

18   Counts Sixteen through Twenty, and the maximum possible penalty

19   provided by law?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  Do you also understand that the Court must

22   impose an order of restitution by law?

23        THE DEFENDANT:  Yes, your Honor.

24        THE COURT:  And do you understand that you are also

25   subject to mandatory asset forfeiture?

82FVBENP                          Plea

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  And do you understand that you have the

3    right to plead not guilty and the right to a trial on the

4    charges against you and, in fact, the right to a jury trial?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  At this time, I'd ask the government to

7    recite the elements of the crimes charged.

8          MR. BAROFSKY:  Yes, your Honor.  For Count One,

9    conspiracy, the government would have to prove the following

10   elements:

11         First, that an agreement or understanding existed to

12   commit the objects charged in the indictment.  Second, the

13   defendant knowingly became a member of that agreement or

14   understanding.  And third, that one of the conspirators

15   knowingly committed at least one overt act in furtherance of

16   the conspiracy during the life of the conspiracy.

17         With respect to Counts Two and Three, securities

18   fraud, the government would have to prove, first, that Bennett,

19   in connection with the purchase or sale of securities, and for

20   Count Two, that would be the notes described in the indictment,

21   and in Count Three, the common stock of Refco described in the

22   indictment, he did one or more of the following:  He either

23   employed a device, scheme, or artifice to defraud or made an

24   untrue statement of a material fact or omitted to state a

25   material fact which made what was said under the circumstances

82FVBENP                        Plea

misleading or engage in an act, practice, or course of business
that operated or would operate as a fraud or deceit on a
purchaser or seller.  Second, that Bennett acted knowingly,
willfully, and with intent to defraud.  And, third, that he
used or caused to be used any means or instruments of
transportation or communication in interstate commerce, but he
used the mails in furtherance of the fraudulent conduct.

           With respect to Count Four, which charges false filing
under the Exchange Act, the first element the government would
have to prove is that Refco was required by the Securities
Exchange Act of 1934 to file the 10-K that's described in Count
Four.  And, second, the defendant knowingly and willfully made
or caused to be made a materially false or misleading statement
in that document or omitted to state any material fact required
to be stated therein or necessary to make the statements
therein not misleading.

           With respect to Counts Five and Six, false filings
under the Securities Act, the government would have to prove,
again, first, that Refco was required under the Securities Act
of 1933 to file the S4, which is described in Count Five, and
the S1 registration statement described in Count Six.  And,
second, that Bennett knowingly and willfully made or caused to
be made a materially false or misleading statement in those
documents or omitted to state any material fact required to be
state therein or necessary to make the statements therein not

82FVBENP                    Plea

1    misleading.

2            With respect to Counts Seven through Thirteen of wire

3    fraud, the government would have to prove, first, that a scheme

4    to defraud must have existed; that Bennett must have

5    participated in the scheme with intent to defraud; that

6    misrepresentations or omissions must have related to material

7    facts were made in furtherance of the fraud; that the scheme

8    was executed to obtain money or property; and that in the

9    execution of the scheme, Bennett used or caused to be used the

10   interstate wires listed in the indictment.  And here for Count

11   Seven is the June 22nd of 2004 email from Robert Trosten; in

12   Count Eight, the August 3, '04 email from Robert Trosten; in

13   Count Nine, the April 6, '05 transmission of the S4 from New

14   York to Virginia; in Count Ten, the July 19th, 2005

15   transmission of 10-K from New York to Virginia; in Count

16   Eleven, the August 5th, 2004 transmission of $4,000,000 from

17   New York to Illinois; in Count Twelve, the August 5th, 2004

18   transmission of $40,000,000 from New York to Illinois; and in

19   Count Thirteen, the August 8th, 2005 transmission of the S1

20   registration statement from New York to Virginia.

21           For Count Fourteen, material misstatements to

22   auditors, the government would have to prove, first, that Refco

23   was a public company that was required to submit financial

24   statements to the SEC; second, that Bennett was a

25   director/officer of Refco; third, Bennett knowingly and

82FVBENP                    Plea

1    willfully made, caused to be made, a materially false or

2    misleading statement or omitted to state a material fact

3    necessary order to make the statements made in light of the

4    circumstances under which such statements were made not

5    misleading to an accountant, and that the statement was made in

6    connection with the audit or examination of the financial

7    statements of Refco required to be made pursuant to the Act.

8            Count Fifteen charges the defendant with bank fraud.

9    And specifically, that on August 5th, 2004, defrauded HSBC.

10   And the government would have to prove, first, there was a

11   scheme to defraud a bank by means of materially false or

12   fraudulent pretenses, representations, or promises; second,

13   that Bennett executed or attempted to execute the scheme with

14   intent to defraud the bank, here, again, HSBC; and third, at

15   the time of the execution of the scheme, HSBC had its deposits

16   insured by the FDIC.  And I'll represent to the Court that at

17   the relevant time periods, HSBC's deposits were insured by the

18   FDIC.

19           And finally, Counts Sixteen through Twenty charge the

20   defendant with money laundering.  And the government would have

21   to prove, first, that Bennett engaged or attempted to engage in

22   monetary transactions involving criminally derived property of

23   a value greater than $10,000; second, that the property

24   involved in the monetary transaction was, in fact, derived and

25   specified unlawful activity; third, that Bennett acted

82FVBENP                         Plea

1   knowingly.  And for these purposes, wire fraud, bank fraud, and

2   securities fraud are all specified unlawful activities and

3   would have to prove each of the transactions listed in the

4   indictment in Counts Sixteen through Twenty, basically the wire

5   transactions which are described therein.

6           THE COURT:  Mr. Bennett, do you understand that if you

7   pled not guilty and went to trial, that the burden would be on

8   the government to prove each and every element of every crime

9   charged beyond a reasonable doubt in order to convict you of

10  that crime?

11          THE DEFENDANT:  I do, your Honor.

12          THE COURT:  Do you understand that at a trial you

13  would have the right to be represented by an attorney at all

14  stages of the proceeding and, if necessary, an attorney would

15  be appointed for you?

16          THE DEFENDANT:  Yes, I do.

17          THE COURT:  And do you understand that at a trial you

18  would have the right to confront and cross-examine witnesses

19  and the right not to be compelled to incriminate yourself?

20          THE DEFENDANT:  I do, your Honor.

21          THE COURT:  And do you understand that at a trial you

22  would be presumed innocent until such time, if ever, the

23  government established your guilt by competent evidence to the

24  satisfaction of the trier of fact beyond a reasonable doubt?

25          THE DEFENDANT:  Yes, your Honor.

82FVBENP                    Plea

1      THE COURT:  And do you understand that at a trial you
2   would have the right to testify and would also be entitled to
3   compulsory process; in other words, the right to call other
4   witnesses on your behalf?
5      THE DEFENDANT:  Yes, your Honor.
6      THE COURT:  And do you understand that if your plea is
7   accepted, that there will be no further trial of any kind, so
8   that by pleading guilty, you are waiving your right to a trial?
9      THE DEFENDANT:  I do understand that, your Honor, yes.
10      THE COURT:  And do you understand that if you are
11   sentenced to a period of supervised release, and if you violate
12   the terms of your supervised release, that an additional period
13   of jail time may be imposed without credit for the time that
14   you've previously spent on supervised release?
15      THE DEFENDANT:  Yes, your Honor.
16      THE COURT:  Do you understand that in connection with
17   your plea of guilty, that the Court may ask you certain
18   questions about the offense to which you have pled; and if you
19   answer those questions under oath and on the record and in the
20   presence of your counsel, that your answers are false may later
21   be used against you in a prosecution against you for perjury or
22   false statement?
23      THE DEFENDANT:  Yes, your Honor.
24      THE COURT:  And I recall, Mr. Bennett, you're a
25   citizen of Great Britain.

82FVBENP                    Plea

1        THE DEFENDANT:  I am, your Honor, yes.

2        THE COURT:  Do you understand that following any

3   sentence that you receive, that you will likely be deported?

4        THE DEFENDANT:  That is my understanding, your Honor,

5   yes.

6        THE COURT:  And do you understand that in determining

7   your sentence, that the Court is obligated to calculate the

8   applicable sentencing guidelines range, and to consider that

9   range and any possible departures under the guidelines and

10  other sentencing factors under the statute which entitles the

11  Court to consider the nature and circumstances of the offense

12  and the history and characteristics of the defendant?

13       THE DEFENDANT:  Yes, your Honor.

14       THE COURT:  And have you reviewed with your counsel

15  the government's letter to them of yesterday which explains the

16  government's position as to the sentence that you face if the

17  sentencing guidelines are applied to your case?

18       THE DEFENDANT:  I have reviewed it, your Honor,

19  correct.

20       THE COURT:  Actually, that was said very badly.  Let

21  me just try it again so that there's no confusion.

22       Have you reviewed that letter with your lawyers which

23  sets forth the government's calculation of the sentence that

24  you face under the sentencing guidelines?

25       THE DEFENDANT:  I have reviewed it.

82FVBENP                    Plea

1      THE COURT:  And do you understand that the government

2   calculates that under the guidelines, that you face a sentence

3   of life imprisonment; and that it has calculated that the

4   maximum possible statutory sentence is 315 years; and that the

5   fine range is from 25,000 to $5,000,000?

6      THE DEFENDANT:  I understand that, your Honor,

7   correct.

8      THE COURT:  And do you understand that that

9   calculation by the guidelines -- that by the government is just

10  based on the information they currently have?

11     THE DEFENDANT:  Yes, your Honor.

12     THE COURT:  And do you further understand that the

13  government's letter doesn't bind either the Court or the

14  probation department, and that ultimately the sentence that you

15  receive will be determined by the Court?

16     THE DEFENDANT:  Yes, your Honor.

17     THE COURT:  Mr. Bennett, have any threats or promises

18  been made to you to make you plead guilty?

19     THE DEFENDANT:  No, your Honor.

20     THE COURT:  Have any understandings or promises been

21  made to you concerning the sentence that you will receive?

22     THE DEFENDANT:  None.

23     THE COURT:  Is your plea voluntary?

24     THE DEFENDANT:  It is, your Honor.

25     THE COURT:  Mr. Bennett, did you commit the crimes

82FVBENP                         Plea

1    that you've been charged with in the indictment?

2            THE DEFENDANT:  I did, your Honor.

3            THE COURT:  Would you tell me in your own words what

4    you did?

5            THE DEFENDANT:  Your Honor, during the period that I

6    served as CEO of Refco, I agreed with other Refco executives to

7    enter into a series of transactions at the end of Refco's

8    financial reporting periods to make it appear as if a

9    receivable due to Refco from Refco Upholdings, Inc., a related

10   party, was instead due from an independent third-party

11   customer.

12           The IGHI receivable was composed of, amongst other

13   things, historical customer losses, bad debts, and expenses

14   that IGHI had incurred on behalf of Refco.

15           I, along with other Refco executives, have caused

16   Refco to enter into these transactions in order to conceal the

17   size and nature of the IGHI receivable.  We concealed the

18   receivable from, amongst others, Refco's auditors, Thomas H.

19   Lee Partners, various lenders who, in 2004, participated in

20   Refco's senior secured credit facility, and the issuance of 9

21   percent senior subordinated notes, and also investors in

22   Refco's common stock.

23           Among the lenders to whom I knowingly caused the IGHI

24   receivable to be misrepresented was HSBC Bank, referenced in

25   Count Fifteen of the indictment.  I and other Refco executives

82FVBENP                    Plea

1    also used the interstate wires to accomplish these acts within

2    this district, as referenced in Counts Seven through Thirteen.

3    Furthermore, I caused funds obtained from the transaction with

4    Thomas H. Lee Partners, referenced in paragraph 34 of the

5    indictment, to be wired to various parties receiving proceeds

6    from the transaction, as referenced in Counts Sixteen through

7    Twenty, knowing that this money had been unlawfully obtained.

8         The IGHI receivable and related party transaction used

9    to conceal it were material information that Refco investors

10   and lenders would have wanted to have known prior to investing

11   in or lending money to Refco.  While I believed that I would be

12   able to pay the IGHI receivable down over time, and did, in

13   fact, ultimately pay off the receivable balance in its

14   entirety, I knew that failing to disclose the receivable was

15   wrong; I knew that obtaining funds from Refco's investors and

16   lenders based on misleading financial statements was also

17   wrong.

18        I also caused Refco to file documents with the SEC,

19   namely S1, S4, and 10-K that did not disclose the full extent

20   of the IGHI receivable or the transactions used to conceal it;

21   and, thus, were false and misleading with respect to material

22   facts.  I knew that failing to disclose these facts in public

23   filings and in connection with Refco's sale and registration of

24   Refco's notes and common stock was wrong, and I deeply regret

25   having done so.

82FVBENP                    Plea

1      Your Honor, I take full responsibility for my actions.

2   I wish to publicly apologize to my family and to all of those

3   who have been harmed by my conduct.  Thank you, your Honor.

4          THE COURT:  Mr. Barofsky, is there anything else you

5   would want me to ask the defendant?

6          MR. BAROFSKY:  Your Honor, can we just have a moment

7   to review?  There's a lot of elements.  Thank you, your Honor.

8          THE COURT:  Certainly.

9          (Pause)

10          MR. BAROFSKY:  Your Honor, just a couple of areas for

11   clarification.  First, if you can please ask the defendant to

12   confirm that he was a director or officer of Refco during this

13   relevant time period.  Should I go one-by-one?

14          THE COURT:  Mr. Bennett, can you confirm that?

15          THE DEFENDANT:  I was, your Honor.

16          MR. BAROFSKY:  Second, your Honor, that the

17   misstatements made about Refco's auditor was in connection with

18   the auditor's preparation of a financial statement, and that

19   occurred after April of 2005.

20          THE COURT:  Can you confirm that?

21          THE DEFENDANT:  That's correct, your Honor.

22          MR. BAROFSKY:  Your Honor, and if you can ask the

23   defendant to confirm he made reference to various wire

24   transfers and wire communications, as well as certain filings

25   in the indictment, if you could please confirm with the

82FVBENP                    Plea

1    defendant that those acts occurred on or about the dates set

2    forth in the indictment.

3            THE DEFENDANT:  They did, your Honor.

4            MR. BAROFSKY:  And finally, your Honor, as I noted

5    earlier, I will represent to the Court that HSBC was --

6    deposits were insured by the FDIC during the relevant time

7    period; and also that Refco was an entity that was required to

8    file the various reports and documents and registration

9    statements under the Exchange Acts of 1933 and 1934, as well as

10   to file financial statements with respect to the 10-K and the

11   misstatement to auditors account.  Thank you, your Honor.

12           THE COURT:  Mr. Bennett, do you still wish to plead

13   guilty?

14           THE DEFENDANT:  I do, your Honor, yes.

15           THE COURT:  Mr. Naftalis, do you know of any reason

16   that Mr. Bennett ought not plead guilty?

17           MR. NAFTALIS:  No, your Honor.

18           THE COURT:  Mr. Bennett, I'm satisfied that you

19   understand the nature of the charge against you and the

20   consequences of your plea; and that your plea is made

21   voluntarily and knowingly; and that there is a factual basis

22   for it.  Accordingly, I will accept your plea of guilty and

23   direct that a presentence report be prepared.

24           THE DEFENDANT:  Thank you, your Honor.

25           THE COURT:  As for a sentencing date, can I just

82FVBENP                    Plea

1   basically count out the requisite number of days or does the
2   government have a view that it should be maybe a little bit
3   more off into the future in light of the trial that's still
4   upcoming?

5          MR. BAROFSKY:  Your Honor, we think we can be prepared
6   in three months.

7          THE COURT:  All right.  Why don't we set sentencing
8   for May 20th at 4 o'clock.  And since I would anticipate some
9   significant presentence submissions, I think we should set a
10  schedule for that.  Why don't we say that the government's
11  submission is due -- the defense submission is due on May 6th,
12  and the government's on May 13th.

13         MR. BAROFSKY:  That's fine, your Honor.

14         MR. NAFTALIS:  Your Honor, if there are things in the
15  government submission that we want to respond to, that's sort
16  of --

17         THE COURT:  Doesn't give you quite enough time.

18         MR. NAFTALIS:  We don't have -- you're having us
19  first, so we don't really sort of provide -- they could go
20  first, we could go second; we wouldn't object to that.

21         MR. BAROFSKY:  We could do simultaneous submissions,
22  as well, your Honor, on the 6th and then we could each respond.

23         THE COURT:  Sounds like fun.

24         MR. BAROFSKY:  Okay.

25         MR. NAFTALIS:  It's a living.

82FVBENP                        Plea

1          THE COURT:  Let's not go there.  Okay?  Are we done?

2          MR. BAROFSKY:  No, your Honor.  There is the issue of

3   bail.  And at this time, your Honor, the government does

4   request that defendant be remanded.  And if your Honor will let

5   me, I would like to speak briefly on the topic.

6          THE COURT:  Okay.

7          MR. BAROFSKY:  Obviously the standard has changed

8   under the Bail Act under 3143.  Before when we appeared before

9   your Honor several years ago, the burden was ours to prove the

10  defendant was a risk of flight.  Now, of course, it is the

11  defendant's burden to prove by clear and convincing evidence

12  that he is not likely to flee.  And respectfully, we submit

13  that there have been some extremely significant changed

14  circumstances, that we respectfully submit the defendant cannot

15  meet the burden in this case.

16         First of all, under the current bond, which, as your

17  Honor may recall, is a $50,000,000 bond, secured by $5,000,000

18  in cash and two properties, that security is now essentially

19  worthless; it's essentially an unsecured bond, because all of

20  those properties and that money are subject to asset

21  forfeiture.  The $5,000,000 we have traced as direct proceeds

22  from the IPO, which the defendant has just admitted was money

23  that was fraudulently obtained, and we already have lis pendens

24  on both of the properties, because basically under substitute

25  assets, we'd be able to take those, as well.  Those are all

82FVBENP                    Plea

1   subject to asset forfeiture and, therefore, don't provide any

2   security for the existing bond.

3          Secondly, the defendant is facing a $2.4 billion asset

4   forfeiture.  We don't think he has $2.4 billion, but we do

5   believe that will essentially -- through proceeds and

6   substitute assets, once this conviction is final -- will

7   basically deprive the defendant of all of his assets.  We have

8   restrained a number of his assets pretrial, but we have not

9   been able to restrain assets that we haven't been able to prove

10  are directly traceable.  And we don't know the exact amount of

11  those items, but we believe that they are in the $20,000,000

12  range, which would certainly facilitate the ability of the

13  defendant to flee.

14         Third, and I guess the most obvious point, is the

15  defendant now faces an advisory guideline range of 315 years of

16  imprisonment.  And that obviously changes the calculus a lot

17  from when we last appeared before your Honor.  We're not

18  suggesting that your Honor is going to --

19         THE COURT:  He always faced that, right?

20         MR. BAROFSKY:  Yes, your Honor; but before,

21  pretrial -- I'm sorry, pre-guilty plea, there was no certainty

22  that he was necessarily going to be convicted in this case.

23  Now, jail is an inevitability.  And I don't mean to presume

24  what the ultimate sentence will be in this case, because

25  there's obviously no way to predict what the precise sentence

82FVBENP                        Plea

1    will be, but the best guess, I think, from anyone's

2    perspective, is that it will be a substantial prison sentence.

3    And for this defendant -- he is now with certainty facing such

4    a sentence that has -- under the guidelines is the equivalent

5    of a life sentence.

6            Defendant is 59 years old.  A sentence of -- a

7    significant sentence in this case may very well prove to be the

8    equivalent of a life sentence.  The defendant is facing certain

9    deportation after he serves that sentence.

10           THE COURT:  Not to a bad place though.

11           MR. BAROFSKY:  Not to a bad place, your Honor.  But it

12   does give the defendant a tremendous incentive to self-deport.

13   In other words, to flee the jurisdiction really with -- unlike

14   most cases, with very little downside.  The worse that happens

15   if he flees and gets caught is he's brought back to the United

16   States and does a jail sentence that probably will be the rest

17   of his life.  If he stays, he's facing pretty much the prospect

18   of the same result, a sentence that may, in fact, result in him

19   being in jail for the rest of his life, given his age.

20           And, your Honor, we respectfully submit that given the

21   shifting of the burden in these really remarkable circumstances

22   of a defendant who's not a U.S. citizen, who's facing the

23   equivalent of a life sentence, and who's now basically would be

24   free on an unsecured bond, that the circumstances dictate the

25   defendant should start serving his sentence, in effect,

82FVBENP                    Plea

1    immediately.  And the defendant should be remanded on the

2    grounds that he cannot meet his burden of demonstrating by

3    clear and convincing evidence that he is not a risk of flight.

4              THE COURT:  Mr. Naftalis.

5              MR. NAFTALIS:  Most respectfully, I find this

6    application most surprising and a baseless one.  And I say it

7    with -- most advisedly.

8              You have a situation here where our client, for almost

9    two and-a-half years, has met every single condition of the

10   bond that was set here.  Your Honor got a report today from the

11   office of pretrial services, which we were given a copy of when

12   we entered the room, in which the office of pretrial services

13   has pointed out that he has complied with the terms of his bail

14   all the way through.

15             And I can sort of punctuate that a little bit because,

16   in fact, if you check with Officer Forelli, who he deals with

17   in pretrial services, you could hear anecdotal information such

18   as Mr. Bennett was the one who has set up the monitoring system

19   in the house in New Jersey because, whatever, I guess they're

20   technophobes, like I, the marshals service, he actually set up

21   the monitoring service which passed their muster in the

22   electronic stuff.  Once, when his bracelet broke down, he

23   immediately reported it to Officer Forelli that it was

24   malfunctioning and he went in.  He's been meticulous in

25   reporting to these people.

82FVBENP                        Plea

1          And secondly, something that the government

2     consciously avoided bringing to your attention, his bond is

3     signed by the three immediate members of his family.  The three

4     of them who are American citizens:  His wife, his daughter, and

5     his son.  They have signed a $50,000,000 bond on his behalf,

6     and these are people with roots in the community.  The daughter

7     is a lawyer, works at a law firm; the son is an investment

8     banker with a leading firm.  The notion that he would run away

9     and do that to his family, I mean, is incomprehensible.  And

10    all we have is rhetoric from the government there.

11         You also have the strict monitoring conditions in

12    which he's under and which he's faithfully complied with for

13    the last two and-a-half years.  Of course, he has no passport;

14    his wife has given up his passport; he has no effective way of

15    leaving the country.

16         And with respect to other situations, in other

17    situations in high-profile cases where people were facing

18    enormous sentences, no such applications were ever granted.

19    For example, the *Computer Associates* case, where the CEO of

20    Computer Associates, Mr. Kumar, who, under the guidelines which

21    were then in effect, more applicable now, after the *Gall* case,

22    the guidelines are just, you know, one ingredient in the soup

23    for your Honor to consider under 3533.  He faced life

24    imprisonment under his guidelines.  After pleading guilty, he

25    continued to be free on bond, even though there were admissions

82FVBENP                    Plea

1    of obstruction of justice in that case.

2            After Kumar was sentenced or he got a 12-year

3    sentence, he continued to be allowed to be -- remained free on

4    bond to work out various issues of restitution and the like.

5            In the case in front of Judge Sand, the *Adelphia* case,

6    which is one of the cases, the Rigases, who got 15 and 20-year

7    sentences, one of them was an eighty -- somewhere in his

8    eighties, they were allowed to remain free on bond pending

9    appeal, even though they had the same sort of issues.  Even

10   Mr. Ebbers, who received the largest sentence in history I've

11   ever heard of, a real outlier sentence, 25 years, he was

12   allowed to remain free on bond pending appeal and the like.

13           And apart from the fact that there is not the

14   slightest bit of evidence for this most unfair application,

15   it's also prejudicial.  As your Honor knows, we have to put in

16   sentencing submissions.  And under 3533, your Honor has a lot

17   of things which you can properly consider in determining in

18   your best judgment what's a fair and just sentence under the

19   case here.  And obviously it's very prejudicial to us in being

20   able to work with our client, who for the last two and-a-half

21   years has been coming to our office every day on a daily basis

22   to work on the case with us.  So I don't see any good-faith

23   basis for any change in bond here whatsoever.

24           THE COURT:  Mr. Barofsky.

25           MR. BAROFSKY:  Your Honor, if there's any specific

82FVBENP                    Plea

1    points you'd like me to respond to.  The ones that jump out to

2    me is, I mean the notion that a defendant can't chronically

3    prepare for sentencing when he's incarcerated, obviously your

4    Honor knows countless defendants who are able to prepare for

5    sentencing when they are incarcerated; and having spent so much

6    time with Mr. Naftalis, I think they are pretty much -- I'm

7    sure they have contemplated this before, this is not the first

8    time.

9         As opposed to those other cases, defendants who are

10   released pending appeal after they've been convicted at trial

11   is a different situation.  There's obviously provisions within

12   3143 when there are issues on appeal that the judge finds are

13   significant issues that need to be considered and possibly

14   could result in the reversal of a conviction.  That's a

15   different -- those are different facts, and that's a different

16   standard.  Here, we have a guilty plea.  I don't think that

17   Mr. Bennett is going to be challenging his conviction in this

18   case.  He just gave a very detailed guilty plea.

19        With respect to his assurances to his family, I don't

20   mean to minimize the bond between Mr. Bennett and his family,

21   but on the flip side, we're looking at a man who just admitted

22   to telling a series of lies to a large number of victims that

23   resulted in the defrauding of $2.4 billion.  1.7 or 8 billion,

24   which we will show for restitution at the time of sentencing,

25   has not been collected.  People are out all of this money.

82FVBENP                      Plea

1          So this man maybe may have some allegiance to his

2     family, but I think you have to look at the flip side as to how

3     strong that may be by a man if he is willing to tell whatever

4     lie is necessary to -- you know, on proportions that are

5     mind-boggling, in the billions of dollars.

6          So we would respectfully submit that -- and we don't

7     contest the fact, by the way, to be clear, that Mr. Bennett has

8     complied with the conditions.  And that is certainly a relevant

9     factor that Mr. Naftalis points out and we don't contest it.

10    We just don't think that that's enough to meet his burden,

11    given his changed circumstances.  And that to allow a defendant

12    like this, who's also not a U.S. citizen, unlike those

13    individuals, out on what is essentially an unsecured bond, it

14    simply isn't the right course of action here.

15          MR. NAFTALIS:  Just one small point, which they

16    reminded me to mention.  Although Mr. Bennett never changed his

17    citizenship, like his wife, or became an American citizen like

18    his children, he's lived in the United States for more than 30

19    years; so it's not like he has any roots anyplace else.  So

20    it's a little unfair for this eleventh-hour application which

21    we heard about today to suggest as if he had someplace to go

22    to.

23          And the government ignored the situation in the *Kumar*

24    case.  He said that all these other cases where people were on

25    appeal.  In the *Kumar* case it was a plea of guilty with someone

82FVBENP                          Plea

1    facing, if one took the government's view of the thing, a life

2    sentence.  And he was allowed out, and he showed up.  Even

3    after he got his sentence of 12 years he remained out on bond

4    to work out the restitution things.

5         And we don't necessarily agree at all with the amount

6    of the forfeiture issues here.  I mean there's a forfeiture

7    issue in the case, but the numbers he tosses around are not

8    numbers that we have stipulated to or agreed to by any stretch

9    of the imagination, and he throws them around.

10        That's the only point I wanted to make.

11        THE COURT:  All right.  I'm not going to remand

12   Mr. Bennett, although I do think I can modify his bail

13   conditions to create greater security.  And I'm not going to do

14   so for a number of reasons, the most important of which is that

15   this indictment was filed in 2005.

16        If Mr. Bennett had wanted to flee, he should have fled

17   before he paid his lawyers all the money, and kept it, and gone

18   to an appealing location.  In fact, having pled guilty, to

19   leave now, extraditing him will be much easier.  So there's a

20   balance there.

21        In addition, I note that just by statute, to release

22   someone on appeal requires the same finding as the finding now.

23   The judicial officer has to be persuaded by clear and

24   convincing evidence that the person is not likely to flee.

25   That's half of the standard.  The appellate issue is the other

1    half, so it's the same standard.

2            And I also think that -- and I want to make it

3    clear -- that I don't make any prejudgments about the substance

4    of the case, but this is a case in which there has been a lot

5    of information, publicly, at least, from the bankruptcy

6    proceeding, and so this is a situation in which Mr. Bennett has

7    had the opportunity to see an examiner put the evidence

8    together.  This is not a situation where as the case approaches

9    trial, the government finally turns over information.  I think

10   Mr. Bennett has had a pretty good idea of the nature of the

11   case and the evidence for at least some time, which makes the

12   fact that he stays more significant.

13           The pretrial officer tells me that it would be easier

14   and more effective to monitor Mr. Bennett if he stayed in one

15   home or the other.  And, I guess -- and tells me that basically

16   the minute he leaves home they know about it.  So given that it

17   would take some time to -- since make an escape without a

18   passport, I think that if we modified the bail conditions to

19   limit his location, pretrial tells me that that makes it a more

20   secure situation.  In addition, if the government has any

21   particular practical economic conditions that you can think of,

22   I'm always willing to listen to those.

23           MR. BAROFSKY:  Your Honor, the posting of additional

24   assets by the defendant, they are largely forfeitable assets,

25   but to the extent that there are assets that have not been --

82FVBENP                    Plea

1   as I said, we estimate that it's in the range of approximately

2   $20,000,000.  If we could at least secure those assets, these

3   are assets that we've not yet secured by having him posted for

4   the bond.

5        In addition, because, frankly, we're going to get

6   those assets anyhow at the conclusion of this case, perhaps the

7   posting the requiring of assets from the children.  He

8   mentioned that the children are successful, one's an investment

9   banker.  And if they have property, that may increase the

10  incentive for Mr. Bennett to stay.

11       THE COURT:  I think it's enough that he's -- the bond

12  mortgages their future if he flees.  We're not taking his kids'

13  money.

14       MR. BAROFSKY:  We aren't.  I wouldn't suggest that we

15  would take it other than if he fled.  We would only be posting

16  whatever interest.  Because really right now the problem, your

17  Honor, and I hear what your Honor is saying, is that he has an

18  unsecured bond, and that just causes us a great deal of

19  concern.  I don't know what the circumstances are in *Kumar* or

20  *Ebbers*, but this is a situation if there is a third party

21  posting collateral --

22       THE COURT:  For all those people, the bottom line is

23  that for any defendant who was older and who was facing

24  sentencing, in, lets call it, the post-Enron era, the situation

25  was the same as for Mr. Bennett.  The possibility that their

82FVBENP                    Plea

1    sentence would be -- that their residence in the Bureau of

2    Prisons was the last residence they are going to have.

3         So I don't think this is really dramatically

4    different.  And I don't think the fact that he's a British

5    citizen changes the situation, that he has to -- I think he

6    gets the credit for having complied with all of his bail

7    conditions and having had two and-a-half years to reflect.

8         MR. BAROFSKY:  Your Honor, to be clear, I wasn't

9    rearguing the bail application.  I was merely trying to respond

10   to your Honor's question whether there were additional economic

11   circumstances.

12        THE COURT:  I'm not asking his children, okay?

13        MR. BAROFSKY:  Well, your Honor, then I would ask that

14   in the alternative, if the defendant could post additional

15   property or money that has not been seized or frozen by the

16   government to secure this bond to at least increase so that

17   there's some notional security of the bond.  And I would ask

18   for a number of $10,000,000 in cash or property.

19        MR. NAFTALIS:  Your Honor, I just think there is no

20   basis whatsoever for the application.  His children, the most

21   important things in the world, are on the hook for $50,000,000

22   if he were to leave.  As they've indicated, they don't have any

23   evidence of anything that he's ever done anything which would

24   indicate he would leave.  As your Honor said, quite correctly,

25   we've known about the evidence in this case; your Honor

82FVBENP                    Plea

1    remembers the litigation with respect to the bankruptcy trusts,

2    these report the motion practice there.  There's no secret

3    about that.  He's showed up all the time; he's complied with

4    all the conditions.  And there's not a reason in the world and

5    there's not a basis in the world for any change here

6    whatsoever.

7        MR. BAROFSKY:  Your Honor, respectfully, I don't see

8    any harm in having him post additional property that could only

9    be used at this time for the purposes to facilitate flight.  He

10   can't transfer these properties without violating the money

11   laundering laws at this point, and I don't see -- I don't even

12   understand how upping the collateral so as to prevent him from

13   fleeing prejudices him in any way.  And we're not asking even

14   for all of the money that we believe is out there, we're asking

15   for $10,000,000 to provide some additional security on what is

16   now an essentially an uncollateralized bond.  It doesn't really

17   move the ball tremendously for us, but it helps.  And at least

18   it would limit his ability to flee, should he make that

19   decision, that it makes more sense to self-deport, since he's

20   going to be going back to England anyhow before he has to face

21   the sentence.  I don't think the government's request is

22   shocking or surprising or terribly dramatic, but we do think it

23   would help, given the situation.

24       MR. NAFTALIS:  They have not shown anything for this

25   eleventh-hour request.  It's totally and absolutely baseless.

82FVBENP                    Plea

1   And I don't think -- I don't know what property may or may not

2   exist, but I don't think that there's any justification.  And

3   they just can't come into court without any basis whatsoever

4   and allege things where all the evidence shows that this

5   application is frivolous.

6            MR. BAROFSKY:  Your Honor, I've listened to this for a

7   fair amount of time now.  And to characterize our application

8   as frivolous and baseless and eleventh-hour I think is unfair.

9            THE COURT:  At least the eleventh hour.

10           MR. BAROFSKY:  I don't know when we were supposed to

11  have made this application.  I don't know if Mr. Naftalis would

12  have had us make it when he notified us about the intent to

13  change his plea yesterday afternoon, I don't think so.  I think

14  the only time we can make a plea based on the changed

15  circumstance of the defendant entering a guilty plea is after

16  he enters the guilty plea.

17           As far as it being baseless, the notion that a

18  defendant who's facing 315 years of prison time --

19           THE COURT:  He wishes.

20           MR. BAROFSKY:  -- is -- that it's baseless to seek his

21  remand when he is an English citizen subject to deportation --

22           THE COURT:  Excuse me.  We're not -- we're sending him

23  to one of the most civilized countries in the world.  It's not

24  punishment to live in England, all right?

25           MR. BAROFSKY:  Exactly, your Honor, which is why we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

82FVBENP                      Plea

1    would ask for additional collateral.

2         THE COURT:  And there is an extradition treaty between

3    the United States and Great Britain, so...

4         MR. BAROFSKY:  Your Honor, I just don't understand the

5    harm --

6         THE COURT:  Because I'm not sure that the purpose of

7    bail is to help you collect, you know, whatever you claim is

8    your eventual restitution.

9         MR. BAROFSKY:  Your Honor, if I wasn't clear on this

10   argument, I apologize.  The reason why we're asking for this is

11   to assure the defendant's appearance.  If that money is posted

12   as a bond, it's not so that we can eventually seize it.  If

13   it's posted as a bond, it's not available for him to use to

14   facilitate flight.  It's also to secure the bond.  This

15   original bond was issued because it was secured by money and

16   property.  Right now it's essentially not secured by money and

17   property.

18        THE COURT:  But that argument applies to any

19   additional money that he would put up.  You would say it was

20   just as forfeitable to you.  So it then becomes unsecured, the

21   same way.

22        MR. BAROFSKY:  But it's unrestrained property, Judge,

23   that's the difference.  This property is actually restrained on

24   top of the fact that it's -- because it's their direct

25   proceeds.

82FVBENP                    Plea

1          What I'm suggesting, these are other properties that

2    have not been restrained, because we're not able to restrain

3    certain properties that are not proceeds.  So this is money

4    that is available to the defendant for use if he wants to

5    facilitate flight.

6          The purpose of a bond, obviously security of a bond,

7    and why your Honor endorsed the order of a secured bond, was

8    because more security means less likelihood of flight.  And all

9    we're suggesting is taking this property that is now available

10   to the defendant and posting it as security for the bond.  And

11   obviously if we are unable to prove, as Mr. Naftalis suggests,

12   that this is property that's subject to asset forfeiture or

13   restitution, he'll get it back when -- at the time of his

14   sentencing or the time that he reports.

15         So we're not taking anything; we're not putting our

16   hands on stuff that we're not entitled to; we're just asking

17   that this bond be really secured, because right now we're

18   basically -- it's the exact same situation we had in October of

19   2005, when he's going out on the same conditions, it's

20   essentially an unsecured bond.  And I don't think that your

21   Honor would have ordered an unsecured bond back then, and we're

22   just asking for some additional security:  Money that is

23   available for the defendant or property, and that we have that

24   to secure the bond in case the defendant flees, and to

25   encourage him not to flee.

82FVBENP                          Plea

1            MR. NAFTALIS:  Apart from the fact that the government

2   has proffered not a single fact that anything has changed, I

3   don't agree with the notion that this bond is unsecured.  One

4   of the homes which is securing the bond -- there's $5,000,000

5   cash, there's two residences, is in a trust.  So without going

6   through all the legalities, I don't think it's so quickly

7   forfeitable, as they say.

8            And the notion of ignoring -- and that will be worked

9   out; we're not here to litigate that issue, but I just -- and

10  the notion that they can continue to ignore the fact that his

11  wife and children have signed a $50,000,000 bond that they will

12  be on the hook for and their lives will be ruined, the notion

13  there's not the slightest reason to suppose that he would do

14  this to his children, he never has, and I have nothing else to

15  say.

16           THE COURT:  I think $50,000,000 is a lot of money.

17  And it does directly affect wife, children, inheritances.  So

18  what about the issue of where he's going to live?

19           MR. NAFTALIS:  If your Honor wants -- feels it would

20  be better, pretrial services --

21           THE COURT:  That's what pretrial tells me.

22           MR. NAFTALIS:  I think he would -- there's a residence

23  in New York and a residence in New Jersey.  I think he would

24  prefer to be in New Jersey where his wife is, and then subject

25  to the fact he could just come to our offices and work with us,

82FVBENP                    Plea

1    which I think he's allowed to do, I think that would be his

2    preference in terms of the quality of the life until the

3    sentence, if that's --

4             THE COURT:   I get the high sign from pretrial; so

5    he'll stay in New Jersey.

6             MR. NAFTALIS:  Okay.

7             THE COURT:   Other than when he goes to you and also

8    when you have to get him to pretrial for -- to probation for

9    his interview.

10            MR. NAFTALIS:  Yes.

11            THE COURT:   Which we do need to do within the two

12   weeks so that the sentencing schedule can proceed.  And the

13   same is true for the government's description of the crimes.

14            Okay?  I think we're done then.

15            MR. NAFTALIS:  Thank you, your Honor.

16            MR. BAROFSKY:  Thank you, your Honor.

17            MR. GARCIA:  Thank you, your Honor.

18            THE DEFENDANT:  Thank you, your Honor.

19                      *    *    *

20

21

22

23

24

25

82KATROPps

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        05 CR 1192  (NRB)

 5   ROBERT TROSTEN,

 6                  Defendant.

 7   ------------------------------x

 8                                     New York, N.Y.
                                       February 20, 2008
 9                                     5:30 p.m.

10
     Before:
11
                    HON. NAOMI REICE BUCHWALD
12
                                         District Judge
13

14                        APPEARANCES

15   MICHAEL J. GARCIA
          Acting United States Attorney for the
16        Southern District of New York
     BY:   CHRISTOPHER GARCIA
17         NEIL BAROFSKY
           Assistant United States Attorneys
18
     MORVILLO, ABRAMOWITZ, GRAND, IASON,
19   ANELLO & BOHRER, P.C.
          Attorneys for Defendant
20   BY:   ROBERT G. MORVILLO
           CHRISTOPHER J. MORVILLO
21         RACHEL M. KORENBLAT

22
     Also Present:   Robert W. Manchak, Criminal Investigator
23                   Rua M. Kelly, Assistant United States Attorney
                     Mary Beth Allen, Paralegal
24                   United States Attorney's Office

25
```

82KATROPps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                        05 CR 1192  (NRB)

5   ROBERT TROSTEN,

6                 Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        February 20, 2008
9                                       5:30 p.m.

10

11  Before:

12                    HON. NAOMI REICE BUCHWALD

13                                       District Judge

14                    APPEARANCES

15  MICHAEL J. GARCIA
         Acting United States Attorney for the
16       Southern District of New York
    BY:  CHRISTOPHER GARCIA
17       NEIL BAROFSKY
         Assistant United States Attorneys
18
    MORVILLO, ABRAMOWITZ, GRAND, IASON,
19  ANELLO & BOHRER, P.C.
         Attorneys for Defendant
20  BY:  ROBERT G. MORVILLO
         CHRISTOPHER J. MORVILLO
21       RACHEL M. KORENBLAT

22
    Also Present:  Robert W. Manchak, Criminal Investigator
23                 Rua M. Kelly, Assistant United States Attorney
                   Mary Beth Allen, Paralegal
24                 United States Attorney's Office

25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

82KATROPps

1          (In open court)

2          THE CLERK:  The case is United States v. Robert

3  Trosten, Docket No. 05 Crim. 1192.  Is the government ready to

4  proceed?

5          MR. GARCIA:  Yes.  Good afternoon, your Honor.

6  Christopher Garcia on behalf of the government.  With me at

7  counsel table is Assistant United States Attorney Neil

8  Barofsky.  And with the Court's permission, also at counsel

9  table:  Robert Manchak, criminal investigator with our office;

10  Mary Beth Allen, paralegal with our office; and also Rua Kelly,

11  also an Assistant United States Attorney with our office.

12          THE CLERK:  And is the defense attorney ready to

13  proceed?

14          MR. R. MORVILLO:  We are, your Honor.  Mr. Trosten is

15  here.  For the record, my name is Robert Morvillo.  I represent

16  Mr. Trosten.  And seated to my left is Christopher Morvillo, my

17  co-counsel.

18          THE DEFENDANT:  Good afternoon.

19          THE COURT:  Good afternoon, Mr. Morvillo.

20          MR. R. MORVILLO:  I think it's my application, your

21  Honor.  We would apply to the Court for permission to withdraw

22  our previously entered plea of not guilty as to Counts One,

23  Two, Seven, Fifteen, and Seventeen of the indictment and enter

24  a plea of guilty.

25          THE COURT:  Mr. Trosten, if you will remain standing

82KATROPps

1    for a moment, would you raise your right hand, please.

2            Do you solemnly swear that the answers to the

3    questions I am about to ask you will be the truth, the whole

4    truth, and nothing but the truth, so help you God?

5            THE DEFENDANT:  I do, your Honor.

6            THE COURT:  Would you state your full name for me,

7    please.

8            THE DEFENDANT:  Robert Charles Trosten, Sr.

9            THE COURT:  And, Mr. Trosten, how old are you?

10           THE DEFENDANT:  38.

11           THE COURT:  Why don't you sit down.

12           THE DEFENDANT:  Thank you.

13           THE COURT:  Mr. Trosten, what was the last grade or

14   level of school that you completed?

15           THE DEFENDANT:  I finished undergraduate college with

16   a B.S. in accounting.

17           THE COURT:  At this time are you under the care of a

18   doctor or psychiatrist?

19           THE DEFENDANT:  Yes, I am.

20           THE COURT:  Which?

21           THE DEFENDANT:  A doctor -- a psychiatrist.

22           THE COURT:  And what condition is he treating you for?

23           THE DEFENDANT:  Dr. Neiman is treating me for sleep

24   and anxiety on occasion.

25           THE COURT:  And are you taking any medicine as a

4

82KATROPps

1  result of or in connection with that treatment?

2          THE DEFENDANT:  I take sleep medicine as needed and

3  anxiety medicine as needed.

4          THE COURT:  At the moment, are you under the influence

5  of any drug or alcohol?

6          THE DEFENDANT:  No, I'm not.

7          THE COURT:  Have you in fact ever been hospitalized or

8  treated for either alcoholism or narcotics addiction?

9          THE DEFENDANT:  No, I have not.

10          THE COURT:  And how are you feeling physically today?

11          THE DEFENDANT:  I feel great.

12          THE COURT:  Have you had sufficient time to discuss

13  the charges against you and your proposed plea with your

14  counsel, the Messrs. Morvillo?

15          THE DEFENDANT:  I have, yes.

16          THE COURT:  And have you been satisfied with the

17  advice and counsel that they have given to you?

18          THE DEFENDANT:  I am.

19          THE COURT:  And at this time, are you ready to change

20  your plea?

21          THE DEFENDANT:  I am indeed.

22          THE COURT:  And what is your plea at the moment?

23  Guilty or not guilty?

24          THE DEFENDANT:  Guilty.

25          THE COURT:  All right.  Mr. Trosten, in order to

82KATROPps

1    determine whether your plea is voluntary and made with a full

2    understanding of the charges against you and the consequences

3    of your plea, I will make certain statements to you and I will

4    ask you certain questions.  I want you to understand that I

5    need not accept your plea unless I am satisfied that you are in

6    fact guilty and that you fully understand your rights.

7            Now, Count One of the indictment charges you with a

8    conspiracy to commit securities fraud, wire fraud, bank fraud,

9    and money laundering, and to make false filings with the SEC

10   and material misstatements to auditors.  This crime carries a

11   maximum statutory penalty of five years in prison, a maximum

12   fine of the greatest of $250,000 or twice the gross pecuniary

13   gain derived from the offense or twice the gross pecuniary loss

14   to a person other than yourself as a result of the offense, a

15   $100 special assessment, and a mandatory term of supervised

16   release of three years.  Do you understand that those are the

17   charges in Count One and the maximum statutory penalties

18   provided for that charge?

19           THE DEFENDANT:  I do.

20           THE COURT:  Count Two charges you with securities

21   fraud.  And this crime carries a maximum possible sentence of

22   20 years in prison, a maximum fine of the greatest of $5

23   million or twice the gross pecuniary loss derived from the

24   offense, or twice the gross pecuniary loss -- I'm sorry.  I

25   think I said twice pecuniary loss.  It's twice the gross

82KATROPps

1   pecuniary gain derived from the offense or twice the gross

2   pecuniary loss to a person other than yourself as a result of

3   the offense, a $100 special assessment, and a maximum term of

4   supervised release of three years.  Do you understand that

5   those are the charges in Count Two and the maximum possible

6   penalties provided by law?

7           THE DEFENDANT:  I do.

8           THE COURT:  Count Seven charges you with wire fraud,

9   and this crime carries a maximum possible sentence of 20 years

10  in prison, a maximum fine of the greatest of $250,000 or twice

11  the gross pecuniary gain derived from the offense or twice the

12  gross pecuniary loss to a person other than yourself as a

13  result of the offense, a $100 special assessment, and a maximum

14  term of supervised release of three years.  Do you understand

15  that those are the charges in Count Seven and the maximum

16  statutory penalty provided for the crime of wire fraud?

17          THE DEFENDANT:  I do, your Honor.

18          THE COURT:  Count Fifteen charges you with bank fraud.

19  And this crime carries a maximum possible sentence of 30 years

20  in prison, a maximum fine of the greatest of $250,000 or twice

21  the gross pecuniary gain derived from the offense or twice the

22  gross pecuniary loss to a person other than yourself as a

23  result of the offense, a $100 special assessment, and a

24  mandatory -- or a maximum term of supervised release of five

25  years.  Do you understand that those are the charges in Count

82KATROPps

1    Fifteen and the maximum statutory penalty provided therefor?

2              THE DEFENDANT:  I do, your Honor.

3              THE COURT:  Count Seventeen charges you with money

4    laundering, and this crime carries a maximum sentence of ten

5    years in prison, a maximum fine of the greatest of $250,000 or

6    twice the gross pecuniary gain derived from the offense or

7    twice the gross pecuniary loss to a person other than yourself

8    as a result of the offense, a $100 mandatory special

9    assessment, and a maximum supervised release term of three

10   years.  Do you understand that that is the charge in Count

11   Seventeen and the maximum penalty provided for it by statute?

12             THE DEFENDANT:  I do, your Honor.

13             THE COURT:  And do you understand that, in addition to

14   the punishments which I just described, that the Court must

15   order restitution with respect to the charges in the

16   indictment?

17             THE DEFENDANT:  I'm sorry, your Honor?

18             THE COURT:  I said, do you understand that in addition

19   to the punishments that I've just described, that the Court

20   must order restitution --

21             THE DEFENDANT:  I do.

22             THE COURT:  -- with respect to the charges to which

23   you are pleading?

24             THE DEFENDANT:  I do.

25             THE COURT:  Do you understand that as part of your

82KATROPps

1   plea agreement, that you have admitted the forfeiture

2   allegations in the indictment and that you agree to forfeit to

3   the United States the sum of $2,400,000,000, as well as all the

4   specific property listed in schedule A to your plea agreement?

5          THE DEFENDANT:  I do, your Honor.

6          THE COURT:  And that as part of this plea agreement,

7   that you have agreed to not file any claims for any of the

8   forfeited property, and also to take such steps as necessary to

9   clear title to the specific property?

10         THE DEFENDANT:  I do, your Honor.

11         THE COURT:  And do you understand that you have the

12  right to plead not guilty and the right to a trial on the

13  charges against you and in fact the right to a jury trial?

14         THE DEFENDANT:  I do.

15         THE COURT:  At this time, Mr. Garcia, I would ask you,

16  please, to recite the elements of the crimes to which

17  Mr. Trosten is pleading.

18         MR. GARCIA:  Yes, your Honor.  With respect to Count

19  One, there are three elements: first, that there existed an

20  agreement or understanding to commit the objects charged;

21  second, that Mr. Trosten knowingly became a member of that

22  agreement or understanding; and, third, that one of the

23  co-conspirators knowingly committed at least one overt act in

24  furtherance of the conspiracy during the life of the

25  conspiracy.

1    With respect to Count Two, the securities fraud count,

2    the first element is that Mr. Trosten, in connection with the

3    purchase or sale of securities, here the notes described in

4    Count Two, did one or more of the following: employed a device,

5    scheme, or artifice to defraud; or made an untrue statement of

6    material fact; or omitted to state a material fact which made

7    what was said, under the circumstances, misleading; or engaged

8    in an act, practice, or course of business that operated or

9    would operate as a fraud or deceit upon a purchaser or seller.

10    Second, that Mr. Trosten acted knowingly, willfully, and with

11    intent to defraud.  And, third, that Mr. Trosten used or caused

12    to be used any means or instruments of transportation or

13    communication in interstate commerce, or the use of the mails,

14    in furtherance of the fraudulent conduct.

15    With respect to Count Seven, the wire fraud count,

16    there are five elements: first, that a scheme to defraud

17    existed; second, that Mr. Trosten must have participated in the

18    scheme with intent to defraud; third, that misrepresentations

19    or omissions must have related to material facts; fourth, that

20    the scheme was executed to obtain money or property; and

21    finally, that in executing the scheme, Mr. Trosten used or

22    caused to be used interstate wires, or the use of such wires

23    were reasonably foreseeable to him, as listed in the

24    indictment.  And here, your Honor, with respect to Count Seven,

25    it is alleged that on June 22, 2004, Mr. Trosten sent an

1    e-mail.

2            With respect to Count Fifteen, the bank fraud charge,

3    your Honor, there are three elements: first, that there was a

4    scheme to defraud a bank by means of materially false or

5    fraudulent pretenses, representations, or promises; second,

6    that Mr. Trosten executed or attempted to execute the scheme

7    with intent to defraud the bank; and, third, that at the time

8    of the execution of the scheme, the bank had its deposits

9    insured by the Federal Deposit Insurance Corporation.

10           At this time, your Honor, the government would proffer

11   and represent that HSBC, which is identified in the indictment,

12   has its deposits, and had its deposits at the relevant period,

13   insured by the Federal Deposit Insurance Corporation.

14           Finally, your Honor, with respect to Count Seventeen,

15   the money laundering count, there are three elements: first,

16   that Mr. Trosten engaged or attempted to engage in monetary

17   transactions involving criminally derived property of a value

18   greater than $10,000; second, that the property involved in the

19   monetary transaction, or attempted transaction, was in fact

20   derived from specified unlawful activity; finally, that

21   Mr. Trosten acted knowingly.  And with respect to this count,

22   the specified unlawful activities are the wire fraud, bank

23   fraud, and securities fraud otherwise charged.

24           THE COURT:  Mr. Trosten, do you understand that if you

25   pled not guilty and went to trial, that the burden would be on

82KATROPps

1    the government to prove each and every element of the crimes

2    charged beyond a reasonable doubt in order to convict you?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  Do you understand that at a trial, you

5    would have the right to be represented by an attorney at all

6    stages of the proceeding and if necessary an attorney would be

7    appointed for you?

8              THE DEFENDANT:  I do, your Honor.

9              THE COURT:  Do you understand that at a trial you

10   would have the right to confront and cross-examine witnesses

11   against you and the right not to be compelled to incriminate

12   yourself?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  And do you understand that at a trial you

15   would be presumed innocent until such time, if ever, the

16   government established your guilt by competent evidence to the

17   satisfaction of the trier of fact beyond a reasonable doubt?

18             THE DEFENDANT:  I do, your Honor.

19             THE COURT:  And do you understand that at a trial, you

20   would have the right to testify and would also be entitled to

21   compulsory process, in other words, the right to call other

22   witnesses on your behalf?

23             THE DEFENDANT:  I do, your Honor.

24             THE COURT:  And do you understand that if your plea is

25   accepted, that there will be no further trial of any kind, so

82KATROPps

1     that by pleading guilty, you are waiving your right to a trial?

2          THE DEFENDANT:  I do.

3          THE COURT:  Do you understand that if you are

4     sentenced to a period of supervised release and if you violate

5     the terms of your supervised release, that an additional period

6     of jail time may be imposed without credit for the time that

7     you had previously spent on supervised release?

8          THE DEFENDANT:  I do.

9          THE COURT:  And do you understand that in connection

10    with your plea of guilty, that the Court may ask you certain

11    questions about the offense to which you have pled, and if you

12    answer those questions under oath and on the record and in the

13    presence of your lawyer, that your answers if false may later

14    be used against you in a prosecution for perjury or false

15    statement?

16         THE DEFENDANT:  I do, your Honor.

17         THE COURT:  And do you understand that, in determining

18    your sentence, that the Court is obligated to calculate the

19    applicable sentencing guidelines range and to consider that

20    range and possible departures under the guidelines, as well as

21    other factors concerning the nature and circumstance of the

22    offense and the history and characteristics of the defendant?

23         THE DEFENDANT:  I do, your Honor.

24         THE COURT:  Mr. Trosten, did you sign a plea agreement

25    earlier today?

82KATROPps

1        THE DEFENDANT:  I did, your Honor.

2        THE COURT:  And before you signed it, did you discuss

3    it with your lawyers?

4        THE DEFENDANT:  I did.

5        THE COURT:  And before you signed it, did you read it?

6        THE DEFENDANT:  I did, your Honor.

7        THE COURT:  Let's just put the plea agreement to one

8    side for a moment.  Apart from the plea agreement, have any

9    threats or promises been made to you to make you plead guilty?

10        THE DEFENDANT:  No, your Honor.

11        THE COURT:  Again, apart from the plea agreement, have

12    any understandings or promises been made to you concerning the

13    sentence that you will receive?

14        THE DEFENDANT:  No, your Honor.

15        THE COURT:  Is your plea voluntary?

16        THE DEFENDANT:  Yes, it is.

17        THE COURT:  I would like to review a few portions of

18    the plea agreement with you.  Do you understand that pursuant

19    to this plea agreement, that you have undertaken to truthfully

20    and completely disclose all information about yourself and

21    others as required of you by the U.S. Attorney's Office; and

22    that you have agreed to fully cooperate with the U.S.

23    Attorney's Office, the United States Postal Inspection Service,

24    the Securities and Exchange Commission, and any other law

25    enforcement agency designated by the Office; that you have

1    agreed to attend all meetings as your presence is requested,

2    and to provide to the U.S. Attorney's Office any document or

3    other tangible evidence relating to any inquiry from the U.S.

4    Attorney's Office or other law enforcement agencies; that you

5    have agreed to truthfully testify before the grand jury and at

6    any other trial or court proceeding; that you have agreed to

7    fully disclose to the U.S. Attorney's Office any crimes that

8    you have committed and any civil or criminal proceedings in

9    which you have been or are a subject target or a witness; and

10   that you have further agreed to commit no further crimes

11   whatsoever?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  And do you understand that the U.S.

14   Attorney's Office has no authority to agree not to prosecute

15   you for any possible criminal tax violations?

16             THE DEFENDANT:  I do, your Honor.

17             THE COURT:  And do you understand that if you fully

18   comply with this agreement, that you will not be further

19   prosecuted by the U.S. Attorney's Office for any crime related

20   to your participation in the crimes described in the

21   indictment, Counts One, Two, Seven, Fifteen, and Seventeen,

22   except for a possible criminal tax violation?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  And are you aware that this agreement

25   doesn't bind any other federal, state, or local prosecuting

82KATROPps

1    office?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  And do you understand further that the

4    sentence that you will receive is within the sole discretion of

5    the Court?

6            THE DEFENDANT:  Yes, your Honor, I do.

7            THE COURT:  And do you understand that if the United

8    States Attorney's Office determines that you have provided

9    substantial assistance in an investigation or prosecution and

10   fully complied with the understandings specified in this plea

11   agreement, that the U.S. Attorney's Office will file a motion

12   pursuant to Section 5K1.1 of the guidelines, requesting that

13   you be sentenced in accordance with the factors set forth in

14   that section?

15           THE DEFENDANT:  I do, your Honor.

16           THE COURT:  And do you understand that even if the

17   U.S. Attorney makes such a motion, that the issue of sentencing

18   remains within the discretion of the Court?

19           THE DEFENDANT:  I do.

20           THE COURT:  And do you understand that if the U.S.

21   Attorney's Office determines that you have not provided

22   substantial assistance, that they are released of any

23   obligation to file a 5K1.1 letter?

24           THE DEFENDANT:  I do, your Honor.

25           THE COURT:  And do you understand that, should you

82KATROPps

1    commit any further crimes or should it be determined that you

2    have given false, incomplete, or misleading testimony or

3    information, that you are thereafter subject to prosecution for

4    additional federal crimes?

5            THE DEFENDANT:  I do, your Honor.

6            THE COURT:  Do you understand that if it is determined

7    that you have committed further crimes or given false or

8    misleading testimony or otherwise violated this agreement, that

9    all statements made by you to the United States Attorney's

10   Office can be used against you in a subsequent prosecution?

11           THE DEFENDANT:  Yes, your Honor.

12           THE COURT:  And are you entering this plea because you

13   are in fact guilty?

14           THE DEFENDANT:  I am, your Honor.

15           THE COURT:  And do you understand that as part of this

16   plea agreement, that you are waiving any right you might have

17   to have the government preserve any physical evidence for

18   future DNA testing or any right you might have for DNA testing

19   at the present time?

20           THE DEFENDANT:  Yes, your Honor.

21           THE COURT:  And do you understand that this agreement

22   takes the place of any prior understanding that you may have

23   reached with the United States Attorney's Office and that there

24   are no conditions beyond those set forth in this written

25   agreement and that there cannot be any additional

82KATROPps

 1  understandings that are not entered into in writing and signed?

 2          THE DEFENDANT:  Yes, your Honor.

 3          THE COURT:  Mr. Trosten, did you commit the offenses

 4  that you are pleading guilty to?

 5          THE DEFENDANT:  I did, your Honor.

 6          THE COURT:  Would you tell me, please, what you did.

 7          THE DEFENDANT:  Your Honor, first, I just would like

 8  to state for the record that, when I said I felt great, it was

 9  relating to medicines that I had taken, as opposed to feeling

10  ill because of those medicines, not because of my conduct,

11  which I deeply regret, your Honor.

12          THE COURT:  I would just like -- are you under the

13  influence of any medicine today?

14          THE DEFENDANT:  I am not, no.  No.

15          THE COURT:  OK.  And you have not had any trouble

16  following any of the questions I have asked you?

17          THE DEFENDANT:  No, I have not.  No, I have not.

18          Your Honor, while I was employed at Refco, I agreed

19  with other Refco executives to hide the true nature of Refco's

20  finances on Refco's financial statements.  I knew that Refco's

21  financial statements did not accurately reflect Refco's

22  financial condition, because the financial statements did not

23  disclose the full amount that Refco Group Holdings, Inc., a

24  related party, owed to Refco.  I understood that the RGHI

25  receivable was underreported because Philip Bennett, Refco's

1   former chief executive officer, and other Refco executives,

2   including me, were involved in a series of transactions at the

3   end of Refco's financial reporting periods to make it appear as

4   if a receivable was due from third-party customers rather than

5   from a related party.

6       The RGHI receivable was composed of, amongst other

7   things, historic customer losses, bad debts, and expenses that

8   RGHI incurred on behalf of Refco.

9       In addition, I participated in a number of

10  transactions that padded or inflated Refco's income.  For

11  example, I participated in transactions that shifted expenses

12  off the books of Refco and onto the books of Refco Group

13  Holdings, Inc.

14      I, along with other Refco executives, agreed to

15  conceal the true size and nature of the RGHI receivable from,

16  amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC,

17  which, in 2004, participated in Refco's senior secured credit

18  facility, as referenced in paragraph 14 -- I'm sorry --

19  paragraph 41 and Count Fifteen of the indictment; and investors

20  who purchased bonds that Refco issued in 2004, as referenced in

21  Count Two of the indictment.

22      I left the company in August of 2004, one year before

23  the IPO of Refco.  I and other Refco executives used the

24  interstate wires to accomplish these acts within this district,

25  as referenced in Count Seven of the indictment.

82KATROPps

1          Furthermore, I received funds obtained from the

2     transaction with Thomas H. Lee Partners, referenced in

3     paragraph 34 of the indictment, which I knew were proceeds from

4     unlawful activity, as referenced in Count Seventeen.

5          The RGHI receivable and the transactions used to

6     conceal it were material information that Refco investors and

7     lenders would have wanted to know before investing in or

8     lending money to Refco.

9          I knew that obtaining funds from Refco investors and

10    lenders based on misleading financial information was wrong.

11          Excuse me.

12          Your Honor, I take full responsibility for my actions

13    and my conduct.

14          I wish to apologize to my family and those that I

15    harmed by my conduct, which I deeply and sincerely regret, your

16    Honor.

17          Thank you.

18          THE COURT:  Mr. Garcia, is there anything else that

19    you wish me to ask Mr. Trosten?

20          MR. GARCIA:  No, your Honor.

21          THE COURT:  Mr. Trosten, do you still wish to plead

22    guilty?

23          THE DEFENDANT:  I do, your Honor.

24          THE COURT:  Mr. Morvillo, do you know of any reason

25    that Mr. Trosten ought not to plead guilty?

82KATROPps

1          MR. R. MORVILLO:  I do not, your Honor.

2          THE COURT:  All right.  Mr. Trosten, I am satisfied

3     that you understand the nature of the charge against you and

4     the consequences of your plea, and that your plea is made

5     voluntarily and knowingly, and that there is a factual basis

6     for your plea.  I will therefore accept your plea of guilty.

7          Mr. Garcia, do you want to give me a control date?

8          MR. GARCIA:  Your Honor, respectfully, the government

9     would request about a year for a control date.

10          THE COURT:  Let's just see if -- OK.  Well, February

11     20, 2009 is a Friday.  So you can write to me then.

12          All right.  Is there anything else at this time?

13          MR. GARCIA:  Nothing more, your Honor, from the

14     government.

15          THE COURT:  Mr. Morvillo?

16          MR. R. MORVILLO:  Nothing, your Honor.  Thank you for

17     accommodating my schedule by sitting as late as you are.

18          THE COURT:  We're always here at this time.

19          MR. GARCIA:  Thank you, Judge.

20                              o0o

21

22

23

24

25

7CJAAMAGP                    Plea                                    1

1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x

3    UNITED STATES OF AMERICA,                    07 CR 1196 (SHS)

4               v.

5    SANTO C. MAGGIO,                             07 SD 312 (RLE)

6               Defendant.

7    ------------------------------x

8                                          New York, N.Y.
9                                          December 19, 2007
                                           11:30 a.m.
10

11   Before:

12                HON. RONALD L. ELLIS,

13                                         Magistrate Judge

14                      APPEARANCES

15   JAMES B. COMEY
          United States Attorney for the
16        Southern District of New York
     NEIL BAROFSKY
17   CHRISTOPHER GARCIA
          Assistant United States Attorney
18

19   PAUL SHECHTMAN
          Attorney for Defendant Maggio
20
     SCOTT E. HERSHMAN
21        Attorney for Defendant Maggio

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1

7CJAAMAGP                        Plea

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  x

UNITED STATES OF AMERICA,

              v.                                    07 SD 312 (RLE)

SANTO C. MAGGIO,

              Defendant.

-  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  x

                                   New York, N.Y.
                                   December 19, 2007
                                   11:30 a.m.

Before:

                        HON. RONALD L. ELLIS,

                                     Magistrate Judge

                         APPEARANCES

JAMES B. COMEY
        United States Attorney for the
        Southern District of New York
NEIL BAROFSKY
CHRISTOPHER GARCIA
        Assistant United States Attorney

PAUL SHECHTMAN
        Attorney for Defendant Maggio

SCOTT E. HERSHMAN
        Attorney for Defendant Maggio

7CJAAMAGP                      Plea

1              (Case called)

2              MR. BAROFSKY:  Neil Barofsky and Christopher Garcia

3        for the government.

4              Good morning, your Honor.

5              MR. SCHECTMAN:  Paul Shechtman, for Mr. Maggio, with

6        Scott Hershman, for Mr. Maggio.

7              THE COURT:  Okay.  I understand that he is going to be

8        pleading to an information.

9              MR. SCHECTMAN:  Correct, your Honor.

10             THE COURT:  Has he waived indictment yet?

11             MR. SCHECTMAN:  You have the paperwork.  We're ready

12       to waive.

13             THE COURT:  We will do those separately.  Treat the

14       waiver as it should be and then I'll consider the taking of the

15       plea.

16             MR. SCHECTMAN:  Sounds right.

17             COURTROOM DEPUTY:  You are Santo Maggio?

18             THE DEFENDANT:  Yes.

19             COURTROOM DEPUTY:  Have you signed this waiver of

20       indictment.

21             THE DEFENDANT:  Yes.

22             COURTROOM DEPUTY:  Before you signed it did you

23       discussion it with your attorney?

24             THE DEFENDANT:  Yes.

25             COURTROOM DEPUTY:  Did he explain it to you?

7CJAAMAGP                          Plea                                    3

1                THE DEFENDANT:  Yes.

2                THE COURT:  Do you understand what you are doing?

3                THE DEFENDANT:  Yes.

4                COURTROOM DEPUTY:  Do you understand that you are

5        under no obligation to waive indictment?

6                THE DEFENDANT:  Yes.

7                COURTROOM DEPUTY:  Do you understand that if you do

8        not waive indictment, if the government wants to prosecute you

9        they will have to present this case to a grand jury which may

10       or may not indict you?

11               THE DEFENDANT:  Yes.

12               THE COURT:  Do you realize by that by signing this

13       waiver of indictment you have given up your right to have this

14       case presented to a grand jury?

15               THE DEFENDANT:  Yes, I do.

16               COURTROOM DEPUTY:  Have you seen a copy of the

17       information?

18               THE DEFENDANT:  Yes, I did.

19               THE COURT:  Would you like for me to read it to you?

20               THE DEFENDANT:  No.

21               COURTROOM DEPUTY:  How do you plead?

22               THE DEFENDANT:  Guilty.

23               COURTROOM DEPUTY:  The case has already been assigned

24       to Judge Stein.

25               MR. SCHECTMAN:  Correct.

7CJAAMAGP                    Plea                                4

1          MR. BAROVSKY:  Your Honor, we consent to the defendant

2    being released on his own recognizance.

3          MR. SCHECTMAN:  We don't object to that.

4          THE COURT:  Technically to the information you are

5    supposed to plead "not guilty".

6          MR. SCHECTMAN:  I think that is right and it is my

7    apologies.

8          THE DEFENDANT:  I plead not guilty now and then later

9    of guilty.

10          MR. SCHECTMAN:  Not guilty at this time, your Honor,

11    but we will be entering a guilty plea.

12          THE COURT:  Objection.  All right.  Now, the actual

13    plea has been referred by Judge Stein; is that it?

14          MR. BAROFSKY:  Yes, your Honor.

15          THE COURT:  And how many counts in the information?

16          MR. BAROFSKY:  Your Honor, there are four counts.

17          THE COURT:  What is he pleading to?

18          MR. BAROFSKY:  All four counts, Judge.

19          THE COURT:  Okay.  Mr. Maggio, this matter has been

20    referred to me before Judge Stein for the purpose of taking

21    your plea.  Did you consent to proceed before a United States

22    magistrate judge on your felony plea allocution?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Before you signed it did you discuss it

25    with your attorneys?

7CJAAMAGP                    Plea

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Did they explain it to you?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you understand that you have an

5    absolute right to have this proceeding before a United States

6    district judge?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  You are voluntarily proceeding before a

9    United States magistrate judge?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Mr. Maggio, you are charged in a four

12   count information.  Count One of the information charges you,

13   well, conspiracy to commit securities fraud, wire fraud, bank

14   fraud and money laundering and to make false filings with the

15   SEC and material misstatements to auditors in violation of

16   Title 18 U.S.C. Sections 371.  This crime carries a maximum

17   sentence of five years imprisonment, a maximum fine which is

18   the greatest of either $250,5000 or twice the gross pecuniary

19   gain derived from the offense or twice the gross pecuniary loss

20   to persons other than yourself as a result of the offense.

21   There is a $100 special assessment and a term of supervised

22   release of three years.

23          Counts Two and Three of the information charge you

24   with securities fraud in violation of Title 15 U.S.C. Section

25   78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal

7CJAAMAGP                    Plea

1    Regulations Section 240, 10 (B) (5) and each of those counts

2    carries a maximum sentence of 20 years imprisonment, a maximum

3    fine which is the greatest of either five million dollars or

4    twice the gross pecuniary gain derived from the offense and

5    twice the gross pecuniary loss of persons other than yourself

6    as a result of the offense.  Each also has a $100 special

7    assessment and a term of supervised release of three years.

8            Count four of the information charges you with wire

9    fraud in violation of Title 18 U.S.C. Section 1343 and carries

10   a maximum sentence of 0 years imprisonment, a maximum fine

11   which is the greatest of either $250,000 or twice the gross

12   pecuniary gain derived from the offense, or twice the gross

13   pecuniary loss to person others than yourself as a result of

14   the offense.  It carries a $100 special assessment and a term

15   of supervised release of three years.

16           A total maximum sentence of incarceration on the

17   information is 65 years imprisonment.  In addition to the

18   foregoing the Court must order restitution with respect to the

19   information and in accordance with U.S.C.

20           In addition, if you are sentenced to any period of

21   supervised release and violate the conditions of your

22   supervised release you may be sentenced to all or part of the

23   supervised release as authorized by statute without any credit

24   for time already served on supervised release.

25           Do you understand that?

7CJAAMAGP                    Plea

1            THE DEFENDANT:  Yes.

2            THE COURT:  So you understand these penalties as I've

3    read them to you?

4            THE DEFENDANT:  Yes, I do.

5            THE COURT:  Have you seen a copy of the information in

6    which the government makes these charges against you?

7            THE DEFENDANT:  Yes, I do.

8            THE COURT:  Have you discussed it with your attorneys?

9            THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  Are you prepared to enter a plea today?

11           THE DEFENDANT:  Yes, I am.

12           THE COURT:  Santo Maggio, how do you plead?

13           THE DEFENDANT:  Guilty.

14           THE COURT:  Mr. Maggio, before I can recommend that

15   your plea be accepted I must determine that you understand the

16   plea and its consequences, that the plea is voluntary and that

17   there's a factual basis for the plea.  For that purpose I must

18   ask you a number of questions and your answers must be under

19   oath.  Do you understand that the answers you give under oath

20   may subject you to prosecution for perjury if you do not tell

21   the truth?

22           THE DEFENDANT:  Yes, I do.

23           THE COURT:  Raise your right hand.

24           (Defendant Santo C. Maggio sworn)

25           THE COURT:  Thank you.  Please state your full name

7CJAAMAGP                    Plea

1   for record.

2            THE DEFENDANT:  Santo C. Maggio.

3            THE COURT:  How far did you go in school?

4            THE DEFENDANT:  I finished high school.

5            THE COURT:  Are you currently being treated by a

6   doctor or psychiatrist for any reason?

7            THE DEFENDANT:  No.

8            THE COURT:  Are you currently on any medications which

9   might effect you in being alert for this proceeding?

10           THE DEFENDANT:  No.

11           THE COURT:  Are you any difficulty seeing, hearing or

12  understanding anything that I am saying?

13           THE DEFENDANT:  No.

14           THE COURT:  Have you had enough time to discuss with

15  your attorneys how you wish to plead?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Are you satisfied with your attorneys?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Do you understand what the government says

20  that you did?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Do you understand that have you a right to

23  plead not guilty?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Do you understand that you have a right to

7CJAAMAGP                          Plea

1    trial by jury on these charges?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Do you understand that if you are to plead

4    not guilty and go to trial you would be presumed innocent until

5    the government proved your guilt beyond a reasonable doubt?

6           THE DEFENDANT:  Yes, I do.

7           THE COURT:  Do you understand that if you were to go

8    to trial you would have a number of important constitutional

9    rights including the right to be represented by counsel and to

10   have counsel appointed for you if you cannot afford an

11   attorney?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Do you understand that at trial you cannot

14   be forced to testify against yourself?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do you understand at a trial you would

17   have the right to confront and cross-examine witnesses called

18   by the government?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Do you understand that at a trial you

21   would have the right to testify yourself and to call witnesses

22   on your behalf and to compel their attendance by subpoena if

23   necessary?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Do you understand that if your guilty plea

7CJAAMAGP                    Plea

1    is accepted there will be no trial of any kind and the only

2    remaining steps in your case will be a presentence report and

3    sentencing by Judge Stein?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Have you discussed with your attorney the

6    role that the sentencing guidelines play in sentencing?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you understand that the district judge

9    will retain discretion regardless of what calculations there

10   are under the guidelines?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Do you understand that the calculation

13   under the guidelines will take into account a number of factors

14   including the actual conduct in which you engaged, any victims

15   of the offense, the role that you played in the offense,

16   whether or not you have accepted responsibility for your acts,

17   whether you have any criminal history or whether you have

18   engaged in any obstruction of justice; do you understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Between now and the date of sentencing the

21   probation department will conduct an investigation and will

22   prepare a presentence report.  Your attorney, the government

23   and Judge Stein will receive copies.  Both your attorney and

24   the government will have the opportunity to object if they

25   believe anything in the report is inaccurate; do you understand

7CJAAMAGP                     Plea

1    that?

2              THE DEFENDANT:   Yes.

3              THE COURT:   Do you understand that until the

4    presentence report is prepared neither your attorney nor the

5    government, nor Judge Stein will be able to determine precisely

6    what range of penalties will be calculated under the

7    guidelines.

8              THE DEFENDANT:   Yes.

9              THE COURT:   Do you understand than regardless of

10   calculation and the guidelines your sentence cannot exceed the

11   maximums that I advised you of earlier?

12             THE DEFENDANT:   Yes.

13             THE COURT:   Do you understand that under certain

14   circumstances both you and the government may have the right to

15   appeal the sentence imposed.

16             THE DEFENDANT:   Yes.

17             THE COURT:   Do you understand that if the sentence is

18   more severe than you expected you will be bound by your guilty

19   plea and will not be permitted to withdraw it?

20             THE DEFENDANT:   Yes.

21             THE COURT:   You understand that parole has been

22   abolished and that if you are sentenced to any term of

23   imprisonment you will be required to serve the entire term?

24             THE DEFENDANT:   Yes.

25             THE COURT:   Mr. Maggio, are you a citizen of the

7CJAAMAGP                    Plea

1    United States?

2              THE DEFENDANT:  Yes, I am.

3              THE COURT:  Mr. Maggio, I have been handed up a plea

4    agreement from your case.  Have you had an opportunity to

5    review and go over this agreement with your attorneys?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Do you understand that one of the

8    provisions in the plea agreement is that you admit the

9    forfeiture allegation in the information and that you agree to

10   forfeit to the United States a sum of money equal to two

11   billion, four hundred million dollars?

12             THE DEFENDANT:  Yes.

13             THE COURT:  That is what it says, right?

14             MR. BAROFSKY:  Yes, your Honor, that number is

15   correct.

16             Your Honor, the plea cooperation agreement also

17   provides, however, that in satisfaction of that amount there

18   are certain schedules attached to the plea agreement which the

19   government will accept in satisfaction of that judgment.

20             MR. SCHECTMAN:  We don't have quite that much, your

21   Honor.

22             THE COURT:  Okay.  I thought had I too many zeros

23   myself at first.

24             MR. SCHECTMAN:  No, you read it right.

25             THE COURT:  That represents the amount of the

7CJAAMAGP                    Plea

1    proceedings obtained as a result of the offense; do you

2    understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  You also understand that any forfeiture

5    would not be treated as satisfaction of any fine, restitution,

6    cause of imprisonment or any other penalty the Court may

7    impose?

8              THE DEFENDANT:  Yes.

9              THE COURT:  And as indicated in the agreement, there

10   is a scheduled pay of assets.  You have seen the schedule and

11   you have gone over it with your attorneys?

12             THE DEFENDANT:  Yes.

13             THE COURT:  To make sure that it's accurate?

14             THE DEFENDANT:  Yes.

15             MR. SCHECTMAN:  Judge, I might point out for the

16   record there is a Schedule B as well, which are assets that are

17   in Mrs.~Maggio's name that are being forfeited as part of the

18   plea and there is a separate agreement that need not concern

19   your Honor in this matter involving Mrs.~Maggio.

20             THE COURT:  Is that correct, Mr. Maggio, there is also

21   a Schedule B?

22             THE DEFENDANT:  Yes.

23             THE COURT:  That's Mrs.~Maggio's assets?

24             THE DEFENDANT:  Yes.

25             THE COURT:  That is also covered by the agreement that

7CJAAMAGP                    Plea

1    you made with the government?

2            THE DEFENDANT:   Yes.

3            THE COURT:   You are also understand the agreement

4    provides that you cooperate fully with the United States

5    attorney's office?

6            THE DEFENDANT:   Yes.

7            THE COURT:   And that in exchange for that cooperation,

8    assuming that the office determines that you have made full and

9    accurate disclosures to them, the government has agreed that it

10   will submit a motion pursuant to Section 5K1.1 of the

11   sentencing guidelines in your favor?

12           THE DEFENDANT:   Yes.

13           THE COURT:   Do you understand that if for any reason

14   the government determines that it will not file such a motion

15   you will not be allowed to withdraw your plea?

16           THE DEFENDANT:   Yes.

17           THE COURT:   You understand that even if the government

18   files such a motion sentencing will still be at the sole

19   discretion of the Court?

20           THE DEFENDANT:   Yes, I did.

21           THE COURT:   Is there anything else in the agreement

22   that I might want to highlight?

23           MR. BAROFSKY:   No, your Honor.

24           THE COURT:   All right.   Other than the representations

25   in this agreement, have any promises been made to you by anyone

7CJAAMAGP                         Plea

1    to influence you to plead guilty?

2              THE DEFENDANT:  No.

3              THE COURT:  This constitutes the sole agreement that

4    you have?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Has anyone promised you a specific

7    sentence if you plead guilty?

8              THE DEFENDANT:  No.

9              THE COURT:  Has anyone made any threats to you to

10   influence you to plead guilty?

11             THE DEFENDANT:  No.

12             THE COURT:  Are you making this plea voluntarily of

13   your own freewill and choice?

14             THE DEFENDANT:  Yes, I am.

15             THE COURT:  The elements of the offense is?

16             MR. BAROFSKY:  Your Honor, for Counts One defendant's

17   is charged with conspiracy.  The government would be required

18   to prove each of the elements beyond a reasonable doubt.

19   First, that there is an assistance of a an agreement or

20   understanding to commit one of the objects charged in the

21   information.

22             Second, the defendant knowingly became a member of

23   that agreement or understanding.

24             And third, that one of the conspirators or

25   coconspirators or Mr. Maggio knowingly committed at least one

7CJAAMAGP                    Plea

1    overt act in furtherance of the conspiracy during its life.

2            With respect to the securities frauds counts in two

3    and three, first, the defendant in connection with the purchase

4    or sale of securities, here the notes that are described in

5    Count Two and the common stock of Revko that's referenced in

6    Count Three did one or more of the following:  Employed a

7    devise, scheme or artifice to defraud or made an untrue

8    statement of a material fact or admitted to state a material

9    fact which made what was said under the circumstances

10   misleading or engaged in an act, practice or course of business

11   that operated or would operate as a fraud or deceit upon a

12   purchase of a seller for securities.

13           Second the defendant acted knowingly, willfully with

14   the intent to defraud.

15           And third, the defendant used or caused to be used any

16   means or instruments of transportation or communication in

17   interstate commerce or use of the mails in furtherance of that

18   fraudulent conduct.

19           and with respect to the Count Four wire fraud, first,

20   that there was a scheme or artifice to defraud that existence

21   the defendant must have participated in the scheme with the

22   intent to defraud misrepresentations or omissions must have

23   related to a material fact, that the scheme was executed to

24   obtain money or property.

25           And finally, that in execution of the scheme the

7CJAAMAGP                         Plea

1    defendant used or caused to be used interstate wires or that

2    such use was reasonably foreseeable to him.

3         THE COURT:  Mr. Maggio, did you hear that recitation?

4         THE DEFENDANT:  Yes.

5         THE COURT:  Did you understand that if the government

6    were to proceed to trial against you it would have the burden

7    of proving each element for each offense, that is, each count

8    beyond a reasonable doubt.

9         THE DEFENDANT:  Yes.

10        THE COURT:  Did you commit the offenses for which you

11   have been charged, Mr. Maggio?

12        THE DEFENDANT:  Yes.

13        THE COURT:  Tell me what you did.

14        MR. SCHECTMAN:  Judge, if it's acceptable to you

15   Mr. Maggio has written out a statement that I think speaks to

16   all four crimes.

17        THE COURT:  Considering the complexities here I'll

18   allow him to read and then if it's not he could fill in the

19   gaps.

20        THE DEFENDANT:  Your Honor, from the late 1990s to

21   October 2005 I was a senior executive at Revko Ink.  During

22   that period I participated with others to hide the true

23   financial health of Revko from banks, counter-parties, auditors

24   and investors.  With my knowledge and active participation

25   Revko's substantial losses were covered up as revenues padded

18

7CJAAMAGP                    Plea

1    and certain operating expenses were moved off its book.  Among

2    the acts I personally engaged in the signing of loan agreements

3    referencing paragraphs 61-D and 61-P of the indictment.

4           As a result of my conduct and that of my

5    coconspirators false financial statements were issued to obtain

6    debt financing from the public including 9 percent senior

7    subordinated notes referenced in Count Two of the indictment.

8           To consummate the sale of 57 percent of Revko to a

9    group headed by Thomas H. Lee in 2004 and to obtain $800

10   million in bank financing the same year and to effect the Revko

11   initial public offering in 2005.  Moreover, with my knowledge

12   false financial statements were filed with the SEC including

13   form 10K referencing Count Four.  The mails and interstate

14   wires were used as part of the fraudulent scheme.

15           I deeply regret my conduct and the harm that it has

16   caused.

17           THE COURT:  First of all, with respect to all of the

18   activities that you've indicate you participated in it

19   knowingly?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Okay.  Where did this take place.

22           THE DEFENDANT:  In New York, New York.  Manhattan, New

23   York.

24           THE COURT:  You said coconspirators, so other people

25   had agreed with you to effectuate this scheme?

7CJAAMAGP                        Plea

1          THE DEFENDANT:  Yes.

2          THE COURT:  And the intent of this scheme was to

3   defraud?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Now, I know you mentioned the notes and I

6   think you mentioned the 2005 initial offering that was

7   addressed to Count Three of the information, that is, whether

8   or not you had a scheme to defraud people based on the value of

9   the stock?

10         THE DEFENDANT:  Correct, your Honor.

11         THE COURT:  Mr. Maggio?

12         THE DEFENDANT:  Yes.

13         THE COURT:  That did involve false statements?

14         THE DEFENDANT:  Yes.

15         THE COURT:  False filings that you've indicated?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Now, you said you used the mails which

18  interstate -- I mean, you used the mails, a phone?  How did you

19  use --

20         THE DEFENDANT:  Yes, used regular mail.  We used

21  Express Mail.  We used e-mail all to effect the scheme.

22         THE COURT:  You submitted false statements in the

23  mail?

24         THE DEFENDANT:  False statements, loan agreements as

25  referenced here, yes.

7CJAAMAGP                          Plea                              20

 1              THE COURT:  Okay.  Any --

 2          MR. BAROFSKY:  Your Honor, I'll just represent to the

 3    Court that with respect to Count Four, the wire transmission

 4    did in fact originate in the Southern District of New York in

 5    Manhattan and was wired outside of the Southern District to

 6    Virginia.

 7              THE COURT:  Anything else?

 8          MR. SCHECTMAN:  Nothing, your Honor.

 9          MR. BAROFSKY:  No, your Honor.

10              THE COURT:  I am depending on you here.  Does any

11    either counsel know of any reason why I should not recommend

12    that this plea not be accepted?

13          MR. BAROFSKY:  No, your Honor.

14          MR. SCHECTMAN:  No, your Honor.

15              THE COURT:  Based on defendant's allocution and the

16    recommendations by the government I find that the defendant

17    understands the nature, the charges and consequences of his

18    guilty plea.  I also find that the plea is voluntary and that

19    there is a factual basis for the plea.  I, therefore, recommend

20    that the plea be accepted and direct that a presentence report

21    be reaped.

22              Sentencing will take place before Judge Stein on.

23          MR. BAROFSKY:  May 9, at 2 p.m.

24              THE COURT:  Is there anything else that needs to be

25    addressed today.

7CJAAMAGP                          Plea                                    21

1          MR. BAROVSKY:  Not from the government, your Honor.

2          MR. SCHECTMAN:  Not from the offense.

3          THE COURT:  We are adjourned.

4                              o 0 o

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3078

84H9GRAF
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,              New York, N.Y.
3
4              v.                           S4 05 Cr. 1192 (NRB)
4
5    TONE GRANT,
5
6                   Defendant.
6
7    ------------------------------x
7
8
8                                          April 17, 2008
9                                          @ a.m.
9
10
10   Before:
11
11                  HON. NAOMI REICE BUCHWALD,
12
12                                          District Judge
13
13
14                        APPEARANCES
14
15   MICHAEL J. GARCIA
15        United States Attorney for the
16        Southern District of New York
16   BY:  NEIL BAROFSKY
17        CHRISTOPHER GARCIA
17        Assistant United States Attorneys
18
18   ZUCKERMAN SPAEDER, LLP
19        Attorneys for Defendant
19   BY:  ROGER ZUCKERMAN
20        AITAN GOELMAN
20        NORMAN EISEN
21
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

84H9GRAF

```
 1                (In open court: jury not present; time noted:
 2     11:53 a.m.)
 3                THE COURT:  Why don't we begin by reporting for the
 4     record the earlier notes that we received yesterday.
 5                The first note arrived in chambers about 3:25 and
 6     read:  "Maria Louisa Pedroza, Juror No. 8 voted as foreperson."
 7                Second note which arrived in chambers about 4:00:  "Is
 8     it possible to obtain a board with/an easel (and marker)?"
 9                The third note arrived upstairs about 4:25 and said:
10     "Can we please use the props with the timeline of events?
11     Thank you, signed forelady."  And we sent back a note that said
12     that we couldn't provide those since they were not in evidence.
13                About 11:35 this morning we received a note which I
14     will read into the record and which I provided copies to
15     counsel:  "Is there anything in evidence other than..." I think
16     they mean the "...notes that were taken by Grant at the
17     Marriott Hotel meeting between Grant and Bennett on May 17,
18     2004?"
19                I assume that there is sort of a word missing, which I
20     would guess a way to rewrite it:  Is there anything else in
21     evidence?  But I'm not saying we have to guess, but that's --
22                MR. BAROFSKY:  Another possible interpretation is that
23     the A with the little circle means about instead of at.  It may
24     mean at or it may mean about.
25                MR. ZUCKERMAN:  It doesn't make much sense if it's
```

84H9GRAF
1   about.  Then it would be the notes that were taken by Grant
2   about.
3              MR. BAROFSKY:  About the meeting.
4              THE COURT:  I think actually if we're going to do a
5   little document analysis -- I'm sorry I didn't give you copies
6   of the earlier memos because they were so -- notes, because
7   they were so ministerial.  But I will show you so that you can
8   all see it, where the parenthesis and I wrote -- and I
9   translate "and marker," it's a similar three-dot thing, so if
10  you want to look at that.
11             MR. BAROFSKY:  Judge, clearly we need some
12  clarification, I think we agree, on what they're asking for.
13             MR. ZUCKERMAN:  I don't object to clarification.  I
14  mean if your Honor wants to write a request for a little
15  additional.
16             MR. BAROFSKY:  Obviously it could apply to large
17  amounts of testimony about the meeting, depending on what
18  they're asking for.
19             THE COURT:  We don't need to battle it out.  We can
20  just ask them.
21             Should we write:  We are uncertain about the meaning
22  of your last note.  Could you please clarify your request?
23             Is that okay?
24             MR. ZUCKERMAN:  Fine.
25             MR. GOELMAN:  Your Honor, when does the Court plan on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

3081

84H9GRAF
 1  feeding them lunch?
 2          THE COURT:  I think we ordered it for 1:00.
 3          MR. BAROFSKY:  Your Honor, can we take lunch at the
 4  same time?
 5          THE COURT:  If you're assuming that they are going to
 6  eat and not work -- there must be a space in time in there that
 7  you can be excused, but just make sure we have a way to get
 8  you.
 9          See you in a few minutes.
10          (Recess pending verdict)
11          (Jury not present; time noted:  12:27).
12          THE COURT:  Let me just read the responsive note into
13  the record.  It's Court Exhibit 6:  "One of the jurors wants to
14  know if there is any other evidence entered about the substance
15  of the conversation for the meeting..." again repeated "...for
16  the meeting, at the Marriott with Tone and Phillip other than
17  Tone Grant's handwritten notes."
18          Counsel agree on a response or is there a discussion
19  about it?
20          MR. BAROFSKY:  Your Honor, I think that one of the
21  discussions that we've just had with Mr. Zuckerman is -- I
22  don't want to speak for Mr. Zuckerman.
23          MR. ZUCKERMAN:  Go ahead.
24          THE COURT:  He'll correct you if you aren't playing
25  the role properly.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

84H9GRAF

1          MR. BAROFSKY:  Its continued ambiguity on "evidence
2    entered."  Our take from this was to think that it was
3    testimonial as well as physical evidence.  Mr. Zuckerman
4    believes that "entered" means just physical exhibits or
5    documents that have been entered.
6          MR. ZUCKERMAN:  That is correct.  And to amplify only
7    briefly, I think there are some legal issues and a morass that
8    we will enter, as the Court may hear if we continue to argue,
9    about what exactly it means for the Court to search the record
10   for evidence that may relate to the substance of the meeting in
11   the form of testimony.  And you will hear, I think, a variety
12   of arguments from the government and from us about what may or
13   may not relate to the substance of the meeting in terms of the
14   inferences that are permissible for a juror to draw.
15         And we, as well, have some concerns about whether
16   that's a permissible undertaking for the Court; that is,
17   whether the Court can define for the jury what it believes to
18   be the evidence that the testimony -- the testimony that
19   relates to the substance of the meeting.
20         So, before entering that thicket, my thought was to
21   simply write another note and ask whether the evidence entered
22   that they are seeking relates to physical exhibits only or
23   whether it relates to physical exhibits and testimony.
24         If it relates to --
25         THE COURT:  Why would you think they would truly be
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3083

84H9GRAF
1    asking at this stage for physical exhibits?  In other words,
2    the government established that Mr. Bennett's secretary rented
3    this room.  But now that there is no real dispute, I don't
4    think, that the meeting occurred, it would seem a little odd to
5    me that that was really what they were focused on.  I would
6    have thought that -- I wouldn't have parsed the word "entered."
7    To me, it's:  Is there any other evidence about the substance
8    of the meeting which is in the record?
9              MR. ZUCKERMAN:  If that is --
10             THE COURT:  That's the way I would view it.
11             MR. ZUCKERMAN:  Fair enough.  I don't think that's
12   obvious.  But if that's the Court's view, then I think we're at
13   an important and awkward spot because there is a variety of
14   testimony -- there's scads of testimony that jurors could look
15   at to allow them to draw inferences about the meeting that
16   occurred and what occurred in the meeting.
17             THE COURT:  The substance of the conversation is what
18   they have asked for.
19             MR. ZUCKERMAN:  But, for example, testimony or
20   evidence regarding the nature of the notes, their preservation
21   and the like, is, in our judgment, relevant to the substance of
22   the conversation that occurred and was argued as such.
23             THE COURT:  That's argument.
24             MR. BAROFSKY:  I don't think there is any testimony
25   regarding preservation.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3084

84H9GRAF

```
 1              MR. ZUCKERMAN:  There's the subpoena.
 2              MR. BAROFSKY:  They have -- they have the physical
 3      documents back there.  That's why I think we were thinking that
 4      this had to be testimonial is because they have every exhibit.
 5              THE COURT:  Isn't really what -- finish.  It just
 6      seems to me there's one -- I think there's one obvious bit of
 7      testimony, and I assume that's what you're ultimately arguing
 8      about.
 9              MR. BAROFSKY:  We believe that --
10              MR. ZUCKERMAN:  I'll let the government make its point
11      and then we'll respond.  Why don't you go ahead.
12              MR. BAROFSKY:  Your Honor, we would point to our
13      interpretation is, would be the testimony of Earl Melamed, the
14      testimony of Sandy Maggio and the testimony of Robert Trosten.
15              THE COURT:  What did Melamed testify about what
16      happened at that meeting?  Was he there?
17              MR. BAROFSKY:  No, Judge, neither were any of these
18      three individuals.
19              THE COURT:  But the issue is what did -- I don't
20      have -- to me I assumed you were talking about the Santo Maggio
21      testimony as to whatever he said before he was going to be
22      talking about, and whatever he said afterwards that Bennett
23      told him.
24              MR. BAROFSKY:  Your Honor, I think clearly that as
25      well as Robert Trosten who has a similar conversation.
```

84H9GRAF

```
 1              THE COURT:  I can't say that I recall that but that's
 2     okay.
 3              MR. BAROFSKY:  Our recollection is that Mr. Trosten
 4     has a similar conversation when he's asked to prepare a
 5     schedule of the related party receivable.
 6              THE COURT:  That's right.
 7              MR. BAROFSKY:  I'm not looking to tilt at windmills on
 8     the Melamed piece.  I'll tell you why I suggested it, was
 9     because the numbers that are reflected in the Grant notes match
10     up with the substance of the testimony of Earl Melamed, but
11     seeing your Honor's reaction --
12              THE COURT:  I think that was a terrific argument but I
13     don't think that that's -- I do not read the note that way.  I
14     think they are talking a much more direct --
15              MR. GOELMAN:  This, I think, is one of the dangers of
16     kind of wading into this morass and deciding what testimony.
17              THE COURT:  We do this all the time, right,
18     Mr. Goelman.  This is not like the first time the jury has
19     asked for:  Is there any testimony in the record about X?
20              MR. GOELMAN:  This is the first time that I've ever
21     seen it.
22              THE COURT:  I have seen many, many times where jurors
23     say:  Can we please have the testimony of John Smith about Y or
24     about X and then you go and you try and identify what John
25     Smith said in direct and cross and you send that back.
```

3086

84H9GRAF

1            MR. GOELMAN:  I have never before seen please identify
2       for us all the evidence, and if you interpret as testimony,
3       about a particular subject matter.  I think that takes it to an
4       entirely different level and it's dangerous for the parties and
5       for the Court to substitute for the jury's recollection about
6       what is and what is not related to a particular subject matter.
7            THE COURT:  I remember my husband used -- I don't
8       remember him, he's still here -- telling me the story once
9       about when he was a prosecutor and the juror asked:  What is
10      all the testimony related to Count 9 of the indictment, and the
11      note ultimately was there is no testimony about Count 9.  So
12      this is not the first time that jurors have asked this type of
13      question; maybe in your experience, but not in my experience.
14      And I understand that lawyers fight about this; that one side
15      wants a narrower interpretation, the other side wants a broader
16      interpretation.  And you each have your own -- oh, another
17      note -- and that there is a litigated reason for the argument.
18           "We need new jury verdict forms.  Also, does the
19      foreperson sign or both?  Or can someone come in and explain
20      the form to us?"
21           That's a first.  Okay, Mr. Goelman, we have a first
22      here.  I don't have any problem getting new forms -- clean
23      forms.  We can obviously print those out.
24           We could direct them to the part of the charge which
25      has the instruction.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

3087

84H9GRAF

```
 1              MR. GOELMAN:  On the verdict form?
 2              THE COURT:  Yes.
 3              MR. GOELMAN:  Your Honor, I don't know what --
 4    obviously this changes things.
 5              THE COURT:  I really don't know what the problem is.
 6              MR. GOELMAN:  The first note that the jury sent out:
 7    Is there anything in evidence other than the notes, I doubt
 8    that the jury doesn't remember that there was testimony from
 9    cooperators about this meeting.  So when you're saying is there
10    anything in evidence other than the notes, to me that is
11    looking for a tangible paper about the meeting.  And I don't
12    see the harm in just sending back:  Are you asking for -- a
13    note saying:  Do you want testimony or do you want exhibits?
14              THE COURT:  I don't need to battle that.  We can send
15    them another note about that.
16              But the question is maybe we should call them into the
17    courtroom and let me tell them.
18              MR. BAROFSKY:  About the verdict form?
19              THE COURT:  About the verdict form.
20              MR. ZUCKERMAN:  Fine.
21              THE COURT:  Josh, before we do, just go up and make
22    some new ones.
23              MR. BAROFSKY:  Judge, can we see the most recent note
24    by any chance?
25              THE COURT:  Absolutely.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3088

84H9GRAF

```
 1              Is it all right if we call the jury in?
 2              I will ask them before we talk about the verdict form,
 3    on the earlier note whether they are looking for an exhibit or
 4    they're looking for testimony as to the substance of the
 5    conversation.
 6              MR. BAROFSKY:  Judge, what -- an alternate suggestion
 7    is that if, just to send a note back to them saying if you --
 8    go ahead.
 9              MR. GARCIA:  One way to read that note potentially,
10    and I don't have it in front of me now, but it may be just a
11    simple question of:  Does the foreperson have to sign or
12    everybody else have to sign?
13              THE COURT:  Yeah.
14              MR. GARCIA:  One suggestion.
15              THE COURT:  I give them like 14 copies of the verdict
16    form.  So my thought is that because I give them that many
17    copies that they think that they all have to sign it.  I do it
18    so that there's a piece of paper that they can all take notes
19    on essentially.  I think that's about all that this is about,
20    that question.  But I can clarify it.  I'm going to just let
21    you know what I'm going to tell them is as to the verdict form
22    the only person that signs the verdict form is the foreperson.
23    Each count you have to deal with separately.  You have to have
24    a unanimous decision on each count.  If you have not -- if you
25    have not reached a unanimous decision on each count, keep
```

84H9GRAF

1    talking.
2              MR. BAROFSKY:  Your Honor, I think Mr. Garcia's
3    suggestion might be a good one and just to send a note back to
4    them with the first part; which is just that the way to -- the
5    foreperson only needs to sign the verdict form and sort of
6    without --
7              THE COURT:  But we have the other issue of the
8    testimony versus the exhibits.
9              MR. ZUCKERMAN:  I think it's appropriate for you to
10   clarify in their presence.
11             THE COURT:  Because they asked to have someone visit
12   them.  So I'm not going to go in there because that would be
13   not right.
14             MR. EISEN:  I had a case like that once.
15             MR. BAROFSKY:  Our concern --
16             THE COURT:  What's the concern?
17             MR. BAROFSKY:  It's not really a concern, it's just
18   that if they are close to a verdict, which they would suggest,
19   it may obviate a need to respond to the note.  That's all that
20   we --
21             THE COURT:  I'm not going to -- believe me, I'm going
22   to tell them -- the first thing I'll say:  Don't tell me
23   anything about where you are in your deliberations.  Let me
24   just ask you a question, let me tell you certain things.  Okay.
25             MR. BAROFSKY:  Thank you, your Honor.

3090

84H9GRAF

```
 1                    (In open court; jury present; time noted: 12:49)
 2              THE COURT:  Sit down, everyone.  I asked you to come
 3     in, in the hopes that I can clarify by speaking to you some of
 4     the notes that you've been sending.
 5              First, one thing.  Absolutely do not say a word to me
 6     now about where you are in terms of your deliberations, not a
 7     word.  Okay.  I don't want to know any votes.  I don't want to
 8     know anything.
 9              Let me ask you first a question.  You asked in the
10     last note:  "One of the jurors wants to know if there is any
11     other evidence entered about the substance of the conversation
12     for the meeting at the Marriott with Tone and Phillip other
13     than Tone Grant's handwritten notes."
14              My question to you is:  Are you looking for other
15     testimony or are you looking for other exhibits?  Or possibly
16     both?
17              THE FOREPERSON:  I think both.
18              THE COURT:  Both.  Okay.
19              Then you had a question about the verdict forms and
20     you wanted to know if the foreperson signs -- it says "or
21     both."  I'm not sure what the "or both" is.  But let me just
22     explain to you that I give you lots of copies of the verdict
23     form just for you to keep track of your deliberations and your
24     vote.  The only person that signs the verdict form is the
25     foreperson.
```

3091
84H9GRAF

1          I want to remind you that you have to deal with each
2     count separately and that you can't return a verdict of guilty
3     or not guilty unless you are unanimous.  Unanimous means
4     everybody agrees.  And if you are not unanimous about anything
5     at this point, I tell you to just keep talking.
6          Does -- just ask does that clarify the questions about
7     the verdict form?
8          THE FOREPERSON:  Yes.
9          THE COURT:  Anybody still have a question about the
10    verdict form?
11         Okay.  So let me give you -- we made up another bunch
12    of forms.  Let me give them to you, and we'll -- and Josh for
13    some reason, some odd thing is happening on his printer that
14    there are little stars on these forms, some place, we don't
15    know why.  We put a new cartridge in and it's doing something
16    weird.  Ignore that.  Stars are irrelevant.  Just follow the
17    typewritten material.
18         So let me send you back and we'll focus on what other
19    testimonial or documentary evidence there is.
20         It's the focus, and just confirm for me, is on the
21    substance of the meeting; in other words, what was said?  Is
22    that what you mean by substance?  Okay.  Very good.  Thank you.
23         (Jury deliberations resumed; time noted:  12:54 p.m.)
24         (Continued on next page)
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3092

84H9GRAF

```
 1                (In open court)
 2                MR. BAROFSKY:  So, your Honor, we're going to look to
 3      identify the relevant portions of Maggio and Trosten's
 4      testimony about their conversations with Phil Bennett about the
 5      substance of the meeting both before and afterwards, what he
 6      planned to say and then whatever.
 7                THE COURT:  To me that seems to be what they're asking
 8      for.  Okay.  So obviously you'll try to agree and then you will
 9      Xerox with just the portions on the pages, black out the other
10      stuff.
11                MR. BAROFSKY:  We'll redact out any objections.
12                THE COURT:  Any objections, just exactly what the
13      question and answer is.
14                MR. GARCIA:  Will do.  Thank you, your Honor.
15                THE COURT:  I'll be upstairs.
16                (Recess pending verdict)
17                (In open court; jury not present; time noted:
18      2:23 p.m.)
19                THE COURT:  First, we received another note.  If I'm
20      correct, we're up to Court Exhibit 8.  And the jury has dated
21      it at 1:44.  And it says:  "Judge Buchwald, the last piece of
22      information we need is what was requested earlier.  Once we
23      obtain this information we can continue our deliberations."
24                I guess the record should reflect that the jury has
25      very recently been given the agreed-upon segments of
```

84H9GRAF
1   Mr. Maggio's testimony and the -- and been told that there's
2   more to come and that now the issue concerns Mr. Trosten's
3   testimony, and there is a dispute about page 1210, lines 8
4   through 17.
5           MR. ZUCKERMAN:  Your Honor, that was the finish of my
6   cross-examination designed to attack the credibility of
7   Mr. Trosten specifically as it related to his description of
8   these key events.
9           So, while the -- his description of the events is
10  elucidating, the fact that the events occurred approximately --
11  that he is describing in his material was used approximately
12  three days before May 20, 2004 when he stole money, the jury
13  could infer from this defendant, certainly is a circumstance
14  that allows the jury to conclude that he is not giving an
15  accurate description of the events on May 17.
16          MR. GARCIA:  Respectfully, your Honor, this piece on
17  NavTech has nothing to do with the conversation that happened
18  on May 17 or May, 2004.  NavTech wasn't discussed.  This is not
19  impeachment of Mr. Trosten's recollection of the conversation
20  that happened.  It's impeachment generally of:  Mr. Trosten is
21  not a great guy.
22          THE COURT:  There's a lot of things that might go to
23  that.  I agree on the government with that.  That was a
24  decision I reached just when I read it before hearing any
25  argument.  So do you have a copy of this ready to go without

3094

84H9GRAF

1   the six lines?
2           MR. GARCIA:  Yes, we do, your Honor.
3           MR. ZUCKERMAN:  Could I raise an unrelated point
4   that's no reflection on the Court's equipment but there is a --
5   one of the stars that appears on the jury verdict form that's
6   to go in is in the guilty box.
7           THE COURT:  Not on my copy.
8           MR. ZUCKERMAN:  It's like a bad omen.
9           THE COURT:  We didn't mean it.  You remember I did
10  tell them that it was Josh's new cartridge.
11          MR. ZUCKERMAN:  If we could erase it, I'll hand mine
12  up.
13          THE COURT:  I'll take your word for it.  I'm just
14  telling you if you look at mine, the -- it really --
15          MR. ZUCKERMAN:  Good.  On this one the star is in not
16  guilty.
17          THE COURT:  They are kind of random, and I think I did
18  explain that to them and I was glad after the -- Bernie told me
19  that someone was concerned about it down here that I had
20  explained it.  I otherwise wouldn't have thought.
21          MR. ZUCKERMAN:  Are they printed or Xeroxed, I guess?
22          THE DEPUTY CLERK:  They are Xeroxed.
23          MR. ZUCKERMAN:  So you Xeroxed them off of that?
24          THE DEPUTY CLERK:  Not the copy you have.
25          THE COURT:  I took one of the group that Josh made for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

3095

84H9GRAF

1    the jury because I actually didn't have the verdict form.
2           MR. ZUCKERMAN:  All right.
3           THE COURT:  Josh, do you want to give this to
4    Mr. Zuckerman.
5           (Recess pending verdict)
6           (In open court; jury not present)
7           THE COURT:  The last note which is timed at 2:40,
8    although the jurors apparently don't know what day it is
9    because they said it was April 19.  The note reads:  "We have
10   reached our verdict."
11          So at this time call the jury back in.
12          (Jury renders verdict; time noted:  2:52 p.m.)
13          THE COURT:  Please be seated.  We have received your
14   note that you've reached a verdict.  And we will now proceed to
15   take that verdict.  Josh.
16          THE DEPUTY CLERK:  Will the jurors please answer
17   present when your name is called.
18          (Jury roll called; all present)
19          Will the foreperson please rise.
20          Has the jury agreed upon a verdict?
21          THE FOREPERSON:  Yes.
22          THE DEPUTY CLERK:  With respect to Count 1, conspiracy
23   to commit securities fraud, wire fraud, bank fraud and/or money
24   laundering, how do you find the defendant with respect to Count
25   1?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3096

84H9GRAF

 1              THE FOREPERSON:  Guilty.
 2              THE DEPUTY CLERK:  Count 2, securities fraud.  How do
 3    you find the defendant with respect to Count 2?
 4              THE FOREPERSON:  Guilty.
 5              THE DEPUTY CLERK:  Count 3, wire fraud.  How do you
 6    find the defendant with respect to Count 3?
 7              THE FOREPERSON:  Guilty.
 8              THE DEPUTY CLERK:  Count 4, bank fraud.  How do you
 9    find the defendant with respect to Count 4?
10              THE FOREPERSON:  Guilty.
11              THE DEPUTY CLERK:  Count 5, money laundering.  How do
12    you find the defendant with respect to count five?
13              THE FOREPERSON:  Guilty.
14              THE DEPUTY CLERK:  Ladies and gentlemen of the jury,
15    listen to your verdict as it stands recorded.
16              With respect to Count 1, the defendant is found
17    guilty.
18              With respect to Count 2, the defendant is found
19    guilty.
20              With respect to Count 3, the defendant is found
21    guilty.
22              With respect to Count 4, the defendant is found
23    guilty.
24              With respect to Count 5, the defendant is found
25    guilty.

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

3097

84H9GRAF
```
 1              THE COURT:  Ladies and Gentlemen, is that your
 2   verdict?
 3              THE JURY:  Yes.
 4              THE COURT:  Is there any further request to poll the
 5   jury?
 6              MR. ZUCKERMAN:  Yes, your Honor, please poll jury.
 7              (Jury polled; each juror answered in the affirmative)
 8              THE DEPUTY CLERK:  Jury polled.  Verdict unanimous.
 9              THE COURT:  Counsel, other than my thanking the jury
10   for their service, do we need to keep them any further?
11              MR. ZUCKERMAN:  No, your Honor.
12              MR. BAROFSKY:  No, your Honor.
13              THE COURT:  Ladies and Gentlemen, when I was talking
14   to you yesterday and excusing the alternate jurors, I told you
15   then that I thank you for your service.  I never thank a jury
16   for its particular verdict.  That is always your decision.  And
17   I think -- I explained fairly clearly yesterday why it is that
18   we thank you and it's for your service and taking the time out
19   of your lives and in your case for being such a really terrific
20   jury.  We never had to wait for you in the morning, and I know
21   some of you came from quite a distance.  And you were
22   attentive.  And you worked hard.  And we very much appreciate
23   your service.  And I thank you again.  And you're excused.
24   Okay.  Thank you very much.
25              (Jury discharged)
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

3098

84H9GRAF

1          THE COURT:  Are there any applications that I should
2    be hearing?
3          MR. BAROFSKY:  No, your Honor.
4          THE COURT:  Okay.  Would someone remind me, because I
5    don't even think I know, what are Mr. Grant's bail conditions?
6          MR. GOELMAN:  He has a bond.  I forget the precise
7    amount of the bond.  I actually don't have my bail file with
8    me.  He has a bond that was entered when he was arraigned last
9    January.
10          MR. BAROFSKY:  Your Honor, we don't have any objection
11    to bail being continued.
12          THE COURT:  I'm not suggesting that you should.  I
13    just was curious as to what the bail condition.
14          MR. BAROFSKY:  Unfortunately, I don't have the file --
15    I think it was a ten million dollar bond.  Your Honor, there
16    were some cosigners and it was a ten million dollar bond, and I
17    think travel was restricted to the 48 states.  And as I said, I
18    don't think we -- we don't have any objection to being
19    continued as such.
20          THE COURT:  Other than setting a sentencing date, is
21    there anything else we need to do?
22          MR. ZUCKERMAN:  No, your Honor.
23          THE COURT:  What about July 23?
24          MR. BAROFSKY:  Your Honor, I'm going to be away.  If
25    we do it the following week, I'll be around.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3099

84H9GRAF

```
 1              THE COURT:  I'm hoping not to be here the following
 2  week.
 3              Is August 13 consistent with everyone's prior
 4  schedule?
 5              MR. ZUCKERMAN:  I don't have a calendar.  I'm sorry.
 6  I think it is.  Mr. Eisen says he is not going to be here.
 7              MR. BAROFSKY:  Nor is Mr. Garcia.
 8              THE COURT:  Before I do the more elaborate version of
 9  the schedule, August 7, does that work?
10              MR. BAROFSKY:  Fine for the government.
11              MR. ZUCKERMAN:  I think so, your Honor.
12              THE COURT:  I assume you're coming up from Washington
13  that morning.  Is something like 11:30 a good time?
14              MR. ZUCKERMAN:  I'm sure we'll come up the night
15  before.
16              THE COURT:  I don't think I have anything on that day
17  at this point.  So I'm just trying to get.
18              MR. ZUCKERMAN:  My sense is that, to allow for the
19  fullness of the proceeding, either the early afternoon or the
20  midmorning so that we have a fair amount of time.
21              THE COURT:  You've already learned that I work through
22  lunch.  Put it down for August 7 at 10:45.
23              MR. ZUCKERMAN:  Fine.
24              MR. BAROFSKY:  Fine, your Honor.
25              THE COURT:  I would like the defense submissions no
```

3100

84H9GRAF

1  later than July 18 in hand in chambers, and the government's
2  submission by July 31 in hand in chambers.  Okay.  I think
3  that's it.  Okay.
4           MR. BAROFSKY:  Thank you, your Honor.
5           MR. GARCIA:  Thank you, your Honor.
6           MR. ZUCKERMAN:  Thank you, your Honor.
7           (Adjourned)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Andrew E. Tomback (AT 9644)
Kylie Davidson (KD 0502)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005
(212) 530-5000
*Counsel for Plaintiff Marc S. Kirschner,*
*as Trustee for the Refco Litigation Trust*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARC S. KIRSCHNER,
as Trustee of the Refco Litigation Trust,

                Plaintiff,

        - against -

THOMAS H. LEE PARTNERS, L.P.;
THOMAS H. LEE ADVISORS, LLC; THL
MANAGERS V, LLC; THL EQUITY
ADVISORS V, L.P.; THOMAS H. LEE
EQUITY FUND V, L.P.; THOMAS H. LEE
PARALLEL FUND V, L.P.; THOMAS H.
LEE EQUITY (CAYMAN) FUND V, L.P.;
THOMAS H. LEE INVESTORS LIMITED
PARTNERSHIP; 1997 THOMAS H. LEE
NOMINEE TRUST; THOMAS H. LEE;
DAVID V. HARKINS; SCOTT L. JAECKEL;
and SCOTT A. SCHOEN,

                Defendants.

No. 07 CIV.  _____

**COMPLAINT**

JURY TRIAL DEMANDED

07 CIV 7074

## COMPLAINT

Plaintiff Marc S. Kirschner (the "Trustee" or "Plaintiff"), as Court-approved Trustee for the Refco Litigation Trust (the "Trust"),[1] brings this action based on information and belief against the following defendants:

- Defendants Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors, LLC, THL Managers V, LLC, THL Equity Advisors V, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust; and

- Thomas H. Lee ("Lee"), David Harkins ("Harkins"), Scott Jaeckel ("Jaeckel"), and Scott Schoen ("Schoen") (collectively, the "THL Directors").

These defendants collectively are referred to herein as "THL" or the "THL Defendants."

Such information and belief is based on the investigation of the Trustee and his counsel and the review of, among other things, (a) filings of Refco Inc. (collectively, with its direct and indirect subsidiaries, "Refco" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) filings, documents, and testimony obtained in connection with Refco's chapter 11 case, including but not limited to documents and testimony obtained in connection with investigations conducted pursuant to Bankruptcy Rule 2004; (c) interviews with current and former employees of Refco; (d) the final report of the Court-appointed Independent Examiner in the bankruptcy cases, and interviews of persons conducted in connection with the preparation of that report; (e) indictments filed in a criminal case against several former Refco executives; and (f) other relevant public documents. Plaintiff believes that

---

[1]     The Trust is the duly authorized representative to commence all claims and causes of action formerly owned by the bankruptcy estates of Refco Inc. and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries, as approved by the United States Bankruptcy Court for the Southern District of New York on December 15, 2006 (the "Plan").

substantial evidentiary support exists for the allegations set forth herein and that after a reasonable opportunity for discovery in this action significant additional evidence will be uncovered.

## STATEMENT OF THE CASE

1.      Refco's collapse and resulting bankruptcy in October 2005 was one of the worst financial disasters ever to befall the securities industry, leaving Refco's creditors and customers owed billions of dollars.  Only two months earlier, in August 2005, under the majority ownership and control of the THL Defendants, Refco had completed a seemingly successful initial public offering (the "IPO").  Through that offering, the THL Defendants pocketed over $162.5 million through their own sales of Refco stock to the public, while at the same time exposing Refco to hundreds of millions of dollars in liabilities to the purchasers of Refco shares who bought shares in reliance on fraudulent financial statements and other misleading representations.

2.      From outward appearances, the THL Defendants were the toast of the financial community, having made a huge score by buying control of Refco in August 2004, purportedly using their much-touted financial acumen and experience to ready Refco for a successful IPO, and then reaping substantial profits from that IPO only twelve months later.

3.      As the THL Defendants knew, but Refco's customers and creditors did not, appearances were deceiving.  Through their control and ownership of Refco, the THL Defendants had become aware of severe problems with Refco, its management, and its accounting.  By the time of the IPO, the THL Defendants knew that certain top executives and managers at Refco were dishonest, and that Refco had unreliable financial statements and a disturbing lack of internal and external accounting controls.

2

4.      As Refco's majority shareholder, with responsibilities pursuant to a lucrative Management Agreement between a THL entity and Refco (the "Management Agreement"), as well as the power to control Refco through board dominance and other means discussed below, THL owed fiduciary duties to Refco. Likewise, while they served on Refco's board, the THL Directors owed similar fiduciary duties to the company. Those fiduciary duties required the THL Defendants to act in Refco's best interest and not just their own interests.

5.      The story of THL's misconduct is one of greed and a failure of integrity. To date, THL has sought to portray itself as a victim that was deceived and defrauded by certain members of Refco's management. However, the THL Defendants have hidden from public view their extensive knowledge of the serious problems at Refco during the period that the THL Defendants were in control.

6.      By the time of the IPO, the THL Defendants were well aware that Refco's existing management was dishonest and had lied to THL and others at the time of the THL Defendants' investment in Refco. They learned that certain members of Refco's management had deceived the THL Defendants about management's own historical compensation. And even more significantly, they learned that certain members of Refco's management had withheld from the THL Defendants a highly critical "management letter" that Refco's outside auditor, Grant Thornton LLP ("Grant Thornton"), had provided to Refco management.

7.      After assuming control of Refco, through the receipt of that letter and other means, the THL Defendants learned that Refco's financial function was in shambles, that its internal accounting and external auditing functions were ineffective, and that Refco was in no condition to be a public company. In private emails, a number of the THL Defendants openly discussed that Refco would be better off hiring a Big Four accounting firm to replace Grant

3

Thornton, which the THL Defendants recognized was not providing the type of auditing services that could be provided by a Big Four firm.

8.    One of the THL Defendants acknowledged in an email that, were Refco to fix its systems and switch to a Big Four firm, Refco might well require a restatement of its financial statements as part of a re-audit.  In other words, prior to taking Refco public the THL Defendants openly discussed the fact that Refco's financial statements could well be materially false and in need of correction, but they forged ahead anyway.

9.    Rather than fix the problems at Refco, the THL Defendants made a conscious choice to bury those problems.  Instead of doing things correctly and in accordance with Refco's best interests, the THL Defendants operated Refco with the singular goal of getting a payday for themselves as quickly as possible.  Notwithstanding the THL Defendants' fiduciary duties to Refco, the THL Defendants focused all of their energies and resources on accomplishing an IPO to benefit themselves, and in the process, did nothing to fix the many problems that should have been apparent to the THL Defendants based on their control of Refco.

10.    To date, THL has been able to obtain the $162.5 million in proceeds from its Refco stock sales, along with another approximately $113 million that the THL Defendants siphoned out of Refco.  THL obtained those $275 million in proceeds even though THL's own breaches of fiduciary duties to Refco resulted in Refco's incurrence of hundreds of millions of dollars in additional liabilities.

11.    The motive for the THL Defendants' actions was entirely selfish.  Aside from the pursuit of cash, the THL Defendants were readying themselves to raise a new multi-billion dollar private equity fund with which to grow their business.  The THL Defendants' ability to mark their Refco investment to market at a significant profit through a seemingly

4

successful IPO was a critical ingredient in the THL Defendants' plan to create a favorable track record for marketing purposes.

12.    As fiduciaries, the THL Defendants had a duty to put Refco's interests ahead of their own. Faced with their need for a substantial payday, however, the THL Defendants chose to pursue their own interests and line their own pockets.

13.    In this action, Plaintiff seeks to recover the damages the THL Defendants caused Plaintiff to suffer as a result of their multiple breaches of fiduciary duties. In addition to compensatory damages, Plaintiff also seeks disgorgement by the THL Defendants of the $162.5 million in proceeds that they received by causing Refco to go public in August 2005. And Plaintiff seeks to recover fraudulent transfers totaling approximately $113 million in payments made by Refco entities to the THL Defendants.

## JURISDICTION AND VENUE

14.    On October 17, 2005, the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"). The Debtors' Plan was confirmed on December 15, 2006 by the United States Bankruptcy Court for the Southern District of New York.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. Many of the acts and transactions alleged herein occurred in substantial part in this District. Additionally, Thomas H. Lee Partners, L.P., as well as many of its subsidiaries, and each of the THL Directors, filed proofs of claim in this District related to their involvement with Refco.[2] By doing so, THL submitted itself to the jurisdiction of this Court.

---

[2]    The entities and persons filing proofs of claim include Thomas H. Lee Partners, L.P., THL Equity Advisors V, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership,

5

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, among other things, Plaintiff was appointed as Trustee in this District; Refco is, and was, headquartered in this District; and many of the acts and transactions alleged herein occurred in substantial part in this District.

## PARTIES

### A.    Plaintiff

17.    <u>Trustee</u>.  Plaintiff Marc S. Kirschner is the Court-approved Trustee of the Trust, which was established in connection with the Plan.  The Trustee is the duly authorized representative to commence all claims and causes of action formerly owned by the Debtors. Plaintiff brings this action on behalf of, among other Refco entities, Refco Group Ltd., LLC; New Refco Group Ltd., LLC; and Refco Inc.

### B.    Certain Refco Entities

18.    <u>Refco Group Ltd., LLC</u>.  Refco Group Ltd., LLC ("<u>RGL</u>") was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RGL filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

19.    <u>New Refco Group Ltd., LLC</u>.  New Refco Group Ltd., LLC ("<u>New Refco</u>") was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  New Refco filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

20.    <u>Refco Inc.</u>  Refco Inc., the corporate parent of both RGL and Refco Capital Markets Ltd., was organized under the laws of Delaware, with its principal place of

_____

the 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York,

10281. Refco Inc. filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on

October 17, 2005. Prior to its bankruptcy filing, Refco Inc. was a publicly traded holding

company that, through its subsidiaries, provided securities brokerage, execution and clearing

services for exchange-trade derivatives, and prime brokerage services in the fixed income and

foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005

Initial Public Offering ("IPO"), and was the issuer of the stock sold pursuant to the IPO.

21. Refco Capital LLC. Refco Capital LLC ("RCC"), a wholly owned

subsidiary of RGL, was organized under the law of Delaware, with its principal place of business

at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.

RCC filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17,

2005.

22. Refco Global Finance Ltd. Refco Global Finance Ltd. ("RGF"), a wholly

owned subsidiary of RGL, was organized under the law of Delaware, with its principal place of

business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York,

10281. RGF filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on

October 17, 2005.

23. Refco Capital Markets Ltd. Refco Capital Markets Ltd. ("RCM") was a

company organized and existed under the laws of Bermuda. At all relevant times, RCM had its

principal place of business at 200 Liberty Street, Tower A, New York, New York, 10281. RCM

filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

RCM was a securities broker and foreign exchange broker and one of the three principal

operating subsidiaries of Refco.

24.    <u>Refco Securities, LLC</u>.  Refco Securities, LLC ("<u>RSL</u>"), a wholly owned subsidiary of RGL, was a Delaware limited liability company and registered broker-dealer with its principal place of business at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281.

25.    <u>Refco LLC</u>.  Refco LLC, a wholly owned subsidiary of RGL, was a Delaware limited liability company and registered broker-dealer with its principal place of business at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281. Refco LLC was a registered Futures Commission Merchant.

26.    Set out below is an organizational chart of Refco demonstrating the relationships of the relevant Refco entities:



C.    **Defendants**

27.    <u>Thomas H. Lee Partners, L.P.</u>  Thomas H. Lee Partners, L.P. ("<u>THLP</u>"), a Delaware limited partnership, is a private equity investment firm headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management.  THLP's business focuses on the acquisition of substantial equity stakes in mid-to-large capitalization companies.

28.    THLP describes itself as "one of the oldest and most successful private

equity investment firms in the United States."  Since its founding in 1974, THLP has represented

itself as a preeminent and highly sophisticated growth buyout firm.  THLP has invested

approximately $12 billion of equity capital in more than 100 businesses with an aggregate

purchase price of more than $100 billion.  THLP holds itself out to the financial community as

extraordinarily sophisticated in business and financial matters.  The firm currently manages

approximately $20 billion of committed capital.  Notable transactions sponsored by THLP

include Dunkin Brands, Nielsen, Michael Foods, Houghton Mifflin Company, Fisher Scientific,

Experian, TransWestern, Snapple Beverage, and ProSiebenSat1 Media.

29.    In June 2004, THLP and its affiliates purchased a controlling 57% equity

stake in Refco for approximately $507 million.  As a result, THLP held a majority stake in Refco

and had de facto control over its operations.  As detailed below, in addition to having voting

control over Refco, THLP and related THL entities had a variety of contractual rights that

provided them with additional control over, and access to information about, Refco's affairs.

The THL entities involved with Refco include:

- Thomas H. Lee Equity Advisors V, L.P. ("Equity Advisors V"), a Delaware limited partnership owned and controlled by THLP with its principal office in Boston, Massachusetts;

- THL Managers V, LLC ("Managers V"), a Delaware limited liability company with its principal office in Boston, Massachusetts of which at all times THLP was the managing and controlling member;

- Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., each a Delaware limited partnership with its principal office in Boston, Massachusetts owned and controlled by Equity Advisors V and Managers V;

- Thomas H. Lee Equity (Cayman) Fund V, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, owned and controlled by Managers V and Equity Advisors V (registered in the Cayman islands as a foreign company) (together with Thomas H. Lee

9

Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., the "Fund
V Entities");

- Thomas H. Lee Advisors, LLC ("THL Advisors"), a Delaware limited
  liability company with its principal office in Boston, Massachusetts, and
  general partner of THLP;

- Thomas H. Lee Investors Limited Partnership, a Massachusetts limited
  partnership controlled by Thomas H. Lee; and

- The 1997 Thomas H. Lee Nominee Trust, a trust over which Thomas H.
  Lee has voting and investment control.

30.    THLP, THL Advisors, Managers V, Equity Advisors V, Fund V Entities,

Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are

collectively referred to herein as the "THL Entities." As discussed in more detail below, the

THL Entities always acted in concert. They owned a majority stake in Refco from the date of

THL's leveraged buyout of Refco (the "LBO") until Refco's IPO. Additionally, from the date of

the LBO until Refco's bankruptcy filing, the THL Entities controlled and directed Refco and

exercised discretion over its affairs.

31.    THL held their interests in Refco through the Fund V Entities.

32.    Thomas H. Lee.  Thomas H. Lee ("Lee") was at all relevant times

subsequent to the LBO a director of Refco. Lee founded the Thomas H. Lee Company, the

predecessor of THLP, in 1974 and served as its Chairman and CEO from its inception until

reportedly leaving that entity after October 2005. As a director of Refco and as Chairman and

CEO of THLP, Lee was actively involved in the decision to invest in Refco and in THLP's

subsequent monitoring of its investment.

33.    David V. Harkins.  David V. Harkins ("Harkins") was at all relevant times

subsequent to the LBO a director of Refco. Harkins also served on Refco's nominating and

governance committee. Harkins is Vice Chairman and Managing Director of Private Equity

Funds of THLP, and has also served as President of THLP.  As a director of Refco and as Chairman and a top executive at THLP, Harkins was actively involved in the decision to invest in Refco and THLP's subsequent monitoring of its investment.

34.    Scott L. Jaeckel.  Scott L. Jaeckel ("Jaeckel") was at all relevant times subsequent to the LBO a director of Refco.  Jaeckel also served as treasurer of New Refco, treasurer of Refco Finance Holdings, LLC, and treasurer of Refco Finance Inc., a co-offeror in Refco's Bond Offering of May 2004.  Jaeckel is a Managing Director of THLP.  Jaeckel previously served as Vice President of THLP from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001.  Jaeckel holds an M.B.A from Harvard University and his extensive experience in corporate finance includes previous employment in the Corporate Finance Department of Morgan Stanley & Co.  As a director and officer of Refco and a top executive at THLP, Jaeckel was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment.  Jaeckel also attended meetings of the audit committee of Refco's Board of Managers.

35.    Scott A. Schoen.  Scott A. Schoen ("Schoen") was at all relevant times after the LBO a director of Refco.  Schoen served as president of New Refco; president of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of May 2004; and sole director of Refco Finance, Inc.  Schoen also served on Refco's nominating and governance committee as well as its compensation committee.  Schoen joined THLP in 1986 and currently serves as its Co-President.  He previously served as a Managing Director of THLP from 1992 to 2004 and as Vice President from 1988 to 1992.  Schoen received an M.B.A. and law degree from Harvard University and, prior to joining THL, was in the private finance department of Goldman, Sachs & Co.  As a director and officer of Refco and a top executive at THLP, Schoen was actively

involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment.

> **D.      The THL Entities' Control Over Refco**

36.      As noted, from the date of the LBO in August 2004 until Refco's IPO in August 2005, the THL Entities and their affiliates owned a majority stake (approximately 57%) of Refco and exercised control over Refco.  From the date of the IPO until Refco's bankruptcy filing, the THL Entities and their affiliates owned approximately 42.7% of Refco and continued to exercise control over the company.  The THL Entities controlled RGL and New Refco as of the LBO and through the date of their bankruptcy filings, and they controlled Refco Inc. as of the date of Refco's reincorporation (discussed below) at the latest and through the date of its bankruptcy filing.

37.      The THL Directors owed fiduciary duties to RGL and New Refco at least as of August 5, 2004, the date of the LBO, when they were made directors of New Refco and when RGL's corporate documents were amended so as to give New Refco (and the THL Directors) complete control over all of RGL's actions.  The THL Directors owed fiduciary duties to Refco Inc. as of August 1, 2005, at the latest, when they were installed on its board.

38.      The basis for and evidence of the THL Entities' control over RGL, New Refco, and Refco Inc., at the times set forth above includes the following:

- The THL Entities owned a majority or a controlling interest in Refco during these periods, and the THL Entities at all times acted as one with respect to their interests;

- In addition to voting control, the THL Entities had various contractual rights providing them with additional control over, and access to information about, Refco's affairs — including, but not limited to, the Management Agreement;

- The THL Entities had the right to appoint 4 of 8 directors of New Refco, as well as a joint right with another shareholder to appoint a fifth director;

- The THL Entities had the right to appoint 3 of 8 directors of Refco Inc., as well as a joint right with another shareholder to appoint a fourth director;

- The THL Entities exercised these rights by installing their own executives on New Refco's and Refco Inc.'s boards and by ensuring that the THL Directors would and did vote as one block in the THL Entities' interests;

- The THL Entities had the right to "reasonable representation" on the key committees of New Refco's boards, including its audit committee, nominating and governance committee, and compensation committee, and it designated certain of the THL Directors to sit on these committees and take part in their review of information and decision making on behalf of the THL Entities;

- Members of the THL Entities had entered into a Management Agreement with New Refco in August 2004, which agreement specifically obligated Managers V to know and understand Refco's business so that it and the THL Entities could provide management and advisory services to Refco in connection with Refco's business operations and the execution of its "strategic plan";

- The Offering Memorandum for Refco's bonds, issued as part of the LBO, indicated that the THL Entities would "have the ability to control all aspects of [Refco's] business" as a result of the LBO;

- Refco characterized itself as a "controlled company" under New York Stock Exchange Rules following Refco's IPO due to the substantial stock holdings of the THL Entities and Refco's other major shareholder;

- In addition to the involvement of the THL Directors in Refco's management, THL also made other employees of THL Entities who were not directors available to work on Refco's oversight, and certain THL executives became officers of New Refco: Schoen, Jaeckel, and George Taylor became President, Treasurer, and Secretary, respectively;

- The Securityholders Agreement entered into between certain THL Entities and New Refco effectively conferred on the THL Entities veto power over a wide range of corporate activities, including the right to merge or sell any of Refco's assets or to effect a public offering — both through a requirement of gaining the vote of 65% of New Refco's outstanding shares to take a number of important actions, and through a requirement of board approval for a wide range of corporate activities; and

- The THL Entities had and exercised the authority on behalf of Refco to sign material documents and SEC filings.

13

39.    As a result of the foregoing, the THL Entities were able to and did exercise control over the business affairs of RGL, New Refco, and Refco Inc.  In recognition of this fact, Federal District Court Judge Gerard Lynch recently denied the THL Entities' motion to dismiss claims alleging control person liability under section 15 of the Securities Act and section 20 of the Securities and Exchange Act.[3]

## FACTUAL BACKGROUND

**A.    Refco**

### 1.    Refco's Business

40.    RGL was a holding company whose direct and indirect subsidiaries were, among other things, providers of execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and foreign exchange markets.  In 2004, the Refco businesses were the largest provider of customer transaction volume to the Chicago Mercantile Exchange, the largest derivatives exchange in the United States.  Refco serviced more than 200,000 accounts from over twenty locations in over ten countries.

41.    On or around August 5, 2004, when THL consummated its Refco LBO, New Refco became the successor parent holding company of the Refco business.

42.    Refco Inc. was formed in connection with Refco's August 2005 IPO, after which 42.7% of Refco Inc.'s stock was owned by the THL Entities and its affiliates; 33.8% was owned directly and indirectly by Phillip Bennett ("Bennett"), then Refco's President and CEO; 2.7% was owned by Refco's management and other related persons; and 20.8% was owned by public investors.

---

[3]    *In re Refco Inc. Sec. Litig.*, No. 05 Civ. 8626, slip op. at 41, 82, 2007 U.S. Dist. LEXIS 31969 (S.D.N.Y., April 30, 2007).

43.    Bennett was President, CEO, and Chairman of RGL from 1998 and later also served in those roles for New Refco and Refco Inc. Bennett was forced to take a leave of absence from Refco on October 10, 2005, the day that Refco announced the existence of a previously undisclosed multi-hundred-million-dollar related-party receivable on Refco's books.

44.    Tone Grant ("Grant") was CEO of RGL until 1998, when Bennett succeeded him. Grant also co-owned a majority of RGL together with Bennett until August 2004.

45.    Robert Trosten ("Trosten") was Executive Vice President and CFO of RGL from 2001 until his resignation in October 2004.

46.    On October 17, 2005, Refco and a number of its wholly owned subsidiaries were forced into bankruptcy and eventual dissolution as a direct and foreseeable result of a massive, financial fraud perpetrated over the course of at least eight years by Bennett with the aid and assistance of various co-conspirators, including former Refco owners (Grant and Thomas Dittmer), former Refco executives (Santo Maggio and Trosten), and others (collectively, the "Bennett Co-Conspirators"). Bennett, Grant, and Trosten have been indicted and currently await trial on related criminal charges.

**B.    Leveraged Buyout**

**1.    THL Undertakes Due Diligence**

47.    THL was contacted by Credit Suisse First Boston ("CSFB") in October 2003 regarding an investment opportunity in Refco. At this early stage, THL already viewed Refco as a candidate for a THL-led IPO. THL analyzed Refco to determine whether it could make a substantial investment in Refco and then quickly turn around and sell Refco or its equity to a third party or the public.

48.     THL expressed its interest in purchasing Refco, and received a detailed "Confidential Information Memorandum" prepared by CSFB.  By mid-November 2003, THL was in talks with CSFB regarding THL's intent to submit an indication of its interest to acquire Refco.

49.     In connection with its leveraged buyout of Refco, THL undertook due diligence.  THL was tantalized by the prospect of a successful IPO of Refco that would result in significant profits to THL and its affiliates.  Although THL's diligence put it on notice of a number of issues requiring additional investigation prior to any IPO, THL did not conduct the type of follow-up that in many cases would have revealed significant problems at Refco.

50.     THL hired outside professionals to assist in its due diligence as it prepared to acquire Refco.  These professionals included Weil, Gotshal & Manges LLP ("Weil"), THL's main outside legal counsel, to conduct legal due diligence; KPMG, to review Refco's financial statements; and McKinsey & Co., which analyzed financial market structures and trends.

51.     After the consummation of the LBO, Refco (not THL) paid the $9.6 million in professional fees generated by these due diligence efforts.  Had THL determined not to go forward with the LBO, it would have been required to pay those professional fees with its own funds.

## 2.     Due Diligence Put THL On Notice That Refco Had Management Problems

52.     If THL had undertaken a thorough and complete review of Refco's operations, it would, undoubtedly, have been on notice of the true state of Refco's problematic financial situation.  As Federal District Court Judge Gerard Lynch recently stated in a related

proceeding, the problems at Refco were "glaringly suggestive of fraud . . . . [T]here was certainly a monster under the bed . . . ."[4]

### a.    Management Thwarts THL's Knowledge Of Management's Misconduct

53.    Throughout its diligence, THL knew that its professionals repeatedly were stonewalled when they tried to obtain key information from the Bennett Co-Conspirators.

54.    In March 2004, KPMG reported to THL on at least three separate occasions regarding roadblocks in KPMG's diligence effort thrown up by the Bennett Co-Conspirators.  KPMG reported the following to THL:

- The Bennett Co-Conspirators had not provided KPMG with key financial information, including information regarding the nature of receivables owed to Refco;

- Rob Trosten, RGL's CFO, was unwilling to provide data underlying certain of Refco's financial figures; and

- KPMG attempted to engage some of the Bennett Co-Conspirators in an in-depth discussion regarding the company's financial information, but those persons restricted the conversation to anecdotal, high-level information.

55.    Initially, THL grew so frustrated with the Bennett Co-Conspirators that it called off its due diligence.  A THL memo dated March 29, 2004 made the point clearly: "we have been disappointed by management's ability to answer diligence questions and respond to data requests."  On March 24, 2004,  THL's Jaeckel emailed KPMG: "please do not spend time & $ on Refco until further notice – we are struggling on diligence."

56.    Nevertheless, THL determined to move ahead with its acquisition, with full knowledge that it could not expect cooperation or candor from the Bennett Co-Conspirators.

---

[4]    *In re Refco Inc. Sec. Litig.*, No. 05 Civ. 8626, slip op. at 57, 2007 U.S. Dist. LEXIS 31969 (S.D.N.Y., April 30, 2007).

### b.    THL's Ignorance Of Related-Party Receivables

57.    THL also failed to insist upon competent documentation of related-party

receivable balances at Refco during its due diligence.

58.    On April 16, 2004 — barely three weeks after it called off its due

diligence before restarting — THL sent a letter confirming its proposal to purchase Refco and

discussing the structure for a "Potential Future Initial Public Offering" for Refco, (the "Proposal

Letter").

59.    The Proposal Letter shows THL's knowledge of related-party receivables

held by Refco Group Holdings, Inc. ("RGHI") and BAWAG[5] at Refco and the significance of

those receivables to Refco's future.  The following were given as preconditions to THL's

purchase of Refco:

> [A]ny existing shareholder loans will be terminated prior to Closing and funded
> with cash otherwise payable to the Sellers [RGHI and BAWAG Overseas], and all
> existing agreements, contracts or arrangements between the Company and the
> Sellers or their affiliates will be terminated . . . .  [T]he Company may distribute
> the $120 million amount that was accrued for distribution as of February 29,
> 2004, provided, however, that no more than $12 million of such distribution will
> be in cash and the remainder will be made solely through the reduction of
> amounts payable to the Company from Sellers [i.e., related-party receivables held
> by RGHI].

60.    On May 17, 2004, KPMG issued a draft report to THL summarizing its

due diligence findings.  In the section titled "Receivables: risk concentration," the report stated

as follows: "Loans at February 28, 2003 included $105 million of receivables from members,

affiliated companies and related parties."  Reflecting KPMG's limited access to information, its

---

[5]    BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse AG
("BAWAG") was at this time the owner of a reported 10% stake in Refco through its subsidiary
BAWAG Overseas Inc.

report provided no analysis of the makeup of this $105 million or any explanation of how the receivable grew so large.

61.    Had THL followed up regarding related-party receivables, it would have uncovered the fraud within Refco and would not have allowed Refco to incur hundreds of millions of dollars in additional liabilities it could not afford.

        **c.    THL's Knowledge Of Regulatory And Legal Problems**

62.    Refco had a highly publicized history of serious regulatory and legal problems, including repeated fines imposed by the Commodity Futures Trading Commission ("CFTC"), among other regulators.  Refco paid millions of dollars to the CFTC as penalties for Refco's improper pooling of and misuse of customer funds.

63.    This checkered past was well known within THL prior to the LBO.  In a March 12, 2004 email, Jaeckel informed THL executives that Refco was a company that played "fast and loose [with] compliance issues."  Likewise, in a May 31, 2004 email, THL's Schoen commented on Refco's history in an email to THL colleagues and a Weil attorney by saying "the old operation [Refco] was in fact fined heavily for activities such as *mixing with client funds* and parceling winnings out selectively between Refco and clients . . . ."

64.    Another internal THL email in March 2004 informed Schoen that Lee had spoken to Arthur Levitt, former head of the SEC, regarding THL's impending acquisition of Refco.  The email stated:  "Arthur [Levitt] said it (Refco) had been known as a 'pump and dump' operation."

65.    THL knew that disciplinary actions brought by Refco's regulators ensnared even the most senior Refco executives, including one of the Bennett Co-Conspirators.  For example, the SEC investigated Refco and Santo Maggio ("Maggio"), President and CEO of

RSL, in connection with an investigation into inappropriate short selling of stock in the Sedona Corporation.

66.    In July 2005, RGL publicly announced that one of Refco's top executives, Maggio, was near a settlement with the SEC which would result in his 1-year suspension from any supervisory duties as a result of his role in the Sedona manipulation. RGL also noted the likelihood of a "substantial civil penalty," for which it had set aside $5 million.

67.    THL also knew that Refco had a history of nondisclosure of uncollectible losses incurred by its customers. One such instance came to light in litigation related to Eastern Trading Company ("Eastern"), a client of what was then Refco Inc. (and later Refco LLC). In the late 1990s, Eastern experienced large trading losses that resulted in a shortfall of $28 million in its account at Refco. During Refco's lawsuit to recover this sum, Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit said: "for reasons having to do with reporting requirements imposed by the commodities exchanges, Refco [Inc.] did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate [RCC] . . . ."[6]

68.    THL did little or nothing to investigate the circumstances relating to Refco's concealment of the debit in its customers' account or the affiliate loan that was used to effect the concealment. As discussed below, the Bennett Co-Conspirators' concealment of customer losses continued during THL's period of majority ownership of Refco and it was the public disclosure of such concealment that precipitated Refco's bankruptcy.

---

[6]    *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 626 (7th Cir. 2000).

69.     These and other well known legal and regulatory problems put THL on notice of Refco's checkered past.  Once it owned Refco, however, THL failed to ensure that Refco had remedied the deficiencies that caused its serious and widespread previous violations.

**d.     THL Ignores Professionals' Requests For Key Information**

70.     THL's due diligence professionals repeatedly warned THL that they were not receiving the information necessary to conduct competent due diligence.  THL repeatedly ignored many of those requests.

71.     On May 10, 2004, Ram Menon of KPMG emailed Jaeckel, George Taylor ("Taylor"), a Vice President at THLP, and Max Strasburg ("Strasburg"), an analyst at THLP, alerting them to additional due diligence difficulties.  Menon's email attached a document summarizing KPMG's discussion with Mark Ramler of Grant Thornton, Refco's outside auditor.  This document indicated that Grant Thornton had not provided KPMG with working papers regarding "credit risk loss reserves," among other things.

72.     KPMG also informed THL of the Bennett Co-Conspirators' questionable tax treatment of the liquidation of the former Refco, Inc. into its successor Refco LLC.  KPMG stated: "We have requested the [relevant documents] in case they describe the basis for management's opinion that no gain was recognized as a result of the conversion. . . .  We have not received this information."

73.     KPMG further informed THL that Grant Thornton "did not provide us with access to their audit planning memoranda, work programs, test work papers, schedule of audit adjustments and audit conclusion memoranda. . . .  [Grant Thornton's] audit conclusions on the fair value or [*sic*] [Refco's] proprietary investments were not also made available."

e.    **THL Never Obtains Documentation Regarding RGHI**

74.    THL knew that the Bennett Co-Conspirators refused to provide key corporate documents regarding the relationship between Refco and Bennett's holding company, RGHI. THL's due diligence professionals repeatedly stressed the need for such documents.

75.    A document titled "Open Diligence Issues" dated February 26, 2004 and prepared by Weil listed RGHI's organizational documents as an "open item." The document also listed this troubling "Open Question": "Relationship of P. Bennett and T. Grant to entities owning Refco Group Ltd., LLC."

76.    Similarly, a May 13, 2004 Weil memo titled "Outstanding Legal Due Diligence Items" stated that Weil still needed to obtain "Voting agreements, stockholders agreements or any other material agreements relating to the relationships between RGHI, Refco Group Holdings LLC, BAWAG Overseas, Inc. and Refco Group Ltd., LLC."

77.    Notwithstanding these open issues, and the myriad unanswered questions, THL pushed forward without ever receiving these key materials regarding the relationship between Refco and its owners.

f.    **THL Learns Of Facts Hidden By Certain Members Of Refco's Management**

78.    As noted, THL was fully aware that it could not expect candor from the Bennett Co-Conspirators. This proved especially true late in THL's due diligence process, when it learned that the Bennett Co-Conspirators had repeatedly failed to be forthright with THL.

79.    Shortly before the LBO, THL learned that a Refco executive had attempted to hide from THL a significant legal obligation that Refco may have owed to Edward McElwreath, who demanded a commission for introducing Refco to THL. By letters dated May 6, 2004, McElwreath's attorney made his demand known to Bennett and to THL's Schoen. The

letter to THL stated that Peter McCarthy, Executive Vice President of RSL, had suggested that McElwreath wait until the close of the THL LBO to make his demand, in order to "keep the contract's existence from [Thomas H. Lee Partners]." This surprising and worrisome disclosure did not deter THL from going forward.

80.     THL also was aware that the Bennett Co-Conspirators had failed to share key information regarding a litigation between Tradewinds Financial and RSL.  On or around June 17, 2004, just six weeks before the LBO, a jury in New York returned a verdict in favor of Tradewinds and against Refco.  Tradewinds had sued Refco for $45 million.  Although THL had been generally aware of a litigation involving Tradewinds and Refco, THL was not told by the Bennett Co-Conspirators that the matter either was on the verge of trial or that the trial had been lost.

81.     After THL and/or Weil raised their concern about the Bennett Co-Conspirators' failure to voluntarily disclose the current status of the Tradewinds litigation, Schoen discussed this topic with Bennett.  On June 19, 2004, Schoen sent an email to THL executives and Jay Tabor, an attorney at Weil, stating:

> Phil [Bennett] and I spoke for about an hour.  He obviously went to great lengths to try to reassure me that there was no deliberate attempt on Dennis [Klejna's (Refco's General Counsel)] part to mislead us.  I focused on the need to have the kind of open communication and transparency that we need as partners, and that he and we need as Directors on an ongoing basis.  I referred to the discussion on the SEC matter [Sedona] as a similar experience, and he understood exactly what I was talking about.  While I do not have satisfaction as to how this miscommunication/misunderstanding occurred, we have at least raised the bar on disclosure.  Phil also understands that this cuts at our credibility with the lenders . . . .

82.     Although Schoen recognized that the THL Directors required "open communication and transparency" in order to fulfill their duties, the THL Directors knew they were not receiving this from the Bennett Co-Conspirators — and yet they went forward with the

LBO and thereafter took action as directors based on insufficient information, as discussed

below.  Likewise, the THL Entities knew of this lack of transparency and yet directed certain of

Refco's acts as controlling shareholder without receiving necessary information.

### g.    THL Learns Of "Deep Throat" And Allegations Of Internal Fraud

83.    Toward the end of its diligence process, THL learned of a Refco insider

(called "Deep Throat" by KPMG) who reported that in the 1990s Refco was "sloughing off"

trading losses into a Refco subsidiary.

84.    KPMG compiled a list of additional diligence items for THL to investigate

Deep Throat's report.  KPMG's John Berndsen sent this list to Schoen at THL on May 28, 2004.

The highest-priority diligence item was to obtain RGHI's financial statements and recent tax

returns, tie them to Refco's books, and "[i]solate and investigate all items not flowing through

from [Refco]."  As discussed below, had THL accepted KPMG's advice and obtained and

analyzed the relevant RGHI documents, THL likely would have uncovered the fraud being

perpetrated by the Bennett Co-Conspirators.  THL did not do so.

85.    Another high-priority item identified by KPMG was to "[o]btain details

and understand the nature of inter-company financing arrangements, both on- and off-balance

sheet."  These intercompany financing arrangements were crucial to understand the workings of

the Bennett Co-Conspirators' receivables scheme.  Again, THL rejected KPMG's advice.

86.    Instead of conducting the recommended due diligence, THL merely

discussed the "Deep Throat" issues with Bennett.  On the question of "application of proceeds in

the Sub S [RGHI], historical distributions, and handling of taxes," Schoen wrote in an email: "I

would not say that [Bennett] has yet committed to actually show us tax returns or Sub S [RGHI]

underlying organizational and ownership documents, but the issue is on the table and we will

have the opportunity to press on until we develop comfort." In connection with THL's request

for a meeting with THL and Ernst & Young, LLP — which had served as tax advisor to the

Refco entities, but resigned from handling Refco's tax returns in 2003 after (among other things)

Refco refused to make what Ernst & Young deemed to be appropriate disclosures regarding the

amount of RGHI's receivable balances — Bennett refused to permit THL's request for a

meeting. THL chose not to press the issue.

      87.    On June 2, 2004, Jaeckel sent an email to other THL executives to

summarize his meeting with Bennett regarding "Deep Throat." According to Jaeckel, Bennett

stated that in the 1990s, customers of Refco had incurred losses, and these losses were run

through certain unconsolidated overseas affiliates of Refco in order to offset their foreign tax

charges. Specifically, Bennett represented to THL that "both historically and going forward

[RGHI] has had and will have no brokerage accounts with any [Refco] entities;" these words,

wholly false, were accepted by THL, without any corroboration, as adequate assurance that there

were no trading losses being hidden by the Bennett Co-Conspirators. Even minimal follow-up

on this representation would have exposed evidence of the fraud at Refco. THL never obtained

appropriate documentation or other evidence from anyone at Refco other than Bennett.

      88.    On June 2, 2004, Schoen sent an email to other THL executives

summarizing this same meeting with Bennett. Schoen stated:

> Phil [Bennett] met with me and Scott Jaeckel to discuss tax liabilities and
> payments by the S Corp [RGHI]. I also pressed him that we really needed at least
> the Readers'[ ]Digest version of who is getting the proceeds from the deal, in
> particular how much is he putting in his pocket versus his rollover. He agreed
> that we need to be taken through all of it, but deferred the entire discussion until
> tomorrow morning. He says he needs to close the loop with Tone Grant before
> opening up these details. We will have to see where this discussion goes
> tomorrow.

89.    On June 3, 2004, David Harkins of THL responded to Schoen's email regarding Bennett's refusal to disclose who was getting the proceeds of the deal. Harkins wrote: "Good luck. *He just will not come clean easily on this one.*"

### 3.    THL Buys 57% Stake In Refco For $507 Million

90.    Had THL pressed for information with respect to any of the leads provided by Deep Throat, rather then failing to do so as set forth above, THL almost certainly would have uncovered the fraud.

91.    However, despite the unanswered questions and risks associated with an acquisition of Refco, THL, one of the world's most sophisticated leveraged buyout firms, forged ahead. As a result, the THL Entities entered into an agreement with various Refco entities, by which the THL Entities and their affiliates agreed to purchase 57% of RGL, a company purportedly valued at $2.25 billion.

92.    To facilitate and fund the LBO, THL created new entities including New Refco and Refco Finance Holdings LLC ("Refco Finance Holdings"). As part of the transactions, THL arranged for $1.4 billion in debt financing at Refco Finance Holdings. Refco Finance borrowed $800 million pursuant to a senior secured credit facility, and $600 million from the issuance by Refco Finance Holdings of unsecured subordinated notes. As part of the same series of transactions, Refco Finance Holdings merged with and into RGL with RGL as the surviving entity.

93.    RGL then purportedly distributed $500 million, supposedly representing excess cash held on RGL's books, to New Refco, which in turn purportedly distributed those funds to RGHI. As Refco and THL agreed, RGL also distributed certain businesses valued at over $237 million, referred to as the Asset Management Entities, to New Refco, which in turn

distributed those businesses to RGHI. These distributions to RGHI, and its sole owner, Bennett, had been endorsed by THL prior to the LBO.

94.    Subsequently, RGHI, and the THL Entities contributed their ownership interests in RGL to New Refco in exchange for the following consideration:

- Bennett, sole owner of RGHI, monetized a portion of his ownership in RGL in the amount of $875 million, and exchanged the remainder of his interest in RGL, with a stated value of $382.5 million, for an approximate 43% interest in New Refco.

- The THL Entities and their affiliates received an aggregate of 280.8 Class A Common Units of New Refco, which amounted to approximately 57% ownership interest.

95.    As a result of these transactions, New Refco owned 100% of RGL and became its sole member.

### 4.    THL Directors Join Refco's Board

96.    As part of the LBO, the THL Entities gained significant control over Refco, notably including the power to appoint board members. The THL Entities designated four THL executives to New Refco's board. In addition, certain THL executives became officers of New Refco: Schoen, Jaeckel, and Taylor became President, Treasurer, and Secretary, respectively.

97.    As a result of their positions as Board members and officers of New Refco, the THL Directors formally assumed fiduciary duties to New Refco.

98.    The THL Directors derived their control from their ownership position in Refco, as well as the Amended and Restated Limited Liability Company Agreement (the "New Refco LLC Agreement"). The New Refco LLC Agreement stated that "The business and affairs of the Company shall be managed and controlled by or under the direction of a Board of Managers . . . . The initial Board of Managers shall be comprised of the individuals set forth on

27

Schedule D." Schedule D listed the following Managers: David V. Harkins (THL); Scott L.

Jaeckel (THL); Thomas H. Lee (THL); Scott A. Schoen (THL); Phillip R. Bennett; Robert C.

Trosten; and Phillip Silverman.

99.    The New Refco LLC Agreement included a section titled "Duties" that

stated: "The Managers, in the performance of their duties, shall owe to the Company and the

Members duties of loyalty and due care of the type owed by the directors of a corporation to such

corporation and its stockholders under the laws of the State of Delaware."

100.    The THL Directors also owed fiduciary duties to RGL.  A Fifth Amended

and Restated Limited Liability Company Agreement of RGL (the "RGL LLC Agreement") was

entered into by New Refco (the sole member of RGL) on August 5, 2004.  The RGL LLC

Agreement included a section titled "Management" that stated:

> The business and affairs of the Company [RGL] shall be managed by the Member
> [New Refco]. . . .  Member shall have complete and absolute control of the affairs
> and business of the Company, and shall possess all powers necessary, convenient
> or appropriate to carrying out the purposes and business of the Company,
> including, without limitation, doing all things and taking all actions necessary to
> carrying out the terms and provisions of this Agreement.

**5.    THL's Lucrative Management Agreement**

101.    As part of the LBO, Managers V agreed that it would serve in an oversight

and managerial capacity for Refco in return for tens of millions of dollars in fees.  This

Management Agreement was entered into on August 5, 2004 by New Refco (the "Company" for

purposes of the Management Agreement), RGL, and Managers V (the "Sponsor").

102.    The Management Agreement was entered into *after* the THL Entities and

their affiliates had made their $507 million investment in the LBO, for which they received a

controlling 57% ownership share of New Refco.

103.    The preamble to the Management Agreement reads in part as follows:

WHEREAS, the Sponsor has staff specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services.

WHEREAS, the Company will require the Sponsor's special skills and management advisory services in connection with its business operations and execution of its strategic plan.

WHEREAS, the Sponsor is willing to provide such skills and services to the Company.

104.    The Management Agreement provided that Managers V would provide advisory services to Refco under the following circumstances:

The Sponsor hereby agrees that if . . . [New Refco or RGL] reasonably and specifically requests that the Sponsor provide the services set forth below and the Sponsor agrees to provide such services, the Sponsor or one of its affiliates will provide the following services to the Company and its subsidiaries:

(a)    advice in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to the Company's or any of its subsidiaries' finances or relationships with banks or other financial institutions; or

(b)    advice with respect to the development and implementation of strategies for improving the operating, marketing and financial performance of the Company and , and [sic] other senior management matters related to the business, administration and policies of the Company and its subsidiaries.

105.    New Refco and RGL agreed to pay Managers V's fees "[i]n exchange for the Sponsor's arrangement of the equity financing and agreement to provide the services set forth" in the Management Agreement.

106.    The first fee to be paid by New Refco and RGL to Managers V was a lump sum payment of $30 million (the "Initial Management Fee"). The second fee was a recurring management fee (the "Annual Management Fee") payable semi-annually and was to be

the *greater* of (a) $2.5 million per year or (b) 1% of Refco's EBITDA.[7] (Indeed, on August 5,

2004 — on the same day as the Management Agreement was signed — Refco paid

approximately $31.627 million to Managers V for the Initial Management Fee and a semi-annual

installment of the Annual Management Fee.)

107. The Management Agreement was to continue in effect until one of three

events took place:

- termination by Managers V;

- automatic termination on the date that Managers V and its affiliates no
  longer owned at least 25% of the equity of New Refco; or

- termination by Managers V upon the consummation of an initial public
  offering by New Refco or any successor entity.

108. If the Management Agreement were terminated upon an IPO (as was

foreseen all along), New Refco and RGL were to pay Managers V a buyout fee (the

"Management Agreement Buyout Fee"). The Management Agreement Buyout Fee was to be

equal to the net present value of the fees payable for *five years* from the termination of the

Management Agreement.

109. The Management Agreement was signed by Bennett on behalf of New

Refco and RGL. Signing on behalf of Managers V were other members of the THL Entities —

THLP (as its Managing Member) and Equity Advisors V (as its General Partner) — and Schoen

(as Managing Director of Managers V).

110. As controlling shareholders, the THL Entities were each an interested

party in the Management Agreement transaction. The THL Entities entered into the

---

[7]     "EBITDA" was defined in the Securityholders Agreement between the parties to the Management
Agreement as consolidated earnings for a given fiscal year of New Refco and its subsidiaries
before interest, taxes, depreciation, and amortization.

Management Agreement with Refco, whose Board of Directors consisted of senior THL executives. At the same time, these senior THL executives exercised control over THL, Equity Advisors V, and Managers V. As a result, the THL Directors were conflicted with respect to each party's different obligations. In fact, the THL Directors' motive was to minimize the requests that Refco made of Managers V, so that that entity could get its money without providing any services in return.

111.    Had they fulfilled their duties to Refco, the THL Directors would not have permitted funds to be paid to the THL Entities pursuant to the Management Agreement. Alternately, they would have caused Refco to make a request to the THL Entities for services under the Management Agreement, so that Refco's processes, controls, and overall financial situation could have been better understood and improved. If nothing else, the deficiencies, resistance, and concealment they encountered in the due diligence process should have caused the THL Directors to liberally utilize the services of a sophisticated entity such as Managers V. They did not do so, and, upon information and belief, THL Managers V never performed any services in return for its lucrative Management Agreement.

### D.    THL's Awareness Of And Failure To Remedy Deficiencies At Refco Post-LBO

112.    After the leveraged buyout, the THL Entities became Refco's majority owner and the THL Entities and THL Directors assumed direct oversight and management of Refco. Moreover, after the leveraged buyout, the THL Entities and THL Directors had unfettered access to all of Refco's information. The THL Defendants could obtain, and indeed had fiduciary obligations to obtain, answers to questions that had been raised but not answered in the course of their due diligence. Moreover, the THL Defendants had the ability, power, and

obligation, to remedy the problems at Refco caused by the Bennett Co-Conspirators. They did
not do so.

113.    After THL was on Refco's board and at the helm, THL learned that
Refco's accounting and auditing function, both internal and external, was a disaster. THL
executives knew and discussed the fact that Refco's accounting function was inadequate for a
company seeking to go public, and that Refco would be better off hiring a "Big Four" accounting
firm.

114.    As fiduciaries, directors, and officers, the THL Entities and THL Directors
had a duty to put Refco's interests ahead of their own. Moreover, to justify the tens of millions
of dollars they reaped in the Management Agreement, the THL Entities and THL Directors
should have, at a minimum, insisted on correcting the problems that they knew to be afflicting
Refco. Rather, for the THL Defendants, the choice was simple and had nothing to do with
fiduciary duties. Taking Refco public would greatly benefit THL. So THL pushed ahead,
without regard for the adverse consequences to Refco. On October 19, 2004, just ten weeks after
the LBO, THL held a key IPO planning meeting with its professionals, and set the gears in
motion for the IPO.

115.    Aside from the financial gain to be made from a sale of Refco stock, the
THL Entities and the THL Directors knew that a successful IPO was critical to the THL Entities
and the THL Directors because they were making preparations to market a new private equity
fund, for which THL hoped to raise approximately $7.5 billion from institutional investors. In an
email exchange with an investor in March 2005, even as a THL executive was discussing THL's
current investments such as Refco, the executive was soliciting interest in "our new fund – Fund
VI and hopefully Q1 2006."

116.    Indeed, after the fact, THL's chief executive acknowledged that Refco's bankruptcy had made it more difficult to raise money for THL's Fund VI.  Scott Sperling of THL called Refco a "disappointment" and said the publicity was "very unpleasant," causing a delay in fund-raising of six months.

117.    By pushing what they knew was an unprepared company into an IPO, the THL Entities and THL Directors breached their duties by causing Refco to incur hundreds of millions of dollars in obligations so that THL could enjoy a quick profit and favorable publicity.

### 1.    THL's Failure To Ensure A Proper Accounting Function

118.    Not long after the LBO, THL realized that Refco should replace Grant Thornton.  The THL Entities and THL Directors were well aware that Grant Thornton had done a substandard job auditing Refco.  Based on, among other things, Grant Thornton's handling of management's opposition to the Management Letter, the THL Defendants knew that Grant Thornton was not sufficiently independent of the Bennett Co-Conspirators to discharge its responsibilities to audit the various financial statements for Refco.  In email exchanges, THL executives noted that in order to clean up Refco's accounting and financial statements, Grant Thornton should be replaced with one of the "Big Four" accounting firms.

119.    THL knew, however, that a new auditor would need time to conduct a proper audit, and therefore would require THL to delay Refco's IPO.  THL was unwilling to accept such a delay.

120.    THL executives also knew and discussed the fact that, besides the question of delay, there was a "restatement risk" that came with hiring competent outside auditors.  This frank admission by THL executives that Refco's audited financials had a significant likelihood of being materially inaccurate, coupled with the decision not to hire competent auditors so as not

to interfere with THL's self-serving drive to the IPO, constituted a breach of the THL Entities'
and THL Defendants' fiduciary duties to Refco.

      121.    THL's conflict was clear.  In an October 6, 2004 email to persons at THL
and KPMG, Jaeckel highlighted two possible courses of action with respect to Refco's outside
auditors.  Jaeckel expressed concern about the "restatement risk" as well as a possible delay in
THL's planned sale of its equity stake in Refco:

> Auditors.  I think we narrowed this down to 2 main options.  Option A – file [the
> IPO] as soon as possible so we are on the road in January.  *We will have to stay
> with GT under option A*. . . .  Frank [Casal of KPMG] cautions that *we run
> 'restatement risk' by switching auditors* (we run this risk in either option but it is
> magnified when you have public equity).  He said the big four take a very hard
> and long look at the books of companies audited by second tier firms.  Option B –
> replace current auditors for fiscal 2005 audit.  Big four are currently swamped
> with year end and SOX work. . . .  Likely to mean that *we wouldn't be selling
> equity until summer*.

      122.    THL faced a stark choice:  improve the dysfunctional audit situation and
remedy the misstated and fraudulent financial statements but delay the IPO, or push ahead with
the IPO notwithstanding serious audit shortcomings.  THL and the THL Directors, to the
detriment of Refco, chose the latter.  They decided to retain Grant Thornton as outside auditor
even though it took ten months from Jaeckel's email to consummate the IPO — more than
enough time to change auditors and long enough for existing problems to fester and worsen
while Refco was without the safeguard of a capable auditor.  The real reason for THL's decision
was its recognition that bringing in a new, objective auditor might reveal problems lurking in
Refco's financial statements with disastrous financial and reputational consequences to the THL
Defendants, including the postponement or cancellation of the IPO on which the THL
Defendants were counting.

      123.    In addition, THL executives repeatedly (and justifiably) expressed concern
over Refco's internal accounting staff:

- On March 28, 2005, Jaeckel wrote an internal THL email in which he said that "[t]he staff departures [of two senior Refco accounting personnel] are troubling – *[I]'m getting increasingly worried about our audit.*"

- On March 30, 2005, Strasburg sent an internal THL email regarding an "Auditor call" with Mark Ramler from Grant Thornton. Strasburg said: "Ramler pulled no punches — essentially calling [Refco's] finance staff ex[cept] Gerry [Sherer] 'lazy.'"

- On April 1, 2005, Taylor sent an internal THL email in which he concurred that "Gerry [Sherer] is clearly a one man band in the short run."

124.    Notwithstanding their well grounded concerns, the THL Entities and THL Directors did not remedy these internal accounting deficiencies.  To fix the problems at Refco would again have placed THL's much-desired IPO at risk.  This was another breach of the THL Entities' and THL Directors' fiduciary duties to Refco.

## 2.    THL Learns Of Grant Thornton's Management Letter

125.    Subsequent events only added to THL's concerns about the deficiencies in Refco's accounting systems.

126.    During the push toward an IPO, THL learned that Refco executives had lied to THL about the existence of a "horrendous" letter to Refco's management from Refco's outside auditors (the "Management Letter").  This letter, which came to light in March 2005, discussed significant accounting deficiencies at Refco.  The Management Letter had been prepared by Grant Thornton in connection with its audit of Refco's financial statements for the fiscal year ending February 29, 2004, but was not provided to THL by the Bennett Co-Conspirators.

127.    THL's Jaeckel learned of the Management Letter on or about March 31, 2005, at which point he forwarded a copy of the Management Letter internally within THL, and asked: "What does this letter say?  I don't recall ever hearing about this letter. you guys?"

128.    THL's Taylor responded with another internal THL email: "I have never seen the [Management] letter before the email and *it is as horrendous as it sounds*."

129.    On April 1, 2005, Jaeckel wrote an internal THL email expressing his anger that the Bennett Co-Conspirators, with the assistance of Refco's outside auditors, had not provided the Management Letter to THL:

> when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. *if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both*[.]

130.    On April 1, 2005, Strasburg sent an internal THL email explaining that at or about the time that Grant Thornton had provided the Management Letter to Refco management, that management had pressured Grant Thornton to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by Grant Thornton:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's then Chief Financial Officer] received it when he first got there [date] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

131.    On April 6, 2005, Jaeckel sent an internal THL email discussing how the Management Letter had not been provided to THL:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

132.    The Management Letter listed nine broad and important "Internal Control Deficiencies" at Refco, each of which put THL on further notice of irregularities within Refco:

36

(1)     IT Environment;

(2)     Consolidation Process;

(3)     Formalized Reporting and Closing Process;

(4)     Internal Audit Function;

(5)     Fixed Asset Subsidiary Ledger;

(6)     Accounting Procedures and Policies;

(7)     Accounting Function;

(8)     Refco Capital Markets Ltd. Custody Reconciliations; and

(9)     Audit Coordination.

133.    Grant Thornton's comment regarding a "Refco Capital Markets Ltd. Custody Reconciliations" deficiency read: "The Company could not produce any custody reconciliations at or around year end for EQ." As discussed below, only through the fraudulent "upstreaming" by the Bennett Co-Conspirators of customer funds in accounts held at RCM was Refco able to fund its operations. Had the THL Defendants asked for RCM's custody reconciliations (which were essential to understand how Refco functioned), they would have seen that Refco's business model, as directed by the Bennett Co-Conspirators, was rooted in fraud and unsustainable.

134.    Grant Thornton's comment regarding Refco's "Internal Audit Function" deficiency stated that "it has become essential to establish an internal audit function [at Refco]."

135.    Had the THL Defendants acted appropriately in light of this information, they would have ensured that the internal audit function was staffed and operating properly. A proper internal audit function would have revealed, before the IPO, to the THL Entities and THL

Directors, the various accounting improprieties and frauds conducted by the Bennett Co-Conspirators within Refco (discussed below).

136. Grant Thornton's comment regarding Refco's "Accounting Function" deficiency read in relevant part:

> *At present, the accounting function does not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer.* Although the Company has taken stop gap measures in engaging PWC to fill these gaps, it is not a solution. The Company needs to hire qualified people with the necessary skills and expertise . . . .

137. Once again, THL was made fully aware that Refco was unprepared for an IPO. The THL Entities and THL Directors breached their fiduciary duties by nevertheless pushing Refco into going public too quickly and without sufficient care — all to meet THL's own timetable.

138. Despite learning that it was lied to about Refco's accounting function, and then learning that the function was a mess, the THL Entities and THL Directors failed to ensure the appropriate remedies were taken, and in so doing breached their fiduciary duties to Refco. Indeed, the Prospectus disclosed deficiencies within Refco's accounting function — proof that the THL Entities and THL Directors had failed to ensure that Refco was prepared to go public.

### 3. THL Becomes Aware of the Profit-Sharing Agreement

139. Subsequent to the LBO, THL confirmed the dishonesty of the Bennett Co-Conspirators. One stark example is THL's discovery that before and after the LBO multiple Refco executives withheld information from the THL Defendants and others regarding an important and lucrative compensation scheme.

140. In or around 2001, eight Refco executives purportedly entered into an arrangement with RGL, pursuant to which they would receive substantial payments from RGL in the event that RGL was sold to a third party for more than $900 million (the "Equity-Like

Arrangement"). By January 1, 2002, the Equity-Like Arrangement had been restructured in an effort to provide favorable tax treatment to the participants. Under the revised scheme, the participants purportedly obtained profit participation interests in RGL pursuant to which they would share in RGL's net annual income equal to their respective equity-like interest in RGL (the "Profit-Sharing Agreement" or "PSA").

141.    This arrangement purportedly was implemented by amending the RGL partnership agreement on January 1, 2002 to allow for profits-only members, who were entitled to share in the annual net profits of RGL but were not entitled to vote.

142.    In June 2004, on the brink of the consummation of the LBO, Refco agreed to redeem the purported equity-like interests by paying the executives a portion of the proceeds derived from a sale of Refco in amounts ranging from $2 to $25 million. The participants did not disclose to THL their purported equity-like interest in RGL, nor that they were to receive substantial redemption payments upon the LBO.

143.    In the pre-LBO due diligence period, Weil, at THL's behest, had asked Refco to provide its "employment arrangements or arrangements with key employees." Weil sent questionnaires to Refco executives asking them to disclose information concerning their respective backgrounds and regarding Refco's executive compensation structure. The questionnaires specifically asked the Refco executives whether they had any personal financial interest in the LBO. None of the eight participating directors or officers disclosed their participation in the PSA. Thus, none of the eight participating directors or officers disclosed that they would gain substantially from a high-priced sale of Refco.

144.    The failure of these directors and officers to make such disclosure was a deliberate effort on their part to deceive THL and others about the financial benefits that those directors and officers would receive upon a sale of Refco.

145.    Immediately after the closing of the LBO, THL began preparing for the IPO. Weil, again at THL's behest, sent identical questionnaires to Refco executives again asking whether they had any personal financial interest in the contemplated transaction.

146.    This time around, two of the members of the management team determined to come clean with THL. Having already been paid millions of dollars, these executives had less to lose by telling the truth. In March 2005, Refco executive Joseph Murphy learned that William Sexton, another Refco executive, planned to disclose his participation in the PSA. Accordingly, Murphy contacted Weil to determine whether he too had to reveal his participation in the PSA. Murphy then revealed that his profit participation interest had been acquired at the LBO for $13.7 million, $9.5 million of which had been paid to him at the time of the LBO, with the remaining $4.2 million to be paid to him at the IPO. Consistent with Murphy's understanding that Sexton was going to disclose his PSA interest, Sexton in fact disclosed on his questionnaire that Refco had agreed to acquire his "outstanding profits participation interest" for a total of $9 million, $6 million of which had been paid to him at the time of the LBO, with the remaining $3 million to be paid to him at the IPO.

147.    Following this partial and belated airing of the truth, Refco subsequently informed Weil that two other executives also participated in the PSA. THL therefore had knowledge that on August 5, 2004, upon consummation of the LBO, the PSA interests held by these four individuals had been partially redeemed for a total of approximately $26 million, using RGL funds routed through RGHI. THL also knew that the remaining redemption

40

payments for the PSA interests were to be accelerated upon consummation of the IPO.  As a result, THL knew that certain of Refco's directors and officers — particularly Bennett, the 100% owner of RGHI — had yet another reason to take Refco public at a high price.

148.    THL and Weil knew that certain of Refco's executives had taken affirmative steps to conceal their equity-like interests in Refco.  Nevertheless, THL did not inquire further about the PSA or its concealment.  Neither THL nor Weil obtained a copy of the underlying documentation of the PSA even after they learned of this key agreement.  Had they done so, instead of turning a blind eye, THL would have learned that four additional Refco executives participated in the PSA.  Bennett was one of them.  He made over $25 million on the LBO solely from the redemption of his PSA interest.

149.    Faced with blatant evidence that certain of the Bennett Co-Conspirators had conspired to engage in fraudulent conduct by failing to disclose the existence of their Profit-Sharing Agreements, the THL Defendants were on plain notice that at least a substantial part of Refco's management was not fit to be leading a public company.  Rather than take steps to deal with that issue, the THL Defendants chose to ignore it and move forward with the IPO that was vital to THL's future financial and reputational success.  Moreover, the THL Defendants opted to keep hidden from Refco's various constituencies the fraudulent conduct and character of these Refco executives in order to ensure that the THL Defendants were able to follow through on their plan to go forward with the IPO.

### 4.    THL's Knowledge Of Acquisitions Without Proper Diligence

150.    On June 14, 2005, a Refco employee emailed the Refco board of directors to request a conference call to discuss Project Key, the code name for Refco's acquisition of Cargill Investor Services.

151.    In response to the request for a board conference call, Jaeckel sent an

internal THL email:

> Phil [Bennett] has not called me back. I hope the analysis is sufficiently
> deep/detailed for a discussion. Since they have never accepted our/Max
> [Strasburg]'s help I'm not sure who is modeling the deal and pro forma company.

152.    The same day, Taylor sent another internal THL email discussing his

concerns with Project Key:

> Jake [Jaeckel] and I caught up with Gerry [Sherer] regarding his request for a
> Board meeting Thursday (now confirmed for 4:00pm) to discuss Project Key
> (Cargill). Phil and Gerry plan to present the financials for Key and discuss with
> the Board whether it is an interesting acquisition candidate. When pressed, **Gerry
> did not sound as if he had a presentation prepared that laid out the pros and
> cons of the deal** . . . . As it stands, **what will be presented to the Board will be a
> relatively rudimentary set of financials that are not integrated into Refco's
> financial results.** We offered to help model the combination by sending Max
> down to assist in pulling the necessary data together (an offer we've made several
> times in the past), but did not get much of a response.

153.    On June 15, 2005, Schoen responded to this email with another internal

THL email expressing similar concerns:

> I had a 30 minute conversation with Phil [Bennett] on the same subject. . . . I gave
> him a pretty good push on the value we could offer in diligence and modeling, the
> importance of doing thorough due diligence and building a financial plan in a
> levered, soon to be public company as compared to their intuitive historical style,
> and my desire to see them present a 10-20 slide deck to the board that walks
> through summary financials, pro formas, accretion/dilution, lays out the key
> executional plan including individual responsibilities, deliverables and
> measurement metrics, and balances key opportunities and risks. **He fully
> acknowledged the need to engage with us in such a process, and then explained
> that these were unusual circumstances and basically blew me off.** He did it with
> respect, but nonetheless seemed to just be giving lip service to this approach.

154.    On June 16, 2005, Strasburg sent an internal THL email about Refco's

strategy for Project Key.  He expressed concern over how this acquisition would be funded: "No

consideration is given to debt costs and **Scott Love [from Refco] thinks they are funding this

without borrowing.  Not sure how.**"

155.     Jaeckel replied with an internal THL email: "They r [*sic*] paying 300mm

for this? *I wouldn't do that* – we have to trade at 10x ebitda for this to be accretive?"

156.     Strasburg replied with another internal THL email: "$215 upfront.

Earnout is additional $67 to $192. *Love could not explain to me how it works.*"

157.     On June 16, 2005, Jaeckel sent an internal THL email expressing concern

over how much Refco intended to pay for Project Key:

> I have not been able to view the Refco package [regarding Project Key] but have
> traded a couple quick emails w/ Max [Strasburg]. If I'm reading them correctly
> Refco would ultimately pay about 300mm for Key, which is over 9x ebitda. *If
> I'm correct in those assumptions I would not do this deal.* There is not enough
> upside in this deal to justify the capital and risk in my view. We only paid 8–8.5x
> ebitda for all of Refco. In our wildest dreams Refco would trade publicly in the
> 10-12x ebitda range (which at this point is at least as much hope as reality). In
> addition the company needs to do a very careful net income comparison to see if
> this [is] accretive after intangible amort[ization]. . . . *Hopefully I've got my facts
> wrong and this deal is more exciting.*

158.     Schoen replied with an internal THL email:

> We have a big task and desperately need our whole team on this, plus Weil and
> Grant Thornton. Phil says he must sign a definitive agreement by Tuesday or it is
> gone forever. I am really upset that with two months of begging to be involved,
> we are now at this point, but we have to get organized ASAP.

159.     On June 18, 2005, after receiving copies of documents for the Project Key

purchase, Jaeckel sent an internal THL email referencing these documents: "Since the biz

[business] is unfamiliar to us I'm not sure if we get a lot out of a page flip."

160.     On June 20, 2005, the THL Directors all approved a board resolution

granting Refco executives the authority to finish the Cargill transaction — notwithstanding their

strong misgivings (expressed as recently as two days earlier) about the procedure used for the

deal and their knowledge that the acquisition was being rushed. In so doing, the THL Entities

and the THL Directors breached their fiduciary duties to the company. Their top priority was

to complete the IPO, and, indeed, the IPO occurred just prior to the closing of the Cargill acquisition. The THL Defendants abdicated their responsibilities as controlling stockholder and directors because their sole interest was to move forward with the IPO. In their singleminded effort to accomplish an IPO payday for themselves as rapidly as possible, which would require the cooperation of Refco's management, the THL Defendants opted not to make waves with that management team, or otherwise take steps to protect Refco from going forward with an acquisition that the THL Defendants recognized was based on flawed and insufficient analysis.

161.    On June 20, 2005, after receiving an email from Sherer at Refco regarding yet another potential acquisition, Jaeckel sent Sherer an email recommending a number of due diligence steps that he considered appropriate. These included the use of outside professionals, which had not been part of the Project Key acquisition.

162.    Jaeckel then forwarded the email he had written to Sherer to Schoen, Taylor, and Strasburg at THL, making clear that he sought to avoid a repeat of Project Key: "Fyi – I didn't want lack of response to be seen as approval of *another disorganized effort*." This and other emails made clear that the THL Defendants were aware that they had approved the Cargill acquisition based on inadequate due diligence.

163.    Schoen responded to this internal THL email:

> A good plan. *Let's discuss this morning how we can try to force the same result in process re Cargill, albeit after the fact since we will be signing a binding agreement first!* We can at least lay out our specific requirements and give them a sample from [redacted] to show the level of work, planning and information that we require, and that absolutely must be done as a public equity filer.

164.    On June 22, 2005, Schoen sent Bennett a letter reading in part as follows:

> As promised, enclosed is a presentation one of our portfolio companies, [redacted], presented to its Board of Directors prior to obtaining a Board resolution to complete an approximately $400 million acquisition of [redacted]. This is an excellent example of the level of disclosure and diligence work we would normally expect for a substantial acquisition. *I recognize that the Cargill*

*process had real limitations we had to live with to be successful.* Hopefully, we
can now do the work and prepare materials of comparable breadth and depth for
our Board meeting.

165.    The decision to go forward with the Cargill transaction resulted in injuries
to Refco because it overpaid for the assets that it acquired.  The Cargill acquisition was not the
only major transaction approved by the THL Entities and the THL Directors in violation of their
fiduciary duties.  Another example is a series of transactions with the Suffolk entities.

166.    In March 2005, RGL, through its subsidiary, RCC, issued a series of loans
totaling $204.2 million (the "Suffolk Loans") to Suffolk, LLC, the controlling shareholder of
PlusFunds Group, Inc., and related entities.

167.    The first loan, a line of credit of $154.2 million, was issued to Suffolk to
be used to purchase the minority shares of PlusFunds.  The second loan, a total loan of $50
million, was issued to certain principals of PlusFunds.  These loans were secured by shares of
PlusFunds.

168.    The Suffolk Loans were nothing more than a sham.  In actuality, Bennett
and certain other Bennett Co-Conspirators had intended that Suffolk would default on the
Suffolk Loans and Refco would thereby foreclose on and acquire the majority interest in
PlusFunds — at a price far higher than market rate.

169.    The Bennett Co-Conspirators overpaid for PlusFunds.  At the time of the
loan, PlusFunds' total net revenue was approximately $26 million.  Nevertheless, the Bennett
Co-Conspirators valued PlusFunds at $250 million, an amount well in excess than its total net
revenues.  In any event, there was insufficient justification for a $204.2 million loan against
illiquid, privately-held stock.

170.    At the time of the Suffolk Loans, the THL Entities and THL Directors
exercised control over the Refco parent entities.  The THL Entities and THL Directors knew that

45

Refco entered into the Suffolk Loans. Despite this knowledge, THL failed to ensure adequate controls over acquisitions, and did not attempt to reverse or remedy this loan of $204 million to a company with little or no collateral. The THL Entities' and THL Directors' lack of diligence caused Refco to spend over $200 million, which Refco did not have, to acquire a company that had been wildly overvalued.

       **E.**    **IPO**

      171.    After conducting continuous due diligence pre- and post-LBO, the THL Entities and THL Directors knew of myriad problems at Refco which were reasons not to go through with the IPO. These problems included the following:

- Various indicia of fraud, including repeated dishonesty by the Bennett Co-Conspirators;

- Disastrous internal and external auditing which had received only "stop gap measures";

- The fact that the IPO would expose Refco to SEC and other reporting requirements for which the company plainly was unprepared;

- Financial statements that could well be in need of restatement;

- Refco was in the middle of a multi-hundred-million-dollar acquisition of Cargill which the Company could not afford, and which required the integration of business components on multiple continents; and

- Refco was highly leveraged, and only a portion of the IPO proceeds would be used to pay down debt.

      172.    The THL Entities, THL Directors, and THL executives serving as officers of Refco — each a fiduciary of Refco — each had a duty to fix those deficiencies. Instead, as they had done prior to their acquisition of Refco, the THL Defendants made a conscious choice to disregard the problems and to proceed with its singular goal of getting a lucrative payday as quickly as possible.

### 1.    The Reincorporation

173.    In preparation for the impending IPO, Refco underwent a reincorporation (the "Reincorporation"), whereby Refco Inc. became the new holding company through which ownership in RGL was held.  As a result, Refco Inc. became the ultimate parent of the Refco entities; New Refco became inoperative except as a subsidiary of Refco Inc. and parent of RGL; and RGL continued to be the main holding company for the Refco businesses.

174.    As part of the Reincorporation, the THL Entities and their affiliates exchanged their 283.24 Class A Common Units of New Refco for 63,122,588 shares of common stock of Refco Inc and thus became majority owner of Refco Inc.

175.    As of August 1, 2005, the following people were directors of Refco Inc.:

- THL Directors:  David V. Harkins; Scott L. Jaeckel; Thomas H. Lee; and Scott A. Schoen;

- Refco Insider:  Phillip R. Bennett; and

- Independents:  Leo R. Breitman; Nathan Gantcher; Ronald L. O'Kelley.

THL therefore had significant control over the board of Refco Inc.

### 2.    The Prospectus

176.    Prior to the IPO, Refco Inc., as Refco's new parent company, filed a final prospectus (the "Prospectus") with the SEC.  The Prospectus described the stock sale as follows:

| | |
|---|---|
| Common stock offered by [Refco] | 12,500,000 shares. |
| Common stock offered by the selling stockholders | 14,000,000 shares. |
| Total offering | 26,500,000 shares. |
| Common stock to be outstanding after this offering | 127,500,000 shares. |

The offering amount of 26,500,000 shares did not include the overallotment of 3,975,000 shares available for purchase by the underwriters (the proceeds of which constituted the greenshoe dividend, discussed below).

47

177.    The Prospectus also included a "Report of Independent Registered Public Accounting Firm" from Grant Thornton, Refco's outside auditors, as well as the audited financials of New Refco, which were audited by Grant Thornton.

178.    As discussed above, THL knew that it would have been prudent to replace Grant Thornton, but — in its haste to cash out in the IPO — it consummated the IPO using Grant Thornton's audit opinion, notwithstanding that THL recognized that a re-audit by a Big Four firm could have required a restatement of Refco's financial statements.

### 3.    Roadshow

179.    THL embarked on a two-week IPO roadshow to market Refco to public investors.  A roadshow is a presentation by an issuer of securities to potential buyers that is intended to create interest in the securities and hence raise the price of the stock sold by the issuer.

180.    During its roadshow, THL touted the financial viability of Refco — despite its knowledge of Refco's troubled state.  In its roadshow presentation, THL claimed that Refco had "strong financial performance" and that it had solid risk management with "no proprietary trading" in order to ensure that Refco would not suffer sustained losses in the future. This was false.  In truth, Refco had suffered grave losses in the past that it had fraudulently masked and its financial model was beset with significant problems.

181.    Moreover, THL misleadingly touted its own involvement at Refco in an effort to overcome the public's poor perception of Refco's business practices.  The roadshow presentation stated that the "[Refco] [m]anagement team, in partnership with THL is poised to deliver the next stage of growth."  Investors were led to believe that THL was ensuring that many of the problems that plagued Refco were being fixed.  This too was false.  THL never informed the investors of the truth — that THL had failed to remedy Refco's troubled state.

48

4.    **Stock Sales in the IPO**

182.    After the roadshow, on August 11, 2005, just one year after the LBO, THL led Refco though an initial public offering of its stock.  At that time, THL and its affiliates sold approximately 8.625 million shares of Refco common stock, with a total sale price of approximately $178.4 million.  After selling this portion of their collective ownership, THL and its affiliates retained approximately 42.7% of ownership of Refco.

183.    Bennett sold 5.375 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $118.25 million.

184.    Refco's proceeds from the IPO totaled approximately $254 million, most of which was used to retire $210 million of the debt taken out to facilitate the LBO, plus a debt prepayment penalty of $18.9 million.

185.    THL and Bennett agreed among themselves to structure the IPO with the principal goal of allowing themselves to cash out, as opposed to raising funds for Refco to reduce the enormous debt with which THL and Bennett had saddled Refco in connection with the LBO.  Again, the THL Defendants put their own interests ahead of Refco's.

186.    When the fraud was disclosed, Refco was saddled with hundreds of millions of dollars in liabilities to all of the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus, notwithstanding that the majority of the proceeds of the public offering had been reaped by the THL Defendants and the Bennett Co-Conspirators (as opposed to Refco itself) through the sale of their stock in Refco.  Thus, the sale of stock resulted in Refco incurring liabilities to investors who had purchased stock based on unreliable financial statements.  These liabilities would not have been incurred had the THL Defendants acted in accordance with their fiduciary duties.

49

### 5.    The Greenshoe

187.    A greenshoe dividend results from the exercise by IPO underwriters of an option to purchase shares beyond their initial allotment.  The proceeds from such a sale are paid out in the form of a dividend to certain investors in the company.

188.    THL began focusing on creating and obtaining a sizeable greenshoe dividend at its very first official IPO planning meeting on October 19, 2004.  The planning culminated in a massive payout to THL less than one year later.  On August 10, 2005, the Refco Board agreed to pay a dividend to pre-IPO shareholders, including THL.  The Board self-servingly determined that after the IPO and the exercise of the Underwriters' Option to purchase additional shares, Refco would have a "sufficient surplus" of funds to permit payment of the dividend to its shareholders — despite the fact that Refco still held debt exceeding one billion dollars incurred in the LBO.

189.    One day later, on August 11, 2005, the Underwriters agreed to exercise their over-allotment option and to purchase 3,975,000 shares of Refco common stock.  Accordingly, it was determined that "an aggregate dividend equal to the net proceeds of the $82,203,000 received from the exercise of the Underwriters' Option . . . be paid."

190.    Having successfully met their long-held goal of a lucrative greenshoe, THL executives immediately expressed their pleasure.  On August 11, 2005, Schoen sent an email to THL executives and Bennett announcing the "[g]reat news" that the greenshoe would be fully paid.  On the same day, Gregory White, a Senior Vice President at THLP, responded in an email that said: "I guess we should change the team name to be the 'Money team.'  Congrats!"

191.    On August 18, 2005, Refco paid the THL Entities $41.1 million as a result of the greenshoe dividend.

F.    **Fraud At Refco**

192.    As noted, by the time of the Initial Public Offering, the THL Entities and

THL Directors knew, among other things, the following about Refco:

- Refco's internal accounting function was in disrepair;

- Refco's outside auditor was inadequate for a company of Refco's size and complexity, giving rise to a "restatement risk" were an appropriate auditor brought in;

- Refco merely had taken "stop gap measures" to deal with the auditing shortcomings;

- The Bennett Co-Conspirators and Refco's outside auditors for months had failed to bring to THL's attention what a THL executive later called a "horrendous" Management Letter criticizing Refco's internal controls;

- Refco played "fast and loose [with] compliance issues," and incurred multiple regulatory sanctions involving the improper handling of customer funds;

- The Bennett Co-Conspirators had affirmatively lied to THL;

- Phillip Bennett "just [would] not come clean easily" on the relationship and dealings between Refco and Bennett's holding company, RGHI;

- The Bennett Co-Conspirators refused to respond to THL's questions regarding $105 million in related-party receivables on its books as of February 28, 2003,

- Despite the "Deep Throat" allegations regarding the "sloughing off" of customer losses into a subsidiary, and KPMG's advice to THL that the highest priority should be to gain an understanding of financial transactions between Refco and RGHI, THL never obtained any documents dealing with these transactions; and

- Refco, at the direction of the Bennett Co-Conspirators, engaged in multi-hundred-million-dollar transactions based only on what THL executives described as a "rudimentary" and "disorganized" due diligence process — and in one instance went forward even though a Refco analyst could not explain to THL how such a large transaction could be funded without incurring additional debt.

193.     Had the THL Entities and THL Directors fulfilled their fiduciary duties, they would have learned that the improprieties within Refco were not limited to the list above. In fact, the same Bennett Co-Conspirators that THL knew to be dishonest had carried out a massive and long-running fraudulent scheme.

194.     The massive fraudulent scheme orchestrated at Refco by the Bennett Co-Conspirators, although multi-pronged and spread out over many years, consisted, generally speaking, of three types of illegitimate transactions.  The common goal was to improve Refco's *apparent* financial condition.

195.     First, there was extensive inappropriate use of related-party accounts to "slough off" customer losses and other items, just as THL had been warned by "Deep Throat." These amounts would have negatively affected Refco's financial position had they been properly recorded on Refco accounting books and records.  To avoid this, and to create a false picture of Refco's financial success, the losses and other items were instead recorded as RGHI's debt to Refco (collectively, the "RGHI Receivable").   Examples of such activity include:

- Losses incurred by Refco as a result of customer defaults and proprietary trading losses that the Bennett Co-Conspirators transferred to RGHI instead of disclosing the existence of these uncollectible sums;

- Operating expenses incurred by Refco but improperly recorded on, or moved to, the books of RGHI, by the Bennett Co-Conspirators, thereby decreasing Refco's expenses and increasing RGHI's debt to Refco; and

- The creation of bogus income for Refco by, *inter alia*, "charging" substantial interest on the debt balances owed by RGHI to Refco.

196.     Second, these related-party receivable balances were kept from public disclosure by means of a "Round-Trip Loan" scheme that had no legitimate business purpose.

197.     Third, the Bennett Co-Conspirators caused Refco to rely for its life and growth upon the fraudulent conversion of billions of dollars of assets that customers of the Refco

subsidiary RCM deposited in RCM for safekeeping. Once the Bennett Co-Conspirators had

directed Refco employees to sell, or cause to be sold, RCM customers' securities, the proceeds

were siphoned out of RCM and "upstreamed" to other Refco subsidiaries.

198.    The Bennett Co-Conspirators' conversion of RCM customers' securities

violated federal law. THL became aware of this business practice in connection with its control

of Refco. Yet, the THL Defendants did nothing pursuant to its fiduciary obligations, or its

obligations under the Management Agreement, to prevent the Bennett Co-Conspirators from

misusing RCM customers' assets.

199.    As a direct result of the THL Entities' and THL Directors' breaches of

their fiduciary duties, this fraudulent scheme continued unabated, and THL pushed Refco into an

IPO that saddled it with hundreds of millions of dollars in obligations it could not fulfill.

1.    **The RGHI Receivable**

a.    **Trading Losses**

200.    One early aspect of the fraudulent scheme involved the improper

concealment of hundreds of million dollars in customer and proprietary trading losses in the late

1990's, including hundreds of millions in losses that were incurred during the Asian debt crisis in

1997 and 1998.

201.    Beginning in or around 1997, certain Refco customers to whom Refco had

extended credit to purchase securities incurred heavy trading losses in the Asian financial crisis

and could not repay the loans extended to them by Refco (the "Asian Losses").

202.    The Bennett Co-Conspirators failed to properly account for the Asian

Losses, which appeared on Refco's books as customer receivables. Because the sums from the

customers were uncollectible, Refco ought to have written the customer receivables off as bad

debts and reduced its operating income accordingly. Instead, the Bennett Co-Conspirators

engaged in financial statement manipulation, periodically and ultimately transferring the amount of uncollectible customer receivables to an RGHI account at Refco, thereby increasing the RGHI Receivable. As a result, a charge to Refco's operating results was avoided and the Refco customer losses were alchemized into an amount due from RGHI, *i.e.*, the RGHI Receivable.

203.    Also in 1997, certain Refco customers in the United States to whom Refco had extended credit — entities associated with Victor Niederhoffer — lost more than $90 million in trades ("Niederhoffer Losses") on the Chicago Mercantile Exchange ("CME"). When rumors at the CME suggested that Refco customers had lost money and that Refco was on the hook, Grant stated to the public that "there is no problem at Refco." This was not true. Rather, when the customer could not meet the margin requirements, the Bennett Co-Conspirators caused Refco to take out an intra-day loan from a financial institution to meet the margin call at the CME and then used funds taken from customers of other Refco entities to repay the loan. The Bennett Co-Conspirators caused Refco to enter into settlement agreements with the Niederhoffer entities pursuant to which the Niederhoffer entities agreed to liquidate the positions in their accounts for the benefit of Refco.

204.    The Bennett Co-Conspirators also failed to properly account for the Niederhoffer Losses. Like the Asian Losses, the Niederhoffer Losses were uncollectible — indeed the settlement agreements released the Niederhoffer entities from liability — and should have been written off in Refco's operating results as a bad debt expense. Instead, approximately $71 million of the Niederhoffer Losses were "sold" or transferred to an RGHI subsidiary and then further transferred to RGHI's account at Refco. Thus, like the Asian Losses, the uncollectible Niederhoffer Losses were transformed from bad debts into what appeared on Refco's books as the RGHI Receivable.

205.     Refco also suffered substantial losses in excess of $40 million during this period from proprietary trades, *i.e.*, trades carried out on its own behalf, which losses were also improperly concealed rather than being written off.  Like the Niederhoffer Losses, rather than being written off in Refco's operating results, these losses — some of which were associated with the decrease in value of Russian bonds in 1998 — were "sold" or transferred to an RGHI subsidiary.

206.     Rather than recognize and properly record the trading losses on Refco's books, the Bennett Co-Conspirators concocted a scheme to transfer some or all of these losses from Refco to RGHI.  As a result, instead of being written off as bad debt, hundreds of millions of dollars in customer losses and proprietary trading losses were "converted" from patently worthless receivables into what appeared to be a legitimate and collectible receivable from RGHI.  This had the effect of making Refco's financial position look materially stronger than it actually was.

207.     RGHI did not, however, have the ability to pay off the RGHI Receivable. RGHI's primary asset was its stock ownership of Refco, the inflated value of which hinged on the Bennett Co-Conspirators' ability to conceal the very losses shifted from Refco's books to RGHI's account.

### b.     Hiding Operating and Other Expenses

208.     In addition to the Asian Losses and other trading losses, the Bennett Co-Conspirators also artificially inflated the appearance of Refco's financial results by inappropriately recording over a hundred million dollars in Refco expenses and other transactions on RGHI's books.  This had the effect of improperly reducing Refco's expenses while at the same time increasing the RGHI Receivable, *i.e.*, increasing RGHI's purported indebtedness to Refco.

209.    The activity making up this aspect of the RGHI Receivable relates to a number of different categories of expenses and charges that should have been recorded by a Refco entity rather than shifted to RGHI to become part of the RGHI Receivable.

210.    One category of improper transactions was expenses that were apparently incurred by Refco but were moved by the Bennett Co-Conspirators from Refco's books to RGHI's books. In many instances, the Bennett Co-Conspirators would cause a Refco entity to make a cash payment for an expense, or credit (reduce) an expense item that was to be transferred to RGHI, and record a resulting receivable from RGHI. At the same time, RGHI would record an expense and a resulting payable to Refco. For example, between 2000 and 2005, tens of millions of dollars in computer expenses were transferred from Refco to RGHI. Further, in or around February 2000, $6.5 million was paid by a Refco entity relating to the settlement of a lawsuit against Refco. The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco. On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

### c.    Phantom Income

211.    The Bennett Co-conspirators also artificially inflated the Refco's financial results by creating hundreds of million of dollars of phantom income from RGHI.

212.    The Bennett Co-Conspirators substantially inflated Refco's income by recording significant interest income from RGHI accruing on the fraudulently created receivable balance. This was bogus income being recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable. For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a transaction described as "Compound Interest To Principal." The $62.75 million of interest had been recorded as income by Refco.

213.    The Bennett Co-Conspirators also caused Refco to inflate its income as a result of "transactions" with RGHI.  On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording by the Bennett Co-Conspirators of income at Refco.  The description of the transaction on the account statement said only "Transfer" for each item.  This practice served as a significant source of Refco's income and continued after the LBO, while THL was in control of Refco.

### d.    Disclosure of the RGHI Receivable

214.    On October 10, 2005, Refco disclosed that a multi-hundred-million dollar related-party receivable had been inaccurately characterized in the company's public financial statements:

> Refco Inc. (NYSE: RFX) today announced that it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. . . .

215.    Refco also announced that, because this receivable was not shown as a related-party transaction in its financial reports, Refco's financial statements for the previous four years "should no longer be relied upon."

216.    Starting with its pre-LBO diligence, the THL Entities and THL Directors knew that the Bennett Co-Conspirators had thwarted THL's professionals from determining the nature of the balances carried in such related-party accounts.  After the LBO, when the THL Entities owned a controlling interest in Refco, when the THL Directors served on Refco's board, and when the Management Agreement was in force, the THL Entities and THL Directors had the right, the ability and the duty to demand such information from Refco's auditors.  THL

inexplicably never requested documentation regarding related-party accounts during this period

of control, despite Refco's auditor's refusal to furnish this information to THL prior to the LBO.

In essence, THL buried the red flag.

217.    In addition, the THL Entities and THL Directors had access to all of

Refco's books and records, including documents related to Refco's related-party transactions

with RGHI. Had the THL Entities and THL Directors exercised their right to review such

documents, they easily could have uncovered the fraud at Refco. By choosing not to demand

such information, the THL Entities and THL Directors breached their fiduciary duties to the

company.

### 2.    The Cover-up: Round-Trip Loans

218.    The multi-hundred million dollar RGHI Receivable was a related-party

obligation that was required to be disclosed in Refco's financial statements. To cover-up the

magnitude and the related-party nature of the RGHI Receivable at key reporting periods, the

Bennett Co-Conspirators came up with a remarkably simple scheme. The scheme involved

implementing a series of transactions at the end of each fiscal year (and also, starting in 2005, at

the end of fiscal quarters) that were designed to reduce temporarily the RGHI Receivable and

replace it on Refco's books with a receivable purportedly owed to Refco by unrelated third

parties (the "Round-Trip Loans"). The transactions were reversed just days after the end of the

reporting period and the RGHI Receivable was reinstated.

219.    Starting as early as February 1998, toward the end of each relevant

reporting period, the Bennett Co-Conspirators would cause RCM, or another one of the Refco

entities, to extend "loans" of up to $720 million at a fixed rate of interest to a third-party

unrelated to Refco, Bennett or RGHI. The "loan" would appear as a credit in the third-party's

account at Refco. The third-party would then "loan" the same amount to RGHI charging an

interest rate that was between 15 and 100 basis points higher than the third-party was being charged on the "loan" from Refco. The "loan" to RGHI would enable it to appear to pay down – by recording a reduction of its obligation – a significant portion of the debt RGHI owed to one or more of the Refco entities. For many of the Round-Trip Loans, the Bennett Co-Conspirators would also cause RGL to issue a guarantee to the third-party lenders for repayment of their "loan" to RGHI.

220.    A few days following the close of the reporting period, the parties would then unwind the entire transaction. The third party would receive a fee for Refco's temporary use of the third parties' legal entity. The fee or risk-free profit was equal to the interest the third-party "charged" on the "loan" to RGHI less the interest the third-party was "charged" on its "loan" from RCM. Indeed, although characterized as "loans" in the transaction documents, most of these transactions occurred on paper only; for the majority of the transactions, except for payment of interest to the third-parties, the "loans" were conducted on a book basis only and no actual transfer of funds occurred.

221.    The effect of the Round Trip Loans was to substitute at the end of each reporting period, for bookkeeping purposes only, a multi-hundred million dollar obligation owed by RGHI to one or more of the Refco entities (which obligation was required to be disclosed) into an obligation owed by an entity purportedly unrelated to Refco (which could be hidden in customer receivables). The Round-Trip Loans were a sham, generating risk-free profit for the third-party participating in these transactions. The Round-Trip Loans served no legitimate business purpose. Rather, they were conducted solely to reduce temporarily the amount of the RGHI Receivable at the end of a reporting period.

222.    There were approximately 30 Round-Trip Loans from 1998 through 2005, always at the end of a financial reporting period, and never at any other time (with one exception). The Round-Trip Loans caused the amount of the RGHI Receivable to be understated by hundreds of millions of dollars at each relevant reporting period and were always unwound a few days into the new reporting period.

223.    The Bennett Co-Conspirators conducted the Round-Trip loans both pre- and post-LBO. The post-LBO loans occurred while the THL Entities were controlling shareholder, while the THL Directors were on the Board of New Refco, and after THL had determined that Refco's accounting function was inadequate. They happened on THL's watch.

### 3.    Fraudulent Conversion Of Customer Assets At RCM

224.    Apart from the fraudulent activity concealed in third-party accounts, the Bennett Co-Conspirators engaged in a longstanding fraudulent conversion of customer assets held at RCM.

225.    RCM, Refco's purported offshore entity, was in the business of effecting securities and foreign exchange transactions for the accounts of customers. RCM held itself out to be a custodian for its customers' securities and cash. In reliance on RCM's supposed practices, customers opened accounts at RCM and entrusted property that allowed them to purchase and/or sell securities and currency that were held for them by RCM.

226.    In reality, however, RCM's actual business was starkly different; the Bennett Co-Conspirators saw to it that RCM did not "hold" or act as custodian of its customers' securities and cash. Rather, the Bennett Co-Conspirators would fraudulently convert customer assets held in the custody of RCM and use the resulting proceeds to sustain Refco's business operations and acquisitions. Without the RCM customers' knowledge, authorization or consent, on an almost daily basis, Refco employees were directed to sell, or cause to be sold, RCM

60

customers' securities through hypothecations or pursuant to agreements to repurchase ("repos").

The proceeds of the repos were then siphoned out of RCM, and transferred to RCC. RCC, in

turn, used the funds for the benefit of other entities resulting in "loans" to other Refco entities,

which entities could not repay those "loans."

227.    The fraudulent scheme perpetrated on the RCM customers was so

fundamental to the operation and financing of Refco that it had to have been apparent to each of

the THL Defendants. The volume and size of the transfers involved, on many occasions

hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets

substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net

uncollectible transfers totaled over $2 billion, while RGL claimed only $515 million in capital in

2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. Without

continued, fresh infusions of RCM customer assets, Refco would not have had sufficient

liquidity to continue functioning, and would have collapsed long before it did.

228.    Not surprisingly, given the size of the funds generated for Refco through

the unauthorized sale of customer securities, the THL Defendants were well aware that RCM

customer funds were not being protected and segregated in accordance with the relevant U.S.

regulatory requirements. While Refco board papers in the relevant period monitor segregation

and net capital requirements for other Refco entities, significantly those same Refco board papers

make clear that no such segregation requirements were observed in relation to RCM.

229.    The Bennett Co-Conspirators also kept careful track of the intercompany

transactions and of the customer assets that were held at RCM at any given time. Refco's

treasury operations were managed by the treasury department of Refco Global Finance. This

department generated regular reports for Refco management showing the amount of customer

assets that could be stolen from RCM customers.  The THL Entities and THL Directors —
including Jaeckel, who was the Treasurer of New Refco — had access to such reports throughout
the relevant period.  Additionally, upon information and belief, the THL Entities and THL
Directors in fact accessed the reports during the relevant period.  On information and belief, it
was by examining reports such as these that Refco management and the THL Defendants
ascertained that Refco was experiencing severe liquidity problems and thus decided to impose a
moratorium on RCM customer withdrawals in October 2005.

       230.    The stolen RCM customer assets were used for a wide variety of funding
purposes by various Refco affiliates.  For example, the Bennett Co-Conspirators used RCM
customer assets to make payroll payments and to fund the daily operations of other Refco
entities.

       231.    Moreover, while THL was in control of Refco, the Bennett Co-
Conspirators used RCM customer assets to fund business acquisitions and other significant
Refco transactions.  For example, in 2005 the Bennett Co-Conspirators used the proceeds from
the conversion of customer securities to loan $154.2 million from RCC to Suffolk, LLC, the
controlling shareholder of PlusFunds, to finance Suffolk's buyout of PlusFunds.  The Bennett
Co-Conspirators also caused RCC to make a $50 million payment at this time to two principals
of PlusFunds.

       232.    Additionally, while THL was in control of Refco, the Bennett Co-
Conspirators used assets converted from RCM customer accounts to fund Refco's purchase of
Cargill Investor Services.  Having completed an LBO which removed "excess" cash from
Refco's books, and having closely monitored the company's finances in preparation of the
upcoming IPO, the THL Entities and THL Directors knew the amount of cash available to

finance the Cargill acquisition. The THL Entities and THL Directors must have known — or at a minimum, strongly suspected and avoided confirming — the illegitimate origin of the approximately $209 million used to finance the Cargill acquisition.

233.    The THL Entities and THL Directors had unfettered access to, and were made aware of, material information concerning RCM and the intercompany transfers of RCM customer assets. For example, the THL Entities and THL Directors, through Jaeckel, received presentations on the results of Grant Thornton's audit of Refco's 2005 financial statements. In addition, documents produced by THLP in connection with the Debtors' bankruptcy proceedings demonstrate that the THL Entities and THL Directors were aware of RCM's practice of "repoing" securities that were supposed to be held in customer accounts and knew that RCM customer securities were being sold to raise cash for RCM and its affiliates.

234.    Given the THL Entities' and the THL Directors' easy access, the sheer size and number of the transfers made in furtherance of the fraudulent scheme, and the importance of the misappropriated funds both to the ongoing viability of Refco and its ability to complete a number of significant acquisitions, it is inconceivable that the THL Entities and the THL Directors would not have known about the use of the RCM customer funds over the course of the sixteen months it controlled Refco prior to the bankruptcy. Had they merely had an understanding of how Refco's businesses were regularly funded, the THL Entities and the THL Directors would have learned the full scope of the RCM fraud.

**G.    Refco's Insolvency**

235.    RGL and New Refco were insolvent starting no later than the LBO. Additionally, as of the Reincorporation, Refco Inc. was insolvent.

236.    Additionally, each of these entities possessed unreasonably small capital — including RGL, which was left with unreasonably small capital as a result of the LBO.

237.    Given that Refco was insolvent and in the zone of insolvency beginning no later than the LBO, the THL Entities and the THL Directors owed fiduciary duties to Refco's creditors, as well as to Refco and its stockholders. After the LBO, and after the THL Entities and THL Directors became majority owner and directors of Refco, numerous improper transactions caused Refco's insolvency to deepen.

238.    First, Refco entered into the ill-advised approximately $209 million Cargill acquisition. As noted, THL executives voiced grave concerns over the lack of due diligence on this transaction, and over the wisdom of the financial terms of the transaction — but nevertheless signed off on the acquisition, so as not to "rock the boat" soon before their IPO.

239.    Second, the THL Entities and THL Directors knew of the Suffolk Loans that financed Suffolk's buyout of PlusFunds. Again, they failed to properly consider whether these loans were in the best interests of Refco. Had they inquired into the validity of these loans, they would have learned that the Suffolk Loans were a sham and that Refco received little or no consideration in return for its loans.

240.    Third, the THL Entities and THL Directors improperly caused Refco to go public in August 2005. The IPO saddled Refco with hundreds of millions of dollars in obligations while THL and the other selling shareholders reaped substantial gains. By entering into an IPO based on a prospectus riddled with misstatements, Refco incurred liabilities under the securities laws to stock purchasers of $670.5 million. Similarly, THL caused Refco to register its bonds under Form S-4, thus causing Refco to incur hundreds of millions of dollars in

additional liabilities. Had THL taken the necessary steps to remedy Refco's internal problems prior to the IPO and the bond registration, Refco would not have incurred these losses.

241.    The THL Defendants violated their fiduciary duties by allowing Refco to enter into these transactions and thus plunge Refco deeper into insolvency.

**H.    Payments to the THL Defendants**

242.    From on or around August 5, 2004 — when the THL Defendants were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made the following payments to one or more of the THL Entities:

- Approximately $31.6 million for the Initial Management Fee and a semi-annual installment of the Annual Management Fee on August 5, 2004;

- $1.5 million as a semi-annual installment of the Annual Management Fee on March 4, 2005;

- Approximately $41.1 million as a "greenshoe" dividend on August 18, 2005;

- Approximately $12.9 million for the Management Agreement Buyout Fee on August 25, 2005;[8]

- Approximately $8.4 million to cover tax obligations owed by the THL Entities; and

- Approximately $3.9 million in payments as part of a "side letter" arrangement entered into on August 5, 2004 as part of the LBO.

243.    From on or around August 5, 2004 — when the THL Entities and THL Directors were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made the following payments for the benefit of one or more of the THL Entities:

---

[8]    Pursuant to the terms of the Management Agreement, New Refco and RGL were required to pay a buyout fee to THL immediately upon an IPO. This "cash lump-sum termination fee" was calculated as the "net present value of the fees that that would have been payable . . . for a period of five (5) years from the date of such termination calculated using the Fee paid for the fiscal year ended prior to such termination and a discount rate equal to the ten-year treasury rate on the date of such termination . . . ."

- Approximately $9.6 million for professional fees incurred in the LBO on or around August 5, 2004; and

- Approximately $3.5 million for professional fees incurred in the IPO.

244.    From on or around August 5, 2004 — when the THL Entities and THL Directors were fiduciaries of the Refco parent entities — RGL, New Refco, and Refco Inc. made approximately $38 million in payments to cover tax obligations owed by owners of Refco. Approximately $8.4 million of these payments were made to the THL Entities; the remainder went to other owners.

245.    The IPO was consummated on August 11, 2005.  At that time, THL and its affiliates sold approximately 7.86 million shares of Refco common stock, and received net proceeds of approximately $162.5 million.

246.    In total, therefore, the THL Defendants received the following approximate transfers and benefits, all of which are recoverable as fraudulent conveyances and/or subject to disgorgement, and which total approximately $275 million:

- $46 million under the Management Agreement;

- $162.5 million in IPO proceeds;

- $41.1 million as a greenshoe dividend;

- $8.4 million to cover the THL Entities' tax obligations;

- $13.1 million for THL's professionals hired for the LBO and IPO; and

- $3.9 million in "side letter" payments.

**I.    Post-Bankruptcy Events**

247.    As noted, on October 10, 2005, less then two months after the IPO, Refco disclosed a related-party receivable of approximately $430 million held at Refco.  The disclosure

precipitated a crisis of confidence among Refco's customers and shareholders. Within one week, Refco and various of its subsidiaries filed for bankruptcy.

248.    Notwithstanding THL's failure to uncover the fraud during its intimate involvement with and management of Refco, federal authorities stepped in and promptly identified massive wrongdoing at Refco. On October 11, 2005, the day after the public disclosure of the related-party receivable, Bennett was arrested and indicted by the United States Attorney for the Southern District of New York ("USAO"). Bennett was charged with fraud for engaging in fraudulent related-party transactions.

249.    On October 24, 2006, the USAO issued a superseding indictment against Bennett, adding Trosten as a defendant, relating to the fraudulent related-party transactions.

250.    Finally, on January 16, 2007, the USAO issued a superseding indictment, adding Grant as a defendant.

## COUNT I
### Recovery of Fraudulent Transfers
### Against the THL Entities
### (11 U.S.C. §§ 544(b), 550(a)(1), and (2); 548(a)(1)(B)(ii)(I), (II), and (IV);
### NY DCL § 270 et seq.)

251.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

252.    Refco Inc., New Refco, and RGL made the following transfers (the "Fraudulent Transfers") to or for the benefit of one of the THL Entities:

| Date | Payor | Payee | Description | Approx. Amount (Millions) |
|---|---|---|---|---|
| 08/05/2004 | RGL | Managers V | Transaction Fee plus one-half of Annual Management Fee | $31.6 |
| 08/05/2004 | Refco Finance Holdings | THL's professionals | Professionals' Fees | $9.6 |
| 03/04/2005 | RGL | Managers V | One-half of Annual Management Fee | $1.5 |
| 08/18/2005 | Refco Inc. | THLP | Greenshoe Dividend | $41.1 |
| 08/25/2005 | RGL | Managers V | Management Agreement Buyout Fee | $12.9 |
| 03/01/2005 – 08/31/2005 | RCC | Fund V Entities; THL Investors L.P.; 1997 THL Nominee Trust | "Side Letter" Payments | $3.9 |
| 05/01/2005 – 08/31/2005 | RGL, RCC | IPO professionals | Professionals' Fees | $3.5 |
| 01/01/2005 – 08/31/2005 | New Refco | THL Investors L.P. | Payments to cover tax obligations | $8.4 |

253.    Each of these Fraudulent Transfers constituted transfers of interests in property of Refco Inc., New Refco, or RGL.  The Fraudulent Transfers totaled approximately $112.5 million.

254.    Each of the Fraudulent Transfers was made for no consideration; was without fair consideration; or was made for less than a reasonably equivalent value.

255.    At the times of each of the Fraudulent Transfers, the payor (RGL, New Refco, or Refco Inc.) had at least one creditor with an unsecured claim for liabilities.

256.    Each of the Fraudulent Transfers was made (a) when the transferor was insolvent; (b) so as to render the transferor insolvent; or (c) so as to leave the transferor with unreasonably small capital.

**COUNT II**
**Recovery of Preferential Transfers**
**Against the THL Entities**
**(11 U.S.C. §§ 547(b); 550(a)(1), and (2))**

257.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

258.    Refco Inc. and RGL made the following transfers (the "Preferential Transfers") to or for the benefit of one of the THL Entities:

| Date | Payor | Payee | Description | Approx. Amount (Millions) |
|------|-------|-------|-------------|---------------------------|
| 03/04/2005 | RGL | Managers V | One-half of Annual Management Fee | **$1.5** |
| 08/18/2005 | Refco Inc. | THLP | Greenshoe Dividend | **$41.1** |
| 08/25/2005 | RGL | Managers V | Management Agreement Buyout Fee | **$12.9** |
| 03/01/2005 – 08/31/2005 | RCC | Fund V Entities; THL Investors L.P.; 1997 THL Nominee Trust | "Side Letter" Payments | **$3.9** |
| 05/01/2005 – 08/31/2005 | RGL, RCC | IPO professionals | Professionals' Fees | **$3.5** |
| 01/01/2005 – 08/31/2005 | New Refco | THL Investors L.P. | Payments to cover tax obligations | **$8.4** |

259.   Each of these Preferential Transfers constituted transfers of interests in property of Refco Inc. or RGL.  The Preferential Transfers totaled approximately $71.3 million.

260.   Each of the Preferential Transfers was made within one year of the filing of the Debtors' bankruptcy petitions on October 17, 2005.

261.   Each of the Preferential Transfers was made while the THL Defendants were insiders of Refco.

262.   Each of the Preferential Transfers was made to or for the benefit of one of the THL Entities for or on account of an antecedent debt owed by Refco Inc. or RGL before the transfers was made.

263.   Each of the Preferential Transfers was made while Refco Inc. and RGL were insolvent.

264.   Each of the Preferential Transfers enabled one of the THL Entities to receive more than they would have received if (a) the case were administered under chapter 7 of the United States Bankruptcy Code; (b) the transfer had not been made; and (c) the transferee received payment to the extent provided by the Bankruptcy Code.

**COUNT III**
**Breach Of Fiduciary Duty**
**Against the THL Entities**
**For Compensatory Damages**

265.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

266.   The THL Entities owed fiduciary duties to New Refco because they owned 57 percent (*i.e.*, a majority interest) of New Refco and exercised control over the business affairs of New Refco while that entity was the operative parent company of Refco.

70

267.    The THL Entities owed fiduciary duties to RGL because the THL Entities owned a majority interest in New Refco while New Refco was the operative parent company of Refco, at which time New Refco wholly owned RGL, and RGL's documents of incorporation provided that "[New Refco] shall have complete and absolute control of the affairs and business of [RGL]." Additionally, the THL Entities exercised control over the business affairs of RGL.

268.    The THL Entities owed fiduciary duties to Refco Inc. because, following the Reincorporation the THL Entities and their affiliates owned 57% of the shares of Refco Inc. and, following the IPO, the THL Entities and their affiliates owned 42.7% of the shares of Refco Inc. Additionally, the THL Entities exercised control over the board and the business affairs of Refco Inc.

269.    These duties required the THL Entities at all times to act faithfully on behalf of the Company and to conduct themselves in a manner they reasonably believed to be in the best interests of the Company.

270.    The THL Entities breached their fiduciary duties when they engaged in acts of self-dealing. As a result of these transactions, the THL Entities received a monetary benefit at the expense of the Refco entities.

271.    The THL Entities had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco. The THL Entities breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

272.    As a direct and proximate result of the THL Entities' acts and omissions, Refco entered into an IPO and incurred hundreds of millions of dollars in related liabilities;

71

Refco entered into acquisitions costing hundreds of millions of dollars which it could not afford; and Refco's insolvency was deepened and its assets were dissipated so that its creditors could not be paid. The THL Entities are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

## COUNT IV
### Breach Of Fiduciary Duty
### Against the THL Entities
### For Restitution

273.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

274.    The THL Entities owed fiduciary duties to New Refco because they owned 57 percent (*i.e.*, a majority interest) of New Refco and exercised control over the business affairs of New Refco while that entity was the operative parent company of Refco.

275.    The THL Entities owed fiduciary duties to RGL because the THL Entities owned a majority interest in New Refco while New Refco was the operative parent company of Refco, at which time New Refco wholly owned RGL, and RGL's documents of incorporation provided that "[New Refco] shall have complete and absolute control of the affairs and business of [RGL]." Additionally, the THL Entities exercised control over the business affairs of RGL.

276.    The THL Entities owed fiduciary duties to Refco Inc. because, following the Reincorporation the THL Entities and their affiliates owned 57% of the shares of Refco Inc. and, following the IPO, the THL Entities and their affiliates owned 42.7% of the shares of Refco Inc. Additionally, the THL Entities exercised control over the board and the business affairs of Refco Inc.

277.    These duties required the THL Entities at all times to act faithfully on behalf of the Company and to conduct themselves in a manner it reasonably believed to be in the best interests of the Company.

278.    The THL Entities breached their fiduciary duties when they engaged in acts of self-dealing.  As a result of these transactions, the THL Entities received a monetary benefit at the expense of the Refco entities.

279.    The THL Entities had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco.  The THL Entities breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

280.    The THL Entities breached their fiduciary duties by causing Refco Inc. to enter into an IPO in which the THL Entities derived an improper benefit at the expense of the Company while causing the Company to incur, among other things, approximately $670.5 million in obligations to shareholders.

281.    As a direct and proximate result of the THL Entities' acts and omissions, the THL Entities were enriched, including enrichment from transfers from the Company.  The THL Entities must disgorge all proceeds so derived, in an amount not less than $275 million.

<u>COUNT V</u>
**Breach of Fiduciary Duty**
**Against David V. Harkins, Scott Jaeckel, Thomas H. Lee, and Scott A. Schoen**
**For Compensatory Damages**

282.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

283.    The THL Directors owed fiduciary duties to New Refco because, as of August 5, 2004 at the latest, each of the THL Directors was a director of New Refco. Additionally, as of July 9, 2004 at the latest, Schoen, Jaeckel, and Taylor were each officers of New Refco.

284.    The THL Directors owed fiduciary duties to Refco Inc. because, as of August 1, 2005 at the latest, each of the THL Directors was a director of Refco Inc.

285.    In addition, the THL Directors owed fiduciary duties to RGL because, as of August 5, 2004 at the latest, the RGL LLC Agreement provided that New Refco had "complete and absolute control of the affairs and business of [RGL]." Accordingly, the duties owed by the THL Directors to New Refco reached RGL as well.

286.    These duties required the THL Directors at all times to act faithfully on behalf of RGL, New Refco, and Refco Inc. and to conduct themselves in a manner they reasonably believed to be in the best interests of these companies.

287.    The THL Directors breached their fiduciary duties when they engaged in acts of self-dealing. As a result of these acts, the THL Directors received a monetary benefit at the expense of the Refco entities. The THL Directors chose to put the interests of THL above the interests of the Refco entities.

288.    The THL Directors had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco. The THL Directors breached their

74

fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

289.     As a direct and proximate result of the THL Directors' acts and omissions, Refco entered into an IPO and incurred hundreds of millions of dollars in related liabilities; Refco entered into acquisitions costing hundreds of millions of dollars which it could not afford; and Refco's insolvency was deepened and its assets were dissipated so that its creditors could not be paid. The THL Directors are liable to the Company to compensate for these and other results of their breaches of fiduciary duties.

**COUNT VI**
**Breach of Fiduciary Duty**
**Against David V. Harkins, Scott Jaeckel, Thomas H. Lee, and Scott A. Schoen**
**For Restitution**

290.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

291.     The THL Directors owed fiduciary duties to New Refco because, as of August 5, 2004 at the latest, each of the THL Directors was a director of New Refco. Additionally, as of July 9, 2004 at the latest, Schoen, Jaeckel, and Taylor were each officers of New Refco.

292.     The THL Directors owed fiduciary duties to Refco Inc. because, as of August 1, 2005 at the latest, each of the THL Directors was a director of Refco Inc.

293.     In addition, the THL Directors owed fiduciary duties to RGL because, as of August 5, 2004 at the latest, the RGL LLC Agreement provided that New Refco had "complete and absolute control of the affairs and business of [RGL]." Accordingly, the duties owed by the THL Directors to New Refco reached RGL as well.

75

294.    These duties required the THL Directors at all times to act faithfully on behalf of RGL, New Refco, and Refco Inc. and to conduct themselves in a manner they reasonably believed to be in the best interests of these companies.

295.    The THL Directors breached their fiduciary duties when they engaged in acts of self-dealing. As a result of these acts, the THL Directors received a monetary benefit at the expense of the Refco entities. The THL Directors chose to put the interests of THL above the interests of the Refco entities.

296.    The THL Directors had a duty to inform themselves of Refco's financial state prior to making business decisions on behalf of Refco. The THL Directors breached their fiduciary duties because based on, among other things, their due diligence they knew, should have known, and should have informed themselves of Refco's true financial state upon assuming a managing role in Refco.

297.    The THL Directors breached their fiduciary duties by causing Refco Inc. to enter into an IPO in which they derived an improper benefit at the expense of the Company while causing the Company to incur $670.5 million in obligations to shareholders.

298.    As a direct and proximate result of the THL Directors' acts and omissions, the THL Directors were enriched, including enrichment from transfers from the Company. The THL Directors must disgorge all proceeds so derived, in an amount not less than $275 million.

<u>**COUNT VII**</u>
**Unjust Enrichment**
**Against All Defendants**

299.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

300.    The THL Defendants were enriched by the following transfers in excess of $275 million:

- Approximately $162.5 million in proceeds that the THL Defendants received by causing Refco to go public.

- Approximately $46 million pursuant to the Management Agreement;

- $41.1 million as a greenshoe dividend;

- $8.4 million to cover the THL Entities' tax obligations;

- $13.1 million for THL's professionals hired for the LBO and IPO; and

- Approximately $3.9 million in payments as part of a "side letter" arrangement entered into on August 5, 2004 as part of the LBO.

301.    When the THL Defendants received the monies described herein, they were enriched at the Company's expense by receiving something of value that belonged to the Company.

302.    The enrichment violates equity and good conscience.  Among other things, as a result of their failure to act appropriately as majority owner and directors of Refco, the THL Defendants must disgorge these monies as it would be inequitable and unjust to allow them to retain these funds.

## COUNT VIII
### Illegal Dividend
### Against the THL Entities and THL Directors
### (DGCL §§ 170 - 174)

303.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

304.    The THL Entities and the THL Directors approved and directed the payment of at least approximately $120.2 million in dividends and distributions by New Refco and Refco Inc., including a greenshoe dividend of approximately $82.2 million as well as approximately $38 million in payments to cover tax obligations owed by owners of Refco.

305.    At all relevant times, New Refco and Refco Inc. were insolvent.  Because these entities' liabilities exceeded their assets, the dividends and distributions approved by and paid to the THL Entities and the THL Directors were illegal under Delaware law.  The THL Entities and THL Directors are each liable for illegal dividends and distributions declared and paid while they were fiduciaries.

## COUNT IX
### Forfeiture of Compensation
### Against the THL Entities and THL Directors

306.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

307.    The THL Entities and THL Directors are required to forfeit all compensation received after the first date of their breaches of fiduciary duties, including after the first instance of a breach of their duty of loyalty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment and grant the following relief:

78

(a)     Entering judgment in favor of the Trust for the benefit of the Trust beneficiaries and against the THL Entities and the THL Directors in this action;

(b)     Avoiding and setting aside the Fraudulent Transfers and Preferential Transfers identified in **Counts I and II**;

(c)     Directing each respective transferee of the Fraudulent Transfers and Preferential Transfers identified in **Counts I and II** to deliver to the Trust for the benefit of the Trust beneficiaries the property transferred or pay the value of such property, in an amount not less than $112.5 million plus prejudgment interest;

(d)     Awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Counts III and V** against the THL Entities and THL Directors, jointly and severally, for all damages sustained by RGL, New Refco, and Refco Inc. as a result of the THL Entities' and THL Directors' breaches of their fiduciary duties, in an amount to be proven at trial, plus prejudgment interest;

(e)     Awarding restitution in favor of the Trust for the benefit of the Trust beneficiaries on **Counts IV and VI** against the THL Entities and THL Directors, jointly and severally, for all proceeds derived by the THL Defendants following the date of the first breach of fiduciary duty, plus prejudgment interest;

(f)     Directing disgorgement, restitution, and damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count VII** against the THL Defendants, jointly and severally, in an amount to be determined at trial, but not less than $275 million, plus prejudgment interest;

(g)     Awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count VIII** against the THL Entities and THL Directors, jointly and

79

severally, in an amount to be determined at trial, but not less than $120.2 million, plus prejudgment interest;

(h)    Directing forfeiture of all compensation received by the THL Entities and THL Directors after the first date of a breach of one of their fiduciary duties, and awarding compensatory damages in favor of the Trust for the benefit of the Trust beneficiaries on **Count IX** against the THL Entities and THL Directors, jointly and severally, in an amount to be determined at trial, but not less than $112.5 million, plus prejudgment interest;

(i)    Awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action; and

(j)    Granting Plaintiff such other and further relief as the Court considers appropriate.

80

## JURY DEMAND

308.    Plaintiff demands a trial by jury on all issues triable by a jury.


Dated: New York, NY
      August 8, 2007

MILBANK, TWEED, HADLEY & McCLOY LLP

_Kylie Davidson_

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Andrew E. Tomback (AT 9644)
Kylie Davidson (KD 0502)
1 Chase Manhattan Plaza
New York, NY  10005
(212) 530-5000

*Counsel for Plaintiff Marc S. Kirschner,*
*as Trustee for the Refco Litigation Trust*

81

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

NEW YORK
COUNTY CLERK'S OFFICE

[AUG 2 7 2007

NOT COMPARED
WITH COPY FILE

| | |
|---|---|
| MARC S. KIRSCHNER,<br>as Trustee of the Refco Private Actions<br>Trust, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| -vs- | )<br>) |
| PHILLIP R. BENNETT, SANTO C.<br>MAGGIO, ROBERT C. TROSTEN,<br>MAYER, BROWN, ROWE & MAW, LLP,<br>GRANT THORNTON LLP, and ERNST &<br>YOUNG U.S. LLP, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Index No. 07-602896

Jury Trial Demanded

## COMPLAINT

Plaintiff Marc S. Kirschner (the "Trustee"), as court-approved Trustee for the Refco Private

Actions Trust (the "Trust") and assignee of all claims related to Refco Inc. (collectively, with its

direct and indirect subsidiaries, "Refco," and with respect to those Refco entities that commenced

Chapter 11 bankruptcy cases, the "Debtors") belonging to, among others, the 75 former Refco

customers listed on Exhibit A (the "FX Customers") who maintained accounts at, and entrusted

funds to, Refco Capital Markets, Ltd. ("RCM"), as and for his Complaint against Phillip R. Bennett

("Bennett"), Santo C. Maggio ("Maggio"), and Robert C. Trosten ("Trosten") (collectively, the

"Refco Insiders"); and Mayer, Brown, Rowe & Maw LLP ("MB"), Grant Thornton LLP ("GT"),

and Ernst & Young U.S. LLP ("E&Y") (collectively, the "Professional Defendants"), states as

follows, based on information and belief, such information and belief based on the investigation of

the Trustee and his counsel and a review of, among other things:

1

       a)      filings of Refco, Inc. with the U.S. Securities and Exchange Commission ("SEC");

       b)      a review of the filings, documents, and testimony produced pursuant to Refco's re-organization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Proceedings") (assigned to the Honorable Judge Robert Drain and jointly administered under the caption "*In re Refco Inc., et al.*, Case No. 05-60006 (RDD)");

       c)      the Final Report of the Court-appointed Independent Examiner (the "Examiner") in the Bankruptcy Proceedings;

       d)      the Third Superseding Indictment in *U.S. v. Phillip R. Bennett, et al.*, S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007); and

       e)      other relevant public documents:

## Nature of the Case

1.     This is an action based on fraud, breach of fiduciary duty, conversion, and aiding and abetting fraud, breach of fiduciary duty, and conversion. The Trustee seeks to recover over half a billion dollars that the FX Customers were fraudulently induced to entrust to RCM and was later siphoned from the FX Customers' accounts by and at the direction of the Refco Insiders and persons or entities acting in active concert or participation with them, with the knowledge, active participation, and substantial assistance of the Professional Defendants.

2.     The ultimate goal of the activities alleged herein was simple: to allow the Refco Insiders and others to monetize and cash out their interests in Refco for more than those interests were worth through one or more liquidity transactions. To accomplish this objective, it was necessary, among other things, to present Refco as having various desirable characteristics, including without limitation: being financially strong and healthy; highly profitable; growing quickly; not

having suffered or being exposed to significant trading losses; having a low-risk business model; not having a balance sheet comprised of enormous amounts of uncollectible and related-party receivables; capable of exercising excellent expense control; able to satisfy its substantial working capital needs and meet growth objectives with its legitimate cash flow and available funds; and having excellent liquidity and strong credit ratings. Refco was able falsely to present itself as having these desirable characteristics because of the activities alleged herein, all of which ultimately related to, and were undertaken because of, a desire to "dress up" Refco for one or more lucrative and personally enriching liquidity events.

3.    As a result of the fraudulent scheme and other activities alleged herein, the Refco Insiders were able to carry out a leveraged buyout ("LBO") in 2004 in which hundreds of millions of dollars were transferred to Bennett and entities he controlled and to persons or entities acting in active concert or participation with him, as well as an initial public offering ("IPO") in 2005 in which Bennett and entities he controlled received transfers of more than $145 million and persons or entities acting in active concert or participation with him received transfers of approximately $226 million. The Professional Defendants not only played substantial roles in the fraudulent scheme, but were aware at all relevant times of the Refco Insiders' desire to consummate one or more liquidity events, and GT and MB played substantial roles in the LBO and the IPO as well.

4.    Before its collapse in October 2005, Refco presented itself to the public as one of the nation's leading independent providers of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange ("FX") markets. In fact, as was first publicly disclosed in October 2005, Refco's business was a house of cards. As would soon be discovered, Refco was being financed, in substantial part, by massive, ongoing, and secretive siphoning of funds entrusted to RCM for specific, limited

purposes by its customers including the FX Customers. Refco would never have been able to undertake the lucrative LBO or IPO had it not been for the massive fraud alleged herein.

5.    When the truth concerning Refco's finances, and the misconduct of the Refco Insiders emerged in October 2005, the house of cards collapsed and bankruptcy filings ensued within days. It was then discovered that over $2 billion of entrusted customer assets had been wrongfully siphoned from the accounts of RCM customers to fund other Refco businesses, to "dress up" Refco for one or more liquidity events, and to line the pockets of the Refco Insiders. The FX Customers instructed RCM to return their property -- as RCM was duty-bound to do -- but discovered, to their shock and dismay, that enormous amounts of property entrusted to RCM for specific, limited purposes -- and supposedly maintained in their accounts at RCM -- had been wrongfully removed from RCM; provided in undocumented, uncollateralized, unsecured, transactions to other Refco entities that lacked the intent and/or the financial wherewithal to repay the wronged RCM customers; and squandered or looted by the Refco Insiders and others. The FX Customers' entrusted property was thus unavailable for return to them pursuant to their instructions.

6.    The FX Customers whose claims have been assigned to the Trust, and whose claims the Trustee asserts in this action, collectively suffered losses totaling over half a billion dollars from the fraudulent inducement to entrust their funds to RCM and the improper siphoning of funds that they had entrusted to RCM and maintained in accounts with RCM for use solely in connection with FX transactions to be conducted pursuant to their instructions. By this action, the Trustee seeks to recover those funds from the Refco Insiders and monetary damages from the Professional Defendants that substantially assisted the Refco Insiders in:

4

a)      creating and maintaining the inducement and opportunity for the FX Customers to place and/or maintain funds in accounts with RCM by permitting RCM to remain in business and to serve as a magnet for such funds despite the undisclosed activities described herein;

b)      allowing, inducing, and causing the FX Customers to entrust their funds to RCM by placing and/or maintaining funds in accounts with RCM;

c)      siphoning, and hiding the siphoning of, the FX Customers' funds from their accounts at RCM, and then from RCM to other Refco entities that had provided no assurances of their ability, intent, or obligation to repay those funds on demand or otherwise, that had provided no security for the siphoned funds, and that, in fact, lacked the intent and/or financial wherewithal to repay the siphoned funds on demand or otherwise; and

d)      diverting the FX Customers' funds, directly or indirectly, from other Refco entities to the Refco Insiders and persons or entities in active concert or participation with them.

### Jurisdiction and Venue

7.      This Court has jurisdiction over defendants pursuant to New York's general jurisdiction statute (CPLR § 301) and long-arm statute (CPLR § 302).

8.      Venue is proper under CPLR § 503 because, among other things, the appointment of the Trustee was approved by the U.S. Bankruptcy Court in New York County and RCM maintained its principal place of business and conducted its business with the FX Customers from Refco's global headquarters in New York County at all relevant times.

### Parties

#### The Plaintiff

9.      Plaintiff Marc S. Kirschner is the Court-approved Trustee of the Refco Private Actions Trust, which was established in connection with the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries confirmed on December 15, 2006 by

5

the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the

Chapter 11 cases and proceedings of Refco on December 15, 2006. The Trustee is the assignee of

all Refco-related claims belonging to a number of persons and entities, including the 75 FX

Customers of RCM listed on Exhibit A, all of whom maintained accounts at Refco's subsidiary

RCM principally for the purpose of engaging in FX trading and who entrusted funds to RCM for the

specific, limited purpose of effectuating FX transactions pursuant to their instructions.

**The Refco Insiders**

10.    Defendant Phillip R. Bennett was the highest ranking corporate officer and Chairman

of various Refco entities until he was forced to resign following the disclosure of the massive fraud

he, Maggio, and Trosten perpetrated at Refco with the assistance of the Professional Defendants.

Among his other positions within Refco, he served as a director and officer of RCM at all relevant

times and therefore owed fiduciary duties both to RCM and to the FX Customers themselves and,

independently, was responsible by virtue of his position within RCM for ensuring that RCM

properly discharged its fiduciary duties to the FX Customers. Bennett is currently under indictment

in the U.S. District Court for the Southern District of New York, and stands charged with conspiracy

to commit securities fraud, wire fraud, to make false filings with the SEC, to make material

misstatements to auditors, bank fraud, and money laundering, as a result, in part, of acts alleged

herein. *See* Third Superseding Indictment ("Indict.") in *U.S. v. Phillip Bennett, et al.*, S3 05 Cr.

1192 (NRB) (S.D.N.Y. Jan. 16, 2007).

11.    Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985,

and held executive positions with various Refco entities until he was forced to resign following the

disclosure of the massive fraud he, Bennett, and Trosten perpetrated on Refco with the assistance of

the Professional Defendants. Among his other positions within Refco, he served as President and a

director of RCM at all relevant times and therefore owed fiduciary duties both to RCM and to the FX

6

Customers themselves and, independently, was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties to the FX Customers.  Maggio ran the brokerage operations of Refco Securities, LLC ("RSL") and RCM and directly participated in, and orchestrated and supervised, the theft of RCM customer assets alleged herein.  According to press reports, Maggio is cooperating with the U.S. Justice Department and the SEC in relation, *inter alia*, to his role in various frauds perpetrated during his tenure at Refco.

12.     Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001, and the Chief Financial Officer of Refco Group Ltd., LLC ("RGL") from 2001 to October 2004.  Trosten was intimately familiar with all details of the fraud he, Bennett, and Maggio perpetrated on Refco with the assistance of the Professional Defendants.  Trosten has been indicted for, among other things, conspiring to commit securities fraud, wire fraud, making false filings to the SEC, and committing bank fraud and money laundering, based, in part, upon the acts alleged herein.

**The Professional Defendants**

13.     Defendant Mayer, Brown, Rowe & Maw LLP is among the largest law practices in the world, with more than 1,500 lawyers operating in 14 major cities.  MB is a combination of two limited liability partnerships, each named Mayer, Brown, Rowe & Maw LLP, one established in Illinois, USA, and one organized in England.  MB served as Refco's principal outside counsel from 1994 until October 2005.  As set forth below in more detail, MB was intimately involved in numerous aspects of the Refco Insiders' fraudulent scheme, including preparing the loan documents through which Refco concealed its trading losses and operational expenses, advising the Refco Insiders as to how to continue diverting RCM's assets to fund Refco's businesses, and playing an active role in the LBO and IPO which it knew was premised on a fictitious picture of Refco's financial condition.  Indeed, the Court-appointed Examiner in the Bankruptcy Proceedings, after exhaustive review of MB's documents and interviews of the responsible MB attorneys, issued a

7

report concluding, among other things, that MB understood that fraudulent loans it structured for Refco were designed to assist the fraud: "there is significant evidence that Mayer Brown . . . assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements" and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

14.     Defendant Grant Thornton LLP is the Chicago-based U.S. member firm of Grant Thornton International, one of six global accounting, tax, and business advisory organizations with member firms in 11 countries and offices in New York.  GT served as Refco's purportedly independent auditor at all relevant times after 2002, when it replaced Arthur Andersen LLP ("AA") in that role.  GT issued clean and unqualified audit opinions on Refco's financial statements for fiscal years 2003, 2004, and 2005.  GT also served as the auditor for RCM and, with GT's authorization, financial statements of RCM audited by GT were periodically delivered to RCM customers, including the FX Customers, as an integral part of the fraud and other actionable conduct alleged herein.  According to the Examiner, whose investigation was limited by an inability to speak to any GT employees or Refco employees who dealt with the lead GT partner on the engagement, GT was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud" and "circumstantial evidence suggests that [GT] may have had actual knowledge of the fraud."

15.     Defendant Ernst & Young U.S. LLP is the New York-based U.S. member firm of Ernst & Young Global Limited.  E&Y is a public accounting firm that provides a range of business

and professional advisory services to companies worldwide, including assisting firms with complex tax issues. E&Y is a Delaware limited liability partnership with 83 offices and over 26,000 employees across the United States. E&Y and its affiliates prepared tax returns for Refco and Refco Group Holdings Inc. ("RGHI") from approximately 1991 through the 2002 tax year and continued to provide tax advice and assistance thereafter until 2005. E&Y also provided Refco with tax advice during that time. As explained in more detail below, during the course of its engagement with Refco and RGHI, E&Y became aware of the fraud alleged herein and actively aided and abetted it. According to the Examiner, "there is sufficient evidence to permit Refco's estate to allege that E&Y had actual knowledge of a fraud and breach of fiduciary duty," and "there is sufficient evidence to state a claim upon which relief may be granted [against E&Y] for aiding and abetting a fraud and/or breach of fiduciary duty."

### Factual Background

#### RCM's Position in Refco's Overall Operations

16.     Before its collapse in 2005, Refco had three major operating subsidiaries:

a)     RSL, a Delaware limited liability company and registered broker-dealer which at all relevant times had its principal place of business in New York, New York;

b)     Refco, LLC ("Refco LLC"), a Delaware limited liability company and regulated futures commission merchant which at all relevant times had its principal place of business in New York, New York; and

c)     RCM, a company which at all relevant times had its principal place of business in New York, New York, held itself out to the public and to customers as a securities and foreign exchange broker, and acted as the clearing house for all FX business conducted by Refco.

17.     Refco offered prime brokerage services, such as securities financing, securities lending, and trade processing through RSL, a registered broker-dealer that was regulated by the SEC

9

and the National Association of Securities Dealers ("NASD"), and was subject to the net capital and other regulatory requirements of those entities. Refco executed and cleared customers' orders for exchange-traded derivatives primarily through Refco LLC, which was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to various net capital and other regulatory requirements of those entities. Refco engaged in various brokerage activities, including clearing FX trades, through RCM.

18. In December 2001, in furtherance of the fraudulent scheme alleged herein, Refco shut down RCM's Bermuda operations and "repatriated" RCM to the U.S. This repatriation was conducted with the advice and assistance of MB, which as a result of this and other work performed for RCM and Refco was intimately familiar with RCM's business and operations and the activities alleged herein.

19. In addition to its major operating subsidiaries, Refco also maintained other subsidiaries, including Refco Capital LLC ("RCC"), a Delaware limited liability company which at all relevant times had its principal place of business in New York, New York, and which functioned as the "bank," "treasury," or "disbursing agent" for Refco. At all relevant times, a substantial portion of the funds disbursed by RCC to or on behalf of various Refco entities in performing this "bank," "treasury," or "disbursing agent" function for Refco were derived from the improper diversion and conversion of entrusted funds and securities from the accounts of RCM customers, including the accounts of the FX Customers. Without conversion of the customer property improperly siphoned from RCM customer accounts, RCC could not have performed its "bank," "treasury," or "disbursing agent" function, and Refco's house of cards would have collapsed for lack

10

of liquidity, as in fact occurred immediately after the fraud alleged herein was first publicly disclosed in October 2005.

**RCM's FX Business Model**

20.    As a result of RCM's implementation of its FX business model and the fraud alleged herein, RCM's FX customers, including the FX Customers whose claims the Trustee asserts in this action, were able and allowed to place and maintain, fraudulently induced to place and maintain, and did in fact place and maintain, a substantial amount of their property in accounts at RCM at all relevant times and entrusted substantial sums of cash to RCM for use for specific, limited purposes in connection with FX transactions at the time of Refco's collapse in October 2005.

21.    A typical FX trade involves the exchange of one currency for another -- *e.g.*, the purchase of Yen with Dollars. When an FX customer engages in an FX trade, the broker simultaneously enters into an offsetting transaction with a market maker and earns either a transaction fee or profit on the spread between the price it charged to the customer and the price it paid to the market maker. FX trades do not constitute trades of "securities" as that term is defined by U.S. federal securities laws.

22.    In order to conduct FX transactions with RCM, the FX Customers were required to deposit with RCM an amount of money which, in the specific context of FX trading, was referred to as "margin." The FX Customers entrusted these funds to RCM for the specific, limited purpose of allowing the customers to engage in specific FX transactions pursuant to the FX Customers' instructions and, as found by U.S. Bankruptcy Judge Robert D. Drain in a closely related context in the Bankruptcy Proceedings, entrusted these funds to RCM with the reasonable expectation that they would be returned to the FX Customers on their instruction.

23.    In this context, the term "margin" has a different meaning than in the securities context. Whereas in the securities context, "margin" typically refers to putting up cash and

11

borrowing against securities to increase buying power, in the context of FX trades, the margin ("FX Margin") is a good-faith or "earnest money" deposit. The FX Margin serves as security for the broker against swings in the value of currencies.

24.    FX trades are typically liquidated before closing, so that the customer will either have his original FX Margin plus a profit (if the currency appreciated in value during the open trade period), or his original FX Margin minus a loss (if the currency decreased in value during the open trade period). Unless and until a new trade is initiated by the customer, this money is not FX Margin, but simply property belonging entirely to the customer and remaining in the customer's account for use in additional FX transactions pursuant to the customer's instructions and, as found by Judge Drain in a closely related context, for return to the customer on the customer's instructions.

25.    At the time of the Refco bankruptcy, according to the rosy picture painted by their periodic account statements, the FX Customers had over half a billion dollars in their accounts at RCM.

26.    The fraud alleged herein enabled the Refco Insiders to cause RCM to continue to implement this FX business model and to continue to obtain improper access to funds maintained in customer accounts by the FX Customers whose claims the Trustee asserts in this action. This was done, in whole or in part, in pursuit of the ultimate goal of the fraud alleged herein: to allow the Refco Insiders to monetize and cash out of their interests in Refco through one or more liquidity transactions for more than those interests were worth. If the fraud alleged herein had not occurred or if the true facts been publicly disclosed at an earlier time, RCM would have been unable to continue to implement its FX business model, and the FX Customers would not have placed and maintained their property in accounts at RCM, where it was wrongfully siphoned by the Refco Insiders.

12

27.     As a result of the fraud alleged herein, and unbeknownst to the FX Customers, RCM was insolvent or in the zone of insolvency at all relevant times.

28.     As a result of the totality of the facts and circumstances surrounding the creation and maintenance of the relationship between the FX Customers and RCM, RCM and its directors and officers, including Bennett and Maggio, had a fiduciary duty to the FX Customers with respect to the protection and use of funds in the FX Customers' accounts, which the FX Customers had entrusted to RCM for the specific, limited purpose of conducting FX transactions pursuant to the customers' instructions.  These facts and circumstances included, among others and without limitation:

a)      RCM's role as a broker-dealer for the FX Customers and its acceptance of responsibility to act at all times on the FX Customers' behalf and in their best interest;

b)      the custodial and entrustment nature of the relationship between RCM and the FX Customers with respect to the FX Customers' funds;

c)      the fact that the FX Customers entrusted their funds to RCM for the specific, limited purpose of conducting FX transactions pursuant to their instructions and, as found by Judge Drain in a closely related context in the Bankruptcy Proceedings, did so with the reasonable expectation that the funds would be returned to the FX Customers on their instruction;

d)      Refco's efforts to position RCM with its customers such that, while purporting to be an off-shore unregulated entity, it was a financially healthy company and its customers' assets were safe and secure;

e)      RCM's decision, at the direction of the Refco Insiders to make use of FX Customer funds for purposes unrelated to RCM or to RCM's ability to service its FX Customers, and without any benefit to RCM or the FX Customers;

13

f)    the undisclosed facts and risks to which the FX Customers were exposed by virtue of the undisclosed, unsecured, uncollateralized transactions alleged herein;

g)    the fact that RCM was insolvent or in the zone of insolvency at all relevant times;

h)    the lack of deposit or similar insurance protecting funds in FX Customer accounts with RCM;

i)    Refco's public statements, designed to foster greater trust and confidence with RCM's customers, concerning, among other things, its "focus on acting as an agent," its "customer-oriented philosophy," its appeal to "customers concerned about . . . potential conflicts of interest," and its efforts to "avoid potential conflicts with [its] customers";

j)    Refco's public statements, designed to foster greater trust and confidence with RCM's customers, that the business of Refco and RCM did not involve proprietary trading for RCM's account but rather involved acting as an agent and executing customer instructions;

k)    Refco's statements to the effect that the relationships between RCM and other Refco entities were structured in such a way as to ensure that RCM would be able to satisfy its obligations to its customers before funds from RCM could be made available to other Refco entities for other corporate purposes, such as discharging obligations under notes issued by other Refco entities on which RCM was not obligated and which RCM did not guarantee;

l)    the terms and conditions of the agreements entered into between RCM and its FX Customers at the time an FX account was opened;

m)    the periodic account statements that RCM provided to its FX Customers which showed, among other things, customer orders being fulfilled and showed them being fulfilled in a way that reflected customer ownership;

n)      the lack of indicia that the relationship between RCM and the FX Customers was a debtor/creditor relationship, in which the customers were lenders or investors in RCM or any other Refco entity;

o)      RCM's failure to disclose to its FX Customers the existence, nature, and extent of the massive intercompany transfers alleged herein;

p)      the structure of the relationship whereby an RCM customer was assigned a dedicated salesperson who was responsible for the customer's account and FX transactions, thereby engendering greater trust and confidence by the FX Customers in RCM;

q)      the lack of any communications from RCM to the FX Customers that would have suggested to the FX Customers that their orders would not be executed or that RCM could not be relied upon to return their funds when instructed to do so; and

r)      RCM's superior knowledge of all of the underlying facts and the fraud alleged herein.

29.     The nature of the relationship between RCM and its customers was considered by Judge Drain in the Bankruptcy Proceedings. RCM asserted that the relationship between it and its customers was not a fiduciary relationship and that its customers did not entrust property with it. Judge Drain rejected this assertion. Judge Drain concluded that the relationship was fiduciary in nature in that RCM's customers entrusted securities and cash to RCM in order to effectuate transactions on the customers' instructions, and his decision stands for the proposition that RCM's customers had every reason to expect that securities and cash in their accounts would be returned to them on their instructions. Although Judge Drain reached this conclusion in connection with RCM's securities customers, it is fully applicable to the FX Customers as well because of the substantial similarities between RCM's relationship with its securities customers and its relationship with its FX

15

Customers. Indeed, Judge Drain noted that it was unfair and inequitable (not withstanding the applicable priority provisions in the Bankruptcy Code) to distinguish cash entrusted to RCM by FX Customers from cash and securities entrusted to RCM by securities customers.

## Refco's Improper Diversion and Conversion of FX Customers' Funds

30.    In order to keep Refco appearing to be a fast-growing group of companies and simultaneously to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available funds" instead of frequently accessing the capital markets to borrow money, Bennett, and other entities controlled by Bennett, had substantial needs for cash. As Refco itself stated, "[r]eady access to cash is essential to our business."

31.    As a result of the Bankruptcy Proceedings, the Trustee has learned that those cash needs were satisfied largely by a scheme to fraudulently induce RCM's customers to entrust their assets with RCM, followed by the diversion and conversion of RCM customer funds and securities and by siphoning those entrusted funds from RCM to other Refco entities that had provided no assurances of their ability, intent, or obligation to repay those assets on demand or otherwise, that had provided no security for the siphoned assets, and that, in fact, lacked the intent and/or financial wherewithal to repay the siphoned assets on demand or otherwise.

32.    RCC collected assets improperly siphoned from RCM customer accounts and distributed those proceeds to Refco affiliates and other entities as directed by the Refco Insiders. Using assets improperly siphoned from RCM customer accounts, including from the FX Customers' accounts, RCC served as the bank for the entire Refco organization and assisted Refco in creating and maintaining a false and misleading appearance of financial health and strength for Refco in the eyes of the public while at the same time allowing RCM customer funds to be used as a personal piggy bank that was looted by the Refco Insiders. By these actions, the Refco Insiders sought to,

and did, "dress up" Refco for one or more lucrative and personally enriching liquidity events, including the LBO and the IPO, which were conducted with the substantial assistance of MB and GT.

33.    The siphoning occurred with respect to all of RCM's customers.  With respect to RCM's FX business specifically, on a daily basis, assets in the accounts of FX Customers were improperly siphoned from those accounts, transferred out of RCM, and then converted for use by other Refco entities.  The Refco Insiders caused RCM to keep as little cash as possible in FX Customer accounts.  As reflected in the account statements sent to the FX Customers, RCM purported to hold hundreds of millions of dollars of FX Customer cash at all relevant times.  In reality, RCM maintained only a minimal amount of cash on hand to prevent routine customer withdrawals from jeopardizing the scheme.  The remainder of the entrusted FX Customer cash was secretly deployed to fund other Refco businesses and to keep the Refco house of cards from collapsing, for the purpose of perpetuating the fraudulent scheme and enriching the Refco Insiders by enabling them to sell some or all of their interests in Refco for more than those interests were worth.

34.    Rather than putting RCM customer assets to their intended uses in connection with transactions conducted pursuant to customer instructions, with appropriate regard for the legitimate and reasonable interests and expectations of RCM's customers, the Refco Insiders, who had clear conflicts of interest and divided loyalties, caused the funds to be "upstreamed," "side-streamed," and "down-streamed" to other Refco entities.  These transfers, which purportedly took the form of "loans" from RCM to other Refco entities, often occurred without any "loan" documentation between RCM and the Refco entities that received assets that had been wrongfully "siphoned" from the accounts of RCM customers.  The purported "loans" of RCM customer funds to other Refco

entities for purposes unrelated to the business of RCM and without benefit to RCM were related-party transactions, reflecting blatant and undisclosed conflicts of interest by the Refco Insiders, and were made:

      a)     without compensation, security or collateral;

      b)     without assurances that the funds would or could be repaid on demand or at all by the Refco entities that received them;

      c)     without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM or RCM's customers of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

      d)     to other Refco entities that in fact lacked the intent and/or the financial wherewithal to repay the siphoned funds;

      e)     for the purpose of perpetuating Refco's shell game and enriching the Refco Insiders and others;

      f)     in transactions that provided no benefits to the affected RCM customers and in which the legitimate and reasonable interests and expectations of the RCM customers were entirely ignored; and

      g)     without appropriate disclosure to, or consent by, the affected RCM customers, including the FX Customers.

35.    As of October 2005, RCM had more than $2 billion of undisclosed and uncollectible related-party receivables outstanding as a result of these transactions by which entrusted funds were siphoned from customer accounts and distributed to other Refco entities without the intent and/or the financial wherewithal to repay RCM these funds. Ultimately, RCM's customers were left with losses of more than $2 billion as a result of these siphoning transactions, including over half a billion

dollars in losses (not including pre-judgment interest) incurred by the FX Customers whose claims the Trustee asserts in this action.

**Refco's Siphoning of RCM Customers' Funds Was Facilitated and Hidden by Fraud**

36.    The Refco Insiders' ultimate goal of cashing out of Refco, in whole or in part, through one or more liquidity events depended on continued improper siphoning from RCM customer accounts, including the FX Customers' accounts, to fund Refco's business and for other purposes.

37.    The Refco Insiders recognized that Refco's business faced inherent "reputational" risks and that customers would not do business with RCM, and place or leave cash and securities in their accounts with RCM, and thereby entrust their funds to RCM, if they did not believe that RCM was financially healthy and strong and was a safe entity to which customers could entrust their cash and securities for specific, limited purposes -- a fact that was indisputably confirmed by the "run" on RCM precipitated by the belated public disclosure of the fraud at Refco in October 2005. Accordingly, the Refco Insiders needed to, and did, commit fraud in order to keep RCM's customers in the dark and RCM's doors open long enough so that they could continue to siphon RCM customer funds until they could find a way to successfully sell some or all of their interests in Refco.

38.    By allowing and causing RCM to continue to implement its FX business model, and by falsely presenting RCM to the public as financially healthy and strong and as a safe entity to which customers could entrust their cash and securities for specific, limited purposes, the Refco Insiders enabled RCM to attract a substantial volume of business from the FX Customers whose assigned claims the Trustee is pursuing in this action, and made huge quantities of cash entrusted to RCM by its customers available to the Refco organization for improper diversion, conversion, and siphoning. The false picture of financial health and strength to which these activities contributed was then used as a basis for the desired liquidity transactions.

39.    As a result of the fraud alleged herein, the quantity of entrusted FX customer funds available for diversion and conversion by the Refco Insiders increased dramatically. For example, for the fiscal year ended February 28, 2001, RCM's FX customers had entrusted approximately $115 million to RCM. Over the years this figure grew by hundreds of millions of dollars and ultimately ballooned to approximately $811 million on October 17, 2005 -- the day Refco filed for bankruptcy. A very substantial percentage of these totals reflect funds entrusted to RCM by the FX Customers whose claims the Trustee asserts in this action. This could not and would not have happened in the absence of the fraud alleged herein.

a.    **Hiding Undisclosed Losses**

40.    To enable Refco to present itself and RCM to the public as financially healthy and strong and as a safe entity to which customers could entrust their cash and securities for the specific, limited purpose of conducting securities, FX, and other transactions pursuant to their instructions, and to ensure that RCM customers would continue to place and maintain cash and securities in their accounts at RCM where they could be improperly siphoned to fund Refco's business, and to portray Refco as having a low-risk business model, not subject to the risk of substantial customer losses impacting Refco, nor the risk of enormous amounts of uncollectible receivables, the Refco Insiders hid significant losses throughout the relevant period.

41.    As discussed in more detail below, Refco had massive undisclosed losses caused by uncollectible customer receivables. These losses were hidden by transferring them to RGHI, (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Tone Grant ("Grant"), Refco's former CEO), increasing a related-party receivable owed by RGHI to Refco (the "RGHI Receivable"), and then concealing the amount due from RGHI through a series of undisclosed sham "loans" timed to occur at the end of Refco's financial reporting periods. This scheme was designed to (and did) enable Refco to temporarily transfer massive amounts of

uncollectible customer receivables off of its books by shifting it between wholly-owned Refco

subsidiaries, related-party companies owned and controlled by the Refco Insiders, and several third-

party customers of Refco. The goal of this scheme was to disguise hundreds of millions of dollars of

uncollectible receivables due to Refco so that Refco could fraudulently avoid recording hundreds of

millions of dollars in write-offs and fraudulently continue to project to the public a false impression

of financial health and strength and a false sense that RCM was a safe entity to which customers

could entrust the customer cash and securities that Refco needed to perpetuate its shell game.

42.     A significant portion of the uncollectible customer receivables originated in trading

losses incurred by Refco's customers in the late 1990s. Refco regularly extended credit to customers

who engaged in securities, commodities and futures trades. As a result, when markets fluctuated

drastically, as they did, for example, during the Asian market collapse in 1997, several Refco

customers (other than the FX Customers), having made large speculative trading bets on securities

tied to Asian currencies, lost huge sums of money (the "Asian Losses") and were unable to repay

over a hundred million dollars worth of loans that Refco had made to them. Refco was forced to

assume those losses.

43.     Also in 1997, certain Refco customers in the United States to whom Refco had

extended credit -- entities associated with Victor Niederhoffer -- lost more than $90 million in trades

(the "Niederhoffer Losses"). When the customer could not meet its margin requirements, the Refco

Insiders caused Refco to take out an intra-day loan from a financial institution to meet its margin call

and then used funds taken from customers of other Refco entities to repay the loan. Ultimately, the

Refco Insiders caused Refco to enter into settlement agreements with the Niederhoffer entities,

pursuant to which the Niederhoffer entities agreed to liquidate the positions in their accounts for the

benefit of Refco. Like the Asian Losses, the Niederhoffer Losses were uncollectible -- in fact, the

21

settlement agreements released the Niederhoffer entities from liability -- and should have been written off in Refco's books as a bad debt expense. Instead, most or all of these losses were transformed from bad debts to apparent assets by "selling" or transferring them to RGHI so that they could become part of the RGHI Receivable.

44.    Refco also suffered substantial losses from its own proprietary trading, *i.e.*, trades carried out on its own behalf, which should have been written off, but instead were "sold" or transferred to RGHI, becoming part of the RGHI Receivable.

45.    Collectively, customer and proprietary trading losses sustained by Refco amounted to hundreds of millions of dollars. If disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management, and severely damaged Refco's business. Out of concern over the effect disclosure of the losses and uncollectible customer debts would have on Refco's business model and financial condition (and the value of their interest on any sale of Refco), the Refco Insiders transferred massive amounts of proprietary trading losses and uncollectible customer debt off Refco's books by shifting it into the RGHI Receivable.

46.    RGHI did not, however, have the ability to pay off the RGHI Receivable. RGHI's primary asset was its stock ownership of Refco, the inflated value of which hinged on the Refco Insiders' ability to conceal the very losses they were shifting off of Refco's books and onto RGHI.

**b.    Concealing Refco Operating Expenses**

47.    In addition to hiding proprietary and customer losses, in order to foster the illusion that Refco was in healthy financial condition and a good prospect for a lucrative buy-out or sale, the Refco Insiders also hid over a hundred million dollars of Refco expenses and other transactions by transferring them to RGHI, thereby fraudulently increasing Refco's apparent profits. Although the expenses were incurred by numerous Refco entities and paid by Refco, they were transferred to the

22

RGHI Receivable. For example, in or around February 2000, $6.5 million was paid by a Refco entity relating to the settlement of a lawsuit against Refco. The related expense, however, was recorded on the books of RGHI along with a corresponding $6.5 million payable to Refco. On Refco's books, Refco increased the amount of the RGHI Receivable by $6.5 million.

48.    Through this scheme, millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses, and millions more in payroll and outside professional expenses, were concealed.

     c.    **Hiding the RGHI Receivable**

49.    The multi-hundred million dollar RGHI Receivable was a related-party obligation that was required to be disclosed in Refco's financial statements. To conceal the magnitude and related-party nature of the RGHI Receivable on these financial statements, the Refco Insiders came up with a remarkably simple scheme that should have been (and was) obvious to GT, MB, and E&Y. The scheme involved implementing a series of Round Trip Loan transactions ("RTLs") at the end of each fiscal year (and also, starting just before the LBO, at the end of several fiscal quarters) to temporarily pay down the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco.

50.    Hiding the related-party debt in this manner allowed Refco to avoid disclosing its massive trading losses and/or writing off the hundreds of millions of dollars in losses, thereby concealing Refco's true financial condition. This, in turn, allowed the Refco Insiders to overstate Refco's financial condition and related operating results, understate its operating expenses, and fraudulently continue to project to the public a false impression of financial health and strength -- falsely securing customer confidence and ensuring continued deposits of cash and securities from customers.

51.    While some of the trading losses were permanently parked at RGHI, others were held at Refco and only moved off Refco's books and transferred into the RGHI Receivable just prior to reporting and auditing periods. Aside from the irregularity of transferring losses off of Refco's books merely days before a reporting period, large intercompany receivables owed to Refco by a related-party (RGHI) would have to be disclosed on Refco's financial statements and would have invited scrutiny and skepticism. The Refco Insiders, with the active assistance of the Professional Defendants, devised the RTLs to conceal the massive related-party receivable.

52.    Thus, at the end of every relevant reporting period, a Refco entity would extend a "loan" for an amount up to $720 million to a third-party with no apparent relation to Bennett or RGHI, and without sufficient collateral to support the loan. That third party ("the RTL Participant") would then "loan" the same amount to RGHI. The RTL was completed when RGHI used the "loan" from the RTL Participant to pay down the debt it owed to Refco. Thus, on Refco's financial statements, the RGHI Receivable was transformed into a loan owed to Refco from an unrelated third-party.

53.    Right after the start of each new reporting period, the RTL was "unwound" by reversing the entire process. RGHI would record a new "loan" from Refco, thereby restoring the RGHI Receivable. Those funds were then transferred to the RTL Participant as repayment for its earlier "loan" to RGHI, and the RTL Participant in turn transferred those funds to Refco in satisfaction of its own "loan" from Refco. This "unwinding" process, like the initial execution of each RTL, often occurred only on paper; no actual transfers occurred other than the payment of fees to third-party RTL Participants. For agreeing to participate in the RTLs, the RTL Participants received payment of the "spread" between the interest rates of the two "loans." The Refco Insiders

generally caused RCM to make these payments, even though RCM obtained no benefit from the RTLs.

54.     In addition, from 2000 through 2005, Refco engaged in approximately 12 wire transfer RTLs with, among others, longtime Refco customer Bank fur Arbeit und Wirtschaft und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG"). Like the other RTLs, the wire transfer RTLs involved transfers in late February, with those transactions being subsequently reversed in early March. Altogether, these fraudulent RTLs occurred at least 30 times from 2000 through 2005, always at the end of a financial reporting period, never at any other time (with one exception), and were always unwound a few days into the new reporting period.

55.     The RGHI Receivable and the RTLs enabled Refco to hide its true financial picture from the public and to continue to present itself and RCM as financially healthy and strong, as having a low-risk business model, and as a entity to which customers could entrust their cash and securities for the specific, limited purpose of conducting securities, FX, and other transactions pursuant to their instructions. The truth -- undisclosed to and unknown by RCM's customers, including the FX Customers -- was that Refco and RCM were a house of cards, highly susceptible to a liquidity crisis upon any disclosure of the fraud and the existence of the RTLs.

56.     Such a liquidity crisis materialized in October 2005, when the RGHI Receivable and the RTLs were publicly disclosed for the first time, leading to an immediate "run" on RCM which RCM was unable to satisfy because the customer cash and securities entrusted to it for specific, limited purposes had been wrongfully siphoned to Refco entities that were unable to repay the victimized RCM customers, including the FX Customers.

**d.**     **Inflating RGL's Revenues with Phantom Income and Commissions**

57.     The Refco Insiders also fraudulently inflated RGL's revenues by recording interest income associated with the fraudulent RGHI Receivable, charging as much as 35% at times. For

example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million

through a transaction described as "Compound Interest To Principal." The $62.75 million of illusory

interest was recorded as income by Refco. But no interest payments were ever made, and because

the RGHI Receivable was falsely created, held by a related-party and not subject to any form of

repayment obligation, the interest income was entirely fictional and should never have been

recorded. Between 2001 and 2005, the fictional interest on the RGHI Receivable amounted to

approximately $250 million.

58.     The Refco Insiders also caused Refco to inflate its income as a result of

"transactions" with RGHI. This practice served as a significant source of RGL's income. On

January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling

approximately $13 million, both of which resulted in the recording by the Refco Insiders of income

at RGL. The description of the transaction on the account statement said only "Transfer" for each

item.

59.     In addition, the Refco Insiders caused fictitious trades in RGHI's account at RCM for

the purpose of creating phantom "losses" at RGHI and corresponding phantom "income" for RCM.

For example, through 2004 and 2005, RGHI conducted fictitious trades in U.S. Treasury Bonds,

buying bonds and selling them at a loss the same day. In this manner, the Refco Insiders

manufactured millions of dollars of fake "income" for RCM's parent corporation.

e.     **Hidden Misuse of RCM Customer Assets**

60.     Having successfully hidden the uncollectible receivables, thereby allowing the Refco

Insiders and others to continue to implement the RCM FX business model, and having fostered a

public perception that Refco and RCM were financially healthy, strong and safe entities to which

customers could entrust their cash and securities, the Refco Insiders devised an equally simple

method of operating Refco's day-to-day business, engaging in costly transactions that they wished to

consummate but for which they lacked the financial wherewithal, and "dressing up" Refco for one or more lucrative and personally enriching liquidity events -- they simply stole operating funds from RCM's customers, including the FX Customers, and replaced the customer assets committed to RCM's safekeeping with, if anything, worthless IOUs from affiliated Refco entities.

61.     At all relevant times, the Refco Insiders engaged in a scheme pursuant to which RCM customer assets, including the assets of the FX Customers whose claims the Trustee asserts in this action, were secretly siphoned from their accounts at RCM and used to prop up Refco and to project a false appearance of financial health and strength on the part of Refco. The theft was accomplished through a series of intercompany transactions fraudulently mischaracterized as "loans" purportedly made from RCM to certain "customers" who were simply other Refco affiliates. By the time Refco filed for bankruptcy on October 17, 2005, over $2 billion in RCM customer assets were missing, and in their place were uncollectible intercompany receivables owed to RCM by Refco affiliates.

62.     As a result of the fraud alleged herein, the quantity of entrusted RCM customer funds siphoned to Refco entities at the direction of the Refco Insiders increased dramatically. By the end of fiscal year 2004, over a billion dollars of funds entrusted to RCM had been siphoned to other Refco entities; by the end of the fiscal year 2005, the amount of customer funds entrusted to RCM siphoned from their accounts at RCM and distributed to other Refco entities had grown to $2 billion and it continued to grow thereafter, so that it totaled over $2 billion on October 17, 2005 -- the day Refco filed for bankruptcy. A very substantial percentage of these totals reflect funds entrusted to RCM by the FX Customers whose claims the Trustee asserts in this action. This could not and would not have happened in the absence of the fraud alleged herein.

63.     Thomas Yorke, the Refco executive primarily responsible for the execution of the hidden siphoning scheme, testified at the Bankruptcy Conversion Motion Hearing on March 3, 2006,

that RCM's customers were not told that entrusted property was swept from their accounts at RCM to other Refco entities. Given the opportunity to testify that RCM's customers were told that this might happen, he could identify no such communications to customers. He further testified that he would not expect RCM's customers to have known "about the inner workings, relative to what the upstream bank was doing, no." Yorke's reference to the "bank" was a reference to RCC.

64.     The scope of the scheme was enormous. Indeed, the scheme was so fundamental to the operation and financing of Refco that it had to have been apparent to each of the Professional Defendants. The volume and size of the transfers involved, on many occasions, hundreds of millions of dollars each, resulting in stolen amounts that dwarfed Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

65.     Without continued, fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue functioning, and would have collapsed long before it did. Indeed, as described above, when disclosures in October 2005 of the previously undisclosed related-party receivable prompted RCM customers to lose confidence in Refco and RCM and to begin to withdraw their securities and funds from RCM, the immediate response by Refco was to impose a moratorium on all activities of RCM, including withdrawals from customer accounts. Without the continued availability of RCM customer assets, Refco collapsed, filing for bankruptcy just days later.

66.     As part of the scheme, on a daily basis, acting on instructions from the Refco Insiders, the Refco executives responsible for maximizing the siphoning of funds entrusted to RCM from FX Customer accounts and for distributing those funds to other Refco entities would transfer all but a *de*

28

*minimis* amount of FX Customer assets to RCM's securities division. Without the knowledge, authorization, or consent of the FX Customers, that money (in addition to assets stolen from RCM's securities customers) would then generally be transferred by RCM to RCC, in a series of undocumented intercompany "loans." RCC functioned as a "disbursing" agent, distributing the looted property wherever it was needed in the Refco organization.

67.    The stolen FX Customer assets were used for a wide variety of general and specific funding purposes by various Refco affiliates, all of which were completely unrelated to RCM, and did not benefit RCM or the FX Customers in any way. Because of the importance of the RCM customer assets to the overall Refco shell game, the Refco Insiders also kept careful track of the intercompany transactions and of the customer funds that were available for diversion and conversion at RCM at any given time. Refco's treasury operations at all relevant times were managed by the treasury department of another Refco entity. This department generated regular reports for management concerning the amount of customer assets available at RCM. The reports were circulated to the Refco Insiders and were available to the Professional Defendants at all relevant times.

68.    The transfers that accomplished the theft of RCM customer assets, including the FX Customer assets, were fraudulently accounted for as "loans" purportedly made by RCM to "customers." In order to support this fiction, RCM issued fraudulent "customer account statements" to RCC, RSL, and other Refco affiliates to which it transferred RCM customer funds. The account statements showed the substantial amounts of indebtedness and interest that the entities owed to RCM. RCM then fraudulently mischaracterized these affiliate "loans" on its books as "customer receivables."

69.    However, these Refco affiliates were not RCM "customers" in any legitimate sense. None was evaluated for creditworthiness or risk, as was required of RCM customers in the normal course. Nor did the debts arise from securities or foreign exchange transactions, which were the ostensible businesses in which RCM was engaged. The debts in question arose from improper, undisclosed, unsecured, and uncollateralized transfers made by RCM to related parties, at the direction of the Refco Insiders, without consideration, without any analysis of the creditworthiness of the supposed "borrowers" or of the risks of the transactions, without proper documentation and corporate formalities, and without disclosure to RCM's customers, including the FX Customers. The recipient Refco affiliates were not required to post collateral or margin. The loans were not collateralized with marketable securities, as were the loans that RCM made to customers in the normal course. Moreover, these purported "loans" were uncollectible because the Refco affiliates to which the "loans" were made lacked the intent and/or the financial wherewithal to repay them.

70.    These transfers served no legitimate business purpose for RCM or the FX Customers. As noted, RCM received no margin, collateral, or security, and the loans were improperly and fraudulently documented. RCM did not even receive security interests in any of the assets purchased with the transferred funds. The monies were simply transferred and dissipated. When Refco filed for bankruptcy, RCM was left with more than $2 billion in receivables from the other Refco affiliates which were uncollectible and which RCM was therefore unable to return to its customers, including the FX Customers.

f.    **The LBO's Destruction of RCM's Asset Value**

71.    By the time the Refco Insiders arrived at their big liquidity event -- an LBO carried out in conjunction with Thomas H. Lee Partners ("THL") -- the unauthorized "loans" by RCM of customer property had grown to approximately $2 billion and were continuing to increase as more and more funds were siphoned from RCM's customers in exchange for undocumented,

30

uncollateralized IOUs from affiliates. Meanwhile, the Refco Insiders, with the active assistance of highly sophisticated legal and financial advisors and auditors, caused RGL (together with all of its domestic subsidiaries, including RCC) to borrow $1.4 billion of bank and bond debt primarily to fund the buyout of RGHI's control of Refco. The LBO proceeds were not used to honor any obligations to RCM in any way, and the advisors and auditors (including, among others, MB and GT) played key parts in masking how RCM's customers were severely damaged by the LBO debt.

72.     Immediately before the LBO, the biggest creditor of RGL and its affiliates was none other than RCM. Even though this was well known to Refco Insiders, and the sophisticated legal and financial advisors and auditors involved in the LBO, the Refco Insiders caused RGL to distribute the proceeds of the LBO debt to themselves, leaving RGL and its affiliates saddled with over $1 billion of new debt, from which RCM received no pay-down.

73.     To foster the illusion that RCM was financially healthy and strong, and was a safe entity to which customers could entrust their cash and securities for specific, limited purposes, RCM was specifically excluded as a guarantor of the debt issued in connection with the LBO, and reference to RCM was glaringly absent in the Offering Circular for the LBO bonds. Nowhere did the Offering Circular explain: (i) that the RCM assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard to RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; and (iii) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard to the interests of RCM.

74.     Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not

31

guaranteed the notes." This was a pretense designed to lull any of RCM's customers who received it into a state of comfort about the financial health of RCM and the impact of the LBO, because maintaining the perception that RCM's customer assets were safe and secure was key to continuing the siphoning scheme. More of the same type of false comfort was provided elsewhere in the Offering Circular: "The effect of this subordination is that, in the event of a bankruptcy . . . , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid." These and similar statements recognize the way the LBO should have been structured -- consistent with the duties of RCM's directors to RCM and its customers -- i.e., ensuring that all of RCM's obligations to its customers were satisfied before siphoning away RCM's funds in exchange for worthless IOUs.

75.    The Professional Defendants working on the LBO each knew and/or consciously avoided knowledge of the magnitude and significance of the Refco entities' obligations to RCM. Each of these defendants reviewed, helped prepare or were aware of the following information set forth in the "payable to customers" line of the condensed consolidating balance sheet to Note O of the financial statements attached to the LBO Offering Circular, which is labeled Condensed Consolidating Financial Information:

32

**Condensed consolidating balance sheet**

<u>February 29, 2004</u>

|  | Parent [RGL] | Guarantor Subsidiaries [Includes RCC] | Non–Guarantor Subsidiaries [Includes RCM and RGF] | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| Liabilities Payable to customers | $465,681 | $1,556,529 | $6,647,453 | ($3,573,946) | $5,095,717 |

76.    By performing professional services for Refco, each of the Professional Defendants were deeply familiar with Refco's corporate structure and its operations. While an outsider would have been unable to discern from the condensed consolidating information the full extent to which RCM funds had been siphoned off to RGL and its other affiliates, these Professional Defendants understood, at least, the following:

(a)    that in order to obfuscate Refco's financial statements and conceal their fraudulent scheme, the Refco Insiders misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";

(b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," these Professional Defendants knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a parent holding company with no trading operations and no "customers";

(c)    RCC, the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did not have

33

any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and

> (d)     that only RCM had the volume of unsegregated customer assets necessary to

fund billions of dollars in intercompany loans.

77.     Furthermore, as these Professional Defendants knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion through a non-Guarantor Subsidiary, Refco Global Finance, Ltd. ("RGF"). Thus, these Professional Defendants knew and/or consciously avoided knowing that the $3.573 billion in consolidation adjustments were the result of eliminating the approximately $465,681,000 of RGL's intercompany debt owed to RCM, the approximately $1.556 billion of RGF's intercompany debt owed to RCM, and the approximately $1.556 billion of RCC's intercompany debt owed to RGF, and that RCM was thus owed $2 billion -- $465 million owed from RGL plus $1.556 billion owed from RCC (which when booked in a back-to-back fashion through RGF, added another $1.556 billion to the consolidation adjustment).

78.     Given their due diligence, detailed in-depth understanding of Refco's financial structure and operations, and access to and preparation of the type of condensed consolidating financial information set forth in Note O, each of the Professional Defendants who assisted and advised Refco in connection with the LBO were fully aware of the massive $2 billion payable owed by RGL and its affiliates to RCM. These legal and financial advisors further understood that none of this debt would be repaid as a result of the LBO, which took $1.4 billion in loan proceeds and used them instead to cash-out the Refco Insiders' and others' interests in Refco.

79.     The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, so as to put cash in the pockets of the Refco Insiders and others, leaving the Refco entities without any assets to satisfy their obligations to creditors such as the FX

34

Customers. Furthermore, as the Professional Defendants were aware, unlike the typical LBO participant, RGL went into the LBO with hundreds of millions of dollars of concealed trading losses, misallocated operating expenses, phantom revenues, and unpaid billions owing to RCM, whose assets had been used to fund Refco's entire operations.

80.    Given Refco's true financial condition -- and the devastating impact the concealed trading losses and hidden operational expenses would ultimately have on its business if properly recorded and disclosed in its financial statements -- the LBO irreparably undermined Refco's already precarious condition. By saddling RGL with $1.4 billion in secured and senior debt which Refco's operations could not service, and by continuing their plan and siphoning out all of RGL's assets, the Refco Insiders sealed Refco's fate and undermined RCM's ability to collect on its approximately $2 billion of IOUs from its Refco affiliates.

81.    The theft of RCM customer assets continued unabated after the LBO, and in fact increased until Refco's bankruptcy filing.

g.    **The IPO Further Damages Refco and RCM**

82.    RCM's ability to collect on its IOUs was further undermined when, just one year after the LBO, the Refco Insiders, with the active participation and assistance of GT and MB, led Refco though an initial public offering of its stock. In the IPO, Bennett sold approximately 7 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $146 million.

83.    The IPO was structured with the principal goal of allowing the Refco Insiders and others to cash out, as opposed to raising funds for Refco to reduce the enormous debt Refco had been saddled with in the LBO. Furthermore, because the LBO had put RGL's insolvency beyond question, approximately $231 million in proceeds from the IPO that Refco Inc. used to retire part of

RGL's LBO debt was entirely wasted; Refco was induced to spend over $200 million on an insolvent subsidiary that was going to file for bankruptcy merely weeks later.

84.    When the fraud was disclosed and Refco filed for bankruptcy only two months after the IPO, Refco was saddled with hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus.  Through the IPO, Refco was again saddled with liabilities it could not satisfy -- this time the liability to pay back investors who had purchased Refco stock.

85.    At the time of the IPO, GT and MB were all aware that Refco was concealing its true financial condition and was in no condition to undertake an IPO.  Indeed, the most blatant indication that GT and MB understood that there were hundreds of millions in undisclosed related-party receivables was the conscious editing of SEC documents to conceal the RGHI Receivable.

86.    Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO.  In early drafts of the S-4 registration statement, which were reviewed and commented on by GT and MB and subsequently submitted to the SEC for comment, the S-4 disclosed only a small portion of the RGHI Receivable, and falsely characterized an amount of $105 million due to Refco from RGHI as a "customer" receivable.  As this was a related-party receivable owed to Refco from RGHI, the SEC questioned the decision to characterize "amounts due from equity members (RGHI) as receivable from customers."  GT and MB thereafter learned that Refco amended the S-4 registration statement to state that the receivable was due from "equity members."  MB and GT thus knew not only that Refco had initially tried to deceive the SEC and the investing public about the RGHI Receivable, but they also knew that the actual amount due from "equity members" was well above the $105 million and that the S-4 was still materially false.

87.    In hopes of concealing the fraud and maintaining the illusion of Refco's financial health for as long as possible, after the IPO was completed in late August 2005, Bennett, with the active participation and assistance of MB, caused Refco to carry out yet another $420 million RTL with an RTL Participant named Liberty Corner Capital Strategies, LLC to once again cover up the existence of the RGHI Receivable.

88.    Approximately two months after consummation of the IPO, on October 10, 2005, the entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI. Refco demanded repayment of the debt by Bennett, who instantly repaid the loan using an emergency loan from BAWAG.

89.    In a press release issued that same day, Refco announced that it had discovered a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction. As a result, Refco announced that "its financial statements, as of, for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005 and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

90.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization. Refco's stock was delisted by the New York Stock Exchange, and the company was forced into bankruptcy.

### MB's Role in the Fraudulent Scheme

91.    MB was aware of the activities alleged herein, or, in the alternative, consciously avoided knowledge of them. By its actions, MB actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and conversion alleged herein.

92.    MB's relationship with Refco dates back to 1994, when MB partner Joseph P. Collins

("Collins") brought the Refco account to MB from his previous law firm.  Until October 2005, MB

was Refco's primary law firm, and Collins was Refco's primary outside legal counsel.  With bills,

on average, of over $4 million a year, Refco was an extremely lucrative client for MB, and as

Collins' largest client, accounted for half of the billings for which Collins was responsible.  Between

1994 and October 2005, MB provided a broad range of legal services to Refco -- from representing

Refco in SEC investigations, to drafting profit sharing plans for key executives, to advising Refco on

corporate governance issues and U.S. and foreign regulations regarding its operations and activities,

to drafting customer agreements, to providing Refco with tax advice, to leading financings for senior

note and loan agreements, to negotiating the terms of and drafting the documents for the RTLs at

issue in this case.  As a result of the varied engagements MB undertook on behalf of Refco, the firm

became thoroughly familiar with the inner machinations of the company.  The vast majority of

important transactions and deals at Refco were cleared through Collins or the attorneys working

under his direct supervision, and Collins was aware of the work that everyone was doing on Refco

matters by virtue of his review of the bills before they were submitted to Refco.

93.    As the Examiner found, MB was aware of Refco's fraud and aided and abetted it.  As

discussed in more detail below:

- MB was aware of Refco customer losses during the late 1990s through, among other things, its legal work helping Refco hide these losses by transferring them to RGHI. MB thus knew and/or consciously avoided knowledge of the existence of the RGHI Receivable as early as 1999, and by no later than June 2002, MB knew that RGHI owed an intercompany debt to RGL of at least $350 million.

- MB drafted virtually all of the RTL documents with respect to 18 separate transactions, negotiated the terms of the RTLs with the third-party RTL participants ("RTL Participants"), and fully understood the nature of the RTLs.

- MB understood that the RTLs ultimately involved lending hundreds of millions of dollars by Refco, for a period of only a few days, to RGHI, an entity that was

38

controlled by Bennett. MB knew that these massive loans were risk-free to the RTL Participants and that they served no legitimate business purpose.

- MB knew that the RTLs were engaged in at the expense of RCM and its customers, including the FX Customers. MB knew and/or consciously avoided knowledge that even though RGHI was the beneficiary of the RTLs, RCM advanced the funds or credits for the RTLs to the RTL Participants, and also paid the interest to the RTL Participants.

- MB knew the RTLs were tied to Refco's financial reporting periods. For example, MB knew and/or consciously avoided knowledge that prior to the LBO in 2004, Refco was required to submit audited financial statements on an annual basis and, after the LBO, was subject to external reporting requirements on a quarterly basis. MB knew that the RTLs straddled Refco's financial reporting periods and audit periods and occurred only at those times (with one exception).

- MB drafted guarantees and indemnities on behalf of RGL in favor of the RTL Participants to guarantee RGHI's repayment obligation, and MB knew that Bennett himself signed virtually all of the guarantees and indemnities on behalf of RGL and the loan documents on behalf of RGHI. MB knew or consciously avoided knowledge that the guarantees and indemnities Refco was signing in connection with the RTLs violated the terms of other loan agreements that MB had prepared for Refco.

## Knowledge of Refco's Balance Sheet Problems

94.    Starting in 1997, MB provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco customers. In those cases, the "bad debts" were assigned to RGHI or related entities. For example, in 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian currency crisis. By 1998, these losses amounted to over a hundred million dollars. MB attorneys were involved in the resolution of Refco's claims against these customers, which debts later became part of the RGHI Receivable.

95.    In October 1997, a Refco customer named Victor Niederhoffer and several funds he controlled lost more than $90 million (the "Niederhoffer Loss"). Instead of disclosing the losses -- which the Niederhoffer funds could not cover -- Refco, with MB's assistance, sold these accounts receivable to an RGHI subsidiary (Wells Ltd.). These losses were subsequently added to the RGHI

39

Receivable. Because MB was advising both Refco and RGHI during the relevant period, MB was thus aware that Refco could and did use RGHI as a repository for bad debts incurred by Refco related to its customers.

96.    MB continued to be aware of the RGHI Receivable. In a letter dated October 15, 1999, Bennett wrote to Collins to provide arguments to be used to support the apparent net worth of RGHI. Bennett stated that RGHI's value was the value of its investment in RGL. Collins, aware of the RGHI Receivable, jotted in his handwritten notes: "Minus loans to RGH[I]." These handwritten notes show that Collins knew RGHI owed money to RGL.

97.    By June 2002, MB was clearly aware that the RGHI Receivable existed and totaled at least $350 million. On June 11, 2002, in connection with legal work for Refco, MB revised legal documents that included a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of intercompany debt of [RGHI]."

98.    The RGHI Receivable was not the only method by which MB actively participated in an effort to hide bad debts. For example, in late 1999 and early 2000, MB was instrumental in hiding what Maggio perceived to be a $6.3 million "bad debt" (the "Deere Park Debit Balance") owed to Refco by a customer called Deere Park Capital ("Deere Park"). Maggio asked his advisors MB and E&Y to assist with the development of a transaction -- the Minglewood scheme -- that would conceal the Deere Park Debit Balance. Based on tax advice from E&Y and legal advice from MB, the parties created a joint venture called Minglewood Investments LLC to which Deere Park contributed certain worthless or highly speculative securities and $2 million in cash, while Refco contributed the Deere Park Debit Balance. As Maggio admitted to one of Deere Park's principals, the Refco Insiders had Refco enter into this joint venture to avoid having to write off the Deere Park

Debit Balance. Under the terms of the agreement drafted by MB, the $6.3 million debit balance was converted into a note that would only be payable from profits Minglewood Investments LLC earned on its securities, and would convert to a zero balance -- in other words, disappear -- after a set time period. As MB understood, the entire purpose and effect of the Minglewood transaction was to hide the $6.3 million debt from Refco's financial statements. A Deere Park principal has testified under oath to having had conversations with an MB attorney regarding the fact that Refco was entering into the Minglewood transaction so that it would not have to write off a receivable.

**The RTL Transactions**

99.     MB was not only aware of the huge RGHI Receivable, but MB drafted and negotiated the fraudulent RTLs whose sole purpose was to hide its existence. Indeed, *over the course of five years, MB drafted virtually all of the documents for RTLs totaling billions of dollars.*

100.    The first RTLs that MB worked on occurred in February/March 2000. Collins and a colleague negotiated the terms of, and drafted the documents for, three RTLs involving a total of $310 million. On or about February 1, 2000, MB was approached by a Refco employee about the possibility of doing "back-to-back loans" -- the first one a loan from RCM to CIM Ventures, a subsidiary of Ingram Micro, Inc., and the second one a loan from CIM Ventures to RGHI. The loans were to take place just before the end of Refco's 2000 fiscal year, and be unwound just after the beginning of the next fiscal year.

101.    Although this loan structure -- a structure whereby a loan was made at the close of a financial reporting period only to be unwound shortly after Refco's financial reporting and audit periods-- was obviously illegitimate, MB proceeded to prepare, edit, and review documents for the CIM Ventures transaction, including loan documents, a guarantee by RGL of RGHI's repayment obligation, and an indemnification agreement by RGL in favor of CIM Ventures. At the end of the

41

process, MB was in possession of RCM loan documents, RGHI loan documents, and an RGL guarantee of RGHI's obligation and an indemnity in favor of CIM Ventures -- all signed by Bennett.

102.    MB's understanding of the substance of the RTLs is confirmed by a letter that CIM Ventures sent to MB along with execution copies of the RTL documents.  This email, dated February 22, 2000, states, in pertinent part:

> It is planned that RCM will deposit the loan proceeds in CIM's account . . . at RCM on February 25, 2000.  CIM will then fax a letter to RCM instructing them to move the funds to RGHI with a 15 basis point uplift in the interest rate.  RCM then will withdraw the funds from CIM's account and deposit them in RGHI's account, thereby completing the back-to-back loan transaction. The steps will be reversed on March 9, 2000.  RCM will then transfer the CIM spread on the transaction to its Royal Bank of Canada account in the Cayman Islands.

103.    MB drafted similar documentation for RTLs with two other RTL Participants in February 2000.

104.    After the February/March 2000 RTLs matured, MB wrote to each of the RTL participants, transmitting to them the original promissory notes which they had signed in connection with their loans from RCM. An MB associate also played an active role in the transactions when he endorsed the notes as "paid in full" as the authorized agent of RCM.

105.    The following year, CIM Ventures agreed to participate in another RTL with RCM and RGHI (with RGL acting as guarantor), this time for $250 million. Once again, MB prepared all of the necessary deal documents, including loan agreements, guarantees, and indemnifications. Once again, Bennett signed the loan documents on behalf of RGHI and also signed the guarantees and indemnities on behalf of RGL.  Once again, MB was told precisely how the RTL transaction would work -- on February 19, 2001, CIM Ventures sent MB a letter almost identical to the one it sent the previous year, again explaining precisely how the RTLs would work, including the fact that RCM would pay the interest spread directly to CIM Ventures.  And once again, the transaction was

42

unwound a few days into the new Refco fiscal year, with the RCM note returned to CIM Ventures and stamped by MB as "paid in full."

106.    In early 2002, Ingram Micro was prepared to go forward with yet another RTL, going so far as to send a mark-up of the 2001 loan documents to Collins. However, Ingram Micro developed second thoughts about engaging in the RTLs due to recent news about the Enron scandal. On January 30, 2002, Ingram Micro sent Refco an email backing out of the proposed RTL, referencing the Enron debacle and the amount of heightened scrutiny from the SEC.

107.    While fear of the Enron scandal was enough to give Ingram Micro second thoughts about engaging in these kinds of sham transactions, MB remained unconcerned. Over the next four years, MB handled RTLs an additional 14 times. Each time, MB drafted (and sometimes negotiated) the deal documents. Each time, Bennett signed the loan documents on behalf of RGHI and signed the guarantees and indemnities on behalf of RGL, except when another Refco insider signed them. The RTL Participants changed over time, with some participants backing out, necessitating redrafts and renegotiations. Significantly, the dollar values of the RTLs increased over time, soaring to as much as $720 million for one RTL in February/March 2004 -- repeatedly occurring in amounts that dwarfed Refco's total capital.

108.    Even more importantly, the frequency of the RTLs increased over time. The RTLs took place every February/March through 2004, and then increased to every fiscal quarter-end beginning May/June 2004 when Refco began having to report its financial statements on a quarterly basis due to the closing of the 2004 LBO. And as Refco's main counsel, MB knew full well that the RTLs were occurring only when Refco had to meet a financial reporting deadline.

109.    On their face, the RTLs had no legitimate business purpose. They were uncollateralized, short-term, back-to-back loans involving the lending of hundreds of millions of

43

dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL participants. The transactions clearly lacked any economic substance and were inherently suspicious.

110.    The RTLs were even more suspicious because, as MB was aware, Refco's bank financings contained covenants prohibiting Refco from incurring additional indebtedness, such as guaranteeing a third party's debts, beyond certain limits. MB knew these covenants existed because *MB had participated in the negotiation and drafting of the LBO financing documents*. Thus, by preparing the RTL documents, MB assisted in transactions that it knew violated loan covenants in financing documents that MB had previously negotiated and drafted.

111.    MB was also fully aware that the Refco Insiders had incentives to manipulate Refco's financial statements. For example, beginning in September 2003, MB began to provide legal services to Refco in connection with what would ultimately become the LBO. Having drafted Refco's executive compensation plan, MB was aware that Refco executives stood to profit directly and considerably by the sale of the company, such as through an LBO. The plan that MB drafted (the "Profit Sharing Agreement" or "PSA") provided certain Refco executives, including the Refco Insiders, with equity-like interests in RGL.

**Maintaining the Fraudulent Business Model**

112.    Refco facilitated its fraudulent scheme to attract and siphon RCM customer funds by purporting to maintain RCM as an unregulated offshore broker-dealer despite the fact that after closing its Bermuda operations in late 2001, RCM conducted all of its activities in the U.S. MB advised Refco and RCM on these efforts beginning no later than October 1996 and continuing through October 2005.

113.    In furtherance of the fraudulent scheme described herein, Refco desired to close down RCM's Bermuda operations and to "repatriate" RCM to the U.S. This was actually accomplished in

2002. In so doing, Refco enlisted the assistance of MB, which advised RCM on the implications of repatriating to the U.S. In the course of so doing and as reflected in, among other things, a June 24, 2002, MB memorandum, MB became intimately familiar with the business and operations of RCM through discussions with Maggio and others. As reflected in an August 3, 1998, MB memorandum, MB was aware when it did this work that RCM was engaging in repurchase agreements ("repos")[1] and buying and selling customer securities "for its own account." In connection with the repatriation of RCM's Bermuda operations to the U.S., MB advised RCM on, among other things, ways to structure its business so as to attempt to avoid being treated as a regulated broker-dealer subject to, *inter alia*, segregation requirements imposed by U.S. law.

114.     According to a January 31, 1999, memorandum from Refco to MB, MB was also involved in and familiar with various other "projects underway with respect to Refco's FX business," which -- along with other aspects of MB's engagements for Refco and RCM -- caused MB to be aware of the siphoning of RCM customer funds to other Refco entities as alleged herein.

115.     In June 2004, in connection with a discussion of financial covenants for a Credit Agreement with Refco Finance Holdings LLC as Borrower, questions were raised concerning Refco's "average cash on hand." One phrase used in connection with this discussion was "house cash," which MB characterized as "a difficult concept." In response to a question regarding whether it would be feasible to have GT provide a better explanation in future quarterly filings of the composition of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," MB notes state emphatically, "No!! Impossible to breakout. Too restrictive operationally i.e. funding." This reaction shows that MB was fully aware of the

---

[1]   In addition to FX transactions, RCM profited from fixed income transactions, where customers engaged predominantly in repos. A repo is a loan to a customer wherein the customer uses its securities as collateral.

manner in which Refco was siphoning RCM customer funds to finance its overall business operations.

116.    MB's knowledge of and participation in the overall scheme is clearly shown through emails from Thomas Yorke to Joseph Collins in January 2005. In those emails, Yorke sought advice from MB on impending regulatory changes that "could mean an extremely large asset transfer away from RCM" and on how to avoid the potential impact of those changes and how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. As MB was aware, the reason that Yorke wanted to minimize any transfer of cash from RCM customer accounts to customer accounts at other Refco entities was that Refco treated the cash in customer accounts at RCM as available to fund Refco's operations and would not be able to treat cash in customer accounts held at other Refco entities as available for this purpose. MB's proposed solutions included "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

117.    As indicated in a MB memorandum draft dated October 11, 2005, just as the massive fraud at Refco was unraveling, MB was fully aware that as a result of the repatriation of RCM's operations from Bermuda on which it had previously advised RCM:

a)    RCM's activities were conducted by RSL and not by RCM, and RCM had no personnel available to look out for the legitimate interests of RCM's customers;

b)    "RCM no longer maintains any personnel or operations in Bermuda and . . . all of its functions and operations are performed by RSL personnel that are located in the United States;"

c)    while assets in RCM customer accounts were "carried on the books of RCM," those assets were in fact not held by RCM;

46

d)    RCM was engaging in "significant" conduct in the U.S. and, with MB's knowledge and advice, had structured its activities with an intent to "avoid U.S. regulatory requirements" and could not properly claim to be exempt from the regulatory requirements of U.S. law; and

e)    RCM was not in fact a "foreign broker-dealer."

118.    The fact that MB was preparing such a memorandum in October 2005, at precisely the same time as the public disclosure of the massive fraud at Refco, is inherently suspicious. By preparing to advise RCM that it should consider changing the way it conducted its business after the fraud had already been disclosed and RCM had been effectively shut down, MB was simply trying to paper the file, cover its tracks, and create the appearance after the fact that it had rendered appropriate, objective advice to RCM when in fact MB had been intimately involved in advising RCM on RCM's earlier repatriation from Bermuda to the U.S. at a time when the law was no different than it was in October 2005. Indeed, all of the authorities cited in that draft MB memorandum pre-dated the advice rendered by MB in 2001 and 2002 with respect to RCM's repatriation.

**MB's Conduct Prior to the LBO**

119.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from MB's conduct prior to the LBO. MB was closely involved in the LBO process. The Equity Purchase and Merger Agreement ("Merger Agreement"), the document underlying the transaction, was negotiated and reviewed by MB. The Merger Agreement represented that there were no undisclosed related-party loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million. This representation was false and MB knew that the guarantee requirement would immediately be breached. There were, in fact, massive related-party loans between Refco and RGHI

that had not been disclosed, but rather had been temporarily hidden by the RTL scheme that MB had been effectuating. Moreover, at the very same time MB was reviewing these provisions in the Merger Agreement, MB was also preparing documents for a $720 million RTL in which a Refco entity -- RGL -- was guaranteeing the debt.

120.    In addition, as the Examiner found, MB "appears to have failed to disclose key information to THL" during the LBO diligence process. When asked by THL's counsel, MB boldly represented, despite having prepared and overseen the execution of dozens of RTLs, that there were no transactions or deals between Refco and RGHI. In fact, at the same time MB was making these representations, MB was preparing documents for the $720 million RTL involving both Refco and RGHI.

121.    Further evidence that MB affirmatively participated in a scheme to hide the existence and nature of the RGHI Receivable comes from its failure to disclose the existence of the RGHI Receivable despite its review of the LBO Offering Circular and its issuance of a legal opinion making representations in connection with the LBO. Furthermore, the Offering Circular: (a) did not mention the existence of RTLs; (b) stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004; (c) did not disclose the guaranty -- that MB itself had prepared -- to a RTL participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) as discussed above, falsely stated that the LBO bond debt was effectively junior to the payables owed to RCM.

**MB's Conduct Before and After the IPO**

122.    After the LBO closed, Refco began the process of registering the Senior Subordinated Notes so that they could become publicly traded, and also began preparing a prospectus that would lead to an IPO. MB was involved with both processes.

123.    During this time, MB continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, $550 million in December 2004, $345 million in February 2005 and $450 million in May 2005).  In addition, MB continued to receive and respond to periodic requests for audit response letters -- keyed to Refco's fiscal quarters that ended in the same months as the RTLs.

124.    In late August 2005, after the IPO was completed, MB assisted Refco in engaging in yet another $420 million RTL designed to cover the existence of the RGHI Receivable.

\*       \*       \*

125.    Given MB's awareness (a) of the massive RGHI Receivable; (b) that the RTLs were merely sham transactions designed to allow RGHI to temporarily pay down the RGHI Receivable at the end of every relevant financial and audit reporting period; (c) of Bennett's dual roles in the RTLs; (d) that the RTLs violated Refco's financing covenants; and (e) that Refco executives had an incentive to maximize Refco's annual profits and ultimate sale price, MB clearly understood that the purpose of the RTLs was to hide the RGHI Receivable from Refco's books in order to create a false impression of financial health and strength and that Refco and RCM were safe repositories for customer cash and securities.

126.    MB also understood that Refco's continued operation and growth objectives required a continuous infusion of cash.  MB knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and purportedly had no segregation or net capital requirements.  MB thus understood that Refco was consuming RCM customer funds, including the property belonging to the FX Customers.

127.    MB further understood that the goal of both the RTLs and the theft of RCM customer funds was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with

a low-risk, high profit business model. MB understood that the ultimate purpose of this deception was to allow the Refco Insiders and others to cash out their interests in Refco. By its actions, MB not only violated applicable ethical and disciplinary rules, it substantially assisted and participated in a scheme that ultimately cost the FX Customers hundreds of millions of dollars in losses. MB is liable for the damages that were incurred as a result of its malfeasance.

**GT's Role in the Fraudulent Scheme**

128.    GT was aware of the activities alleged herein, or, in the alternative, consciously avoided knowledge of them. By its actions, as alleged herein, GT actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and conversion alleged herein.

129.    After it took over the Refco engagement from AA in 2002, GT provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005. GT served as the purportedly independent auditor of RGL and its affiliates, not just on a consolidated basis, but also audited Refco subsidiaries, such as RCM, on a stand-alone basis. Refco's financial statements were audited by GT on a consolidated basis under RGL's name. The financial information of RGHI -- RGL's parent company "shell" -- was not consolidated with Refco. As a result, as GT knew, the ballooning RGHI Receivable was hidden from the public to preserve Refco's reputation in the marketplace and to conceal the hundreds of millions of dollars of losses that Refco had transferred to a related-party entity owned by Bennett and Grant.

130.    Accordingly, GT was on both sides of the fence, giving it a complete picture of the finances, operations, and business of both RCM and the rest of Refco. Given its multiple roles, GT had access to all material information concerning the improper transfers of FX Customer assets alleged herein and the uncollectible debts owed to RCM by other Refco entities. As Refco's auditor,

50

GT also had a complete picture of Refco's third-party transactions, including its related-party transactions with RGHI. GT thus had access to all material information regarding the RTLs and the fraudulent scheme to hide the RGHI Receivable from Refco's books. Given its intimate familiarity with Refco's finances, GT thus knew and/or consciously avoided the details of the fraud described herein and substantially assisted the Refco Insiders in perpetrating a fraud on RCM's customers, including the FX Customers whose claims the Trustee asserts in this action.

131.    As GT knew, clean audit opinions were essential to Refco's continued functioning. Had GT ever failed to issue a clean audit opinion for Refco in general or for RCM in particular, the entire fraudulent scheme would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005 notwithstanding GT's efforts to assist the Refco Insiders to hide the true facts.

132.    In each of its audits for Refco and affiliated entities, GT failed to satisfy the minimum acceptable standards of professional conduct, including but not limited to Generally Accepted Auditing Standards ("GAAS"), and failed to ensure that Refco's financials were consistent with Generally Accepted Accounting Principles ("GAAP"). Audits performed with the appropriate degree of diligence and professional skepticism would have uncovered the fraudulent scheme alleged herein, and would have prevented the theft of FX Customer assets.

133.    Auditors are not permitted to accept corporate assurances at face value; if directors and corporate records were to be blindly accepted, there would be little or no point in performing an audit. For that reason auditors must conduct themselves at all times with a high degree of professional skepticism and with an independence in mental attitude. The lead partner on the engagement, Mark Ramler, throughout his tenure both at AA and at GT, consistently failed to act with the requisite degree of professional skepticism. Ramler not only took Bennett and other Refco

employees at their word -- he personally vouched for their trustworthiness and veracity. Ramler's motivation for doing so was obvious; Refco was an extremely valuable account, and keeping the account through a successful IPO would constitute a coup both for GT and for Ramler. In a conscious attempt to maintain the illusion that Refco was financially solid so as to allow the Refco Insiders and others to cash-out, GT regularly issued unqualified audit opinions following a procedure that amounted to no audit at all.

134.    GT also failed to perform sufficient fieldwork and neglected to obtain competent evidence to afford a reasonable basis for forming an opinion regarding Refco's financial statements. For example, GT failed to analyze RCM account statements for "customers" who were Refco entities, related parties or RTL Participants, despite their availability to GT. Similarly, contrary to the requirements of GAAS, GT failed to satisfy itself that Refco had implemented adequate safeguards, procedures and controls. GAAS specifically identifies a number of "red flags" for auditors to consider that GT knew and/or consciously avoided knowing were present in this case, including without limitation (a) significant related-party transactions totaling hundreds of millions of dollars annually; (b) strong pressures to perpetrate fraud, since the Refco Insiders had confessed a desire to maintain Refco's value for a personally enriching sale of the company in the near future; (c) weaknesses in internal control; (d) numerous undocumented intercompany transfers; and (e) unusual or unexpected analytical relationships evidenced by asymmetrical balance sheets that did not accurately reflect intercompany transactions, including significant funds diverted from RCM without any loan documentation.

135.    This is not a case of an auditor overlooking a few details. GT completely abandoned its obligations of independence, learned first-hand of the fraud, and then aided and abetted that fraud by, among other things, continuing to provide clean audit opinions in the face of grotesque

52

accounting manipulations. GT was aware of all aspects of the Refco Insiders' scheme to prop up

Refco long enough to cash out their interests, from the fraudulent RTLs designed to hide Refco's

losses to the theft of RCM customer money, including FX Customer money.

**GT's Knowledge of Refco's Balance Sheet Problems**

136.    Each year, GT issued, among other things, unqualified audit opinions that the

financial statements of RGL fairly presented RGL's financial condition in accordance with

GAAP and that its audits had been conducted in accordance with GAAS. In addition, GT

consented to the incorporation of its audit opinion in RCM's stand alone financial statements.

137.    The RCM financial statements for each of years 2003, 2004, and 2005 were false and

misleading and failed to state material facts necessary to make the statements contained therein not

misleading. In particular, the RCM financial statements were false because they failed to disclose

that the "loans" that RCM had made to other Refco affiliates were uncollectible and should have

been written off -- a fact which would have shown that RCM's net income, net assets, and

stockholders equity were negative.

138.    For example, RCM's 2003 financial statements failed to recognize losses with respect

to approximately $275 million in uncollectible obligations which the financial statements falsely

characterized as "receivable from customers." In fact, as GT was aware, these were simply RCM

customer assets, including FX Customer assets, that had been improperly directed and converted,

removed from RCM and siphoned to other uncreditworthy Refco entities, had been improperly

characterized as "receivable from customers" and should instead have been written off. Moreover,

had GT properly audited the 2003 financial statements, it would have recognized the need to write

off an additional approximately $650 million in uncollectible receivables owed to RCM by Refco

affiliates that were being used to finance RTLs at the end of the 2003 fiscal reporting period.

53

139.    The 2004 RCM financial statements similarly failed to recognize losses with respect to approximately $1.1 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." Again, as GT was aware, these were simply RCM customer assets, including FX Customer assets, that had been improperly siphoned, removed from RCM and siphoned to other uncreditworthy Refco entities, had been improperly characterized as "receivable from customers" and should instead have been written off. Moreover, had GT properly audited the 2004 financial statements, it would have recognized the need to write off an additional approximately $720 million in uncollectible receivables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2004 fiscal reporting period.

140.    The 2005 RCM financial statements failed to recognize losses with respect to approximately $2.1 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." As GT was aware, these were simply RCM customer assets, including FX Customer assets, that had been improperly siphoned, removed from RCM and siphoned to other uncreditworthy Refco entities, had been improperly characterized as "receivable from customers" and should instead have been written off. Moreover, had GT properly audited the 2005 financial statements, it would have recognized the need to write off an additional approximately $345 million in uncollectible receivables owed to RCM by Refco affiliates that were being used to finance RTLs at the end of the 2005 fiscal reporting period.

141.    Although in each case, the RCM financial statements that GT audited stated that a portion of these "receivable[s] from customers" were attributable to "related-party transactions," the financial statements falsely mischaracterized these transactions as having consisted of "securities and other financial instrument transactions" that RCM had transacted with related parties "in the normal course of business." In fact, as GT was aware, a significant portion of these transactions were

simply extractions of money, with no collateral, and were certainly not in the normal course of business, as the affiliated companies that received RCM customer assets lacked the intent and/or the financial wherewithal to repay the stolen assets.

142.    GT knew and/or consciously avoided knowing that these assertions in the RCM financial statements were false because it not only had access to, but actually reviewed material information concerning RCM and the intercompany transfers of RCM customer assets.  GT knowingly or recklessly failed to take the required audit steps or disregarded the resulting audit evidence.  For almost all of the transactions, the affiliated companies lacked the intent and/or financial wherewithal to repay RCM, the loans had no legitimate business purpose for RCM but benefited only the affiliates, the loans were falsely documented as "customer" receivables, RCM's board of directors never approved the transactions, and no collateral or security existed of any value. These facts constituted huge "red flags" which were known and/or consciously avoided by GT. Any proper audit examination would have revealed these facts and uncovered the fraud alleged herein.

143.    GT also ignored numerous other instances in which the Refco Insiders fraudulently manipulated Refco's financial results through transactions with RGHI.  As discussed above, the Refco Insiders hid tens of millions of dollars of Refco expenses -- computer expenses, payroll and outside professional fees -- by allocating them to RGHI. GT knew and/or consciously avoided knowing about these transactions, which resulted in a massive overstatement of Refco's operating results.  GT also permitted Refco Insiders to fraudulently book approximately $250 million in fraudulent interest on the RGHI receivable and ignored the fictitious trades in U.S. Treasury Notes in RGHI's account at RCM which created phantom "losses" at RGHI and corresponding phantom "income" for RCM's parent company.

55

**GT's Knowledge of The RTL Transactions**

144.    In addition to its knowledge of the looting of FX Customer funds and the fraudulent manipulation of Refco's operating results through the use of the RGHI Receivable, GT was well aware of the RTL scheme that was used to hide the RGHI Receivable.

145.    Before 2002, AA served as Refco's supposedly independent and objective auditor. However, in reality, AA's Ramler had abandoned any pretense of independence or objectivity. While at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his thoughts and advice. Ramler also bragged that Bennett and other senior Refco management called him on an almost daily basis to discuss transactions and business issues.

146.    After AA collapsed under the weight of the Enron debacle, Ramler moved to GT, taking the Refco engagement with him. Refco was a marquee customer for GT, was Ramler's ticket to partnership at GT, and stood to be an even better client for GT if, as GT anticipated, Refco went public. During the course of the Refco engagement, GT earned close to $10 million in fees. With Ramler heading the engagement, GT continued AA's practice of turning a blind eye to billions of dollars of questionable accounting transactions in Refco's consolidated financial statements.

147.    Based on his long experience with Refco, when Ramler joined GT, he brought with him knowledge of the following facts:

- As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next 3 to 10 years.

- Refco's internal accounting controls were deficient and readily capable of being overridden by Refco's management.

- As of February 28, 2002, RGHI was a shell entity with no operations that owed RGL approximately $170 million, and whose financial results were not included in RGL's consolidated financial statements.

56

- Refco was engaging in substantial and complex related-party transactions with RGHI and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

- Bennett had promised AA that the RGHI Receivable would no longer increase, would be paid down, and that $35 million of the RGHI Receivable would be paid off in fiscal year 2003.

148.    GT was thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable was a viable tool for accomplishing such manipulation. GT was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards of the need to apply far more scrutiny to related-party transactions than to ordinary arm's length transactions, when conducting an audit. Accordingly, GT internally categorized Refco as a "high risk" client in part because it engaged in significant and complex related-party transactions, lacked an internal audit function, and was dominated by a limited number of senior executives and managers who had an interest in maximizing the apparent financial condition and operating results of the company in order to cash our their stake in the company.

149.    Nevertheless, GT utterly failed to properly audit Refco's related-party transactions. As a result, even though GT knew and/or consciously avoided knowledge that the RGHI Receivable was used to fraudulently inflate Refco's operating results and learned of the RTLs which served to hide the RGHI Receivable, it continued to issue clean audit opinions for Refco as a whole and separate clean audit opinions for the stand alone audits of various Refco subsidiaries, including RCM.

150.    For example, in connection with the 2003 audit, on April 28, 2003, Ramler obtained a letter from Bennett concerning Bennett's intent to pay down the receivable owed by RGHI. In that letter, Bennett noted that the RGHI shareholders intended to reduce the amount of the receivable, then purportedly totaling $105 million, by at least $35 million per year, resulting in full payment by

57

February 28, 2006. GT made no effort to determine whether those payments actually were made --
and indeed, they were not. Nor did GT make any attempt to verify the $105 million figure, which
was false, or seek any assurance that RGHI and/or its shareholders had the financial wherewithal to
repay the amount. During its 2004 and 2005 audits, GT likewise failed to obtain sufficient evidence
to provide any reasonable assurance that related-party transactions were properly reflected in the
financial statements. And GT repeatedly ignored the fact that, contrary to Bennett's assurances, the
RGHI receivable was not paid, and in fact increased.

151.    GT's work papers from the 2003 audit show that GT contemplated steps to scrutinize
related-party transactions, but simply chose not to implement any of them. For example, in
conducting its audit of RCC in 2003, GT told Refco that it needed to see certain loan receivables
owed to RCC on the books of the affiliate owing the money. When making this inquiry, GT
specifically requested the information about a loan from RCC to RGHI purporting to have a balance
of approximately $71 million, including documents to verify the existence and terms of the loan and
ensure that RGHI was actually making payments that were received by RCC and reflected on its
bank statements. In violation of GT's own practices, as well as GAAS, GT never carried out any of
these procedures. Had GT done so, GT would have quickly exposed the fraud.

152.    Furthermore, despite the high degree of risk GT knew was connected with
related-party transactions at Refco, GT deliberately chose not to take the simple and obvious step of
examining the customer statement for the RGHI account at RCC for the months of February and
March 2003. Had GT done so, it would have seen the following:

- Until February 21, 2003 (*i.e.*, just seven days before Refco's fiscal year-end), RGHI
  owed Refco over $600 million.

- On February 21, 2003, RGHI's account at RCC received "transfer funds" for $308.5
  million, reducing the amount that RGHI owed RCC.

58

- On February 25, 2003, RGHI received two credits for an aggregate of $250 million from a wire transfer from a bank in New York.

- By March 4, 2003, (*i.e.*, just 4 days after Refco's fiscal year-end), the above entries were reversed, and the amount RGHI owed to RCC ballooned from $71.8 million on February 28, 2003 back up to over $600 million.

153.    Moreover, the disclosed portion of the February 28, 2003 receivable balance from RGHI's account of over $70 million represented an approximately $30 million increase over the prior year. Although GT inquired as to the reason for the increase, it took at face value the explanation from a Refco insider that the $30 million represented "additional loans" and never questioned why, during a time when Bennett had promised that RGHI would pay down the RGHI Receivable, RCC was extending RGHI additional credit.

154.    GT's audit plan for 2003 also called for GT to review loan documents concerning the RGHI Receivable at RCC and to perform an assessment of the interest income represented by Refco to have accrued on the RGHI Receivable. GT failed to perform either procedure.

155.    In fact, after the 2003 audit, GT failed to perform any procedures whatsoever to test the RGHI Receivable at RCC. One glaring omission in GT's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates." This document, which Refco's auditors had obtained and reviewed as part of every Refco audit from 1996 to 2003, detailed Refco's related-party receivables. Refco failed to provide this document to GT for the 2004 and 2005 audits. GT did nothing to investigate this change in documentation, even though the statement for RGHI's account at RCC made clear that RGHI still had a massive debit balance in favor of RCC. GT intentionally turned a blind eye to this issue.

156.    Similarly, GT failed to properly examine the RGHI balances at RCM. Though Ramler knew that in the past, RGHI owed substantial sums of money to Refco through an account at RCM, GT failed to perform even the simplest procedure to ensure that this

related-party account was being properly recorded in Refco's books. Had GT looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year end), GT would have seen the following:

- The debit balance in the account as of February 1, 2003 was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003 of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar manipulations of RGHI's account at RCM.

157.    GT's failure to examine the customer account statements of the related-party RGHI was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it can only be evidence of a willful blindness -- an intentional effort to avoid exposing evidence of the accounting fraud at Refco.

158.    During its audits of Refco, GT not only knew of, and failed to properly audit, the RGHI Receivable, but it also came face-to-face with the RTLs themselves. Again, GT deliberately ignored numerous red flags indicating that these RTLs were part and parcel of the accounting fraud being perpetuated by the Refco Insiders.

159.    The RTLs that occurred during the periods audited by GT were accomplished by RCM falsely recording the cash loan as a "reverse repo" or "time deposit" in the RTL Participant's customer account. A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and a "time deposit" is a loan extended to a customer for purposes of trading. Both "reverse repos" and "time deposits" require the use of collateral, and because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks and warrant heightened scrutiny by auditors. Professional audit standards

advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, and not merely their amount.

160.    GT ignored these standards, deliberately failed to inquire into the obviously suspicious circumstances of these transactions, and subjected them to little or no scrutiny at all. As noted, the RTLs were not actually "reverse repos" or "time deposits." The RTLs lacked the hallmark of both transactions -- collateral. Nor did the RTL Participants' total capital provide Refco with adequate security for these substantial advances. Nevertheless, GT accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

161.    For example, during its audit of RCM for 2003, GT noted large, period-end, round-dollar so-called "reverse repo" transactions between RCM and two of the RTL Participants totaling $650 million. The transactions were timed precisely to span Refco's fiscal year-end. On April 16, 2003, GT sent simple confirmation requests to these RTL Participants, which were signed and returned to GT. Although GT performed additional credit risk testing on other RCM customer accounts for 2003, GT did not conduct additional testing on these RTL Participant accounts and GT did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Participants' total capital.

162.    In the 2004 audit, GT noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner. As in 2003, GT sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did. This year, however, GT took the additional step of reviewing the potential credit risk from the transaction. GT noted that the entire amount of Liberty Corner's debit balance -- $720 million -- was at risk, meaning that no collateral secured it. However,

61

GT did not identify the account as a credit risk and ignored the fact that a real "reverse repo" transaction should be secured by collateral.

163.    As these examples illustrate, in every audit and review that it conducted of Refco, GT received information that RCM was engaging in large period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Participants. In each case, GT understood that the transactions were in fact unsecured loans of hundreds of millions of dollars made to entities without the intent and/or financial wherewithal to repay the loans rather than collateralized "reverse repo" transactions. Yet in each case, GT declined to investigate further based on information -- often merely a representation from management -- that the unsecured balance had been repaid. Moreover, despite being engaged for years as Refco's auditor, GT never alerted anyone to the pattern and never questioned why Refco entered into these uncollateralized transactions at the end of each and every relevant financial and audit reporting period. Nor did GT ever question why Refco was characterizing these transactions as "reverse repos" or "time deposits" when they were not collateralized.

164.    Further evidence that GT understood that the RTLs were being used to hide the RGHI Receivable comes from Ramler's own handwritten notes. In these notes, Ramler wrote the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL participants). Next to the name of Liberty Corner appear the words "mature transaction" and below it are the words "clean-up of interco accounts." During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts. This is a connection Ramler would not have made unless he, and thus GT, had actual knowledge of the fraud.

62

165.    Records of internal communications within GT's management show that GT understood it was subject to liability for its conduct with respect to Refco. In late December 2004, Ramler had a conversation with a member of GT's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO. The note states, in part: "Atty called -- also this AM -- Refco makes Firm uncomfortable . . . issue is sig. def. . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to demonstrate GT's concerns about Refco and the upcoming IPO: "They are moving very fast -- too fast for comfort . . . what to do -- we would be sued." (emphasis in original).

166.    Unlike the FX Customers, GT knew that Refco was misappropriating RCM customer assets, including the deposits of the FX Customers, and using it for other Refco purposes. GT also knew and/or consciously avoided knowing that Refco was engaging in the RTL scheme in order to hide the fact that Refco was suffering massive losses due to uncollectible receivables, and that RGL was being saddled with guarantees for the RTLs. In sum, GT knew and/or consciously avoided knowing that Bennett and his cronies were fraudulently "dressing up" Refco using these schemes in order to cash out their own Refco interests. GT was a sophisticated audit and accounting firm that, when faced with knowledge of this fraudulent scheme, chose to look the other way -- apparently to keep a marquee customer happy. GT not only violated the governing standards of GAAS, it substantially assisted and participated in a scheme that ultimately cost the FX Customers over half a billion dollars in losses. GT is liable for the damages that were incurred as a result of its malfeasance.

**GT's Substantial Assistance in Maintaining the Fraudulent Business Model**

167.    GT substantially assisted the fraud, allowing the fraud to continue and advancing the objectives of the fraud, by, among other things: ignoring red flags that alerted GT to the existence of accounting fraud; knowingly issuing unqualified opinions on Refco's consolidated financial

statements for each of fiscal years 2003, 2004, and 2005 that materially misrepresented Refco's financial condition; opining separately on the financial statements of RCM and authorizing the delivery of its clean audit opinions on RCM's fraudulent financial statements to RCM's customers, including the FX Customers; and continuing to act as Refco's auditor despite its knowledge of the fraud.

168.    GT also substantially assisted the Refco Insiders by issuing an unqualified audit opinion in connection with its re-audit of Refco's 2002 financial statements in the Fall of 2004 in connection with the LBO. As GT knew, it was a closing condition to the LBO that Refco's financial statements be SEC Regulation S-X compliant for fiscal years 2002 through 2004. Nonetheless, in re-auditing Refco's 2002 financial statements, which had not been Regulation S-X compliant, GT again chose to consciously avoid the numerous signs of the Refco Insiders' fraud.

169.    Further evidence of GT's knowledge of fraud, and GT's active assistance in covering up the fraud, comes from a Management Deficiency Letter ("Management Letter") prepared by GT following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco. As set forth in this letter, among the accounting irregularities and deficiencies known by GT to have existed well before the LBO were: "Consolidation Process," "Formalized Reporting and Closing Process," "Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," "RCM Custody Reconciliations," "Audit Coordination, " and "IT Environment Deficiencies."

170.    As the Management Letter revealed, GT was fully aware that Refco's internal accounting and auditing functions were in a shambles, that there was no internal audit function, there was insufficient audit coordination and that there were deficiencies in accounting procedures and functions and in the consolidation processes. Despite these numerous longstanding deficiencies, the

64

correction of which would have made the various accounting improprieties and frauds conducted by the Refco Insiders harder to conceal, GT provided Refco with a clean audit opinion prior to and in connection with the LBO.

171.    Despite being aware of these deficiencies prior to the LBO and having "previously discussed" these longstanding deficiencies with Trosten and other Refco Insiders, it was only after the LBO that, to cover its inaction and failure to properly audit Refco, GT "papered" the deficiencies in a letter to Bennett dated October 15, 2004. As GT alludes to in its Deficiency Letter, Refco's "accounting function d[id] not have the necessary resources or expertise in accounting and financial reporting expected of a public issuer." As GT recognized, Refco's deficient accounting practices, and the fraud they helped conceal, could not withstand the increased scrutiny that Refco would be receiving from regulators and investors given the impending IPO. Nonetheless, in its cover letter to Bennett, GT minimizes the significance of these deficiencies by referring to them as merely "matters that are opportunities for strengthening internal control and operating efficiency." As set forth below, however, as GT admitted a few months later (after the February 28, 2005 audit and just before the IPO), Refco had "significant" accounting and control deficiencies.

172.    Even after belatedly presenting the Management Letter to Bennett in October 2004, GT failed to follow-up with Bennett or anyone else at Refco regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed. Even then, GT modified its findings at the instructions of Refco management and then affirmatively lied about the letter's existence when GT was asked by THL whether any such management letter existed during the LBO due diligence process.

173.    In late March 2005, long after the conclusion of the LBO, THL learned of the existence of the Management Letter. In an April 1, 2005, internal email, a THL executive expressed

65

his anger that neither Refco nor GT had provided the Management Letter to THL during the due diligence leading up to the LBO. As THL stated internally, "when was the letter issued? i can't remember if we sa[w] auditor letters during diligence, perhaps we should send it to berndsen [at KPMG] to get his views and see if he remembers it. if this letter was release[d] in oct and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at both[.]"

174.    The same day, in another internal email, another THL executive explained his discovery that at or about the time that GT provided the Management Letter to the company, Refco management had pressured GT to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by GT:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

175.    A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and GT if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

176.    In sum, GT not only knew and/or consciously avoided knowledge of numerous accounting and controls deficiencies at Refco before, during and after the LBO, but GT also eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter. These facts demonstrate both GT's knowledge of and substantial assistance in the Refco Insiders' fraud.

## E&Y's Role in the Fraudulent Scheme

177.    E&Y was aware of the activities alleged herein, or, in the alternative, consciously avoided knowledge of them.  By its actions, as alleged herein, E&Y actively participated and substantially assisted the Refco Insiders in carrying out the fraud, breach of fiduciary duties, and conversion alleged herein.

178.    E&Y began working for Refco around 1991, with the understanding that its client was RGHI and all of the subsidiaries below it, including RGL and Refco, Inc (which entity later became Refco LLC).  Initially, E&Y was retained to review tax returns and answer tax questions.  In 1993 or 1994, E&Y began preparing tax returns and later helped with IRS audits as well as state and municipal tax audits.  In 2001 - 2002, E&Y provided Bennett with tax advice and proposed structures through which a partial sale of Refco could be effectuated with favorable tax treatment.  During this time period, E&Y also prepared tax returns for RGL and its subsidiaries and affiliates, including RGHI, through the tax year 2002.  E&Y and its affiliates continued to provide tax advice and tax services to Refco through as late as 2005, including the preparation of RGL's New York City tax returns.

179.    E&Y understood that the tax returns it was preparing for Refco were not only submitted to the IRS, but would also be reviewed by Refco's innocent directors, officers and agents and would be presented by Refco to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to get financing for Refco and, ultimately, to sell their interests in Refco.

180.    But E&Y was not simply a tax preparer for Refco.  E&Y also repeatedly provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and potential third-party investments involving Refco.  E&Y thus assisted virtually every step of the plan

to enable the Refco Insiders and others to monetize and cash out their interests in Refco for more than those interests were worth through one or more liquidity transactions. Among the most significant transactions and issues on which E&Y assisted Refco were:

- RGHI's 1997 conversion to an S corporation and the efforts to avoid "busting" the S election or triggering a "Built-in-Gain" tax;

- Planning beginning in 1997 to take advantage of the Niederhoffer Loss;

- BAWAG's 1999 acquisition of a 10% interest in RGL;

- The 2000 Minglewood transaction designed to avoid the need to write off a $6.3 million "bad debt";

- The 2001 conversion of RGL subsidiary Refco, Inc. from a C corporation to an LLC (Refco, LLC);

- Structuring and analyzing the tax consequences of plans for profits-only interests in RGL for certain Refco executives;

- A 2001/2002 proposed acquisition by BAWAG of a controlling interest in RGL while minimizing or avoiding tax consequences to RGHI; and

- A 2002 proposed BAWAG investment of hundreds of millions of dollars in RGL in three installments in exchange for BAWAG's right to "participate" in the proceeds of a sale of Refco.

181.    E&Y's assistance in facilitating the Refco Insiders' fraudulent scheme was a two-way street. In 2000 and 2001, E&Y used Refco as a vehicle for a series of improper and fraudulent tax shelter transactions termed "Contingent Deferred Swaps" ("CDS"). These transactions were designed to create the illusion that the E&Y clients participating in the tax shelter scheme were losing money in trading activities (i.e. suffering business expenses) that could then be charged against these customers' sizable taxable incomes. The success of these tax shelters depended on E&Y fooling the IRS into believing that E&Y's clients were actually engaging in legitimate currency trading. Refco provided E&Y with the vehicle through which it could create that illusion.

182.    E&Y placed its clients' funds in Refco trading accounts and engaged in a high volume of short-term trades designed to create the appearance that the money was being traded and

68

was subject to trading risk. In reality, the trades were merely designed to preserve the clients' capital so it could be returned to the client once the tax benefit -- *i.e.*, the fraudulent write-offs -- had been obtained.

183.    On May 22, 2007, four E&Y partners were indicted in connection with these CDS tax shelters. As the U.S. Senate's Permanent Subcommittee on Investigations noted in its reports on the Role of Professional Firms in the U.S. Tax Shelter Industry, E&Y enlisted a number of professional firms to help carry out CDS transactions" "including investment firms, law firms, and . . . Refco Bank, who participated as the counter-parties for swaps . . . from 2000-2001."

184.    As a result of E&Y's tax consulting and advice to Refco and involvement with Refco in connection with its CDS tax shelters and otherwise, E&Y understood as early as 1997 that Bennett wanted to sell the company.

185.    In mid-2001 through mid-2002, E&Y performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party. During the course of this work, Trosten asked E&Y to assume the existence of a receivable owed by RGHI to RGL in the amount of $720 million to $1 billion. E&Y's advice on this issue ultimately led Refco to structure its July 2002 transaction with BAWAG as a Proceeds Participation Agreement in which a BAWAG affiliate made payments to Refco in exchange for the right to participate in the proceeds of a future sale of RGL. E&Y understood that certain senior Refco executives stood to profit directly and considerably by a sale of the company and had a corresponding incentive to manipulate Refco's financial statements and related disclosures in addition to its tax returns.

186.    Through rendering tax advice to Refco, E&Y also learned that Refco, aided by GT and MB, was falsifying its financial statements. In 1999, E&Y provided tax advice in connection with the structuring of BAWAG's purchase of a 10% interest in RGL. In connection with this

process, E&Y reviewed and commented on the deal documents that MB drafted. An E&Y internal memorandum shows that E&Y disagreed with representations contained in these draft documents to the effect that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been paid.

187.    Moreover, as a result of its work for Refco, E&Y was aware that the RGHI Receivable was not a bona fide debt, but was a sham, based on, among other things, the following:

- E&Y knew that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value, and that RGHI lacked the ability to pay off the RGHI receivable;

- E&Y knew that Refco's officers were using the RGHI Receivable to intentionally manipulate Refco's financial statements for the purpose of bolstering the financial appearance of the company;

- By as early as September 2001, E&Y understood the RGHI Receivable stood at approximately $720 million to $900 million, even though E&Y knew that Refco's February 28, 2001 audited financial statements disclosed a related-party receivable balance of only approximately $219 million;

- As early as February 2002, E&Y knew about the RTL transactions whereby RCM loaned funds to a third party, who in turn loaned the funds to RGHI to pay down the RGHI Receivable. E&Y also knew these transactions occurred in late February and would be reversed in early March, straddling the end of Refco's financial year;

- By September 2002, E&Y knew that the Niederhoffer Loss, which made up part of the RGHI Receivable, was entirely uncollectible because the debt had been settled and released in 1997;

- E&Y knew that at least one purpose of the RTLs was to improve Refco's balance sheet on its financial statements by concealing the fact that the RGHI Receivable was composed of trading losses and operating expenses that were inappropriately moved to RGHI for the sole purpose of overstating Refco's financial position and operating results; and

- E&Y knew that Refco's income for tax reporting purposes was inaccurate and that correspondingly the income or loss of RGHI for tax reporting purposes was also inaccurate.

70

188.    Based on E&Y's knowledge of the Refco fraud, the senior E&Y advisor on the Refco engagement decided in late 2003 that E&Y should resign from its engagement with Refco. Nevertheless, E&Y continued to work for Refco on at least tax audits through as late as 2005, several months after the LBO, and carried out its withdrawal from Refco assignments in such a way as to allow the fraudulent scheme to continue.

**E&Y's Knowledge of Refco's Balance Sheet Problems**

189.    As early as 1998, E&Y was aware of a related-party receivable owed by RGHI to Refco that was created when RGHI purchased "bad debt receivables" for full face value from Refco. E&Y was also aware that this receivable had been sitting on RGL's books accruing interest "for years" while a corresponding payable grew on RGHI's books.

190.    In particular, E&Y was aware that one component of the RGHI Receivable was the so-called "Niederhoffer Loss," involving a "bad debt" purchased by an RGHI subsidiary, Wells, Ltd., at face value -- a price that vastly exceeded fair market value. By at least September 2002, and likely much earlier, E&Y knew that the Niederhoffer Loss was completely uncollectible from Niederhoffer because there had been a settlement and release in 1997 between Niederhoffer and Refco, Inc. pertaining to the losses. In addition, numerous E&Y documents discuss the "Wells losses," which pertain to losses of approximately $50 million on Russian Securities involving the same wholly owned subsidiary of RGHI (Wells, Ltd.) which purchased the Niederhoffer Loss. E&Y documents show that E&Y understood these losses also formed part of the RGHI Receivable.

191.    E&Y also knew that Refco had a practice of allocating vaguely described expenses -- often listed as IT and computer expenses -- to RGHI, but having RGL actually pay the expense and then adding those expenses to the RGHI Receivable.

192.    E&Y clearly understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL. In an email dated August 8, 2001, an E&Y partner observed that a

71

write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were "protected and buffered" by RGHI. This email demonstrates that E&Y knew that the RGHI Receivable was being maintained, not because it was legitimate debt, but because elimination of the receivable would destroy RGL's appearance of profitability.

193.    In addition, E&Y was fully aware that the RGHI Receivable was a sham based on the following evidence:

- E&Y never saw a written agreement evidencing the RGHI debt, never knew the terms and conditions of the debt or its repayment schedule, and never knew of any valuable consideration for the debt;

- E&Y never received a requested confirmation directly from Refco's counsel that the debt was valid;

- Other than the sham RTLs, RGHI never made a payment to service or pay down its debt during E&Y's engagement;

- RGHI never made interest payments on its debt and instead simply added accrued interest to the outstanding receivable balance; and

- RGHI never expressed an intention to repay the debt and, never could repay the debt, because, as E&Y knew, RGHI was "basically insolvent."

## E&Y's Knowledge of the RTL Transactions

194.    In approximately September 2001, E&Y discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements. While the financial statements reported inter-company receivables of approximately $219 million, the RGHI Receivable was in the range of at least $700 to $900 million. When E&Y asked a Refco officer about the discrepancy, E&Y was told directly that Refco utilized the RTLs at fiscal year end in order to "clean up" the balance sheet and, for that reason, the related-party receivable balances did not appear on RGL's financial statements.

195.    E&Y has admitted to the Examiner that by no later than February 28, 2002, it knew that at the end of every Refco's fiscal year, RGHI would borrow funds from a third party to pay down the RGHI Receivable and the transaction would be reversed a few days later.

196.    E&Y was also aware and/or consciously avoided knowing, that the source of the third party funds in these annual fraudulent transactions was actually RCM. Several E&Y documents refer to "circular flows of cash" in the context of discussions of pay down of the RGHI Receivable at fiscal year end. For example, a November 6, 1997, E&Y handwritten memo regarding the Niederhoffer Loss (which E&Y knew to be part of the RGHI Receivable) states, in part, "Did RCM advance funds. Circular flow of cash." The handwritten notes of an E&Y partner dated March 4, 2002, contains the phrases "borrowed cash from RGL," "third party customer," and "Niederhoffer." In other words, the third-party customer had actually borrowed funds from RGL (via its subsidiary, RCM) to in turn loan to RGHI to hide the RGHI Receivable, which was partly composed of the Niederhoffer Loss. These notes demonstrate that E&Y understood that a Refco entity was likely the vehicle which RGHI was using to temporarily pay down its receivable.

## E&Y's Substantial Assistance in Maintaining the Fraudulent Business Model

197.    E&Y's own documents demonstrate that as early as 1997, E&Y had significant concerns about potential fraud at Refco and E&Y's own potential liability arising out of its involvement with Refco. Yet E&Y did nothing to address these concerns, and instead chose to assist Refco in perpetuating the fraud.

198.    For example, in November 1997, Kurt Neidhardt, the E&Y partner handling the Refco engagement, was concerned about how Refco had treated the Niederhoffer Loss. Concerned that E&Y could be viewed as "being an accessory to some type of fraud," Neidhardt met with the head of E&Y's Financial Services Department, Jerry Goldman. Incredibly, instead of advising Neidhardt to alert someone to this obvious accounting fraud and instead of demanding that E&Y

73

withdraw from representing Refco, Goldman informed Neidhardt that so long as E&Y prepared Refco's tax returns correctly and never gave Refco any accounting advice, E&Y should not be concerned. This cavalier attitude towards Refco's fraud would be shocking enough from one of the world's largest accounting firms. But even more egregious was the fact that E&Y **was not** preparing Refco's tax returns correctly. As discussed below, the RGL tax returns E&Y prepared were inaccurately reporting interest income from the RGHI Receivable that was not being paid and that RGHI did not have the wherewithal to pay. Accordingly, the tax returns were showing erroneous and inflated income on RGL's tax reporting documents.

199.    E&Y continued to have concerns about Refco, specifically about Refco's use of the sham RGHI Receivable to hide losses and other expenses. In the years 2001 through 2003, E&Y sent Refco a letter asking Refco to provide, *inter alia*: (a) a representation from Refco's legal counsel that the related-party receivable from RGHI to RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI"; and (c) an analysis of related-party accounts. Despite these requests, E&Y *never* received a written or verbal representation directly from Refco's legal counsel that the related-party payable was a legally enforceable obligation. Instead, E&Y accepted a representation from a Refco officer to that effect without demanding anything further. In addition, E&Y *never* received the requested schedule of expenses or analysis of related-party accounts. Despite Refco management having ignored E&Y's request, E&Y took no action and continued to prepare false and misleading tax returns and supporting tax documents that E&Y knew included a huge uncollectible related-party receivable.

200.    On July 8, 2002, Neidhardt met with the number two partner in E&Y's tax department, Mike Kelley, to discuss E&Y's knowledge that RGHI (which E&Y knew was

unaudited) owed RGL approximately $750 million, that RGL's audited financial statements reflected a related-party receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable just before fiscal year end and reinstate it just afterwards so that only a receivable balance of $225 million would be reflected on RGL's audited financial statements. Echoing Goldman's earlier outrageous (and erroneous) reaction, Kelley concluded that this was not a tax return issue, despite the obvious manipulation of the audited financial statements. E&Y did not, however, request further information from Refco or its auditors. E&Y simply continued to prepare false tax returns for Refco based on inflated operating results and continued to provide the Refco Insiders with tax advice regarding their exit strategies.

201.    On January 16, 2003, Neidhardt met again with Kelley to discuss concerns over Refco. This time, Neidhardt described another RGHI transaction in which a third party would allow RGHI to pay down the RGHI Receivable at fiscal year end in a manner that would hide the related-party nature of the receivable and improve the balance sheet without disclosing why the balance sheet improved. Once again, the number two partner in E&Y's tax department chose to ignore this obviously fraudulent manipulation of Refco's balance sheet because he believed that as long as E&Y got Refco's tax returns correct (which it didn't), the fraud was not E&Y's concern.

202.    In or about November 2003, E&Y purported to resign from the Refco engagement, based in large part over its concerns over potential liability for aiding and abetting the Refco fraud as a result of its knowledge of the massive RGHI Receivable and the fiscal year-end pay down and reinstatement of the RGHI Receivable.

203.    But E&Y did not really resign. Though E&Y did not prepare Refco's 2003 tax returns, E&Y continued to perform tax services for Refco through at least 2005. Moreover, despite

its concerns, E&Y did not tell Refco's subsequent tax accountants (or anyone else) the true reasons for its decision to resign or the concerns it had about Refco.

204.    E&Y continued to be nervous about its relationship with Refco, even after December 2004. In October 2005, Rory Alex, an E&Y accountant who did not work on the prior Refco engagement, sent Neidhardt an email asking about the possibility of doing work for RGL. The next day, Neidhardt sent an email to another E&Y tax partner who had worked on the Refco account previously, saying "we need to be very careful here. I left [Rory Alex] a message too . . . [anything] we tell him must be strictly confidential. I may have Nancy Altobello [an E&Y employee] shut him down."

205.    E&Y clearly knew that the RGHI Receivable was a sham transaction and that it was not a bona fide debt on which interest income could properly accrue for tax purposes. Accordingly, the RGL tax returns reflected interest income associated with the RGHI Receivable that E&Y knew was partially or entirely inaccurate. (E&Y also knew and/or consciously avoided knowing that RGHI was falsely underreporting its own income by taking false deductions for this interest.) E&Y also knew that the RGL tax return balance sheets (Schedule L) included as assets the RGHI Receivable. Thus, the Schedules showed an erroneous and inflated income for tax reporting purposes by RGL. These falsehoods substantially assisted the Refco Insiders' efforts to create the illusion that Refco was profitable and financially healthy.

206.    E&Y substantially assisted the fraud by preparing and filing tax returns that E&Y knew were inaccurate or false, but that E&Y knew would be reviewed by Refco's innocent directors, officers and agents, and would be presented to lenders, potential investors, underwriters, and other third parties in connection with the Refco Insiders' continuous efforts to get financing for Refco and, ultimately, to facilitate a lucrative cashing out of their interests in Refco.

207.   E&Y also actively assisted the Refco Insiders in hiding Refco's uncollectible customer debts. As discussed above, in late 1999 and early 2000, Refco entered into the Minglewood transaction in order to avoid having to write off the Deere Park Debit Balance. E&Y substantially assisted the Refco Insiders with this goal by devising the structure of the Minglewood transaction, a structure that allowed Refco to keep the Deere Park Debit Balance off its financial statements.

208.   E&Y understood that Refco's continued operation and growth objectives required a continuous infusion of cash. E&Y knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities -- RSL, Refco LLC, and RCM -- and that only RCM was purportedly unregulated and had no net capital requirements. E&Y thus understood that Refco was consuming RCM customer funds, including the property belonging to the FX Customers.

209.   E&Y further understood that the goal of both the RTLs and the theft of RCM customer funds was to falsely portray Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model. E&Y understood that the ultimate purpose of this deception was to allow the Refco Insiders, and other Refco insiders to cash out their interests in Refco at an inflated value. By its actions, E&Y substantially assisted and participated in a scheme that ultimately cost the FX Customers hundreds of millions of dollars in losses. E&Y is liable for the damages that were incurred as a result of its malfeasance.

## FIRST CLAIM FOR RELIEF
### (Fraud Against Refco Insiders)

210.   Paragraphs 1 to 209 are incorporated as if fully set forth herein.

211.   Bennett, Maggio, and Trosten were the masterminds behind the fraudulent scheme alleged herein, controlling and directing every aspect of the fraud.

212.    Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them made, directed, or are otherwise responsible for all of the fraudulent statements and omissions of Refco and RCM alleged herein.

213.    As a result of the fraud alleged herein, RCM was permitted to continue to implement its FX business model and to remain available to receive and maintain customer cash and securities, including property provided by the FX Customers. Absent the fraud, RCM would not have been able to attract, receive, and retain cash and securities from its customers, and the FX Customers would not have placed and held their property in accounts at RCM, where it was available to be improperly siphoned by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, as alleged herein.

214.    Bennett, Maggio, and Trosten and persons or entities acting in active concert or participation with them were in a position of unique and superior knowledge regarding the true facts concerning the siphoning of RCM customers' cash and securities, the manner in which that siphoning was concealed, and the fact that the appearance of Refco's financial health and strength was manufactured.

215.    As expected and anticipated by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, RCM customers, including the FX Customers, placed and maintained cash and securities into accounts at RCM in ignorance of the fraud alleged herein. Had the true facts been fully disclosed, RCM's customers, including the FX Customers, would not have done business with RCM, and their cash and securities would not have been available to be improperly siphoned by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, as alleged herein.

216.   In placing and maintaining funds in accounts at RCM, the FX Customers relied to their detriment on the appearance of financial health and strength fraudulently created by Bennett, Maggio, and Trosten, and persons or entities acting in active concert or participation with them, and on their ignorance of the true facts with respect to the improper diversion and conversion of funds from their accounts at RCM.

217.   Under the facts and circumstances alleged herein, reliance on the fraud by the FX Customers may be presumed.

218.   As a result of the fraud alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Bennett and Maggio)

219.   Paragraphs 1 to 218 are incorporated as if fully set forth herein.

220.   At all relevant times, RCM was insolvent or operating in the zone of insolvency. Accordingly, all relevant times, Bennett and Maggio, as directors of RCM, owed fiduciary duties of loyalty, care, honesty, good faith, and trust to RCM and the FX Customers, who were creditors of RCM.

221.   At all relevant times, RCM owed fiduciary duties of care and loyalty to the FX Customers, the discharge of which was under the direction and control of Bennett, Maggio, and persons or entities acting in active concert or participation with them.

222.   RCM, Bennett, and Maggio breached their fiduciary duties of care and loyalty to the FX Customers.

223.   In the alternative, Bennett and Maggio are liable for aiding and abetting RCM's breach of its fiduciary duties to the FX Customers because, among other things, they were aware of

the existence of those duties and actively participated in and substantially assisted the breach of those duties, as alleged herein.

224.   As a result of the breach of fiduciary duties alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

## THIRD CLAIM FOR RELIEF
### (Conversion Against the Refco Insiders)

225.   Paragraphs 1 to 224 are incorporated as if fully set forth herein.

226.   At all relevant times, the FX Customers entrusted funds to RCM for specific, limited purposes and the amounts entrusted to RCM were reflected on periodic account statements that the FX Customers received from RCM.

227.   By the actions alleged herein, the Refco Insiders, and persons or entities acting in active concert or participation with them wrongfully converted funds that had been entrusted to RCM for specific, limited purposes by the FX Customers.

228.   In the alternative, the Refco Insiders are liable for aiding and abetting RCM's and/or Refco's conversion of funds that had been entrusted to RCM for specific, limited purposes by the FX Customers because, among other things, they were aware of the conversion and actively participated in and substantially assisted the conversion.

229.   As a result of the conversion alleged herein, the FX Customers were damaged in an amount to be proved at trial, but not less than over a half billion dollars.

## FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Against the Professional Defendants)

230.   Paragraphs 1 to 229 are incorporated as if fully set forth herein.

231.   MB, GT and E&Y had actual knowledge of the fraud alleged herein. Alternatively, MB, GT and E&Y consciously avoided the truth.

232.    Notwithstanding this knowledge, MB, GT and E&Y substantially assisted in the fraud.

## FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Against the Professional Defendants)

233.    Paragraphs 1 to 232 are incorporated as if fully set forth herein.

234.    MB, GT and E&Y had actual knowledge of the breaches of fiduciary duties alleged herein. Alternatively, MB, GT and E&Y consciously avoided the truth.

235.    Notwithstanding this knowledge, MB, GT and E&Y substantially assisted in the breaches of fiduciary duty.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Conversion Against the Professional Defendants)

236.    Paragraphs 1 to 235 are incorporated as if fully set forth herein.

237.    MB, GT and E&Y had actual knowledge of the conversion alleged herein. Alternatively, MB, GT and E&Y consciously avoided the truth.

238.    Notwithstanding this knowledge, MB, GT and E&Y substantially assisted in the conversion.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment and grant the following relief:

(a)    An award of an amount to be proven at trial in compensatory damages for the losses that the FX Customers have incurred as a result of the acts and omissions of the defendants set forth in this Complaint;

(b)    An award of punitive damages;

(c)    An award of all costs incurred in connection with the prosecution of this action;

81

(d)    An award of attorneys' fees incurred in the prosecution of this action; and

(e)    Prejudgment and post-judgment interest as allowed by law.

DATED:    New York, New York
          August 27, 2007

                              QUINN EMANUEL URQUHART OLIVER &
                              HEDGES, LLP


                       By: _____
                              Richard I. Werder, Jr.
                              Michael B. Carlinsky
                              Susheel Kirpalani
                              Sascha N. Rand
                              Robert C. Juman

                              51 Madison Avenue, 22nd Floor
                              New York, New York 10010-1601
                              (212) 849-7000

                              *Attorneys for Plaintiff*
                              *Marc S. Kirschner, as Trustee for the*
                              *Refco Private Actions Trust*


                         **JURY DEMAND**

Plaintiff demands a jury trial on all matters so triable.

82

# EXHIBIT A

| Customer | Claim Amount |
| --- | --- |
| ABADI & CO SECURITIES | $83,654.80 |
| ABU DHABI INVESTMENT AUTHORITY | $29,918,680.50 |
| ADVANCE CURRENCY MARKETS SA | $495,750.01 |
| ALARON TRADING CORPORATION | $378,282.41 |
| ALDARRA FUND SPC CLASS A EURO | $399,713.47 |
| ALPEN AGENCY LIMITED | $1,280,832.51 |
| ALPEN FUND LTD. | $5,026,911.19 |
| ALPHIX CO LTD | $760,556.51 |
| AQR ABSOLUTE RETURN MASTER ACCOUNT | $19,383,500.00 |
| AQR GLOBAL ASSET ALLOCATION MASTER ACCOUNT LP | $8,828,886.64 |
| AMERICAN PEGASUS PERPETUAL INCOME NTD PLUS | $148,677.52 |
| ANSELAN S A | $172,920.00 |
| CARGILL FINANCIAL SERVICES CORPORATION | $23,358,164.23 |
| CARGILL GLOBAL FUNDING PLC | $5,825,291.75 |
| CARGILL INCORPORATED | $21,377,793.66 |
| CENTRAL COOPERATIVE BANK PLC | $10,000.00 |
| COSMOREX LTD | $105,850,964.00 |
| CREATIVE FINANCE LIMITED | $4,235,972.00 |
| CREATIVE FINANCE LIMITED | $65,445,343.00 |
| DE SHAW LAMINAR PORTFOLIOS LLC | $3,949,848.10 |
| DENALI ASSET MANAGEMENT LLP | $7,968,275.23 |
| DENIZBANK A S | $332,743.00 |
| DFD DIVERSIFIED TRUST | $1,040,818.55 |
| DK ACQUISITION PARTNERS LP | $1,374,811.78 |
| DOMINIQUE MOTTAS | $296,772.55 |
| EDUARD SARKISYAN | $205,445.74 |
| ESPIRITO SANTO FUNDOS DE PENSOES, S A (ESAF) | $1,447,915.76 |
| EUROPEAN SICAV ALLIANCE ODIN | $33,677.21 |
| EUROPEAN SICAV ALLIANCE-INSULATE | $12,996,905.79 |
| FELBURY FINANCE LIMITED | $262,233.00 |
| FINNAVAL MARITIME LIMITED | $4,224,254.14 |
| GARY STECKEL | $17,331.46 |
| GRAND TRADING LIMITED | $3,543,331.87 |
| GUIDO RASO | $329,640.57 |
| HAIN CAPITAL/MBT TECHNOLOGIES | $852,559.00 |
| IDS MANAGED FUND LLC | $3,267,928.79 |
| IDS MANAGED FUTURES LP | $8,326,047.12 |
| IDS MANAGED FUTURES II LP | $1,550,582.38 |
| JWH GLOBAL TRUST | $56,544,205.40 |
| KPC CORPORATION | $7,842,900.65 |
| LE ROSE INCORPORATED | $80,190.83 |
| LEUTHOLD FUNDS INC | $67,855,495.84 |

| | |
|---|---|
| LYXOR ESTLANDER & RONNLUND LTD | $5,029,268.72 |
| LYXOR/BEACH DISCRETIONARY FUND LTD | $7,696,965.14 |
| MULTI MANAGER FUTURES LIMITED | $1,082,602.10 |
| MYRTLE ASSET LIMITED | $199,474.65 |
| NAMOS CAPITAL INTERNATIONAL LIMITED | $1,126,578.00 |
| NIKKO FUTURES FUND | $1,355,107.69 |
| OLEG ILCHENKO | $19,350.96 |
| REFCO ADVANTAGE MULTI-MANAGER FUND | $41,678,077.43 |
| REFCO DIVERSIFIED FUTURES | $27,222,787.85 |
| SAGE FUND LP | $1,184,068.04 |
| SAPPHIRE SPECIAL OPPORTUNITIES FUND | $1,718,014.68 |
| STILTON INTERNATIONAL HOLDINGS LIMITED | $54,000,000.00 |
| STRATFORD TRADING LLC | $1,158,727.80 |
| TAGOL SA | $477,862.98 |
| TAU 28 FUND LTD | $4,238,735.00 |
| TE GRINHAM PORTFOLIO, LTD. | $24,584,718.28 |
| TE JENKINS PORTFOLIO, LTD. | $124,052.52 |
| THE EVEREST FUND | $5,546,244.71 |
| THE EVEREST FUND | $1,936,086.95 |
| TOKYO FOREX FINANCIAL CO LTD | $11,514,726.54 |
| UNION HOLDING COMPANY INC | $251,592.96 |
| WAYLAND DISTRESSED OPPORTUNITIES FUND I-B LLC | $129,682.56 |
| WAYLAND DISTRESSED OPPORTUNITIES FUND I-C LLC | $191,208.10 |
| WAYLAND DISTRESSED OPPORTUNITIES I-A LLC | $134,113.89 |
| WAYLAND INVESTMENT FUND | $4,568,101.19 |
| WAYLAND INVESTMENT FUND LLC | $1,600,034.91 |
| WAYLAND INVESTMENT FUND LLC | $234,151.00 |
| WAYLAND INVESTMENT FUND LLC | $858,553.00 |
| WAYLAND INVESTMENT FUND LLC | $1,209,780.00 |
| WAYZATA RECOVERY FUND LLC | $652,990.76 |
| WAYZATA RECOVERY FUND LLC | $335,861.10 |
| WINTERBOTHAM TRUST CO LTD | $550,735.00 |
| YAMAZEN SHOJI CO LTD | $788,987.14 |

TOTAL CLAIMS                    $680,725,050.61

# AFFIDAVIT OF SERVICE

### SUPREME COURT OF THE STATE OF NEW YORK / NEW YORK COUNTY
No. 07-602896

**MARC S. KIRSCHNER, as Trustee of the Refco Private Actions Trust,**

Plaintiff,

-against-

**PHILLIP R. BENNETT, ET AL,**
Defendants.

**FILED**

AUG 3 0 2007

NEW YORK
COUNTY CLERK'S OFFICE

State Of New York, County of New York SS.:
**ROBIN RAMSON**
Being duly sworn, deposes and says that he is over the age of 18 years, is not a party to this action and resides in New York.

That on the 28TH day of AUGUST 2007, At: 2:30 PM

At: C/O NATIONAL REGISTERED AGENTS, INC., 875 AVENUE OF THE AMERICAS, SUITE 501, NEW YORK, NEW YORK 10001

Deponent served the Annexed: **SUMMONS AND COMPLAINT**

Upon: **ERNST & YOUNG LLP**

### PERSONAL SERVICE ON A LIMITED LIABILITY PARTNERSHIP
A limited liability partnership, by delivering thereat a true copy to **MARIA GARCIA (SERVICE OF PROCESS RECEIVER)** personally; who stated, that she is the said individual to be *Authorized To Accept Service* thereof.

### DESCRIPTION - Deponent describes the individual served or spoken to as follows:
Sex: **FEMALE** Color: **WHITE** Hair: **RED** App. Age: **39** App. Ht: **5'6"** App. Wt. **150**
Other identifying features:

Sworn to before me this 28TH
day of AUGUST 2007

**JOLANTYNA CAGNEY**
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County
Commission Expires June 14, 2008

**ROBIN RAMSON** 956-346

# AFFIDAVIT OF SERVICE

## SUPREME COURT OF THE STATE OF NEW YORK / NEW YORK COUNTY

No. 07-602896

**MARC S. KIRSCHNER, as Trustee of the Refco Private Actions Trust,**

Plaintiff,

-against-

**PHILLIP R. BENNETT, ET AL,**

Defendants.

**FILED**

AUG 3 0 2007

NEW YORK
COUNTY CLERK'S OFFICE

State Of New York, County of New York SS:

**ROBIN RAMSON**

Being duly sworn, deposes and says that he is over the age of 18 years, is not a party to this action and resides in New York.

That on the 28TH day of AUGUST 2007, At: 3:15 PM

At: C/O CT CORPORATION SYSTEM, 111 8TH AVENUE, NEW YORK, NEW YORK 10011

Deponent served the Annexed: SUMMONS AND COMPLAINT

Upon: MAYER, BROWN, ROWE & MAW LLP

### PERSONAL SERVICE ON A LIMITED LIABILITY PARTNERSHIP

A limited liability partnership, by delivering thereat a true copy to NORA DINDYAL (SUPERVISORY CLERK) personally; who stated, that she is the said individual to be *Authorized To Accept Service* thereof.

### DESCRIPTION - Deponent describes the individual served or spoken to as follows:

Sex: **FEMALE** Color: **BROWN** Hair: **BLACK** App. Age: 35 App. Ht: 5'4" App. Wt. 135
Other identifying features:

Sworn to before me this 28TH
day of AUGUST 2007

JOLANTYNA CAGNEY
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County
Commission Expires June 14, 2008

ROBIN RAMSON 956-346

# AFFIDAVIT OF SERVICE

## SUPREME COURT OF THE STATE OF NEW YORK / NEW YORK COUNTY

No. 07-602896

MARC S. KIRSCHNER, as Trustee of the Refco Private
Actions Trust,

Plaintiff,

-against-

PHILLIP R. BENNETT, ET AL,

Defendants.

State Of New York, County of New York SS:
**ROBIN RAMSON**
Being duly sworn, deposes and says that he is over the age of 18 years, is not a party to this action and
resides in New York.

That on the 28TH day of AUGUST 2007, At: 3:51 PM

At: 666 3RD AVENUE , NEW YORK, NEW YORK  10017

Deponent served the Annexed: SUMMONS AND COMPLAINT

Upon: GRANT THORNTON, LLP (ATTN. MARTIN E. COOPERMAN)

### PERSONAL SERVICE ON A LIMITED LIABILITY PARTNERSHIP

A limited liability partnership by delivering thereat a true copy to JOANN GIALLONZO
(ASSISTANT TO MARVIN E. COOPERMAN ) personally; who stated, that she is the said
individual to be *Authorized To Accept Service* thereof.

### DESCRIPTION - Deponent describes the individual served or spoken to as follows:
Sex: **FEMALE** Color: **WHITE** Hair: **BROWN** App. Age: **35** App. Ht: **5'6"** App. Wt. **110**
Other identifying features:

Sworn to before me this 28TH
day of AUGUST 2007

JOLANTYNA CAGNEY
NOTARY PUBLIC State of New York
No. 01CA6111489
Qualified in New York County
Commission Expires June 14, 2008

ROBIN RAMSON 956-346