**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re REFCO INC. SECURITIES LITIGATION :  07 MDL No. 1902 (GEL)
 :
 :
----------------------------------------------------------------x
----------------------------------------------------------------x
MARC S. KIRSCHNER, :
as Trustee of the Refco Litigation Trust, :
 :  Case No. 07 Civ. 11604 (GEL)
     Plaintiff, :
 :  ECF FILED
   v. :
 :
GRANT THORNTON LLP; MAYER :
BROWN, ROWE & MAW, LLP; ERNST & :
YOUNG U.S. LLP; :
PRICEWATERHOUSECOOPERS LLP; :
CREDIT SUISSE SECURITIES (USA) LLC :
(f/k/a CREDIT SUISSE FIRST BOSTON :
LLC); BANC OF AMERICA SECURITIES :
LLC; DEUTSCHE BANK SECURITIES :
INC.; PHILLIP R. BENNETT; SANTO C. :
MAGGIO; ROBERT C. TROSTEN; TONE N. :
GRANT; REFCO GROUP HOLDINGS, INC.; :
LIBERTY CORNER CAPITAL :
STRATEGIES, LLC; WILLIAM T. PIGOTT; :
EMF FINANCIAL PRODUCTS, LLC; EMF :
CORE FUND, LTD.; DELTA FLYER FUND, :
LLC; ERIC M. FLANAGAN; INGRAM :
MICRO, INC.; CIM VENTURES, INC.; :
BECKENHAM TRADING CO. INC.; :
ANDREW KRIEGER; COAST ASSET :
MANAGEMENT, LLC (f/k/a COAST ASSET :
MANAGEMENT LP); CS LAND :
MANAGEMENT, LLC; and CHRISTOPHER :
PETITT, :
     Defendants. :
 :
----------------------------------------------------------------x

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANT MAYER BROWN LLP'S MOTION TO DISMISS**</u>

May 30, 2008

John K. Villa (admitted *pro hac vice*)
Michael S. Sundermeyer (admitted *pro hac vice*)
Craig D. Singer (admitted *pro hac vice*)
Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Attorneys for Defendant Mayer Brown LLP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

THE ALLEGATIONS IN THE COMPLAINT................................................... 3

ARGUMENT ...................................................................................................... 7

I.    THE TRUSTEE'S CLAIMS ARE BARRED BY THE *WAGONER* RULE
      AND THE DOCTRINE OF *IN PARI DELICTO.* ......................................... 7

      A.    All of the Claims Against Mayer Brown Should Be Dismissed for
            Lack of Standing under the *Wagoner* Rule.............................................. 7

            1.    The "adverse interest" exception is inapplicable because the
                  Refco entities derived a benefit from the wrongdoing.............................. 10

            2.    The "adverse interest" exception is inapplicable because the
                  Refco Insiders were the sole relevant actors............................................. 13

      B.    New York Law Applies to the Trustee's Claims. ................................. 16

            1.    The "presumptively applicable law" is New York's. ............................. 16

            2.    Restatement §§ 6 and 145 reinforce the applicability of New
                  York law....................................................................................................... 18

                  a.    Under Restatement § 145, New York has the most
                        significant contacts to the events at issue ..................................... 18

                  b.    Under Restatement § 6, New York has a stronger
                        interest in have its law applied...................................................... 20

      C.    In the Event Illinois Law Applies, the Complaint Should Be Dismissed
            under the Doctrine of *In Pari Delicto.* ................................................. 20

II.   THE TRUSTEE'S CLAIM FOR AIDING AND ABETTING FRAUD
      SHOULD BE DISMISSED FOR FAILURE TO PLEAD JUSTIFIABLE
      RELIANCE.................................................................................................... 21

III.  THE TRUSTEE'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO
      PLEAD MAYER BROWN'S ACTUAL KNOWLEDGE OF
      WRONGDOING............................................................................................. 22

      A.    The Complaint Does Not Allege Mayer Brown's Actual Knowledge of
            Any Improper Transfers from RCM to Other Refco Entities. ............... 25

      B.    The Complaint Does Not Allege Mayer Brown's Actual Knowledge of
            Hidden Inter-Company Debt..................................................................... 28

IV.   THE TRUSTEE'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO
      PLEAD CAUSATION.................................................................................... 31

      A.    Mayer Brown's Regulatory Advice Was Not a Proximate Cause of the
            Alleged Looting of RCM's Assets............................................................ 33

i

B.     The Complaint Fails To Allege that RGL or Refco Inc. Suffered a Cognizable Harm from the LBO or IPO.............................................................. 33

C.     Mayer Brown's Conduct Was Not a Proximate Cause of the Refco Insiders' Alleged Cashing Out of Their Interests in Refco................................... 34

V.     THE BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIMS SHOULD BE DISMISSED AS DUPLICATIVE OF THE MALPRACTICE CLAIMS. ....................................................... 37

VI.     THE TRUSTEE'S MALPRACTICE AND BREACH OF FIDUCIARY DUTY CLAIMS ARE PREEMPTED BY NEW YORK'S MARTIN ACT.................... 38

VII.     THE TRUSTEE'S BREACH OF FIDUCIARY DUTY AND MALPRACTICE CLAIMS ARE BASED ON INVALID ASSIGNMENTS UNDER ILLINOIS LAW................................................................................................. 38

VIII.     THE TRUSTEE'S CLAIMS ARE PREEMPTED BY SLUSA ....................................... 40

CONCLUSION............................................................................................................................. 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.)*, 353 B.R. 324
(Bankr. D.D.C. 2006)..............................................................................................11

*Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.),* 333 B.R. 506
(Bankr. D.D.C. 2005)..............................................................................................11

*American Financial International Group-Asia, LLC v. Bennett,* No. 05 Civ. 8988, 2007
WL 1732427 (S.D.N.Y. June 14, 2007) .................................................................22

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 233 F.R.D. 327
(S.D.N.Y. 2005).......................................................................................................15

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F. Supp. 2d
79 (S.D.N.Y. 2004)..............................................................................................9, 21

*AUSA Life Insurance Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000) ...................32

*Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006)...................................................10, 11

*Baker v. Dorfman*, 239 F.3d 415 (2d Cir. 2000)...........................................................21

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ..............................................25

*Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599 (2d Cir. 2001) .......................16

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985).........35, 36

*Bloor v. Dansker (In re Investment Funding Corporation of New York Securities
Litigation)*, 523 F. Supp. 533 (S.D.N.Y. 1980) .......................................................34

*Bondi v. Grant Thornton International (In re Parmalat Securities Litigation)*, No. 04 Civ.
9771, 2007 WL 541466 (S.D.N.Y. Feb. 22, 2007)..................................................18

*Bondi v. Grant Thornton International (In re Parmalat Securities Litigation)*, 421 F.
Supp. 2d 703 (S.D.N.Y. 2006)................................................................................36

*Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704 (S.D.N.Y. 2001)....................13

*Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94
(2d Cir. 2003)....................................................................................7, 9, 13, 15

*Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982)..........................20, 21

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ........................................................................................................36

*Cobalt Multifamily Investors I, LLC v. Shapiro*, No. 06 Civ. 6468, 2008 WL 833237 (S.D.N.Y. Mar. 28, 2008) ........................................................................ passim

*Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005) ..................................32, 37

*Ernst & Young v. Bankruptcy Services (In re CBI Holding Co.)*, 311 B.R. 350 (S.D.N.Y. 2004) ...........................................................................................................10, 13

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)...............32, 33, 36, 37

*Frota v. Prudential-Bache Securities, Inc.*, 639 F. Supp. 1186 (S.D.N.Y. 1986) ................... 24-25

*Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072 (S.D.N.Y. July 26, 2007) ..............................................................................24, 32

*Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) .........................................................................7, 8, 9, 20, 35

*Goldin v. Primavera Familienstuftung Tag Associates (In re Granite Partners, L.P.)*, 194 B.R. 318 (Bankr. S.D.N.Y. 1996) .........................................................................9, 20

*Granite Partners, L.P. v. Bear Stearns & Co.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998) ..............8, 38

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ...........................................8, 9, 17

*Hoagland v. Sandberg, Phoenix & Von Gontard, P.C.*, 385 F.3d 737 (7th Cir. 2004)................37

*In re J.E. Marion, Inc.*, 199 B.R. 635 (Bankr. S.D. Tex. 1996) ....................................................39

*Kirk v. Heppt*, 532 F. Supp. 2d 586 (S.D.N.Y. 2008) ...................................................................32

*Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996) .........................................24, 33

*Krause v. Forex Exchange Market, Inc.*, 356 F. Supp. 2d 332 (S.D.N.Y. 2005) ..........................23

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ......................................................23, 24

*Martinez v. Freedom Mortgage Team, Inc.*, 527 F. Supp. 2d 827 (N.D. Ill. 2007)......................21

*Maxwell v. KPMG LLP*, 520 F.3d 713 (7th Cir. 2008)...........................................................2, 36

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ..............................32, 33, 37

*Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822 (2d Cir. 1997) ................ passim

*Medline Industries Inc. v. Maersk Medical Ltd.*, 230 F. Supp. 2d 857 (N.D. Ill. 2002)...............18

*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993) (per curiam)......................................................16

*O'Connell v. Arthur Andersen LLP (In re AlphaStar Insurance Group Ltd.)*, 383 B.R. 231 (Bankr. S.D.N.Y. 2008) ..................................................................................................13

*Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003)..........................................................................................8, 13

*Official Committee of Unsecured Creditors v. Donaldson, Lufkin and Jenrette Securities Corp.*, No. 00 Civ. 8688, 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) .....................................25

*Official Committee of Unsecured Creditors v. McConnell (In re Grumman Olson Industries, Inc.)*, 329 B.R. 411 (Bankr. S.D.N.Y. 2005) ........................................................8, 10

*In re Parmalat Securities Litigation*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007) ........................ passim

*Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006)....................................................23, 32

*In re Refco, Inc. Securities Litigation*, No. 07 Civ. 11604, 2008 WL 1827644 (S.D.N.Y. Apr. 21, 2008) .......................................................................................................................40

*Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081 (S.D.N.Y. June 16, 2000) ...............................................................................................................................30

*Ryan v. Hunton & Williams*, No. 99 Civ. 5938, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ...............................................................................................................................30

*Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 Civ. 3120, 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ..................................................................................................38

*Serova v. Teplen*, No. 05 Civ. 6748, 2006 WL 349624 (S.D.N.Y. Feb. 16, 2006) .......................37

*Shearson Lehman Hutton Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ...................................7, 8

*Stoneridge Investment Partners LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008) ..............36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ..........................................24

*Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, No. 06 Civ. 14211, 2007 WL 2219485 (S.D.N.Y. Aug. 2, 2007)................................................................................32

*United States v. Bennett*, No. 05 Cr. 1192 (S.D.N.Y.).....................................................................3

*United States v. Maggio*, No. 07 Cr. 1196 (S.D.N.Y) ......................................................................3

*Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d. Cir. 2000) ..............................................................7

## STATE CASES

*Barbara's Sales Inc. v. Intel Corp.*, 879 N.E.2d 910 (Ill. 2007)......................................16

*Baum v. Duckor Spradling & Metzger*, 84 Cal. Rptr. 2d 703 (Ct. App. 1999) .............................39

*CPC International Corp. v. McKesson Corp.*, 70 N.Y.2d 268 (1987) .........................................38

*D.S.A. Financial Corp. v. County of Cook*, 801 N.E.2d 1075 (Ill. App. Ct. 2003) ......................22

*Gonzalez v. Profile Sanding Equipment, Inc.*, 776 N.E.2d 667 (Ill. App. Ct. 2002) ....................39

*Hoth v. Stogsdill*, 569 N.E.2d 34 (Ill. App. Ct. 1991)...................................................39

*King v. First Capital Financial Services Corp.*, 828 N.E.2d 1155 (Ill. 2005) ...........................20

*Laub v. Faessel*, 745 N.Y.S.2d 534 (App. Div. 2002)...................................................32

*O'Hara v. Ahlgren, Blumenfeld & Kempster*, 537 N.E.2d 730 (Ill. 1989).................................20

*Serino v. Lipper*, 846 N.Y.S.2d 138 (App. Div. 2007) .................................................22

*Town of North Hempstead v. Winston & Strawn, LLP*, 814 N.Y.S.2d 237
   (App. Div. 2006)...................................................................................32

*Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893 (Ill. 2007)...............................16, 17, 18, 20

## DOCKETED CASES

*Kirschner v. Grant Thornton LLP*, No. 07 Civ. 5306 (N.D. Ill.)....................................40

*Kirschner v. Thomas H. Lee Partners, L.P.*, No. 07 Civ. 7074 (GEL) (S.D.N.Y.) ......................15

*In re Refco Inc.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y.) ...........................................17

*In re Refco Securities Litigation*, No. 05 Civ. 8626 (GEL) (S.D.N.Y.)................................. 31-32

*Thomas H. Lee Equity Fund V, L.P. v. Mayer, Brown, Rowe and Maw LLP*, No. 07 Civ.
   6767 (GEL) (S.D.N.Y.)...........................................................................31

## FEDERAL STATUTES, REGULATORY FILINGS, AND RULES

Bankruptcy Code, § 1123 ...............................................................................39, 40

Federal Rule of Civil Procedure 8(a)....................................................................25

Federal Rule of Civil Procedure 9(b)....................................................................24, 33

Federal Rule of Civil Procedure 12 ......................................................................8, 9

SEC Release No. IA-2176 (Sept. 25, 2003)..................................................................26

SEC Release No. IA-2333 (Dec. 7, 2004) .................................................................26

## STATE STATUTES

Martin Act, N.Y. Gen. Bus. Law § 352 *et seq.* ...........................................................38

## MISCELLANEOUS

Restatement (Second) of Conflicts of Laws § 6 ...........................................................20

Restatement (Second) of Conflicts of Laws § 145 .......................................................18

Restatement (Second) of Conflicts of Laws § 148 comment a......................................17

Restatement (Second) of Conflicts of Laws § 148(1).....................................................17

Restatement (Second) of Torts § 876(b).......................................................................23

## INTRODUCTION

In this lawsuit, the Trustee of the Refco Litigation Trust asserts multiple claims against Mayer Brown LLP ("Mayer Brown")[1] and many other defendants for alleged harm to Refco Inc. and two of its subsidiaries. The Trustee alleges that he obtained these claims by assignment through the Refco bankruptcy plan. As a consequence, he stands in the shoes of the three Refco entities that assigned them. The Complaint asserts that the three Refco entities suffered harm from a massive fraud perpetrated and orchestrated by Refco's senior management. Mayer Brown, and other professionals here sued, allegedly are responsible for assisting the guilty insiders or for failing to stop them from harming the company.

On the face of the Complaint, this is a poster child case for application of the *Wagoner* Rule or the related doctrine of *in pari delicto*. The principal wrongdoers are alleged to be Refco's management, whose conduct is imputed to Refco. Refco and its assignee, the Litigation Trust, therefore cannot sue the outside professionals who allegedly helped Refco harm itself.

The Trustee obviously anticipated this glaring problem and seeks to plead around it, alleging that Refco's principals acted for their own enrichment, against the interests of the company, and thus Refco (and now the Trustee) is not responsible for what they did. The "adverse interest" exception to the *Wagoner* Rule does not salvage the Trustee's claims, however, because the Complaint alleges that the insiders' conduct enabled Refco to achieve short-term profits. The law requires no more to defeat a claim of "adverse interest" and to impute the insiders' conduct to the company. Even if the Complaint had alleged total adversity

---

[1]    Mayer Brown LLP is an Illinois limited partnership formerly known as Mayer, Brown, Rowe & Maw LLP. The Complaint describes "Defendant Mayer, Brown, Rowe & Maw LLP" as a "combination" of two legal entities – an Illinois limited liability partnership and a limited liability partnership formed under English law. Compl. ¶ 41. There is no such single entity. The instant Motion is brought by the Illinois limited liability partnership, Mayer Brown. Mayer Brown International LLP, the limited liability partnership incorporated in England and Wales, is filing a separate motion to dismiss.

(it does not), the "adverse interest" exception is inapplicable when the wrongdoers sufficiently dominate the company.  Here, Bennett, Maggio, Trosten, and Grant unmistakably are alleged to have exerted such control over Refco.  Imputation is unavoidable.

The Trustee may argue that Illinois law applies, and thus *Wagoner*'s New York doctrines are inapplicable.  New York law applies, but the difference is of no moment.  Illinois law recognizes the doctrine of *in pari delicto*, and its application too would require dismissal.

The above principles should end this case against Mayer Brown.  But other defects in the Complaint also are fatal, in the event it may be necessary to consider them.  The Trustee's claims that Mayer Brown aided and abetted Refco's insiders do not sufficiently plead Refco's justifiable reliance on its own insiders' fraud.  All of the Trustee's claims, moreover, fail to allege that Mayer Brown knowingly participated in, or proximately caused, any of Refco's alleged injuries.  The Trustee's breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims also should be dismissed as duplicative of the malpractice claim; and his negligence and breach of fiduciary duty claims are pre-empted by New York's Martin Act.  Finally, if the Trustee were successful in arguing for application of Illinois law, then the assignments from Refco on which he purports to sue are invalid, as malpractice claims are not assignable in Illinois.

The Seventh Circuit recently decried the tendency of bankruptcy trustees to assert unsound claims that litigants spending their own money would not, in the hope of extracting settlements based on intimidating damages claims.  *See Maxwell v. KPMG LLP*, 520 F.3d 713, 718 (7th Cir. 2008).  This is an appropriate occasion to apply the admonition that courts "be vigilant in policing the litigation judgment exercised by trustees in bankruptcy."  *Id.*

## THE ALLEGATIONS IN THE COMPLAINT

Refco Inc. was formed in connection with Refco's August 2005 Initial Public Offering as a publicly traded holding company.  Compl. ¶ 32.  Upon its formation, it held ownership in a number of subsidiary entities including Refco Group Ltd., LLC ("RGL") and Refco Capital Markets, Ltd. ("RCM").  *See id.*  RGL, formed in 1999, was the privately held corporate parent of the Refco group of entities until it became a subsidiary of Refco Inc. in connection with the IPO.  *See id.*  RCM was "an unregulated securities broker and foreign exchange broker, and one of the three principal operating subsidiaries of Refco."  *Id.*

The Complaint alleges that the Refco entities' controlling shareholders and top-level management, including Chief Executive Officer Phillip R. Bennett, President and former Chief Executive Officer Tone N. Grant, Chief Financial Officer Robert C. Trosten, and Executive Vice President and Director Santo C. Maggio (collectively the "Refco Insiders") defrauded "Refco,"[2] causing billions of dollars in damage.  *See id*. ¶¶ 2-3.  Since the Complaint was filed, all four Refco Insiders have been convicted of multiple counts of securities fraud and bank and wire fraud for their roles in orchestrating the fraud.  *See United States v. Bennett*, No. 05 Cr. 1192 (S.D.N.Y.); *United States v. Maggio*, No. 07 Cr. 1196 (S.D.N.Y).  Bennett, Maggio and Trosten pleaded guilty, and a jury found Grant guilty after a three-week trial.  *See id.*

The Complaint alleges that the Refco Insiders' fraud took the form of a three-part scheme.  First, the Refco Insiders allegedly schemed to conceal millions of dollars in trading and operating losses that "Refco" had suffered beginning as early as 1997 by engaging in a complex accounting fraud.  Compl. ¶¶ 61–66.  The Trustee alleges that the purpose of this fraud was to keep Refco in business so that the Refco Insiders ultimately could "cash[] out" their interests.

---

[2] The Complaint, in the introductory paragraph, defines "Refco" as "Refco Inc. and certain of its direct and indirect subsidiaries . . . including [RGL and RCM]," and its allegations often fail to differentiate among these entities.

*See id.* ¶ 60.  He alleges that, "[i]f disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management, and severely damaged Refco's business."  *Id.* ¶ 63.

This aspect of the scheme allegedly began with the transfer of millions of dollars in undisclosed losses to Refco Group Holdings, Inc. ("RGHI"), an "alter-ego" of Bennett and Grant, in return for a receivable from RGHI (the "Receivable").  *Id.*  ¶ 40; *see id.* ¶ 78.  Although RGHI never paid any interest on the Receivable, the Refco Insiders recorded "fictitious" interest income on the debt in order to inflate Refco's financial statements.  *Id.* ¶¶ 71–72.  To conceal the RGHI Receivable, the Complaint alleges that the Refco Insiders also "devis[ed] and implement[ed]" a series of short-term loan transactions beginning in 1998 that allowed RGHI to pay down the Receivable temporarily around the end of Refco's fiscal year.  *Id.* ¶ 75; *see id.* ¶¶ 76-77.  The structure of the loan transactions was as follows:  first, a "Refco entity (typically RCM)" lent money to a Refco customer, which then lent the same amount to RGHI.  *Id.* ¶ 78.  Then, in the third leg of the transaction, RGHI would temporarily pay down its debt to Refco.[3]  *Id.*  After this paydown, "Refco's financial statements" would reflect a loan to the customer rather than a receivable from RGHI.  *Id.*  The Trustee describes these transactions as the "Round Trip Loan Transactions."  *Id.* ¶ 6. The Trustee alleges that the Refco Insiders arranged for these loans to be made just before the end of an accounting period so that the RGHI Receivable would not appear on its financial statements.  *See id.* ¶ 77.  Shortly after the end of the fiscal year or

---

[3]     The Trustee presumably uses the term "round trip loan transactions" or "RTLs" because he includes in his description the "third leg" of the transaction — the RGHI Receivable paydown — which is the crux of his theory of the Refco fraud.  *See* Compl. ¶ 78.  While the Complaint alleges that Mayer Brown attorneys worked on the loan documentation for the first two legs of the transaction, *see id.* ¶¶ 213–16, it does not allege any facts from which one could infer that any Mayer Brown attorney had knowledge of or involvement in the "third leg."  To avoid confusion, Mayer Brown uses the term "back-to-back" loans to describe the first two legs of the transactions, for which it provided legal services.  A diagram showing the structure of the loan transactions based on the Trustee's allegations is attached to the Declaration of Thomas G. Ward in Support of Defendant Mayer Brown LLP's Motion to Dismiss ("Ward Decl.") as Exhibit A.

quarter, the loans would be repaid and the RGHI Receivable "was restored to its full value." *Id.* ¶ 79.

The second part of the Refco Insiders' fraudulent scheme, according to the Trustee, was to "t[ake] money and property entrusted to RCM by its customers and s[end] the funds to other Refco entities." *Id.* ¶ 95. These asset transfers, which were made in the form of "unsecured inter-company loans," *id.* ¶ 99, allegedly were designed "to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion the Refco was highly profitable, healthy, and able to satisfy its . . . needs" without having to borrow money, *id.* ¶ 94. The Refco entities that received RCM's funds had neither the intention nor "financial wherewithal" to repay RCM. *Id.* ¶ 95. By August 2004, "RCM was owed approximately $2 billion by Refco affiliates." *Id.* ¶ 102. "The diverted RCM assets" allegedly were "used for a variety of general and specific funding purposes by various Refco affiliates who would not have been able to sustain their reported financial health without using the funds stolen from RCM." *Id.* ¶ 98.

The third part of the Refco Insiders' fraud purportedly was to cash out their interests in Refco by causing the company to undergo a leveraged buyout ("LBO") in August 2004 and an initial public offering ("IPO") in July 2005, which together raised over $1.4 billion.[4] *See id.* ¶¶ 103, 113, 340. The Complaint alleges that the LBO harmed RGL by "saddling [it] with $1.4 billion in secured and senior debt that Refco's operations could not service," *id.* ¶ 132, and that the IPO harmed Refco Inc. by "saddl[ing] [it] with hundreds of millions of dollars in liabilities" to investors who allegedly were misled, *id.* ¶ 137.

---

[4]     According to the Complaint, "Bennett and others acting in active concert or participation with him received $106 million" of the $1.4 billion raised in the IPO. Compl. ¶ 113. It does not specify how much the Refco Insiders received from the IPO, alleging only that Bennett sold his shares for approximately $146 million, *id.* ¶ 135, and that a "greenshoe" option was exercised paying "an aggregate dividend" of $80 million to "Refco's pre-IPO shareholders," *id.* ¶ 136.

The Trustee seeks to hold Mayer Brown, which served as one of Refco's outside counsel during the period in question, liable for the Refco Insiders' conduct under four theories. The Complaint alleges that Mayer Brown (a) committed malpractice, (b) breached its fiduciary duties to Refco, (c) aided and abetted the Refco Insiders' fraud, and (d) aided and abetted the Refco Insiders' breach of their fiduciary duties to the company.[5] In his effort to tie Mayer Brown to the wrongdoing of his own assignors' principals, the Trustee asserts a laundry list of conclusory and unsupported allegations. Most prominent in the Complaint, the Trustee alleges that Mayer Brown participated in drafting and negotiating the back-to-back loans, supposedly to help the Refco Insiders conceal the RGHI Receivable. *See, e.g.*, *id.* ¶¶ 75-93, 213–27. The Complaint also asserts that Mayer Brown gave advice to RCM on regulatory matters that supposedly furthered the Refco Insiders' scheme to siphon assets from RCM to other Refco entities. *See, e.g.*, *id.* ¶¶ 228-34. The Trustee further alleges that Mayer Brown helped the Refco Insiders lead the company through an imprudent LBO and IPO by misrepresenting RGL's and Refco Inc.'s financial condition in negotiations with investors and in transaction documents, which allegedly enabled the Refco Insiders to "cash out" their fraudulent scheme. *See, e.g.*, *id.* ¶¶ 235-47. Finally, the Trustee alleges that Mayer Brown failed to blow the whistle on the Refco Insiders by disclosing the fraud to Refco's innocent officers and directors. *See, e.g.*, *id.* ¶¶ 101, 122.

As explained in detail below, the Trustee's claims are barred by the *Wagoner* Rule and the doctrine of *in pari delicto*. His claims fail for the additional reasons that the Complaint does not plead any facts that would demonstrate a viable theory of reliance or proximate causation, or

---

[5]    The Trustee originally filed the Complaint on August 21, 2007, in the Circuit Court of Cook County, Illinois. Certain defendants removed the action to the Northern District of Illinois and moved the Judicial Panel on Multi-District Litigation to transfer the action to this Court, which the MDL Panel did by order dated December 28, 2007. On April 21, 2008, this Court denied the Trustee's motion to remand the suit back to the Circuit Court of Cook County.

that give rise to a strong inference that any Mayer Brown lawyer knowingly and substantially assisted the Refco Insiders' fraud.  For these and the other reasons discussed below, the Complaint should be dismissed in its entirety.

## ARGUMENT

**I.      THE TRUSTEE'S CLAIMS ARE BARRED BY THE *WAGONER* RULE AND THE DOCTRINE OF *IN PARI DELICTO*.**

### A.      All of the Claims Against Mayer Brown Should Be Dismissed for Lack of Standing under the *Wagoner* Rule.

The *Wagoner* Rule provides that, under New York law, a bankruptcy trustee may only "assert claims held by the bankrupt corporation itself," and the trustee lacks standing to assert "[a] claim against a third party for defrauding a corporation with the cooperation of management" on behalf of "the guilty corporation."  *Shearson Lehman Hutton Inc. v. Wagoner*, 944 F.2d 114, 118, 120 (2d Cir. 1991); *see Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94 (2d Cir. 2003) (affirming dismissal of trustee's complaint against debtor's former attorneys for lack of standing); *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 826 (2d Cir. 1997) (affirming dismissal of unsecured creditors committee's claims against parties alleged to have aided and abetted misconduct of debtor's sole shareholder).  The Rule derives from the "fundamental principle of agency that the misconduct of managers in the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86-87 (2d Cir. 2000), *quoted in Global Crossing Estate Rep. v. Winnick*, No. 04 Civ. 2558, 2006 WL 2212776, at *12 n.16 (S.D.N.Y. Aug. 3, 2006).  "[M]anagement's misconduct is imputed to the corporation, and because the trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he essentially took part in." *Wight*, 219 F.3d at 87.

While the *Wagoner* case itself addressed the claims of a Chapter 11 trustee, the Rule applies equally to the Trustee who similarly stands in the shoes of the Refco plaintiff entities Refco Inc., RGL and RCM. *See Mediators*, 105 F.3d at 826 (*Wagoner* barred claims by unsecured creditors committee); *Official Comm. of Unsecured Creditors v. McConnell (In re Grumman Olson Indus., Inc.),* 329 B.R. 411 (Bankr. S.D.N.Y. 2005) (same); *Global Crossing*, 2006 WL 2212776, at *13 (Estate Representative created for the benefit of creditors subject to same standing limitations as the debtor).

Where a complaint's allegations demonstrate that a trustee lacks standing to sue under the *Wagoner* Rule, the complaint should be dismissed on a Rule 12 motion, prior to discovery. Because *Wagoner* is framed as a rule of standing, it should be resolved at the earliest opportunity. *Wagoner*, 944 F.2d at 117 ("[Standing] is a threshold issue in all cases . . ."). Courts accordingly have not hesitated to apply *Wagoner* to dismiss deficient claims on their pleadings. *See, e.g.*, *Mediators*, 105 F.3d at 826-27 (affirming dismissal of claims by unsecured creditors on motion to dismiss); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) (affirming dismissal of Chapter 11 Trustee's claims against debtor's accountants on motion to dismiss); *cf. Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 164 (2d Cir. 2003) ("[T]his Court has affirmed the dismissal of . . . claims on the pleadings upon findings that *in pari delicto* had been established in the complaints."); *Granite Partners, L.P. v. Bear Stearns & Co.*, 17 F. Supp. 2d 275, 308-10 (S.D.N.Y. 1998) (doctrine of *in pari delicto* required dismissal of estate representative's claims against brokers on motion to dismiss)..

Dismissal is required here as well. All of the Trustee's claims against Mayer Brown are expressly premised on the theory that the law firm allegedly aided Refco's owners and managers

in defrauding the corporation.[6]  *See* Compl. ¶¶ 401–03, 406–08, 410–13, 415–19 (alleging that Mayer Brown attorneys aided the Refco Insiders in fraudulently diverting funds from RCM); *id.* ¶¶ 481–84, 486–90, 492–95, 497–500 (alleging that Mayer Brown attorneys aided the Refco Insiders in fraudulently misrepresenting RGL's financials); *id.* ¶¶ 596–601, 603–06 (alleging that Mayer Brown attorneys aided the Refco Insiders in fraudulently misrepresenting Refco Inc.'s financials).  Thus the Trustee's claims fall squarely within the prohibitions of the *Wagoner* Rule. *See, e.g.*, *Bennett Funding,* 336 F.3d at 100 (barring trustee's claims against debtor's former attorneys where "management and a third party collaborated in the fraudulent scheme"); *Hirsch*, 72 F.3d at 1094 (barring trustee's claims against accountants for professional malpractice).[7]

The *Wagoner* Rule admits of limited exceptions, but none applies here.  The Trustee apparently has crafted his Complaint in the hope of satisfying the "adverse interest" exception, which holds that when the corporate insider's actions were wholly adverse to the corporation, a court need not apply "the usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal."  *Mediators*, 105 F.3d at 827.  For at least two reasons, the Trustee's allegations fail to salvage standing.  *First*, the Refco Insiders'

---

[6]     The Rule does not depend on how the causes of action are styled:  it "applies to professional malpractice claims" and breach of fiduciary duty claims, *see Bennett Funding*, 336 F.3d at 100 (citing *Hirsch, supra*), as well as claims for aiding and abetting, *see Goldin v. Primavera Familienstuftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 330 (Bankr. S.D.N.Y. 1996); *see also Cobalt Multifamily Investors I, LLC v. Shapiro*, No. 06 Civ. 6468, 2008 WL 833237, at *4 (S.D.N.Y. Mar. 28, 2008) (*Wagoner* Rule barred all claims against the law firm defendants "whether framed as legal malpractice or otherwise").

[7]     The allegations that this Court addressed in *Global Crossing* reveal, by contrast, that dismissal is appropriate here.  While the Court there observed that, under certain circumstances, "applicability of [the *Wagoner* Rule and *in pari delicto*] *may* hinge on certain fact-based considerations that cannot be addressed at the pleadings stage," 2006 WL 2212776 at *15 (emphasis added), Rule 12 dismissal is appropriate when the facts relevant to the *Wagoner* Rule are spelled out on the face of the Complaint and the documents it incorporates by reference, *see, e.g.*, *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 98 (S.D.N.Y. 2004) (dismissing certain malpractice claims pursuant to *Wagoner* on a motion to dismiss).  In stark contrast to this case, the Complaint in *Global Crossing* alleged that the defendants controlled and dominated the company, giving rise to questions of relative fault that are nowhere presented in this case, where the Refco Insiders (not Mayer Brown) are alleged to have run the show.  *See, e.g.*, Compl. ¶ 59 (Refco Insiders "engineer[ed]" the fraudulent scheme).

actions were not wholly "adverse" to the Refco plaintiff entities, and the narrow adverse interest exception accordingly does not apply.  *Second*, the "sole actor" rule defeats any claimed "adverse interest" exception because the alleged wrongdoers, Bennett, Grant, Trosten and Maggio, were the dominant decision-makers for Refco.

### 1.    The "adverse interest" exception is inapplicable because the Refco entities derived a benefit from the wrongdoing.

The adverse interest exception is "narrow":  It allows a corporation to avoid imputation of employee wrongdoing only when the employee has "*totally abandoned*" the company's interests.  *Mediators*, 105 F.3d at 827 (emphasis added) (quotations marks omitted).  "The exception does not apply simply because the agent has a conflict of interest or does not act primarily for his principal."  *Grumman Olsen*, 329 B.R. at 425.  On the contrary, if the insider's alleged misconduct serves *any* corporate purpose, even if the primary purpose is self-aggrandizement, he cannot be said to be acting "entirely for his own or another's purposes," *Ernst & Young v. Bankr. Servs. Inc. (In re CBI Holding, Co.)*, 311 B.R. 350, 369 (S.D.N.Y. 2004) (quotation marks omitted), and his conduct is imputed to the company.

Courts addressing facts very similar to those alleged here routinely decline to apply the adverse interest exception when the corporation derives a short-term benefit from the wrongful conduct.  In *Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006), for example, the litigation trustee sued Lernout & Hauspie's former accountants for failing to alert its outside directors of the irregularities in its financial statements and issuing unqualified opinion letters allowing it to incur hundreds of millions of dollars in new debt that it could not repay.  453 F.3d at 4.  The primary wrongdoers were Lernout & Hauspie's officers and directors who had fraudulently overstated the company's revenues and profits by over a quarter billion dollars.  *Id.* at 3.  The First Circuit held that the adverse interest exception did not apply because "[a] fraud by top

management to overstate earnings, and so facilitate stock sales or acquisitions" while "not in the long-term interest[s] of the company" nevertheless "profits the company in the first instance." *Id.* at 7.

Similarly, in *Greater Southeast*, a liquidation trustee sued the debtor's former attorneys alleging that they assisted corporate officers in harming the corporation. *See Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp.)*, 333 B.R. 506, 513-14 (Bankr. D.D.C. 2005) (incorporated by reference into *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp.)*, 353 B.R. 324, 333 (Bankr. D.D.C. 2006)). The debtor's former officers caused the corporation to borrow money in order to keep afloat a Ponzi scheme that ultimately drained the company and sent it into bankruptcy. 333 B.R. at 515. The court found that the adverse interest exception did not apply because "infusions of cash" from questionable loans "kept the debtors going." 353 B.R. at 368. While they "may have injured the debtors in the long run" they "provided a short-term benefit that the debtors . . . eagerly accepted." *Id.* "No matter how much evidence of wrongdoing [the trustee] produces, there simply are no set of facts under which a company that is harmed by the artificial prolongation of its existence does not also benefit to some degree by that same prolongation at the expense of innocent third parties"; therefore, the adverse interest exception "does not and cannot apply." *Id.*

Finally, in *Cobalt*, a receiver sued a corporation's former attorneys for breach of contract, breach of fiduciary duty and legal malpractice for assisting corporate insiders in defrauding investors into investing millions of dollars. *See* 2008 WL 833237, at *2. The law firm defendants allegedly aided the insiders' fraud by making omissions and misstatements in investor documents and by failing to provide accurate and complete legal advice to the corporation. *Id.* at *3. Judge Wood held that the receiver's claims were barred, and that the

11

adverse interest exception did not apply, because the insiders' misconduct "provided *at least some financial benefit* to the Cobalt entities." *Id.* at *4 (emphasis added). For example, the complaint in that case alleged that the insiders misappropriated a "majority . . . but not all" of the $22 million that they fraudulently raised from investors. *Id.* (quotation marks omitted). Thus, while "the [insiders'] looting may not have served any corporate purpose, [their] other fraudulent activities certainly did" and therefore, the adverse interest exception did not apply. *Id.* at *4 n.10.

The same reasoning applies here. The Trustee affirmatively alleges in great detail that the Refco entities benefited from the Refco Insiders' wrongful conduct. During the Asian market collapse in 1997, Refco suffered massive customer and proprietary trading losses. Compl. ¶¶ 62-63. "If disclosed, trading losses of this magnitude would have raised many tough questions for Refco, devastated customer confidence in Refco's management and severely damaged Refco's business." *Id.* ¶ 63. The Trustee openly concedes that both the allegedly improper "RTLs" and the transfers of funds from RCM were designed to, and in fact did, buttress the entire Refco organization, bolstering its financial statements, and profiting Refco in the short-term. *Id.* ¶¶ 32, 64, 492. Without the "infusions" of cash from RCM, RGL and its affiliates would not have been candidates for the LBO and IPO, which together raised well over $1.4 billion. *Id.* ¶¶ 103, 113, 340. And, if Refco had been unable to present itself as a financially healthy company, "customers would not [have done] business with Refco's operating subsidiaries, and Refco's considerable goodwill would [have been] severely eroded." *Id.* ¶ 63.

Thus, far from "totally abandoning" Refco's interests, the Refco Insiders' conduct sustained Refco for nearly a decade and provided it with an opportunity to address and possibly reverse the financial problems the Trustee claims it experienced in 1997. Under these

circumstances, any suggestion that the Refco Insiders' conduct was wholly adverse to Refco is insupportable, and the "adverse interest" exception should be rejected.

> **2.      The "adverse interest" exception is inapplicable because the Refco Insiders were the sole relevant actors.**

Even if their wrongdoing could be considered completely "adverse" to Refco (which it was not), the Refco Insiders' conduct would not qualify for the "adverse interest exception" because these wrongdoers controlled and dominated the company.  "Regardless of the circumstances, the adverse interest exception does not apply if the wrongdoing agent is the corporation's sole shareholder or all the corporation's management participated in the wrongdoing."  *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group Ltd.)*, 383 B.R. 231, 273 (Bankr. S.D.N.Y. 2008) (citations omitted); *see also Mediators*, 105 F.3d at 827 ("Where  . . . a sole shareholder is alleged to have stripped the corporation of assets, the adverse interest exception to the presumption of knowledge cannot apply."); *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 710 (S.D.N.Y. 2001) ("[T]he *Wagoner* rule imputes the misconduct of corrupt management to the corporation whenever management dominates the company."); *Color Tile*, 322 F.3d at 165 (applying Texas law) ("where . . . the persons dominating and controlling the corporation orchestrated the fraudulent conduct, their knowledge is imputed to the corporation as principal under the sole actor rule") (internal quotation marks omitted).  The existence of one or more "innocent" officers or directors who "might in some metaphysical sense [have] stopped the fraud" does not change the analysis.  *Bennett Funding*, 336 F.3d at 101.  The sole actor exception applies unless the alleged innocent insiders actually possessed authority to stop the fraud.  *See CBI Holding*, 311 B.R. at 373.

The Complaint alleges unmistakably that the controlling shareholders and top management of the Refco plaintiff entities – Bennett, Grant, Trosten and Maggio – were the

masterminds and primary executors of the alleged wrongdoing.  These four now stand convicted of criminal offenses based on their misdeeds as principals of Refco.

The Trustee concedes that Bennett and Grant effectively controlled RGL from 1999 until the LBO in 2004.  *See* Compl. ¶ 40 (RGHI, the "controlling shareholder of Refco" before the LBO, was owned by Bennett and Grant "and was at all relevant times, an alter-ego of Bennett and Grant"); *id.* ¶ 35 ("[f]rom 1999 until the LBO, RGHI had a 90% interest in RGL (the principal Refco holding company before the LBO)" and the remaining 10% was held by a subsidiary of a financial institution closely tied to Bennett).  Bennett and Grant thus also controlled RCM, "an indirect subsidiary" wholly-owned by RGL.  *Id.* ¶ 32; Ward Decl., Ex. B (Corporate Ownership Statement).  In addition, Bennett, through his controlling interest in RGHI, also owned a substantial stake in New Refco Group Ltd. Inc., the holding company formed in the LBO and the predecessor to Refco Inc. which was formed in the IPO.  Compl. ¶¶ 33, 34 (and accompanying diagram).  The Complaint similarly reveals that the Refco Insiders were the top level officers and directors of the Refco plaintiff entities.  For example, from 1981 on, Bennett and Grant occupied the positions of CEO and President of RGL.  Compl. ¶¶ 36, 39. Bennett was the President and CEO of Refco Inc.  *See* Ward Decl., Ex. C (Superseding Indictment) ¶ 2.  Trosten was "RGL's Chief Finance Officer from 2001 to October 2004," Compl. ¶ 38, and Maggio served as "President" and "director of RCM," *id.* ¶ 37.

In a transparent effort to defeat the sole actor rule, the Trustee identifies a single so-called innocent director and one alternative director of RCM, whom he labels the "RCM Outside Directors," but he provides no factual basis whatsoever to conclude that these two individuals had any authority, ability, or willingness to derail the Refco Insiders' scheme.  *See id.* ¶ 101. Tellingly, they are mentioned only fleetingly in the Complaint, and the Trustee makes absolutely

no effort to explain what their powers and responsibilities were. Without any specific allegations regarding the RCM Outside Directors' authority, it is impossible to conclude that they could have or would have prevented the fraud. Mere speculation cannot defeat the *Wagoner* Rule. *See Bennett Funding*, 336 F.3d at 101 (sole decision-maker exception is not a "would-a, could-a, should-a" test); *see also Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 233 F.R.D. 327, 330 (S.D.N.Y. 2005) (agreeing with those courts that reject legal viability of "innocent insider" exception to *Wagoner* Rule) (quotation marks omitted).

Nor can the Trustee survive dismissal on the theory that Thomas H. Lee Partners ("THL") might not have invested in the LBO if it had known of the fraud. *See* Compl. ¶ 118. Until the LBO transaction was consummated, THL was not a shareholder or decision-maker of Refco; what THL may have done if it had discovered a fraud before the LBO accordingly has no bearing on the adverse interest inquiry. As for the time period *after* the LBO, when Refco entered into the IPO, the Litigation Trustee has not alleged that THL would have prevented this transaction (or any other harm to Refco) if it had known of the fraud. On the contrary, the Trustee has *sued* THL for its actions during this time period, alleging that it *did* know of Refco's financial condition and yet "engaged in acts of self-dealing," and "caus[ed] Refco Inc. to enter into an IPO in which [THL] derived an improper benefit. *See* Complaint ¶¶ 278, 280, in *Kirschner v. Thomas H. Lee Partners, L.P.*, No. 07 Civ. 7074 (GEL) (S.D.N.Y.).

In sum, the Trustee's own allegations establish that the Refco Insiders possessed an overwhelming and controlling ownership stake and held the highest level positions in the Refco organization. The knowing and purposeful misconduct of Refco's controlling shareholders and top management set forth in the Complaint precludes application of the adverse interest exception. The Trustee's claims accordingly are barred by the *Wagoner* Rule.

**B.      New York Law Applies to the Trustee's Claims.**

Having filed this action in Illinois, the Trustee may contend that Illinois law, not New York's *Wagoner* Rule, should apply.  As explained below in Part I.C, the same considerations that require application of *Wagoner* also would compel dismissal under the Illinois doctrine of *in pari delicto*.  Accordingly, it should not matter for purposes of this motion which state's law governs.  We briefly address the conflict-of-laws issue, however, in the event the Court finds a meaningful difference between them.  The conflicts analysis strongly favors New York law, as New York has the most significant relationship to the claims.

A federal court hearing state law claims by virtue of bankruptcy relatedness jurisdiction should apply state law choice-of-law principles, in the absence of a significant federal policy calling for a federal conflicts rule.  *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605–06 (2d Cir. 2001).  Illinois choice-of-law rules apply here, because "a transferee court applies the . . . choice-of-law rules[] of the jurisdiction in which the action was filed."  *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (per curiam).  Illinois has adopted the Restatement (Second) of Conflicts of Laws, which applies the "most significant relationship test."  *See generally Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893 (Ill. 2007) (quotation marks omitted).  This test proceeds in two-steps:  the court (1) "chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule," in the Restatement and then (2) "tests this choice against the principles of [Restatement] § 6 in light of [the] relevant contacts identified by [the] general provisions [of Restatement] § 145."  *Id.* at 903; *Barbara's Sales Inc. v. Intel Corp.*, 879 N.E.2d 910 (Ill. 2007).

**1.      The "presumptively applicable law" is New York's.**

The first step of the "most significant relationship" test is to determine the "presumptively applicable law" under the "appropriate jurisdiction-selecting rule."  *See*

*Townsend*, 897 N.E.2d at 903 (internal quotations omitted).  The most analogous-jurisdiction

selecting rule is Restatement § 148, which governs "actions brought to recover pecuniary

damages suffered on account of false representations, whether fraudulent, negligent or innocent."

Restatement (Second) of Conflicts of Laws § 148, cmt. a; *see generally Hirsch*, 72 F.3d at 1094

n.6 (claims denominated as malpractice claims were effectively based in fraud).  Under § 148,

where the "plaintiff has suffered pecuniary harm on account of his reliance on the defendant's

false representations and when the plaintiff's action in reliance took place in the state where the

false representations were made and received," there is a presumption that "the local law of this

state determines the rights and liabilities of the parties."  Restatement § 148(1).

While the Complaint does not detail what misrepresentations supposedly were made, or

to whom, *see* Part II, below, the allegations that form the basis for the Trustee's claims point

unmistakably to New York.  For example:

- At the time of both the LBO and IPO, all three Refco plaintiff entities (RGL, RCM and Refco Inc.) had their principal place of business in New York,[8] as did Refco Group's worldwide corporate headquarters.  *See* Ward Decl., Ex. F (LBO Offering Circular) at 82 (Incorporated by reference in Compl. ¶¶ 122-25).

- Key due diligence meetings between THL and Refco regarding the IPO and LBO were held in New York.  *See* Ward Decl., Ex. G (Examiner's Report exhibits) at D-61, D-62 (Incorporated by reference in Compl. at 2).

- The LBO and IPO closed in New York.  *See* Ward Decl., Ex. H (Equity Purchase & Merger Agreement) at Art. 1.6 (Incorporated by reference in Compl. ¶ 113); Ward Decl., Ex. I (Refco Press Release).

- The S-4 and S-1 Registration Statements Refco executed in connection with the IPO as well as Refco's 2005 Annual Report were all signed in New York.  *See* Ward

---

[8]    This is evident from public documents and the Trustee's own complaint in a related bankruptcy proceeding. *See* Ward Decl., Ex. D (Refco Inc.'s S-1 Registration Statement indicates that Refco Inc.'s principal place of business was New York); Ward Decl., Ex. E (RGL's S-4 Registration Statement indicates that RCM and RGL's principal place of business was New York); *see also* Complaint filed in *In re Refco Inc.*, No. 05-60006 (RDD) (Bankr. SDNY) at ¶¶ 17, 18, 20 (Litigation Trustee alleges that New York was the principal place of business of all three entities).

Decl. Ex. C (Superseding Indictment) ¶¶ 49–51 (incorporated by reference in Compl. at 2).

- Key communications between Collins and Bennett such as Bennett's October 15, 1999 letter to Collins were sent and received in New York.  *See* Ward Decl., Ex. J (Incorporated by reference in Compl. ¶ 210).

### 2.    Restatement §§ 6 and 145 reinforce the applicability of New York law.

After determining that New York law is "presumptively applicable," the next step in the choice-of-law analysis is to test this choice against Restatement §§ 6 and 145.  *See Townsend,* 879 N.E.2d at 905-06.  Illinois courts "first identif[y] the four contacts listed in section 145(2) and then appl[y] the general principles of section 6 to those contacts."  *Id.* at 905.

### a.    Under Restatement § 145, New York has the most significant contacts with the events at issue.

In a tort action, courts examine the following contacts: (1) "the place where the injury occurred;" (2) "the place where the conduct causing the injury occurred;" (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties;" and (4) "the place where the relationship, if any, between the parties is centered."  Restatement § 145.  Here, the relevant contacts strongly favor New York.

The place where the injury occurred is undoubtedly New York.  Economic injuries, such as those alleged in the Complaint, are usually found to occur where the plaintiff resides.  *See Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, No. 04 Civ. 9771, 2007 WL 541466, *8-9 (S.D.N.Y. Feb. 22, 2007); *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 864 (N.D. Ill. 2002).  All three of the Refco plaintiff entities had their principal place of business in New York.

The second contact, where the conduct causing the alleged injury occurred, also favors New York.  As discussed in Part I.B.1, above, key communications between Collins and Bennett were sent and received in New York.  Key meetings between THL and Refco regarding the IPO

18

and LBO took place in New York.  Additionally, Mayer Brown's (limited) work on the back-to-back loans was performed primarily by an associate in the firm's New York office, *see* Ward Decl., Ex. K[9] (correspondence from New York-based Mayer Brown associate transmitting loan documents), and the vast majority of the fraudulent conduct that Mayer Brown is accused of aiding and abetting also occurred in New York, *see* Ward Decl., Ex. C (Superseding Indictment) ¶¶ 38-46 (listing acts committed in New York).  By contrast, the Complaint does not provide a single example of wrongful conduct that took place in Illinois except for the conclusory and unsupported statement that "Bennett, Maggio, Trosten, and Grant met with MB and GT . . . in Chicago to perpetrate the fraudulent activities and scheme detailed herein."  Compl. ¶ 22.

The third and fourth contacts — the place of incorporation and principal place of business of the parties and the place where the parties' relationship was centered — do not point in favor of either state's law.  All three Refco entities had their principal place of business in New York.  RCM was incorporated in Bermuda while Refco Inc. and RGL were incorporated in Delaware. *Id.* ¶ 32.  While Mayer Brown is an Illinois limited liability partnership, *see id.* ¶ 16, it has a substantial (200-lawyer) New York office.  Mayer Brown's relationship with Refco was centered in both Illinois and New York.

### b.    Under Restatement § 6, New York has a stronger interest in having its law applied.

Finally, the general principles of Restatement § 6(2) also favor applying New York law. In a tort action, the court should consider:  (a) "the relevant policies of the forum," (b) "the relevant policies of other interested states," and (c) "the basic policies underlying the particular field of tort law."  *See Townsend*, 879 N.E.2d at 906-07.  In this case, the policies of the two states are one and the same:  New York's *Wagoner* rule, like the doctrine of *in pari delicto* in

---

[9]    Incorporated by reference in Compl. ¶ 241.

Illinois, is based on the core tort law principle that "denying judicial relief to a wrongdoer deters illegal conduct." *Goldin*, 194 B.R. 318 at 328 (quotation marks omitted); *see O'Hara v. Ahlgren, Blumenfeld & Kempster*, 537 N.E.2d 730, 737 (Ill. 1989). Here, where the relevant contacts occurred predominantly in New York, there is no question that New York has the stronger interest in furthering its policy of deterring misconduct that occurs, and the effects of which are felt, within its borders.

### C. In the Event Illinois Law Applied, the Complaint Should Be Dismissed under the Doctrine of *In Pari Delicto*.

Even if the Court were to conclude that Illinois law applies, the result would be the same, because the Trustee's claims are barred by *in pari delicto*. Although they may differ in form, the *Wagoner* Rule and the doctrine of *in pari delicto* are "effectively identical" in substance. *See Global Crossing*, 2006 WL 2212776, at *12 n.16. In Illinois, as in New York, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *King v. First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1173 (Ill. 2005) (quotation marks omitted); *see also Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir. 1982) ("[A] participant in a fraud cannot also be a victim entitled to recover damages."). Under the *in pari delicto* doctrine, fraud by employees is imputed to the corporation "if the fraud permeates the top management of the company," thus turning the company into "an engine of theft against outsiders — creditors, prospective stockholders, insurers, etc." *Cenco*, 686 F.2d at 454; *see id.* at 456 ("[F]raud on behalf of a corporation is not the same thing as fraud against it").

As discussed in Part I.A, above, that is precisely the situation presented by this lawsuit. The Complaint clearly outlines the Trustee's theory of how the fraud orchestrated by Refco's major shareholders and top-level management sustained the company for nearly a decade, turning it into an engine of theft against prospective stockholders and creditors. *See generally,*

20

Compl. ¶¶ 59-149.  Accordingly, the doctrine of *in pari delicto* bars the Trustee's claims against Mayer Brown in this case.

## II.    THE TRUSTEE'S CLAIM FOR AIDING AND ABETTING FRAUD SHOULD BE DISMISSED FOR FAILURE TO PLEAD JUSTIFIABLE RELIANCE.

The Trustee claims that Mayer Brown aided and abetted the Refco Insiders' fraud upon RGL and RCM.  *See* Compl. ¶¶ 414-19, 496-500.  The Complaint utterly fails to plead facts establishing the Refco entities' justifiable reliance on any material misrepresentation or actionable omission by the Refco Insiders.  This is an essential element of any fraud claim under either New York or Illinois law.  *Baker v. Dorfman*, 239 F.3d 415, 423 (2d Cir. 2000); *Martinez v. Freedom Mortgage Team, Inc*., 527 F. Supp. 2d 827, 837 (N.D. Ill. 2007).  The Trustee neither identifies any particular misrepresentation nor establishes how Refco relied on it.  Far less does he explain how Mayer Brown supposedly aided and abetted such a fraud.

As explained in Part I addressing the *Wagoner* Rule and the doctrine of *in pari delicto*, the knowledge of the Refco Insiders — the top management and controlling shareholders of RGL and RCM — is imputed to each corporation.  Imputation is fatal to the Trustee's claims because RGL and RCM cannot assert claims against Mayer Brown for aiding and abetting Refco in deceiving *itself*.  *See Am. Tissue*, 351 F. Supp. 2d at 92 (corporation "cannot plausibly assert that its corporate structure concealed its debts from itself.").

Even if the Trustee somehow could avoid imputation, he does not plead a viable reliance theory.  While he appears to assert that "innocent" officers and directors were misled,[10] the Complaint does not explain *how* they were misled or on what exactly they relied.  It does not allege that they actually read any of the allegedly misleading financial statements.  It merely

---

[10]    The Complaint completely fails to allege what authority the outside director and alternative director of RCM possessed.  *See* Part I.A.2, *supra*.  And as far as RGL is concerned, the Trustee has not identified any specific innocent insiders whatsoever.

alleges in conclusory fashion that the innocent officers and directors of RGL and RCM "were justified in relying on" the Refco Insiders' representations. Compl. ¶¶ 366, 469. This Court has already determined in a related Refco case that similar allegations fail to state a claim. "Only statements actually relied upon can give rise to a claim . . . Because the reliance allegations cannot be tracked to any particular statement, they are insufficient to give the defendants fair notice of the claims against them." *Am. Fin. Int'l Group-Asia, LLC v. Bennett,* No. 05 Civ. 8988, 2007 WL 1732427, at *10 (S.D.N.Y. June 14, 2007).

The Complaint also pleads no facts demonstrating that any innocent insider could not have discovered the truth by exercising reasonable diligence. In order to "find justifiable reliance, the court considers whether the party was reasonable in relying on [the] representation in light of the facts within his actual knowledge and any he might have discovered by the exercise of ordinary prudence." *D.S.A. Fin. Corp. v. County of Cook*, 801 N.E.2d 1075, 1081 (Ill. App. Ct. 2003); *see also Serino v. Lipper*, 846 N.Y.S.2d 138, 144-45 (App. Div. 2007) (dismissing manager's fraud claim against accountants where manager had access to the valuations underlying the financial statements). While the Complaint purports to allege justifiable reliance in conclusory fashion, *see* Compl. ¶¶ 235, 365, its assertions lack any supporting details and are directly inconsistent with the Trustee's position that the Refco Insiders' fraud was so obvious and pervasive that Refco's auditors, outside counsel, tax accountants and investment banks all had to have been aware of it, *see, e.g.*, *id*. ¶ 104.

## III. THE TRUSTEE'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD MAYER BROWN'S ACTUAL KNOWLEDGE OF WRONGDOING.

All of the Trustee's claims, whether styled as "aiding and abetting" or otherwise, proceed on the misguided theory that Mayer Brown attorneys were active participants in the Refco Insiders' scheme. For example, the Complaint alleges that Mayer Brown attorneys actually

knew about the RGHI Receivable and the Refco Insiders' siphoning of assets from RCM. The Complaint, however, fails to allege any facts that plausibly support the Trustee's theory.

Such a failure to plead facts showing actual knowledge undoubtedly requires dismissal of the Trustee's claims for aiding and abetting breach of fiduciary duty and aiding and abetting fraud. Actual knowledge is an element of both of these claims. *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006)*; see also* Restatement (Second) of Torts § 876(b) (1979) (defendant liable for aiding and abetting when he "*knows* that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself" (emphasis added)). Accordingly, the Trustee must plead specific facts showing that Mayer Brown attorneys actually knew of Refco's fraud; allegations that the firm suspected fraud or knew of improper conduct will not withstand a motion to dismiss. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006); *Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 339 (S.D.N.Y. 2005) (plaintiff must allege factual basis for aider-abettor's knowledge). The actual knowledge requirement also forecloses claims based on recklessness or willful blindness. *See Pension Comm.,* at 201 n.279 (collecting cases).

The facts supporting actual knowledge must be alleged with specificity. Applying this principle, in *Lerner,* the Second Circuit dismissed the plaintiffs' claim for aiding and abetting fraud against certain defendants because the "plaintiffs conclusorily allege that the [defendants] had actual knowledge," and did not "allege[] facts . . . giv[ing] rise to the 'strong inference,' required by Federal Rule of Civil Procedure 9(b), of actual knowledge of [the fraudulent conduct]."). 459 F.3d at 292-93. As the Supreme Court recently explained in the context of a federal securities claim, allegations in a complaint give rise to a "strong inference" of scienter

"only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007) (quotation marks omitted). A court applying Rule 9(b) to an aiding and abetting claim requiring actual knowledge should employ the same standard. *See Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072, at *10 n.5 (S.D.N.Y. July 26, 2007) (Supreme Court's interpretation of the "strong inference" of scienter requirement in *Tellabs* also guides district courts charged with evaluating claims for common law fraud under the heightened pleading standard required by Rule 9(b)).

These standards should apply equally to the Trustee's other claims. Though styled as malpractice and breach of fiduciary duty causes of action, they are based on the same allegations of fraud.[11] Accordingly, the Trustee's allegations regarding Mayer Brown's actual knowledge must meet the same heightened pleading standard, *see Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996), and the particularity requirements of Rule 9(b) apply uniformly, *see Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) (dismissing common law breach of fiduciary duty claims for failure to meet 9(b) where those claims "merely incorporate[d] the allegations of [prior] securities fraud and RICO counts").

Even if Rule 8(a)'s general pleading standard applied to some or all of the Trustee's claims, they should be dismissed. Under that rule, a complaint must plead facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007); *see also Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *8-10 (S.D.N.Y. Mar. 6, 2002) (plaintiff

---

[11]     *Compare*: (a) Compl. ¶¶ 398-401 *and id.* ¶¶ 405-07 *with id.* ¶¶ 409-13; (b) *id.* ¶¶ 478-83 *and id.* ¶¶ 485-90 *with id.* ¶¶ 497-500; and (c) Compl. ¶¶ 598-99 *with id.* ¶¶ 602-06.

must "allege some facts, in non-conclusory terms, showing that [alleged aiders and abettors] knowingly participated in [the primary actors'] breach").

The Trustee's claims against Mayer Brown should be dismissed under either standard, because the Complaint fails to allege facts giving rise to a strong inference, or even a plausible inference, that any Mayer Brown attorney had actual knowledge of the Refco Insiders' misconduct.[12]

### A. The Complaint Does Not Allege Mayer Brown's Actual Knowledge of Any Improper Transfers from RCM to Other Refco Entities.

The Complaint alleges virtually nothing to support its conclusion that Mayer Brown knew that the Refco Insiders improperly transferred RCM funds to other Refco entities "to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its . . . needs."  Compl. ¶ 95.  The Trustee contends that Mayer Brown gave legal advice to RCM on certain regulatory matters, but he fails to offer any explanation tying that advice to the allegedly improper transfer of RCM funds. Indeed, *none* of the documents cited in the Complaint bears the slightest relationship to the allegedly illegal transfers.

The Trustee alleges that Mayer Brown's knowledge of the RCM transfers is "clearly shown through emails between Refco employee Thomas Yorke and [Mayer Brown attorney] Joseph Collins in January 2005."  Compl. ¶ 232.  But these e-mails (which are attached as Ward Decl. Ex. L), say nothing about any alleged transfers by Refco Insiders and are, in fact,

---

[12]    Not only does the Complaint fail to allege that Mayer Brown attorneys were actually aware of the Refco Insiders' misconduct, it also fails to allege plausibly that any Mayer Brown attorney actually knew that the Refco Insiders concealed their misconduct from any innocent officers or directors of RGL or RCM.  For example, there is no allegation that any Mayer Brown attorney was privy to any communication between the Refco Insiders and Refco's innocent officers and directors or was informed about what information the innocent officers and directors did or did not have.  The Trustee's conclusory statements that Mayer Brown "had actual knowledge of and/or consciously avoided knowing that" the Refco Insiders concealed certain information from RGL or RCM's innocent officers and directors, Compl. ¶¶ 415, 497, are plainly insufficient.

completely inconsistent with fraudulent intent.  They show that Yorke sought advice about the impact of a new SEC regulation requiring certain investment advisors, who had previously been exempt from registration, to register with the SEC.  *See id*.; *see also* SEC Release No. IA-2333 (Dec. 7, 2004) *available at* http://www.sec.gov/rules/final/ia-2333.htm (last visited May 21, 2008).  Because registered investment advisors were required to keep their funds with a "qualified custodian," and RCM was not a "qualified custodian" because it had no duty to segregate customer funds, the new regulation could have resulted in those affected investment advisors withdrawing the funds that they managed from their accounts at RCM.  *See* Ward Decl., Ex. L;  *see also* SEC Release No. IA-2176 (September 25, 2003) *available at* http://www.sec.gov/rules/final/ia-2176.htm#IIB (last visited May 21, 2008).

The emails show that Collins understood that Yorke was concerned about the loss of those customers, which "could mean an extremely large asset transfer away from RCM."  Ward Decl., Ex. L.  Collins proposed a number of options that would allow compliance with the regulation while addressing Yorke's concern.  *Id.*  He proposed, among other things,[13] that RCM could "segregate the funds and make the necessary disclosures" or "keep the funds at RSL or Refco LLC," which were both regulated entities with a duty to segregate.  *Id.*  Far from demonstrating guilty knowledge, Collins's advice shows that he was not complicit in the alleged scheme to use RCM funds to prop up other Refco entities.  If he had been, he would have known that segregating customer funds at RCM or moving funds from RCM to a regulated entity with a segregation requirement were not options, because the alleged "RCM scheme" relied upon the Refco Insiders having unfettered access to RCM's non-segregated and unregulated funds to transfer to other Refco entities as they saw fit.

---

[13]     Collins also suggested that RCM could "stall on the [] registration," reflecting that the pertinent requirement did not take effect for a full year after the date of his e-mail.  Ward Decl., Ex. L at 2.

The Trustee also asserts that the timing of Mayer Brown's October 11, 2005 memorandum, attached as Ward Decl., Ex. M, is "inherently suspicious" because it post-dates disclosure of the fraud.  Compl. ¶¶ 233-34.  In that memorandum, Mayer Brown attorneys analyzed whether the SEC's broker-dealer registration requirement would apply to RCM, concluding that registration would not be required for RCM's foreign exchange and derivative trading, but may be required for certain securities-related activities.  Ward Decl., Ex. M.  The Trustee claims that the memorandum shows that Mayer Brown was attempting to "paper the file" or "cover its tracks" by only offering "appropriate, objective advice" after the Refco fraud had already been disclosed.  Compl. ¶¶ 234.  In fact, the "appropriate, objective advice" in the October 11, 2005 memo is no different than the advice Mayer Brown provided to Refco *over three years earlier* in a similar memorandum.  *Id.* ¶ 229 (incorporating this document, which is attached as Ward Decl., Ex. N).[14]

In sum, despite the Trustee's access to over 40 million pages of Refco's documents, there is absolutely no basis in the Complaint for the allegation that Mayer Brown attorneys actually knew of – let alone assisted in – a scheme to transfer RCM's assets.  As discussed below in Part IV, the Complaint therefore not only fails to show Mayer Brown's actual knowledge of the RCM transfers but also fails to plead proximate cause.  While the Complaint should be dismissed in its entirety, the Trustee's claims regarding RCM are exceedingly weak and should be dismissed whatever the disposition of the remaining claims.

---

[14]    The Trustee also points to a January 31, 1999, memo from Refco to Mayer Brown attorneys and a June 2004 document setting forth questions about definitions in a Refco Credit Agreement.  *See* Ward Decl., Exs. O, P.  Nothing in either document indicates that Mayer Brown knew that the Refco Insiders were transferring customer funds away from RCM.  The handwritten notations (whose author is unidentified) simply reflect that RCM, an unregulated entity, did not segregate customer funds, and therefore, it would be difficult to distinguish "house cash" from "customer cash" or "regulated cash."

**B.    The Complaint Does Not Allege Mayer Brown's Actual Knowledge of Hidden Inter-Company Debt.**

The Trustee's claims on behalf of Refco Inc. and RGL are premised on Mayer Brown's alleged knowledge of Refco's substantial *hidden* inter-company debt, which Mayer Brown attorneys allegedly helped conceal through their work on the back-to-back loans.  Without knowledge of that hidden debt, Mayer Brown could not have been aware that the LBO or the IPO would be harmful to Refco or that the disclosures made in connection with those transactions were inaccurate.  The Complaint offers absolutely no support for the claim that Mayer Brown had such knowledge.

According to the Complaint, the true amount of the RGHI Receivable ranged between $387 million in 1998 and $919 million in 2004.  *See* Compl. ¶ 73.  Yet the Complaint does not allege that Mayer Brown attorneys ever knew about hidden inter-company debt of that magnitude.  In fact, the sporadic encounters Mayer Brown attorneys are alleged to have had with a far more limited and public amount of inter-company debt at Refco dispel any inference that they were, or should have been, aware of a larger, hidden RGHI Receivable.  There is no better evidence of this than the handwritten notations[15] to the October 15, 1999, draft letter that the Complaint claims support the allegation that "[Mayer Brown attorneys] knew that RGHI owed money to RGL."  Compl. ¶ 210.  The letter itself attaches Refco's audited financial results for fiscal year 1998, which openly disclose under an entry for "Related Party Transactions" that Refco was owed "net loans" amounting to $252 million from, among other entities, its "stockholder" – RGHI.  Ward Decl., Ex. J (emphasis added).  The handwritten note referencing "loans to RGH[I]" confirms only that, on one occasion, a Mayer Brown lawyer was exposed to

---

[15]    The Complaint attributes these notations to Joseph Collins without providing any explanation or support. In fact these notations were not made by Collins.

the fact that Refco had reported inter-company debt on its audited financial statements.  It does not suggest any knowledge at all about *hidden* inter-company debt.

The same is true of the Complaint's allegations regarding $350 million in inter-company debt disclosed in a June 2002 "Letter Agreement" between Refco and a third party.  Compl. ¶ 211; *see* Ward Decl., Ex. R.  The Complaint does not allege any facts to suggest that the Mayer Brown attorneys who worked on the transaction thought this $350 million inter-company receivable was in any way secret, much less that Refco had a secret receivable of $919 million. As the Complaint alleges, the $350 million debt was disclosed openly as part of an agreement providing that it was to be paid off using part of the transaction proceeds.  *Id.*  Thus, any Mayer Brown attorney reading the transaction documents would have believed not only that Refco disclosed its inter-company debt, but that the debt was scheduled to be paid off.

Similarly there is no factual basis in the Complaint to support the notion that any Mayer Brown attorney connected — or even should have connected — the back-to-back loans with the inter-company debt.  As an initial matter, the Complaint does not and cannot allege that Mayer Brown attorneys were aware of the fraudulent third leg of the so-called "round trip loan transactions" in which RGHI allegedly used the loan proceeds from a Refco customer to periodically pay down the RGHI Receivable.  Although Mayer Brown lawyers worked on the back-to-back loans (the first two legs of the transactions), the Complaint does not and cannot allege that they worked on or had any knowledge of the third leg of the transactions, which was how Refco effectuated the fraud.  Moreover, the amounts of inter-company debt to which any single Mayer Brown lawyer was fleetingly exposed bore no relation to the dollar amounts of the back-to-back loans.  The highest level of inter-company debt that any Mayer Brown lawyer

allegedly was aware of is $350 million in 2002.  The back-to-back loans peaked at $720 million in February 2004.  *See* Compl. ¶¶ 217-19.

The Complaint's remaining allegations regarding the impropriety of the "round trip loan transactions" also fail to show actual knowledge.  For example, the Trustee asks the Court to infer that Mayer Brown "knew and/or consciously avoided knowing" that the "RTLs were designed to hide the RGHI Receivable" from the fact that "Refco went to great lengths to hit specific targets for each RTL" and that "the RTLs always straddled the end of Refco's financial reporting periods and never occurred at any other time."  *Id.* ¶¶ 219-21.  The Trustee cannot bootstrap actual knowledge from these alleged "red flags."  *See Ryan v. Hunton & Williams*, No. 99 Civ. 5938, 2000 WL 1375265, at *8-10 (E.D.N.Y. Sept. 20, 2000) (allegation that defendant knew of "red flags" suggesting its client was using accounts for fraudulent activities insufficient to establish actual knowledge); *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 2000 WL 781081, at *7-8 (S.D.N.Y. June 16, 2000) (defendant's knowledge that bank rejected "questionable transactions" and his "uneas[iness]" about the proposed transactions did not establish that defendant actually knew that they were fraudulent).

In any event, there is no support for a conclusion even that Mayer Brown should have known of the Refco Insiders' fraud from the structure of the back-to-back loans.  Back-to-back loans are commonly used in financing transactions.[16]  The purpose of these back-to-back loans, as is clear from the face of the loan documents, was to provide RGHI with short-term liquidity, which is unremarkable for financial institutions and brokerage houses.  It is not unusual for

---

[16]    Back-to-back loans are used legitimately in numerous contexts, including for tax purposes, regulatory purposes, foreign exchange transactions, whole business securitization, municipal financing, and sovereign debt restructuring, not to mention for investment purposes.  *See, e.g.*, JP Morgan Shares Down After Financing Bear Stearns; Analysts Back Rankings, available at http://www.forbes.com/afxnewslimited/feeds/afx/2008/03/14/ afx4775498.html (last visited May 21, 2008) (discussing Federal Reserve's financing of Bear Stearns through "back-to-back financing" through JP Morgan).

privately-held parent companies to obtain liquidity for themselves or their shareholders by borrowing money from their subsidiaries rather than taking dividends. Similarly, it is of no moment that the loans usually occurred at regular intervals. *See* Compl. ¶¶ 219–21. RGHI could have wanted the money for a cyclical investment or trading opportunity. Such opportunities abound in the sophisticated commodities futures and foreign exchange markets in which Refco operated.[17] Nor would it have been of concern that RGHI sought liquidity close to the end of Refco's financial reporting periods. Companies frequently engage in legitimate year- and quarter-end transactions; and attorneys need not assume that such conduct is evidence of fraud.

In summary, the Complaint's allegations of actual knowledge are entirely insufficient,[18] and the Trustee's claims against Mayer Brown should be dismissed.

## IV.    THE TRUSTEE'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD CAUSATION.

The Complaint does not adequately plead that Mayer Brown's conduct proximately caused Refco's alleged injuries. Failure to allege proximate cause is fatal to all of the Trustee's claims and this defect is properly addressed in a motion to dismiss. *See, e.g.*, *Kirk v. Heppt*, 532 F. Supp. 2d 586, 591-92 (S.D.N.Y. 2008) (dismissing breach of fiduciary duty claim analyzed as legal malpractice claim); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, No. 06 Civ. 14211, 2007 WL 2219485, at *4 (S.D.N.Y. Aug. 2, 2007) (dismissing breach of fiduciary

---

[17]    The fluctuations in the loan amounts are more consistent with legitimate use than fraud. The Complaint alleges that the amount of the inter-company receivable was ever-increasing, demanding larger and larger loans to cover it. However, according to the Complaint, the amount of the back-to-back loans fluctuated, ranging from $550 million in December 2004 to $345 million in February 2005 and back up to $450 million in May 2005. Compl. ¶ 84. Such variation in the loan amounts is more consistent with efforts to take advantage of investment opportunities than it is with covering a steadily growing deficit.

[18]    The Complaint asserts many other baseless and unsupported allegations regarding the knowledge of Mayer Brown attorneys. While it is not feasible to address here each and every one of the allegations in the Trustee's 154-page Complaint, Mayer Brown respectfully refers the Court to its briefing in *Thomas H. Lee Equity Fund V L.P. v. Mayer, Brown, Rowe & Maw LLP*, No. 07 Civ. 6767 (GEL) (S.D.N.Y.) and *In re Refco Securities Litigation*, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) where it addressed nearly identical allegations. *See, e.g.*, Mayer Brown's Mem. in Supp. of Mot. to Dismiss (docket no. 56) at 36–44 in the *Thomas H. Lee* case.

duty claim); *Pension Comm.*, 446 F. Supp. 2d at 201-02 (dismissing claims for aiding and abetting fraud and breach of fiduciary duty).  Proximate cause requires a direct relationship between the plaintiff's injury and the defendant's injurious conduct.  *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 343-46 (2005) (requiring a direct causal connection between the defendant's conduct and the plaintiff's economic loss); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 226 (2d Cir. 2008) (central question in proximate cause inquiry is whether the alleged violation led *directly* to the plaintiff's injuries); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769–72 (2d Cir. 1994);[19] *Glidepath,* 2007 WL 2176072, at *16 (proximate cause inquiry requires consideration of foreseeability, intervention of other independent causes, and directness); *Town of N. Hempstead v. Winston & Strawn, LLP*,  814 N.Y.S.2d 237, 239-40 (App. Div. 2006) (plaintiff must show that "the attorney's conduct was the proximate cause of the loss sustained" and that he "sustained damages as a direct result of the attorney's actions."). "Furthermore, when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions."  *Gelt*, 27 F.3d at 769, *accord McLaughlin*, 522 F.3d at 226.  Where the Trustee's claims sound in fraud, allegations of Mayer Brown's culpable participation must meet the requirements of Rule 9(b).  *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 581 (S.D.N.Y. 2007); *Kolbeck*, 939 F. Supp. at 245.

The Trustee alleges that the Refco plaintiff entities were harmed in three ways:  (1) the Refco Insiders "looted" RCM by causing it to lend over $2 billion to Refco affiliates who did not provide security for the loans and could not repay them, *see, e.g.,* Compl. ¶¶ 29, 95, 97–98;

---

[19]    Although *Dura*, *Gelt,* and *McLaughlin* involved federal securities fraud and RICO claims and invoke the concept of "loss causation," they recognize that this is equivalent to proximate cause.  *See also AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000); *Laub v. Faessel*, 745 N.Y.S.2d 534, 536-37 (App. Div. 2002). Accordingly, these principles are equally applicable to the Trustee's common-law claims against Mayer Brown.

(2) the Refco Insiders caused Refco Inc. and RGL to engage in the LBO and IPO transactions and thereby "saddled" these entities with debts and liabilities that they could not repay, *id*. ¶¶ 132, 137; and (3) the Refco Insiders misused the proceeds of the LBO and IPO by "cash[ing] out" their interests in Refco rather than using the money to pay down Refco Inc. and RGL's debts, *id*. ¶¶ 129, 136.  On each of these theories, the Complaint fails to show that Mayer Brown attorneys proximately caused any cognizable injury to the Refco plaintiff entities.

### A.     Mayer Brown's Regulatory Advice Was Not a Proximate Cause of the Alleged Looting of RCM's Assets.

The Complaint offers only rank speculation, rather than any allegation of supporting fact, that Mayer Brown attorneys proximately caused the alleged improper transfers out of RCM.  As discussed in detail in Part III.A, above there is not one statement in the documents cited by the Trustee that could plausibly lead the reader to infer that Mayer Brown participated in improperly siphoning RCM assets.  Nor has the Trustee alleged that Refco employed Mayer Brown's regulatory advice for sinister purposes or otherwise explained how such advice may have contributed to the Refco Insiders' alleged transfers.  These allegations fail even to satisfy the minimal requirement of "but for" causation, much less allege a direct causal relationship between Mayer Brown's conduct and the alleged harm.

### B.     The Complaint Fails To Allege that RGL or Refco Inc. Suffered a Cognizable Harm from the LBO or IPO.

The Trustee claims that RGL "entered into the LBO whereby it incurred $1.4 billion in new LBO debt" and was thereby damaged because it was "no longer able to repay the funds diverted from RCM to RGL and its affiliates."  Compl. ¶¶ 484, 490, 495, 500.  This theory rests upon the faulty assumption that an insolvent company deepens its insolvency when it raises funds by incurring debt.  On the contrary, "[a] company's insolvency is not deepened simply by the incurrence of new debt when the company suffers no loss on the loan transaction."

33

*Parmalat*, 501 F. Supp. 2d at 574; *Bloor v. Dansker (In re Investors Funding Corp. of N. Y. Sec. Litig.)*, 523 F. Supp. 533, 539 (S.D.N.Y. 1980).  In *Parmalat*, the plaintiffs alleged that the "defendants' improper actions misled innocent decision makers . . . about Parmalat's financial health" and that the innocent decision makers relied on these misrepresentations "caus[ing] the already-insolvent Companies to incur debt they were unable to pay, thus deepening their insolvency."  501 F. Supp. 2d at 573.  Judge Kaplan rejected this theory of liability because the plaintiffs did not allege that the "companies  . . . suffered any loss on the loan transactions in question."  *Id.* at 575.  Here too, the Trustee has not alleged that RGL received less cash from the LBO than the amount of debt it took on.  Thus, RGL's LBO debt left it no worse off than before. *Id.* at 574.  To the contrary, an infusion of working capital gave Refco an opportunity to reverse its financial problems.

As to Refco Inc., the Trustee claims that it "undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged."  Compl. ¶¶ 598, 606.  This theory of "harm" ignores that Refco Inc. was *created* through the IPO; it did not exist beforehand.  In any event, to the extent the Trustee is alleging that the IPO left Refco Inc. with liabilities to investors and creditors that it could not repay, Refco Inc. has been released from any such claims through the bankruptcy process.  This theory also suffers from the same defect as the Trustee's claims against RGL discussed above.

### C.     Mayer Brown's Conduct Was Not a Proximate Cause of the Refco Insiders' Alleged Cashing Out of Their Interests in Refco.

The Trustee does not allege that Mayer Brown's conduct directly caused the Refco Insiders' alleged cashing out of LBO and IPO proceeds.  Instead his Complaint relies on an attenuated chain of causation, alleging that Mayer Brown failed to disclose the existence of the RGHI Receivable and the back-to-back loans, that the Refco entities were then able to

consummate the LBO and IPO, which in turn put the corrupt Refco Insiders in a position to cash-out their interests in Refco. *See*, *e.g.*, *Compl.* ¶¶ 245, 247. The Trustee's theory of "injury" is fundamentally flawed because the sale of the Refco Insiders' ownership interests to public investors did not hurt Refco Inc. and RGL. As this Court observed in *Global Crossing*, 2006 WL 2212776, at *8 n.10 ("a corporation has no property interest in shares *held by its shareholders*.") (emphasis in original).

Even if some cognizable injury had been alleged, however, there would be no proximate cause, as courts in this Circuit repeatedly have concluded when faced with similar allegations. For example, in *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985), the trustee of a bankrupt company sued, among others, a law firm that allegedly prepared SEC filings and other documents that misrepresented the company's financial condition. The trustee claimed that the misrepresentations enabled the company to raise large amounts of capital that ultimately were looted by corporate officers. The Second Circuit rejected this theory of causation, finding that the "claims allege[d] only 'but for' causation" and "fail[ed] to show that [the company's] subsequent losses were caused by [the law firm's] actions." *Id.* at 62. "[T]he theft of corporate funds by officers was hardly a reasonably foreseeable result, let alone the direct result, of any of [the law firm's] alleged actions." *Id.*; *see also Parmalat*, 501 F. Supp. 2d at 579-80 (following *Bloor* and dismissing similar claim against a company's auditors); *Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 421 F. Supp. 2d 703, 722 (S.D.N.Y. 2006) ("Conduct that merely creates a condition that made the resulting injury possible is too remote to constitute legal cause.").

Here too, the Refco Insiders' alleged misuse of the LBO and IPO proceeds was not proximately caused by anything Mayer Brown is alleged to have done. *See Gelt*, 27 F.3d at 769

35

("when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions."). Certainly Mayer Brown's work on the back-to-back loans had no such direct relationship to the alleged cash-out. That the Refco Insiders had the proceeds of the LBO and IPO available to them does not make it foreseeable that they would decide to misuse those proceeds. *See Bloor*, 754 F.2d at 61–62; *see also Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc*., 128 S. Ct. 761, 770 (2008) (defendants' actions did not "ma[ke the fraud] necessary or inevitable"); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A*., 511 U.S. 164, 189 (1994) (extending liability to aiders and abettors likely would increase the cost and reduce the availability of professional services); *Maxwell*, 520 F.3d at 717 (applying Illinois law) ("To hold the defendant liable [in the absence of loss causation] would . . . mak[e] him an insurer against conditions outside [of] his control.") (quotation marks omitted).

Indeed, even "but for" causation is lacking here, as the Trustee does not articulate facts demonstrating that the alleged harm would have been prevented if Mayer Brown had not behaved as alleged. The Complaint repeatedly alleges that Mayer Brown should have reported up the chain of command to Refco's "innocent" officers and directors. *See, e.g.*, Compl. ¶¶ 235, 243. As described above, however, the Complaint fails to name *any* innocent decision-makers at Refco Inc. or RGL, and is cryptic at best about the RCM Outside Directors. *See* Part I.A.2, *supra*. It contains not a single allegation addressing how the alleged innocent decision-makers (if any existed) could have prevented or remedied Refco's claimed injuries. It is sheer speculation to argue that outside directors could have penetrated the false veneer created by the Refco Insiders or that they would have taken actions that would have changed Refco's financial

plight.  *See Dura*, 544 U.S. at 343-46 (forbidding speculative inferences of causation);

*McLaughlin*, 522 F.3d at 226-27 (same); *Gelt*, 27 F.3d at 769-72 (same).

## V.     THE BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIMS SHOULD BE DISMISSED AS DUPLICATIVE OF THE MALPRACTICE CLAIMS.

The Trustee's claims for breach of fiduciary duty and aiding and abetting breach of

fiduciary duty should be dismissed for the additional reason that they are duplicative of the

malpractice claims.  *See, e.g.*, *Serova v. Teplen*, No. 05 Civ. 6748, 2006 WL 349624, at *4

(S.D.N.Y. Feb. 16, 2006) ("In New York, a claim for breach of fiduciary duty that is premised on

the same facts and seek[s] the identical relief sought in a malpractice cause of action is redundant

and should be dismissed.") (quotation marks omitted); *Hoagland v. Sandberg, Phoenix & Von

Gontard, P.C.,* 385 F.3d 737, 744 (7th Cir. 2004) ("Illinois courts hold that 'when a breach of

fiduciary duty claim is based on the same operative facts as a legal malpractice claim, and results

in the same injury, the later claim should be dismissed as duplicative.") (quotation marks

omitted).  Here, the malpractice, breach of fiduciary duty, and aiding and abetting breach of

fiduciary duty claims against Mayer Brown are premised on virtually identical facts, and the

Trustee seeks identical relief for the same alleged injury[20] with respect to all three causes of

action.[21]  Accordingly, the Trustee's claims against Mayer Brown for breach of fiduciary duty

and aiding and abetting breach of fiduciary duty should be dismissed.

---

[20]     Compare: (a)  Compl. ¶ 403, *with id*. ¶¶ 408, 413; and (b) *id*. ¶ 484, *with id*.¶¶ 490, 495; and (c) *id*. ¶ 601, *with id*. ¶ 606.

[21]     *Compare*: (a) Compl. ¶¶ 398-401, *with id*. ¶¶ 405-407, 412; and (b) *id*. ¶¶ 478-483, *with id*. ¶¶ 486-490, 494; and (c) *id*. ¶ 598-99, *with id*. ¶ 605.

VI.   **THE TRUSTEE'S MALPRACTICE AND BREACH OF FIDUCIARY DUTY CLAIMS ARE PREEMPTED BY NEW YORK'S MARTIN ACT.**

The Martin Act, N.Y. Gen. Bus. Law § 352 *et seq.*, prohibits a broad range of conduct including: "any representation or statement which is false," whether made negligently or recklessly, "where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, . . . regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted." It is well established that "there exists no private right of action for claims that are within [the Act's] purview." *Granite Partners*, 17 F. Supp. 2d at 291; *CPC Int'l Corp. v McKesson Corp.*, 70 N.Y.2d 268, 276 (1987).

New York courts have construed the Martin Act to preempt common-law claims of negligence and breach of fiduciary duty based on conduct occurring in the course of preparing disclosures and engaging in negotiations concerning securities. *See, e.g.*, *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 Civ. 3120, 2005 WL 1902780, at *21 (S.D.N.Y. Aug. 9, 2005). The Trustee's malpractice and breach of fiduciary duty claims against Mayer Brown are premised in whole or in part on Refco's misrepresentations or omissions in documents and disclosures connected with the securities sold in connection with the LBO and IPO, *see* Compl. ¶¶ 235-38, 240, 242-43. These claims are preempted by the Martin Act and should be dismissed.

VII.  **THE TRUSTEE'S BREACH OF FIDUCIARY DUTY AND MALPRACTICE CLAIMS ARE BASED ON INVALID ASSIGNMENTS UNDER ILLINOIS LAW.**

If the Court determines that Illinois law applies in this action, then the Trustee's malpractice and breach of fiduciary duty claims should be dismissed because Illinois law prohibits assignment of these personal causes of action. *See Gonzalez v. Profile Sanding Equip., Inc.*, 776 N.E.2d 667, 696 (Ill. App. Ct. 2002) (because "[t]he fiduciary relationship between an attorney and client is a personal and confidential one," neither legal malpractice claims nor

claims for breach of fiduciary duty against an attorney may be assigned); *Hoth v. Stogsdill*, 569

N.E.2d 34, 38-39 (Ill. App. Ct. 1991) (suggesting that even under the bankruptcy code,

assignment of legal malpractice claims is prohibited by Illinois law).

Courts have held that post-bankruptcy assignments of claims to creditors are invalid

where prohibited by state law. *See Baum v. Duckor Spradling & Metzger*, 84 Cal. Rptr. 2d 703,

(Ct. App. 1999) (dismissing legal malpractice claims that had been assigned to creditors of the

estate in bankruptcy proceeding because such claims are non-assignable under California law);

*In re J.E. Marion, Inc.*, 199 B.R. 635, 637-38 (Bankr. S.D. Tex. 1996) (legal malpractice claims

against former counsel for debtor could not be assigned to a creditor group).[22]  Here too, because

Illinois law clearly prohibits the assignment of legal malpractice and breach of fiduciary duty

claims, the Trustee may not assert them pursuant to an assignment.

Nor can the Trustee escape this clear prohibition by reference to a Refco bankruptcy plan

provision purporting to magically undo any assignment that is held to be invalid.[23]  The Court

should reject any such attempt by the Trustee to have his cake and eat it too.  As the Court

recognized in its recent decision, the Plan provided for the "*irrevocabl[e]* transfer[]" of

"Contributed Claims" to the Litigation Trust, effective on December 26, 2006, and also provided

---

[22]    While some other courts have held state law preempted by the Bankruptcy Code, this reasoning is severely flawed and ignores the fundamental principle that state law governs the nature and extent of a bankrupt debtor's property rights.

[23]        "To the extent that any Contributed Claims cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Contributed Claims shall be deemed to have been retained by the Reorganized Debtors and RCM, as applicable, and the Litigation Trustee shall be deemed to have been designated as a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Contributed Claims on behalf of the Estates."

Ward Decl., Ex. Q (Bankruptcy Plan) § 5.7(b).

that "[u]pon transfer of the Contributed Claims to the Litigation Trust, the Debtors, RCM, and the Plan Administrator shall have *no interest* in or with respect to the Contributed Claims or the Litigation Trust." *In re Refco, Inc. Sec. Litig.*, No. 07 Civ. 11604, 2008 WL 1827644, at *2 (S.D.N.Y. Apr. 21, 2008) (emphases added). Indeed, the Trustee emphasized the "clear and unambiguous transfer of claims from the Refco Debtors to the Litigation Trust" in his remand briefing. Trustee Reply Br. (docket no. 115, filed in *Kirschner v. Grant Thornton LLP*, No. 07 Civ. 5306 (N.D. Ill.)) at 2.

## VIII.  THE TRUSTEE'S CLAIMS ARE PREEMPTED BY SLUSA.

Mayer Brown adopts and incorporates the portion of Grant Thornton LLP's motion to dismiss in this action that addresses preemption under the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78 bb(f)(1)(A).

## CONCLUSION

For the foregoing reasons, all of the claims asserted against Mayer Brown should be dismissed.

Dated: Washington, D.C.
         May 30, 2008

Respectfully submitted,

John K. Villa (admitted *pro hac vice*)
Michael S. Sundermeyer (admitted *pro hac vice*)
Craig Singer (admitted *pro hac vice*)
Thomas G. Ward (TW-6255)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Attorneys for Defendant Mayer Brown LLP*