**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: REFCO INC. SECURITIES LITIGATION | 07-MDL No. 1902 (GEL) |

| | |
|---|---|
| MARC S. KIRSCHNER,<br>As Trustee of the Refco Litigation Trust,<br><br>                         Plaintiff,<br><br>              v.<br><br>GRANT THORNTON LLP, MAYER BROWN, ROWE & MAW, LLP; ERNST & YOUNG U.S. LLP; PRICEWATERHOUSECOOPERS LLP; CREDIT SUISSE SECURITIES (USA) LLC (f/k/a CREDIT SUISSE FIRST BOSTON LLC); BANC OF AMERICA SECURITIES LLC; DEUTSCHE BANK SECURITIES INC.; PHILLIP R. BENNETT; SANTO C. MAGGIO; ROBERT C. TROSTEN; TONE N. GRANT; REFCO GROUP HOLDINGS, INC.; LIBERTY CORNER CAPITAL STRATEGIES, LLC; WILLIAM T. PIGOTT; EMF FINANCIAL PRODUCTS, LLC; EMF CORE FUND, LTD.; DELTA FLYER FUND, LLC; ERIC M. FLANAGAN; INGRAM MICRO, INC.; CIM VENTURES, INC.; BECKENHAM TRADING CO. INC.; ANDREW KRIEGER; COAST ASSET MANAGEMENT, LLC (f/k/a COAST ASSET MANAGEMENT LP); CS LAND MANAGEMENT, LLC; and CHRISTOPHER PETITT,<br><br>                         Defendants. | 07-Civ. No. 11604 (GEL)<br><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br><br>**ECF Filed**<br><br>**Oral Argument Requested** |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF ALLEGATIONS ...........................................................................4

    A.    Overview Of The Fraudulent Scheme. ..................................................4

    B.    The Insiders' Fraud And Breaches Of Fiduciary Duty...........................6

    C.    The Harm Caused To The Refco Entities By The Fraudulent Scheme. .................7

    D.    The Roles Of The Various Defendants. ..................................................8

        1.    Grant Thornton.......................................................................8

        2.    Mayer Brown. .........................................................................9

        3.    PricewaterhouseCoopers........................................................9

        4.    The Investment Banks Defendants ........................................10

        5.    The RTL Defendants..............................................................10

ARGUMENT ...........................................................................................................11

I.    THE TRUSTEE'S CLAIMS ARE NOT BARRED BY *WAGONER* ..............11

    A.    The *Wagoner* Framework. ..................................................................12

    B.    The Complaint Adequately Pleads The Adverse-Interest Exception. ...................14

    C.    The Sole-Actor Exception Cannot Be Deemed Applicable As A Matter Of Law On The Face Of The Complaint. ..................................17

        1.    RCM......................................................................................19

        2.    RGL......................................................................................20

        3.    Refco Inc..............................................................................22

    D.    Even If The Sole-Actor Exception Were Otherwise Applicable, Defendants Are Precluded From Invoking It Because They Knew The Refco Insiders Were Acting Adversely To The Companies' Interests.................22

E.    The Trustee Need Not Further Allege That The Debtor Companies' Injuries Are Distinct From Those Of The Creditors, But In Any Event Has Done So.................................................................................................25

1.    RCM.................................................................................................26

2.    RGL.................................................................................................28

3.    Refco Inc. ........................................................................................28

II.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR AIDING AND ABETTING FRAUD AND BREACH OF FIDUCIARY DUTY ......................................30

A.    The Trustee Has Sufficiently Alleged The Underlying Fraud And Breaches Of Fiduciary Duty Of The Refco Insiders.................................................31

B.    The Trustee Has Sufficiently Alleged Defendants' Knowledge Of The Insiders' Fraud  And Breaches Of Fiduciary Duties.................................................33

1.    GT. ...................................................................................................35

2.    Mayer Brown. ...................................................................................39

3.    The Investment Bank Defendants. .....................................................43

4.    PricewaterhouseCoopers....................................................................46

5.    The RTL Defendants..........................................................................50

C.    The Trustee Has Adequately Alleged That Each Defendant Substantially Assisted The Underlying Fraud And Breaches Of Fiduciary Duties....................53

1.    GT. ...................................................................................................55

2.    Mayer Brown. ...................................................................................57

3.    The Investment Bank Defendants. .....................................................59

4.    PricewaterhouseCoopers....................................................................60

5.    The RTL Defendants..........................................................................61

III.    ONLY THE NEGLIGENT MISREPRESENTATION CLAIMS AND BREACH OF FIDUCIARY DUTY CLAIMS, NOT THE AIDING AND ABETTING CLAIMS, ARE DUPLICATIVE OF THE MALPRACTICE CLAIMS.........................63

IV.    THE MALPRACTICE CLAIMS SHOULD BE SUSTAINED .......................................64

A.    The Complaint Sufficiently Alleges Malpractice By Credit Suisse. ....................64

B.      The Complaint Sufficiently Alleges Malpractice By
        PricewaterhouseCoopers. ................................................................66

C.      The Complaint Sufficiently Alleges Malpractice By GT. ....................................68

V.      ILLINOIS LAW DOES NOT BAR THE TRUSTEE FROM ASSERTING THE
        CLAIMS ................................................................................................69

VI.     SLUSA DOES NOT PRECLUDE ANY OF THE TRUSTEE'S CLAIMS.....................71

A.      This Action Is Not A "Covered Class Action." ........................................72

        1.      The Trustee Does Not Seek Damages On Behalf Of More Than 50
                Persons. ........................................................................72

        2.      The Trustee's Action Is Not Part Of A "Group Of Lawsuits.".................74

B.      The Trustee's Claims Do Not Allege An Untrue Statement Or Omission In
        Connection With Purchase Or Sale Of A Covered Security.................................76

VII.    THE MARTIN ACT DOES NOT PREEMPT ANY OF THE TRUSTEE'S
        CLAIMS ................................................................................................78

VIII.   MAYER BROWN INTERNATIONAL IS A PROPER DEFENDANT .........................81

IX.     VENUE IS PROPER AS TO PRICEWATERHOUSECOOPERS ................................82

X.      IN THE EVENT THIS COURT FINDS THE COMPLAINT'S ALLEGATIONS
        INSUFFICIENT, THE TRUSTEE SHOULD BE GRANTED LEAVE TO
        REPLEAD..............................................................................................84

CONCLUSION...............................................................................................85

# TABLE OF AUTHORITIES

**Page**

### Cases

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
   957 F. Supp. 1308 .................................................................................................61

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).....................................................................................84

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
   390 B.R. 64 (S.D.N.Y. 2008).................................................................................17

*Allard v. Arthur Andersen & Co.*,
   924 F. Supp. 488 (S.D.N.Y. 1996).........................................................................13

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   351 F. Supp. 2d 79 (S.D.N.Y. 2004)....................................................26, 27, 29, 54

*American Financial International Group-Asia, L.L.C v. Bennett*,
   2007 WL 1732427 (S.D.N.Y. June 14, 2007) .......................................................32

*Arrowsmith v. United Press Int'l*,
   320 F.2d 219 (2d Cir. 1963)  *(en banc)* ................................................................82

*Ash v. Georgia-Pacific Corp.*,
   957 F.2d 432 (7th Cir. 1992) .................................................................................23

*Badem Bldgs. v. Abrams*,
   70 N.Y.2d 45 (1987)...............................................................................................80

*Bankruptcy Services, Inc. v. Ernst & Young LLP (In re CBI Holding Co.)*,
   529 F.3d 432 (2d Cir. 2008)............................................................................ passim

*Baum v. Duckor Spradling & Metzger*,
   84 Cal. Rptr. 2d 703 (Ct. App. 1999)....................................................................71

*Bell Atlantic v. Twombly*,
   127 S. Ct. 1955 (2007)...........................................................................................30

*Bellikoff v. Eaton Vance Corp.*,
   481 F.3d 110 (2d Cir. 2007)...................................................................................84

*In re Bennett Funding Group, Inc.*,
   336 F.3d 94 (2d Cir. 2003)...............................................................................17, 20

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
   754 F.2d 57 (2d Cir. 1985).....................................................................................58

iv

*Bondi v. Banc of Am. Corp. (In re Parmalat Secs. Litig.)*,
    412 F. Supp. 2d 392 (S.D.N.Y. 2007)..................................................................56, 57, 58

*Bondi v. Grant Thornton Int'l (In re Parmalat Secs. Litig.)*,
    421 F. Supp. 2d 703 (S.D.N.Y. 2006)..................................................................54

*In re CBI HoldingCo.*,
    311 B.R. 350 (S.D.N.Y. 2004).............................................................................. passim

*CPC Int'l Inc. v. McKesson Corp.*,
    70 N.Y.2d 268 (1987) ..........................................................................................79

*Caboara v. Babylon Cove Dev., LLC*,
    -- A.D.3d --, 2008 WL 2747188 (N.Y. App. Div. July 15, 2008) ........................80

*Cape Ann Investors LLC v. Lepone*,
    296 F. Supp. 2d 4 (D. Mass. 2003) ......................................................72, 74, 78

*Capital Wireless Corp. v. Deloitte & Touche*,
    216 A.D.2d 663 (N.Y. App. Div. 1995) ..............................................................13, 15

*Center v. Hampton Affiliates, Inc.*,
    66 N.Y.2d 782 (1985) ..........................................................................................13

*Century Pacific, Inc. v. Hilton Hotels Corp.*,
    528 F. Supp. 2d 206 (S.D.N.Y. 2007)..................................................................33

*Colnaghi U.S.A., Ltd. v. Jewelers Protection Servs. Ltd.*,
    81 N.Y.2d 821 (1993) ..........................................................................................65

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)..................................................................33, 36

*Credit Alliance Corp. v. Arthur Andersen & Co.*,
    65 N.Y.2d 536 (1985) ..........................................................................................66

*Cromer Finance Ltd. v. Berger*,
    2003 WL 21436164 (S.D.N.Y. June 23, 2003) ...................................................34, 53

*DeJohn v. The .TV Corp. Int'l*,
    245 F. Supp. 2d 913 (N.D. Ill. 2003) ..................................................................83

*Di Vittorio v. Equidyne Extractive Indus. Inc.*,
    822 F.2d 1242 (2d Cir. 1987)...............................................................................26

*Dreieck Finanz AG v. Sun*,
    1990 WL 11537 (S.D.N.Y Feb. 9, 1990)..............................................................33, 53

*Dujardin v. Liberty Media Corp.*,
    359 F. Supp. 2d 337 (S.D.N.Y. 2005)..................................................................80

*Exprezit Convenience Stores, LLC v. Transaction Tracking Techs., Inc.*,
    2005 WL 2704891 (N.D. Fla. Oct. 19, 2005) ......................................................83

*Filler v. Hanvit Bank*,
   339 F. Supp. 2d 553 (S.D.N.Y. 2004).................................................................62

*Foman v. Davis*,
   371 U.S. 178 (1962).........................................................................................84

*Foy v. Pratt & Whitney Group*,
   127 F.3d 229 (2d Cir. 1997)............................................................................32

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005)............................................................80

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
   479 F. Supp. 2d 349 (2d Cir. 2007) ...............................................31, 34, 54

*In re Friedman's Inc.*,
   385 B.R. 381 (S.D. Ga. 2008)........................................................................71

*Gavin v. AT&T Corp.*,
   464 F.3d 634 (7th Cir. 2006) .........................................................................77

*Global Crossing Estate Rep. v. Winnick*,
   2006 WL 2212776 (S.D.N.Y Aug. 3, 2006) ............................................. passim

*In re Global Crossing, Ltd. Secs. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)............................................................15

*In re Global Crossing, Ltd. Secs. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004)......................................................36, 47

*Gonzalez v. Profile Sanding Equip., Inc.*,
   776 N.E.2d 667 (Ill. App. 2002) ...................................................................69

*Gordon Partners v. Blumenthal*,
   2007 WL 1438753 (S.D.N.Y. May 16, 2007) .................................................76

*Greene v. Hanover Direct, Inc.*,
   2007 WL 4224372 (S.D.N.Y. Nov. 17, 2007).................................................79

*Guilbert v. Gardner*,
   480 F.3d 140 (2d Cir. 2007)...........................................................................31

*Hirsch v. Arthur Andersen & Co.*,
   178 B.R. 40 (D. Conn. 1994).........................................................................27

*Hoth v. Stogsdill*,
   569 N.E.2d 34 (Ill. App. 1991) .....................................................................70

*Houbigant, Inc. v. Deloitte & Touche LLP*,
   303 A.D.2d 92 (N.Y. App. Div. 2003) .....................................................30, 38

*Hughes v. BCI Int'l Holdings, Inc.*,
   452 F. Supp. 2d 290 (S.D.N.Y. 2006)............................................................33

*Hydro Investors, Inc. v. Trafalgar Power Inc.*,
   227 F.3d 8 (2d Cir. 2000) ..................................................................64

*IUE AFL-CIO Pension Fund v. Hermann*,
   9 F.3d 1049 (2d Cir. 1993)...........................................................26, 30

*Instituto de Prevision Militar v. Merrill Lynch*,
   485 F. Supp. 2d 1340 (S.D. Fla. 2007) .............................................76

*In re J.E. Marion, Inc.*,
   199 B.R. 635 (Bankr. S.D. Tex. 1996) ..............................................71

*JP Morgan Chase Bank v. Winnick*,
   406 F. Supp. 2d 247 (S.D.N.Y. 2005).......................................... passim

*Joffee v. Lehman Bros., Inc.*,
   2005 WL 1492101 (S.D.N.Y. June 23, 2005) ...................................80

*Kerobo v. Southwestern Clean Fuels Corp.*,
   285 F.3d 531 (6th Cir. 2002) .............................................................83

*Kimmell v. Schaeffer*,
   89 N.Y.2d 257 (1996) .......................................................................32

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991)..............................................................19

*LaSala v. Bank of Cyprus Pub. Co.*,
   510 F. Supp. 2d 246 (S.D.N.Y. 2007)................................................71

*LaSala v. Bordier et Cie*,
   519 F.3d 121 ................................................................................72, 73

*LaSala v. Lloyds TBS Bank, PLC*,
   514 F. Supp. 2d 447 (S.D.N.Y. 2007)................................................74

*LaSala v. UBS, AG*,
   510 F. Supp. 2d 213 (S.D.N.Y. 2007)...........................................74, 77

*Lee v. Marsh & McLennan Cos.*,
   2007 WL 704033 (S.D.N.Y. Mar. 7, 2007) .......................................74

*Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
   179 F. Supp. 2d 159 (S.D.N.Y. 2001)...........................................79, 81

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)...........................................................53, 59

*Levine v. Torino Jewelers, Ltd.*,
   2006 WL 709098 (S.D.N.Y. Mar. 22, 2006) .....................................40

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998)............................................................................84

*McDaniel v. Bear Stearns & Co.*,
   196 F. Supp. 2d 343 (S.D.N.Y. 2002) ............................................................... 55

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
   547 U.S. 71 (2006) ............................................................................................ 71, 76

*In re Monahan Ford Corp. of Flushing*,
   340 B.R. 1 (Bankr. E.D.N.Y. 2006) ................................................................. 17, 54

*N. Am. Catholic Ed. Programming Found., Inc. v. Gheewalla*,
   930 A.2d 92 (Del. 2007) ................................................................................... 32, 33

*NCP Litig. Trust v. KPMG LLP*,
   901 A.2d 871 (N.J. 2006) ...................................................................................... 15

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
   2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003) ................................................. 80, 81

*In re New York City Mun. Secs. Litig.*,
   572 F.2d 49 (2d Cir. 1978) .................................................................................... 78

*Newby v. Enron Corp.*,
   2006 WL 3716669 (S.D. Tex. Dec. 12, 2006) ..................................................... 76

*Norman, III v. Salomon Smith Barney Inc.*,
   350 F. Supp. 2d 382 (S.D.N.Y. 2004) .................................................................. 77

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin
   & Jenrette Secs. Corp.*,
   2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) .......................................................... 45

*One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*,
   312 F. Supp. 2d 824 (E.D.Va. 2004) .................................................................... 83

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   51 F. Supp. 2d 290 (S.D.N.Y. 1999) ................................................................ 36, 37

*PT United Can Co. v. Crown Cork & Seal Co.*,
   138 F.3d 65 (2d Cir. 1998) .................................................................................... 83

*In re Parmalat Secs. Litig.*,
   501 F. Supp. 2d 560 (S.D.N.Y. 2007) .......................................................... passim

*Pelman v. McDonalds Corp.*,
   237 F. Supp. 2d 512 (S.D.N.Y. 2003) .................................................................. 54

*Pension Comm. of the University of the Montreal Pension Plan v.
   Banc of America Securities, LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) .................................................................. 34

*People ex rel. Spitzer v. Coventry First LLC*,
   2007 WL 2905486 (N.Y. Sup. Ct. Sept. 25, 2007) .............................................. 81

*Phar-Mor, Inc. v. Coopers & Lybrand (In re Phar-Mor, Inc. Sec. Litig.),*
    900 F. Supp. 784 (W.D. Pa. 1995) ...................................................................12, 15

*Polizzi v. Cowles Magazines, Inc.,*
    345 U.S. 663 (1953) ...................................................................................................83

*Primavera Familienstifung v. Askin,*
    130 F. Supp. 2d 450 (S.D.N.Y. 2001) ...........................................................53, 59, 62

*Prof'l Management Assoc., Inc. Employees' Profit*
    *Sharing Plan v. KPMG LLP,*
    335 F.3d 800 (8th Cir. 2003) ....................................................................................78

*RSL Commc'ns PLC v. Bildirici,*
    2006 WL 2689869 (S.D.N.Y. Sept. 14, 2006) .........................................................33

*Raider v. Friedman,*
    162 A.D.2d 112 (N.Y. App. Div. 1990) ....................................................................54

*In re Refco Secs. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) .........................................................35, 40, 51

*Rolf v. Blyth, Eastman Dillon & Co.,*
    570 F.2d 38 (2d Cir. 1978) ........................................................................................59

*Robertson v. Seidman & Seidman,*
    609 F.2d 583 (2d Cir. 1979) ......................................................................................16

*Schacht v. Brown,*
    711 F.2d 1343 (7th Cir. 1983) ...................................................................................15

*Sedona Corp. v. Ladenburg Thalmann & Co.,*
    2005 WL 1902780 (S.D.N.Y. Aug 9, 2005) ..............................................................79

*In re Sept. 11 Prop. Damage & Bus. Loss Litig.,*
    468 F. Supp. 2d 508 (S.D.N.Y. 2006) ......................................................................54

*In re Sharp Intern'l Corp.,*
    302 B.R. 760 (E.D.N.Y. 2003) ..................................................................................60

*Shearson Lehman Hutton, Inc. v. Wagoner*
    944 F.2d 114 (2d Cir. 1991)............................................................................. passim

*Sonnenschine v. Giacomo,*
    295 A.D.2d 287 (N.Y. App. Div. 2002) ....................................................................63

*Stanley v. Trinchard,*
    500 F.3d 411 (5th Cir. 2007) .....................................................................................70

*State v. 7040 Colonial Road Assocs. Co.,*
    176 Misc. 2d 367, 671 N.Y.S.2d 938 (N.Y. Sup. Ct. 1998) ....................................80

*In re Symbol Tech. Secs. Litig.,*
    762 F. Supp. 510 (E.D.N.Y. 1991) ...........................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ........................................................................................30

*Thomas H. Lee Equity Fund V, L.P. v. GT LLP*,
    2008 WL 3166536 (S.D.N.Y. Aug. 6, 2008) ...................................................... passim

*Thompson v. County of Franklin*,
    15 F.3d 245 (2d Cir. 1994) ................................................................................4, 18

*In re Wedtech Sec. Litig.*,
    138 B.R. 5 (S.D.N.Y. 1992) ..................................................................................14

*Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*,
    10 A.D.3d 267 (N.Y. App. Div. 2004) .................................................................63

*Whitney v. Citibank, N.A.*,
    782 F.2d 1106 (2d Cir. 1986) ..............................................................................35

*Wight v. Bankamerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ...............................................................4, 18, 19, 20

*Wight v. Bankamerica Corp.*,
    1999 WL 199021 (S.D.N.Y. Apr. 8, 1999) ..........................................................34

*In re WorldCom, Inc. Secs. Litig.*,
    308 F. Supp. 2d 236 (S.D.N.Y. 2004) ..................................................................76

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*,
    341 F. Supp. 2d 258 (S.D.N.Y. 2004) ..................................................................79

## Statutes

11 U.S.C. § 522(b) ...........................................................................................................68

15 U.S.C. § 77p(b) .....................................................................................................72, 76

15 U.S.C. § 77p(f)(3) .............................................................................................72, 74, 78

15 U.S.C. § 77p(f)(2) .................................................................................................72, 76

15 U.S.C. § 78bb(f)(5)(B) ...............................................................................................72

15 U.S.C. § 78bb(f)(5)(C) ...........................................................................73, 74, 76, 78

15 U.S.C. § 78bb(f)(5)(D) ...............................................................................................73

28 U.S.C. § 1404 .......................................................................................................83, 84

28 U.S.C. § 1441(a) ........................................................................................................83

805 ILCS 205/6(1) ...........................................................................................................81

Fed. R. Civ. P. 15(a) .......................................................................................................82

Fed. R. Civ. P. 27(a) .................................................................................................82

N.Y. Gen. Bus. Law § 352 .......................................................................................78

N.Y. P'ship Law § 10[1] ..........................................................................................81

## **Miscellaneous**

4  Collier on Bankruptcy ¶ 541.07 (15th ed. 1996) ................................................70

H.R. Rep. No. 1130, 90th Cong., 2d Sess.,
    *reprinted in* 2 U.S.C.C.A.N. pp. 1898-1900 (1968) ...............................................76

Restatement (Third) of Agency § 5.04, cmt. c (2006)................................................15, 16, 23

S. Rep. No. 105-182, at 8 (May 4, 1998)....................................................................74

Plaintiff Marc S. Kirschner, the Trustee for the Refco Litigation Trust (the "Trustee"), respectfully submits this memorandum of law in opposition to defendants' motions to dismiss the Complaint.

## PRELIMINARY STATEMENT

This action arises out of the October 2005 collapse of Refco Inc. and certain of its subsidiaries, including Refco Group, Ltd. LLC ("RGL") and Refco Capital Markets, Ltd. ("RCM") (collectively, "Refco" or the "Company"). Defendants include Refco's auditors, legal advisors, and financial advisors who helped several corrupt Refco Insiders (the "Insiders")[1] cash out their interests in the company at fraudulently inflated prices. This was no mere tort; it has led to the criminal convictions of four people and the indictment of a fifth, Mayer Brown partner Joseph Collins.

Relying on a multitude of arguments that alternately betray precedent and raise factual issues unsuitable for resolution on a motion to dismiss, defendants seek to escape liability for their substantial roles in the fraud that caused Refco's collapse. As explained below, the Trustee's claims are well-pleaded and defendants' motions should be denied.

*First*, the Trustee has standing to assert his claims on behalf of the Refco estates because he properly alleges the adverse-interest exception to the *Wagoner* imputation rule. In particular, the Second Circuit recently made clear that short-term benefits that a company may receive incident to corrupt insiders' misconduct do not defeat the adverse-interest exception. As to the sole-actor exception to the adverse-interest exception, it does not apply here because the Complaint clearly alleges that innocent insiders were present at all relevant times. *See* Point I, *infra*.

---

[1] the Insiders include Phillip Bennett ("Bennett"), Robert Trosten ("Trosten"), Tone Grant ("Grant"), and Santo Maggio ("Maggio"). (Compl. ¶ 1.)

*Second*, the Trustee's Complaint adequately alleges claims for aiding and abetting fraud and breach of fiduciary duty. At the threshold, defendants do not seriously challenge the allegations of the underlying fraud and breaches of fiduciary duty. And, contrary to defendants' arguments, the Trustee's detailed allegations support a strong inference of defendants' actual knowledge (or, at the very least, conscious avoidance of knowledge) of the Insiders' fraud and breaches of fiduciary duty and their substantial assistance of those acts. *See* Point II, *infra*.

*Third*, while the Trustee agrees with defendants that certain of his negligent misrepresentation and breach of fiduciary duty claims are duplicative of his malpractice claims, he disagrees with defendants' unsupported argument that the claims for aiding and abetting breach of fiduciary duty are duplicative of other claims. Such claims depend not upon defendants' duty of care to Refco, but rather on their knowing and substantial assistance of the Insiders' breaches of their separate duty of care to Refco. *See* Point III, *infra*.

*Fourth*, the Trustee's malpractice claims should be sustained because they each adequately allege that defendants breached their duties of care. *See* Point IV, *infra*. Contrary to Mayer Brown's argument, Illinois law, even if applicable here, does not preclude the Trustee from pursuing such claims that were originally held by the debtors. *See* Point V, *infra*.

*Fifth*, the Trustee's claims are neither subject to dismissal under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") nor preempted by New York's Martin Act. With respect to SLUSA, this action is not a "covered class action" because (a) the Trustee seeks relief on behalf of the *three* Refco estates, *i.e.*, not more than fifty persons, and (b) his suit is not part of a group of lawsuits. Even if this were a "covered class action," the Trustee's claims lack a sufficient nexus to securities fraud to fall within SLUSA. *See* Point VI, *infra*. The tangential relationship

between the Trustee's claims and securities fraud on the investing public similarly defeats defendants' Martin Act preemption argument. *See* Point VII, *infra*.

*Sixth*, Mayer Brown International LLP ("Mayer Brown International") is a proper defendant because it and Mayer Brown LLP ("Mayer Brown") together constitute a "legal partnership" under New York law. If the Court rules otherwise based on the present allegations, the Trustee respectfully requests the opportunity to take pre-complaint discovery to determine Mayer Brown International's role in the fraud, including its relationship at all relevant times with what is now Mayer Brown. *See* Point VIII, *infra*.

*Seventh*, PricewaterhouseCoopers' ("PwC") contention that venue is "improper" in the Northern District of Illinois fails, *inter alia*, because PwC waived this argument both by removing the action to federal court and by seeking resolution of the Trustee's claims on the merits. At most, the Trustee's claims should be transferred to the Southern District of New York – but there is no reason to do so now since they are already pending here for pre-trial purposes. *See* Point IX, *infra*.

*Eighth*, and finally, to the extent that the Court dismisses any of the Trustee's claims, it should do so without prejudice so that he may amend the Complaint. In this Circuit, the usual practice is to grant a plaintiff leave to amend at least once, and there is no basis to depart from that practice here. *See* Point X, *infra*.

# STATEMENT OF ALLEGATIONS[2]

The Insiders falsely and fraudulently concealed the true financial condition of Refco to engineer a lucrative cashing-out of their interests through a leveraged buy-out ("LBO") and initial public offering ("IPO") that Refco was clearly unsuited to undertake. (Compl. ¶¶ 3, 138.) As a result of the Insiders' misconduct, the Refco entities were left destitute and were forced to file for bankruptcy once the fraudulent scheme came to light. (*Id.* ¶ 12.)

The defendants – auditors, accountants, financial advisors, lawyers, investment banks, and hedge funds – knowingly provided substantial assistance to the Insiders' scheme and also breached their own direct duties of care to Refco. (*Id.* ¶¶ 1-2, 91, 151, 205, 281, 313-17, 345-46.) Several have been found culpable by the Bankruptcy Court-appointed Examiner[3] (*id.* ¶¶ 41-43, 108-10, 207), and one – Mayer Brown's Joseph Collins ("Collins") – has been indicted. (Indictment, *United States v. Collins*, No. 07 Cr. 01170 (S.D.N.Y. Filed Dec. 18, 2007) ("Collins Indictment"), Rand Decl. Exh. B.) The Trustee was appointed to bring claims on behalf of the Refco entities against the Insiders and their collaborators.

## A.    Overview Of The Fraudulent Scheme.

The Insiders conspired for over seven years to defraud Refco by "cleaning up" the Company's financial statements to create the illusion of financial health, and maintaining that

---

[2]  The Trustee's Complaint must be taken as true, with all reasonable inferences construed in his favor. *See, e.g.*, *Wight v. Bankamerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) ("[T]he district court correctly 'construe[d] the complaint in favor' of the liquidators and credited their adverse interest allegation as true.") (quoting *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994))). *See also JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 251 n.2 (S.D.N.Y. 2005) ("[T]his Court can detect no move away from permitting fraud plaintiffs all reasonable inferences.").

[3]  The Final Report of the Court-appointed Examiner (the "Examiner's Report"), dated July 11, 2007 – referenced throughout the Complaint (Compl. ¶¶ Introduction, 41-45, 48, 55, 68, 108-10, 182, 207, 227, 235, 237, 266) – is attached hereto as Exhibit A to the Declaration of Sascha N. Rand, dated August 29, 2008 ("Rand Decl.").

illusion long enough for the Insiders to cash out through an LBO followed by an IPO. (*Id.* ¶¶ 4-6.) This scheme could not have gone forward without defendants' knowing and substantial assistance.

The Insiders created the illusion that Refco was a financially solid and healthy broker-dealer by concealing hundreds of millions of dollars in trading losses, misallocating operating expenses, and inflating revenues with phantom income. (*Id.* ¶¶ 59-73.) A portion of Refco's trading business included extending credit to customers who engaged in securities, commodities, and futures trades. (*Id.* ¶ 61.) Refco was thus vulnerable to drastic market fluctuations, such as the Asian market collapse in 1997. (*Id.* ¶¶ 61-62.) Refco's and its customers' trading losses between 1997-1999 alone amounted to hundreds of millions of dollars – losses that, if discovered, would have undermined confidence in Refco's management and damaged Refco's business. (*Id.* ¶ 63.) Instead of disclosing these losses, the Insiders caused them to be secretly transferred to Refco Group Holdings, Inc. ("RGHI"), a holding company owned and controlled by Bennett that was not part of the Refco consolidated entities. (*Id.* ¶¶ 35-36, 64.) The losses were recorded as receivables owed *to* Refco by RGHI (the "RGHI Receivable"), making Refco's financial position look materially stronger than it was. (*Id.* ¶ 66.) The Insiders also moved tens of millions of dollars of Refco operating expenses from Refco's books to RGHI, further increasing the RGHI Receivable. (*Id.* ¶¶ 67-69.) Finally, the Insiders charged a usurious interest rate on the RGHI Receivable and recorded the interest as income even though it was never intended to be paid. (*Id.* ¶¶ 70-73.)

The Insiders also kept up the illusion of financial stability by orchestrating a fraudulent "Round Trip Loan" ("RTL") shell game. (*Id.* ¶¶ 75-93.) The RTLs involved transferring massive amounts of the RGHI Receivable off Refco's books through a series of sham "loans." First, Refco would "loan" money to third-party Refco customers who agreed to serve, for a fee, as conduits. (*Id.* ¶ 75-76.) The third-party would then "loan" the same amount to RGHI. RGHI would use the third-

party "loan" to pay down the debt it owed to Refco. (*Id*. ¶ 77-78.) Thus, on Refco's financial statements, the RGHI Receivable was transformed from a receivable owed by a related-party, holding company with no operations of its own, into a payable owed to Refco from an unrelated third-party. (*Id*. ¶ 78.) But at the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process, leaving the full amount of the RGHI Receivable unpaid. (*Id*. ¶ 79.)

In yet another fraudulent stratagem that amounted to outright theft, the Insiders boosted Refco's financial appearance by looting money from RCM and sending the funds to other Refco entities through a series of intercompany "loans" that these entities essentially had no ability to repay. (*Id*. ¶¶ 7, 94-105.)

The Insiders then exploited this false image of Refco's financial health by orchestrating a lucrative cashing-out of their interests for far more than those interests were worth through an LBO with Thomas H. Lee Partners ("THL"), followed by an IPO. (*Id*. ¶¶ 9-10, 106-18, 134-36.) Ultimately, the fraud was revealed by an innocent Refco employee, and bankruptcy ensued within weeks. (*Id*. ¶¶ 147-49.)

### B.    The Insiders' Fraud And Breaches Of Fiduciary Duty.

With the actual knowledge (or, at the very least, conscious avoidance of knowledge) and substantial assistance of the defendants, the Insiders defrauded and breached their fiduciary duties to RGL, and Refco Inc. by, among other acts (including those described above): (1) concealing the customer trading losses at RGHI (*id*. ¶¶ 61-66); (2) transferring expenses to RGHI (*id*. ¶¶ 67-69); (3) booking fictitious interest income on the RGHI Receivable (*id*. ¶¶ 70-73); (4) concealing the magnitude of the receivable owed by RGHI to RGL by, among other means, entering into RTLs at the end of each reporting and audit period (*id*. ¶¶ 74-93); and (5) orchestrating the cashing-out of their interests in Refco through the LBO (including an "Exxon Capital" exchange in which the bonds

issued in the LBO were registered with the SEC) and the IPO (*id.* ¶¶ 106-36).  Had these and other

facts been disclosed to Refco's innocent insiders,[4]  Refco would not have entered into the LBO or

IPO and the Insiders' misconduct would have been stopped.  (*Id.* ¶¶ 101, 118, 465, 464-74.)

Insiders Bennett and Maggio also defrauded RCM and breached their fiduciary duties to

RCM by transferring RCM's assets to other Refco affiliates without negotiating or documenting the

terms upon which these transfers were effected or requiring the posting of any collateral or security.

(*Id.* ¶¶ 94-105.)  Given Refco's true financial condition (*i.e.*, accounting for the RGHI Receivable

scheme), these Refco affiliates had essentially no ability – based on their operating income – to

repay the amounts owed to RCM.  (*Id.* ¶¶ 7.)  The LBO transaction further impaired the ability of

these affiliates to repay these amounts by subordinating RCM's right to repayment of the $1.4 billion

debt incurred in the LBO and using the proceeds of the transaction to "cash out" the Insiders'

interests, all the while RCM was insolvent or operating in the zone of insolvency.  (*Id.* ¶¶ 11, 32,

118, 129-33, 350.)  Had these facts been disclosed to RCM's innocent insiders, those persons would

have sought repayment of the amounts owed to RCM and stopped the transfers out of RCM.  (*Id.* ¶

369.)

### C.    The Harm Caused To The Refco Entities By The Fraudulent Scheme.

The Insiders' fraudulent scheme harmed Refco in a number of ways.  In the LBO, RGL

distributed the proceeds to the Insiders and assumed over $1 billion in debt obligations that, given its

true financial condition, RGL could not satisfy, rendering it insolvent and threatening its viability.

---

[4]  While the Complaint refers to "innocent insiders and outside directors," the term "innocent insiders" herein shall include reference to Refco's outside directors.

(*Id.* ¶¶ 121, 130-33.)  The LBO also substantially impaired the ability of RGL and its affiliates to repay the amounts owed to RCM, thereby harming both RCM and RGL.  (*Id.*)[5]

Similarly, when it came to the IPO, instead of using the proceeds to repay the amounts owed to RCM by its affiliates or fully paying down the RGHI Receivable, the Insiders used the proceeds to pay themselves, other equity holders, and the Investment Bank Defendants.  (*Id.* ¶¶ 45-47, 134-36, 342.)  Refco was not in a financial condition to undertake the IPO, and the transaction constituted a second squandered opportunity for Refco to raise funds that could have been used to repay the amounts owed to RCM or pay down the RGHI Receivable.  (*Id.* ¶ 136.)   Furthermore, the IPO saddled Refco Inc. with hundreds of millions of dollars in liabilities to the purchasers of Refco Inc. stock.  (*Id.* ¶¶ 590-593.)

> **D.**    **The Roles Of The Various Defendants.**
>
> **1.**    **Grant Thornton.**

Grant Thornton ("GT"), Refco's purportedly independent auditor at all relevant times after 2002, committed gross malpractice and substantially assisted the Insiders in carrying out the fraud and breaching their fiduciary duties.  (*Id.* ¶¶ 151- 204.)  GT was intimately familiar with Refco's financial condition and was aware of the RGHI Receivable and the RTLs.  (*Id.* ¶¶ 151-82.)  GT also knew about the transfer of RCM assets to RGL and its affiliates.  (*Id.* ¶¶ 154, 183-97.) GT nonetheless flagrantly violated professional standards of conduct and its own policies, ignoring numerous indications of the Insiders fraudulent conduct, and issued a series of unqualified audit opinions that materially misrepresented Refco's financial position, all the while knowing that the

---

[5]  The Trustee's summary of the harm to Refco is not meant to endorse defendants' incorrect suggestion that the Complaint must detail a damages methodology.  (*See* Memorandum of Law in Support of PwC's Motion to Dismiss ("PwC Br.") at 22; Memorandum of Law in Support of Investment Bank Defendants' Motion to Dismiss ("Inv. Banks Br.") at 11.)

Insiders were planning to cash out their interests in an LBO that could never happen without the clean audit opinions that GT willingly provided.  (*Id*. ¶¶ 151-172.)

### 2. Mayer Brown.

Mayer Brown served as Refco's principal outside counsel from 1994 until October 2005 and was intimately involved in numerous aspects of the Insiders' scheme, including preparing the loan documents through which Refco concealed the RGHI Receivable, advising that RCM could remain unregulated and facilitating the Insiders' diversion of RCM's assets, and playing an active role in the LBO and IPO.  (*Id*. ¶¶ 205-47.)  Mayer Brown was well aware of Refco's trading losses and balance sheet problems from the beginning, as it advised both RGHI and Refco throughout the relevant time period.  (*Id*. ¶¶ 208-12.)  Mayer Brown also understood that the Insiders were looking to cash out their interests in Refco.  (*Id*. ¶¶ 208-20.)[6]

### 3. PricewaterhouseCoopers.

PwC advised Refco in connection with the LBO and IPO and provided Refco with advice and consulting services on numerous accounting and financial reporting matters.  (*Id*. ¶¶ 281-312.)  In addition, PwC served as Refco's tax preparer during and after the LBO and up through the IPO.  (*Id*. ¶ 297.)  Specifically, PwC analyzed the propriety of the LBO and prepared documents to be filed with the SEC in connection with the LBO, the public registration of the LBO bonds, and the IPO.  (*Id*. ¶¶ 281-312.)  PwC also became the *de facto* chief accounting officer for Refco and was responsible for "assisting in the initial planning and staffing of audits" and implementing improved accounting controls, in response to concerns over deficiencies in the practices at Refco.  (*Id*. ¶ 286.)

---

[6]  Allegations regarding Mayer Brown's facilitation of the Proceeds Participation Agreement – which are not included in the Complaint because the information came to light after the Complaint was filed – can be found in the Collins Indictment.  (Rand Decl. Exh. A.)

As such, PwC had unfettered access to Refco personnel and accounting systems and became aware of the RGHI Receivable and the RTLs. (*Id.* ¶¶ 284, 289.)

### 4. The Investment Banks Defendants

Credit Suisse Securities (USA) LLC ("Credit Suisse"), Deutsche Bank Securities, Inc. ("Deutsche Bank"), and Banc of America Securities LLC ("BAS") (collectively, the "Investment Bank Defendants") structured and facilitated the lucrative cashing-out of the Insiders' interests, all the while recognizing that the LBO would leave RCM's intercompany loans unpaid and harm the company. (*Id.* ¶¶ 313-343.) These sophisticated defendants not only knew that a broker-dealer such as Refco was an inappropriate candidate for an LBO, they also learned that the Insiders were diverting RCM customer assets to other Refco entities to make Refco appear financially stable as the LBO approached. (*Id.* ¶¶ 313-314.) Further, they knew that the LBO would have the effect of subordinating the repayment of the amounts owed to RCM to the obligations RGL and its affiliates assumed in the LBO. (*Id.* ¶¶ 334-37.) Nevertheless, they facilitated the LBO, thereby causing harm to both RCM and RGL. (*Id.* ¶¶ 334-39.) Tellingly, the credit risk management group at Deutsche Bank, before being overridden by senior management, altogether rejected Deutsche Bank's participation in the LBO given its concern over the impact of the LBO on Refco's existing obligations. (*Id.* ¶¶ 319, 330.)

### 5. The RTL Defendants.

Liberty Corner Capital Strategies, LLC and William Pigott (collectively, "Liberty Corner"), and Cim Ventures Inc. and Ingram Micro Inc. (collectively, "CIM/Ingram") (collectively, the "RTL Defendants") played a pivotal role in the Insiders' scheme to hide the RGHI Receivable. Each participated in the RTLs despite knowing that the RTLs had no legitimate business purpose and were designed to manipulate Refco's financial condition. (*Id.* ¶¶ 344-348.)

**ARGUMENT**

**I.     THE TRUSTEE'S CLAIMS ARE NOT BARRED BY *WAGONER***

Defendants incorrectly contend that, at this preliminary pleading stage, the Trustee has failed to allege the adverse-interest exception to the imputation rule for purposes of the "effectively identical" standing (*Wagoner*) and *in pari delicto* doctrines. *See Global Crossing Estate Rep. v. Winnick*, 2006 WL 2212776, at *12 n.16 (S.D.N.Y Aug. 3, 2006). Specifically, *Bankruptcy Services, Inc. v. Ernst & Young LLP (In re CBI Holding Co.)*, 529 F.3d 432 (2d Cir. 2008) ("*CBI*"), forecloses defendants' argument that Refco's receipt of some short-term benefit from the Insiders' wrongful conduct defeats the adverse-interest exception. Under *CBI*, such incidental, illusory benefits are not determinative – instead, the touchstone is the Insiders' *intent*, a quintessentially factual issue unsuitable for resolution on a motion to dismiss. Here, the Trustee has clearly and adequately alleged that the Insiders' intent was to cash out their interests in the companies entirely for personal gain.

Nor can it be determined on the face of the Complaint and as a matter of law that the sole-actor exception to the adverse-interest exception applies. The Complaint alleges, for each entity, that the Insiders were *not* the sole actors/decisionmakers – innocent insiders were present at all relevant times. But even ignoring the presence of those innocent insiders, each of the defendants is precluded from relying on the sole-actor rule because, under the allegations of the Complaint (which must be taken as true), each defendant knew that the Insiders were acting adversely to the interest of the companies.

In addressing why the Trustee's claims are not barred by *Wagoner*, first, we summarize the relevant legal framework. Second, we demonstrate that the Trustee's allegations satisfy the adverse-

interest exception.[7]  Third, we show that the sole-actor exception to the adverse-interest exception does not apply as a matter of law at this preliminary pleading stage, where all allegations must be construed in favor of the Trustee as plaintiff.  Finally, we explain that the Trustee need not to make a further showing at this stage that his claims are distinct from claims of creditors, but that in any event the Complaint's allegations support an inference of distinctness.

A.    The *Wagoner* Framework.

*Step one: the imputation rule.*  "Under New York law, '[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation.'"  *CBI*, 529 F.3d at 447 (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) (alteration in original).   "Because a bankruptcy 'trustee stands in the shoes of the bankrupt corporation' and can maintain only those actions that the debtors could have brought prior to the bankruptcy proceedings, 'when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage.'"  *Id.* (quoting *Wagoner*, 944 F.2d at 118).

*Step two: the adverse-interest exception.*  "Under New York law, the adverse interest exception rebuts th[is] usual presumption …" of imputation.  *Id.* at 448 (citation and quotation marks omitted; alteration in original).  "Under the exception, management misconduct will *not* be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation."  *Id.* (citation and quotation marks omitted; emphasis added).  In determining whether the wrongdoing insider "acted entirely in his own interests" – or, equivalently, "'totally abandoned'

---

[7]    We do not rely on a free-standing "innocent insider" exception to *Wagoner*/*in pari delicto* imputation.  The presence of innocent insiders is relevant not as a free-standing exception to imputation, but rather because it makes inapplicable the sole-actor exception.  *See CBI*, 529 F.3d at 447 n.5.

his corporation's interests," *id.* (quoting *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784-85 (1985)) – courts "loo[k] principally to the *intent* of the managers engaged in the misconduct." *Id.* at 451 (citation omitted) (emphasis added). Thus, "[e]vidence that [the now-bankrupt corporation] *actually benefited* from … management's fraud" does not undermine allegations that "management did not *intend to benefit* the company …." *Id.* (emphasis in original).

> Indeed, even where the purpose of a fraud was to continue a corporation past insolvency in order to give its management time "to resolve [the corporation's] underlying business problems, such a motivation does not … necessarily equate to a finding that the fraudulent actors intended to benefit [the corporation]…. [A] reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries, … and reputations …." *Phar-Mor, Inc. v. Coopers & Lybrand (In re Phar-Mor, Inc. Sec. Litig.)*, 900 F. Supp. 784, 787 (W.D. Pa. 1995); *see also Capital Wireless*, 216 A.D.2d at 666 (finding an issue for trial in applying the adverse interest exception where, although the "fraud generated much needed financing for plaintiff and forestalled its bankruptcy," the wrongdoer might still have totally abandoned the company's interest) ….

*Id.* (alterations in original).

Moreover, that the corporation received benefits from the wrongdoing is even less relevant where the benefits are "illusory." "'A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.'" *Id.* at 453 (citation omitted). For example, "the 'benefit' provided by 'further indebtedness' – capital – 'may provide an illusory financial cushion that lulls shareholders into postponing the decision to dissolve the corporation' and thus 'miss an opportunity to cut their losses.'" *Id.* (quoting *Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996)) (additional quotation marks omitted in original).

<u>*Step three: the sole-actor exception to the adverse-interest exception*</u>. The "'sole actor' rule" is "an exception to the exception." *Id.* at 453 n.9. This rule "applies where the principal and agent are one and the same or, in the corporate context, where the principal is a corporation and the agent

is its sole shareholder." *Id.* (internal quotation marks and citation omitted). Conversely, the sole-actor rule does *not* apply "[w]here only some of a corporation's owners were involved in a fraud" and there existed other "insiders who were innocent and unaware of the misconduct [and] had sufficient authority to stop the fraud." *In re CBI Holding Co.*, 311 B.R. 350, 373 (S.D.N.Y. 2004), *rev'd on other grounds*, 529 F.3d 432; *see also CBI*, 529 F.3d at 447 n.5; *Global Crossing*, 2006 WL 2212776, at *15 (sole-actor rule asks "whether all relevant decisionmakers were involved in the alleged misconduct … or rather whether there exists an 'innocent member' of management who could have prevented the wrongs if he knew about them").

### B.    The Complaint Adequately Pleads The Adverse-Interest Exception.

Rather than discuss whether the Trustee has alleged that the Insiders *intended to benefit only themselves*, defendants rely on pre-*CBI* case law in pointing to benefits to the company as undermining the adverse-interest exception here.  (Memorandum of Law in Support of Grant Thornton LLP's Motion to Dismiss ("GT Br.") at 8 ("'[t]he relevant issue is *short term benefit* or detriment to the corporation'") (quoting *In re Wedtech Sec. Litig.*, 138 B.R. 5, 9 (S.D.N.Y. 1992)) (emphasis added); *id.* ("The complaint makes clear that the Insiders' fraud provided a substantial *benefit* to Refco, at least *temporarily*.") (emphasis added); Memorandum of Law in Support of Mayer Brown's Motion to Dismiss ("MB Br.") at 10 ("Courts addressing facts very similar to those alleged here routinely decline to apply the adverse interest exception when the corporation derives a *short-term benefit* from the wrongful conduct.") (emphasis added); Inv. Banks Br. at 9 ("the Insiders' scheme … was designed to *benefit* Refco - *at least temporarily* - and thus the fortunes of its primary equity holders, the Refco Insiders") (emphasis added); Memorandum of Law in Support of CIM Ventures Inc.'s and Ingram Micro Inc.'s Motion to Dismiss ("CIM/Ingram Br.") at 12 (arguing that adverse-interest exception does not apply because Complaint alleges that wrongdoing insiders' "acts of promotion and capital infusion plainly *benefited* RGL") (emphasis added).)

14

*CBI*, as explained above, unequivocally forecloses such arguments. The Second Circuit held that benefit is *not* the touchstone; rather, the adverse-interest exception "looks principally to the *intent* of the managers engaged in misconduct." *CBI*, 529 F.3d at 451 (emphasis added).[8] Thus, in *CBI*, evidence that the company (CBI) "*actually benefited* from CBI's management's fraud does not make the bankruptcy court's finding that CBI's management did not *intend to benefit* the company clearly erroneous." *Id.* (emphasis in original); *see also id.* ("[E]ven where the purpose of a fraud was to continue a corporation past insolvency in order to give its management time to resolve [the corporation's] underlying business problems, such a motivation does not … necessarily equate to a finding that the fraudulent actors intended to benefit [the corporation] …. [A] reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries, … and reputations ….'" (quoting *Phar-Mor*, 900 F. Supp. at 787) (alterations in original)).

While the procedural posture of *CBI* was post-trial, the Second Circuit's approving citation of cases like *Phar-Mor* and *Capital Wireless Corp. v. Deloitte & Touche*, 216 A.D.2d 663 (N.Y. App. Div. 1995), both of which denied motions for summary judgment using an intent-based standard, establishes *a fortiori* that the same intent-based analysis applies at the motion-to-dismiss stage. *See generally In re Global Crossing, Ltd. Secs. Litig.*, 313 F. Supp. 2d 189, 199 (S.D.N.Y. 2003) ("'[I]nferences … must be drawn in determining intent …, [and w]hen conflicting inferences

---

[8]  *See also* RESTATEMENT (THIRD) OF AGENCY § 5.04, cmt. c (2006) ("In many cases, courts determine whether an agent acted adversely to a principal by assessing the motives with which the agent acted.… The agent's own testimony is not determinative. Ascertaining the motives with which an agent acted is often a fact-intensive exercise."). The *CBI* approach is consistent with the "equitable" approach taken by other courts, under which the participation of insiders in misconduct does not foreclose recovery by the company or its bankruptcy estate. *See, e.g.*, *NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871, 887 (N.J. 2006) ("If we allow imputation to shield a negligent auditor from the consequences of its actions, we will force shareholders to shoulder the entire loss – a result that violates principles of fairness and equity."); *Schacht v. Brown*, 711 F.2d 1343, 1349 (7th Cir. (footnote continued)

can be drawn from the facts, ... summary judgment is inappropriate.' A fortiori, caution is warranted in approaching a motion for judgment on the pleadings on such issues.") (quoting *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979)) (citations omitted in original; brackets in original); RESTATEMENT (THIRD) OF AGENCY § 5.04, cmt. c ("Ascertaining the motives with which an agent acted is often a fact-intensive exercise.").

Applying *CBI*'s intent-based inquiry here, it is clear that the Trustee has adequately alleged the adverse-interest exception as to each of the three companies (RCM, RGL, and Refco Inc.). First, the Trustee has made direct allegations concerning the Insiders' intent to serve only their own selfish interests, including that:

- "[T]he Refco Insiders … acted solely to enrich themselves …" (Compl. ¶ 12);

- "The purpose of the entire scheme was to allow the Refco Insiders to sell their interests in Refco at a fraudulently inflated price." (*Id.* ¶ 106);

- Transfers of assets out of RCM "were for the sole purpose of maintaining the perception of Refco's financial strength and health *so that Bennett, Maggio, and the other Refco Insiders could personally benefit* from a lucrative cashing-out of their interests in Refco" (*Id.* ¶ 352) (emphasis added);

- "*In order to facilitate a lucrative sale of their interests in Refco*, Bennett, Maggio, and Trosten engaged in a fraudulent scheme through which they propped up the perceived financial condition of RGL and its affiliates and caused RGL to enter into an imprudent LBO …." (*Id.* ¶ 463) (emphasis added).

Second, the Trustee has also alleged that the corrupt Insiders in fact benefited from the scheme. While *CBI* holds that allegations or evidence of *benefits to the corporation* do not undermine the adverse-interest exception, it also explains that allegations of *benefits to the Insiders* do provide circumstantial evidence of the corrupt Insiders' intent. *See CBI*, 529 F.3d at 452-53

---

1983) ("[T]he prolonged artificial insolvency of Reserve benefited only Reserve's managers and the other alleged conspirators, not the corporation.").

(discussing three ways in which "the fraudulent scheme benefited" the corrupt insider).   For example:

- "As a result of the lucrative LBO, Bennett and others acting in active concert or participation with him received $106 million, with at least $25 million going to Bennett personally." (Compl. ¶ 113);

- "In the IPO, Bennett sold approximately 7 million shares … for a total price of approximately $146 million." (*Id.* ¶ 134).

Either of these types of allegations, and certainly both of them together, suffices to plead the adverse-interest exception under *CBI*.

### C.     The Sole-Actor Exception Cannot Be Deemed Applicable As A Matter Of Law On The Face Of The Complaint.

As noted, the sole-actor rule asks "whether all relevant decisionmakers were involved in the alleged misconduct" (in which case the sole-actor exception applies) or "rather whether there exists an 'innocent member' of management who could have prevented the wrongs if he knew about them" (in which case the sole-actor exception does not apply).  *Global Crossing*, 2006 WL 2212776, at *15.  The inquiry must be undertaken with special caution at the pleading stage.  *See, e.g.*, *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64, 80 (S.D.N.Y. 2008) ("In the case of the 'sole actor exception' … there are issues of fact because it is not clear at all from the Complaint that the Rigas family alone, or with Brown and Mulcahy, are to be considered a sole 'actor,' without evidentiary detail as to the operation of Adelphia, and the performance of other Adelphia directors."); *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 24 (Bankr. E.D.N.Y. 2006) (defendants' motion "comes before the Court on a pre-answer motion to dismiss, and there has been no evidentiary hearing.  In this context, the complaint must be construed liberally and inferences must be drawn in the light most favorable to plaintiff.").  By contrast, in *In re Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir. 2003), upon which defendants heavily rely (Inv. Banks Br. 12; CIM/Ingram Br. 13 n.7; GT Br. 10; MB Br. 13, 15), the district court's determination regarding the sole-actor rule was made

17

"after a four-day evidentiary hearing on the issue of standing, at which the district court heard testimony, weighed the evidence and reached factual conclusions." *In re Monahan Ford*, 340 B.R. at 24 (discussing *Bennett Funding*).

Thus, in *Wight v. Bankamerica Corp.*, 219 F.3d 79 (2d Cir. 2000), which defendants ignore when it comes to the sole-actor rule, the Second Circuit examined a complaint that alleged that the defunct company (BCCI) "'was adversely dominated by corrupt [management], who[] act[ed] in their own interests and not in the interests of BCCI.'" *Id.* at 87 (alterations in original). The defendant moved to dismiss, invoking the "sole actor" rule based on the allegation that BCCI was "*dominated* by corrupt prior senior managers and directors." *Id.* (emphasis in original). The defendant inferred from this allegation of "domination" that "all relevant shareholders and/or decisionmakers [were] involved in the fraud," *id.*, and thus the sole-actor rule applied as a matter of law. The Second Circuit rejected the argument, holding that even an allegation of "domination" by corrupt insiders was susceptible to an inference (in favor of the plaintiff) that there existed an innocent decisionmaker who could have stopped the misconduct had he been aware of it. *See id.* at 87 ("For purposes of SPIB's Rule 12 motion, the district court correctly 'construe[d] the complaint in favor' of the Liquidators." (quoting *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994))).

Applying these standards here, the allegations in the Complaint plainly do not establish that the sole-actor exception applies as a matter of law. Under *Wight*, a plaintiff need not even explicitly or affirmatively plead that there were innocent insiders who could have stopped the fraud. Rather, the court must infer that fact, even in the face of an allegation that the company was "dominated" by corrupt insiders. *Wight*, 219 F.3d at 87; *compare* GT Br. 10 ("the complaint makes clear that the four Insiders dominated both Refco's leadership and its corporate ownership"). Defendants' motions

18

to dismiss on these grounds should therefore be denied on the understanding that defendants will have ample opportunity to make their sole-actor argument at the summary-judgment stage and/or at trial.[9]

Even if there were a requirement that the plaintiff make some affirmative allegation regarding innocent insiders, the Complaint does so.  *Global Crossing* is instructive; there, this Court, in denying a motion to dismiss, observed that the complaint's allegation that "not all relevant decisionmakers were complicit in defendants' scheme" sufficed to render inapplicable the sole-actor exception "at least at this juncture."  2006 WL 2212776, at *15-16.  Here, as to each of the three companies, the Trustee has made an allegation on par with or exceeding that in *Global Crossing*.

### 1.     RCM.

The Complaint alleges that, if either RCM's outside director or its outside alternate director "had learned of the fraudulent nature of the diversion of RCM's assets in daily undocumented and uncollateralized intercompany transactions to other uncreditworthy Refco entities, they would have taken steps to stop the misappropriation."  (Compl. ¶ 101; *see also, e.g.*, *id.* ¶ 365 ("RCM's Outside Directors and innocent officers and agents did not have access to the books and records maintained by Bennett and Maggio through which these intercompany transfers were made …."). )[10]  This goes

---

[9]  PwC's request that the Court take judicial notice of documents relating to the pleas and convictions of four Refco officers is overbroad.  "[C]ourts routinely take judicial notice of documents filed in other courts, … not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see also Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP*, 2008 WL 3166536, at *11 n.10 ("These indictments ... represent the government's theory of criminal liability, and GT advances no persuasive reason why the civil plaintiffs in this case should be bound by the government's criminal theory.").

[10]  Although the Complaint identifies RCM's outside directors by name (Compl. ¶ 101), there is no requirement that a complaint do so.  *See, e.g.*, *Wight*, 219 F.3d at 87 (holding that sole-actor exception did not apply to complaint that did not even allude to innocent insiders, much less (footnote continued)

even further than the allegation in *Global Crossing* that "not all relevant decisionmakers were complicit in defendants' scheme." 2006 WL 2212776, at *15. Indeed, it even satisfies the requirement imposed *after an evidentiary hearing* (*i.e.*, not at the pleading stage) by *Bennett Funding*: that the innocent insiders "could have stopped the fraud." 336 F.3d at 101. Accordingly, it is easily sufficient to render inapplicable the sole-actor rule at the pleading stage.

Mayer Brown disparages the allegation concerning RCM's outside directors because the Complaint "makes no effort to explain what their powers and responsibilities were" or to elaborate on *how* these innocent insiders could have stopped the fraud. (MB Br. 14-15; *see also* Inv. Banks Br. 10 n.9.) But none of the defendants cites a single authority in support of such a heightened pleading requirement; and *Wight* and *Global Crossing* hold that there is no such requirement. Moreover, the allegation in the Complaint that RCM's outside director and alternate outside director (partners in a prominent Bermuda law firm) would have been able to stop the looting of a Bermuda-registered company is more than plausible. The time for defendants to dispute this evidence and offer a contrary account is at summary judgment and/or trial, not on a motion to dismiss.

### 2. RGL.

The Trustee again goes well beyond what is necessary at the pleading stage, meeting the *Bennett Funding* requirement (applicable only after an evidentiary hearing) that the innocent insiders must have been in a position to stop the misconduct. Specifically, the Trustee alleges that there were innocent insiders at RGL "who would have put a stop to the fraudulent activity had they known about it." (Compl. ¶ 93.) As to one innocent insider at the time of the LBO, THL, the Complaint also alleges that "[h]ad THL learned the substance and scope of (a) the RGHI Receivable, (b) the

---

name them); *Global Crossing*, 2006 WL 2212776, at *15 (complaint referred to, but did not name, "relevant decisionmakers" who were not complicit in the wrongdoing).

RTLs, and (c) the resulting house of cards Refco relied upon, THL would not have gone ahead with the LBO, and the failure of the LBO transaction would have prevented RGL and its domestic subsidiaries from assuming $1.4 billion in new debt obligations." (*Id.* ¶ 118.)[11] Indeed, alleging that it was deceived in entering into the LBO, THL has commenced actions (both pending in this Court) against Mayer Brown and GT seeking damages for their alleged fraudulent conduct in connection with the LBO. (Complaints filed in *Thomas H. Lee Equity Fund V, L.P. et al. v. Grant Thornton LLP*, 07 Civ. 8663 (GEL) (S.D.N.Y.), Rand Decl. Exh C; *Thomas H. Lee Equity Fund V, L.P. et al. v. Mayer, Brown, Rowe & Maw LLP*, 07 Civ. 6767 (GEL) (S.D.N.Y.), Rand Decl. Exh. D.)

The Complaint also contains many allegations indistinguishable from that sustained in *Global Crossing* (that "not all relevant decisionmakers were complicit in defendants' scheme"). 2006 WL 2212776, at *15. (*See, e.g.*, Compl. ¶¶ 448 (there existed "innocent RGL directors, officers and agents, including inside counsel" who were ignorant of numerous material facts, including that "as a result of the [Insiders'] breaches of fiduciary duty, RGL was insolvent or operating in the zone of insolvency"); 456-57, 465 (similar); 467 (Refco Insiders made "material omissions and affirmative misrepresentations with the intent to deceive RGL, the innocent RGL directors, officers and agents, including inside counsel and others, so as to induce RGL to enter into an imprudent LBO which would solely benefit the Refco Insiders at RGL's expense."); 483, 494,

---

[11]    Mayer Brown makes the factual argument that "[u]ntil the LBO transaction was consummated, THL was not a shareholder or decision-maker of Refco; what THL may have done if it had discovered a fraud before the LBO accordingly has no bearing on the adverse interest inquiry." (MB Br. 15.) Mayer Brown is wrong. THL became a majority holder in RGL before the LBO debt was assumed by the entity or the LBO proceeds were distributed to the Insiders. (Compl. ¶ 113.) Had it learned of the fraudulent conduct of the Insiders and the defendants in the ensuing days or weeks, it could have unwound the LBO and prevented Refco from being harmed. Even aside from THL, the Complaint alleges the existence of other innocent insiders, including "inside counsel" (Compl. ¶ 448) Dennis Klejna, who was brought in as General Counsel to clear up the company's (footnote continued)

499, 504, 505, 511, 517, 523, 552, 561, 577, 586 (each referring to "the innocent RGL directors, officers and agents, including inside counsel and others").)

### 3.    Refco Inc.

The Complaint alleges that, as at RCM and RGL, innocent insiders existed at Refco Inc. (*Id.* ¶¶ 598, 600, 605, 616, 622 (referring to "Refco Inc.'s innocent directors, officers and agents, including inside counsel and others")), and further alleges – or at the very least supports an inference – that these innocent insiders were in a position to stop the IPO from going forward had they known the full facts, (*id.* ¶¶ 600-01 (alleging that facts were not disclosed to the innocent insiders and that "[a]s a proximate result … Refco Inc. undertook an IPO based on an inaccurate understanding of its financial condition and was thereby damaged"); 605-06, 616-17, 622-23 (similar)).    These allegations again exceed the allegation sustained in *Global Crossing*.

The Investment Bank Defendants argue that "the Trustee has not identified a single director or officer of Refco Inc. who could have prevented the alleged wrongdoing."  (Inv. Banks Br. 14 n.14.)  But the Trustee is not required to do so on a motion to dismiss.  *See* n.10, *supra*.  In any event, as is reasonably clear from the face of the Complaint, these innocent insiders included the independent outside directors of THL who were appointed to Refco's Board in November 2004 (Nathan Gantcher, Ronald O'Kelly, and Leo Brietman) and the General Counsel (Dennis Klejna) who was brought in to clear up the company's bad reputation with regulators.

### D.    Even If The Sole-Actor Exception Were Otherwise Applicable, Defendants Are Precluded From Invoking It Because They Knew The Refco Insiders Were Acting Adversely To The Companies' Interests.

We note at the threshold that this Court need not consider this argument unless it rejects our argument above that the sole-actor exception does not apply as a matter of law.  We establish here,

---

bad reputation with regulators.  Under *Wight* and *Global Crossing*, it must be inferred that Klejna (footnote continued)

in the alternative, that, even if the sole-actor exception does apply in the abstract, defendants are precluded from invoking it because they knew that the Insiders were acting adversely to the companies.  As the Seventh Circuit (through Judge Easterbrook) has explained:

> None of the 'sole actor' cases we could find allows the imputation of knowledge to the principal where the adverse party knew that the agent was acting adversely to his employer–where, indeed, the adverse party participated in the fraud.…  All of the cases … deal with innocent third parties.  They hold that as between the employer of a dishonest agent and a stranger …, the employer bears the responsibility – for it, at least, could select and monitor the agent. Exposure to liability then induces the employer to take cost-justified precautions.  Georgia-Pacific did not need J & W to take precautions to protect it from Wallenmeyer; it was not in doubt where Wallenmeyer's loyalty lay.

*Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 436 (7th Cir. 1992); *see generally* RESTATEMENT (THIRD) OF AGENCY § 5.04, cmt. c ("[W]hen the third party whose legal relations with the principal are at issue … has not dealt in good faith, the principal does not bear the risk that its agent may withhold relevant information or serve the agent's own purposes or those of another person…. [T]he third party should not benefit from imputing the agent's knowledge to the principal when the third party itself acted wrongfully or otherwise in bad faith.").

The Complaint amply alleges "circumstances," including the "magnitude of the benefit" the agent stands to gain, that would "place a reasonable third party on notice that the agent will withhold material information from the principal." RESTATEMENT (THIRD) OF AGENCY § 5.04, cmt. c.  As to all defendants, the Trustee has alleged that (1) defendants knew that the Insiders wanted to cash out their interests in Refco, but understood that this required Refco to be a successful, financially secure broker-dealer (Compl. ¶ 2); and (2)  neither the LBO nor the IPO served any legitimate business purpose (*Id.* ¶ 11; *see also id.* ¶¶ 9, 113, 121, 124-25 (mechanics of LBO); 10, 134-36 (mechanics of

---

would have stopped the corrupt Insiders' misconduct had he known about it.  (*Id.* ¶ 93.)

IPO)).   As to the Professional Defendants (Mayer Brown, GT, Ernst & Young, PwC, and the Investment Bank Defendants), the Trustee has further alleged that they understood that the effect of the LBO "was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, so as to put cash in Refco Insiders' pockets, leaving RGL and RCM without any assets to satisfy their outstanding obligations to their creditors."  (*Id*. ¶¶ 129-130.)

Other allegations provide further basis for a conclusion that the defendants knew that the Insiders were acting adversely to the companies' interest.  For example:

- "[T]he most blatant indication that GT, MB, and PwC understood that the Refco Insiders were attempting to hide hundreds of millions of dollars in undisclosed related party receivables was the conscious editing of SEC disclosure documents to hide the RGHI Receivable."  (*Id*. ¶ 139.)

- GT was aware as early as 1998 of Bennett's plan to sell because Bennett informed GT that he "intended to restructure Refco over the next 3-10 years" and "increase earnings and maintain RGL's book value" because he and others working with him wanted to liquidate their positions.  (*Id*. ¶ 108.)

- The Professional Defendants did not disclose the RGHI Receivable on the S-1 Registration statement that was prepared in connection with Refco Inc.'s IPO, despite the fact that none of the Professional Defendants sought or received any confirmation that the $105 million portion of the Receivable disclosed as "from equity members" had actually been paid down.  (*Id*. ¶¶ 143-145.)

- As the Examiner found, "no later than February 6, 2002," and possibly long before that, "[Mayer Brown] knew that the ultimate goal of ... Bennett and other [Refco employees] ... was to sell RGL."  (*Id*. ¶ 110.)

- Mayer Brown knew from working on the LBO that the proceeds were not used to retire the RGHI Receivable, pay the operating expenses that were concealed on RGHI's books, or repay any of the loans owed to RCM, which amounted to over $2 billion; instead, as Mayer Brown knew, the LBO proceeds were distributed to Refco Insiders. (*Id*. ¶¶ 121, 128, 129.)

- "In 2001 and 2002, the Refco Insiders hired Credit Suisse to try to find a major investment bank to purchase Refco outright.  Credit Suisse was unable to identify a suitable purchaser." *Id*. ¶ 106.  After efforts to sell Refco outright failed, Credit Suisse developed other ways through which the Refco Insiders could sell all or a portion of the company.  (*Id*. ¶ 111.)

- As evidenced by a "greenshoe" option whereby the Investment Bank Defendants agreed to purchase common shares of Refco with the over-allotment paid to Refco's IPO shareholders, the IPO was structured with the primary goal of cashing out the Insiders, as opposed to raising funds to reduce the LBO debt.  (*Id*. ¶ 135-36.)

Whether the Trustee can prove these allegations is a matter for summary judgment and/or trial.  On a motion to dismiss, the allegations easily support an inference that the defendants knew that the Insiders were acting adversely to the interests of the companies and therefore that the defendants may not rely upon the sole-actor exception to the adverse-interest exception.

### E.    The Trustee Need Not Further Allege That The Debtor Companies' Injuries Are Distinct From Those Of The Creditors, But In Any Event Has Done So.

We acknowledge that this Court, in determining whether a plaintiff asserting estate claims has standing, has undertaken both (1) a *Wagoner* analysis *and* (2) an analysis whether the debtor's injuries are distinct from those sustained by individual creditors.  *See Global Crossing*, 2006 WL 2212776, at *13-16 (first addressing distinctness of injuries, then addressing *Wagoner*); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 90-98 (S.D.N.Y. 2004) (same). The Trustee respectfully submits, however, that the Second Circuit's recent decision in *CBI* treats these inquiries as one and the same.  *See* 529 F.3d at 447-53 (addressing *only Wagoner*, not distinctness of injuries).  This is because the *Wagoner* inquiry is designed to answer the very question whether the "'claim accrues … to creditors, [or] to the guilty corporation.'"  *Id.* at 447 (quoting *Wagoner*, 944 F.2d at 120).  If the former, then the Trustee lacks standing; if the latter, the Trustee has standing.  Defendants GT and Mayer Brown appear to agree, as they, like *CBI*, address only *Wagoner*.  (GT Br. 5-13; MB Br. 7-15.)

But even if a plaintiff must make a distinctness-of-injuries showing above and beyond satisfying (or, to be precise, avoiding) *Wagoner*, the Trustee has clearly done so.  Again, it is helpful to consider the three companies in turn.

1.    **RCM.**

Contrary to defendants' arguments (Inv. Banks Br. 7; CIM/Ingram Br. 9 n.4; PwC Br. at 21-22), RCM's injury is indeed distinct from the injury sustained by RCM's foreign exchange customers. The injury suffered by the customers consists of the "money and property [they] entrusted to RCM," which "[t]he Refco Insiders simply took … and sent … to other Refco entities" and which were never given back to the customers. (Compl. ¶ 95.) On the other hand, the injury suffered by RCM is the impairment, caused by the RGHI Receivable scheme, the LBO and the IPO, of the receivables owed to RCM by the other Refco entities. (*Id.* ¶¶ 357, 368, 395, 408, 434, 439, 444.)[12] These receivables were comprised of RCM's *own* assets, including customer deposits that the Insiders had converted.

To be sure, the injury suffered by RCM may appear to overlap with the injury suffered by RCM's customers. But it is not identical, and the extent of overlap cannot be determined at the pleading stage. Suppose, for example, that RCM's FX customers entrusted it with $75; the Insiders caused RCM to transfer $150 ($75 of customer deposits that the Insiders converted, plus $75 in other RCM assets) to other Refco entities; and the Insiders engage in misconduct that deprives those other entities of the ability to repay any of the $150. In this situation, RCM has suffered an injury of $150 that is distinct from, even if it appears to overlap with, the injury sustained by RCM's FX customers.

---

[12]    The Investment Bank Defendants contend (Inv. Banks. Br. 19) that, according to the Complaint, RGL never had the ability or intention to repay the amounts owed. The Complaint alleges that, given the RGHI Receivable scheme, before the LBO, RGL and its affiliates had "*essentially* no ability and no intention of repaying the RCM customer funds." (Compl. ¶ 7.) However, the proceeds of the LBO could have been used to repay RCM. Instead, the LBO subordinated the repayment of the amounts owed to RCM to over $1 billion in new debt and cashed out the Insiders with the proceeds, further impairing the ability of RGL and its affiliates to repay these amounts to RCM. The allegations in the Complaint amply put the Investment Bank Defendants on notice of the "claims and factual ground upon which the claims are based." *Di Vittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1058 (2d Cir. 1993).

To the extent that the customers stand to receive (as creditors of RCM) the $75 that the Trustee recovers on behalf of RCM, as well as the $75 they may recover in their separate action, this potential for double recovery can be avoided through careful jury instructions, a remittitur, or some other mechanism.  *Cf. Global Crossing*, 2006 WL 2212776, at *15 (discussing *In re Symbol Tech. Sec. Litig.*, 762 F. Supp. 510, 518 (E.D.N.Y. 1991), in which damages awarded in first action were "'held in trust pending the resolution of related proceedings'").  It is not, however, a basis for granting a motion to dismiss, especially when it is unclear at this stage whether either of the Trustee's suits (*i.e.*, this one and the one on behalf of the FX customers) will result in a damages award and in what amount.[13]  Nor does it raise a standing issue.[14]

---

[13]   It is telling that Mayer Brown and GT argue that RCM's claims are barred by *in pari delicto*, while at the same time asserting that the foreign exchange customer claims asserted by the Trustee of the Private Actions Trust (*Kirschner v. Bennett et al.*, 07-Civ.-8165 (GEL) (the "FX Customer Action")) should be dismissed as derivative claims to be brought only by the Trustee. (Mayer Brown & GT Memoranda of Law in Support of Motions to Dismiss in No. 07-Civ.-8165 at 7-12 and 6-9, respectively.)  The most logical course is to let the various cases go forward and if there is a genuine issue that damages are being duplicated, the parties can address the issue at the appropriate time.

[14]   Citing *Hirsch v. Arthur Andersen & Company* and *American Tissue*, the Investment Bank Defendants contend (Inv. Banks Br. 7) that the Trustee lacks standing to assert claims on behalf of RCM because he "has ... alleged no more than that RCM was damaged to the extent that it was unable to return what he asserts were its customers' stolen assets."  Neither *Hirsch* nor *American Tissue* applies here.  In both of those cases, the trustee and debtor-in-possession, respectively, pled that their injuries (and the measures of their damages) were directly related to (and not distinct from) the losses sustained by their creditors as a result of the debtors' bankruptcies.  *Am. Tissue*, 351 F. Supp. 2d at 90-91; *Hirsch*, 178 B.R. 40, 43 (D. Conn. 1994).  Here, in sharp contrast, the Complaint alleges that RCM was injured because *its assets* were wasted at a time that its directors were duty-bound to preserve the company's assets for the benefit of its creditors.  (Compl. ¶¶ 352, 360, 364.)

Notably, as discussed in note 13, *supra*, at least two of the defendants agree that the Trustee has standing to seek redress for the injury inflicted on RCM.  While the Investment Bank Defendants assert (incorrectly) that the Trustee lacks standing to assert RCM's claims because these claims belong to RCM's customers, in the FX Customer Action GT and Mayer Brown vigorously argue to the contrary.  *See* Memorandum in Law in Support of Grant Thornton LLP's Motion to Dismiss the Complaint in the FX Customer Action, at 6-7 ("[A]ll losses suffered by FX Customers are entirely derivative of losses suffered by RCM itself.... Claims for these damages therefore belong to the RCM's estate, and only the estate has standing to bring them."); (footnote continued)

In any event, even if RCM suffered no damages distinct from the customers, the aiding and abetting breach of fiduciary duty claims must survive because, under New York law, "a showing of damage to a corporation is unnecessary to assert a fiduciary duty claim, and … in lieu of damages, the defendants' profits arising from the breach can be disgorged to the corporation." *Global Crossing*, 2006 WL 2212776, at *14. Here, those profits consist of the fees and other benefits obtained by defendants as a result of their dealings with the Refco entities.

### 2. RGL.

RGL's injury is distinct from the injuries of RCM (as noted, the impairment, caused by the RGHI Receivable scheme, the LBO and the IPO, of the RCM receivable owed to RCM by the other Refco entities) and of the RCM foreign exchange customers (as noted, the loss of money or property they entrusted to RCM). RGL was damaged to the extent that money was taken out of RGL or wasted. (*See, e.g.*, Compl. ¶¶ 444, 452, 460, 476, 484, 490, 495, 500, 506, 513 (RGL damaged when it "distributed its assets to the Refco Insiders and other RGL equity holders").) In addition, RGL's viability as a going concern was impaired by undertaking an LBO, the public registration of its bonds, and the IPO, all on the basis of false financial statements and the concealment of the Insiders' fraudulent scheme.

### 3. Refco Inc.

Refco Inc.'s injury is distinct from the injuries suffered by the other Refco entities  and by RCM's foreign-exchange customers. Specifically, Refco Inc. was injured because (a) it "was

---

Memorandum of Law in Support of Defendant Mayer Brown LLP's Motion to Dismiss the Complaint in the FX Customer Action, at 7 ("The Trustee's claims on behalf of the FX customers are entirely derivative of RCM's claims."). Because the claims and injuries suffered by RCM and the FX customers are entirely distinct, GT and Mayer Brown are, however, mistaken when they contend that the FX customers lack standing, an issue that will be addressed in the opposition to the motions to dismiss filed in the FX Customer Action.

saddled with hundreds of millions of dollars in liabilities to the purchasers of Refco [Inc.] stock in the IPO who had claims against Refco [Inc.] based on its false and misleading registration statement and prospectus" (*id.* ¶ 137);[15] and (b) it used "$231 million in proceeds from the IPO … to retire part of RGL's LBO debt" (*id.* ¶ 136), a plainly wasteful expenditure given that RGL was operating in the zone of insolvency and there was no need to retire its debt. These injuries are distinct from those of RGL (the wasting of money taken out of RGL and the impairment of RGL's viability as a going concern); RCM (the impairment, caused by the RGHI Receivable scheme, the LBO and the IPO, of the RCM receivable owed to RCM by the other Refco entities) and of the RCM foreign exchange customers (the loss of money or property they entrusted to RCM).

Contrary to the Investment Bank Defendants' characterization (Inv. Banks Br. 12-13 (citing *Am. Tissue*, 351 F. Supp. 2d at 93-94 & n.14)), the Trustee does not contend that the infusion of cash into Refco Inc. at the instant of the IPO caused Refco Inc.'s injury. Rather, it was the consequences of the IPO – specifically, the wasteful use of that cash infusion and the incurrence of securities fraud liability to purchasers in the IPO – that caused the injury. To be sure, those consequences would not have occurred but for the IPO; but that is no basis to deny recovery. Indeed, the very decision cited by the Investment Banks, *American Tissue*, recognizes that events surrounding an equity infusion can cause injury to a corporation. *See* 351 F. Supp. 2d at 93 ("unanticipated and allegedly unfavorable loans [in connection with the equity infusion] conceivably injured ATI").

---

[15] This allegation supports the inference that Refco Inc. suffered reputational damage. *See Am. Tissue*, 351 F. Supp. 2d at 94 n.15 ("ATI does not allege that the false information in the prospectus caused it reputational damage or any other injury that conceivably harmed the corporation as distinct from its investors.") If the Trustee is required explicitly so to allege, the Trustee respectfully requests leave to do so. *See* Point X, *infra*.

## II.     THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR AIDING AND ABETTING FRAUD AND BREACH OF FIDUCIARY DUTY

As this Court recently re-affirmed in sustaining THL's claim against GT for aiding and abetting the Insiders' fraud, "[a] defendant must meet a stringent standard in order to obtain dismissal for failure to state a claim.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Thomas H. Lee Equity Fund V, L.P. v. GT LLP*, 2008 WL 3166536, at *4 (S.D.N.Y. Aug. 6, 2008) (internal quotations marks and citation omitted).[16]  To sustain its claims at the pleading stage, the plaintiff need only set forth facts sufficient to "'raise the right to relief above the speculative level.'"  *Id.* at *5 (quoting *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1974 (2007)).[17]

---

[16]     *See also IUE AFL-CIO Pension Fund*, 9 F.3d at 1058 (where a "thorough reading of the Complaint puts the defendant on fair notice both as to the claims and the factual ground upon which the claims are based," and where "a more particularized account of the fraud claims [can] only be established through discovery," the complaint should not be dismissed); *Houbigant, Inc. v. Deloitte & Touche L.L.P.*, 303 A.D.2d 92, 97 (N.Y. App. Div. 2003) ("[A]t the pleading stage of a fraud claim against an accountant, the plaintiff need not be able to make an evidentiary showing of exactly what the accountant knew as to falsehoods in the certified financial statements.").

[17]     Citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), Mayer Brown and PwC argue that the facts alleging knowledge of fraud are sufficient "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw."  (MB Br. 23-24; PwC Br. 8-9.)  In *Tellabs*, however, the Supreme Court was commenting on the heightened degree of fraudulent intent required under the securities laws pursuant to the Private Securities Litigation Reform Act ("PSLRA").  In any event, this Court previously rejected a nearly identical argument to that made by Mayer Brown and PwC here.  *See Winnick*, 406 F. Supp. 2d at 251 n.2 ("While the Second Circuit has equated its 'strong inference' requirement under Rule 9(b) with that contained in the PSLRA, it has not addressed itself to what, if any, impact the PSLRA or Rule 9(b) have on the inferences permissible on a motion to dismiss.  But this Court can detect no move away from permitting fraud plaintiffs all reasonable inferences.").

The Trustee's allegations supporting his aiding and abetting claims far exceed this minimum pleading standard, raising strong inferences that each defendant knew about and substantially assisted the Insiders' fraud and breaches of fiduciary duties.[18]

### A.    The Trustee Has Sufficiently Alleged The Underlying Fraud And Breaches Of Fiduciary Duty Of The Refco Insiders.

Defendants cannot seriously contest the adequacy of the Complaint's allegations regarding the underlying fraud and breaches of fiduciary duty.  Insiders Bennett, Maggio, Trosten, and Grant have either pleaded guilty or been found guilty of engaging in the same fraudulent acts and misconduct upon which the Trustee's claims here are based.

Nonetheless, Mayer Brown erroneously asserts (MB Br. 21) that the Complaint is deficient because it "does not explain *how* [the innocent insiders and outside directors] were misled or on what exactly they relied.  It does not allege that they actually read any of the allegedly misleading financial statements." (*Id.*)  This argument is baseless.  First, the Complaint sets forth in elaborate detail the Insiders' various omissions upon which the innocent insiders relied.  (Compl. ¶¶ 360, 465); *see also Guilbert v. Gardner*, 480 F.3d 140, 147 n.5 (2d Cir. 2007) (a claim for fraud under New York law may be based on misstatements or omissions).)  Second, the Complaint alleges that RCM's financial statements affirmatively misrepresented the true state of the Company and that the innocent insiders relied on the financial statements. (*Id.* ¶¶ 361-63, 463-64, 467, 472.)

In addition, the Complaint explains why the innocent insiders were justified in relying on the Insiders' misrepresentations and omissions (*id.* ¶¶ 364-66, 469), and that the innocent insiders would

---

[18]    A claim for aiding and abetting fraud or breach of fiduciary duty requires the plaintiff to prove (i) the existence of a fraud or breach of fiduciary duty, (ii) the defendant had knowledge of the fraud or breach of fiduciary duty, and (iii) the defendants provided substantial assistance to advance the commission of the fraud or breach of fiduciary duty.  *See Winnick*, 406 F. Supp. 2d at 252; *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 360 (2d Cir. 2007).

have sought the repayment of amounts owed to RCM, and prevented the further transfer of RCM's assets, the LBO, and the IPO had they not been misled by the Insiders' misrepresentations and omissions. (*Id.* ¶¶ 363, 365, 369, 470-73.) In any event, so long as the alleged reliance is not unreasonable as a matter of law (and Mayer Brown does not suggest that it is), whether or not the innocent insiders were "justified" in relying on the Insiders' omissions and misrepresentations is appropriately resolved by the fact-finder; the issue may not be resolved on the pleadings.[19] *See Thomas H. Lee*, 2008 WL 3166536, at *12-13; *see also Foy v. Pratt & Whitney Group*, 127 F.3d 229, 235 (2d Cir. 1997) ("reasonable reliance" determined by fact-finder); *Kimmell v. Schaeffer*, 89 N.Y.2d 257, 263-64 (1996) ("justifiable reliance" determined by fact-finder).

The only substantive challenge to the allegations of the Insiders' underlying breaches of fiduciary duties is raised by the Investment Bank Defendants. The Investment Bank Defendants contend (Inv. Banks. Br. 16 n.15) that because RCM was a wholly owned subsidiary of RGL, Bennett and Maggio were obligated to operate RCM in the best interests of RGL and could therefore transfer RCM's assets to RGL for the latter's benefit, implying that the transfer of RCM's assets was not a breach of fiduciary duty. As the Investment Banks acknowledge, however, the Complaint alleges that RCM was at all relevant times insolvent or operating in the zone of insolvency. (*Id.*; Compl. ¶¶ 443-44.) Consequently, RCM's directors had a duty to safeguard its assets for the benefit of its creditors and could not simply transfer assets out of RCM – knowing they would not be returned – to bolster the illusion that RGL was a lucrative, healthy company. *See N. Am. Catholic*

---

[19]     Mayer Brown's reliance on *American Financial International Group-Asia, L.L.C v. Bennett*, 2007 WL 1732427 (S.D.N.Y. June 14, 2007), is misplaced. In stark contrast to the "cursory" and "general" allegations of reliance asserted there, *Bennett*, 2007 WL 1732427, at *9, the Trustee here describes in detail the precise omissions and misstatements upon which the innocent insiders and outside directors relied.

*Ed. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007) (in insolvency, directors have a duty to maintain the value of the corporation because "[t]he corporation's insolvency 'makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value.'" (citation omitted)); *see also RSL Commc'ns PLC v. Bildirici*, 2006 WL 2689869, at *8-9 (S.D.N.Y. Sept. 14, 2006) (once a company enters the "zone of insolvency ... the directors of the subsidiary must consider the *subsidiary's* creditors' interests in addition to the parent's interests.") (emphasis in original)); *Hughes v. BCI Int'l Holdings, Inc*., 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006) ("Under New York law, directors of an insolvent corporation owe a duty to preserve the assets of the corporation for the benefit of creditors." (citation omitted)); Declaration of David R. Kessaram, dated Aug. 27, 2008, Rand Decl. Exh. E (under Bermuda law, "when a company is insolvent or in the zone of insolvency, although his duties are still to the company, the company's interests are treated as being the interests of its creditors and it is to their interests that the director must have regard in exercising his powers and duties.").

### B. The Trustee Has Sufficiently Alleged Defendants' Knowledge Of The Insiders' Fraud And Breaches Of Fiduciary Duties.

A claim for aiding and abetting fraud need not allege direct evidence of knowledge of the fraud; circumstantial evidence is sufficient. *See Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007) ("[E]vidence of fraud is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inferences therefrom." (internal quotation marks and citation omitted)); *Dreieck Finanz AG v. Sun*, 1990 WL 11537, at *4 (S.D.N.Y Feb. 9, 1990) ("Although the complaint does not allege any particular instances which show directly that [the defendant] knew of the fraud, it alleges facts that amply support the inference that she knew of the underlying principal violations.").  Moreover, courts in this district have held that conscious disregard, or willful blindness, of the underlying fraud or breach of fiduciary duty

satisfies the knowledge element of an aiding and abetting claim.[20]  *See, e.g.*, *Fraternity Fund*, 479 F. Supp. 2d at 367-68; *Cromer Finance Ltd. v. Berger*, 2003 WL 21436164, at *9 (S.D.N.Y. June 23, 2003); *Wight v. Bankamerica Corp.*, 1999 WL 199021, at *8 (S.D.N.Y. Apr. 8, 1999) (willful blindness is "legally equivalent" to actual knowledge for purposes of an aiding and abetting fraud claim).

More than meeting these standards, the Complaint alleges the defendants' actual knowledge of the Insiders' fraud and breaches of fiduciary duty.  Indeed, some of the defendants readily acknowledge that the Trustee's allegations raise a strong inference that the defendants knew the Insiders were engaged in improper conduct; these defendants argue only that the Trustee's allegations do not establish that the defendants knew the exact magnitude, the precise mechanics, or the ultimate purpose of the fraud.  (CIM/Ingram Br. 19; Memorandum of Law in Support of Liberty Corner's and William T. Pigott's Motion to Dismiss ("LC Br.") at 16; MB Br. 28.  But such specificity is not required at the pleading stage, and even if it were required and is lacking here (the Trustee does not concede either point), it is only because defendants intentionally avoided asking obvious questions or further investigating red flags.  As noted above, it is well-established that such conscious disregard or willful blindness of fraudulent conduct does not immunize a defendant from aiding and abetting liability.  *See Fraternity Fund*, 479 F. Supp. 2d at 367-68; *Cromer Finance Ltd.*, 2003 WL 21436164, at *9.

---

[20]  *Pension Committee of the University of the Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163, 201 n.279 (S.D.N.Y. 2006), cited by Mayer Brown (MB Br. 23), states in *dicta* that "recklessness or willful blindness" is not equivalent to actual knowledge. However, each of the authorities cited by the court in support of this proposition refers only to recklessness; none holds or even suggests that willful blindness is not equivalent to knowledge.

Moreover, defendants' contention that their awareness of "red flags" is insufficient to create an inference of knowledge in the absence of evidence that they connected the dots is simply false. *See Thomas H. Lee*, 2008 WL 3166536, at *10 (plaintiffs' allegations of knowledge sufficient where "the complaint sets forth numerous red flags that purportedly alerted GT to the Refco fraud"); *In re Refco Secs. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("The red flags on which plaintiffs rely are glaringly suggestive of fraud ... to those who were or should have been aware of them."); *see also Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115-16 (2d Cir. 1986) (third-party can be held liable for aiding and abetting breach of fiduciary duty for failing to investigate despite "red flags flying all over the place"); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 335 (S.D.N.Y. 2001) (holding that the scienter element of Rule 9(b) is satisfied where "a strong inference of willful blindness is stated on the face of the complaint through [] allegations of [] various 'red flags'"). [21]

As shown below, defendants' more specific attacks on the Trustee's allegations are no more persuasive than the general ones just discussed.

### 1.    GT.

GT erroneously asserts that the aiding and abetting claims against it are supported by only three specific allegations of knowledge: (1) GT partner Mark Ramler ("Ramler") was, at some point, aware of a large receivable from RGHI; (2) Ramler's note regarding one of the RTL transactions; and (3) GT's Management Letter identifying deficiencies at Refco.  (GT Br. 20.)  In fact, the Complaint includes fifty paragraphs of additional allegations that, together with the allegations referenced by GT, support the strong inference that GT knew of the Insiders' fraud and breaches of

---

[21]   To the extent that that the Trustee's aiding and abetting claims are subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard, this Court previously has stated that the standard is satisfied with respect to aiding and abetting claims if the fact alleged raise a "strong inference of fraudulent intent."  *Winnick*, 406 F. Supp. 2d at 252 (internal quotation marks and citation omitted).  As demonstrated below, the Complaint's allegations meet this standard.

fiduciary duty. (Compl. ¶¶ 151-204.) This Court recently sustained THL's aiding and abetting claims against GT based on similar allegations. *See Thomas H. Lee*, 2008 WL 3166536, at *11.

Specifically, the Complaint alleges that Ramler was concerned about the RGHI Receivable while he was at Arthur Andersen, before he even came to GT. (Compl. ¶¶ 162-63.) These allegations are particularly relevant in light of the Trustee's other allegations that: (1) before the Refco engagement was accepted, Ramler informed GT that Refco was at "high risk" of material misstatements arising from related-party transactions between Refco and RGHI (*id.* ¶¶ 162-63, 182); (2) Ramler was aware that RGHI was a "shell" entity with no operations, and whose financial results were not consolidated with Refco's (*id.* ¶ 162); (3) Ramler knew that RGHI's owners were looking to sell Refco, and therefore had an interest in improving Refco's apparent financial condition (*id.* ¶ 162-63); (4) in violation of GAAS and its own audit plan for Refco, GT purposefully failed to test the RGHI Receivable (*id.* ¶¶ 166-72); (5) as the RGHI Receivable became larger, GT stopped requiring Refco to provide certain key documents that Refco had previously provided in every prior audit – in particular, the "Schedule of Loans to Stockholders and Unconsolidated Affiliates" (*id.* ¶ 170); and (6) after being told by Bennett that the RGHI Receivable would be paid down, GT did nothing to verify whether it was in fact paid down (*id.* ¶ 165).

These allegations amply support the inference that GT was aware that the RGHI Receivable was substantially larger than the amount disclosed in Refco's financial statements. *See In re Global Crossing, Ltd. Secs. Litig.*, 322 F. Supp. 2d 319, 347 (S.D.N.Y. 2004) (allegation that "[auditor] ignored numerous red flags, and was aware of and itself perpetrated numerous GAAP and GAAS violations in connection with [its audits]" supported inference of fraudulent intent); *In re Complete Mgmt.*, 153 F. Supp. 2d at 334 (scienter adequately pleaded where auditor failed to investigate receivables owed by shareholder); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290,

36

295 (S.D.N.Y. 1999) ("egregious refusal to see the obvious, or to investigate the doubtful" supports inference of scienter).

GT next contends that the Trustee errs in inferring GT's knowledge of the RTL scheme from a handwritten note by Ramler that, according to GT, "could be interpreted in any number of ways." (GT Br. 20-21.) This contention is incorrect for two reasons. First, Ramler's note does not stand alone; GT ignores numerous other allegations regarding GT's knowledge of the RTLs. The Complaint alleges, for example, that: (1) in its 2003 audit of RCM, GT identified large period-end transactions between RCM and two of the RTL defendants (Liberty Corner and Delta Flyer), which were timed to straddle Refco's year-end (*id.* ¶ 176); (2) in its 2004 audit, GT specifically noted that a $720 million, period-end, *unsecured* loan to Liberty Corner was mischaracterized as a "reverse repo" (*id.* ¶ 177); and (3) although applicable auditing standards required GT to investigate these loans, GT refrained from doing so (*id.* ¶¶ 176-78, 183). Significantly, these loans were in amounts substantially more than Refco's stated capital. (Compl. ¶¶ 84, 329.)

Second, particularly when considered in light of the Trustee's other allegations, Ramler's note is hardly "vague." (GT Br. 20.) "In Ramler's own handwritten notes, Ramler writes the words '$450,000 million' and 'contract loan,' with a line drawn between '$450,000' and the words Liberty Corner Capital Strategy Fund LLC (one of the RTL defendants). Next to the name Liberty Corner appear the words 'mature transaction' and below it are the words 'clean-up of interco accounts.'" (Compl. ¶ 179.) The note thus unambiguously describes the $450 million RTL between RCM, RGHI, and Liberty Corner on May 31, 2005, which was used to "clean up" Refco's inter-company accounts. (*Id.*) Thus, reasonable jurors could find that the note confirms Ramler's knowledge of the RTLs and his understanding of their fraudulent purpose.

GT's final contention – that it would not have authored the Management Letter criticizing Refco's internal controls if it had been aware of the fraud (GT Br. 20) – misses the point. It is irrelevant that GT *privately* urged the Insiders to strengthen Refco's internal accounting function in advance of the LBO. When it came to *public* disclosure of the letter or even disclosure beyond the Insiders' tight circle (which would have invited scrutiny of Refco's financial statements), GT watered down its critique, issuing a new letter in which it deleted all references to "significant deficiencies." (*Id.* ¶¶ 190-96.) Tellingly, GT ignores these allegations.

Notably, GT does not contest the sufficiency of the Trustee's allegations concerning GT's knowledge of the transfer of RCM assets to other Refco entities. Nor could it. As alleged in the Complaint, in its 2003, 2004, and 2005 audits of RCM, GT reviewed material information concerning the intercompany transfers of RCM customer assets. (*Id.* ¶¶ 185-89.) Thus, GT knew that at the time of the LBO over a billion dollars in receivables from un-creditworthy Refco entities had been misleadingly booked as "receivables from customers." (*Id.*) The Complaint further alleges that although GT knew that these loans were impaired, it failed to disclose this fact. Finally, GT knew that the LBO further impaired RGL's and its affiliates' ability to repay these amounts. (*Id.* ¶¶ 113, 126-32, 504.)

In sum, these allegations, coupled with Ramler's longstanding concerns regarding the "high risk of material misstatement" posed by related-party transactions between Refco and RGHI (*id.* ¶ 162), amply support a strong inference of GT's actual knowledge of the underlying fraud and breaches of fiduciary duty. *See Thomas H. Lee*, 2008 WL 3166536, at *11; *Houbigant, Inc. v. Deloitte & Touche LLP*, 303 A.D.2d 92, 97 (N.Y. App. Div. 2003) ("[A]t the pleading stage of a fraud claim against an accountant, the plaintiff need not be able to make an evidentiary showing of exactly what the accountant knew as to the falsehoods in the certified financial statements.").

### 2.    Mayer Brown.

The Complaint alleges Mayer Brown's (1) role as primary outside counsel to both Refco and RGHI throughout the relevant period (Compl. ¶¶ 206, 209), (2) role in negotiating and drafting the documents for each of the eighteen fraudulent RTLs (*id.* ¶¶ 213-27), (3) knowledge of the RGHI Receivable (*id.* ¶¶ 140, 210-11), and (4) knowledge of the diversion of RCM customer assets to fund Refco's operations (*id.* ¶¶ 229-31).   Given these allegations, and the indictment of Mayer Brown partner Joseph Collins for conspiring to commit the very fraud here alleged, Mayer Brown is hard-pressed to argue that the Complaint fails adequately to allege Mayer Brown's knowledge of the Insiders' fraud and breaches of fiduciary duties.[22]

Concerning Mayer Brown's knowledge of the RGHI Receivable, for example, the Complaint discusses a decisive piece of evidence: a June 11, 2002 Letter Agreement between RGL and RGHI that was an early draft of what became the Proceeds Participation Agreement discussed in the Collins Indictment.  (Compl. ¶ 211; Letter Agreement, Rand Decl. Exh. F; Collins Indictment, Rand Decl. Exh. B.)  In the Letter Agreement, RGL agreed that "$350 million" would be used "for the retirement of related party debt of [RGHI]."  (Compl. ¶ 211' Letter Agreement § 11.1.)  As of June 11, 2002, therefore, Mayer Brown was aware that the RGHI Receivable was *at least* $350 million, substantially more than any amount ever disclosed in Refco's financial statements.

---

[22]    The Complaint also alleges that Mayer Brown structured and drafted all the deal documents for the Minglewood scheme, in which Refco hid a $6.3 million "bad debt" from Deere Park Capital LLC ("Deere Park") by creating a shell company – Minglewood Investments LLC – to which it sold the debt for face value.  (Compl. ¶ 212.)  A Deere Park principal testified under oath that he had conversations with a Mayer Brown attorney regarding the fact that Refco was entering the transaction for the sole purpose of being able to avoid having to write off the bad debt.  (*Id.*)  Significantly, Mayer Brown does not refute this allegation or even address the Minglewood transaction in its brief.

Contrary to Mayer Brown's assertion (MB Br. 28), whether Mayer Brown knew the full extent of the RGHI Receivable is irrelevant. The Complaint alleges that Mayer Brown, aware that RGHI owed Refco hundreds of millions of dollars (substantially more than was disclosed in Refco's financial statements), and knowing that the Insiders were trying to improve Refco's apparent financial condition in order to sell the company, negotiated and drafted the documents for eighteen RTLs (Compl. ¶¶ 213-17) – transactions whose sole and obvious purpose was to hide related-party debt. The RTLs involved lending hundreds of millions of dollars in *uncollateralized* loans from RCM, *through a third party*, to RGHI for a period of only a few days spanning Refco's year and quarter ends. (*Id.*; *see also In re Refco*, 503 F. Supp. 2d at 648 ("The [RTLs] were certainly large, and their timing, recurrent nature, and obvious lack of business purpose would certainly have been suspicious to anyone who became aware of them.").) Mayer Brown also drafted guaranties and indemnity agreements to ensure the loans were entirely *risk-free* for the RTL participants. (*Id.* ¶ 224.) That there was no legitimate business purpose to these loans, and that they were designed to conceal related-party indebtedness in Refco's financial statements was thus patently clear from the very terms of the RTLs.

In response, Mayer Brown makes the factual argument that it had no idea the loans were fraudulent because they might have had a legitimate business purpose. (MB Br. 30.)[23]  But such factual issues may not be resolved on the pleadings. *See Winnick*, 406 F. Supp. 2d at 258; *Levine v. Torino Jewelers, Ltd.*, 2006 WL 709098, at *4 (S.D.N.Y. Mar. 22, 2006) ("[T]he complaint must simply make allegations that, if true, would allow a fact-finder to deem defendant liable for plaintiff's injury; it need not ... show that no other interpretation of the facts is possible."). Nor does

Mayer Brown's idle speculation as to what legitimate purposes the RTLs *might* have been intended for have any merit. Each of Mayer Brown's explanations assumes that RGHI had its own trading operations. (*See, e.g.*, MB Br. 30 ("the purpose of the loans was ... to provide RGHI with short-term liquidity, which is unremarkable for financial institutions and brokerage houses.... RGHI could have wanted the money for a cyclical investment or trading opportunity.").)[24] But Mayer Brown knew that RGHI was merely a holding company with no operations of its own. (Compl. ¶¶ 162, 209-10.)

Mayer Brown also errs in contending (MB Br. 25-27) that the Trustee has failed to allege facts that raise a strong inference that Mayer Brown was aware of the transfer of RCM's assets to the other Refco affiliates. The Complaint alleges that, as Refco's primary outside counsel, Mayer Brown performed a range of services for the company, including advising RCM on regulatory matters. (Compl. ¶¶ 41, 206, 222, 233.) For example, in a June 2002 draft memorandum, prepared around the same time that RCM's operations were being repatriated to the United States, Mayer Brown expressed concern that Refco might conduct RCM's securities-related activities in such a way as to make them subject to United States regulatory requirements, including, *inter alia*, segregation requirements. (*Id.* ¶¶ 228-29.) Three years later, on the very day the fraud was coming to public light, Mayer Brown, in an attempt to "paper the file," drafted a memorandum stating that RCM was required to comply with United States broker-dealer regulations or transfer its securities customers to a regulated Refco entity. (*Id.* ¶¶ 233-34.)

---

[23] Notably, although Mayer Brown identifies (MB Br. 30 n.16) several purposes for which back-to-back loans may legitimately be used, it does not suggest that it thought the RTLs were conducted for any of these purposes.

[24] While Mayer Brown contends (MB Br. 31) that "privately-held parent companies [] obtain liquidity for themselves or their shareholders by borrowing money from their subsidiaries," it fails to explain why RGHI did not simply borrow *directly* from RGL or RCM, or why RGL would guarantee RGHI's short-term liquidity "borrowings." (Compl. ¶ 224.)

Contrary to Mayer Brown's argument (MB Br. 27), the 2002 and 2005 memoranda, in conjunction with the Complaint's allegations regarding Mayer Brown's active involvement in all the other facets of the Insiders' fraudulent scheme, support the strong inference that Mayer Brown knew that: (1) the regulatory status of RCM's operations was, at best, questionable; (2) RCM's securities operations were, upon repatriation to the United States, subject to domestic regulation and RCM should have been segregating at least its securities deposits; (3) the Insiders sought to operate RCM as a purportedly unregulated entity because they wanted to use RCM's assets (including converted customer deposits) to support their fraudulent scheme; and (4) the Insiders structured RCM's operations in such a way as to maximize their ability to use RCM's assets to further their scheme without making any provision for the repayment of the amounts owed to RCM.

This strong inference is further supported by an e-mail exchange between Refco employee Thomas Yorke and Joseph Collins regarding ways in which Refco could avoid the impact of an impending regulatory change that might have required "a cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. (Compl. ¶ 232.) Mayer Brown asserts (MB Br. 26) that, as Collins was advising Refco that it would have to segregate the funds if they remained at RCM, one inference that may be drawn from the e-mail is that Collins was not aware of the transfer of RCM assets to RGL affiliates. In the e-mail, however, Collins goes on to suggest that Refco should "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets ... are beyond the scope" of the new rule. (*Id.* ¶ 232.)) Collins' effort to keep the RCM clients' assets un-segregated and unregulated further supports the strong inference that Mayer

Brown knew that RCM was maintained as an unregulated entity in order to continue to divert RCM assets.[25]

The Complaint also alleges that Mayer Brown knew the magnitude of the intercompany transfers. (*Id.* ¶¶ 125, 128.) Indeed, in advising Refco through the LBO and preparing the LBO documents, Mayer Brown reviewed Note O of the Consolidating Statements included in the Offering Circular, and RCM's audited financial statements, which indicated that the Insiders had siphoned off $2 billion of RCM's assets to RGL and its affiliates. (*Id.* ¶¶ 41, 125-26, 128, 206.) Mayer Brown also represented Refco in the LBO and thus knew that the LBO would and did impair RGL's ability to repay these receivables to RCM. (*Id.* ¶¶ 235-38.)

In short, the foregoing allegations support a strong inference that MB knew that the Insiders were operating RCM as a purportedly unregulated entity so that they could continue to transfer assets to other Refco entities, and that these entities' ability to repay these amounts was impaired and would be further impaired by the LBO and IPO.

### 3.    The Investment Bank Defendants.

Contrary to the Investment Banks Defendants' contention, the allegations in the Complaint create a strong inference that each of them knew that: (1) Bennett and Maggio were transferring

---

[25]    Similarly, the Complaint alleges that Mayer Brown understood that cash being utilized by Refco included "customer" cash – *i.e.*, cash that RCM owed to its customers. For example, in June 2004, when THL questioned whether it would be possible to have GT break out the composition of Refco's "average cash on hand," and to distinguish between "house [i.e., Refco's] cash," "customer cash," and "regulated cash," Mayer Brown noted emphatically, "No!! Impossible to breakout. Too restrictive operationally i.e. funding." (*Id.* ¶ 231.) While Mayer Brown suggests in a footnote (MB Br. 27 n.14) that this document reflects only that RCM did not segregate its customer funds, the document convincingly shows that Mayer Brown understood that these "customer" funds – which included customer deposits that had been converted by the Insiders – were commingled with "house" and "regulated" funds, and that RCM's assets were treated in such a way – i.e., transferred to affiliates – that it would be "impossible to break out" the various types of cash.

billions in assets from RCM to other Refco entities in an effort to improve Refco's perceived financial condition; (2) the LBO subordinated the repayment of these amounts to the obligation to repay the LBO debt; (3) the LBO proceeds were used to cash out the Insiders' interests in the company rather than paying the amounts owed to RCM; and (4) by entering into the imprudent LBO, the Insiders' breached their fiduciary duties to RCM and RGL.[26]

The Complaint alleges that the Investment Bank Defendants conducted extensive due diligence of RCM's financials in preparation for the LBO and IPO.  (*Id.* ¶¶ 126, 128, 316, 318, 321, 326.)  Through this process, and based on their review of RCM's financial statements and the consolidating financial statement included in the LBO Bond Offering Circular, the S-4, and the S-1, the Investment Bank Defendants learned that RCM held between $1 billion (before the LBO) and $2 billion (before the IPO) in receivables from related-parties.  (*Id.* ¶¶ 73, 186, 318, 326.)  The Investment Bank Defendants knew that these receivables far exceeded RGL's stated capital.  (*Id.* ¶ 329.)

The Complaint further alleges that the Investment Bank Defendants scrutinized these transfers of RCM's assets.  For example, early in the diligence process, BAS questioned how Refco used its capital and how its "net capital change[d] from period to period."  (*Id.* ¶ 322.)  After undertaking a review of the intercompany receivables and obtaining a schedule of receivable balances from Trosten, BAS sought further information to "be able to answer what Refco is doing with their capital and why."  (*Id.*)  BAS specifically requested an "[e]xplanation of capital flows over ... eight quarters between regulated and non-regulated entities."  (*Id.* ¶ 323.)  Similarly, Deutsche

---

[26]    Even assuming *arguendo* that the Trustee's fraud claims are subject to the heightened pleading requirements of Rule 9(b), the Trustee's aiding and abetting breach of fiduciary duty claims against the Investment Bank Defendants may be subject only to Rule 8(a)'s general pleading (footnote continued)

Bank questioned how "money flow[ed] into and out of the regulated entities" and the magnitude of "affiliate loans to regulated entities." (*Id.* ¶ 323.) Deutsche Bank also recognized that an entity like RCM, whose assets remained unsegregated, could have its assets siphoned out through intercompany loans. (*Id.* ¶ 319.) Indeed, Deutsche Bank's Credit Risk Management committee initially rejected Deutsche Bank's participation in the LBO on this very basis. (*Id.*) These allegations create a strong inference that the Investment Bank Defendants knew that there were substantial transfers and loans between RCM and the other Refco entities.

The Complaint goes on to allege that the Investment Bank Defendants knew that Refco would have to use RCM's assets to service the LBO debt. As one BAS employee proclaimed in an email: "FYI ... looks like Refco Capital Markets isn't regulated ... that's good for us!" (*Id.* ¶ 325.) In addition, in the LBO Offering Circular, the Investment Bank Defendants falsely represented that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." The Investment Bank Defendants knew this was a blatant misrepresentation (*id.* ¶¶ 334-35), as the Credit Agreement for the LBO ensures that RCM's right to repayment from the other Refco entities is subordinated to the Investment Bank Defendants' right to repayment on the bonds. (*Id.* ¶ 336.) Similarly, the bond indenture prevented RGL from repaying its debt to RCM before servicing the newly acquired bond debt. (*Id.* ¶ 337.)

The Complaint also alleges that the Investment Bank Defendants began their engagements with Refco from a position of distrust. (*Id.* ¶¶ 331, 333.) "[A] BAS employee noted in an email dated April 23, 2004, that he could not 'look at [Trosten] without thinking of lovitz and his

---

requirements. *See Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002).

pathological liar routine on [Saturday Night Live]'" (*Id.* ¶ 333), and a Deutsche executive acknowledged the "reputational risk DB is taking" by doing business with Refco (*id.* ¶ 331).

Motivated by the prospect of earning lucrative fees (*id.* ¶ 320, 330, 332) and comfortable that the LBO bond debt would be quickly paid off (*id.* ¶¶ 10, 313), the Investment Bank Defendants turned a blind eye to the fact that the Insiders were using the LBO to cash out their interests at falsely inflated values, leaving RGL without the ability to repay the money it owed to its creditor, RCM, and leaving RCM without the ability to meet its obligations to its creditors. (*Id.* ¶¶ 320, 324, 329, 333.) Thus, the Investment Banks were well aware that by engaging in the LBO, the Insiders breached their fiduciary duties to RGL and RCM. (*Id.*) Similarly, as of the IPO, RGL owed $2 billion to RCM (*Id.* ¶¶ 326, 625), and the Investment Banks knew that the Insiders breached their fiduciary duties to Refco Inc. by having it undertake an IPO which would leave it unable to satisfy its obligations to RCM. (*Id.* ¶ 625.)

### 4. PricewaterhouseCoopers.

Prior to the LBO, PwC was engaged by Refco to provide a host of services including: (i) advising Refco "with accounting and financial reporting matters" relevant to the LBO and, in particular, the bond offering (Compl. ¶¶ 44, 283); (ii) serving as Refco's tax preparer (*id.* ¶¶ 44, 288); (iii) serving, after the LBO and the departure of the Chief Financial Officer, as Refco's *de facto* chief accounting officer, during which time PwC assisted in the initial planning and staffing of audits (*id.* ¶¶ 44, 286, 291); and (iv) providing consulting services relating to numerous accounting and financial reporting matters, including assisting in the preparation of documents to be filed with the SEC in connection with the registration of the LBO bonds and the IPO and strengthening Refco's internal accounting controls (*id.* ¶¶ 44, 285-87). As a result of the various hats it wore at Refco – audit planner, financial, management, and tax advisor – PwC had unfettered access to Refco

personnel and accounting systems and was in a unique position to learn of the Insiders' fraudulent scheme. (*Id.* ¶ 289.)

The Complaint alleges that PwC "prepared and/or reviewed and commented on" Refco's S-4 registration statement. (*Id.* ¶ 302.) PwC also reviewed Refco's Rule 144A Offering document. (*See* Declaration of James J Capra, dated May 21, 2008 ("Capra Decl."), Exh. 1 (PwC's engagement letter provides that the engagement "includ[es] reading and discussing with you … the Rule 144A Offering document as appropriate").) Both documents included the express representation that, just prior to the LBO, RGHI owed RGL $105 million. (Compl. ¶¶ 302-303.) The S-4 stated that this amount was purportedly paid before the LBO. (Capra Decl., Exh. 7 (S-4) ("The $105 million due from Refco Group Holdings, Inc., included in receivables from customers at February 28, 2003, was received by February 29, 2004.").) At the same time, in PwC's role as RGL's 2004 tax preparer, PwC reviewed and had access to the historical and 2004 *calendar* year-end receivable balances owed to RGL by RGHI. (Compl. ¶ 297.) As alleged in the Complaint, PwC knew that RGHI owed RGL substantially more than $105 million, and that the additional amount was not reflected in Refco's fiscal year-end financials statements. (*Id.* ¶ 298.)

These two facts alone, coupled with PwC's role as Refco's *de facto* chief accounting officer, supports a strong inference that PwC knew that the RGHI Receivable far exceeded the $105 million that was disclosed. *See also Global Crossing*, 322 F. Supp. 2d at 319 (allegations went "well beyond the realm of aiding and abetting liability" where complaint alleged that accountant "reviewed every public filing, earnings release, and quarterly financial report" and "materially assisted in the preparation of all public financial disclosures, including public filings, statements to the press and investing public, earnings releases, and press releases relating to financial issues").

The Complaint also discusses the November 22, 2004 e-mail exchange between RCM's Victor Zarate and PwC's Henri Steenkamp, manager of Global Capital Markets at PwC. In asserting (PwC Br. 11) that the e-mail merely confirmed the receivable balances owed to RGL by BAWAG and RGHI, PwC raises a factual issue that may not be resolved on the pleadings. *See Winnick*, 406 F. Supp. 2d at 258. Zarate's e-mail includes a schedule of the BAWAG "deposits" made by Refco to collateralize the BAWAG wire transfer loans. (*Id.* ¶ 293; *see* Examiner's Report at 58-59, Rand Decl. Exh. A.) The schedule lists the exact sum of money Refco deposited in BAWAG to fund the fraudulent BAWAG wire transfer RTLs, which reduced the RGHI Receivable. (Compl. ¶ 293.) PwC responded to Zarate's email by asking for "the RGHI loan balances as well for th[ose] periods." (*Id.* ¶ 294). Jurors could reasonably infer from this e-mail that PwC was asking for the RGHI loan balances because it understood that the RGHI Receivable was being reduced by the amounts being deposited at BAWAG.

Furthermore, it is significant that there were no RTLs in effect on two of the seven dates indicated in the e-mail – 7/31/04 and 8/31/03 – for which PwC asked Zarate for the RGHI loan balances. (Compl. ¶ 84.) It is reasonable to infer that Zarate responded to PwC's request with the RGHI loan balances for these two dates and that PwC saw the full magnitude of the RGHI Receivable.

The Trustee's allegations that PwC was aware of the RGHI Receivable are further supported by PwC's concealment of the true "related party" nature of the $105 million receivable in the drafts of the Form S-4 submitted to the SEC. PwC knew it was Refco's standard practice to refer to related-party transactions – such as those between RGHI and RGL – as being between "customers," thereby concealing the related-party nature of the transactions from Refco's innocent decision makers, as well as regulators and investors. (*Id.* ¶ 301.) Upon reviewing initial drafts of the S-4, the

SEC staff – who were far less familiar with Refco and its affiliates than PwC – were immediately able to identify the mischaracterization and questioned "amounts due from equity members (RGHI) as receivable from customers." (*Id.* ¶ 302.) PwC and the other Professional Defendants were forced to amend subsequent drafts of the S-4 to reflect that the receivable was from "equity members" and not customers. (*Id.* ¶¶ 140, 302, 309.)

PwC also knew that Refco was looting RCM's customers assets in order to satisfy Refco's substantial working capital needs and to create the perception that Refco was an appropriate candidate for the LBO and IPO. (*Id.* ¶ 305-06.) PwC was responsible for assisting Refco with the LBO offering materials, the IPO offering materials, and the financial reports and registration statements filed in connection with the LBO and the IPO, including the S-1 and the S-4. (*Id.* ¶ 307.) These materials included the consolidating financial statement that PwC reviewed and understood, given that PwC was providing Refco with advice in connection with these very documents. (*Id.* ¶ 126.) PwC knew that the "payable to customer" line item referred to in the condensed consolidating financial statements represented intercompany loans. (*Id.* at ¶¶ 126, 283, 287, 306-08.) PwC also knew that the only Refco operating entity that was maintained as a purportedly unregulated entity (and therefore treated by Refco as not having to segregate its customer deposits or abide by other regulations regarding the use and transfer of such deposits) was RCM. (*Id.* ¶ 126.) The consolidated financial statements disclosed that there were billions of dollars in consolidating intercompany transfers, of which $2 billion would have had to have come from RCM. (*Id.*)[27]

---

[27] Additionally, PwC undoubtedly reviewed RCM's financial statements which, given PwC's role as Refco's financial reporting advisor and its understanding that receivables from related-parties were booked as receivables "from customers" (Compl. ¶¶ 283, 287, 306-08), would have indicated to PwC the extent to which RCM's assets were being transferred to its affiliates.

PwC's knowledge of the intercompany transfers from RCM is further supported by its movement of the following cryptic sentence to the "related party" section of the consolidated financial statement footnotes: "[I]n the normal course of business, a member of the Group engages in customer related activities which result in receivable from or payable to customer balances, which change daily." (*Id.* ¶ 309.) As PwC notes (PwC Br. 14), it requested this change before the LBO. PwC's understanding that this sentence, relating to RCM transfers, belonged in the "related party" section further supports the strong inference that PwC knew about the transfer of RCM assets to RGL and its affiliates.

PwC was also aware that RGL would be assuming $1.4 billion of debt as a result of the LBO, and that this money would be paid out to the Insiders, thereby impairing RGL's and its affiliates' ability to repay RCM. (*Id.* ¶ 310.) Similarly, the IPO made no provision for the repayment of any of the billions in assets transferred from RCM to RGL and its affiliates. (*Id.* ¶¶ 134-37.)

### 5.    The RTL Defendants.

At the outset, the patently fraudulent nature of the RTLs suffices to support a strong inference of actual knowledge on the part of each of the RTL Defendants.[28] Each RTL Defendant knew that the loans originating from Refco and ultimately received by RGHI were related-party transactions. (*Id.* ¶ 348.) Each RTL Defendant also knew that it lacked the financial wherewithal to receive loans of such magnitude on an uncollateralized basis. (*Id.* ¶ 347.) In addition, each RTL Defendant was aware of the size, duration, and timing of the loans to which it was a party – *i.e.*,

---

[28]    Since the Complaint was filed, RTL Defendants Coast Asset Management LLC, CS Land Management, LLC, and Christopher Petitt settled the Trustee's claims against them. RTL Defendants Beckenham Trading Co. and Andrew Krieger answered the Trustee's complaint. RTL Defendants EMF Financial Products, LLC, EMF Core Fund, Ltd., Delta Flyer Fund, LLC, and Eric M. Flanagan and presently papering the settlement with the Trustee. Only RTL Defendants Liberty Corner, William Pigott, CIM Ventures, and Ingram Micro filed motions to dismiss the Trustee's claims against them.

hundreds of millions of dollars loaned for only a few days spanning Refco's year- and quarter-ends. (*Id.* ¶¶ 75-84, 347.)   Finally, each RTL Defendant was aware that – aside from the "interest payments" to the RTL Defendants themselves – no cash ever moved as a result of the transactions. (*Id.* ¶ 90.)   Notably, the RTL Defendants do not dispute any of these allegations or attempt to identify any legitimate purpose for which the RTLs might have been intended.

The Insiders' attempts to conceal RCM's loans to RGHI were indisputably suspicious.   If there had been a legitimate reason for RCM to loan hundreds of millions of dollars to RGHI for several days over audit and reporting periods, RCM could simply have loaned the money to RGHI *directly*.   Instead, as the RTL defendants knew from their participation in the loans, the Insiders were willing to (1) make substantial interest payments to the RTL defendants, (2) ensure the RTLs were entirely risk-free for the RTL defendants by causing RGL to guarantee RGHI's repayment obligation and to indemnify the RTL defendants, and (3) incur legal fees to Mayer Brown, all in an effort to conceal the related-party nature of the loans.   (*Id.* ¶¶ 81, 347.)

These allegations alone raise a strong inference that the RTL defendants were aware that the RTLs were fraudulent.  *See In re Refco*, 503 F. Supp. 2d at 648 ("The [RTLs] were certainly large, and their timing, recurrent nature, and obvious lack of business purpose would certainly have been suspicious  to anyone who became aware of them.")   But the Complaint's allegations go further. With respect to Liberty Corner, for example, the Complaint alleges that, after the LBO – when Refco became obligated to report its financials on a quarterly, as opposed to yearly, basis – Liberty Corner began engaging in quarterly RTLs.   (*Id.* ¶¶ 84, 86, 347.)   Indeed, from February 2001 through September 2005, Liberty Corner engaged in no less than ten RTLs, each ranging in value from $325 million to $720 million, and each lasting only a matter of days spanning an audit or reporting period.

51

(*Id.* ¶ 84.) Thus, there can be no question that Liberty Corner knew that the purpose of the RTLs was tied directly to the Insiders' scheme to manipulate Refco's financials.

CIM/Ingram further demonstrated its knowledge of the inherently fraudulent nature of the RTLs when, in the wake of the Enron scandal, and after Ingram had already participated in two RTLs, it decided to back out of an RTL at the last minute because "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies." (*Id.* ¶ 89.) CIM/Ingram was clearly aware that increased disclosure might expose these loans to scrutiny. As CIM/Ingram knew, and clearly feared, even a minimum degree of such scrutiny would reveal the loans as fraudulent. (*Id.*)

In response to the Trustee's allegations, CIM/Ingram argues that the Complaint fails to allege that it had actual knowledge that the Insiders' plan was to use those loans to misrepresent RGL's financial condition and "cash-out" their interest in the company. (CIM/Ingram Br. 17.) Similarly, the Liberty Corner defendants assert that the Trustee fails to allege "any communication by which Pigott, or anyone else at LCCS, learned that Refco was attempting to hide a receivable." (LC Br. 18.) As an initial matter, and as explained above, that the purpose of the RTLs was to misrepresent RGL's financial condition was obvious by the very nature of the transactions. That the Complaint does not allege that the RTL defendants were aware of the Receivable itself, or the Insiders' goal of cashing out their interests, is irrelevant. The Trustee adequately alleges that the RTL defendants knew that the purpose of the loans was to mask Refco's related party balances for financial reporting purposes, thereby warding off the skepticism and scrutiny of Refco's financial statements that such massive related-party receivables would invite.

At this stage in the proceedings, the Trustee is not required to allege that the RTL Defendants knew every detail of the Insiders' fraudulent scheme, but merely that they aided and abetted a

fraudulent act that, ultimately, and foreseeably, caused harm to the company. *See In re Parmalat Secs. Litig.*, 501 F. Supp. 2d 560, 580 (S.D.N.Y. 2007) ("It is reasonably foreseeable that misrepresenting a company's financial conditions, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm."); *Dreieck Finanz*, 1990 WL 11537, at *4 ("Although the complaint does not allege any particular instances which show directly that [defendant] knew of the fraud, it alleges facts that amply support the inference that she knew of the underlying principal violations.").

In any event, even assuming that the RTL Defendants did not know the ultimate objective of the fraudulent RTLs – though the Trustee has adequately alleged that they did – it is only because the RTL Defendants intentionally refrained from inquiring. As discussed above, conscious disregard of fraudulent conduct does not immunize an aider and abettor from liability. *See Fraternity Fund*, 479 F. Supp. 2d at 367-68; *Cromer Finance Ltd.*, 2003 WL 21436164, at *9.[29]

C.    **The Trustee Has Adequately Alleged That Each Defendant Substantially Assisted The Underlying Fraud And Breaches Of Fiduciary Duties.**

In New York, substantial assistance exists where a defendant "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the fraud or breach of fiduciary duty to occur." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) (internal quotation marks and citation omitted); *see also Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001) ("Substantial assistance can take many forms.").

---

[29]    Liberty Corner's attempt to analogize its role in the Refco fraud to that of Prudential in *Fraternity Fund* is unavailing. In *Fraternity Fund*, the court dismissed aiding and abetting claims against Prudential because what it was alleged to have done, while consistent with fraudulent intent, was equally consistent with laziness, "at least in the absence of allegations that Prudential ... had any motive to assist [the fraud]." 479 F. Supp. 2d at 369. Unlike Prudential, the RTL Defendants engaged in transactions that are not consistent with any legitimate purpose or nonculpable explanation.

Unable to challenge the Trustee's allegations regarding each defendant's substantial assistance, defendants erroneously assert that the Trustee must meet the additional burden of proving that their substantial assistance *proximately caused* the Trustee's harm.  (MB Br. 31-37; GT Br. 22-24;  PwC Br. 16-20; LC Br. 21; CIM/Ingram Br. 22-25; Inv. Banks Br. 16.)  But it is premature to resolve proximate causation on a motion to dismiss.  *See, e.g.*, *In re Sept. 11 Prop. Damage & Bus. Loss Litig.*, 468 F. Supp. 2d 508, 531 (S.D.N.Y. 2006) ("the issue of proximate cause is fact laden and inappropriate for a motion to dismiss at the pleading stage"); *Am. Tissue*, 351 F. Supp. 2d at 91 ("proximate causation generally remains an issue of fact for the jury"); *Raider v. Friedman*, 162 A.D.2d 112, 113 (N.Y. App. Div. 1990) (same).  As this Court explained in *Winnick*, a court need not, on a motion to dismiss, "decide whether the facts alleged in the Complaint ultimately prove that [a defendant's] actions are a sufficiently proximate cause of the ... losses."[30]  406 F. Supp. 2d at 258-59.  Only where "no reasonable person could find causation based on the facts alleged in the complaint" can proximate cause be determined on the pleadings as a matter of law.  (CIM/Ingram Br. 22 (citing *Pelman v. McDonalds Corp.*, 237 F. Supp. 2d 512, 538 (S.D.N.Y. 2003); *Bondi v. Grant Thornton Int'l (In re Parmalat Secs. Litig.)*, 421 F. Supp. 2d 703, 721-22 (S.D.N.Y. 2006).)  That is not the case here.

In any event, the Trustee's allegations establish that each defendant's substantial assistance meets the standard for proximate cause.  Proximate cause may be found where defendant "ought

---

[30]    This Court previously noted in *Winnick* that it had "some doubt whether 'substantial assistance' can be equated with proximate cause" because "[a] person can make a meaningful contribut[ion] to a fraudulent scheme without being understood to have legally 'caused' the scheme or its results."  406 F. Supp. 2d at 246 n.6; *see also In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 34 (E.D.N.Y. 2006) ("some question has been expressed whether the 'proximate cause standard should be utilized in the context of aiding and abetting liability"); *Fraternity Fund*, 479 F. Supp. 2d at 370-71 & n.113 (finding plaintiffs adequately pled proximate cause but acknowledging "debate (footnote continued)

reasonably to have foreseen [the plaintiff's injury] as a probable consequence of the fraud." *McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343, 359 (S.D.N.Y. 2002). And here, as shown below, "[i]t is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm." *Parmalat*, 501 F. Supp. 2d at 580.

## 1. GT.

For each of GT's 2003, 2004, and 2005 audits of Refco's financial statements (not to mention GT's re-audit of Refco's 2002 financials), GT falsely represented that it performed its audits in conformance with GAAS, and that Refco's financial statements fairly presented its financial condition. (Compl. ¶¶ 152, 166, 183.) GT *knew* that Refco's financial statements were false. (*Id.* ¶¶ 184-89.) In confirming Refco's financial statements, GT actively concealed from investors and Refco's innocent decision makers: (1) the RGHI Receivable; (2) the full extent to which RCM had transferred assets to RGL and its affiliates; (3) the degree to which RGL and its affiliates were unable to repay these amounts to RCM given the existence of the RGHI Receivable; and (4) the degree to which the LBO would further impair RGL's ability to repay RCM. In doing so, GT gave Refco's innocent insiders and investors the false impression that Refco was a viable candidate for an LBO and IPO and that such transactions would benefit the company. GT actively concealed the truth: that Refco was in no shape to undergo either transaction, that both transactions would serve only to line the Insiders' pockets, and that the LBO would leave RGL with insufficient capital to meet its obligations, including repaying the amounts owed to RCM.

---

about whether proximate cause and substantial assistance ought to be equated in the aiding and abetting context.").

GT does not suggest that it did not know its audits would be relied on by investors and Refco's innocent insiders in determining whether the LBO and IPO were appropriate and in the interest of Refco. Nor could it. Indeed, GT was hired to re-audit Refco's 2002 financials for the sole purpose of ensuring Refco's 2002-2004 financial statements were compliant with SEC Regulation S-X – a closing condition of the LBO. (*Id.* ¶ 156.) "Had GT ever failed to issue a clean audit opinion for Refco in general or for RCM in particular, the entire fraudulent scheme would have been immediately publicized to all interested persons and come to a crashing halt, as it in fact did when the fraud was first revealed in October 2005." (*Id.* ¶ 157.)

GT attempts to evade these allegations by making a series of red herring arguments. First, GT asserts that the Trustee has "alleged no facts to suggest that [GT's] audits played any role in *causing* the Insiders to steal RCM's assets." (GT Br. 22 (emphasis added).) The question, however, is not whether GT caused the Insiders to steal from RCM, but whether GT substantially assisted them in doing so – which, as explained above, the Complaint adequately alleges GT did.

GT next argues that the Trustee "has not explained how or why these intercompany loans were uncollectible in the first place – nor has he made any effort to connect that uncollectibility with [GT]." (GT Br. 23.) The Complaint does not allege that GT *rendered* the loans uncollectible. It alleges that GT *knew* the receivables owed to RCM were impaired, that their impairment made RCM's financial statements misleading, and that GT should have disclosed these facts – as required by GAAS – in its audit reports. (Compl. ¶¶ 200-02.) By intentionally refraining from doing so, and instead issuing clean audit opinions, GT gave a false impression of Refco's financial health and assisted the Insiders in their fraudulent scheme. *See Bondi v. Banc of Am. Corp. (In re Parmalat Secs. Litig.)*, 412 F. Supp. 2d 392, 403-04 (S.D.N.Y. 2007) (proximate cause adequately pled where plaintiff alleged that defendants' "material omissions lulled Parmalat's innocent insiders into a false

sense of security in the health of the Company" and that "the innocent insiders relied on the mirage in failing to investigate further and thus failing to discover the fraud").

Finally, GT argues that "the complaint cannot explain what role [GT's] audit opinions played in causing [the LBO and IPO] in the first place." (GT Br. 24.) Again, the relevant inquiry is not whether GT was the sole cause of the LBO or IPO, but rather whether GT facilitated transactions that ultimately harmed the company. And GT did that by concealing Refco's true financial condition from investors and Refco's innocent insiders. (Compl. ¶¶ 386-89, 391-95, 515-18, 520-24.)

### 2.    Mayer Brown.

The Complaint alleges that Mayer Brown substantially assisted the Insiders in virtually every aspect of their fraudulent scheme. (Compl. ¶¶ 205, 207-08, 212-18, 221, 227.) Mayer Brown does not dispute the sufficiency of the Trustee's allegations regarding Mayer Brown's substantial assistance of the Insiders' fraud; rather, Mayer Brown, like GT, argues that the Trustee has failed to allege that its substantial assistance "proximately caused" the looting of RCM's assets or the Insiders' cashing out of their interests in Refco. (MB Br. 33-37.)

Specifically, Mayer Brown contends that the Trustee "does not allege that Mayer Brown's conduct directly caused the Insiders' alleged cashing out of the LBO and IPO proceeds." (MB Br. 34.) But the Complaint alleges that Mayer Brown substantially assisted the Insiders' cashing out of their interests in Refco through the LBO and IPO by *negotiating and drafting the very documents underlying these transactions*. (Compl. ¶¶ 235-36.) It is hard to imagine a more direct type of substantial assistance. Moreover, the cashing out through the LBO and IPO could never have been accomplished had Mayer Brown not assisted the Insiders in concealing the RGHI Receivable from Refco's innocent decision makers and investors through the RTLs. (*Id.* ¶¶ 213-18.)

57

The Insiders' cashing out of their interests through the LBO and IPO was certainly foreseeable to Mayer Brown because it is precisely what the transactions were designed to accomplish. The LBO and IPO documents – documents Mayer Brown helped prepare – provided for substantial payouts to the Insiders. In this respect, *Bloor v. Carro, Spanbock, Londin, Rodman & Fass* and *In re Parmalat Securities Litigation* (cited at MB Br. 35) are entirely distinguishable. In each of those cases, the plaintiff alleged that the defendant's misrepresentations allowed the company to obtain financing that ultimately was looted or mismanaged by insiders as part of the ongoing fraud. *See, e.g., Bloor*, 754 F.2d 57, 62 (2d Cir. 1985); *Parmalat*, 501 F. Supp. 2d at 579-80. Critical to each court's finding that the plaintiff failed adequately to plead "loss causation" under section 10(b) was the fact that the complaint did not allege that the defendant would have foreseen that the proceeds of the financing transaction would be looted. *Bloor*, 754 F.2d at 62; *Parmalat*, 501 F. Supp. 2d at 579-81. The money could have been used to benefit the company. *Id.* In this case, by contrast, the financing transactions – the LBO and IPO – were *designed* to cash out the Insiders' interests. Unlike in *Bloor* and *Parmalat*, there was no possibility that the LBO and IPO proceeds would be used to benefit the company; by the very terms of the LBO and IPO, the money came into the company only long enough to be paid out to the Insiders.

Mayer Brown also substantially assisted the Insiders' scheme by concealing from the innocent insiders that: (1) the Insiders sought to operate RCM as a purportedly unregulated entity because they wanted to use RCM's assets to support their fraudulent scheme; (2) the Insiders had structured RCM's operations in such a way as to maximize their ability to use RCM's assets to further their scheme without making any provision for the repayment of the amounts owed to RCM; (3) the regulatory status of RCM's operations was, at best, questionable and suspect; (4) RCM's securities operations were, upon repatriation to the United States, subject to domestic regulation; (5)

RCM was required to segregate at least its securities deposits; and (6) given RCM's transfer of its assets to RGL and its affiliates, RCM would be unable to recover its assets as a result of the RGHI Receivable scheme and the LBO.  (Compl. ¶¶ 228-34; *see also* Point II.B.2, *supra*.)  Mayer Brown's failure to require that RCM segregate at least its securities deposits, and be able to return its customer deposits, as well as Mayer Brown's concealment of these facts from the innocent insiders, assisted the Insiders' scheme by allowing the Insiders to continue diverting RCM's assets.  *See Lerner,* 459 F.3d at 295 (substantial assistance exists where a defendant "affirmatively assists, helps conceal *or fails to act when required to do so*, thereby enabling the fraud or breach of fiduciary duty to occur") (emphasis added).

### 3.    The Investment Bank Defendants.

The Investment Bank Defendants directly facilitated the LBO and IPO by conducting due diligence (*id.* ¶¶ 128, 316), providing Refco with the credit facility (*id.* ¶ 113. 336), facilitating the issuance of the LBO notes, and assisting in the preparation of the Offering Circular (*id.* ¶ 336).  It was the Investment Banks who devised and arranged the LBO.  (*Id.* ¶¶ 443, 583.)  In light of the Trustee's allegations that the Investment Bank Defendants knew that the LBO and IPO would impair RGL's ability to repay RCM, and RCM's ability to repay its customers, it was foreseeable to the Investment Bank Defendants that the LBO and IPO they facilitated would cause these entities harm. *See Primavera Familienstifung*, 130 F. Supp. 2d at 511 ("Participation in financing a fraudulent scheme" may constitute substantial assistance); *see also Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) ("Substantial assistance might include ... executing transactions, or

investing proceeds, or perhaps *financing transactions*." (internal quotation marks and citation omitted)).[31]

### 4.    PricewaterhouseCoopers.

PwC's contention that it did not substantially assist in the LBO because it was "never able to provide advice on the business decision whether to enter into the LBO" (PwC Br. 17) is unavailing. Substantial assistance does not require the degree of causation that PwC suggests; by its very terms, the element focuses on whether the defendant substantially *assisted* the primary wrongdoer's fraudulent acts. PwC knew that the RGHI Receivable was much larger than was being disclosed and was fully aware that Refco was in no state to undertake an LBO or IPO. (Compl. ¶¶ 138, 289, 291, 305-10.) Nevertheless, PwC actively assisted the Insiders by preparing, advising, and commenting on the LBO Bond Offering Circular, the Form S-4 that registered the bonds with the SEC, and the Form S-1 for the IPO prospectus. (*Id.* ¶¶ 283-90.) PwC thereby facilitated transactions that would foreseeably harm Refco given its true financial condition.

PwC erroneously asserts (PwC Br. 18) that, because it was engaged by *RGL*, it was not foreseeable that its substantial assistance of the Insiders' scheme would cause harm to *RCM*. As set forth above, PwC was aware of the RGHI Receivable and the substantial transfers of RCM's assets

---

[31]    The Investment Banks' reliance (Inv. Banks Br. 16-19) on *In re Sharp Int'l Corp.*, 302 B.R. 760, 774 (E.D.N.Y. 2003), is misplaced. In *Sharp*, the court held that it was not foreseeable to the defendant bank that by providing financing to the company, the bank was facilitating the managers' looting of company assets. 302 B.R. at 777. But *Sharp* did not involve a financing transaction which, by its very terms, caused harm to the company. In *Sharp*, as in *Bloor* and *Parmalat*, the financing could have been used to benefit the company. Here, by contrast, LBO and IPO layered $1.4 billion in debt onto RGL in order to cash out the Insiders' interests, thereby further impairing RGL's ability to repay RCM. That the LBO and IPO would cause harm to the Refco entities was not just foreseeable, it was the inevitable result.

to RGL and its affiliates.  It could therefore foresee that by layering additional debt on RGL through the LBO and IPO, these transactions – which PwC assisted – would harm RCM.[32]

Finally, like Mayer Brown, PwC argues that the true cause of Refco's damages was not the LBO or IPO, but the Insiders' "looting" of the proceeds of these transactions after they were consummated.  (PwC Br. 19 ("[T]he non-repayment of [RGL's debt to RCM] was due, not to the LBO itself, but to management's imprudent use of the LBO proceeds.").)  But as explained in Point II.C.2., *supra*, the LBO and IPO were *designed* to cash out the Insiders' interests in Refco.

### 5.    The RTL Defendants.

Each of the RTL Defendants played a central role in the RTL transactions, which were the primary means by which the Insiders concealed the RGHI Receivable at the end of each reporting period and a critical element of the Insiders' fraudulent scheme.  It is therefore indisputable, at least at the motion to dismiss stage, that the RTL Defendants substantially assisted the Insiders' fraud and breaches of fiduciary duty.  *See ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1330 (substantial assistance where defendants "encouraged and facilitated the ongoing fraudulent scheme.")  It was also foreseeable that by assisting in the fraudulent transactions the RTL Defendants would cause harm to the Company.  *See Winnick*, 406 F. Supp. 2d at 247 (proximate cause adequately alleged because defendant "assist[ed] in the transactions at the core of the fraudulent scheme"); *Parmalat*, 501 F. Supp. 2d at 580 ("It is reasonably foreseeable that

---

[32]    PwC's assertion (PwC Br. 18) that the LBO Offering Circular stated that the LBO debt would be "effectively junior" to the existing liabilities of subsidiaries does not undermine the allegation that PwC knew this not to be the case.  As alleged in the Complaint, those defendants who worked on the LBO knew – because they reviewed the Credit Agreement and Bond Indenture, which subordinated RCM's right to repayment – that the Offering Circular was false.  (Compl. ¶¶ 129-33, 336-37.)  Moreover, it is disingenuous for PwC to claim it was misled by the Offering Circular, a document it helped prepare.  (*Id.* ¶ 283.)

misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm.").

The Liberty Corner Defendants argue that the Complaint fails to plead substantial assistance because the Trustee "does not allege facts showing that the Loan Transactions themselves were 'atypical' or 'non-routine.'" (LC Br. 21.)  This argument is unavailing for three reasons.  First, the argument raises a fact issue that cannot be resolved on a motion to dismiss.  *See, e.g.*, *Winnick*, 406 F. Supp. 2d at 258.  Second, it is well established that "[e]xecuting transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances." *Primavera Familienstifung*, 130 F. Supp. 2d  at 51; *see also Winnick*, 406 F. Supp. 2d at 257 (same).  "The critical test is not ... whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud." *Winnick*, 406 F. Supp. 2d at 257. Third, the RTL transactions were far from typical or routine:  The RTLs involved lending money from a company to its affiliate, *through a third party conduit*, for a period of only a few days spanning the company's audit and reporting periods.

Finally, CIM/Ingram erroneously asserts that "the Trustee's affirmative assistance allegations against Ingram and CIM are even more deficient than those that were dismissed by the Second Circuit in *Filler*.")  (Ingram/CIM Br. 21 (citing *Filler v. Hanvit Bank*, 339 F. Supp. 2d 553 (S.D.N.Y. 2004).)  *Filler* actually *supports* the Trustee's position that his allegations of substantial assistance are adequately pleaded; it held that the plaintiff sufficiently alleged that the defendants had substantially assisted the subsidiary's fraud, and it dismissed the claims only because the subsidiary's fraud was not the fraud complained of.  *Filler*, 339 F. Supp. 2d  at 558 ("[P]laintiffs do not assert that [the subsidiary's] fraud directly injured them, or that the parent and subsidiary should be regarded as one entity, such that the acts of the latter are attributable to the former....  From

62

defendants' perspective, [the parent] could have been the victim or unwitting conduit of [the subsidiary's] fraud as easily as it could have been the perpetrator of a fraud upon others."). Here, by contrast, the primary fraud complained of is that perpetrated by the *Insiders*. Indeed, the Insiders used *both* RCM (which provided the funds (Compl. ¶ 78)) *and* RGL (which provided the guaranties and indemnity (*id.* ¶ 81)) to accomplish the RTLs.[33]

## III.  ONLY THE NEGLIGENT MISREPRESENTATION CLAIMS AND BREACH OF FIDUCIARY DUTY CLAIMS, NOT THE AIDING AND ABETTING CLAIMS, ARE DUPLICATIVE OF THE MALPRACTICE CLAIMS

Mayer Brown, GT, and Credit Suisse contend that the Trustee's claims for negligent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty should be dismissed as duplicative of the malpractice claims against these defendants. (MB Br. 37; GT Br. 25; Inv. Banks Br. 23 & n.20.) (Defendants do not argue that the aiding and abetting fraud claims are duplicative of the malpractice claims.) The Trustee concedes that his claims for negligent misrepresentation against GT and Credit Suisse (Counts 4, 24, and 35) and for breach of fiduciary duty against Mayer Brown (Counts 8, 20) should be dismissed as duplicative of his malpractice claims (Counts 3, 7, 19, 23, 34). *See, e.g.*, *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 10 A.D.3d 267, 271 (N.Y. App. Div. 2004); *Sonnenschine v. Giacomo*, 295 A.D.2d 287, 288 (N.Y. App. Div. 2002).

Defendants are incorrect, however, when it comes to the Trustee's claims for aiding and abetting breach of fiduciary duty (Counts 5, 9, 21, 25, 36, 40, 42, 44). Defendants cite no authority that such claims are subject to dismissal as duplicative. This is hardly surprising because, unlike

---

[33]    Contrary to CIM/Ingram's assertion regarding reliance (CIM/Ingram Br. 22), the Complaint clearly alleges that the RTLs concealed the RGHI Receivable in Refco's financial statements and that RGL's innocent decision makers relied on these financial statements in agreeing to enter into the LBO and IPO. (Compl. ¶¶ 78, 88, 91, 93 586, 589.)

malpractice, negligent misrepresentation, and breach of fiduciary duty claims – each of which turns on a professional's duties to its client – a claim for aiding and abetting a breach of fiduciary duty involves the professional's assistance to a third-party and thus does not depend on that professional's relationship to the client. Thus, here, whereas the allegations in the Trustee's malpractice claims involve the Professional Defendants' breaches of their respective duties of care to RCM, RGL, and Refco Inc. (Compl. ¶¶ 373, 400, 481, 504, 552, 568, 598, 610, 622), the allegations in the Trustee's aiding and abetting breach of fiduciary claims involve the Professional Defendants' knowledge of the numerous ways in which Bennett, Maggio, Trosten, Grant, and RGHI were breaching their own duties and the Professional Defendants' substantial assistance of those breaches (*id.* ¶¶ 386-89, 410-13, 431-34, 441-44, 492-95, 515-18, 556-59, 581-84, 603-06, 614-17, 625-28).

## IV.    THE MALPRACTICE CLAIMS SHOULD BE SUSTAINED

Under New York law, "professional malpractice[ ] is a species of negligence." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000). Thus, to state a claim for malpractice, a plaintiff must allege that: (1) the defendant owed it a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach. *Id.* Except as discussed below, defendants do not contest that the Trustee has adequately pled malpractice claims against them.[34]

### A.    The Complaint Sufficiently Alleges Malpractice By Credit Suisse.

As a threshold matter, contrary to Credit Suisse's contentions (Inv. Banks Br. 21-23), its engagement letter with RGL does not bar the Trustee's claims for malpractice on RGL's behalf. That letter states, in relevant part, that RGL "agrees that [Credit Suisse] shall have no liability to

---

[34]    The Trustee also asserts three malpractice claims against Mayer Brown. (Counts 7, 19, 39). Mayer Brown does not specifically challenge the sufficiency of these allegations apart from its arguments regarding knowledge and causation discussed in Point II, *supra*.

[RGL] for any losses, claims, damages or liabilities ["Losses"] ... related to or arising out of the engagement or [Credit Suisse's] performance thereof, *except ... [for] any Losses that are finally determined by a court or arbitral tribunal to have resulted primarily from the bad faith, willful misconduct, or gross negligence of [Credit Suisse.]*" (Winer Decl. Exh. F, at p. 6 (emphasis added).) This exclusion recognizes the New York law that releases of claims for gross negligence or intentional misconduct are unenforceable. *See, e.g.*, *Colnaghi U.S.A., Ltd. v. Jewelers Protection Servs. Ltd.*, 81 N.Y.2d 821, 823-24 (1993).

Far from simply alleging ordinary negligence, the Complaint alleges that Credit Suisse consciously, and with deliberate disregard of the consequences, structured an LBO that would leave RGL without sufficient funds to cover its obligations. According to the Complaint, Credit Suisse "acted as RGL's 'exclusive financial advisor' in connection with marketing and selling RGL" (Compl. ¶ 566), despite knowing based on its "experience and expertise" that "a broker-dealer such as Refco was an inappropriate candidate for a leveraged buy-out" because "leveraged buy-outs required real cash flows to service such a large amount of debt, and that broker-dealers such as Refco typically did not have sufficient unencumbered cash flows of their own to service such debt loads" (*id.* ¶ 313). In particular, the Complaint alleges that Credit Suisse permitted the LBO to go forward despite Credit Suisse's inability to recreate Refco management's projected cash flows, its inability to rely on cash distributions from Refco's regulated subsidiaries, and its knowledge that Refco had been making RCM's assets available to RGL and its affiliates. (*Id.* ¶ 316.) Thus, according to the Complaint, "Credit Suisse was grossly negligent in breaching its duty of care to RGL by, among other things, developing an LBO in which RGL would be left with unreasonably small capital to pay its debts, including its obligation to repay the RCM intercompany loans." (*Id.* ¶ 569.) These allegations persuasively support the conclusion that Credit Suisse's malfeasance rises

to the level of gross negligence. Credit Suisse's arguments to the contrary are for the trier of fact, not a basis for Rule 12(b)(6) dismissal.[35]

Credit Suisse also contends (Inv. Banks Br. 25) that it never had an engagement with *Refco Inc.* and therefore is not subject to a malpractice claim. But this argument again raises a factual dispute that may not be resolved on a motion to dismiss. The Complaint alleges that Credit Suisse was Refco Inc.'s exclusive financial advisor in connection with the IPO and was responsible for "assisting Refco Inc. with evaluating proposals from potential purchasers and with structuring and negotiating the sale of the company." (Compl. ¶¶ 619-20.) Nothing in *RGL's* engagement letter with Credit Suisse suggests otherwise, and, in any event, Refco Inc. need not have its own engagement letter because New York law does not require strict privity for a malpractice claim. *See, e.g.*, *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536 (1985).[36]

## B.    The Complaint Sufficiently Alleges Malpractice By PricewaterhouseCoopers.

PwC first argues (PwC Br. 6) that the Trustee's malpractice claim against PwC premised on a failure to provide advice is outside the scope of its engagement with RGL. PwC contends that the malpractice claim is "premised entirely on PwC's failure to advise RGL against, or otherwise prevent RGL from, entering into the LBO." (*Id.*) But this mischaracterizes the Complaint, which

---

[35]    Credit Suisse's contention (Inv. Banks Br. 22-23) that it could not have been grossly negligent because the Complaint alleges that certain RGL outside directors and officers were unaware of the fraud is specious. Credit Suisse does not explain how these innocent insiders' failure to discover the fraud absolves Credit Suisse of its professional duties. Moreover, Credit Suisse's argument ignores that the innocent insiders were relying on the expertise of professionals like Credit Suisse to evaluate Refco's financial health and the impact of the LBO and IPO on Refco.

[36]    Credit Suisse's challenge to causation (Inv. Banks Br. 25) is likewise deficient, as it ignores that Credit Suisse neglected to inform the innocent insiders of the company's true financial state. (Compl. ¶ 622.) In particular, Credit Suisse's failure to advise them that the IPO would leave Refco Inc. unable to pay the over $2 billion it owed to RCM caused Refco Inc. to enter into the IPO without an accurate understanding of its financial condition. (*Id.* ¶¶ 622-23.)

alleges that, as RGL's *de facto* chief accounting officer and a financial and accounting consultant for RGL in connection with the LBO, the public registration of the LBO bonds, and the IPO (Compl. ¶¶ 283-84, 550-51), PwC had a duty to disclose, among other things, the RGHI Receivable, the RTLs, that RGL was using RCM's assets to finance its operations and acquisitions, that the LBO would leave RGL with insufficient capital, and that RGL was insolvent or operating in the zone of insolvency. (*Id.* ¶¶ 291-296, 298-301, 305-310, 552-53.) In other words, PwC's duty was to provide – not hide – truthful information about RGL's financial situation when it assisted and advised Refco in connection with entry into the LBO, the issuance of the 144A bonds, and the preparation of the Exxon Capital exchange "Form S-4" and IPO "Form S-1" disclosure statement filed with the SEC. (*Id.* ¶¶ 283-85, 287, 302-03.) PwC's engagement letter with RGL makes that obligation clear. (Capra Decl. Exh. 1 ("The advisory services that we will perform in connection with the Rule 144A Offering [LBO] will consist of the following: ... providing advice with respect to accounting and financial reporting matters relevant to the Rule 144A Offering, including reading and discussing with you and other Officers of the Company the Rule 144A Offering document as appropriate.").) Moreover, the engagement was broadened by the September 28, 2004 Amendment to the May 5, 2004 engagement letter, which "expanded [PwC's services] to include providing [Refco] with advice and assistance related to the accounting and financial reporting matters for the quarter ended August 31, 2004." (Capra Decl., Ex. 1 at 7.) Thus, the malpractice claim is premised on PwC's failure to inform RGL of financial conditions that were well within its purview, especially given that such purview was expanded to include advice and assistance related to general accounting and financial reporting matters.

The Complaint also satisfactorily alleges proximate causation with respect to PwC's malpractice. Even if RGL had intended to enter into the LBO at the time it engaged PwC to help

plan and prepare for it and to advise RGL on reporting matters related thereto (PwC Br. 7 (citing Compl. ¶¶ 283, 334)), the crucial point is that the LBO and IPO would never have happened if PwC had informed the innocent insiders of the company's precarious financial state (Compl. ¶ 552-53). By withholding that information from the innocent insiders, PwC caused RGL to enter into the LBO without knowing that it would incur $1.4 billion in debt that it would be unable to repay. (*Id.* ¶ 554.)

### C.    The Complaint Sufficiently Alleges Malpractice By GT.

The Complaint also sufficiently alleges causation with respect to the malpractice claim against GT. Regarding Refco Inc., the Complaint alleges that, had GT disclosed to innocent insiders the RGHI Receivable, the RTLs, the inaccuracies in Refco's financial statements, or that the IPO would cause Refco, Inc. to pay $231 million to an insolvent subsidiary (RGL), Refco Inc. would not have undertaken the IPO based on an inaccurate understanding of its financial condition. (Compl. ¶¶ 373-74, 610-12.) Similarly, regarding RCM, had GT disclosed to innocent insiders its knowledge of the massive amount of intercompany receivables owed to RCM by Refco affiliates and the impact the RGHI Receivable and LBO had on RGL's and its affiliates' ability to repay these amounts, RCM would not have transferred some $2 billion to Refco affiliates, which lacked the ability or intent to fully repay it, and would have sought repayment of the existing loans. (Compl. ¶¶ 373-75, 380-84.) GT does not expressly challenge the Trustee's causation theory with respect to the claims on behalf of RGL, and, in any event, that theory is fully explained above in Point II.C.1, *supra*.[37]

---

[37]    GT does not contest that the Complaint satisfactorily alleges the other elements of a malpractice claim, including breach of duty based on allegations that it failed to comply with numerous accounting regulations and guidelines. (*See, e.g.*, Compl. ¶¶ 198-204.)

## V.    ILLINOIS LAW DOES NOT BAR THE TRUSTEE FROM ASSERTING THE CLAIMS

Mayer Brown argues (MB Br. 38-40) that, to the extent that Illinois law applies to this action, the Trustee may not assert claims for malpractice or breach of fiduciary duty because Refco could not lawfully assign those claims under Illinois law.  As a threshold matter, New York law applies under the "most significant relationship" test since Refco was headquartered in New York, key communications between Mayer Brown and Refco were sent and received in New York, the LBO and IPO closed in New York, and the injury to Refco occurred in New York.  Indeed, Mayer Brown argues in the first instance (MB Br. 16-20) that New York law applies, as do all of the other defendants (Inv. Banks. Br. 6 n.2; CIM/Ingram Br. 11 n.6; LC Br. 11-13; PwC Br. 6 n.7; GT Br. 6 n.3).  And Mayer Brown does not contest that, if New York law governs this issue, the Trustee may assert these claims.

But even if Illinois law were to apply to these claims, the Trustee may properly assert them.  While it is true that, due to their personal nature, malpractice and breach of fiduciary duty claims against an attorney that are subject to Illinois law may not generally be assigned, *see, e.g.*, *Gonzalez v. Profile Sanding Equip., Inc.*, 776 N.E.2d 667, 696 (Ill. App. 2002), this limitation does *not* affect a bankruptcy trustee's ability to pursue such claims that were originally held by a debtor.[38]  In *CBI*, the

---

[38]  Mayer Brown acknowledges that the Trustee, as a bankruptcy-court approved Litigation Trustee, is equivalent to a bankruptcy trustee.  (MB Br. 8 ("While the *Wagoner* case itself addressed the claims of a Chapter 11 trustee, the Rule applies equally to the Trustee who similarly stands in the shoes of the Refco plaintiff entities.").)  In any event, the Bankruptcy Plan unambiguously authorizes him to assert the claims *as a representative of the Refco Estates*.  (Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries, at § 5.7(b), attached as Exhibit Q to the Declaration of Thomas G. Ward, dated May 30, 2008.)  Mayer Brown cites no authority prohibiting the Trustee from acting in this manner, and the various statements by the Court and the Trustee construing the transfer of the claims to the Trust did not address this provision.  (MB Br. 39-40.)  The Plan speaks for itself and plainly authorizes the Trustee to assert these claims as a representative of the Estates if he cannot do so on behalf of the Trust.

Second Circuit held that a state-law rule prohibiting a trustee from enforcing rights assigned by creditors "has been undermined by the inclusion of § 541(a)(7) in the current Bankruptcy Code." 529 F.3d at 456. (Section 541 of the Bankruptcy Code broadly defines a bankruptcy estate to include all kinds of property, including causes of action.). Similarly, the Fifth Circuit has explained that, even if a bankruptcy trustee could be considered as an "assignee" and a debtor as an "assignor," state laws limiting assignments of claims must bow to the Bankruptcy Code, which determines the scope of the debtor's estate and provides for the trustee to step into the debtor's shoes. *Stanley v. Trinchard*, 500 F.3d 411, 425-26 (5th Cir. 2007); *see generally* 4 COLLIER ON BANKRUPTCY ¶ 541.07 (15th ed. 1996) ("[U]nder the Code, all interests of the debtor in property come into the estate pursuant to section 541(a)(1) regardless of whether they are transferable, or whether creditors could have by some means reached them.").

Far from "suggesting that even under the bankruptcy code, assignment of legal malpractice claims is prohibited" (MB Br. 39), the only *Illinois* authority that Mayer Brown cites – *Hoth v. Stogsdill*, 569 N.E.2d 34 (Ill. App. Ct. 1991) – suggests that the opposite is true. Specifically, the court stated that, under Section 541, all property of the debtor, including all potential causes of action regardless of state law restraints on assignability, is included in the estate. *Hoth*, 569 N.E.2d at 665. And, while the court held out the possibility that a debtor might be able to exclude a legal malpractice claim from the estate if 11 U.S.C. § 522(b) – which applies only to individual debtors – recognized common-law exemptions (like Illinois' common-law prohibition on assignments), the debtor still must have affirmatively elected to make that exemption when filing its bankruptcy

70

petition. *Id.* at 665-67.  Here, of course, Refco is not an individual debtor and did not opt to exclude these claims.[39]

## VI.     SLUSA DOES NOT PRECLUDE ANY OF THE TRUSTEE'S CLAIMS

GT, joined by Mayer Brown, contends that SLUSA preempts each of the ten claims that the Trustee has brought against them.  (GT Br. 14-17; MB Br. 40.)  The Investment Bank Defendants join GT's argument with respect to the two claims that the Trustee has asserted against them on behalf of Refco Inc.  (Inv. Banks Br. 25 n.23.)  This argument is unpersuasive.

By way of background, SLUSA was enacted after the restrictions in the Private Securities Litigation Reform Act of 1995 ("PSLRA") had the unintended effect of causing some securities class action lawyers to sidestep the restrictions imposed on securities class actions by bringing class actions under state law in state court.  Congress wanted "[t]o stem this 'shif[t] from Federal to State courts' and 'prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of' the PSLRA."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 82 (2006) (quoting SLUSA §§ 2(2), (5), 112 Stat. 3227).  SLUSA was intended to regulate the class action vehicle in connection with securities law claims.  As relevant here, "[t]o dismiss an action under SLUSA, the defendant must show:  (1) the action is a 'covered class action' under SLUSA; (2) the action is based on state law; and (3) the action is one in which the party alleges 'an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security....'"  *LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246, 267 (S.D.N.Y.

---

[39]     The other cases upon which Mayer Brown relies (MB Br. 39) – *Baum v. Duckor Spradling & Metzger*, 84 Cal. Rptr. 2d 703 (Cal. Ct. App. 1999); *In re J.E. Marion, Inc.*, 199 B.R. 635 (Bankr. S.D. Tex. 1996) – are distinguishable because, unlike here, they involved the trustee's assignment of claims to creditors that had not been appointed or approved by the bankruptcy court. *See In re Friedman's Inc.*, 385 B.R. 381, 447-48 (S.D. Ga. 2008), *vacated in part on reconsideration by* 2008 WL 1758815 (S.D. Ga. Apr. 16, 2008).

2007) (quoting 15 U.S.C. § 77p(b)).  SLUSA was never intended to reach claims – like the ones at issue here –brought by, or on behalf of, a company against its advisors, auditors, or other third-parties that engaged in tortious conduct or malpractice to the detriment of the company.  Indeed, Congress expressly excluded "derivative actions" from the definition of "covered actions," 15 U.S.C. §§ 77p(f)(3), 78bb(f)(5)(C), thereby permitting individuals to pursue claims on behalf of a corporation against their fiduciaries, just as the Trustee has done here.

As discussed below, the Trustee's action is not a "covered class action" under SLUSA and, even if it were, none of the Trustee's claims falls within the Act's securities-focused scope.

### A.    This Action Is Not A "Covered Class Action."

Contrary to GT's contention (GT Br. 14), the Trustee's action does not constitute a "covered class action," which SLUSA defines as a single lawsuit in which (a) "damages are sought on behalf of more than 50 persons" where "questions of law or fact common to those persons ... predominate" *or* (b) a group of lawsuits "filed in or pending in the same court and involving common questions of law or fact, in which (1) damages are sought on behalf of more than 50 persons; and (2) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose."  15 U.S.C. §§ 77p(f)(2), 78bb(f)(5)(B).

### 1.    The Trustee Does Not Seek Damages On Behalf Of More Than 50 Persons.

As to the first prong of the definition, the Trustee's action does not seek damages on behalf of more than 50 persons because these claims were originally held by the *three* Refco entities (and then their bankruptcy estates).  Numerous courts have held that an action by a trustee asserting a bankruptcy estate's claims for the benefit of its creditors is not a "covered class action."  *See LaSala v. Bordier et Cie*, 519 F.3d 121, 135-37 (3d Cir. 2008); *Cape Ann Investors LLC v. Lepone*, 296 F. Supp. 2d 4, 12-13 (D. Mass. 2003) (distinguishing between claims assigned to trust by shareholders,

which were precluded, and trust's claims on behalf of bankrupt company, which were not precluded).

In *LaSala*, the Third Circuit held that a litigation trustee's claims on behalf of a bankrupt estate were not on behalf of more than fifty persons despite the fact that more than 6,000 creditors would benefit from any judgment.[40]  The court reasoned, first, that for the definition of "covered action" (an action in which "damages are sought on behalf of more than *50 persons*" and "questions of law or fact common to *those persons* ... predominate") to make any sense, "persons" must "refer to the original owners of a claim – those injured by the complained of conduct, as those are the persons who might have common questions of law or fact related to the claim that predominate over individual questions of law or fact." *LaSala*, 519 F.3d at 134.  Were "persons" interpreted to refer to the assignees or beneficiaries of a claim, "the second prong of the definition would lack any pertinence, because ... [t]here are no questions of law or fact that involve [assignees or beneficiaries], much less common ones that predominate over individual ones." *Id.* at 133.  Second, the Third Circuit read §§ 78bb(f)(5)(C) (exclusively derivative actions are not "covered actions") and 78bb(f)(5)(D) (corporations are not to be counted as more than one person unless established for the purpose of litigation) to mean that "Congress did not intend SLUSA to reach *any* corporate-originated claims." *Id.* at 135.  Third, the court recognized that treating a bankruptcy trustee as more than one person is contrary to congressional intent; indeed, the Senate Banking Committee reported that, in the final version of the bill, the definition of "covered action" was changed so that "*a trustee*

---

[40]    There is no pertinent distinction between the trustee of a litigation trust (such as the plaintiff here) and a Chapter 11 trustee.  Both assert the claims of the debtor and both are "persons or entities duly authorized by law (other than by a provision of state or federal law governing class action procedures) to seek damages on behalf of another person or entity." *LaSala*, 519 F.3d at 135-36 (3d Cir. 2008); (*see also* MB Br. 8 (Trustee stands in same position as bankruptcy trustee)).

*in bankruptcy*, a guardian, a receiver, and other persons or entities duly authorized by law (other than

by a provision of state or federal law governing class action procedures) to seek damages on behalf

of another person or entity *would not be covered by this provision*."  S. Rep. No. 105-182, at 8 (May

4, 1998) (emphasis added).  This Court should follow the Third Circuit's well-reasoned approach.[41]

As the Supreme Court has explained, SLUSA does not "preempt" any cause of action, but

merely "denies plaintiffs the right to use the class action device to vindicate certain claims."  *Dabit*,

547 U.S. at 87.  Indeed, as the Supreme Court emphasized, SLUSA was not intended to "deny any

individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law

cause of action that may exist."  *Id.*  Using SLUSA to dismiss the Trustee's claims would be

tantamount to preemption because there is no other mechanism for him to pursue his claims.  This is

not a situation where the Trustee could choose to pursue his claims on an individual basis if he is not

permitted to do so in this action.

### 2.    The Trustee's Action Is Not Part Of A "Group Of Lawsuits."

Nor does the Trustee's action come within the "group of lawsuits" prong of the "covered

class action" definition.[42]  GT appears to argue (GT Br. 16) that this action has been "consolidated"

---

[41]    As against *LaSala*, GT unpersuasively invokes the Supreme Court's general statement (regarding a different issue) that "Congress envisioned a broad construction" of SLUSA.  (GT Br. 15 n.9 (citing *Dabit*, 547 U.S. at 86).)  GT's other cases (GT Br. 15) – both decided by the same judge – are unpersuasive or inapposite.  *LaSala v. UBS, AG*, 510 F. Supp. 2d 213 (S.D.N.Y. 2007), and *LaSala v. Lloyds TBS Bank, PLC*, 514 F. Supp. 2d 447 (S.D.N.Y. 2007), did not address the tension in the definition of "covered action" if assignees or beneficiaries are treated as "persons," failed to acknowledge that Congress clearly intended to exempt claims on behalf of a corporation (as shown by the derivative exception, *see* 15 U.S.C. §§ 77p(f)(3), 77bb(f)(5)(C)), and relied in part on the decision that the Third Circuit reversed.  *Cape Ann Investors* held that a litigation trust *could* pursue claims originally held by the bankrupt company.  296 F. Supp. 2d at 12-13.  *Lee v. Marsh & McLennan Cos.*, 2007 WL 704033, *4 (S.D.N.Y. Mar. 7, 2007), did not involve claims brought by a trustee on behalf of a bankrupt entity.

[42]    The Trustee acknowledges that the "damages … on behalf of fifty or more persons" prerequisite is satisfied when it comes to the group of lawsuits prong, since some of the lawsuits in (footnote continued)

within the meaning of SLUSA because it has been transferred – over the Trustee's objection – to one court for pre-trial proceedings by the Judicial Panel on Multidistrict Litigation.  But GT ignores that it and its co-defendants never even requested consolidation – instead asking the MDL Panel to transfer the action to this Court "for *coordination* for pretrial purposes" (Moving Defendants' Motion for Transfer of Action to the Southern District of New York Pursuant to 28 U.S.C. § 1407, at 1 (MDL No. 1902; Sept. 19, 2007), Rand Decl. Exh. G) – and neither the MDL Panel nor this Court ordered consolidation.

Indeed, the only way in which the cases in the Refco MDL are proceeding in parallel concerns fact deposition discovery pursuant to the Deposition Protocol Order.  (Deposition Protocol Order, § XIV, Rand Decl. Exh. H.)  That Order specifically provides that the parties to it "agree that this deposition protocol, and the fact that the parties may enter into a confidentiality agreement and electronic service agreement governing the Refco-Related Actions, will not be used by any party to argue that any of the claims asserted in the above-referenced actions are preempted pursuant to the Securities Litigation Uniform Standards Act ('SLUSA')."  (*Id.*)

Moreover, GT cites no case in which an action has been deemed a "covered class action" simply because it was involuntarily subject to a MDL proceeding.  Under GT's view, plaintiffs' legitimate state-law claims would be subject to dismissal not because the plaintiffs were trying to circumvent SLUSA through strategic mass filings, but because of the fortuity of being drawn into an MDL proceeding.  The MDL mechanism, however, was designed to streamline pre-trial proceedings to achieve efficiency, not to eliminate substantive claims,[43] and there is no indication that Congress

---

the MDL, unlike the Trustee's action on behalf of the three estates, seek damages on behalf of fifty or more persons.

[43]  *See, e.g.*, *In re New York City Mun. Secs. Litig.*, 572 F.2d 49, 51 (2d Cir. 1978) ("[T]he essential purpose of Congress in enacting [section] 1407 was to permit the centralization in one (footnote continued)

intended such a perverse result when it enacted SLUSA.   Not surprisingly, GT's case citations are readily distinguishable from the circumstances here, insofar as they involved consolidation of related actions filed by the same plaintiff in the same court, *see Instituto de Prevision Militar v. Merrill Lynch*, 485 F. Supp. 2d 1340, 1343-45 (S.D. Fla. 2007); an unopposed consolidation for pre-trial purposes of nearly identical complaints filed by the same attorneys, *see Newby v. Enron Corp. (In re Enron Corp. Secs., Derivative & "ERISA" Litig.)*, 2006 WL 3716669, *7 (S.D. Tex. Dec. 12, 2006), *aff'd* 2008 WL 2689248 (5th Cir. July 10, 2008); *In re WorldCom, Inc. Secs. Litig.*, 308 F. Supp. 2d 236, 240-41, 246 (S.D.N.Y. 2004); or a consented-to consolidation with a related class action for pre-trial purposes, *see Gordon Partners v. Blumenthal*, 2007 WL 1438753, *3 (S.D.N.Y. May 16, 2007).   Thus, the Trustee's action does not fall within the "group of lawsuits" prong of SLUSA's definition of a "covered class action."

## B.   The Trustee's Claims Do Not Allege An Untrue Statement Or Omission In Connection With Purchase Or Sale Of A Covered Security.

Even if the Trustee's action constitutes a "covered class action," his *claims* are not subject to dismissal under SLUSA because they do not allege "an untrue statement or omission of material fact *in connection with* the purchase or sale of a covered security." 15 U.S.C. § 77p(b) (emphasis added). The Supreme Court has interpreted that provision to require that the "fraud 'coincide' with a securities transaction." *Dabit*, 547 U.S. at 86.

---

district of all pretrial proceedings '(w)hen civil actions involving one or more common questions of facts are pending in different districts.' As said in the report of the House Judiciary Committee, '(t)he objective of the legislation is to provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the 'just and efficient conduct' of such actions' and '(t)o accomplish this objective the bill provides for the transfer of venue of an action for the limited purpose of conducting coordinated pretrial proceedings.'") (quoting H.R. REP. NO. 1130, 90th Cong., 2d Sess., *reprinted in* 2 U.S.C.C.A.N. pp. 1898-1900 (1968)).

But the Trustee's claims neither "coincide with a securities transaction" nor remotely resemble claims for securities fraud.  Indeed, the damages that the Trustee seeks to recover on behalf of the three estates do not relate in any way to the value of the securities Refco sold in the IPO. Instead:

- the RCM claims arise out of the $2 billion in RCM assets that the Insiders, with the Professional Defendants' substantial assistance, took from RCM to finance Refco affiliates whose ability to repay these amounts was substantially impaired by the LBO (Compl. ¶¶ 370-419);

- the RGL claims arise out of the LBO through which the Insiders, with the Professional Defendants' substantial assistance, enriched themselves by taking the proceeds of the LBO, saddling RGL with over $1 billion in LBO debt, and rendering RGL unable to service its existing debt including that of its largest creditor, RCM (*id.* ¶¶ 477-524); and

- the Refco Inc. claims concern an ill-advised transaction (the IPO) through which the Insiders caused Refco Inc. to waste over $230 million to service RGL's LBO debt (even though RGL was already insolvent), pay over $40 million in underwriting fees and expenses, potentially incur civil liability as a result of the public offering, and distribute $80 million in the form of a "greenshoe" dividend for which Refco Inc. received no value.  (*Id.* ¶¶ 590-628).

Furthermore, simply because, as GT argues (GT Br. 17), the Insider's fraudulent scheme "culminated" in the IPO – by deceiving the innocent insiders from taking steps to stop it – does not mean that the assistance GT and Mayer Brown provided to earlier phases of the scheme "coincided" with the IPO.  The case law makes clear that such a tangential relationship to a securities transaction falls well short of satisfying SLUSA's "in connection with" requirement.  *See*, *e.g.*, *Gavin v. AT&T Corp.*, 464 F.3d 634, 639 (7th Cir. 2006) (Posner, J.) (SLUSA inapplicable because defendant's failure to inform shareholders of full array of options following merger did not concern federal securities laws); *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 240 (S.D.N.Y. 2007) ("Where the alleged conduct giving rise to the claim is too far removed from a securities transaction, the 'in connection with' requirement is not met."); *Norman, III v. Salomon Smith Barney Inc.*, 350 F. Supp. 2d 382, 387-88 (S.D.N.Y. 2004) (while the plaintiffs' claims could "also form the factual predicate for a

securities fraud action by different plaintiffs…the mere involvement of securities [does] not implicate the anti-fraud provisions of the securities laws") (internal citation and quotation marks omitted). And SLUSA itself, with its exception for "derivative claims," 15 U.S.C. §§ 77p(f)(3), 78bb(f)(5)(C), makes clear that Congress did not intend to preclude a corporation from bringing claims against its insiders, controlling stockholders or advisors merely because those claims had some relationship to the corporation's securities.[44]

## VII.   THE MARTIN ACT DOES NOT PREEMPT ANY OF THE TRUSTEE'S CLAIMS

GT (GT Br. 13-14), joined by the Investment Bank Defendants (Inv. Banks Br. 25 n.23), contends that the Martin Act preempts each of the Trustee's claims against them; Mayer Brown (MB Br. 38) contends that the Martin Act preempts only the malpractice and breach of fiduciary duty claims. Their arguments are unavailing.

The Martin Act prohibits a person from making "[a]ny representation or statement which is false ... where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities ... regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted." N.Y. GEN. BUS. LAW § 352-c.[45] Notably the scope of the Martin Act is even narrower than that of SLUSA – the Martin Act applies only to claims directly related to the "purchase and sale" of securities.

---

[44]   GT's reliance (GT Br. 17) on *Professional Management Assoc., Inc. Employees' Profit Sharing Plan v. KPMG LLP*, 335 F.3d 800 (8th Cir. 2003), and *Cape Ann Investors*, 296 F. Supp. 2d 4 (D. Mass. 2003), is misplaced. The "in connection with" requirement was easily satisfied in those cases because, unlike here, the claims were garden-variety securities fraud claims – claims brought by or on behalf of investors suing over the artificially inflated value of their securities. *See Prof'l Mgmt.*, 335 F.3d at 802-03; *Cape Ann*, 296 F. Supp. 2d at 11-12.

[45]   The Martin Act defines securities as "stocks, bonds, notes, [and] evidences of indebtedness." N.Y. GEN. BUS. LAW § 352(1).

As an initial matter, as just discussed regarding SLUSA's inapplicability, none of the Trustee's claims has the requisite nexus to a securities *purchase* or *sale*, a criterion imposed by the Martin Act's language that the actionable representation have been "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities." *See, e.g.*, *Greene v. Hanover Direct, Inc.*, 2007 WL 4224372, *5 (S.D.N.Y. Nov. 17, 2007) (Martin Act "grants the Attorney General exclusive enforcement powers over various fraudulent and deceitful practices *in connection with the sale and purchase of securities*.") (internal citation omitted) (emphasis added); *Sedona Corp. v. Ladenburg Thalmann & Co.,* 2005 WL 1902780, *22 (S.D.N.Y. Aug. 9, 2005) ("[T]he weight of authority holds that common law claims of negligent misrepresentation, negligence, and breach of fiduciary duty *arising from securities fraud* are preempted by the Martin Act." ) (emphasis added); *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) (Martin Act preemption argument was "without merit because the *Complaint does not allege violations of any securities law – state or federal*") (emphasis added); *Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001) ("[C]ourts have held that the Martin Act preempts claims of negligent misrepresentation, negligence and breach of fiduciary duty *predicated on securities fraud.*") (emphasis added).

Moreover, the New York Court of Appeals has made clear that the Martin Act is concerned with claims of securities fraud directed at the public, not claims by corporations against insiders and those who assisted them. *See CPC Int'l Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 277 (1987) ("[T]he specific purpose of the statute was to create a statutory mechanism in which the Attorney-General would have broad regulatory and remedial powers *to prevent fraudulent securities practices* by investigating and intervening at the first indication of *possible securities fraud on the public* ...")

(emphasis added); *Badem Bldgs. v. Abrams*, 70 N.Y.2d 45, 54 (1987) ("The statute was enacted to *protect the public from fraudulent exploitation in the offer and sale of securities*...") (emphasis added); *see also State v. 7040 Colonial Road Assocs. Co.*, 176 Misc.2d 367, 369, 671 N.Y.S.2d 938, 941 (N.Y. Sup. Ct. 1998) ("Under the Act the Attorney General is responsible both for *protecting the investing public as a whole*, and for redressing harm suffered by *individual investors* because of misleading or fraudulent practices in connection with the promotion or sale of securities.") (emphasis added).

Even if that nexus were met, however, courts have uniformly held that the Martin Act does not preempt those common-law claims that, unlike the Martin Act, require proof of deceitful intent. *See, e.g.*, *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 355 (S.D.N.Y. 2005); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003); *Joffee v. Lehman Bros., Inc.*, 2005 WL 1492101, at *14 (S.D.N.Y. June 23, 2005); *Caboara v. Babylon Cove Dev., LLC*, -- A.D.3d --, 2008 WL 2747188, at *2 (N.Y. App. Div. July 15, 2008). Thus, to the extent that GT and the Investment Banks seek dismissal of the claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty, such claims are not subject to the Attorney General's exclusive jurisdiction, and therefore they cannot be preempted.

Finally, and in any event, there is no Martin Act preemption because no purchase or sale of securities occurred exclusively "within or from" New York. To conduct the LBO and the IPO, Refco relied on the advice of underwriters and other professionals outside of New York, and neither the LBO or the IPO were restricted to New York participants. (*See, e.g.*, Compl. ¶¶ 41-47, 112, 134-45.) Under these circumstances, the Martin Act does not preempt the Trustee's claims. *See, e.g.*, *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 410 (S.D.N.Y. 2005) (refusing to dismiss a claim for breach of fiduciary duty based on Martin Act preemption where,

despite an allegation in the complaint that plaintiffs' "'purchase and sale of securities occurred in New York,' ... it appears that the conduct was not confined to New York and, indeed, that some plaintiffs may have interacted with defendants exclusively outside of New York"); *Nanopierce Tech.*, 2003 WL 22052894, at *5 (Martin Act did not preempt a claim for breach of fiduciary duty where the securities at issue where not sold "within or from" New York); *Lehman Bros.*, 179 F. Supp. 2d at 165 (Martin Act did not preempt claims for negligence, negligent misrepresentation and breach of fiduciary duty arising from the sale of negotiable certificates of deposit where traders in London and Hong Kong negotiated the sale with a buyer in Beijing"); *People ex rel. Spitzer v. Coventry First LLC*, 2007 WL 2905486, *5 (N.Y. Sup. Ct.. Sept. 25, 2007) ("[T]he State's authority to sue under the Martin Act is limited since the statute only regulates securities transactions occurring 'within or from' New York.").

## VIII.    MAYER BROWN INTERNATIONAL IS A PROPER DEFENDANT

Mayer Brown International asserts that it should be dismissed from this action on the ground that it is an outside party bearing no responsibility for Mayer Brown's engagement with Refco. However, it appears that, at all relevant times, Mayer Brown International and Mayer Brown constituted a "legal partnership," or "combination," under New York law,[46] such that Mayer Brown International is liable for Mayer Brown's conduct with respect to Refco.

There is no dispute that (1) at all relevant times, Mayer Brown and Mayer Brown International held themselves out to the public with one name: Mayer, Brown, Rowe & Maw LLP; and (2) just prior to the Trustee's filing of this action, the Mayer, Brown, Rowe & Maw LLP established in Illinois changed its name to "Mayer Brown LLP," and the Mayer, Brown, Rowe &

---

[46]    New York and Illinois define a partnership as "an association of two or more persons to carry on as co-owners of a business for profit."  N.Y. P'SHIP LAW § 10[1]; 805 ILCS 205/6(1).

Maw LLP established in England changed its name to "Mayer Brown International LLP." (Compl. ¶ 41; *see also* First Amended Complaint in *Thomas H. Lee Equity Fund V, L.P. et al. v. Mayer Brown, Rowe and Maw LLP*, 07 Civ. 6767 (GEL), at ¶¶11-12 and exhibits annexed thereto, Rand Decl. Exh. D). The timing of this name change is unusual, if not suspicious. Furthermore, the Trustee has not been able to determine the precise nature of the relationship between Mayer Brown and Mayer Brown International because the U.S. Department of Justice has asked him not to take any discovery of Mayer Brown out of deference to the pending criminal proceeding against Mayer Brown partner Joseph Collins. (Rand Decl. ¶ 2.)

The Trustee therefore respectfully requests that, if the allegations in the Complaint (Compl. ¶¶ 16, 41) are deemed insufficient as against Mayer Brown International, the Trustee be permitted to replead its claims against Mayer Brown International after taking narrow discovery to determine Mayer Brown International's role with respect to Refco, its historical and present relationship with Mayer Brown, and whether Mayer Brown and Mayer Brown International are transferring assets in an effort to impede collection of any judgment(s) that may be entered in the Refco-related cases currently pending before this Court. *See generally* Fed. R. Civ. P. 27(a).

## IX.    VENUE IS PROPER AS TO PRICEWATERHOUSECOOPERS

PwC challenges venue based on a forum-selection clause in its engagement letter with RGL specifying New York state and federal courts. Essentially, PwC asks this Court to dismiss the Trustee's claims under Rule 12(b)(3) due to improper venue in the Northern District of Illinois (the transferor court), but if and only if it does not first dismiss those claims on the merits under Rule 12(b)(6). PwC's approach is flawed for several reasons.

First, in affirmatively asking the Court to resolve the merits of the dispute, PwC has waived any contention that venue is improper. Venue is a threshold issue that the Court must resolve before considering the merits. *See, e.g.*, *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)

(*en banc*) (instructing district court, on remand, to consider "the issue of venue prior to consideration of the merits"); *DeJohn v. The .TV Corp. Int'l*, 245 F. Supp. 2d 913, 920 -922 (N.D. Ill. 2003) ("because venue is a threshold question, the court [would] begin with" Rule 12(b)(3) motion before considering Rule 12(b)(6) motion). Accordingly, by consenting to the Court's determination of the merits through its Rule 12(b)(6) motion, PwC has waived any objection to venue.

Second, having removed this action to the Northern District of Illinois, PwC may not now contend that venue is "improper" there, as is necessary to invoke Rule 12(b)(3); rather, its sole remedy is to seek transfer under 28 U.S.C. § 1404. This is so because venue *is* "proper" in the Northern District of Illinois pursuant to 28 U.S.C. § 1441(a) (concerning venue for removed actions), *see Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665 (1953), and a forum-selection clause does not render venue "improper." *See, e.g.*, *Kerobo v. Southwestern Clean Fuels Corp.*, 285 F.3d 531 (6th Cir. 2002) (district court cannot dismiss under Rule 12(b)(3) for improper venue an action removed to the proper venue, notwithstanding a forum selection clause specifying a different court); *PT United Can Co.  v. Crown Cork & Seal Co.*, 138 F.3d 65, 72 (2d Cir. 1998) (where case is removed, "one may not challenge venue in the district court as of right, according to that district court's venue rules, as if the case had originally been brought there"). The correct way to challenge venue in a removed case is instead through a motion for discretionary transfer pursuant to 28 U.S.C. § 1404. *See, e.g.*, *Exprezit Convenience Stores, LLC v. Transaction Tracking Techs., Inc.*, 2005 WL 2704891, *3 (N.D. Fla. Oct. 19, 2005) ("the appropriate procedural mechanism for seeking to enforce a forum selection clause which designates a domestic [federal] forum is 28 U.S.C. § 1404(a)"); *One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F. Supp. 2d 824, 832-33 (E.D.Va. 2004) (similar).

Third, even if PwC had moved for a discretionary transfer under § 1404(a), there would be no need for the case to be transferred at this juncture. PwC ignores that this case is presently part of a MDL proceeding that is pending in federal court in New York – a court expressly selected by the forum-selection clause. Should the claims against PwC survive summary judgment, such that the case would return to the Northern District of Illinois pursuant to *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), PwC may always move to transfer the case to this Court for trial under 28 U.S.C. § 1404(a), which, unlike Rule 12(b)(3), has no temporal limitation.

## X.    IN THE EVENT THIS COURT FINDS THE COMPLAINT'S ALLEGATIONS INSUFFICIENT, THE TRUSTEE SHOULD BE GRANTED LEAVE TO REPLEAD

If the Court determines that, as presently pleaded, any of the Trustee's claims should be dismissed, the Court should grant the Trustee leave to amend. Federal Rule of Civil Procedure 15(a) states that "[t]he court shall freely give leave when justice so requires." Indeed, in this Circuit, "when a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007).[47]  This is particularly so where a claim is dismissed for failure to satisfy a heightened pleading standard. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

As indicated throughout this brief, discovery – which is ongoing – has yielded additional evidence regarding defendants' misconduct. (Examples are found herein at pages 9 n.4, 28 n.13, 48

---

[47]    While leave to amend may be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc," *Foman v. Davis*, 371 U.S. 178, 182 (1962), none of those considerations applies here.

n.26.)  To the extent the Court identifies deficiencies with the allegations in the Complaint, newly-discovered evidence supports additional allegations that would remedy any such deficiencies.[48]

## CONCLUSION

Defendants' motions to dismiss should be denied.  In the alternative, the Trustee should be granted leave to replead his Complaint.

DATED:  August 29, 2008                    Respectfully submitted,

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP


By   /s/ Richard I. Werder, Jr.

Richard I. Werder, Jr.
*rickwerder@quinnemanuel.com*
Sascha N. Rand
*sascharand@quinnemanuel.com*
Sanford I. Weisburst
*sandyweisburst@quinnemanuel.com*
William B. Adams
*williamadams@quinnemanuel.com*
Stephen A. Broome
*stephenbroome@quinnemanuel.com*

51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Marc S. Kirschner, in his capacity
as Trustee of the Refco Litigation Trust*

---

[48]  Unlike the plaintiffs in *VR Global, L.P. v. Bennett*, No. 07 Civ. 8686 (S.D.N.Y. Aug. 28, 2008) – where this Court recently denied leave to replead – the Trustee did not have the benefit of filing the Complaint after an "extensive Opinion and Order ... detailing the deficiencies in [the] original pleading."  *Id.* at 42.