UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                       :

MARC S. KIRSCHNER, as Trustee of the Refco  :
Litigation Trust,

               Plaintiff,  :

                       :

      -v-  :

GRANT THORNTON LLP; MAYER BROWN,  :
ROWE & MAW, LLP, ERNST & YOUNG U.S.  :
LLP, PRICEWATERHOUSECOOPERS LLP;  :
CREDIT SUISSE SECURITIES (USA) LLC;  :
(f/k/a CREDIT SUISSE FIRST BOSTON LLC);  :
BANC OF AMERICA SECURITIES LLC;  :
DEUTSCHE BANK SECURITIES INC.;  :
PHILLIP R. BENNETT; SANTO C. MAGGIO  :
ROBERT C. TROSTEN; TONE N. GRANT  :
REFCO GROUP HOLDINGS, INC.; LIBERTY  :
CORNER CAPITAL STRATEGIES, LLC;  :
WILLIAM T. PIGOTT; EMF FINANCIAL  :
PRODUCTS, LLC; EMF CORE FUND, LTD.;  :
DELTA FLYER FUND, LLC; ERIC M.  :
FLANAGAN; INGRAM MICRO, INC.; CIM  :
VENTURES, INC.; ANDREW KRIEGER;  :
COAST ASSET MANAGEMENT, LLC (f/k/a  :
COAST ASSET MANAGEMENT LP); CS LAND  :
MANAGEMENT, LLC; and CHRISTOPHER  :
PETITT,

              Defendants.  :

                       :

------------------------------------------------------------x



07 Civ. 11604 (GEL)

**OPINION AND ORDER**

Richard I. Werder, Jr., Sascha N. Rand, William
B. Adams, Stephen A. Broome, Quinn Emanuel
Urquhart Oliver & Hedges LLP, New York,
NY, for plaintiff.

David E. Mollón, Bradley E. Lerman, Catherine
W. Joyce, Linda T. Coberly, Winston & Strawn
LLP, New York, NY, and Chicago, IL,
for defendant Grant Thornton LLP.

James J. Capra Jr., James P. Cusick,

Kenneth Y. Turnbull, Orrick, Herrington
& Sutcliffe LLP, New York, NY, and Washington,
DC, for defendant PricewaterhouseCoopers LLP.

Thomas G. Ward, Craig D. Singer, John K. Villa,
Michael S. Sundermeyer, Williams &
Connolly LLP, Washington, DC, for defendant
Mayer Brown LLP.

Joel M. Cohen, Anthony M. Candido, Timothy
Casey, Clifford Chance U.S. LLP, New York, NY,
for Defendant Mayer Brown International LLP.

Robert B. McCaw, Philip D. Anker, Lori A.
Martin, John V.H. Pierce, Dawn M. Wilson,
Jeremy S. Winer, Ross E. Firsenbaum, Wilmer
Cutler Pickering Hale and Dorr, New York,
NY, for defendants Credit Suisse Securities
(USA) LLC (f/k/a Credit Suisse First Boston
LLC), Banc of America Securities LLC,
and Deutsche Bank Securities Inc.

Robert F. Wise, Jr., Paul Spagnoletti, Davis Polk
& Wardwell, New York, NY, and Peter C. John,
Williams Montgomery & John Ltd., Chicago,
IL, for defendants Ingram Micro Inc. and CIM
Ventures Inc.

Kevin H. Marino, John D. Tortorella, Rosann
Bassler Dal Pra, Marino Tortorella PC, Chatham, NJ,
for defendants Liberty Corner Capital Strategies,
LLC and William T. Pigott.

GERARD E. LYNCH, District Judge:

Plaintiff Marc S. Kirschner, in his capacity as Trustee of the Refco Litigation Trust

("Trustee" or "Litigation Trustee"), brings this suit on behalf of Refco Group Ltd., LLC

("RGL"), its indirect subsidiary, Refco Captial Markets, Ltd. ("RCM"), and Refco Inc., the

entity created by Refco's Initial Public Offering ("IPO"). The Trustee originally filed this action

in the Circuit Court of Cook County, Illinois, asserting claims under Illinois state law against

certain Refco insiders, professionals, and advisors for, inter alia, fraud, breach of fiduciary duty, and malpractice.  Certain defendants removed the case to the United States District Court for the Northern District of Illinois, and the Panel on Multidistrict Litigation ("MDL Panel") subsequently transferred it to this Court.  See In re Refco, Inc. Sec. Litig., No. 07 Civ. 11604, 2008 WL 1827644, at *2 (S.D.N.Y. Apr. 21, 2008) (denying the Trustee's motion to remand or abstain).

This opinion addresses seven motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), filed by the investment banks (collectively the "Investment Bank Defendants"),[1] various professional firms,[2] and several third-party participants in the so-called round-trip loans (collectively the "RTL Defendants").[3]  The threshold question is whether the Litigation Trustee, standing in the shoes of Refco, lacks standing to bring suit to recover for damages arising from a fraudulent scheme devised and carried out by Refco's own senior management.  See Shearson Lehman Hutton v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991).[4]

---

[1] The Investment Bank Defendants are Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC), Banc of America Securities LLC, and Deutsche Bank Securities Inc.

[2] These defendants include Grant Thornton LLP, Mayer Brown LLP, Mayer Brown International LLP, and PricewaterhouseCoopers LLP.

[3] Of the RTL Defendants, only Liberty Corner Capital Strategies LLC, Ingram Micro, Inc., CIM Ventures, Inc., and William T. Pigott have filed motions to dismiss.  The opinion's discussion of the RTL Defendants refers solely to these defendants.

[4] Wagoner is an application of the substantive law of New York.  In re Parmalat, 383 F. Supp. 2d 587, 595 (S.D.N.Y. 2005); see also Wight v. BankAmerica Corp., 219 F.3d 79, 86 (2nd Cir. 2000).  Although the complaint was originally filed in Illinois state court, the parties now all either expressly assert that New York law governs, or cite to and rely on New York law.  This implied consent to the application of New York law is sufficient to establish choice of law. Golden Pacific Bancorp v. FDIC, 273 F.3d 509, 514 n.4 (2d Cir. 2001), citing Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).

Because a trustee cannot sue to recover for a wrong undertaken by the debtor itself, the motions

to dismiss will be granted in their entirety.  Further, because an amended pleading cannot

remedy this jurisdictional defect, such a pleading would be futile and plaintiff's request for leave

to replead will be denied and the complaint dismissed with prejudice.  See Manson v. Stacescu,

11 F.3d 1127, 1133 (2d Cir. 1993).

## BACKGROUND

I.    The Refco Fraud

Prior to its collapse in the fall of 2005, Refco[5] was among the world's largest providers of

brokerage and clearing services in the international derivatives, currency, and futures markets.

(Compl. ¶ 56.[6])  Beginning in the late 1990s, Refco's controlling officer-shareholders – Phillip

R. Bennett, Tone N. Grant, Robert C. Trosten, and Santo C. Maggio (collectively, the

"insiders")[7] – with the aid of certain professionals and financial advisors, orchestrated a complex

---

[5] The term "Refco," as used throughout this opinion, refers to both Refco Inc., the publicly traded company formed pursuant to the August 2005 IPO, and RGL, the company through which Refco's business was primarily conducted prior to the IPO, as well as to RGL's direct and indirect subsidiaries.

[6] All references to the complaint in this opinion are to the complaint originally filed in the Circuit Court of Cook County, Illinois.  All factual allegations in the complaint are assumed to be true for purposes of this motion.  See Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001).

[7] These "insiders" held the top leadership positions at RGL, RCM and Refco Inc. (Compl. ¶¶ 1, 36-39.)  Beginning in September 1998, Bennett was President, CEO, and Chairman of RGL.  (Compl. ¶ 36.)  Maggio was the Executive Vice President of RGL, and President and a director of RCM.  (Compl. ¶ 37.)  In that capacity, he "ran the brokerage operations of RCM and directed, orchestrated, and supervised the diversion of RCM assets." (Compl. ¶ 37.)  Trosten was a member of Refco's corporate finance team from 1997 to 2001 and RGL's chief financial officer from 2001 through October 2004.  (Compl. ¶ 38.)  Grant was Bennett's predecessor as President and CEO of RGL, and, until August 2004, he held a significant ownership stake in Refco.  (Compl. ¶ 39.)  All four men since have been convicted of, or pleaded guilty to, criminal charges involving their conduct at Refco.

fraudulent scheme to artificially enhance Refco's performance and conceal Refco's true financial

condition, so that these insiders, through the company's August 2004 leveraged buy-out

("LBO") and August 2005 IPO, could cash out their interests in Refco on lucrative terms.

(Compl. ¶¶ 4-7, 32, 59-149.)  That scheme, which has been thoroughly discussed in this Court's

prior opinions,[8] involved both concealment of Refco's uncollectible debt and the

misappropriation of customer assets.

The concealment of Refco's uncollectible debt involved a two-part process. First,

hundreds of millions of dollars in uncollectible trading losses and other operating expenses were

transferred and converted into legitimate receivables *owed to* Refco by RGHI, a related-party

holding company, or "alter-ego" owned by Bennett and Grant. (Compl. ¶¶ 35, 39, 60, 65, 68.)

These transfers offloaded debt from Refco, specifically RGL – the holding company through

which Refco's business was primarily conducted prior to the IPO and which was controlled by

RGHI[9] – and artificially inflated RGL's earnings capability. (Compl. ¶ 68.)  Refco's apparent

financial outlook was further improved by the fact that Refco then charged RGHI as much as 35

---

[8] See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 618-20 (S.D.N.Y. 2007)
(describing the so-called round-trip loans that concealed Refco's massive uncollectible
receivables); Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP, No. 07 Civ. 8663,
2008 WL 3166536, at *1-2 (S.D.N.Y. Aug. 6, 2008) (same), In re Refco Capital Markets, Ltd.
Brokerage Customer Sec. Litig. ("RCM I"), No. 06 Civ. 643, 2007 WL 2694469, at *4
(S.D.N.Y. Sept. 13, 2007) (describing the scheme in which RCM allegedly diverted customer
assets and improperly used the proceeds to make loans and fund the business operations of other
Refco affiliates).

[9] Prior to the LBO, RGHI, a shell entity with no operations of its own, held a 90 percent
interest in RGL.  That interest was owned in equal shares by Bennett and Grant. (Compl. ¶¶ 33,
35.)  In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the
sole owner of RGHI.  The remaining 10 percent interest in RGL was held by a subsidiary of
Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft
("BAWAG"), a foreign financial institution "closely tied to Bennett." (Compl. ¶ 35.)

percent interest on the sham receivables, which between 2001 and 2004 amounted to at least $250 million. (Compl. ¶ 71.) Although that accrued interest was recorded as income at Refco, it was never, in fact, collected. (Id.)

Next, the insiders disappeared the receivables parked at RGHI through a series of so-called round-trip loans. This additional maneuver was necessary because the disclosure of large "related-party" receivables – the sum of which dwarfed Refco's net income – would have raised red flags among investors and regulators. (Compl. ¶¶ 75-78). These "loans," which straddled the end of each fiscal year starting in 1998 and, after the LBO, at the end of several fiscal quarters as well, all worked in essentially the same way. (Compl. ¶¶ 77-79.) Several days before Refco closed its books for each financial period, RCM – an unregulated, indirect subsidiary wholly owned by RGL and thus by Bennett and Grant (Compl. ¶¶ 32, 57) – would loan hundreds of millions of dollars to a third-party customer who then, through the customer's account at Refco, simultaneously loaned the same amount to RGHI. (Compl. ¶ 78.) The loan agreements between the third party and RCM – which were done on a book basis (the principal never changed hands) – were meticulously structured so that they were essentially risk-free to the third-party customers: the customers' loans to RGHI were guaranteed by Refco and the customers profited for their participation in the "loans" through interest earned on their loans to RGHI, which by design exceeded the interest they were charged by RCM.[10] (Compl. ¶¶ 79-81.) RGHI, in turn, used the loans from the customers to pay down the money it owed to Refco for its

---

[10] Although the third parties purportedly earned interest from RGHI, the payment of the difference in interest was made by RCM. (Compl. ¶¶ 79-80.) In effect, RCM paid the interest on a loan extended by a customer to a purportedly separate entity, RGHI. (Id.) This payment to the third-party customer was the only occasion on which funds actually changed hands in these "round-trip" transactions. (Compl. ¶ 79.)

uncollectible receivables. (Compl. ¶ 78.) The net effect of these transactions was that at the close of each reporting period, Refco's books would show apparently legitimate loans to third-party customers, and the RGHI receivables would be gone. (Id.) Then, just days after the financial period closed, the transactions were unwound – the "loans" were repaid, and the uncollectible receivables from RGHI were returned to Refco's books. (Compl. ¶ 79.) Through these transactions, Refco lent money to itself, through third parties, to conceal its trading losses, its true operating expenses, and the fictitious nature of hundreds of millions of dollars in revenue. (Compl. ¶ 83.)

In addition to concealing Refco's debt, the insiders routinely misappropriated customer assets held at RCM in order to obtain cash infusions to prop up other Refco entities. (Compl. ¶¶ 57, 94-95.) This cash was distributed to Refco affiliates through a series of intercompany transfers that contained no safeguards and for which no appropriate documents were kept. (Compl. ¶¶ 7, 94-105.) Although the receiving entities had no ability to repay these "loans," Refco's overall financial health depended on the steady influx of these illicit RCM assets (Compl. ¶¶ 95, 98), and, accordingly, the insiders kept careful track of these transactions and distributed among themselves daily "cash flow" statements that calculated the amount of customer assets available for diversion to other Refco entities. (Compl. ¶¶ 99-100.) The size of these uncollateralized intercompany transfers – like the size of Refco's concealed debt – was substantial; they involved hundreds of millions of dollars and dwarfed Refco's total capital. (Compl. ¶¶ 101, 104, 329.) At the time of the LBO, Refco affiliates owed RCM approximately two billion dollars. (Compl. ¶ 102.)

II.     The LBO and IPO

The illusion of a thriving company enabled Refco insiders to position Refco for, and

ultimately to carry out, what appeared to be a legitimate "buy-out" of the insiders' interests for far more than those interests were worth. In 2004, after a number of unsuccessful attempts at the partial or complete sale of their interests in Refco (Compl. ¶ 106), Thomas H. Lee Partners ("THL"), a private equity firm, purchased a 57 percent controlling interest in Refco for $507 million as part of a leveraged buy-out transaction ("LBO") (Compl. ¶¶ 112-13). For its part, Refco sold $600 million in unregistered notes to the Investment Bank Defendants[11] and obtained $800 million in financing. (Compl. ¶¶ 113, 338.) This $1.4 billion of bank and bond debt, which Refco could not possibly repay (Compl.¶ 132), became senior to the debt owed to RCM, Refco's largest creditor. (Compl. ¶ 114.) The LBO was lucrative, however, for the insiders – Bennett and others received $106 million, with at least $25 million going to Bennett personally. (Compl. ¶ 113.)

Less than a year after the LBO, with Refco still concealing its grim financial condition, Refco insiders and THL led Refco through an initial public offering of its stock. The offering generated $258.5 million in proceeds for Refco Inc. and approximately $289.5 million in proceeds for the selling shareholders. (Compl. ¶ 341.) Some of the IPO proceeds were used to retire part of RGL's LBO debt – a move that the Trustee characterizes as "waste" because RGL was already insolvent (Compl. ¶ 136) – but, consistent with maintaining Refco's good reputation and the ongoing concealment of the Refco fraud, no proceeds were used to repay the amounts

---

[11] The Investment Bank Defendants severally purchased, at 97.5 percent of their principal value, $600 million in notes pursuant to Securities and Exchange Commission ("SEC") Rule 144A, 17 C.F.R. § 230.144A, which exempts private placements to qualified institutional buyers from the registration requirements of the Securities Act. (Compl. ¶ 339.) These notes, according to their design, were later exchanged for registered securities through a so-called "Exxon Capital Exchange," which allowed the banks to sell their Refco interests and to shunt all but a small portion of the LBO debt onto other purchasers. (Id.)

owed to RCM or to pay down the RGHI recievables (Compl. ¶¶ 45-47, 134-36). Instead, the insiders used the proceeds to pay themselves, other equity holders, and the Investment Bank Defendants. (Compl. ¶ 135, 342.) Bennett himself sold approximately seven million shares through his holding vehicles for a total price of $146 million and THL and its affiliates sold approximately ten million shares of Refco common stock, with a total sale price of approximately $223 million. (Compl. ¶ 134.) Weeks after the IPO, in the wake of the public disclosure of the RGHI receivables, Refco and its subsidiaries and affiliates declared bankruptcy. (Compl. ¶ 32.)

III.    The Refco Litigation Trust

On December 15, 2006, approximately fourteen months after Refco filed for bankruptcy, the United States Bankruptcy Court for the Southern District of New York confirmed the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan"). (Compl. ¶ 31.) The Plan provided for the establishment of a Litigation Trust and the appointment of a Litigation Trustee to pursue any claims and causes of action transferred from the bankruptcy estates of RGL, RCM and Refco Inc. (Compl. ¶¶ 31-32.)

**DISCUSSION**

I.    Standard of Review

When considering whether a plaintiff has standing, the court must accept as true all material allegations in the complaint and construe the allegations in the complaining party's favor. Warth v. Seldin, 422 U.S. 490, 501 (1975). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). Ultimately, the plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. This "flexible 'plausibility

9

standard,' . . . obliges a pleader to amplify a claim with some factual allegations in those

contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490

F.3d 143, 157-58 (2d Cir. 2007), quoting Twombly, 127 S. Ct. at 1968 (emphasis in original). If

plaintiffs "have not nudged their claims across the line from conceivable to plausible, their

complaint must be dismissed." Twombly, 127 S. Ct. at 1974.

　　　While the rules of pleading in federal court usually require only "a short and plain

statement" of the plaintiff's claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "stated

with particularity," Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a plaintiff must: "(1) specify

the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the statements were fraudulent."

Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted).

Accordingly, where the fraud is based on alleged misrepresentations, the complaint must

"specify the statements it claims were false or misleading, give particulars as to the respect in

which plaintiff contends the statements were fraudulent, state when and where the statements

were made, and identify those responsible for the statements." Suez Equity Investors, L.P. v.

Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001), quoting Cosmas v. Hassett, 886 F.2d 8,

11 (2d Cir. 1989). A plaintiff pleading fraud based on deceptive conduct "must specify what

deceptive or manipulative acts were performed, which defendants performed them, when the

acts were performed, and the effect the scheme had on investors in the securities at issue." In re

Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2006).

II.　　The Trustee's Standing

　　　A.　　The Wagoner Rule

　　　The threshold issue in this case is the Litigation Trustee's standing to assert a claim

10

against the defendants. Under New York law, a bankruptcy trustee[12] lacks standing to seek recovery on behalf of a debtor company against third-parties for injuries incurred by the misconduct of the debtor's controlling managers. See Wagoner, 944 F.2d at 118. As the Second Circuit has held, "if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation [on standing] that the legal rights asserted must be his own." Id.; see also In re Bennett Funding Group, Inc., 336 F.3d 94, 100 (2d Cir. 2003); Warth, 422 U.S. at 499; Wight v. BankAmerica Corp., 219 F.3d 79, 86 (2nd Cir. 2000); In re Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997); See also, e.g., Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir. 1995). This axiom, also known as the "Wagoner rule,"

> derives from the fundamental principle of agency that the
> misconduct of managers within the scope of their employment will
> normally be imputed to the corporation. Because management's
> misconduct is imputed to the corporation, and because a trustee
> stands in the shoes of the corporation, the Wagoner rule bars a
> trustee from suing to recover for a wrong that he himself
> essentially took part in.

---

[12] The Bankruptcy Code places a trustee in the shoes of the bankruptcy estate. Thus, a trustee has standing to bring any suit that the bankrupt corporation could have brought had the corporation not filed a petition for bankruptcy. See 11 U.S.C. §§ 541-42; In re Bennett Funding Group, Inc., 336 F.3d 94, 99-100 (2d Cir. 2003), citing Wagoner, 944 F.2d at 118. Under New York law, when the trustee of a bankrupt estate sues on behalf of the estate, "the Article III 'case or controversy' requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee." Id. at 99, quoting Hirsch, 72 F.3d at 1091. Here, although the Litigation Trustee is no longer formally the bankruptcy trustee, the Trustee's "function is virtually indistinguishable from that of the bankruptcy estate itself: to gather the assets of a defunct debtor for distribution to its creditors." In re Refco, Inc. Sec. Litig., 2008 WL 1827644, at *8; see also In re Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997) (applying Wagoner to a suit brought by an unsecured creditors' committee, which is "analogous" to a trustee in bankruptcy).

Wight, 219 F.3d at 86-87 (citations omitted).[13]  Accordingly, a court must dismiss a trustee's claim against third-party professionals for allegedly aiding and abetting corrupt management in a scheme to defraud the debtor corporation because those causes of action accrue to the creditors of the defunct corporate entity, and not to the bankrupt entity itself.  See, e.g., In re Mediators, 105 F.3d at 826; Wagoner, 944 F.2d at 120 ("[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation").

All parties agree that if the Wagoner rule applies, the Litigation Trustee lacks standing to assert any of Refco's claims against the defendants because the conduct at issue constitutes "a single form of wrongdoing under different names." Hirsch, 72 F.3d at 1092 (citation omitted). Thus, the parties' dispute focuses solely on whether the narrow exception to the Wagoner rule – the "adverse-interest" exception – applies.

    B.    The "Adverse-Interest" Exception

For the adverse-interest exception to apply, "the [corporate officer] must have totally abandoned [the corporation's] interests and be acting entirely for his own or another's purposes." In re Bennett Funding Group, 336 F.3d at 100, citing In re Mediators,105 F.3d at 827; accord Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784-85 (1985). Such abandonment "rebuts [Wagoner's] usual presumption," In re Mediators, 105 F.3d at 827, because where an officer acts entirely in his own interests and adversely to the interests of the corporation, that

---

[13] Like the *in pari delicto* doctrine, therefore, the Wagoner rule relies on principles of agency law in determining whether management's misconduct is to be imputed to the bankrupt corporation. See In re Parmalat Sec. Litig., 477 F. Supp. 2d 602, 609 n.45 (S.D.N.Y. 2007) (the two doctrines are "quite similar," though the Wagoner rule concerns standing, and *in pari delicto* is a defense).

12

misconduct cannot be imputed to the corporation. See Wight, 219 F.3d at 87; see also In re CBI Holding Company Inc. v. Ernst & Young ("CBI I"), 311 B.R. 350, 370 (S.D.N.Y. 2004), aff'd in part, rev'd in part, 529 F.3d 432 ("CBI II") (2d Cir. 2008) (explaining that the adverse interest exception is "entirely consistent with the principles of agency law"). As the Second Circuit recently explained,

> The theory is that "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, . . . he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." However, New York courts have cautioned that this exception is a narrow one and that the guilty manager "must have totally abandoned" his corporation's interests for it to apply.

CBI II, 529 F.3d at 448 (citations omitted); In re Bennett, 336 F.3d at 100 (adverse-interest exception applies where an agent is "committing a fraud for his own benefit").

In determining whether an agent's actions were indeed adverse to the corporation, courts have identified "[t]he relevant issue [as being the] short term benefit or detriment to the corporation, not any detriment to the corporation resulting from the unmasking of the fraud." In re Wedtech Corp., 81 B.R. 240, 242 (S.D.N.Y. 1987), citing Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449, 456 (7th Cir. 1982); Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006) ("A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance and the company is still civilly and criminally liable"). At least one court in this district has found that, under New York law, "where a corporation benefits to *any* extent from the fraudulent acts of its agents, the agents cannot be said to have 'totally abandoned' the interests of the corporation." Cobalt Multifamily Investors I, LLC v. Shapiro, 2008 WL 833237, at *4 n.10 (S.D.N.Y. Mar. 28, 2008) (finding that the adverse-interest exception did not apply because the

13

insiders' misconduct "provided at least some financial benefit" to the corporation) (emphasis in original); see also Cenco, 686 F.2d at 454-55 (finding that where management's fraudulent valuation scheme involved stealing *for* the corporation rather than *from* the corporation, the scheme benefitted the corporation).

This line of precedent forecloses the Trustee's claims. The complaint is saturated by allegations that Refco received substantial benefits from the insiders' alleged wrongdoing. The Trustee alleges both that had Refco's trading losses been disclosed, it would have "severely damaged Refco's business" and that the improper round-trip loans and the misappropriation of customer assets at RCM were designed to, and did, in fact, buttress Refco's organization. (Compl. ¶¶ 32, 64, 492.) The illicit cash flow from RCM, in particular, was used for a "wide variety of general and specific funding purposes by various Refco affiliates who would not have been able to sustain their reported financial health and operations without using funds stolen from RCM." (Compl. ¶ 98.) These benefits are plainly evident in the Trustee's allegations that the insiders' conduct enabled the false reporting of the company's steady growth, which in turn, attracted and retained capital from investors in the LBO and the IPO. (Compl. ¶ 94-105.) Indeed, the gravamen of the Trustee's allegations is not that the insiders stole assets *from* Refco, but rather that the insiders' fraudulent scheme was to steal *for* Refco – to inflate the value of Refco's interests on behalf of Refco itself by maintaining the illusion that Refco was "fast-growing, highly profitable, and able to satisfy its substantial working capital needs without having to borrow money" (Compl. ¶ 94). See Censo, 686 F.2d at 454 (imputing fraud where the insiders "are turning the company into an engine of theft against outsiders -- creditors, prospective stockholders, insurers etc."); Bullmore v. Ernst & Young Cayman Islands, 861 N.Y.S.2d 578, 582-83 (N.Y. Sup. Ct. 2008) (finding no standing where the insiders "inflated the

14

value of the Fund's portfolio on behalf of the Fund itself"). As in <u>Censo</u>, the burden of the insiders' fraud was not borne by Refco or its then-current shareholders who were themselves the insiders – but rather by outside parties, including Refco's customers, creditors, and third parties who acquired shares through the IPO.

The Trustee argues, however, that the adverse-interest exception nevertheless applies because the insiders intended to benefit only themselves and, after <u>CBI II</u>, the exception looks "principally to the intent of the managers engaged in misconduct," <u>id</u>. at 451, which is a fact-intensive exercise unsuitable for a motion to dismiss. (Pl. Opp. at 15.) The Trustee then supports this argument by pointing to his allegations that the Refco insiders were acting "solely to enrich themselves" by "sell[ing] their interests in Refco at a fraudulently inflated price" (Compl. ¶¶ 12, 106), and asserts that these allegations, inter alia, "suffice[] to plead the adverse-interest exception" under <u>CBI II</u>. (Pl. Opp. at 16-17.) The Trustee's interpretation of <u>CBI II</u> – that the adverse-interest exception does not apply if the wrongdoers were ultimately motivated by their own interests, thereby establishing an "intent-based" standard – is industrious, but without merit.

In <u>CBI II</u>, the Second Circuit considered whether the bankruptcy court's factual finding that a company's president and chairman had defrauded his company solely for his own benefit and at the company's expense was "clearly erroneous." 529 F.3d at 449. In reversing the district court on this question, the court explained that the bankruptcy court finder-of-fact was entitled to determine the probative weight of the accounting supervisor's testimony that the "real reason" for the fraud was to maximize [the CEO's] bonus even though there was other evidence in the record that CBI had "actually benefitted" from the fraud and the witness who testified could not rule out that the CEO might have also had other motives. <u>Id</u>.

15

The Trustee interprets this holding as affirming that the applicability of the adverse-interest exception to the <u>Wagoner</u> rule may not be resolved on a motion to dismiss. Such an interpretation is unwarranted, however, because deferring to a finder-of-fact's choice as to which evidence to credit after a trial, or acknowledging that facts related to intent could contribute to the explication of how a fraud worked and to whose benefit it accrued, does not make the participants' intent the "touchstone" of the analysis such that it precludes dismissal on the pleadings. Nor does <u>CBI II</u> hold that the mere allegations of an insider's intent to personally profit is sufficient to defeat application of the <u>Wagoner</u> rule at the pleading stage. The critical flaw in the Trustee's reasoning is that the <u>Wagoner</u> rule concerns standing. That is, it addresses the question of who has a claim for relief, which, in the context of fraud, means who has been harmed and who has benefitted by the fraudulent conduct alleged. This question concerns the nature and consequences of the alleged fraud, not the extent to which the perpetrators acted from self-interested motives.[14] Thus, the issue remains whether the Trustee has pleaded facts that show that the insiders acted adversely to – or "totally abandoned" – the corporation's interest. In other words, the Trustee must allege, not that the insiders intended to, or to some extent did, benefit from their scheme, but that the corporation was *harmed* by the scheme, rather than being one of its beneficiaries. Such harm – as opposed to the mere allegation that the insiders were bent on deriving some personal benefit (Compl. ¶ 12) – is required because the Trustee, standing in the shoes of the corporate debtor, "must allege personal injury [to the corporation] fairly

---

[14] To hold otherwise would be to explode the adverse-interest exception, transforming it from a "narrow" exception, <u>see</u> <u>CBI II</u>, 529 F.3d at 448 (citing New York law), into a new, and nearly impermeable rule barring imputation. Whenever insiders conduct a corporate fraud they are doing so, at least in part, to promote their own advantage, whether by obtaining unearned bonuses, embezzling funds, or selling their stock at an inflated price.

traceable to the [insiders'] alleged unlawful conduct [that is] likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). As the Trustee would have it, if the insiders were motivated for their own ends, but in pursuing them did no harm to the corporation, the corporation would still have standing. That makes no sense.

The Trustee's characterization of the substantial and overwhelming fraud at Refco falls short of alleging harm to Refco itself. The crux of the Trustee's theory is that RCM, RGL, and Refco Inc. were injured by an "imprudent" LBO and IPO (Compl. ¶¶ 352, 463), in that RCM was injured when the receivables owed to it by other Refco entities were subordinated by the receivables owed to the Investment Bank Defendants following the LBO (Compl. ¶ 336), RGL was damaged when it incurred $1.4 billion in new LBO debt and was no longer able to repay the funds diverted from RCM to RGL and its affiliates (Compl. ¶¶ 452, 460, 476), and Refo Inc. was injured when it was "saddled with hundreds of millions of dollars in liability to the purchasers of Refco stock," and used $231 million in proceeds from the IPO to retire part of RGL's LBO debt (Compl. ¶¶ 136-37). The Trustee's theory is unsound.

It is a basic principle of corporate finance that extending credit to a distressed entity in itself does the entity no harm. See Am. Tissue Ins. v. Donaldson, 351 F. Supp. 2d 79, 93 (S.D.N.Y. 2004) (finding that "the equity infusion . . . benefitted [the company]; it gained $25 million in equity. Under no theory can that be characterized as an injury"). Cash infusions expand the debt of a corporation in precise proportion to the expansion of assets in the form of new cash contributed by the underwriters and investors. Accordingly, with respect to injury to the corporate body, as distinguished from any injury thereby to creditors or prospective shareholders, the extension of credit is – at worst – neutral.

That is the case even where, as here, credit is extended to an entity that is, as the Trustee

17

alleges, "insolvent or in the zone of insolvency." (Compl. ¶ 136.) Creating an illusion of solvency is not necessarily, in itself, a corporate benefit sufficient to rebut the adverse-interest exception, but neither does it harm the corporation. While a "corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it," CBI II, 529 F.3d at 453, quoting In re Investors Funding Corp. of N.Y. Sec. Litig., 523 F. Supp. 533, 541 (S.D.N.Y. 1980), any *harm* done to the corporation is not done by the extension of credit itself but by any subsequent looting or embezzlement. That is, where insiders prop up moribund entities in order to misappropriate corporate assets for personal gain, such plunder is adverse and cannot thereby be imputed to the corporation. See Schacht v. Brown, 711 F.2d 1343, 1348 (7th Cir. 1983) (no imputation to the corporation where past the point of solvency it was "systematically looted of its most profitable and least risky business and more than $3,000,000 in income"); In re Investors, 523 F. Supp. at 541 (no imputation where wrongdoers "misdirected" corporate assets into personal accounts); CBI II, 529 F.3d at 453 (no imputation where payment of a CEO's undeserved bonus drained assets from the company).

Here, although the Trustee styles his allegations with respect to the LBO and IPO as constituting "waste" or the "siphoning out" of Refco's assets (Compl. ¶¶ 132, 136), the Trustee has pleaded no facts that would support that the insiders used the LBO and IPO to embezzle Refco's assets, for example, by diverting the cash infusion into personal accounts, or by any other conduct that would be recognized as "totally adverse" to the corporation.[15]

---

[15] A number of cases do not specify any particular corporate harm but merely state that "the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability." Schacht, 711 F.2d at 1348. What is meant by this assertion is unclear. Insolvency is, by definition under the federal bankruptcy law, the difference

18

According to the allegations of the Trustee, the insiders in this scheme "line[d] their

pockets" not by embezzlement, but by selling their interests in Refco at fraudulently-induced

prices. (Compl. ¶¶ 106-07.) The fate of the insiders – far from being at odds with the interests

of Refco *qua* Refco – thus remained aligned with those of the corporate entity. However

reprehensible the conduct of the insiders, it simply makes no difference *to Refco* whether an

insider or an unsuspecting innocent is holding the inflated value of a Refco share. The fraud

here produced an influx of cash to the company, not an outflow, and the benefit procured by the

insiders came at the expense of the securities purchasers, not of Refco itself.[16]

The Trustee's attempt to parse the Refco fraud in pursuit of establishing a corporate

injury to some particular corporate unit within Refco is unpersuasive. Both Refco's round-robin

---

between a corporation's debts and the assets available to satisfy those debts. See 11 U.S.C. §
101(32). Deepening insolvency occurs when the insolvent corporation's debts continue to
mount against its remaining assets. The harm of deepening insolvency, thus necessarily accrues
to the corporation's creditors, because, being insolvent, the corporation has no means with which
to pay the increased debt in any event. Accordingly, in the context of applying the Wagoner
rule, it is appropriate to distinguish between acts that merely increase the corporation's exposure
to creditor liability and those that, under the cover provided by prolonged corporate life,
facilitate the accomplishment of additional acts – like embezzlement – that are "totally adverse"
to the corporation.

[16] Nor can it be said that the cash infusions at issue here "provide[d] an illusory financial
cushion that lull[ed] shareholders into postponing the decision to dissolve the corporation."
Allard v. Arthur Andersen & Co., 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (internal quotation
marks omitted). First, the relevant shareholders prior to the LBO were, themselves, the insiders
conducting the fraud. Thus, far from "miss[ing] an opportunity to cut their losses," id., the only
way the insiders could benefit was by selling their interests to incoming shareholders who were
innocent of their fraud. Moreover, the Trustee alleges that at the time of the LBO, Refco was
already insolvent, thus any interests held subsequent to that date were already "lost" and only
Refco's *creditors* suffered a diminished expectancy by the failure to liquidate. Refco itself
sustained no harm that it would not have sustained otherwise had it ceased operations earlier.
See Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 195
(3d Cir. 2003) (finding that "the very purpose of the corporate form is to limit the liability of
investors to the capital they pay in").

fraud and its distribution of LBO and IPO debt were dedicated to "maintain[ing] the illusion of [the] financial and operational strength and stability" of *Refco*. (Compl. ¶ 4.) Both RCM and RGL participated – for good and for ill – in the Refco fraud. Although the assets at RCM were siphoned to other Refco entities, the Trustee acknowledges that absent Refco's – and preeminently RGL's – artificially-induced solvency, customers would not have "continued [to make] deposits of cash and securities . . . needed to facilitate and fund" the corporation. (Compl. ¶¶ 60, 63.) In turn, the fact that RGL was "finance[d]" and "prop[ped] up" by assets misappropriated from RCM (Compl. ¶¶ 7, 448), benefitted RGL. The concealment of Refco's losses "maintained the illusion that Refco was a highly successful, financially secure broker-dealer." (Compl. ¶ 2.) The fact that RGL could not repay its "loans" to RCM upon incurring $1.4 billion in new LBO debt (Compl. ¶¶ 452, 460, 476), assuming – against the Trustee's other allegations – that RGL would have been in a position to repay those debts in any event (Compl. ¶¶ 7, 94-105), is a harm not to RGL but to RGL's creditors, to whom the assets were owed. Finally, the Trustee's argument that Refco Inc. was harmed because proceeds from the IPO should not have been used to pay down underwriting fees and expenses related to the IPO or to retire part of RGL's LBO debt (Compl. ¶ 136) is likewise deficient. The IPO injected hundreds of millions of dollars of capital into Refco Inc. and it was used, consistent with Refco's facade, to compensate the professionals and pay down Refco's publically-known debt. Distributing cash to keep the fraud going is not evidence of corporate harm.[17]

---

[17] Nor is exposure to securities fraud liability based on Refco's "false and misleading registration statement and prospectus." (Compl. ¶¶ 10, 137.) Not only would liability be a consequence of the unmasking of the fraud, see In re Wedtech Corp., 81 B.R. at 242, but "[c]laims based on misleading information in the prospectus . . . [are] barred by the Wagoner," Am. Tissue, 351 F. Supp. 2d at 94 n.15.

20

The Trustee's attempt to parse the Refco fraud fails because the Trustee "cannot plausibly assert that [Refco's] corporate structure concealed its debts from itself." Am. Tissue, 351 F. Supp. 2d at 92. Ultimately Refco participated in, and benefitted from, the very wrong for which it seeks to recover. See Censo, 686 F.2d at 454 ("a participant in a fraud cannot also be a victim entitled to recover damages, for he cannot have relied on the truth of the fraudulent representations") Accordingly the Trustee's claims are barred. See Wight, 219 F.3d at 87. The Trustee's allegations of "siphoning," "looting" or "waste" are legal conclusions, not factual allegations, and therefore the Court need not credit them. Mason v. Am. Tobacco Co., 346 F.3d 36, 39 (2d Cir. 2003).

Because the Trustee has not alleged that the insiders' conduct was "totally adverse" to Refco the conduct of the Refco insiders must be legally imputed to Refco and the motions to dismiss must be granted. "A claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Wagoner, 944 F.2d at 120.

## CONCLUSION

For the reasons stated above, the motions to dismiss all claims of the Litigation Trustee against these defendants is granted. This conclusion is the inevitable product of the Trustee's own complaint, which both on its face and after close examination, documents in detail how Refco participated in, and how it benefitted from, the very fraudulent acts on which the Trustee seeks to sue. Accordingly, leave to replead is denied, and the complaint is dismissed with prejudice.

As this ruling disposes of all claims against these defendants and there is no just reason

21

for delay, the Clerk is directed, pursuant to Fed. R. Civ. P. 54(b), to enter final judgment with respect to those defendants.

SO ORDERED:

Dated: New York, New York
        April 14, 2009

GERARD E. LYNCH
United States District Judge

22